**JUDGE DANIELS**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**12 CV          3852**

——————————————————————— x
DAVID SMITH, Individually and on Behalf of :     Civil Action No.
All Others Similarly Situated,                          :
                                                                  :     CLASS ACTION COMPLAINT
                          Plaintiff,                       :
                                                                  :
                                                                  :
          vs.                                                 :
                                                                  :     **JURY TRIAL DEMANDED**
JPMORGAN CHASE & CO., JAMES            :
DIMON, INA R. DREW and DOUGLAS L.   :
BRAUNSTEIN,                                        :
                                                                  :
                          Defendants.                   :
——————————————————————— x

RECEIVED
MAY 14 2012
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff has alleged the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by JPMorgan Chase & Co. ("JPMorgan" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of purchasers of the common stock of JPMorgan between April 13, 2012 and May 11, 2012, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.

4.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

5.      In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the New York Stock Exchange ("NYSE"), a national securities market located in this district.

**PARTIES**

6.      Plaintiff David Smith, as set forth in the accompanying certification and incorporated by reference herein, purchased the common stock of JPMorgan during the Class Period and has been damaged thereby.

7.      Defendant JPMorgan is a financial holding company, which provides various financial services worldwide..

8.      Defendant James Dimon ("Dimon") serves as JPMorgan's Chairman, Chief Executive Officer, President, Member of the Executive Committee, Member of the Stock Committee and Member of the Operating Committee.

9.      Defendant Ina R. Drew ("Drew"), served as JPMorgan's Chief Investment Officer and Member of the Operating Committee during the Class Period.

10.      Defendant Douglas L. Braunstein ("Braunstein") serves  as JPMorgan's Executive Vice President and Chief Financial Officer.

11.      Defendants Dimon, Drew and Braunstein are collectively referred to herein as the "Individual Defendants."

12.      During the Class Period, the Individual Defendants, as senior executive officers and/or directors of JPMorgan, were privy to confidential and proprietary information concerning JPMorgan, its operations, finances, financial condition and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning JPMorgan, as discussed in detail below.  Because of their positions with JPMorgan, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in

connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

13. The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of JPMorgan's business.

14. The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

15. As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to JPMorgan's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market

price of JPMorgan common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

16. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of JPMorgan common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding JPMorgan's business, operations and management and the intrinsic value of JPMorgan common stock; and (ii) caused Plaintiff and members of the Class to purchase JPMorgan common stock at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

17. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common stock of JPMorgan between April 13, 2012 and May 11, 2012, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

18. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, JPMorgan common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by JPMorgan or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

19.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

20.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

21.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

        (a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

        (b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of JPMorgan;

        (c)     whether the price of JPMorgan common stock was artificially inflated during the Class Period; and

        (d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

22.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

23.     Defendant JPMorgan is a financial holding company, which provides various financial services worldwide.

24.     On April 6, 2012, *Bloomberg* issued a report entitled *JPMorgan Trader's Positions Said To Distort Credit Indexes*.  According to the report, "[a] JPMorgan Chase & Co. trader of derivatives linked to the financial health of corporations has amassed positions so large that he's driving price moves in the $10 trillion market."

25.     The Class Period begins on April 13, 2012.  On that date, JPMorgan issued an earnings release for the first quarter of 2012, the period ending March 31, 2012.  The supplement to the earnings release included information about the positions of the Chief Investment Office ("CIO").  The reported "Quarterly Trends" for the Treasury and CIO investment securities were small and positive: JPMorgan reported that the average value of the Treasury and CIO investment securities portfolio had increased 3% since the previous quarter.  JPMorgan also reported that the CIO's value-at-risk ("VaR"), which it defines as a "measure of the dollar amount of potential loss from adverse market moves in an ordinary market environment," had declined from $69 million in the fourth quarter of 2011 to $67 million in the first quarter of 2012.

26.     JPMorgan's VaR is an important measure of the risk of its positions.  The $67 million number represented the maximum likely loss on the CIO's positions.  Specifically, by stating that the CIO's VaR was $67 million, JPMorgan was representing that in 95% of likely scenarios, the maximum amount the CIO's positions would lose was $67 million.  JPMorgan emphasized in its earnings release supplement that the CIO's positions were used for risk management to reduce the risk of other positions JPMorgan held outside of the CIO, stating that "CIO VaR includes positions, primarily in debt securities and credit products, used to manage structural risk and other risks, including interest rate, credit and mortgage risks arising from the Firm's ongoing business activities."

  
27.    On April 13, 2012, JPMorgan also held a conference call with analysts and investors to discuss its earnings for the first quarter of 2012 ("First Quarter Conf. Call").  During the First Quarter Conference Call, Defendants made numerous statements about the Company's CIO.  In his opening remarks, Defendant Braunstein, stated, in pertinent part, as follows:

> And so, before I turn it over to Jamie, I did want to talk about the topics in the news around CIO and just sort of take a step back and remind our investors about that activity and performance.  We have more liabilities, $1.1 trillion of deposits than we have loans, approximately $720 billion. And we take that differential and we invest it, and that portfolio today is approximately $360 billion.  We invest those securities in high grade, low-risk securities.  We have got about $175 billion worth of mortgage securities, we have got government agency securities, high-grade credit and covered bonds, securitized products, municipals, marketable CDs.  The vast majority of those are government or government-backed and very high grade in nature.  We invest those in order to hedge the interest rate risk of the Firm as a function of that liability and asset mismatch.  We hedge basis risk, we hedge convexity risk, foreign exchange risk is managed through CIO, and MSR risk.  We also do it to generate NII, which we do with that portfolio.  The result of all of that is we also need to manage the stress loss associated with that portfolio, and so we have put on positions to manage for a significant stress event in Credit.  We have had that position on for many years and the activities that have been reported in the paper are basically part of managing that stress loss position, which we moderate and change over time depending upon our views as to what the risks are for stress loss from credit.
>
> All of those decisions are made on a very long-term basis.  They are done to keep the Company effectively balanced from a risk standpoint. We are very comfortable with our positions as they are held today.  And I would add that all those positions are fully transparent to the regulators.  They review them, have access to them at any point in time, get the information on those positions on a regular and recurring basis as part of our normalized reporting. All of those positions are put on pursuant to the risk management at the Firmwide level.
>
> The last comment that I would make is that based on, we believe, the spirit of the legislation as well as our reading of the legislation and consistent with this long-term investment philosophy we have in CIO we believe all of this is consistent with what we believe the ultimate outcome will be related to Volcker.

28.    During the First Quarter Conference Call, Defendant Dimon was asked directly about the trading activities of CIO and dismissed any concerns.  The following exchange took place:

**Guy Moszkowski** - BofA Merrill Lynch - Analyst

Good morning. On the CIO question, which obviously you have addressed and has gotten so much attention in the press this week, can I just ask one further question, which is, are all of the results of the CIO group reflected only within Corporate and Other? There is no sharing of any of those results with, say, FICC in terms of the reporting that we would see in the Investment Bank?

**Jamie Dimon** - JPMorgan Chase & Company - Chairman & CEO

No, God, no. No, no. A lot of the NII is given to the businesses that generate the deposits on a consistent fund transfer methodology, which – but not in the Investment Bank. Remember, most of that portfolio is an AFS portfolio, not all of it, but most of it.

**Guy Moszkowski** - BofA Merrill Lynch - Analyst

Right, fair enough. It's just I (multiple speakers)

**Jamie Dimon** - JPMorgan Chase & Company - Chairman & CEO

We disclosed both realized gains, unrealized gains, and mark-to-market gains. You get all of that.

**Guy Moszkowski** - BofA Merrill Lynch - Analyst

Yes, that is just a question that I ask in order to sort of assess the tempest in the teapot nature of the stories relative to the revenues that we see that just don't seem to be that big.

**Jamie Dimon** - JPMorgan Chase & Company - Chairman & CEO

**It's a complete tempest in a teapot. Every bank has a major portfolio; in those portfolios you make investments that you think are wise to offset your exposures.**

Obviously, it's a big portfolio; we are a large company and we try to run it -- it's sophisticated obviously with complex things. But at the end of the day that is our job is to invest that portfolio wisely, intelligently over a long period of time to earn income and to offset other exposures that we have.

[Emphasis added.]

29.     The statements referenced above in ¶¶25-28 were each materially false and misleading when made because they failed to disclose that the Company had engaged in extremely risky speculative trades that generated enormous losses for the Company.

30.     Then, on May 10, 2012, JPMorgan filed its Form 10-Q for the quarter ended March 31, 2012, with the SEC. After the market closed, JPMorgan held a conference call with analysts and investors to discuss the Form 10-Q. Defendant Dimon opened the conference call by revealing that the Company had sustained a multi-billion dollar trading loss, stating, in pertinent part, as follows:

Operator, thank you. Good afternoon everybody. I would like to thank you all for joining on short notice. I want to update you on a few items that we have in our just filed 10-Q. Specifically, we've given prior guidance that Corporate -- that net income in the Corporate segment, remember it's not the corporation, it's just one of the segments, excl.-Private Equity and litigation, would be approximately plus or minus $200 million. This includes CIO's overall performance.

We would currently estimate this number to be minus $800 million after-tax. This change is due to two items, both in CIO this quarter. I'm about to give you pretax numbers now. **Slightly more than $2 billion trading loss under synthetic credit positions and $1 billion of securities gains, largely on the sale of credit exposures. I want to remind you the CIO has over $200 billion in its investment portfolio and unrealized gains as of March 30 of $8 billion.**

The CIO manages all the exposures in total as a whole and it does it in light of the firm's total requirements. We are also amending a disclosure in the first quarter press release about CIO's VAR, Value at Risk. We had shown average VAR at 67. It will now be 129. In the first quarter, we implemented a new VAR model, which we now deemed inadequate and we went back to the old one, which had been used for the prior several years, which we deemed to be more adequate. The numbers I just gave are effective March 30, the first quarter.

Regarding what happened, the synthetic credit portfolio was a strategy to hedge the firm's overall credit exposure, which is our largest risk overall in a stressed credit environment. We are reducing that hedge, but in hindsight the new strategy was flawed, complex, poorly reviewed, poorly executed, and poorly monitored. The portfolio has proven to be riskier, more volatile, and less effective as an economic hedge than we thought.

What have we done? We've had teams from audit, legal, risk, and various control functions, all from Corporate, involved in extensive review of what happened. We have more work to do but it's obvious at this point that there are many errors, sloppiness, and bad judgment. I do remind you that none of this has anything to do with clients. We've had many lessons learned and we've already changed some policies and procedures as we've gone along. In addition, you should know that all appropriate corrective action will be taken as necessary in the future. Most important, some of our best talent from across the Company, particularly traders and risk managers, are fully engaged and helping to manage the portfolio.

The portfolio still has a lot of risk and volatility going forward. So how are we going to manage that? So number one, we're going to manage it to maximize economic value for shareholders. What does that mean? It means we're going to do something stupid. We're willing to hold as long as necessary inventory and we're willing to bear volatility. Therefore, the volatility for the rest of this quarter and next quarter or so will be high. It could cost us as much as $1 billion or more. Obviously, we're going to work hard to have that not be a negative at all, but it is risky and it will be for a couple of quarters.

Clearly, markets and our decisions will be a critical factor here. Hopefully this will not be an issue by the end of the year, but it does depend on the decisions and the markets -- the decisions we make and the markets we have.

However unfortunate this event is, I do want to put this in perspective. One of the reasons we keep a fortress balance sheet is to handle surprises, although this is not the kind of surprise we wanted to have. Our Basel I ratio will stay very strong and it doesn't change at all as a result of -- at March 31, a result of this. Our Basel III ratio, which remember, is a rough estimate anyway, will be amended down to 8.2 from 8.4 effective March 30. We will, however, in the future, continue to meet our very conservative targets for both Basel I and Basel III.

I also want to say, while we don't give overall earnings guidance and we're not confirming analyst estimates, if you did adjust current analyst estimates for the loss, we would still earn approximately $4 billion after-tax this quarter, give or take. Neither of these things absolves us from blame, so speaking for the senior management team and myself, while we can't assure you we won't make mistakes, we can assure you we're going to try not to. These were egregious mistakes. They were self-inflicted, we were accountable, and what happened violates our own standards and principles by how we want to operate the Company. This is not how we want to run a business.

We will discuss all these matters and more and in fulsome detail on our second quarter analyst call, and we're going to take some questions on this call. I do want to tell you now we're not going to take questions about specific risk positions, strategies, or specific people.

Finally, however unfortunate this incident is, we will do what we always do. We will admit it. We will learn from it. We will fix it. We will move on. Hopefully, in the end it will make us a better company. We are in business to serve clients and nothing here detracts from all the great things that our 250,000 employees around the world do every day for our clients and communities. So thank you for spending a little time with us and we'll be happy to take a few minutes of questions.

[Emphasis added.]

31.     In response to the disclosure of the massive trading loss, the price of JPMorgan stock declined from $ 40.74 per share to $ 36.96 per share on extremely heavy trading volume.

32.     The market for JPMorgan common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, JPMorgan common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired JPMorgan common stock relying upon the integrity of the market price of JPMorgan common stock and market information relating to JPMorgan, and have been damaged thereby.

33.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of JPMorgan common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

34.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about JPMorgan's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of JPMorgan and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class

purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

### Additional Scienter Allegations

35.     As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company or in their own name during the Class Period were materially false and misleading.  Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding JPMorgan, their control over, and/or receipt and/or modification of JPMorgan's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

### Loss Causation/Economic Loss

36.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of JPMorgan common stock and operated as a fraud or deceit on Class Period purchasers of JPMorgan common stock by failing to disclose and misrepresenting the adverse facts detailed herein.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of JPMorgan common stock fell precipitously as the prior artificial inflation came out.

37.     As a result of their purchases of JPMorgan common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.  Defendants' false and misleading statements had the intended effect and caused JPMorgan common stock to trade at artificially inflated levels throughout the Class Period.

38.     By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of JPMorgan's business and prospects.  When the truth about the Company was revealed to the market, the price of JPMorgan common stock fell precipitously.  These declines removed the inflation from the price of JPMorgan common stock, causing real economic loss to investors who had purchased JPMorgan common stock during the Class Period.

39.     The declines in the price of JPMorgan common stock after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in JPMorgan common stock negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of JPMorgan common stock and the subsequent significant decline in the value of JPMorgan common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

### Applicability of Presumption of Reliance: Fraud on the Market Doctrine

40.     At all relevant times, the market for JPMorgan common stock was an efficient market for the following reasons, among others:

(a)     JPMorgan common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient, electronic stock market;

(b)     as a regulated issuer, JPMorgan filed periodic public reports with the SEC and the NYSE;

(c)    JPMorgan regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    JPMorgan was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

41.    As a result of the foregoing, the market for JPMorgan common stock promptly digested current information regarding JPMorgan from all publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all purchasers of JPMorgan common stock during the Class Period suffered similar injury through their purchase of JPMorgan common stock at artificially inflated prices and a presumption of reliance applies.

**No Safe Harbor**

42.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was

false, and/or the forward-looking statement was authorized and/or approved by an executive officer of JPMorgan who knew that those statements were false when made.

## COUNT I

### Violation of Section 10(b) of
### the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

43.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

44.     During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

45.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

46.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for JPMorgan common stock.  Plaintiff and the Class would not have purchased JPMorgan common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

47.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of JPMorgan common stock during the Class Period.

- 15 -

## COUNT II

### Violation of Section 20(a) of
### the Exchange Act Against the Individual Defendants

48.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

49.     The Individual Defendants acted as controlling persons of JPMorgan within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of JPMorgan, and their ownership of JPMorgan common stock, the Individual Defendants had the power and authority to cause JPMorgan to engage in the wrongful conduct complained of herein.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  May 14, 2012

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD


_____
SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
ROBBINS GELLER RUDMAN & DOWD LLP
DARREN J. ROBBINS
DAVE WALTON
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)


Attorneys for Plaintiff

- 17 -

## CERTIFICATION OF DAVID SMITH
## IN SUPPORT OF CLASS ACTION COMPLAINT

David Smith ("plaintiff") declares, as to the claims asserted under the federal securities laws, that:

1.     Plaintiff has reviewed the complaint prepared by counsel and has authorized its filing.

2.     Plaintiff did not purchase the security that is the subject of the complaint at the direction of plaintiffs' counsel or in order to participate in any private action arising under the federal securities laws.

3.     Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.     During the proposed Class Period, plaintiff executed the following transactions relating to JPMorgan Chase & Co.:

Purchase of 100 shares at $43.50 per share on 04/26/12

5.     In the past three years, plaintiff has not sought to serve as a representative party on behalf of a class in an action filed under the federal securities laws.

6.     Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs

and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

The foregoing are, to the best of my knowledge and belief, true and correct statements.

May 14, 2012

_____
DAVID SMITH