**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE JPMORGAN CHASE & CO. SECURITIES LITIGATION | Master File No. 1:12-cv-03852-GBD |
|  | **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** |
|  | **JURY TRIAL DEMANDED** |
|  | **ECF CASE** |

RECEIVED
2012 NOV 20 P 8: 27
U S DISTRICT COURT SDNY

**TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................................. 2

II.  JURISDICTION AND VENUE .......................................................................... 6

III. PARTIES .............................................................................................................. 7

     A.   LEAD PLAINTIFFS ................................................................................. 7

     B.   DEFENDANTS ......................................................................................... 9

     C.   CONFIDENTIAL WITNESSES ........................................................... 11

IV.  FACTS ................................................................................................................ 12

     A.   JPMORGAN TOUTED ITS SUPERIOR RISK MANAGEMENT ACUMEN
          AND CULTIVATED DIMON'S REPUTATION AS THE "KING OF RISK
          MANAGEMENT" ................................................................................... 12

     B.   THE CIO PURPORTEDLY WAS A CORE COMPONENT OF
          JPMORGAN'S RISK MANAGEMENT ............................................... 13

     C.   DIMON SECRETLY TRANSFORMED THE CIO INTO A HIGH-RISK
          PROPRIETARY TRADING DESK, DIRECTLY CONTRADICTING
          JPMORGAN'S REPRESENTATIONS THAT THE CIO MANAGED RISK ... 15

     D.   JPMORGAN ELIMINATES THE RISK CONTROLS AND
          TRANSPARENCY IT TOUTED TO INVESTORS IN ORDER TO
          FACILITATE HIGH-RISK PROPRIETARY TRADING IN THE CIO, AND
          DIMON REJECTS ANY EFFORT TO IMPROVE THE CIO'S RISK
          MANAGEMENT ..................................................................................... 21

     E.   FREED FROM RISK MANAGEMENT PROTOCOLS, DIMON'S
          PROPRIETARY TRADING DESK SECRETLY GENERATES
          MASSIVE GAINS AND LOSSES ......................................................... 25

     F.   JPMORGAN MISSTATED ITS FINANCIAL RESULTS BY FAILING TO
          RESERVE FOR THE CIO'S ILLIQUID POSITIONS IN THE SYNTHETIC-
          CREDIT PORTFOLIO ............................................................................ 28

     G.   JPMORGAN'S TOP MANAGEMENT KNEW THAT ITS CIO RISKED
          LARGER LOSSES THAN ITS INVESTMENT BANK, EVEN
          THOUGH THE CIO INVESTED FAR LESS CAPITAL ..................... 31

     H.   DEFENDANTS MANIPULATE THE CIO'S VaR MODEL TO TRY TO
          CONCEAL THE CIO'S RISKS AND TO ENABLE THE CIO
          TO MAKE EVEN BIGGER BETS ......................................................... 35

i

I.    THE "LONDON WHALE'S" MOUNTING LOSSES THREATEN TO EXPOSE THE CIO'S TRUE FUNCTION ................................................... 36

J.    THE CIO'S DEFICIENT RISK-MANAGEMENT PROTOCOLS PERMITTED TRADERS TO MANIPULATE THE VALUATION OF THEIR CREDIT DERIVATIVES.................................................. 41

K.    JPMORGAN DECEIVES INVESTORS AND REGULATORS AS TO THE TRUE IMPACT OF THE CIO'S TRADES ........................................ 43

L.    JPMORGAN DISCLOSES THE CIO'S MASSIVE TRADING LOSS, REVEALING THE CIO'S TRUE NATURE FOR THE FIRST TIME.............. 47

M.    JPMORGAN RESTATES EARNINGS AND VaR, ADMITTING THAT ITS PRIOR FINANCIAL STATEMENTS LACKED INTEGRITY AND WERE TAINTED BY FRAUDULENT MISVALUATIONS OF THE SYNTHETIC-CREDIT PORTFOLIO, AND THAT ITS INTERNAL CONTROLS WERE DEFICIENT ...................................................................................................... 52

V.    FALSE AND MISLEADING STATEMENTS.............................................. 60

A.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ABOUT THE CIO ..................................................... 60

B.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS CONCERNING THE COMPANY'S RISK MANAGEMENT STRUCTURE AND ITS ABILITY TO ADEQUATELY MONITOR AND CONTROL RISK ....................................... 65

    1.    Misrepresentations In the 2009 Form 10-K and Documents that Incorporated the 2009 Form 10-K by Reference ...................................... 66

    2.    Material Misrepresentations Contained in the 2010 Form 10-K and Documents that Incorporated the 2010 Form 10-K by Reference ............ 69

C.    DEFENDANTS' FALSE STATEMENTS ABOUT JPMORGAN'S FINANCIAL RESULTS........................................................................................ 72

D.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS CONTINUED IN 2012  AS THE COMPANY EMPLOYED MULTIPLE SCHEMES TO CONCEAL THE CIO'S LOSSES ............................................ 74

VI.    DEFENDANTS MADE THE FOREGOING FALSE AND MISLEADING STATEMENTS WITH SCIENTER ................................................................. 91

A.    DIMON ....................................................................................... 92

B.    CAVANAGH................................................................................. 98

      C.      BRAUNSTEIN ............................................................................ 100

      D.      JPMORGAN ............................................................................. 103

      E.      DREW ...................................................................................... 104

VII.    LOSS CAUSATION.................................................................................. 109

VIII.   THE FRAUD ON THE MARKET PRESUMPTION OF RELIANCE APPLIES ........ 116

IX.    THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION
      DOCTRINE ARE INAPPLICABLE.............................................................. 117

X.     CLASS ACTION ALLEGATIONS .............................................................. 118

XI.    CAUSES OF ACTION .............................................................................. 120

COUNT I .......................................................................................................... 120

For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated
Thereunder Against JPMorgan and Defendants Dimon, Cavanagh and Braunstein

COUNT II .......................................................................................................... 124

For Violations of Section 20(A) of the Exchange Act Against the Individual Defendants

PRAYER FOR RELIEF ....................................................................................... 126

JURY TRIAL DEMANDED.................................................................................. 126

1.      Court-appointed Lead Plaintiffs the Arkansas Teacher Retirement System ("Arkansas Teachers"), the Ohio Public Employees Retirement System ("Ohio PERS"), the School Employees Retirement System of Ohio ("SERS Ohio"), Sjunde AP-Fonden ("AP7"), the State of Oregon by and through the Oregon State Treasurer on behalf of the Common School Fund and, together with the Oregon Public Employee Retirement Board, on behalf of the Oregon Public Employee Retirement Fund ("Oregon"), and the State Teachers Retirement System of Ohio ("STRS Ohio") (collectively, "Lead Plaintiffs") bring this action individually and on behalf of all persons and entities, except Defendants and their affiliates (defined below in ¶¶25-29, 278), who purchased or otherwise acquired the publicly traded common stock of JPMorgan Chase & Co. ("JPMorgan" or the "Company") between February 24, 2010 and May 21, 2012, inclusive (the "Class Period") and were injured thereby.

2.      Lead Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters.  Lead Plaintiffs' information and belief is based on, *inter alia*, the investigation of Court-appointed Co-Lead Counsel, Bernstein Litowitz Berger & Grossmann LLP, Grant & Eisenhofer P.A, and Kessler Topaz Meltzer & Check, LLP.  The investigation included, but was not limited to, interviews and consultations with former employees of JPMorgan and its subsidiaries, as well as review and analysis of: (i) JPMorgan's public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) research reports by securities and financial analysts; (iii) transcripts of investor conference calls; (iv) publicly available presentations by JPMorgan; (v) press releases and media reports; (vi) economic analyses of securities movement and pricing data; (vii) public material obtained in connection with the continuing investigation by the United States Congress; and (viii) consultation with various relevant experts.

## I.      INTRODUCTION

3.       This action arises from JPMorgan's misrepresentations about the critical risk-management role that the Company's Chief Investment Office (the "CIO") supposedly played in furthering JPMorgan's putative "commitment to world-class risk management."  Throughout the Class Period, JPMorgan held itself out as a paragon of risk management and touted to investors the Company's "robust risk management discipline."  The Company's Chief Executive Officer ("CEO"), Defendant James Dimon ("Dimon"), was credited with having shepherded JPMorgan through the financial crisis while other financial institutions crumbled, earning a reputation as the "king of risk management."  That reputation distinguished JPMorgan from other banks and caused JPMorgan stock to trade at a premium.

4.       In particular, JPMorgan represented that its CIO, a unit in the Company's Corporate Division, played the central role in managing the Company's risks.  The Company repeatedly told investors that the CIO had "responsibility for managing . . . risk" and did so by monitoring risk throughout the Company and entering into hedging transactions to offset positions held by other JPMorgan units.  Based upon JPMorgan's public representations concerning the function and activities of the CIO, analysts considered the CIO to be JPMorgan's "principal risk management unit."[1]  The Company made clear that the CIO's primary role was to mitigate risk – not to trade for profit.

5.       Defendants' representations concerning the risk-management activities of the CIO were false.  By the start of the Class Period, Dimon had secretly transformed the CIO from a risk management unit into a proprietary trading desk whose principal purpose was to engage in speculative, high-risk bets designed to generate profits.  Indeed, generating profits through the

---

[1]       All emphasis in quotations herein is added, except as otherwise noted.

CIO had become "Jamie's new vision for the company," according to a former JPMorgan executive.

6. To facilitate the aggressive trading required to meet Dimon's profit objectives, the CIO abandoned JPMorgan's purported "risk management discipline."  Among other things, the Company removed the "stop loss limits" that previously required CIO traders to exit positions when losses reached $20 million, and Defendants made the conscious decision not to impose any risk limits on the CIO's complex portfolio of synthetic-credit derivatives – exotic investments tied to corporate and government debt – despite public assurances to the contrary.  To keep the CIO's aggressive trading secret, JPMorgan excluded executives from business units outside the CIO from the CIO's risk meetings.  Executives who pushed Dimon and the head of the CIO, Defendant Ina Drew ("Drew"), to impose risk controls on the CIO were terminated or demoted. And because the Company represented that the CIO merely managed risk, the CIO was not closely monitored by regulators.

7. Reflecting the fact that the CIO was not a risk management tool but one intended to generate substantial profits, the earnings generated by the CIO's secret trading operation became a major undisclosed basis for JPMorgan's financial performance.  Although during the Class Period the Company never disclosed separately the CIO's profits, analysts later determined that the CIO contributed as much as $0.80 per share to JPMorgan's earnings – or 35% of the Company's earnings – at certain points during the Class Period.

8. The riskiest component of the CIO's portfolio was its synthetic-credit portfolio. That multi-billion dollar portfolio, which was managed by a London-based trader named Bruno Iksil, became the CIO's largest position during the Class Period, and constituted such a large part of the market for synthetic-credit derivatives that, by the end of 2009, Iksil's position was

illiquid.  Because the synthetic-credit portfolio could not be sold, JPMorgan faced enormous losses if the market moved against the CIO's position in this portfolio.

9.     The illiquidity risk presented by the synthetic-credit portfolio was so severe that, in early 2010 (the start of the Class Period), a senior JPMorgan executive prepared a detailed report documenting the need for a $2 to $4 billion reserve to guard against losses in the CIO. Creating such a reserve, however, would have materially reduced the earnings of the entire Company.  Unwilling to sacrifice profits, JPMorgan did not establish any reserve for the CIO, and thereby caused the Company's net income to be overstated by billions of dollars throughout the Class Period.

10.     The CIO's synthetic-credit portfolio continued to swell during the Class Period. Remarkably, the Company's own model for measuring risk, known as "value at risk" or "VaR," which measured and monitored how much money a trader could lose on a given day, showed that the synthetic-credit portfolio could lose as much money in a single day as the entire Investment Bank.  In other words, JPMorgan knew that a single position in the CIO – which purportedly did not make risky investments – could lose as much money in one day as the hundreds of positions in the Investment Bank, which managed more than twice as much capital as the entire CIO.

11.     By no later than mid-2011, JPMorgan knew that the CIO's synthetic-credit portfolio had grown to "a perilous size" (as Defendant Cavanagh described it) such that the Company's publicly reported VaR would spike if accurately calculated and reported.  JPMorgan could not, however, reduce the CIO's synthetic-credit portfolio without selling assets at enormous losses – and taking those losses would reveal the truth about the CIO.  Accordingly, in order to conceal the true purpose of and risk associated with the CIO, JPMorgan developed a

new VaR model that was designed to artificially lower the CIO's VaR.  Defendant Dimon personally approved the development of this new model, and its implementation in January 2012.  Using that new model, JPMorgan falsely reported in the first quarter of 2012 that the CIO's VaR was virtually unchanged from the prior quarter when, in truth, the original VaR model showed that the risk of loss had doubled.  But Defendants did not disclose that the CIO's VaR model had been changed in either JPMorgan's 2011 annual report or when announcing results for the first quarter of 2012, after the change was made.

12.     The existence of the CIO's synthetic-credit portfolio was only first revealed to investors in April 2012, when *Bloomberg* and the *Wall Street Journal* reported that the CIO had amassed a portfolio of credit derivatives so large that Bruno Iksil had been nicknamed the "London Whale" by credit derivatives traders.  Although the losses in the synthetic-credit portfolio had already reached nearly $1 billion by that point, and internal JPMorgan reports were warning that the synthetic-credit portfolio could lose as much as $9 billion, Dimon dismissed analysts' questions about the CIO, calling the news about the portfolio a "tempest in a teapot."

13.     Just weeks later, on May 10, 2012, Dimon shocked investors by disclosing that, despite JPMorgan's public representations that the CIO was primarily charged with enforcing risk management, the trades within the CIO's synthetic-credit portfolio had caused $2 billion in losses to the Company.  According to Dimon, the losses were the result of "self-inflicted" "egregious mistakes" in a strategy that was "flawed, complex, poorly reviewed, poorly executed, and poorly monitored."  The disclosure of those losses, and the fact that the losses occurred within the CIO, which purportedly was dedicated to sound risk management, caused the price of JPMorgan stock to fall nearly 10%.  That decline wiped out over $14 billion of shareholder wealth.  Within days, the CIO's loss had grown to $3 billion.  Then, on May 21 – the last day of

the Class Period – JPMorgan revealed that the CIO's losses were so severe that the Company was forced to abandon a share repurchase program that it had initiated in March 2012. All told, the revelations about the CIO's high-risk trading and the losses it caused drove the price of JPMorgan stock down more than $8 per share, wiping out over $31 billion of the Company's market capitalization. To date, the CIO's losses have surpassed $6.25 billion, or 63% of the Company's publicly reported net income for the first half of 2012.

14.     Two months after the end of the Class Period, JPMorgan announced that it would restate its financial results for the first quarter of 2012, conceding that those financial results were materially misstated because the valuation of the synthetic-credit portfolio lacked "integrity," and had been deliberately misstated "to avoid showing the full amount of the losses in the portfolio." Virtually every employee associated with the CIO's high-risk strategy and disastrous trades – except Dimon – was terminated, and JPMorgan has determined to claw back tens of millions of dollars in compensation from the CIO traders who placed the bets that resulted in the losses. For example, when Defendant Drew was terminated, she forfeited more than $20 million of compensation – her entire income for the previous two years. Dimon has admitted to "egregious mistakes," and has testified that there were no risk limits on the synthetic-credit portfolio, he was fully aware of the CIO's extraordinarily risky trading strategy, and he was directly responsible for the losses that strategy caused, stating "<u>I am absolutely responsible. The buck stops with me</u>."

## II.     JURISDICTION AND VENUE

15.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5 (17 C.F.R. § 240.10b-5).

16.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and under 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

17.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and under 28 U.S.C. § 1391(b), (c) and (d) because many of the acts and transactions that constitute violations of law complained of herein, including the dissemination of the materially false and misleading statements set forth herein, occurred in this District, and were perpetrated by the Company that is headquartered in this District.

18.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the New York Stock Exchange ("NYSE").

## III.   PARTIES

### A.     LEAD PLAINTIFFS

19.     Lead Plaintiff Arkansas Teacher Retirement System ("Arkansas Teachers") is a public pension fund established in 1937 for the benefit of the employees of Arkansas' education community and manages billions of dollars in assets.  As reflected on its certification previously filed in this action (ECF No. 16-1), Arkansas Teachers purchased shares of JPMorgan common stock on the NYSE during the Class Period and suffered losses as a result of the conduct complained of herein.

20.     Lead Plaintiff Ohio Public Employees Retirement System ("Ohio PERS") is a public pension fund organized under Ohio law for the benefit of public employees throughout the State of Ohio who are not covered by another state or local retirement plan or system. As of December 31, 2011, Ohio PERS manages more than $74 billion in assets and serves more than

986,000 members. As reflected on its certification previously filed in this action (ECF No. 16-1), Ohio PERS purchased shares of JPMorgan common stock on the NYSE during the Class Period and suffered losses as a result of the conduct complained of herein.

21.     Lead Plaintiff School Employees Retirement System of Ohio ("SERS Ohio") is a public pension fund organized under Ohio law for the benefit of current and retired public school, non-teaching employees in the State of Ohio. As of December 31, 2011, SERS Ohio manages more than $10.5 billion in assets and serves more than 125,000 active, inactive and retired Ohio public school, non-teaching employees. As reflected on its certification previously filed in this action (ECF No. 16-1), SERS Ohio purchased shares of JPMorgan common stock on the NYSE during the Class Period and suffered losses as a result of the conduct complained of herein.

22.     Lead Plaintiff Sjunde AP-Fonden ("AP7") is a state pension fund located in Sweden that manages over $14 billion in premium pension assets on behalf of more than 6 million Swedish investors. As reflected on its certification previously filed in this action (ECF No. 16-1), AP7 purchased shares of JPMorgan common stock on the NYSE during the Class Period and suffered losses as a result of the conduct complained of herein.

23.     Lead Plaintiff State Teachers Retirement System of Ohio ("STRS Ohio") is a public pension fund organized under Ohio law for the benefit of current and retired educators in the State of Ohio. As of December 31, 2011, STRS Ohio manages more than $67 billion in assets and serves more than 475,200 active, inactive and retired Ohio public educators. As reflected on its certification previously filed in this action (ECF No. 16-1), STRS Ohio purchased shares of JPMorgan common stock on the NYSE during the Class Period and suffered losses as a result of the conduct complained of herein.

24.     Lead Plaintiff State of Oregon by and through the Oregon State Treasurer on behalf of the Common School Fund and, together with the Oregon Public Employee Retirement Board, on behalf of the Oregon Public Employee Retirement Fund ("Oregon") operates and oversees public funds for the benefit of public schools and retirees, respectively.  The Oregon Public Employee Retirement Fund is a state pension fund for retired public employees overseeing approximately $55.5 billion in assets as of December 31, 2011.  The Common School Fund is a fund with approximately $1.1 billion in assets as of December 2010 that seeks to generate investment earnings to support Oregon public schools.  As reflected on its certification previously filed in this action (ECF No. 16-1), Oregon purchased shares of JPMorgan common stock on the NYSE during the Class Period and suffered losses as a result of the conduct complained of herein.

### B.     DEFENDANTS

25.     Defendant JPMorgan is a Delaware corporation headquartered in New York, New York.  The Company's stock is listed on the NYSE under the ticker symbol "JPM," and it is a component of the Dow Jones Industrial Average.  JPMorgan is a worldwide holding company that, through its subsidiaries, provides broad-based banking services across the globe.  JPMorgan is the largest bank in the United States with $2.32 trillion in assets and $189.73 billion of shareholder equity, as of March 31, 2012.

26.     Defendant Dimon is the Chairman of the Board of Directors, President, and CEO of JPMorgan.  Dimon arrived at JPMorgan in 2004 and assumed the role of President and Chief Operating Officer ("COO").  On December 31, 2005, he was promoted to CEO, and on December 31, 2006, Dimon took on the additional role of Chairman of the Board.  During the Class Period, Dimon signed the Company's Forms 10-K for 2009, 2010 and 2011, and certified the accuracy of its Forms 10-Q for each quarter. These documents contained materially false and

misleading statements and omissions concerning the function of the CIO, the Company's risk-management procedures and practices, and various financial metrics. He also participated in the Company's quarterly earnings conference calls on April 14, 2010; July 15, 2010; October 13, 2010; January 14, 2011; April 13, 2011; July 14, 2011; October 13, 2011; January 13, 2012; and April 13, 2012, during which the Company made materially false and misleading statements and omissions, as alleged below.

27.     Defendant Michael J. Cavanagh ("Cavanagh") served as the Executive Vice President and Chief Financial Officer ("CFO") of JPMorgan from before the beginning of the Class Period until June 2010, when he became CEO of the Company's Treasury and Securities Services Business, a position he retained throughout the end of the Class Period. During the Class Period, Cavanagh signed the Company's 2009 Form 10-K and certified the accuracy of its Forms 10-Q for each quarter when he was CFO. These documents contained materially false and misleading statements and omissions concerning the function of the CIO, the Company's risk-management procedures and practices, and various financial metrics. He also participated in the Company's quarterly earnings conference calls on April 14, 2010 and July 15, 2010, during which the Company made materially false and misleading statements and omissions, as alleged below. Since July 2012, Cavanagh has served as Co-Chief Executive Officer of the Corporate & Investment Bank at JPMorgan.

28.     Defendant Douglas L. Braunstein ("Braunstein") was the Executive Vice President and CFO of JPMorgan from June 2010 through the end of the Class Period. During the Class Period, Braunstein signed the Company's Forms 10-K for 2010 and 2011 and certified the accuracy of its Forms 10-Q for each quarter when he was CFO. These documents contained materially false and misleading statements and omissions concerning the function of the CIO, the

10

Company's risk-management procedures and practices, and various financial metrics.  He also participated in the Company's quarterly earnings conference calls on July 15, 2010; October 13, 2010; January 14, 2011; April 13, 2011; July 14, 2011; October 13, 2011; January 13, 2012; and April 13, 2012, during which the Company made materially false and misleading statements and omissions, as alleged below.  He was ousted from his role as CFO after the end of the Class Period, but remains with the Company.

29.     Defendant Drew was the Chief Investment Officer and a member of the Operating Committee of JPMorgan during the Class Period.  As part of her role, Drew oversaw and managed the CIO, including its investments and trading operations, during the Class Period. Before becoming Chief Investment Officer in February 2005, Drew was JPMorgan's Head of Global Treasury.  Drew was terminated on May 13, 2012 as a result of the CIO trading scandal and was also forced to forfeit two years of her compensation totaling more than $20 million pursuant to JPMorgan's clawback policies.

30.     The Defendants named in ¶¶26 through 29 are referred to collectively herein as the "Individual Defendants."

## C.    CONFIDENTIAL WITNESSES

31.     Certain of the allegations herein are based on information provided by confidential witnesses ("CWs") who are former employees of JPMorgan interviewed by Lead Plaintiffs' representatives.

32.     CW 1 worked as an associate in the CIO in New York from February 2007 through July 2009 and was primarily responsible for risk reporting and middle office support, which included booking trades and tracking valuations and portfolio values.  CW 1 reported to JPMorgan executive directors Tom Mauro and Matthew Davis.  While primarily supporting CIO traders in the New York office, CW 1 occasionally provided support to the CIO's London office.

33.    CW 2 worked in London for JPMorgan as a Front Office Risk Analyst in Credit

Exotics & Hybrids Trading, Risk Exploration & Transparency ("RET") from May 2006 through

October 2010.  Starting in 2007, CW 2 reported to the head of the RET unit for that trading

group.  The RET team, which comprised a diverse group of employees with a variety of

backgrounds and experiences, analyzed risks associated with JPMorgan's positions and provided

periodic reports to upper management.

34.    CW 3 worked for JPMorgan from 1994 until 2011.  CW 3 was a Vice President in

the New York office of the CIO from April 2010 to April 2011, and reported to one of the

executive directors of the CIO.

## IV.    FACTS

### A.    JPMORGAN TOUTED ITS SUPERIOR RISK MANAGEMENT ACUMEN AND CULTIVATED DIMON'S REPUTATION AS THE "KING OF RISK MANAGEMENT"

35.    From the start of the Class Period in February 2010, JPMorgan's reputation for

risk management was paramount to investors.  While other Wall Street banks were roiled by the

credit crisis in 2008 and 2009, either collapsing outright or requiring massive government

bailouts after disclosing billion-dollar losses caused by risky investments, JPMorgan held itself

apart as a paragon of prudence with unmatched risk-management expertise.  For example,

throughout the Class Period, JPMorgan and its executives repeatedly touted the Company's

"long standing commitment to world-class risk management practices and to building a culture

of 'no surprises' and early escalation, which are cornerstones for success in our industry."  The

Company also claimed that it employed a "robust risk management discipline to capture,

monitor, and control the risks created by its business activities."

36.    As JPMorgan's CEO, Dimon took personal credit for having successfully steered

JPMorgan through the financial crisis.  His stewardship of the Company represented to investors

that JPMorgan stood, most of all, for the rigorous management of risk.  In his annual letters to shareholders during the Class Period, Dimon stressed the Company's risk management expertise, citing its "best-in-class financial and risk systems."  Numerous commentators and news media— including the *New York Times* and *Wall Street Journal*—considered Dimon "Wall Street's best risk manager," and a CEO who "thrived through the global financial crisis and who has long been known for paying close attention to the bank's trading activity, its risk profile and the activities of its senior employees."   JPMorgan's supposed strict adherence to its risk-management policies was so significant to the market that books with titles like *The Last Man Standing* and *The House of Dimon* were devoted to praising Dimon's risk-management acumen and success in steering JPMorgan through the financial crisis.  Simon Johnson, a former Chief Economist of the International Monetary Fund, stated that Dimon "presents himself, and is believed by others to be, the king of risk management."

37.     As a result of its reputation for unparalleled risk management, JPMorgan stock traded at a premium to that of other financial institutions.  As analysts at Susquehanna Capital noted shortly after the start of the Class Period, "Our target multiple [for JPMorgan] represents a 20% premium to where we would expect other very large banks to trade, but we believe JPM will be accorded a premium multiple by virtue of its overall management strength and superior record of risk management."

**B.     THE CIO PURPORTEDLY WAS A CORE COMPONENT OF JPMORGAN'S RISK MANAGEMENT**

38.     Throughout the Class Period, the Company told investors that its CIO served the critical risk-management function that provided the foundation for the Company's sterling reputation.  The CIO was the unit of JPMorgan's Corporate Division that JPMorgan described in its Form 10-K as having "responsibility for managing . . . risk."  Indeed, the Company identified

13

the CIO as one of a few select "corporate functions with risk management-related responsibilities" at JPMorgan.   In particular, the CIO was responsible for "measuring, monitoring, reporting and managing the Firm's liquidity, interest rate and foreign exchange risk, and other structural risks."   Analysts also viewed the CIO as JPMorgan's "principal risk management unit."  The head of the CIO, Defendant Ina Drew, reported directly to Dimon.

39.     One of the most important functions of a bank treasury office, such as the CIO, is to manage the risks associated with an imbalance between deposits (liabilities) and loans (assets). In the wake of the recent financial crisis, hundreds of billions of dollars in excess deposits surged into JPMorgan's coffers due to the bank's perceived soundness.  As Dimon reported in an April 2011 letter to shareholders, "[i]n a two-month period, $150 billion flowed in – we barely knew what to do with it."  According to the 2011 Form 10-K, JPMorgan had $740 billion in deposits at the end of 2007 and $1.12 trillion at the end of 2011 – a $380 billion increase.  During that same period, JPMorgan's portfolio of loans only expanded from $519 billion to $723 billion – a $204 billion increase.  By the end of 2011, for every dollar that JPMorgan had on deposit, it was only lending out about $0.64.  Accordingly, since the CIO was responsible for managing excess deposits, the size of its portfolio ballooned over this time period.  JPMorgan's acquisitions of Washington Mutual and Bear Stearns also increased the importance of the CIO, by adding to both JPMorgan's excess deposits and the risks that the CIO had to hedge against.  Between the end of 2007 and the end of the second quarter of 2012, the CIO's investment-securities portfolio increased almost 500%, from $76 billion to $359 billion.

40.     Throughout the Class Period, the CIO's portfolio was a significant component of JPMorgan's overall assets.   The table below shows the size of the combined investment-securities portfolio of the CIO and Treasury units (whose financial data were combined and

reported together to the public) from the end of 2009 to the end of the second quarter of 2012 (all figures are in $ millions).

| 2Q12 | 2011 | 2010 | 2009 |
|---|---|---|---|
| 359,130 | 355,605 | 310,801 | 340,163 |

41.     To put these figures into context, JPMorgan has seven business segments: Corporate/Private Equity, which houses the CIO; the Investment Bank; Commercial Banking; Treasury & Securities Services; Asset Management; Retail Financial Services; and Card Services & Auto.  The total assets of these business segments (other than Corporate/Private Equity) are presented in the table below (all figures are in $ millions).

| | 2Q12 | 2011 | 2010 | 2009 |
|---|---|---|---|---|
| Investment Bank | 829,655 | 776,430 | 825,150 | 706,944 |
| Retail Financial Services | 264,320 | 274,795 | 299,950 | 322,185 |
| Card Services & Auto | 198,805 | 208,467 | 208,793 | 255,029 |
| Commercial Banking | 163,698 | 158,040 | 142,646 | 130,280 |
| Treasury & Securities Services | 67,758 | 68,665 | 45,481 | 38,054 |
| Asset Management | 98,704 | 86,242 | 68,997 | 64,502 |

42.     Thus, during the Class Period the CIO managed a larger portfolio than any of JPMorgan's other core businesses, except for its Investment Bank.  Given the size of its portfolio, it was imperative that the CIO adhere to the strong risk management practices that JPMorgan publicly represented it followed.  As set forth herein, however, that is not what occurred.

**C.     DIMON SECRETLY TRANSFORMED THE CIO INTO A HIGH-RISK PROPRIETARY TRADING DESK, DIRECTLY CONTRADICTING JPMORGAN'S REPRESENTATIONS THAT THE CIO MANAGED RISK**

43.     In stark contrast to the portrait of the "king of risk management" that Dimon presented to investors during the Class Period, Dimon secretly transformed the CIO into a high-risk, proprietary trading desk.  Proprietary trading by a bank such as JPMorgan means the bank is

trading its own capital to generate profits from the return on investment, and is thus distinct from trading customer capital (whereby the bank profits from commissions), market making (whereby the bank trades to facilitate transactions by its clients), and hedging (whereby the bank trades to offset an existing risk).  By the end of 2009, the CIO had been changed to conform to Dimon's vision of a unit whose principal objective was not to manage risk, as the Company publicly represented, but to generate massive profits for JPMorgan through speculative trading that exposed the Company to the risk of enormous losses.

44.     The CIO was an ideal front for Dimon's secret trading desk because the Company portrayed it as a run-of-the-mill bank treasury department, representing in the 2010 Form 10-K, for example, that the "CIO is primarily concerned with managing structural risks which arise out of the various business activities of the Firm."  Typically, the core function of a bank treasury department is measuring, monitoring, and controlling interest rate risk (*i.e.*, the risk that changes in interest rates will adversely impact the value of the bank's assets and liabilities), as well as managing the bank's reserve and risk capital requirements and funding the bank's balance sheet. In contrast to the treasury department's risk-management role, a bank's commercial and investment-banking units are responsible for generating profits by putting the bank's capital at risk, whether making loans, underwriting securities, or trading for the bank's own account. JPMorgan's representations that the CIO was managing the bank's risks meant that the CIO was responsible for hedging risks incurred by other business units by entering into conservative trades that closely matched and offset those existing risks.  When executing trades to hedge risk, the CIO's purported objective was to generate neither risk nor profits.

45.     By the start of Class Period, however, Dimon had secretly transformed the CIO from a risk-management unit into an internal hedge fund making huge, proprietary trades that

exposed the Company to extreme, undisclosed losses.  Those trades included massive bets on over $200 billion of corporate debt and holdings of $150 billion of securities backed by residential mortgages and other asset-backed securities.  To facilitate that high-risk investing, JPMorgan staffed the CIO with former hedge fund traders who had no risk-management experience, and then abandoned the oversight and risk-management controls that would have hindered their trading.  When senior executives questioned Dimon about the CIO's bets running counter to the CIO's stated purpose, Dimon simply removed them from their positions.

46.     According to numerous former JPMorgan employees, Dimon himself directed the transformation of the CIO.  Indeed, Dimon told CIO employees explicitly that the CIO's job was not to mitigate risk, but to make money.  For example, David Olson, a former head of credit trading for the CIO in North America, told *Bloomberg* that, when he was hired in 2006, two JPMorgan executives told him that the CIO's role was "<u>to ramp up the ability to generate profit for the firm</u>."  According to Olson, generating profit through the CIO was "<u>Jamie's new vision for the company</u>."

47.     Similarly, CW 1, an associate responsible for risk reporting who worked at the CIO in New York from February 2007 through July 2009, confirmed that the role of the CIO was to generate profits, not manage risk.  CW 1 said that when he interviewed for his position at the CIO in 2007, he was told by Neil Grossman, one of the most senior CIO traders, that the CIO was working to generate profits for JPMorgan.  When CW 1 noticed that certain of the CIO trades were losing money, CW 1 questioned CIO employees as to what risks these trades were hedging.  CW 1 did not receive any answers to these questions or to questions that CW 1 posed concerning why JPMorgan's CIO was attempting to make profits from what were supposed to be hedge positions.

48.     To build Dimon's secret hedge fund, Drew – whom Dimon appointed to run the CIO – hired a team of proprietary traders to take speculative positions in currencies and interest-rate products, as well as structured credit, equities and derivatives, according to *Bloomberg*. These traders included Achilles Macris, who ran the proprietary trading desk for Dresdner Kleinwort Wasserstein before taking control of the CIO's London office.  Macris, who had a reputation as an aggressive, high-risk trader, surrounded himself with other traders he worked with at Dresdner, as well as former hedge fund traders.

49.     These new hires lacked any experience in risk management.  Instead, they were brought in specifically for their skill and reputation as aggressive proprietary traders with experience in trading credit derivatives for profit.  As reported by *Bloomberg* on April 13, 2012, these traders received permission to put more of the Company's capital at risk.

50.     From Dimon's and Drew's perspective, the CIO was a particularly good unit in which to house JPMorgan's proprietary trading activities because it was shielded from regulatory oversight.  That is because the CIO was housed in JPMorgan's Corporate Division alongside its Treasury Department and, as Dimon knew, regulators were not typically stationed at banks' treasury departments.  Indeed, JPMorgan convinced its regulators that the CIO acted in a manner similar to the treasury departments of other Wall Street banks and did not take any risks that would be a cause for concern.  As reported by the *New York Times*, while JPMorgan's primary federal regulators had approximately 110 regulatory personnel embedded inside the Company to monitor risks, none were stationed in the CIO.  That is because the regulators, like investors, believed that the CIO did not engage in proprietary trading, and therefore did not require the same oversight as the JPMorgan business divisions that were known to be exposing the Company to risk.

51.     For example, in a post-Class Period letter explaining why the Office of the Comptroller of the Currency ("OCC") did not have regulators within the CIO during the Class Period, Thomas Curry, the head of the OCC, wrote that "[t]he CIO activities were not historically considered to be high-risk."   Explaining that the high-risk trading JPMorgan conducted through the CIO constituted a departure from the typical and expected conduct of bank treasury departments, the OCC stated that "a similar level of activity or situation (large hedges that are illiquid and otherwise very complex) is not present in other large national banks. . . . [O]ther large banks do not conduct activity with synthetic credit derivatives to the extent (in size or complexity) that JPMC has in this situation."   According to over a dozen current and former regulators cited by the *New York Times* on May 25, 2012, JPMorgan strongly resisted regulatory oversight of the CIO following the financial crisis.

52.     In addition, in order to protect the CIO from regulatory scrutiny, Dimon and Drew publicly campaigned against the Volcker Rule.  A central component of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, the Volcker Rule generally prohibits proprietary trading by commercial banks, precisely the kind of trading in which the CIO was secretly engaged.  Under the Dodd-Frank Act, the rule was to be implemented by regulations to be promulgated by the federal financial regulatory agencies effective July 21, 2012.  In the debate during the Class Period over how to implement the rule, proponents of strict implementation argued that the regulations should permit banks to enter into hedges that closely matched and offset specific underlying positions, but not into purported hedges that did not closely match specific underlying positions and were more accurately viewed as prohibited proprietary trades.  Opponents of the Volcker Rule, of which JPMorgan was the most aggressive, sought loose regulations that would permit banks to designate transactions as hedges (and thus

19

not forbidden proprietary trades) even if the transactions did not closely match and offset specific underlying positions.

53.     Indeed, Dimon was one of the most vocal critics of the Volcker Rule, and led a team of JPMorgan representatives who met with regulators on dozens of occasions during the Class Period to lobby for exemptions to the Volcker Rule that would permit "portfolio hedging"—a loosely defined term that would enable the CIO to continue making proprietary investments so long as JPMorgan described those trades as "hedges."  A former Treasury official quoted by the *New York Times* on May 12, 2012 stated that "JPMorgan was the one that made the strongest arguments to allow hedging, and specifically to allow this type of portfolio hedging."

54.     In addition to being shielded from regulatory oversight, the CIO was an attractive vehicle for proprietary trading because its cost of investment capital was lower than the Investment Bank's cost.  While JPMorgan's Investment Bank traded with capital borrowed primarily under securities repurchase agreements, the CIO invested cash received from depositors, which cost JPMorgan less than cash borrowed under repurchase agreements.  In explaining the disparity between the cost of capital in the CIO and Investment Bank, a former JPMorgan employee cited by *Reuters* on May 16, 2012 stated that the CIO "was very large, but was never very transparent, and it wasn't clear that they had an appropriate funding cost.  They were running more risk than the investment bank – and with no peer review process [from those in the investment bank]."

55.     In addition to using cheaper investment capital, proprietary trading in the CIO was more profitable for JPMorgan than comparable trading by the Investment Bank because, as reported by *Bloomberg*, traders in the CIO retained a smaller share of their trading profits than

did traders in the Investment Bank. This compensation structure provided Dimon with an additional incentive to build his secret proprietary trading desk within the CIO.

56.     The individual traders within the CIO were also incentivized to take on bigger risks because JPMorgan directly linked their compensation to their ability to generate larger returns than a standard bank treasury portfolio would generate. A former CIO executive cited by *Reuters* on July 12, 2012 explained that compensation for CIO traders was tied to their ability to outperform an index of the return on a standard bank treasury portfolio—clear evidence that the CIO's function was to make bets, not mitigate risk.

**D.      JPMORGAN ELIMINATES THE RISK CONTROLS AND TRANSPARENCY IT TOUTED TO INVESTORS IN ORDER TO FACILITATE HIGH-RISK PROPRIETARY TRADING IN THE CIO, AND DIMON REJECTS ANY EFFORT TO IMPROVE THE CIO'S RISK MANAGEMENT**

57.     At Dimon's and Drew's direction, the CIO expanded into risky investments in corporate and mortgage-debt products to increase profits. As *Bloomberg* reported on May 14, 2012, citing five former JPMorgan executives, Dimon pushed the CIO to seek profit by speculating on higher-yielding assets such as credit derivatives. According to a current JPMorgan executive cited by *Bloomberg* on May 14, 2012, Dimon himself suggested positions the CIO should take. This was corroborated by CW 1, who stated that Dimon gave the CIO specific guidance for trades he wanted implemented, and the CIO handled those trades for Dimon. As one former JPMorgan banker told the *Telegraph*, "I think the CIO was effectively a way for [Dimon] to take his own views on the market without the processes of the rest of the bank getting in the way of things."

58.     According to JPMorgan executives cited by *Bloomberg*, Dimon treated the CIO differently from other JPMorgan departments, and exempted it from the scrutiny he applied to risk management in JPMorgan's Investment Bank. As reported by *Bloomberg*, the CIO's risk-

management systems, especially in credit-derivative transactions, did not keep pace with the expansion of the CIO. While the CIO's London office grew tenfold in staffing, the Company did not install risk-management staff or technology at the CIO, according to *Bloomberg*. According to a JPMorgan executive cited in the *Telegraph*, "[the CIO] took on [an] enormous amount of risk with very few staff and the reporting was very poor." Indeed, as Defendant Cavanagh would admit after the end of the Class Period, "[T]he level of scrutiny of CIO did not evolve commensurate with its increased complexity. . . . So as a result, we collectively ended up with a level of scrutiny that fell short of the high standards we apply to our client businesses, especially as the complexity increased."

59.     Beginning before the start of the Class Period, the lack of risk controls and oversight of the CIO was readily apparent to senior executives at JPMorgan. For example, in 2009, Bill Winters ("Winters") and Steven Black ("Black"), then co-CEOs of the Investment Bank, challenged Dimon regarding the proprietary trading by the CIO. JPMorgan executives who participated in those conversations told *Bloomberg* that Winters and Black specifically questioned Dimon regarding the adequacy of risk management at the CIO.

60.     To try to remedy the glaring risk-control deficiencies at the CIO, Winters and Black asked Dimon to disclose the CIO's risk positions in greater detail at review meetings, and to involve other members of JPMorgan's Operating Committee in assessing the CIO's risks. In particular, Winters and Black proposed that Ashley Bacon, then head of market risk of the Investment Bank, be allowed to extend his oversight to the CIO, according to sources cited by *Bloomberg*. Dimon rejected these requests.

61.     Winters also pressed Dimon to implement within the CIO a Risk Exploration & Transparency ("RET") Unit, a team of specially trained risk analysts used at other JPMorgan

divisions to assess risk in exotic credit and hybrid trading.  CW 2 worked as a Front Office Risk Analyst in JPMorgan's London office from May 2006 through October 2010 and, as a member of the RET, was directly involved in Winters' effort to improve transparency and risk management at the CIO.  According to CW 2, the RET team improved risk transparency at other divisions in the Company by drafting and distributing risk reports that were presented to Dimon and other senior executives.  In stark contrast, according to CW 2, the CIO had no transparency to the rest of the Company.

62.     According to a *Bloomberg* report on June 14, 2012, Dimon did not implement the improved risk controls requested by Winters and Black, and refused to implement an RET Unit within the CIO.  Instead, in September 2009, Dimon fired Winters and relieved Black of operating responsibility.  CW 2 said that he believed Winters was fired because he was "the one person who promoted transparency" at the CIO.  After Dimon fired Winters, the efforts to create a RET unit for the CIO stopped, according to CW 2.

63.     Dimon further concealed the CIO's high-risk trading by excluding executives from the Company's other segments from the CIO's risk-committee meetings.  In stark contrast, weekly risk-committee meetings in the Investment Bank were open to all members of the Company's senior management, with Drew and Macris frequently in attendance, according to a *Bloomberg* report on June 12, 2012.  By limiting scrutiny of the CIO, Dimon freed Drew's team of traders to pursue a less-disciplined approach to investing, according to numerous former JPMorgan executives cited by *Bloomberg* on May 14, 2012.

64.     Critically, to facilitate the high-risk, high-profit trading that Dimon desired, before the start of the Class Period, Drew and her lieutenant Macris eliminated stop-loss limits to allow traders to pursue bigger and bigger bets.  Drew and Macris abandoned these limits, which

required traders to exit positions if losses exceeded $20 million, in order to facilitate higher-stakes trading by the CIO, according to one former London CIO trader cited in the May 14, 2012 *Bloomberg* report.  Moreover, as Dimon admitted in testimony he provided to Congress after the end of the Class Period, JPMorgan never imposed any specific risk limits on the CIO's portfolio of complex derivative instruments that ultimately caused the $6.25 billion loss to the Company.

65.     Three former executives cited by *Bloomberg* in a June 12, 2012 article confirmed that the CIO's stop-loss limits were scrapped and that CIO traders were thus free to make trades that could result in massive gains or losses.  Moreover, Cavanagh conceded in a post-Class Period conference call that the CIO lacked "a well-designed limit structure" and did not have limits on specific portfolios or stop-loss limits on trades.  According to Cavanagh, the few limits applicable to the CIO were "clearly inadequate," "unsophisticated" and "of little use as a control measure."

66.     This secret abandonment of basic risk-control measures directly contradicted the Company's statement in its Forms 10-K filed during the Class Period that the CIO, like all of JPMorgan's other divisions, was "responsible for adhering to established limits, against which exposures are monitored and reported."  Moreover, the removal of stop loss limits directly contradicted the repeated representation in JPMorgan's annual reports during the Class Period that "Businesses are responsible for <u>adhering to established limits, against which exposures are monitored and reported</u>.  Limit breaches are reported in a timely manner to senior management, and the affected business segment is required to reduce trading positions or consult with senior management on the appropriate action."

E.  **FREED FROM RISK MANAGEMENT PROTOCOLS, DIMON'S PROPRIETARY TRADING DESK SECRETLY GENERATES MASSIVE GAINS AND LOSSES**

67.  Unencumbered by risk controls, risk oversight, or stop-loss limits, by the end of 2009 – the time period described in the Form 10-K whose issuance begins the Class Period – the CIO had become a secret hedge fund charged with high-risk proprietary trading intended to generate substantial profits.  Indeed, individual trades grew so large that they could affect the profitability of JPMorgan's entire Corporate Division.  In one example concealed from investors, the CIO made approximately $1 billion in profits in 2007 and 2008 on a series of bets against subprime mortgages, which paid off when the housing market collapsed, according to sources cited by the *Wall Street Journal* and *Bloomberg* on June 12, 2012.  Significantly, while those CIO trades generated $1 billion in profit, JPMorgan reported that the entire Corporate Division earned just $557 million in 2008.  Dimon was aware of those trades and spoke directly with the traders who executed them, according to the *Wall Street Journal*.  One of those traders was Bruno Iksil.  In 2007, Iksil was promoted to head the CIO's credit desk, and began trading in an asset class in which the CIO did not previously invest.

68.  According to CW 1, a CIO employee in New York, the CIO's profitable bet against subprime mortgages was one "obvious" example of the CIO trading for profit rather than to mitigate risk.  Based upon discussions that CW 1 had with David Olson, the CIO's former head of North American credit trading, CW 1 "knew for sure" that Dimon was aware of the bets that Olson and Iksil made against subprime mortgages, and that it was Dimon himself who ordered the CIO traders to close out their position so that the Company could "lock-in" the profits from that trade.

69.  The high-risk trading that Dimon encouraged in the CIO also led to massive losses.  For example, according to the *Wall Street Journal*, in 2008, a group of CIO traders in

New York, including Olson, lost about $1 billion on investments in Fannie Mae and Freddie Mac preferred stock. The *Wall Street Journal* reported that Dimon knew of those trades, and CW 1 confirmed that Olson informed CW 1 that Dimon "explicitly approved" them. In fact, Olson himself admitted to *Bloomberg* that the only reason he was not fired was because Dimon had been "intimately familiar with the positions."

70.     Similarly, in 2010 the CIO's London traders incurred large losses on complex bets tied to foreign currencies. According to the *Wall Street Journal*, those foreign currency trades lost the CIO about $300 million over the course of just a few days. Joseph Bonocore, then the CIO's CFO, concluded that the trades had been made without any corresponding gains to offset the losses, meaning that the trades were not hedges. Bonocore brought the matter to the attention of Defendant Michael Cavanagh, then JPMorgan's CFO, who reported to Dimon. Dimon was told of the trades, and knew that the trades were not hedges, according to the *Wall Street Journal*.

71.     Some of the concealed, high-risk positions taken by the CIO were so massive that they affected entire markets. For example, starting in 2009 the CIO began to amass a portfolio of risky asset-backed securities, including European mortgage-backed securities ("MBS") and other complex debt securities, according to a dozen senior traders and credit experts cited by the *Financial Times*. That position ultimately grew to over $150 billion—nearly half of the total investment assets of the CIO and Treasury combined, and an amount comparable to JPMorgan's current market capitalization. The CIO's purchases of nearly $20 billion in U.K. MBS single-handedly rejuvenated the market for such securities in the United Kingdom, according to the *Financial Times*. The CIO also became the largest investor in tranches of collateralized debt obligations ("CDOs"), exotic, complex securities of which the CIO purchased $1 billion at the

end of 2008, according to *Bloomberg*.  The CIO's substantial investments in high-risk instruments such as MBS and CDOs were particularly striking given that these were the very kinds of securities that caused many investment banks to suffer staggering losses during the financial crisis – losses that JPMorgan purportedly avoided due to its "best-in-class . . . risk systems."

72.     The investments described above, including the CIO's bets against subprime mortgages and on Fannie Mae and Freddie Mac securities, were examples of the CIO's proprietary trading activities and were not undertaken to hedge or manage risk.  When CW 1 asked CIO traders what risks they were hedging, they did not identify any positions being hedged by their trades.

73.     Further establishing that the CIO was not a risk-management unit but a business segment engaging in high-risk trading in order to generate enormous profits, the CIO secretly accounted for a substantial portion of JPMorgan's earnings during the Class Period.  Tellingly, during the Class Period, JPMorgan never separately disclosed the CIO's contributions to its net income.  It was only after the Class Period ended that JPMorgan for the first time separately disclosed the earnings of the CIO, and admitted that one portfolio of the CIO – the synthetic-credit portfolio – accounted for at least 20% of the Company's net income for most of the Class Period – a total of $2 billion during 2007-2011.  But even these belated admissions about the CIO's earnings understated the CIO's contributions: analysts noted that because the CIO invested capital for other JPMorgan divisions, the profits it generated flowed to, and were reported by, units other than the CIO.  For example, according to a report by Portales Partners quoted by *Bloomberg* on June 12, 2012, the CIO contributed as much as $0.80 per share to the Company's earnings during the Class Period.  According to the Portales Partners analysis, at the

27

start of the Class Period, when the Company reported earnings of $2.26 per share for 2009, the

CIO would have been responsible for 35% of the Company's earnings.

### F. JPMORGAN MISSTATED ITS FINANCIAL RESULTS BY FAILING TO RESERVE FOR THE CIO'S ILLIQUID POSITIONS IN THE SYNTHETIC-CREDIT PORTFOLIO

74.    Bruno Iksil, the CIO trader who managed JPMorgan's bet against subprime

mortgages, managed the CIO's synthetic-credit portfolio under the supervision of Ina Drew in

New York and Achilles Macris in London.  According to an internal JPMorgan document cited

by the *New York Times*, the CIO assigned Iksil to "relative value investing," a strategy used by

hedge funds to "exploit price differences between various assets."  Relative value investing was

a proprietary trading strategy designed to generate profits, and inconsistent with the CIO's

publicly touted risk-management function.  Attempting to profit from perceived mispricing in the

marketplace did nothing to hedge against JPMorgan's other positions or exposures.

75.    By 2009, unbeknownst to investors, the CIO's synthetic-credit portfolio grew so

large that it "could move markets," according to CW 2.  Indeed, as noted by one trader cited by

the *International Financing Review* on July 21, 2012, JPMorgan's CIO was, until recently, the

major source of liquidity in that market.  Several current and former CIO employees cited by the

*New York Times* on May 15, 2012, likewise said that the size and illiquidity of these large

positions caused the CIO's internal risk managers to raise specific concerns as early as 2009.

76.    The Defendants have now explicitly admitted that the synthetic-credit portfolio

was an improper trading strategy that did not belong in the CIO.  As Dimon himself conceded on

July 13, 2012, after the end of the Class Period, the portfolio "was too big, <u>it was un-vetted</u>, it

shouldn't have been done, <u>it was illiquid</u>. It was bad."  Indeed, the liquidity risk of the CIO's

synthetic-credit portfolio was a primary concern of JPMorgan executives during the Class

Period.  The market for synthetic-credit derivatives, in which the CIO was fast becoming the

largest player, was thinly traded and limited to a small number of highly sophisticated investors. As a result, the CIO faced substantial risks by taking a large position in synthetic-credit derivatives because there was no assurance that JPMorgan would be able to locate counterparties for a given trade. The CIO therefore faced a material risk that it would not be able to sell those positions if it wanted to liquidate them, and could face enormous losses in the event of adverse market moves. As reported by the *Wall Street Journal*, by early 2010, the size and risk of the CIO's undisclosed synthetic-credit portfolio had become untenable to CIO managers in New York, who were actively discussing how to rein in the CIO's traders in London.

77. Specifically, according to executives cited by *Bloomberg* on June 14, 2012, the CIO's Chief Risk Officer, Peter Weiland, had become concerned by 2010 that the CIO's synthetic-credit portfolio was a complex and illiquid position that would generate significant losses if the CIO were forced to sell. Weiland therefore confronted Drew and Macris repeatedly in 2010 regarding the illiquidity of that position. Weiland's concerns were shared by other CIO executives, and the synthetic-credit portfolio became a frequent topic of discussion at the CIO's global weekly meetings run by Drew.

78. Concerns about the illiquidity of the CIO's synthetic-credit portfolio were so severe that, in early 2010, a senior CIO executive recommended that JPMorgan establish a $2 to $4 billion liquidity reserve to guard against possible losses in that portfolio. As reported by the *New York Times* on June 28, 2012, that executive documented that such a reserve was required after conducting a detailed review in the beginning of 2010. This review concluded that the size, risk, and illiquidity of the CIO's synthetic-credit positions required the establishment of a liquidity reserve. The CIO executive supported his recommendation to establish the reserve with a detailed internal report that estimated the amount of money the Company would lose if it had

to liquidate the CIO's positions within 30 days.  On May 31 and June 13, 2012 *Bloomberg Surveillance* podcasts, Christopher Whalen, a senior managing director at Tangent Capital Partners and an analyst who has been covering the banking industry, including JPMorgan, for the past several years, said that he had spoken about the need for that reserve to "people that were inside."  Whalen reported on *Bloomberg* that the required reserve needed to be at least $2 billion – and as much as $4 billion – to account for the illiquidity of the CIO's positions.  According to Whalen, the required reserve was discussed "at the CFO level."

79.     Significantly, according to Whalen, the mere fact that the synthetic-credit portfolio needed to be reserved against meant that the trades comprising that portfolio were not hedges.  As Whalen explained on the *Bloomberg Surveillance* program on June 13, 2012, "this . . . goes back to the issue of was this a hedge?  No, <u>if we are posting a reserve against it, it is not a hedge, right, it is a separate exposure</u>."

80.     The size of the needed reserve was highly material to JPMorgan's bottom line.  Under Statement of Financial Accounting Standards No. 5, which is part of Generally Accepted Accounting Principles ("GAAP"), creating such a reserve would offset net income on a dollar-for-dollar basis.  In 2010, the Company reported net income of $1.258 billion for the Corporate Division and $17.37 billion for the entire Company.  Accordingly, establishing even the minimum required reserve of $2 billion in 2010 would have wiped out all of the profits reported by the Corporate Division, and reduced the overall company profit by almost 12%.

81.     Despite the CIO executive's detailed internal report about the need for a $2 to $4 billion reserve, because the Company did not want to reduce its profits, JPMorgan did not establish any reserve to account for the illiquidity of the CIO's synthetic-credit portfolio.  Because the Company never took the liquidity reserve it was required to have taken, the

Company's net income was overstated by at least $2 billion each quarter during the Class Period, rendering JPMorgan's financial statements materially false.

### G.   JPMORGAN'S TOP MANAGEMENT KNEW THAT ITS CIO RISKED LARGER LOSSES THAN ITS INVESTMENT BANK, EVEN THOUGH THE CIO INVESTED FAR LESS CAPITAL

82.    JPMorgan utilized a financial metric known as value-at-risk, or "VaR," to track how much money the Company might lose on any given trading day as a result of the positions taken by its various business units, including the CIO and the Investment Bank.  The VaR models calculated how much money the Company might lose from a particular position on a specified number of trading days in a given period, *e.g.*, a certain trader or unit with a VaR of $20 million might lose $20 million on 95 out of 100 trading days.  The VaR for the positions of the CIO and other business units was calculated daily and was "reported to senior management and regulators, and they [fed] regulatory capital calculations," according to the Company's 2010 Form 10-K.  The Company's VaR, and the VaR of its individual business units, was regularly communicated to investors so that investors could assess and track the risks being assumed by JPMorgan and its various business units.

83.    While JPMorgan publicly reported the VaR of both the CIO and the Investment Bank throughout the Class Period, JPMorgan deceived investors about the meaning of the CIO's VaR by falsely representing that the CIO's positions on which the VaR was based were hedges of risks that existed in other divisions of the Company.  Specifically, in describing the CIO's VaR to investors in its SEC filings, the Company stated that it "includes positions employed as part of the Firm's risk management function," and that it "includes positions, primarily in debt securities and credit products, used to manage structural and other risks including interest rate, credit and mortgage risks arising from the Firm's ongoing business activities."  Those representations led investors to understand that the market risk reflected by the CIO's VaR was

offset by other positions within the Company, because the CIO's positions were purportedly hedges used to manage risk, not proprietary trades.  Investors therefore believed that, unlike the Investment Bank, which engaged in proprietary trading that created risk, the CIO's positions mitigated risk.  Accordingly, investors attempting to compare the reported VaR of the CIO and Investment Bank understood that, even when the two numbers were the same, because the CIO was purportedly hedging risks, the losses it experienced would largely be balanced out by corresponding gains in other units of JPMorgan's business.

84.     Beginning in 2010, JPMorgan's own VaR models showed that the CIO's synthetic-credit positions could lose tens of millions of dollars on a given trading day, according to several JPMorgan employees cited in a June 1, 2012 *Bloomberg* article.  Investors were not told during the Class Period that the VaR for the CIO's synthetic-credit portfolio was larger at times than the VaR of the Company's entire Investment Bank.  That meant that a single portfolio of exotic instruments being managed by the CIO could lose JPMorgan more money than all of the investments of the entire Investment Bank.  That disparity is even more striking given that, unlike the CIO, the Investment Bank was supposed to be taking on risk to generate profit, and the Investment Bank's assets were more than double the size of the CIO's total portfolio. Specifically, the combined Treasury and CIO (whose financial data were combined and reported together to the public) had a total investment securities portfolio of $311 billion at the end of 2010 and $356 billion at the end of 2011, while the Investment Bank had total assets of $825 billion and $776 billion, respectively, at those times.  Accordingly, during the Class Period, JPMorgan's own risk models, which were reported to and reviewed by its senior officers, established that the CIO had abandoned its publicly stated risk-management function and was

aggressively trading for profit, exposing JPMorgan to incredible amounts of risk relative to the size of its investments.

85.     JPMorgan represented that it closely tracked the VaR "to estimate the potential loss from adverse market moves" by each day undertaking "a comprehensive VaR calculation that includes the majority of its material market risks."  Reporting by *Bloomberg* makes clear that the Company internally broke out the VaR for individual traders, including Iksil, on a daily basis.

86.     JPMorgan's senior officers, including Dimon, also knew that a significant portion of the CIO's VaR was attributable to one portfolio of illiquid synthetic-credit derivatives.  While JPMorgan's SEC filings reflected that the CIO had an average VaR of approximately $76 million by the beginning of 2010, internal JPMorgan reports showed that Iksil's daily individual VaR accounted for between $30 million and $40 million of that amount, according to JPMorgan executives cited by *Bloomberg*.

87.     The growing risk presented by the CIO's synthetic-credit portfolio sparked intense conflict between the CIO's New York and London offices in 2010 and 2011.  During daily 7 a.m. conference calls between London and New York over which Drew presided, CIO executives in New York, who became increasingly concerned about the size and illiquidity of that portfolio, frequently argued with the CIO's London office, led by Achilles Macris, about the risk profile of that investment, according to former traders cited by *Bloomberg* on June 12, 2012.

88.     According to a senior JPMorgan executive cited by the *Telegraph*, "Achilles [Macris] used to say [during these discussions] that Jamie [Dimon] was his *de facto* boss and that he effectively reported to [Dimon]."  This executive said that Dimon was repeatedly warned

about the risks presented by the positions taken by the CIO in London, but did absolutely nothing to address those concerns.

89.     Indeed, according to numerous JPMorgan executives cited by the *Wall Street Journal* in a May 11, 2012 report, Dimon was regularly briefed on the details of the CIO's positions.  According to a senior JPMorgan executive cited by *Bloomberg* on May 14, 2012, Dimon knew about the losing synthetic-credit portfolio trades because Dimon reviewed the profit-and-loss reports on large positions in the CIO every day.  In addition, the CIO produced a regular report called "Jamie's Report" that contained financial information, including aggregate trade positions and associated risk.  "Jamie's Report" was sent to the CIO's Chief Financial Officer for presentation to Dimon, according to CW 1, who prepared spreadsheets that were part of "Jamie's Report."

90.     CW 1 believed that most CIO deals were approved by JPMorgan's senior executives, "going all the way up to Jamie Dimon," who met with CIO traders to discuss their trades.  CW 1 also said that Dimon approved trading strategies in the CIO, and was a "huge micromanager."  That was corroborated by Norma Corio, who took over the CIO's Special Investments Group in 2012 after working as a Managing Director in JPMorgan's Treasury Department.  Corio told the *Wall Street Journal* that Dimon was intimately aware of the CIO's positions during the Class Period.  As reported in a May 24, 2012 *Wall Street Journal* article, Corio said that Dimon "likes to know what is going on all the time, everywhere at this firm. . . . Full stop."  In fact, after the Class Period, Dimon conceded his involvement and responsibility for the CIO's disastrous trades in testimony before the U.S. House of Representatives Financial Services Committee, acknowledging that he was aware of the CIO's trading strategy and

monitored the CIO.  As Dimon admitted, "I am absolutely responsible.  The buck stops with me."

### H.   DEFENDANTS MANIPULATE THE CIO'S VAR MODEL TO TRY TO CONCEAL THE CIO'S RISKS AND TO ENABLE THE CIO TO MAKE EVEN BIGGER BETS

91.     Given the size and complexity of the synthetic-credit portfolio, any effort to reduce the size of the CIO's synthetic-credit portfolio was extremely problematic.  Selling off the CIO's positions in the synthetic-credit portfolio would have resulted in significant losses, which would have revealed the proprietary trading program within the CIO.  According to one JPMorgan executive cited by *Bloomberg* on June 12, 2012, then-CIO Chief Risk Officer Weiland compared efforts to reduce the illiquid credit-derivative positions to trying to land a Boeing 747 without flying lessons.  Because the position was so large and illiquid, Weiland said he could not get the plane below 35,000 feet.

92.     In the summer of 2011, Weiland began a review of the CIO's risk limits and spoke with other CIO executives about tightening restrictions on the CIO's trading positions, according to a *Wall Street Journal* article published on June 12, 2012.  But the controls that Weiland wanted were not implemented.  Instead, unable to reduce the risk presented by the CIO's synthetic-credit portfolio, the CIO began an effort in mid-2011 to conceal that risk by developing a new model that would intentionally understate the publicly-reported VaR of that portfolio.  As Cavanagh would later admit on July 13, 2012, by mid-2011, the CIO began work on a "new" VaR model that would generate a figure reflecting that the CIO was taking on less risk than it actually was incurring.

93.     According to Cavanagh's statement on July 13, 2012, in the process of testing the new CIO VaR model, the employees responsible for implementing that change—including individual CIO traders and risk officers, together with officials from JPMorgan's "independent"

model review group in the corporate risk management group—understood that the new model would produce a VaR figure that was lower (*i.e.*, reflected less risk) than the model in place at the time.  In fact, the new model reflected that the purported VaR for the CIO would be only half of what would have been calculated under the old model for the identical positions.  Thus, the new model deliberately – and materially – understated the synthetic-credit portfolio's risk.  Dimon has admitted that he knew that the CIO was implementing a new VaR model, and that he personally approved the adoption of that new model on or about January 15, 2012.  Cavanagh also admitted that the VaR change was deliberately undertaken with the "expectation of all parties involved in the model approval" that the new model would generate a "lower measure [of] VaR."

**I.      THE "LONDON WHALE'S" MOUNTING LOSSES THREATEN TO EXPOSE THE CIO'S TRUE FUNCTION**

94.      According to the *New York Times*, in late 2011 Defendant Drew approved a trading strategy to try to hedge the CIO's synthetic-credit positions by entering into additional synthetic credit positions.  The *Wall Street Journal* reported that Dimon personally approved the concept behind that strategy, and after the Class Period Dimon admitted his role in the CIO's trading strategy in his testimony before a U.S. Senate committee.

95.      While the CIO's synthetic-credit portfolio included a variety of positions, according to JPMorgan's recent admissions the net position of that portfolio in 2011 was a bet against corporate debt.  That is, the CIO was generally wagering that corporations, particularly those issuing U.S. high-yield, or "junk" bonds, would default on those bonds.  Instead of selling off the instruments that constituted that wager, the CIO purportedly tried to balance its portfolio by placing an offsetting—and much larger—bet that other corporations (all AAA-rated) included in separate indices would remain financially sound and not default on their obligations.  After the

end of the Class Period, JPMorgan claimed that these two trades were intended to balance each other out.

96.     Drew remained in close contact with the London traders as they attempted to balance the synthetic-credit portfolio, and spoke with them weekly.  As reported by the *New York Times*, Drew met with Macris and Javier Martin-Artajo, the chief deputy to Macris in the CIO's London office, in New York in December 2011 to discuss the positions being taken by the CIO.

97.     However, instead of providing any offset or hedge, the proprietary-trading strategy approved by Dimon and Drew materially increased the risk in the CIO's synthetic-credit portfolio.  Because the original CIO position – the bet that companies issuing high-yield debt would default – was so large, the CIO was required to amass an enormous bet that the companies issuing AAA-rated debt would remain sound.  At the same time, the new strategy implemented by the CIO required the original position – the bet that certain companies would default – to increase as well.  Specifically, the CIO's bet that highly-rated companies would remain sound more than tripled during the first quarter of 2012.  At the same time, the CIO's bet that companies issuing high-yield debt would default doubled.  As Cavanagh later put it, the portfolio grew to a "perilous size with numerous embedded risks . . . ."

98.     In quickly amassing that large position in the thinly traded market for synthetic-credit derivatives, the CIO drew the attention of the hedge funds that typically trade those instruments.  These hedge-fund traders recognized that a single market participant was accruing a major position in credit derivatives, but in 2011 did not yet know that the trader behind those positions was at JPMorgan's CIO.  Not knowing his identity, the hedge-fund traders nicknamed the unknown trader the "London Whale," due to the outsized positions he had taken.

99.     Knowing that a single market participant had so much exposure in an illiquid market enabled other market participants to trade against the CIO's position.  Seizing upon the price distortions that the CIO had created, hedge fund traders – such as Boaz Weinstein, the founder of Saba Capital and former co-head of credit trading at Deutsche Bank – took direct aim at the "London Whale" and thus at JPMorgan itself.  Weinstein advised investors to take positions adverse to the London Whale, thus compromising the CIO's ability to manage its existing risk.

100.     In January 2012, the synthetic-credit positions breached the few remaining risk limits applicable to the CIO.  While JPMorgan never established any risk limits specific to the multi-billion dollar synthetic-credit portfolio (despite the fact that the Investment Bank, which maintained a similar portfolio, was subject to granular, portfolio-level risk limits), and Drew and Macris had removed the $20 million stop-loss risk limits for individual trades, certain risk limits still applied to the CIO as a whole.  In January 2012, the positions in the synthetic-credit portfolio triggered those risk limits, which Cavanagh later described as "clearly inadequate" and "unsophisticated."

101.     Specifically, in January 2012, a measurement of the impact of credit spreads exceeded the limits established for the CIO.  Although JPMorgan publicly represented in its Forms 10-K that such a breach in credit-spread limits should have been reported in a "timely manner to senior management, and the affected line-of-business [wa]s <u>required to reduce trading positions</u> or consult with senior management on the appropriate action," the CIO's positions were not reduced.  Instead, as JPMorgan later admitted, the credit-limit violation in January was "reviewed by CIO's Market Risk Officer," who simply ignored the violation of the credit limit.

102.     At the same time that those limits were breached, JPMorgan demoted Weiland, the CIO's Chief Risk Officer, who months earlier had pushed for new, tighter risk limits within the CIO.  Drew replaced Weiland with Irvin Goldman, a former trader whose conduct when he was employed at Cantor Fitzgerald resulted in a regulatory sanction for that firm.  Goldman was the brother-in-law of JPMorgan's then-Chief Risk Officer, Barry Zubrow.  As reported by the *Wall Street Journal* on May 20, 2012 and *Bloomberg* journalist Stephanie Ruhle on May 21, 2012, Goldman lacked risk-management experience and had no experience trading the synthetic-credit products that presented the single largest risk to the CIO, yet was put in a "critical oversight role" that included "overseeing risk limits and trading positions" for that portfolio.  Moreover, Drew's involvement with Goldman's appointment – effectively hand-picking her own risk officer – created dual loyalties and constituted a flagrant conflict of interest, according to sources cited by *Reuters*.

103.     Just two weeks after the CIO-wide risk limits were breached, the Company's firm-wide risk limits were breached because of the CIO's holdings.  Once again, JPMorgan ignored the violation of risk limits.  Indeed, this time, Dimon himself personally granted the reprieve from the Company's risk limits, which JPMorgan had repeatedly told shareholders were the cornerstone of its risk-management protocol.  Specifically, in mid-January, in response to an email seeking an exemption from the Company's firm-wide VaR limit, Dimon and JPMorgan's newly installed Chief Risk Officer, John Hogan, permitted a "temporary increase of firm-wide VaR" to accommodate the spiking CIO VaR that was driven by the increased risk of the synthetic-credit portfolio.

104.     Dimon called the breach "temporary" because he knew that the new VaR model being developed for the CIO's synthetic-credit portfolio would significantly – and artificially –

reduce the VaR of that portfolio, and bring the CIO's VaR back within limits.  Indeed, the email in which Dimon and Hogan granted their approval of the Company-wide increase in the VaR explicitly noted that the new CIO VaR model "was expected to lower VaR."  In other words, within days of credit-spread risk limits in the CIO exceeding their maximum permitted levels, Dimon approved an exception to the Company's firm-wide VaR limit, knowing that, with the implementation of the new VaR model for the CIO's synthetic-credit portfolio, the Company's risk would appear to have decreased.

105.    By the end of January, the new VaR model was implemented solely within the CIO – but not any other division of JPMorgan.  This new model produced a drastically lower CIO VaR than the prior model, and thus also artificially lowered JPMorgan's firm-wide VaR.  The Company's 2011 Form 10-K, which was issued on February 29, 2012, just one month after JPMorgan implemented the new VaR model, did not disclose that a new VaR model was being applied to the CIO.  Moreover, when JPMorgan ultimately reported its VaR for the first quarter of 2012 (in a Financial Supplement issued on April 13, 2012), the Company reported CIO VaR of $67 million when, in reality, the VaR had increased to $129 million under the prior model.  In sum, the new VaR model allowed JPMorgan to falsely represent that the CIO VaR was roughly half of what it truly was.

106.    Also on February 29, 2012, JPMorgan's senior management (including Dimon) and senior executives of the CIO met and discussed the CIO's synthetic-credit portfolio, according to Cavanagh's July 13, 2012 presentation, but again, no effort was made to reduce the positions or provide any disclosure to shareholders.

**J.  THE CIO'S DEFICIENT RISK-MANAGEMENT PROTOCOLS PERMITTED TRADERS TO MANIPULATE THE VALUATION OF THEIR CREDIT DERIVATIVES**

107.  The implementation of the new VaR model helped to conceal the CIO's true risk profile from investors and regulators, but did nothing to change the actual risk of the synthetic-credit portfolio, which was known to Defendants.  To further conceal the CIO's risky positions from regulators and investors, the CIO's traders resorted to "painting the tape"—a term for trades that are designed to manipulate prices in a thinly-traded market, as reported by *Bloomberg* on July 24, 2012.  As discussed above, the CIO's synthetic-credit derivatives were instruments linked to specific indices of companies and countries that issued debt.  The value of those instruments was therefore tied to those indices.  According to market data, the daily volume of trading on one particular index of corporate debt issuers that the CIO traded against – known as the CDX.NA.IG.9 index – more than doubled at the end of January and doubled yet again at the end of February.  The massive increase in trading on that index occurred just before the Company's end-of-the month audits to verify prices, and enabled JPMorgan to raise the value of the CIO's positions that were linked to that index.

108.  According to three former senior CIO executives and a senior executive in JPMorgan's market risk group cited by *Bloomberg*, an internal control group at JPMorgan verifies all prices across the bank's trading businesses at the end of each month and quarter.  In this instance, JPMorgan was able to influence the index in its favor by trading on the CDX.NA.IG.9 index in large enough volumes to affect the price of the index.  Thus, JPMorgan manipulated the price of the index, as evidenced by the fact that other comparable indices failed to mimic the large price swings in the CDX.NA.IG.9 caused by JPMorgan.

109.  Despite the benefit to the CIO's position achieved by "painting the tape," the effect of that manipulation was still insufficient to bring the CIO's valuation marks to where

JPMorgan needed them to be.  Having already manipulated the pricing of the underlying index and changed the VaR model, the CIO traders moved on to cooking their books by simply choosing marks that suited them, rather than using true market prices.  As reported by the *Wall Street Journal* on August 3, 2012, a person who reviewed communications at issue in JPMorgan's investigation into the trading losses said that Iksil was told by Javier Martin-Artajo, his supervisor in the CIO's London office (and who reported to Macris), to mark the CIO's credit derivatives at higher values than those positions could have fetched on the open market.  Iksil agreed on repeated occasions to intentionally mismark the value of the CIO's credit derivatives.  Such manipulations would not have been possible if Defendants had not weakened the CIO's risk management protocols, as described herein.

110.    In the communications discussed in the *Wall Street Journal*, Martin-Artajo is shown prodding Iksil toward higher prices, stating that "[w]e should not be showing" a certain amount of losses from the trades "until we see where the market is going," according to people who have reviewed those communications.  Instead, Martin-Artajo told Iksil that he would "prefer" that a higher price be put on certain positions.  According to a source cited by *Bloomberg*, the CIO was valuing its trades at prices that differed from those at JPMorgan's Investment Bank, the largest dealer in such credit derivatives in the United States.  Because of the enormous size of the CIO's positions, even small differences in how the trades were marked could result in a huge difference in the value of the positions, potentially masking the CIO's losses by hundreds of millions of dollars, according to a source cited by *Bloomberg*.

111.    CW 3 confirmed that JPMorgan's marking process could be subject to manipulation.  CW 3, who worked in the New York office of the CIO until April 2011 and saw the CIO's positions in 2010-2011, knew of at least one occasion when the CIO had marked an

asset at a different value than other divisions within the Company.  CW 3 said that even though valuation control should have been handled by a single department and determined in a uniform manner across all divisions of the Company, the CIO was treated differently and permitted more leeway in terms of valuation.  As the Company itself ultimately admitted, information within JPMorgan "raise[d] questions about the integrity of the trader marks and suggest[ed] that certain individuals may have been seeking to avoid showing the full amount of the losses in the portfolio during the first quarter."

### K.   JPMORGAN DECEIVES INVESTORS AND REGULATORS AS TO THE TRUE IMPACT OF THE CIO'S TRADES

112.   Despite the fact that the CIO's synthetic-credit portfolio had already breached risk limits, in February 2012 Dimon and Drew stepped up their campaign to prevent regulatory scrutiny of the CIO.  Specifically, on February 2, 2012, Drew and a five-member team from JPMorgan met with Federal Reserve staff to urge that "portfolio hedging" be permitted under the regulations implementing the Volcker Rule.  According to the *New York Times*, Drew argued that anything but a loose implementation of the Volcker Rule would hinder the Company's "hedging" activities purportedly performed by her office.

113.   Then, on February 13, 2012, JPMorgan submitted a detailed comment letter that ridiculed the suggestion that "banking entities will camouflage prohibited proprietary trading to evade the rule."  Indeed, JPMorgan falsely claimed in the comment letter that the CIO was "responsible for making investments to hedge the structural risks of our balance sheet on a consolidated basis" when, in truth, the CIO was engaged in precisely the kind of proprietary trading that the Volcker Rule sought to rein in.

114.   On March 23, 2012, the London Whale's positions breached a risk limit in the CIO for the second time in just a few weeks.  Despite the implementation of the new VaR model

that was designed to conceal the level of risk within the CIO, and despite the trades designed to paint the tape, credit-risk limits were still being breached.  As reported by the *New York Times* on October 3, 2012, Drew became so concerned that she ordered the CIO traders to stop trading the synthetic-credit portfolio, and began holding daily teleconferences with traders in London to manage the position.

115.    On April 5 and 6, *Bloomberg* and the *Wall Street Journal* reported on rumors in the derivatives markets about the "London Whale," whom they identified as Bruno Iksil.  This was the first time it was publicly reported that a CIO trader was taking enormous positions in the credit-derivatives market.  However, rather than reveal the truth about the CIO, a JPMorgan spokesperson told the *Wall Street Journal* that the CIO's positions were hedges, and insisted that the CIO is "focused on managing the long-term structural assets and liabilities of the firm and is not focused on short-term profits."

116.    At this same time, according to a senior supervisor at the Federal Reserve cited by the *New York Times* on May 25, 2012, JPMorgan's senior management assured its regulators that the CIO's trades were not a concern.  Specifically, the Federal Reserve supervisor cited by the *New York Times* said he was told in the first week of April 2012 that JPMorgan's senior management was not worried about the CIO's synthetic-credit trades.

117.    Dimon ordered a review of the CIO synthetic-credit portfolio in preparation for JPMorgan's previously scheduled quarterly earnings conference call on April 13, 2012.  According to Cavanagh, Drew led that review, which included the participation of Dimon and Braunstein.  Before the April 13 conference call, the losses in the synthetic-credit portfolio had ballooned to over $700 million.  Moreover, an April 2012 internal JPMorgan report projected

losses of $9 billion from the synthetic-credit portfolio, according to the *New York Times* on June 28, 2012.

118.    Notwithstanding the fact that the CIO accounted for at least 20% of the Company's net income during the Class Period, the April 13 conference call was the first time JPMorgan's senior management ever substantively discussed the CIO on any such call.  Even then, rather than tell investors the truth about the CIO's proprietary investments, the significant losses they had already caused and the massive additional losses that were looming, Dimon and Braunstein lied about the CIO and its role in JPMorgan's business, the "London Whale," and the synthetic-credit trades.  Indeed, Braunstein went to great lengths to stress the purportedly risk-reducing nature of the CIO's trading, describing the CIO's transactions as "hedges" on "high-grade credit" products that would protect against extremely unlikely and unexpected "stress loss" or "tail risk" events that could harm the Company in the event of a severe market downturn, such as a severe recession in Europe.  Braunstein noted that "[w]e hedge basis risk, we hedge convexity risk, foreign exchange risk is managed through CIO, and [mortgage servicing rights] risk.  We also [invest] to generate [net interest income], which we do with that portfolio."

119.    According to Braunstein, the trade by the "London Whale" that had received attention in the news media was simply the result of the Company's active management of this risk.  Appearing to address the reported rumors concerning the size of Iksil's positions, Braunstein said the trades needed to be sufficiently large to protect against a "significant stress event in credit," even if such a "stress event" was highly unlikely to occur.  Remarkably, Braunstein dismissed concerns about the London Whale's trading, stating that JPMorgan's senior management and its regulators had reviewed and were "very comfortable" with those positions:

> We have had that position on for many years and the activities that have been reported in the paper are basically part of <u>managing that stress loss position</u>,

45

which we moderate and change over time depending upon our views as to what the risks are for stress loss from credit.

All of those decisions are made on a very long-term basis.  They are done to keep the Company effectively balanced from a risk standpoint.  We are very comfortable with our positions as they are held today.

And I would add that all those positions are fully transparent to the regulators.  They review them, have access to them at any point in time, get the information on those positions on a regular and recurring basis as part of our normalized reporting.  All of those positions are put on pursuant to the risk management at the Firm-wide level.

120.    Dimon further assured investors that the CIO was not gambling with high-risk directional bets.  Dimon noted that "most of that portfolio is an [available for sale] portfolio," which required JPMorgan to report the fair value of the assets in the portfolio.  Dimon explained that the Company reported the portfolio's positions on a mark-to-market basis (as opposed to a more subjective "mark-to-model" basis), suggesting that there were indeed verifiable market prices for the CIO's positions.  In fact, Dimon claimed, JPMorgan was entirely transparent about the CIO and its positions: "[w]e disclosed both realized gains, unrealized gains, and mark-to-market gains.  You get all of that."

121.    When directly asked whether investors should be concerned about the reports concerning the "London Whale," Dimon dismissed such concerns outright, stating "[i]t's a complete tempest in a teapot.  Every bank has a major portfolio; in those portfolios you make investments that you think are wise to offset your exposure."  Dimon and Braunstein provided these assurances to investors despite the facts that: (i) the CIO's trades were high-risk, proprietary trades, not hedges; (ii) the trades had already breached credit limits; (iii) Dimon had approved a waiver of the Company-wide VaR limit and a secret change in the CIO's VaR model to accommodate the CIO's ballooning risk profile; (iv) the CIO was "painting the tape" and marking the synthetic-credit portfolio at above-market prices to avoid recognizing the hundreds

of millions of dollars in losses already incurred on the portfolio; and (v) internal reports were warning that losses from the portfolio could reach as high as $9 billion.

122.    JPMorgan's deception worked.    Market analysts accepted Defendants' reassurances about the CIO, and nearly all analysts considered it a non-issue, not worthy of mention in their reports on the Company's earnings.  After the conference call ended, JPMorgan stock opened at $44.95 per share on April 13, up from the prior day's closing price of $44.84 per share.  On April 16, 2012, Macquarie (USA) Equities Research, echoing Dimon's reassurances, downplayed the role of the CIO, stating that the "company also noted that its CIO unit is housed in the corporate segment and helps the firm manage its interest rate and credit risks.  <u>Recent attention paid to the unit in the media has distorted the largely low risk trades the unit makes</u>."

## L.    JPMORGAN DISCLOSES THE CIO'S MASSIVE TRADING LOSS, REVEALING THE CIO'S TRUE NATURE FOR THE FIRST TIME

123.    Less than one month later, on May 10, 2012, Dimon shocked investors by disclosing that the CIO's trades were anything but "a tempest in a teapot," and that the Company had lost at least $2 billion on those trades.  Dimon further admitted that "egregious mistakes" were made and "what happened violate[d] our own standards and principles":

> [T]he synthetic credit portfolio was a strategy to hedge the firm's overall credit exposure, which is our largest risk overall in a stressed credit environment. We were reducing that hedge, but in hindsight <u>the new strategy was flawed, complex, poorly reviewed, poorly executed, and poorly monitored</u>. The portfolio has proven to be riskier, more volatile, and less effective as an economic hedge than we thought. . . . [I]t's obvious at this point that there are many errors, sloppiness, and bad judgment. . . . These were egregious mistakes. They were self-inflicted, <u>we were accountable, and what happened violates our own standards and principles by how we want to operate the Company</u>. This is not how we want to run a business.

124.    When an analyst questioned Dimon's statement that the losses resulted from a "new" strategy, Dimon acknowledged that it was "[n]ot new.  It was, I said new but what I meant it was the strategy to reduce the credit hedge. So it's kind of a new strategy was devised and I

already said it was poorly constructed and poorly monitored, all of that. And that took place over the course of the last couple of months."

125.    Responding to questions about JPMorgan's risk management, Dimon described the failures that contributed to the CIO's loss as "egregious," stating: "[W]e operate in a risk business and obviously it puts egg on our face and we deserve any criticisms we get.  So feel free to give it to us and we'll probably agree with you. . . . We are going to make mistakes. . . . This one we would put in the egregious category and I understand fully why you or anybody else would question us generally."

126.    Notwithstanding the disclosure of the CIO's losses and the "egregious" risk-management failures that facilitated that loss, Dimon continued to conceal the transformation of the CIO into a proprietary trading desk.  Asked on the May 10 call whether the CIO's mandate had changed over the past five years, Dimon insisted that that there had been only "[a] little change" and that while the CIO had hired "different types of people," he "wouldn't call it more aggressive."  Indeed, Dimon continued to mask the full extent of the CIO's transformation into a proprietary trading desk, saying that the CIO had been "very, very careful" in managing the credit portfolio and that JPMorgan been "very careful" in "all of the things we've done" in the CIO.

127.    As noted in the Company's quarterly report on Form 10-Q filed that day, contrary to JPMorgan's prior guidance that it would report net income of $200 million for the first quarter of 2012, the CIO losses would result in an estimated loss of $800 million to the Company.  The 10-Q stated that the "CIO has had significant mark-to-market losses in its synthetic credit portfolio, and this portfolio has proven to be riskier, more volatile and less effective as an economic hedge than the Firm previously believed."

48

128.    On the May 10 call, Dimon also disclosed for the first time that the Company had changed the CIO's VaR model during the prior quarter and that the new model had artificially lowered the CIO's VaR.  As Dimon admitted, "[i]n the first quarter, we implemented a new VaR model, which we now deemed inadequate and we went back to the old one, which had been used for the prior several years, which we deemed to be more adequate."  The Form 10-Q filed on May 10 revealed the impact of the new VaR model.  Specifically, the Company reported that the CIO's VaR at the end of the first quarter was actually $129 million, or almost double the $67 million VaR reported just weeks earlier in the Company's April 13 quarterly earnings release.

129.    In response to the May 10 disclosures of the CIO's massive trading losses, the improper VaR calculation, and the risk-management failures that enabled the losses to occur, JPMorgan stock plunged nearly 10%, falling from a $40.74 per share close on May 10, 2012 to $36.96 per share on May 11, 2012, on the highest single-day trading volume in the Company's history.  The stock decline on May 11 wiped out over $14 billion in market capitalization, and was the largest single-day decline in the Company's stock price since the height of the financial crisis in 2008.

130.    Analysts were shocked by the Company's disclosures, explaining that the CIO's losses and the serious risk-management deficiencies that accompanied them took investors by complete surprise.  For example, a May 11, 2012, report by the Buckingham Research Group recognized that the disclosure of the then-$2 billion loss revealed that "JPM [was] proving not to be as low risk as many investors previously believed" and was a "black eye for JPM's risk management."  Also on May 11, Miller Tabak + Co., LLC issued a report stating that "[i]n yet another example of how making huge speculative bets with shareholders' funds seems to be an embedded behavioral problem for the 'Masters of the Universe' traders at giant banks, JPMorgan

Chase & Co. . . . yesterday reported a major trading loss in credit derivatives by its Chief Investment Office, which is supposed to adopt prudent hedges against risks taken by its different trading units."  On that same day, RBC Capital Markets published a report stating that after "this blemish, questions will be raised about further exposures and whether risk management practices are adequate."

131.   The Company's disclosures on May 10 prompted other analysts to revise their ratings of JPMorgan.  Paul Miller of FBR Capital Markets cut his ratings on JPMorgan to "hold" from "buy" for the first time since he initiated coverage of the bank in June 2010.  "I was one of those guys that said if anybody can manage a major bank of this size it's Jamie," Miller told the *Wall Street Journal*.  Stifel Nicolaus's Christopher Mutascio likewise downgraded JPMorgan to "hold" from "buy," writing that "[t]he one thing that made us comfortable with the [derivatives] exposure was the sound risk management behind it, which now comes into question."

132.   The next trading day, following disclosures that the SEC was investigating the Company's representations about the CIO's trades and that both Moody's and S&P put warnings on the Company's credit rating, JPMorgan stock dropped further, from a close of $36.96 on May 11, 2012 to $35.79 on May 14, 2012.

133.   In an appearance on NBC's Meet the Press on May 13, 2012, Dimon conceded that the trading losses were the result of a "terrible, egregious mistake," that the trading "strategy we had was badly vetted, badly monitored," and that "there's almost no excuse for it."  The next day, JPMorgan stated in a press release that Ina Drew was being terminated as head of the CIO.

134.   At JPMorgan's annual shareholder meeting on May 15, 2012, senior management confirmed that the trading losses would continue to be "volatile" and could increase.  However, that warning did not prepare investors for the extent of the CIO's losses that were yet to be

revealed.  On May 16, 2012, after the close of trading, the *New York Times* reported that losses in the CIO had increased by 50% in just days, to over $3 billion.  In response, JPMorgan stock dropped another 4% to close at $33.93 per share on May 17.

135.    The disclosure of additional losses from the CIO on May 16 prompted warnings from analysts that the true impact of the CIO's trading activities on JPMorgan was not reflected by the Company's prior disclosures.  For example, Deutsche Bank issued a report stating that the key issues related to JPMorgan's share price were "1) the ultimate level of the trading losses, 2) the earnings impact from a likely smaller CIO/Treasury unit and 3) the regulatory/political fallout."  Deutsche Bank also stated that "we have no way of knowing what potential losses may be."  A report issued by Morgan Stanley on May 18 echoed Deutsche Bank's concerns that the reduction of proprietary trading in the CIO would reduce a significant profit source that investors were not previously aware of.  Specifically, Morgan Stanley wrote that, before the disclosure of the loss and the revelations about the CIO's aggressive investments, JPMorgan investors did not appreciate the extent to which the CIO's earnings fueled the Company's performance.  Morgan Stanley estimated, for the first time, that the CIO contributed about 20% of JPMorgan's total earnings over the prior two years.  In light of the revelations about the CIO, Morgan Stanley revised its estimates for JPMorgan's future performance, stating that "[l]ooking forward we assume more plain vanilla investing/hedging in the CIO portfolio and expect earnings contribution to decline to about 2% of JPM earnings."

136.    Finally, during an investor meeting on May 21, 2012, Dimon announced that the Company was halting its $15 billion share-buyback program, which it had announced just months earlier.  Dimon attributed the decision to suspend the share-buyback program to the CIO's mounting losses and regulators' insistence that JPMorgan increase its capital cushion in

light of the reduction to JPMorgan's earnings and the increased risk posed by the CIO's positions.  During that meeting, Dimon also admitted that the CIO's loss was a basic, elementary "Risk 101 mistake."  In response to this disclosure, which ends the Class Period, JPMorgan's stock fell another 3%, dropping to $32.51 per share on May 21, 2012 from its $33.49 per share close on May 18, 2012, the previous trading day.

137.    The disclosures revealing the massive losses incurred by the CIO's high-risk trading and the risk-management deficiencies that contributed to that loss caused massive damages to JPMorgan's investors.   Indeed, in testimony before the U.S. House of Representatives Financial Services Committee on June 19, 2012, Dimon admitted that the CIO's trading losses resulted in JPMorgan's losing approximately $30 billion in market capitalization and that "yes, it did affect our shareholders, yes."

### M.    JPMORGAN RESTATES EARNINGS AND VAR, ADMITTING THAT ITS PRIOR FINANCIAL STATEMENTS LACKED INTEGRITY AND WERE TAINTED BY FRAUDULENT MISVALUATIONS OF THE SYNTHETIC-CREDIT PORTFOLIO, AND THAT ITS INTERNAL CONTROLS WERE DEFICIENT

138.    After the close of the Class Period, the Company provided additional information about the CIO's transactions that caused JPMorgan's massive losses.   Specifically, on the morning of July 13, 2012, before the Company's earnings conference call that preceded the start of trading that day, JPMorgan disclosed that the Company would restate its financial statements for the first quarter of 2012.  That restatement reduced the Company's previously reported net income for the first quarter by $459 million, or 8.5%.  The Company's restatement also included an admission that there was a "material weakness in [JPMorgan's] internal controls over financial reporting at March 31, 2012 related to CIO's internal controls over valuation of the synthetic credit portfolio."

139.    As Defendant Cavanagh, then CEO of the Company's Treasury & Securities

Services Division, explained on the conference call on July 13, the restatement occurred because

JPMorgan engaged in intentional fraud, and because gross deficiencies in JPMorgan's risk

management procedures and internal controls allowed that fraud to occur.   As Cavanagh

explained, JPMorgan had an internal accounting group that was supposed to monitor valuations

of trading positions to ensure that valuations were accurate.   Cavanagh admitted that these

procedures were not properly implemented in valuing the CIO's synthetic-credit portfolio, and

that, as a result, senior JPMorgan traders within the CIO were able to deliberately falsify the

valuation of the portfolio:

> [T]raders in CIO were expected to mark their positions where they would expect
> to be able to execute in the market. In this instance, while the positions were
> within thresholds established by an independent valuation control group within
> CIO, <u>the firm has recently discovered information that raises questions about the
> integrity of the trader marks and suggests that certain individuals may have been
> seeking to avoid showing the full amount of the losses in the portfolio during the
> first quarter</u>.  As a result, we are no longer confident that the trader marks
> reflected good faith estimates of fair value at quarter end and we decided to
> remark the positions utilizing external "mid-market" benchmarks, adjusted for
> liquidity considerations.

In sum, JPMorgan admitted that its prior valuation of the synthetic-credit portfolio lacked

integrity and represented a fraudulent attempt to conceal the CIO's losses, resulting in materially

false and misleading financial statements that had to be restated.

140.    On the call, Dimon acknowledged that most of the instruments in the CIO's

synthetic-credit portfolio were traded on exchanges or clearing houses and had observable prices,

and thus there were verifiable sources that should have been compared with the traders' marks to

verify them.

141.    Moreover, it is standard practice for a bank like JPMorgan to have its internal

auditors compare valuations across different units of the bank to ensure that the same types of

financial instruments are valued consistently across the bank. This procedure also was not followed with respect to the CIO's synthetic-credit portfolio. *Bloomberg* has reported that the CIO valued many of its positions at different prices than JPMorgan's Investment Bank valued the same positions. Again, however, JPMorgan senior management did not verify or correct the CIO's mispricing of its positions.

142. Significantly, JPMorgan replaced every JPMorgan employee with responsibility for the CIO's synthetic-credit portfolio other than Dimon and, in a clear acknowledgment that the portfolio should never have been part of the CIO, removed the portfolio from the CIO and transferred it to the Investment Bank, which had the risk management tools needed to manage that portfolio. Specifically, the Company announced on July 13, 2012, that all of the CIO managers responsible for the synthetic-credit portfolio in London had been "separated from the firm." The *Times* of London reported on July 14, 2012 that those individuals included Drew, Iksil, Macris, and Martin-Artajo. The Company said that it would not provide any severance for the recently departed individuals, that it would withhold all of their 2012 incentive compensation, and that it would claw back their past years' compensation packages.

143. Indeed, JPMorgan disclosed that, because of her role in the fraud, Drew had forfeited two years of compensation in bonuses, share options, and deferred benefits worth an estimated $21 million. Under JPMorgan's policies as described in its 2011 proxy statement, such "claw backs" can be sought when, among other things, an employee is terminated for cause, or receives compensation that was based on material misrepresentations by the employee.

144. According to the *Wall Street Journal* on September 9, 2012, Dimon's compensation is also likely to be reviewed and Dimon is expected to "pay a price for the [CIO] trading losses" when the board of directors next meets to plan executive compensation. When

asked during his testimony before the House Financial Services Committee on June 19, 2012, whether his "compensation [was] on the table for consideration of callbacks [sic]," Dimon acknowledged that it was.

145.   As Dimon also explained on July 13, "[w]e have shut down synthetic credit trading in CIO.  We'll no longer be doing it."  Instead, Cavanagh explained, the Company was "refocusing on the core mission of managing the AFS [available for sale] investment portfolio," the "synthetic credit activity has been shut down, and the liquidated portfolio transferred to the Investment Bank, where it will be better managed."

146.   A Mediobanca Securities analyst report on July 17, 2012 confirmed that the "refocusing" of the CIO actually meant that unit would start doing what the Company publicly represented it was doing throughout the Class Period: "The role of the CIO has been redefined to reflect the situation the market thought existed before the revelations on 10th May.  The CIO will no longer run a synthetic credit portfolio and will conservatively manage the bank's excess deposits (it currently has a US$323bn [available for sale] portfolio with an average rating of AA+ and unrealised [sic] gains of US$7.9bn), with the aim of protecting the bank against rapidly rising interest rates."

147.   On the July 13 conference call, Cavanagh also admitted that the CIO never had adequate risk management or controls in place, and that the CIO's lack of controls sharply distinguished it from JPMorgan's other "client" businesses.  Specifically, Cavanagh said that "the trading approach itself was poorly conceived, reviewed and executed. . . . [T]he portfolio grew to a perilous size, with numerous embedded risks. . . ."  Significantly, Cavanagh disclosed for the first time that the CIO had inadequate risk limits and that the synthetic-credit portfolio was subject to no risk limits whatsoever:

[The] risk limits in CIO were not granular enough [and] we gave ourselves too few opportunities to engage risk or other senior people as would have been the case <u>if we had a well-designed limit structure</u> around this portfolio.  First, <u>there were no risk limits specific to the synthetic credit portfolio</u>. The limits applied to more aggregated portfolios, often at the level of CIO <u>which was clearly inadequate</u>. Obviously, though, what was needed was granular position level limits for the portfolio itself. And I'd just say that in our Investment Bank credit derivatives business, the limits are already very granular.  <u>I believe that had the synthetic credit portfolio been risk managed under equivalent standards, it would not have experienced the unchecked transformation and growth that led to the losses.</u>

148.   Cavanagh also acknowledged that JPMorgan's internal controls for the CIO were inadequate to effectively manage the risks associated with the CIO's complexity:

[T]he level of scrutiny of CIO did not evolve commensurate with its increased complexity. . . . So some of the contributing factors here was [sic] the belief and experience that the core activities of CIO were managed appropriately, contributing to the unit's successful track record. Second was the capability of and experience of Ina [Drew] herself, and third was the modest but positive results of the synthetic credit portfolio historically. So as a result, we collectively ended up with a level of scrutiny that fell short of the high standards we apply to our client businesses, especially as the complexity increased.

149.   Similarly, Cavanagh stated on the same call that the CIO never should have been engaging in the synthetic-credit transactions that led to the massive loss, and that such trades were inconsistent with the CIO's publicly represented function.  As Cavanagh admitted, "the overall mistake was <u>allowing something that wasn't like the rest of the [asset liability management] type of activities to get housed inside CIO</u>.  That had one form of risk management structure, and then [we] put something new in that required a whole different type of risk wrapped around it, and [we] didn't do it at the time."  Cavanagh also acknowledged that the "dedicated risk management team supporting CIO was ineffective in dealing with the challenges of this portfolio. . . . [and] that CIO risk management was ineffective in its responsibility to the synthetic credit portfolio."

150.     With regard to the implementation of the new VaR model in the CIO in January

2012, Cavanagh stated that the "CIO risk team did not perform adequately when it came to the

VaR model approval and implementation."  Cavanagh made clear that those who were involved

in approving the VaR model—including Dimon—knew that it would result in a lower measure

of risk.  Cavanaugh also admitted that changing the VaR model was part of a deliberate process

that required committee approval:

> [T]he model, the approval and implementation of synthetic credit VaR model . . .
> that happened in the quarter, was poorly done. . . . [T]he final observation, is that
> the synthetic credit VaR model approval and implementation were inadequate. <u>So
> there's been some speculation here that this model was approved abruptly and by
> CIO alone, but that's not true.</u>

151.     While Cavanagh attempted to justify the Company's decision to restate its

financial results as "conservative," given that misreported marks were "generally within the bid

ask spread," the truth was that the misreported marks concealed the magnitude of the losses by

hundreds of millions of dollars, as reported by *Bloomberg* on May 31, 2012.  JPMorgan admitted

as much in an investor presentation entitled "Executive Comments" that was released on July 13

in advance of the analyst call.  That document revealed that once transferred to the Investment

Bank, the synthetic-credit portfolio increased the Investment Bank's VaR from $74 million to

$113 million, a 55% increase, even after the size of the position was materially reduced before

the transfer.

152.     Both Dimon and Cavanagh acknowledged that the problems with the CIO's

synthetic-credit portfolio did not just materialize in the first quarter of 2012, and, as Dimon

noted, "[w]e should have caught it earlier."  According to Cavanagh, for over five years the

"complexity" of the CIO's synthetic-credit portfolio had demanded greater scrutiny and risk

control measures:

I would say it's something that the complexity of synthetic credit was there over five years, and there were things that obviously we could have caught it sooner, but it didn't until the circumstances of the first quarter got us.

153. Also on July 13, the Company for the first time provided details about the size of the CIO and its contributions to the Company's bottom line. Specifically, the Company disclosed that the size of the CIO portfolio was $323 billion, compared to $199 billion in Treasury, and that the CIO contributed approximately $2 billion to the Company's total net income from 2007 to 2011, of which approximately $1.4 billion was from 2008 to 2010. As noted, several analysts had questioned whether the net income directly attributed to the CIO told the full story about the CIO's contributions to the Company, given that the CIO routinely invested capital on behalf of other divisions, which would themselves report the income earned through the CIO's investment of their capital.

154. Following the July 13 disclosures, Mike Mayo of Credit Agricole Securities criticized the Company's prior failure to disclose specific information about the CIO: "February 28 we were all here [at JPMorgan], eight hours of presentations [by the Company], over 200 slides, no mention of CIO."

155. On October 15, 2012, JPMorgan disclosed that the losses from the CIO's synthetic-credit positions increased even more. Specifically, JPMorgan reported that the losses on the $12 billion in synthetic-credit positions that remained in the CIO were approximately $449 million in the third quarter. JPMorgan refused to disclose the size of losses on the more significant and volatile $30 billion in synthetic-credit positions that were transferred to the Investment Bank. Accordingly, while a full accounting of the CIO's synthetic-credit positions has not been disclosed, the CIO's losses exceeded $6.25 billion as of October 15, and could be much higher. All told, JPMorgan's losses from the synthetic-credit portfolio were equal to at

least 40% of the $15.59 billion of net income the Company reported for the nine months ended September 30, 2012.

156.    On November 8, 2012, JPMorgan admitted in its third-quarter Form 10-Q that the CIO's internal controls during the first quarter of 2012 were materially deficient in several respects, including deficiencies in the procedures employed by the CIO Valuation Control Group in performing price verifications, and that the Company lacked adequate "formal reviews of price testing calculations" and "procedures around the establishment and monitoring of price testing thresholds."

157.    To date, several criminal and civil investigations into the CIO's trading and JPMorgan's disclosures have been announced.  After the disclosure of the SEC investigation, the Federal Reserve and the U.K. Financial Services Authority were the first to request additional information from JPMorgan concerning the CIO's trades, as reported by the *New York Times* on May 11, 2012.  On May 15, 2012, the Department of Justice opened a probe into the CIO's operations and the "London Whale" trades.  *TIME Business* reported on May 15, 2012 that the investigation is being led by the FBI's New York field office. In September, the Senate Permanent Subcommittee on Investigations opened an investigation and began interviewing current and former employees of JPMorgan, as reported by *Reuters* on September 6, 2012.

158.    In the months that followed the disclosure of the CIO's losses, almost all of the relevant players in the CIO's trading losses were terminated or left JPMorgan.  On October 1, 2012, having already jettisoned Drew, Macris, and Martin-Artajo, and following the departure of the "London Whale" Iksil himself, JPMorgan announced that Irene Tse, who headed the CIO's New York office from early 2011 and often complained about the levels of risk in the CIO's London office, was departing to run her own hedge fund.  Around that same time, Barry Zubrow,

the Chief Risk Officer, resigned from the Company. Finally, on October 10, 2012, Douglas Braunstein, JPMorgan's CFO since 2010, stepped down.

## V.     FALSE AND MISLEADING STATEMENTS

159.     During the Class Period, Defendants made materially false and misleading statements about (1) the CIO's purported role as a risk-management unit, which concealed its role as an aggressive proprietary trading desk; (2) JPMorgan's supposedly rigorous risk-management practices; (3) JPMorgan's financial results; and (4) the CIO's trading activities during 2012, when its massive synthetic-credit portfolio incurred huge net losses.

### A.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ABOUT THE CIO

160.     Throughout the Class Period, Defendants made numerous false statements about the CIO's role in the Company, consistently depicting the CIO as performing a conservative risk-management function similar to a typical bank treasury department. Defendants did not disclose that the CIO was actually engaged in high-risk proprietary trading that was not intended to hedge risks arising from the Company's other businesses.

161.     On February 24, 2010, the first day of the Class Period, JPMorgan filed its annual report on Form 10-K for the year ended December 31, 2009 (the "2009 Form 10-K") with the SEC. The 2009 Form 10-K was signed by Defendants Dimon and Cavanagh.

162.     The 2009 Form 10-K made the following representations about the CIO:

   a) "The Chief Investment Office is primarily concerned with managing structural market risks which arise out of the various business activities of the Firm. These include structural interest rate risk, and foreign exchange risk."

   b) "[T]he Chief Investment Office manage[s] capital, liquidity, interest rate and foreign exchange risk and the investment portfolio for the Firm."

   c) "Overlaying the line of business risk management are four corporate functions with risk management-related responsibilities, including the

Chief Investment Office, Corporate Treasury, Legal and Compliance and Risk Management."

163.     These statements regarding the CIO in JPMorgan's 2009 Form 10-K were materially false and misleading because, by the end of 2009, the CIO was not "primarily concerned" with managing risk.  To the contrary, as CIO executive David Olson reported to *Bloomberg* (¶46), the CIO was a proprietary trading unit that created substantial risk in order to "ramp up the ability to generate profit for the firm" in accordance with "Jamie's new vision." Specifically, as set forth above:

   a) Based on Dimon's "new vision" for the CIO, Drew staffed the CIO with traders known for their proprietary trading expertise and aggressive risk taking.  ¶¶46-49. These traders lacked risk management experience.

   b) With the full knowledge and consent of Dimon and Drew, the CIO's proprietary traders made enormous speculative wagers, including bets on subprime mortgages ($1 billion profit), government bailouts ($1 billion loss) and foreign currency ($300 million loss).  ¶¶67-73.  Witnesses described those trades as proprietary bets that were not made to hedge existing risks.

   c) The CIO amassed an enormous, extraordinarily risky, illiquid portfolio of synthetic-credit derivatives, which was also a proprietary bet, not a hedge.  ¶¶74-81.  Indeed, Defendant Dimon later admitted the synthetic-credit portfolio was extremely "risky," contained "complex and hard-to-manage risks," and, as Cavanagh explained, had "numerous embedded risks that the team did not understand, and were not equipped to manage." ¶147.  Bruno Iksil, with the knowledge and consent of Dimon and Drew, developed that position using "relative value investing," which is a proprietary trading strategy, not a risk management strategy.  ¶74.

   d) The CIO's synthetic credit portfolio did not serve any risk mitigation function. Instead, the risk generated by that portfolio was so great that, by the end of 2009, GAAP required JPMorgan to establish a $2 billion to $4 billion liquidity reserve, which the Company refused to do.  As alleged above, the fact that JPMorgan executives determined that the position required a reserve establishes that the position was not a hedge of existing risks.  ¶¶80-81.

   e) Dimon admitted after the Class Period that the CIO lacked "the people, the expertise, the capacity, the trading platform, the market franchise to effectively trade and manage" the synthetic credit portfolio.  As Dimon admitted after the Class Period, the synthetic-credit portfolio did not belong in the CIO, and it was

transferred to the Investment Bank because, unlike the CIO, the Investment Bank had the ability to effectively manage those positions.  ¶¶142, 145.

f)  Cavanagh has admitted that the proprietary trading in the CIO was inconsistent with the risk management operations that were purportedly the "primar[y] concern" of the CIO, stating with regard to the "complexity of synthetic credit" in the CIO that "the overall mistake was allowing something that wasn't like the rest of the [Asset Liability Management] type of activities to get housed inside CIO." ¶149.

g)  To facilitate the CIO's proprietary trading, Drew removed stop-loss limits and never established "granular" risk controls for the synthetic credit portfolio, distinguishing it from other JPMorgan units.  ¶¶64-66, 147-49.

h)  Trading on the scale the CIO pursued – with positions as large as $200 billion on credit derivatives and $150 billion on asset-backed securities (including $20 billion just on U.K. residential mortgage securities), with profits and losses as big as $1 billion – was possible only because Drew had eliminated stop-loss limits for trades in the CIO and the Company had never implemented "granular" limits on specific positions within the CIO.  ¶¶64-66, 100, 147.  The scale of those transactions is emblematic of high-stakes proprietary trading, rather than risk management.

i)  The CIO's proprietary trades generated a significant portion of the Company's net income during the Class Period, which was not separately disclosed to investors. ¶¶67-73, 153, 234.  The fact that the CIO accounted for such a substantial portion of the Company's net income is compelling evidence that the CIO was not a risk management tool, but one designed to generate substantial profit.

164.    The 2009 Form 10-K also specifically misrepresented the investments made by the CIO, describing those investments as hedges used to manage existing risks.  Specifically, in the context of explaining the CIO's risk management function, the 2009 Form 10-K represented that the "value at risk" or "VaR" for the CIO did not reflect additional risk to which JPMorgan was exposed, stating:  "The CIO VaR includes positions, primarily in debt securities and credit products, used to manage structural risk and other risks, including interest rate, credit and mortgage risks arising from the Firm's ongoing business activities."

165.    The statement that the CIO took positions to "manage" or hedge existing risks was materially false and misleading because, as explained above in ¶¶43-49 and ¶¶67-73, the

CIO operated as a proprietary trading unit that took positions in order to generate profits – not to manage risks.  This statement not only deceived investors regarding the true function and investment activities of the CIO, but also misled investors regarding the meaning of the CIO's VaR.  Specifically, by telling investors that the CIO's VaR reflected positions taken to "manage" risk, the Company created the false impression that losses incurred on those positions would be offset by gains on existing positions elsewhere in the Company.  In other words, JPMorgan told investors that the CIO's VaR did not represent the amount of money the Company could actually lose as a result of trading in the CIO, on a net basis.  In truth, as explained above, the CIO's positions were speculative bets that generated risk, rather than hedges designed to "manage" risk incurred by other departments within JPMorgan.  Moreover, investors were not told that a significant portion of the CIO's VaR – more than 50% at some points during the Class Period – was generated by the CIO's extremely risky portfolio of illiquid synthetic-credit derivatives.

166.   Defendants continued to misrepresent the nature and function of the CIO throughout the Class Period.  The same false and misleading statements set forth above in ¶162 describing the CIO as being "primarily concerned" with risk management and that the CIO's VaR reflected positions that were used to "manage" risk were repeated or specifically incorporated by reference in the following documents filed with the SEC by JPMorgan during the Class Period:

- Definitive Proxy Statement on Form DEF 14A, dated March 31, 2010 (the "2010 Proxy Statement");

- quarterly report on Form 10-Q for the three-month period ended March 31, 2010 filed with the SEC on May 10, 2010 (the "1Q 2010 Form 10-Q");

- quarterly report on Form 10-Q for the three-month period ended June 30, 2010, filed with the SEC on August 6, 2010 (the "2Q 2010 Form 10-Q");

- quarterly report on Form 10-Q for the three-month period ended September 30, 2010 filed with the SEC on November 9, 2010 (the "3Q 2010 Form 10-Q");

- annual report on Form 10-K for the year ended December 31, 2010 filed with the SEC on February 28, 2011 (the "2010 Form 10-K"), signed by Dimon and Braunstein;

- Definitive Proxy Statement on Form DEF 14A filed with the SEC on April 7, 2011 (the "2011 Proxy Statement");

- quarterly report on Form 10-Q for the three month-period ended March 31, 2011 filed with the SEC on May 6, 2011 (the "1Q 2011 Form 10-Q");

- quarterly report on Form 10-Q for the three-month period ended June 30, 2011 filed with the SEC on August 5, 2011 (the "2Q 2011 Form 10-Q"); and

- quarterly report on Form 10-Q for the three-month period ended September 30, 2011 filed with the SEC on November 4, 2011 (the "3Q 2011 Form 10-Q").

167.    In addition, the Company repeated the misrepresentation that the type of investments included in the CIO VaR as those that were used to "manage structural risk and other risks" in an Earnings Release Financial Supplement filed with the SEC each quarter during the Class Period as an exhibit to a Form 8-K.  The statements in the Financial Supplements representing that the CIO's VaR consisted of investments that were used to "manage" risk were materially false and misleading for the reasons set forth in ¶165 above.

168.    The description of the CIO as a risk management unit, as well as the description of the investments comprising the CIO's VaR as those used to "manage" risk, that were repeated in JPMorgan's SEC filings throughout 2010 and 2011 were false and misleading for the additional reason that the scope of the CIO's highest-risk positions continued to expand during the Class Period.  Specifically:

a)  A detailed internal report prepared in early 2010 by a senior CIO executive documented that, because the synthetic-credit portfolio was illiquid, the Company was required to establish a reserve of as much as $4 billion.  As the synthetic-credit portfolio grew larger during 2010 and 2011, the size of the required reserve increased commensurately. ¶¶78-81.

b)  In 2010 and 2011, the risk presented by the synthetic-credit portfolio caused the CIO's VaR to increase.  Unbeknownst to the market, the increase in the CIO's VaR reflected the continued growth of the synthetic-credit portfolio throughout

2010 and 2011. Over that period, the wagers on corporate debt that comprised that portfolio grew to over $200 billion – what Cavanagh later admitted was a "perilous size with numerous embedded risks." ¶¶97, 147. As a result, at times during the Class Period, the CIO's VaR exceeded that of the entire Investment Bank and the VaR for the synthetic credit portfolio alone was as large as the VaR of the entire Investment Bank. ¶¶82-86. The position grew so large that other credit-derivatives traders named the unknown figure behind the trades the "London Whale." ¶¶98-99.

c) By mid-2011, the risk level in the CIO had grown so severe that the most senior officers of the Company, including Dimon, recognized the need to manipulate the CIO's reported VaR in order to conceal that risk from investors. Accordingly, JPMorgan began to develop a new VaR model specifically designed to reduce the reported VaR of the CIO. ¶¶91-93. The development of that model was approved by Defendant Dimon, who authorized the implementation of the new model in January 2012 – instantly cutting the CIO's reported VaR in half.

d) Dimon continued to protect the secret use of the CIO for proprietary trading by removing executives who demanded greater risk controls, including Weiland, the Chief Risk Officer of the CIO, whom JPMorgan demoted in 2011. ¶102. Throughout 2010 and 2011, Weiland warned Dimon and Drew about the risk presented by the CIO's proprietary trading. ¶¶77, 91-92. When, in 2011, Weiland undertook an effort "to improve the risk limit structure for the CIO," including by implementing the risk limits that JPMorgan publicly represented to investors were already in place, Drew removed him as Chief Risk Officer of the CIO – the highest risk officer in what was purportedly the Company's most important risk management unit. ¶102.

e) By late 2011, the Company's most senior officers – including Dimon and Drew – approved a high-risk plan to rapidly expand the synthetic credit portfolio's positions. ¶¶94-97. As Cavanagh later admitted, this trading strategy was "poorly conceived, reviewed and executed." ¶147.

## B. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS CONCERNING THE COMPANY'S RISK MANAGEMENT STRUCTURE AND ITS ABILITY TO ADEQUATELY MONITOR AND CONTROL RISK

169. In addition to the specific statements concerning the CIO's role and function, Defendants made numerous false statements throughout the Class Period about the Company's risk management practices, which represented that JPMorgan had a robust, comprehensive risk-management system that included the use of limits to measure and control the Company's risks.

1.      **Misrepresentations In the 2009 Form 10-K and Documents that Incorporated the 2009 Form 10-K by Reference**

170.    In the 2009 Form 10-K and in the Company's subsequently filed SEC reports that incorporated statements from the 2009 Form 10-K, the Company described JPMorgan's risk-management framework, which the Company noted was "critical" to its financial condition and profitability:

> The Firm's risk management framework and governance structure are intended to provide comprehensive controls and ongoing management of the major risks inherent in its business activities.  It is also intended to create a culture of risk awareness and personal responsibility throughout the Firm. The Firm's ability to properly identify, measure, monitor and report risk is critical to both its soundness and profitability.

171.    JPMorgan further told investors that the "risk management framework" was enforced through the use of defined risk limits that all business units were required to adhere to, and that were closely monitored by senior management:

> "The [Company's] risk management policies and procedures incorporate risk mitigation strategies and include <u>approval limits</u> by customer, product, industry, country and business.  <u>These limits are monitored on a daily, weekly and monthly basis, as appropriate</u>."

> "<u>Market risk is controlled primarily through a series of limits</u>.  Limits reflect the Firm's risk appetite in the context of the market environment and business strategy."

With regard to those limits, the 2009 Form 10-K also stated:

> In setting limits, the Firm takes into consideration factors such as market volatility, product liquidity, business trends and management experience.  Market risk management regularly reviews and updates risk limits.  <u>Senior management, including the Firm's Chief Executive Officer and Chief Risk Officer, is responsible for reviewing and approving risk limits on an ongoing basis</u>.  The Firm maintains different levels of limits.  Corporate-level limits include VaR and stress limits.  Similarly, line-of-business limits include VaR and stress limits and may be supplemented by loss advisories, nonstatistical measurements and instrument authorities. <u>Businesses are responsible for adhering to established limits, against which exposures are monitored and reported.  Limit breaches are reported in a timely manner to senior management, and the affected business</u>

<u>segment is required to reduce trading positions or consult with senior management on the appropriate action.</u>

The Company also represented in the 2009 Form 10-K that it measured risk using "models and related assumptions [that] are routinely reviewed with the goal of ensuring that the Firm's risk estimates are reasonable and reflect underlying positions." According to JPMorgan, "[t]hese measures <u>provide granular information on the Firm's market risk exposure</u>" and "[t]hey are aggregated by line of business and by risk type, and <u>are used for monitoring limits</u>, one-off approvals and tactical control."

172.   These statements regarding the Company's risk management framework and practices were materially false and misleading for the following reasons:

a) When the Company announced on July 13, 2012 that it was restating its financial results, the Defendants admitted that the synthetic-credit portfolio was never subject to appropriate risk management and protocols, and the failure of the Company's risk management framework caused the massive losses incurred by the CIO. Specifically, Defendant Cavanagh stated that "CIO risk management was ineffective in its responsibility to the synthetic credit portfolio" due, in part, to a "lack of quality resources and a less robust risk committee." Cavanagh concluded that "the CIO risk failed to meet reasonable expectations" and "<u>never developed a sufficient understanding of the risk of the portfolio</u>…." ¶¶147-49.

b) As Cavanagh ultimately admitted on July 13, 2012, the CIO did not have "a well-designed limit structure around the [synthetic-credit] portfolio." According to Cavanagh, "there were no risk limits specific to the synthetic credit portfolio." Specifically, Cavanagh admitted that the CIO had "<u>no limits</u>" in place to monitor the "size, asset type or risk factor[s] for [the] Synthetic Credit Portfolio" during the Class Period. ¶¶147-49.

c) Cavanagh further admitted that the Investment Bank did use such limits on similar investments during the Class Period, and "had the synthetic credit portfolio been risk-managed under equivalent standards, it would not have experienced the unchecked transformation and growth that led to the losses." The Company further admitted on July 13, 2012 that the CIO's synthetic-credit portfolio had "required a whole different type of risk management <u>for nearly five years</u>," yet the CIO failed to employ any of the necessary risk-management measures during the Class Period. ¶¶147-49.

d) The CIO also failed to employ stop-loss limits that would have required traders to exit positions once losses reached a pre-determined threshold. Indeed, by the start of the

Class Period, the $20 million stop-loss limits that were in place at the CIO were abandoned in order to allow it to engage in extremely speculative trading. ¶¶61-66.

e)  Ignoring the repeated demands of senior JPMorgan executives, Dimon refused to implement a Risk Exploration and Transparency ("RET") unit—a team staffed with specially trained risk analysts—within the CIO, even though RET units were employed to improve risk management, oversight and transparency in other JPMorgan units. ¶¶61-62.

f)  The Company rejected repeated requests for additional risk controls and transparency for the CIO by senior executives, including Winters and Black, and demoted or terminated those executives for seeking improved risk controls. Punishing executives who advocated for stronger risk management was a means of stifling dissent, and therefore contrary to the "culture of risk awareness and personal responsibility" that the Company stated it sought to create. ¶¶62, 102.

g)  The Company prevented risk management oversight of the CIO, excluding executives from other business units from the CIO's risk committee meetings, even though such meetings in other JPMorgan units were open to executives across the Company. As a result, according to Cavanagh, "the level of scrutiny of the CIO did not evolve commensurate with its increased complexity" and the Company "ended up with a level of scrutiny that fell short of the high standards we apply to our client businesses especially as the complexity increased." ¶¶63, 147-49.

h)  The Company developed a proprietary trading desk within the CIO because the CIO was not subject to regulatory oversight, and the Company repeatedly assured regulators that the CIO's activities did not expose the Company to risk to ensure that regulators would not scrutinize the CIO's operations. ¶¶50-51.

i)  Dimon crystallized the risk management failure of permitting the CIO to engage in proprietary trading using exotic credit derivatives when he later explained that the synthetic-credit portfolio had been moved from the CIO to the Investment Bank because only the Investment Bank had "the people, the expertise, the capacity, the trading platform, the market franchise to effectively trade and manage" that portfolio. Cavanagh confirmed that the CIO was unable to manage that portfolio because it had "numerous embedded risks that the team did not understand and were not equipped to manage." As Cavanagh explained, "the overall mistake was allowing something that wasn't like the rest of the [Asset Liability Management] type of activities to get housed inside CIO." ¶¶97, 147.

j)  The few limits in place at the CIO "applied to more aggregated portfolios, often at the level of CIO, which was clearly inadequate" according to Cavanagh, who described one of those few limits as "an unsophisticated tool for measuring risk" and was "of little use as a control measure." ¶¶147-49.

k)  Accordingly, the representation that the Company relied on "granular information" and "models" to "monitor limits" was false because, as Cavanagh later admitted, "risk

limits in CIO were not granular enough" and "what was needed was granular position level limits for the [synthetic-credit] portfolio itself."  ¶¶147-49.

173.    In addition to the statements regarding risk management that were repeated from the 2009 Form 10-K, the 2010 Proxy Statement also stated the following with respect to JPMorgan's risk management:

> JPMorgan Chase has in place a robust risk management discipline that captures, monitors, and controls the risks created by its business activities.  The goal is not only to manage the dynamic risks of the Firm, but also to create a culture of risk awareness and personal accountability.  Any substantial introduction of emerging risks or increase in risks routinely taken would be largely controlled by risk limits in place or identified through the frequent risk report that occurs throughout the Firm.  This risk discipline seeks to ensure that the potential for excessive risk-taking by any individual, group, or business is controlled, regardless of motivation.

174.    These statements were materially false and misleading because, as alleged in ¶¶147-49, JPMorgan did not have a robust risk management discipline in place and, by Defendants' own admission, the CIO and the synthetic-credit portfolio did not have adequate (or any) risk limits in place.  Additionally, the statements in the 2010 Proxy were materially false and misleading because the growing synthetic-credit portfolio "increas[ed the] risks routinely taken" yet was not "controlled by risk limits."  Indeed, JPMorgan later admitted that no limits existed to control the "size, asset type or risk factor[s]" in the synthetic-credit portfolio.  ¶¶147-49.

### 2.    Material Misrepresentations Contained in the 2010 Form 10-K and Documents that Incorporated the 2010 Form 10-K by Reference

175.    The Company's 2010 Form 10-K and the Company's subsequently filed SEC reports that incorporated statements from the 2010 Form 10-K, repeated the representations concerning risk management in the 2009 Form 10-K, and actually expanded upon the Company's description of its "holistic" approach to risk management.  Specifically, the 2010 Form 10-K stated:

The Firm's risk management framework and governance structure are intended to provide comprehensive controls and ongoing management of the major risks taken in its business activities.  <u>The Firm employs a holistic approach to risk management to ensure the broad spectrum of risk types are considered in managing its business activities</u>.  The Firm's risk management framework is intended to create a culture of risk awareness and personal responsibility throughout the Firm where collaboration, discussion, escalation and sharing of information is encouraged.

* * *

The Firm's ability to properly identify, measure, monitor and report risk is critical to both its soundness and profitability.

176.   The 2010 Form 10-K also tracked the representations concerning the use of limits to manage risk that appeared in the 2009 Form 10-K as discussed above in ¶171.  Specifically, the 2010 Form 10-K stated that:

The Firm's risk management policies and procedures incorporate risk mitigation strategies and include approval limits by customer, product, industry, country, and business.  These limits are monitored on a daily, weekly and monthly basis, as appropriate.

Market risk is controlled primarily through a series of limits.  Limits reflect the Firm's risk appetite in the context of the market environment and business strategy.

With regard to the use of limits to manage risk, the 2010 Form 10-K further stated that:

In setting limits, the Firm takes into consideration factors such as senior management risk appetite, market volatility, product liquidity, accommodation of client business and management experience. Market risk management regularly reviews and updates risk limits. <u>Senior management, including the Firm's Chief Executive Officer and Chief Risk Officer, is responsible for reviewing and approving certain risk limits on an ongoing basis</u>. The Firm maintains different levels of limits. Corporate-level limits include VaR and stress limits. Similarly, line-of-business limits include VaR and stress limits and may be supplemented by loss advisories, nonstatistical measurements and profit and loss drawdowns. <u>Businesses are responsible for adhering to established limits, against which exposures are monitored and reported. Limit breaches are reported in a timely manner to senior management, and the affected line-of-business is required to reduce trading positions or consult with senior management on the appropriate action</u>.

In addition, like the 2009 Form 10-K, the Company's 2010 Form 10-K falsely represented that the Company measured risk using "models and related assumptions [that] are routinely subject to internal model review, empirical validation and benchmarking with the goal of ensuring that the Firm's risk estimates are reasonable and reflective of the risk of the underlying positions." According to JPMorgan, "[t]hese measures provide granular information on the Firm's market risk exposure" and "[t]hey are aggregated by line-of-business and by risk type, and are used for tactical control and monitoring limits."

177.  The 2011 Proxy Statement, 1Q 2011 Form 10-Q, 2Q 2011 Form 10-Q, and 3Q 2011 Form 10-Q specifically incorporated by reference the misrepresentations regarding JPMorgan's risk management that appeared in the 2010 Form 10-K, as set forth in ¶¶175-76.

178.  These statements in the 2010 Form 10-K, and the documents that incorporated the 2010 Form 10-K by reference, were materially false and misleading for the same reasons alleged above in ¶172.  In addition, these statements were materially false and misleading because:

a) Throughout 2011, the CIO's VaR continued to spike such that, by the middle of that year, Dimon approved a plan to manipulate the CIO's VaR.  Indeed the CIO's synthetic-credit portfolio was a "perilous size" according to Cavanagh, and included wagers on more than $200 billion of corporate and other debt.  Accordingly, with Dimon's approval, the Company at that time began to develop a new VaR model for the CIO that would cut the unit's reported VaR in half.  ¶¶45, 91-93, 147.

b) The synthetic-credit portfolio became so large, illiquid and dangerous that other credit derivatives traders nicknamed Iksil the "London Whale."  ¶¶98-99, 115.

c) By no later than mid-2011, Weiland, the Chief Risk Officer of the CIO and the most senior risk officer of the division JPMorgan claimed was its most important risk management unit, undertook an effort "to improve the risk limit structure for the CIO," including by attempting to implement the risk limits that JPMorgan publicly represented to investors were already in place.  Weiland's efforts were rejected by Dimon and Drew, who removed Weiland from his position and demoted him because he sought to rein in the CIO's high-risk trading.  ¶¶92, 102.  The Company replaced Weiland with Irv Goldman, a trader with no experience in either risk management or synthetic-credit derivatives, who was unqualified to monitor the trading activities of the CIO's synthetic-credit portfolio.  ¶102.

d) Throughout 2011, as the synthetic-credit portfolio continued to increase in size and illiquidity, Dimon and Drew approved a trading strategy that drastically increased the size, complexity and risk of that portfolio. ¶94. That strategy ran counter to the risk management protocols described to investors in the SEC filings discussed above. Indeed, by the end of 2011, Iksil's credit derivative positions had ballooned to over $200 billion. ¶45.

e) Rather than using VaR as one of the limits to monitor and control risk, the Company ignored the clear warning signs presented by the growing VaR for the CIO and the synthetic-credit portfolio. ¶¶103-05. Indeed, the Company failed to use the VaR as a risk management tool even when Iksil's VaR matched that of the entire Investment Bank. ¶84. When that VaR became so large that it threatened to reveal the truth about the CIO, JPMorgan's most senior officers, including Dimon, approved the manipulation of the VaR model to conceal the truth. ¶¶91-93.

## C.   DEFENDANTS' FALSE STATEMENTS ABOUT JPMORGAN'S FINANCIAL RESULTS

179.   JPMorgan refused to establish the multi-billion dollar reserve that was needed to guard against the illiquidity risk presented by the CIO's synthetic-credit portfolio. The Company did not establish a reserve even after a senior executive prepared a detailed memorandum in early 2010 documenting the need for a reserve of $2 billion to $4 billion which was discussed at the "CFO-level" or when, as Defendant Cavanagh described it, that portfolio grew to a "perilous size."

180.   The Company's deliberate and knowing failure to establish the required reserve, in contravention of the memorandum documenting the need for the reserve, caused JPMorgan to materially overstate its net income (as well as its earnings per share) throughout the Class Period. Specifically, these financial results were filed with the SEC as an exhibit to a Form 8-K on April 14, 2010, July 15, 2010, October 13, 2010, January 14, 2011, April 13, 2011, July 14, 2011, October 13, 2011, January 13, 2012, and April 13, 2012. These same financial results were also discussed on earnings conference calls on those same dates by Defendant Dimon and Defendants Cavanagh and Braunstein during the respective tenures as CFO. In addition, the Company repeated these financial results in quarterly and annual reports filed with the SEC on Forms 10-Q

and Forms 10-K as set forth above in ¶166.  These financial results were materially false and misleading due to the Company's failure to establish the required reserve, as follows:

| Reporting Period | Reported Net Income (in millions) | Maximum True Income (in millions) | Minimum Overstatement |
|---|---|---|---|
| Fourth Quarter 2009 | $3,278 | $1,278 | 156% |
| Fiscal Year 2009 | $11,728 | $9,728 | 21% |
| First Quarter 2010 | $3,326 | $1,326 | 151% |
| Second Quarter 2010 | $4,795 | $2,795 | 72% |
| Third Quarter 2010 | $4,418 | $2,418 | 83% |
| Fourth Quarter 2010 | $4,831 | $2,831 | 71% |
| Fiscal Year 2010 | $17,370 | $15,370 | 13% |
| First Quarter 2011 | $5,555 | $3,555 | 56% |
| Second Quarter 2011 | $5,431 | $3,431 | 58% |
| Third Quarter 2011 | $4,262 | $2,262 | 88% |
| Fourth Quarter 2011 | $3,728 | $1,728 | 116% |
| Fiscal Year 2011 | $18,976 | $16,976 | 12% |
| First Quarter 2012 | $5,383 | $3,383 | 59% |

181.    These overstatements had a dramatic impact on the Company's reported financial results, overstating reported net income by over 10% in each relevant reporting period.

182.    As the size and illiquidity of the synthetic-credit portfolio increased during the Class Period, the size of the needed reserve also increased, causing a commensurate increase in the Company's overstatement of its financial results.  Accordingly, the overstatement reflected in the above chart is the <u>minimum</u> amount by which the Company overstated its net income, assuming that it should have taken only the minimum reserve of $2 billion required at the start of the Class Period.

183.    In each of the Company's Forms 10-Q and 10-K reporting financial results during the Class Period, the Company stated that its financial results were prepared in accordance with GAAP.  That representation was materially false and misleading because the Company's failure to establish a liquidity reserve for the CIO's synthetic-credit portfolio violated GAAP.  As a result, the reported net income and earnings per share discussed above were not properly

calculated in accordance with GAAP.  Indeed, under well-established accounting provisions, including Accounting Standards Codification ("ASC") ASC 820-10-35-6C, such a reserve was required even if JPMorgan had no intention of selling the CIO's synthetic-credit derivatives.

### D.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS CONTINUED IN 2012 AS THE COMPANY EMPLOYED MULTIPLE SCHEMES TO CONCEAL THE CIO'S LOSSES

184.   As alleged in detail in ¶¶91-96, by no later than 2011 the CIO's synthetic-credit portfolio was in crisis.  By that time, the Company was developing a new VaR model to conceal the growing risk in the CIO, and Dimon and Drew had approved a plan to "balance" the CIO's synthetic-credit portfolio by expanding investments in synthetic-credit derivatives.  In January 2012, the new VaR model was implemented and Dimon and Drew pressed their lobbying campaign against an implementation of the Volcker Rule that would have prevented them from using the CIO for proprietary trading.  However, notwithstanding the mounting crisis in the CIO and the increasingly desperate measures being taken by the Company to conceal that crisis, Defendants persisted in misrepresenting to investors the CIO's role as a risk-management unit, JPMorgan's overall risk-management system, and the Company's financial results.   When analysts raised questions about the CIO's synthetic-credit portfolio, Defendants misled investors by denying the existence of any problem in the CIO.  The Company has now admitted that many of the assurances and statements it made to investors in 2012 were materially false and misleading.

185.   On January 13, 2012, JPMorgan announced "full year 2011 record net income of $19 billion."   That announcement was made in a press release disclosing the Company's financial results for the fourth quarter and full year of 2011 (the "4Q 2011 Press Release").  That press release was filed with the SEC pursuant to Form 8-K, which also included (i) the 4Q Financial Supplement and (ii) a copy of the presentation slides JPMorgan provided to investors

and analysts (the "4Q 2011 Earnings Presentation Slides").  JPMorgan also held a conference call with analysts that day to discuss its financial results (the "4Q 2011 Earnings Conference Call").  Defendants Dimon and Braunstein participated in the 4Q 2011 Earnings Conference Call.  There was no mention of the CIO on that conference call.

186.     Specifically, the 4Q 2011 Press Release reported that the Company earned $4.48 per share in 2011, up from $3.96 per share in 2010.  For the fourth quarter of 2011, JPMorgan reported net income of $3.7 billion and earnings per share of $0.90.  The 4Q 2011 Financial Supplement and 4Q 2011 Earnings Presentation Slides included the financial results set forth above in ¶180.  During the 4Q 2011 Earnings Conference Call, Defendant Braunstein announced those same financial results.

187.     As explained above in ¶¶180-82, the full year and fourth quarter net income and earnings per share for the Company that JPMorgan reported on January 13, 2012, were materially overstated because the Company had not established a liquidity reserve for the CIO's synthetic credit-portfolio.  In reality, even assuming JPMorgan took only a $2 billion reserve for the portfolio, JPMorgan should have reported a profit of $1.7 billion for the fourth quarter 2011—or less than half of what it actually reported.

188.     In addition to overstating its financial results, the 4Q 2011 Financial Supplement represented that the Company's financial results were prepared in accordance with GAAP.  That representation was materially false and misleading because the Company's failure to establish a liquidity reserve for the CIO's synthetic-credit portfolio violated GAAP.  As a result, the reported net income and earnings per share discussed above were not properly calculated in accordance with GAAP, as explained in ¶183, above.

189.    On February 29, 2012, JPMorgan filed its annual report on Form 10-K for 2011 (the "2011 Form 10-K") with the SEC.  The 2011 Form 10-K was signed by Defendants Dimon and Braunstein, among others.  The 2011 Form 10-K repeated the "record" financial results for the full year and fourth quarter 2011 that were first reported on January 13, 2012. Those statements, specifically the reported net income for the Corporate Division and Company and the Company's earnings per share were materially false and misleading for the reasons set forth in ¶¶180-82.

190.    In the 2011 Form 10-K, the Company continued to misrepresent the nature and purpose of the CIO.  Specifically, the 2011 Form 10-K repeated the following statements about the CIO that were previously made in the Company's 2009 and 2010 Forms 10-K:

a)   "CIO is primarily concerned with managing structural market risks which arise out of the various business activities of the Firm."

b)   "The Chief Investment Office [is] responsible for measuring, monitoring, reporting and managing the Firm's liquidity, interest rate and foreign exchange risk, and other structural risks."

c)   "Overlaying line of business risk management are four corporate functions with risk management-related responsibilities:  Risk Management, the Chief Investment Office, Corporate Treasury, and Legal and Compliance."

191.    That description of the CIO's purpose and function in the 2011 Form 10-K was materially false and misleading for the reasons set forth above in ¶163 and ¶168, and for the additional reasons listed below.  Indeed, by the end of 2011, the CIO itself had become one of the primary sources of risk at JPMorgan.  Rather than using the CIO to manage risks, the Defendants were pursuing increasingly desperate measures to conceal the risk posed by the CIO's synthetic-credit portfolio.  Accordingly, in addition to the facts set forth in ¶163 and ¶168 that rendered the same description of the CIO in the 2009 and 2010 Forms 10-K materially false and misleading, these statements in the 2011 Form 10-K were also false because:

a) The CIO breached its VaR limits by no later than January 2012 due to the synthetic credit portfolio, which evidenced that that the CIO was engaged in high-risk proprietary trading rather than risk management. ¶¶100-04.

b) Dimon approved the implementation of a new VaR model for the synthetic-credit portfolio that was intentionally designed to artificially lower the VaR in that portfolio and conceal the CIO's proprietary trading. In January 2012, a month before the 2011 Form 10-K was issued, JPMorgan implemented the new VaR model in the CIO specifically in order to cut the CIO's VaR for the 1Q 2012 in half. ¶¶91-93, 104-05.

c) At the same time the Company was implementing the new VaR model, Iksil was working to implement a high-risk strategy – approved by Dimon and Drew – to expand the CIO's position in synthetic-credit derivatives. As JPMorgan admitted a few months later, that strategy "was flawed, complex, poorly reviewed, poorly executed, and poorly monitored"; "it was un-vetted, it shouldn't have been done." That strategy was implemented because the CIO could not reduce the position without incurring massive losses. ¶¶76, 94, 123.

d) Also during the first quarter 2012, when the 2011 Form 10-K was issued, CIO traders were manipulating the value of the synthetic-credit portfolio by heavily trading the indices to which that portfolio was linked – "painting the tape" – to conceal the increasing losses in the CIO's largest position. ¶¶107-09.

e) Because "painting the tape" was insufficient to fully conceal those losses, CIO traders simply falsified the value of that position, mis-marking the value of the CIO's synthetic-credit derivative holdings by hundreds of millions of dollars despite their knowledge of contrary market prices for those positions. ¶¶109-11.

192. The 2011 Form 10-K also continued to describe the CIO's trades as positions used to manage risks. Specifically, in the context of explaining the CIO's risk management function, the 2011 Form 10-K stated that: "The CIO VaR includes positions, primarily in debt securities and credit products, used to manage structural and other risks including interest rate, credit and mortgage risks arising from the Firm's ongoing business activities."

193. For the reasons detailed in ¶¶163 and 168, the above description of the CIO's trades as used to "manage structural and other risks" was materially false and misleading because the CIO was trading for profit, and not to manage risk. Indeed, by the end of 2011 the majority of the CIO's VaR was attributable to the CIO's synthetic-credit portfolio, a proprietary bet that was not used to manage risk, and was in fact extraordinarily risky. ¶¶86, 91-93, 97.

194.    The 2011 Form 10-K made additional misrepresentations about the CIO's VaR. Specifically, the 2011 Form 10-K stated that VaR was a "consistent" and "comparable" risk metric used to compare risks across business units.  Specifically, the 2011 Form 10-K stated:

> JPMorgan Chase utilizes VaR, a statistical risk measure, to estimate the potential loss from adverse market moves.  Each business day, as part of its risk management activities, the Firm undertakes a comprehensive VaR calculation that includes the majority of its material market risks.  <u>VaR provides a consistent cross-business measure of risk profiles and levels of diversification and is used for comparing risks across businesses and monitoring limits</u>.  These VaR results are reported to senior management and regulators, and they are utilized in regulatory capital calculations.

195.    Similarly, the 2011 Form 10-K stated that the "Firm calculates VaR to estimate possible economic outcomes for its current positions using historical simulation, which <u>measures risk across instruments and portfolios in a consistent, comparable way</u>."

196.    These statements regarding the "consistency" of VaR across units and the use of VaR to measure and compare risks across businesses and portfolios were materially false and misleading because, by early January 2012, Defendants were manipulating the CIO's VaR to conceal the significant and mounting risk presented by the synthetic-credit portfolio, as explained in ¶¶91-93.  Because the new VaR model was implemented only in the CIO, and not in the Investment Bank or other units, VaR did not provide a "consistent, comparable" measure of risk "across businesses."  Moreover, the representation that the Company used VaR to "estimate the potential loss" was materially false due to the implementation of a new VaR model designed to artificially lower the VaR and conceal risk, rather than accurately estimate potential losses. Despite the unprecedented implementation of a new VaR model designed specifically to decrease VaR only in the CIO, the Company omitted any discussion of the VaR model change in the 2011 Form 10-K, even though the 2011 Form 10-K included a "Subsequent [E]vents" section

which purported to disclose any and all material events that had taken place since December 31, 2011.

197.     The 2011 Form 10-K also repeated the Company's prior misstatements about JPMorgan's risk management framework and the risk limits that the Company purportedly used to measure and control risk.  Specifically, the 2011 Form 10-K repeated the description of JPMorgan's risk-management framework that appeared in the Company's 2010 Form 10-K as set forth above in ¶¶170-71, 173, 175-76.  Those statements included the misrepresentation that the Company's risk management framework was "intended to provide comprehensive controls and ongoing management of the major risks inherent in its business activities" and that the Company "employs a holistic approach to risk management" where "collaboration, discussion, escalation and sharing of information is encouraged."

198.     The 2011 Form 10-K also repeated the misrepresentations in the 2009 and 2010 Forms 10-K (*see* ¶¶170-71, 173 and 175-76) that JPMorgan used strict limits and models to manage and control risk, which were closely monitored by senior management.  Specifically, the 2011 Form 10-K once again assured investors that:

a) the Company's use of specific "risk mitigation strategies" included "<u>approval limits</u> by customer, product, industry, country and business," which were "<u>monitored on a daily, weekly and monthly basis, as appropriate</u>."

b) with regard to the use of limits used to manage risk, "<u>[m]arket risk is controlled primarily through a series of limits</u>," that "reflect the Firm's risk appetite in the context of the market environment and business strategy."

c) individual business units, including the CIO, were "responsible for adhering to <u>established limits</u>, against which exposures are monitored and reported" and that "<u>[l]imit breaches are reported in a timely manner to senior management</u>, and the affected line-of-business is required to reduce trading positions or consult with senior management on the appropriate action."

d) JPMorgan's "models and related assumptions are routinely subject to internal model review, empirical validation and benchmarking with the goal of ensuring that the Firm's risk estimates are reasonable and reflective of the risk of the underlying

positions," and that "[t]hese measures provide granular information on the Firm's market risks exposure."

   e)   the Company's market risk was "aggregated by line-of-business and by risk type, and are used for tactical control and monitoring limits."

   199.   These statements concerning the Company's risk management framework and the Company's use of risk limits to "control" risk were materially false and misleading for the reasons set forth above in ¶¶172, 174 and 178.  In addition, those statements were false and misleading because:

   a)   The Company imposed no stop-loss limits or position limits in the CIO.  ¶¶64-67.

   b)   The Company did not rely on any "granular information" or "models" to "monitor limits" in the CIO because the CIO had no such limits on specific portfolios, such as the synthetic credit portfolio, or individual trades.  ¶¶64-67, 147-49.

   c)   Cavanagh admitted in July 2012 that the CIO lacked "a well-designed limit structure" for the synthetic-credit portfolio.  As he further admitted, the few limits applicable to the CIO as a whole were "clearly inadequate," "unsophisticated" and "of little use as a control measure."  ¶¶147-49.

   d)   When those "inadequate" and "unsophisticated" limits were breached, the Company simply disregarded the breach.  Specifically, as JPMorgan later admitted, the risks posed by the CIO's synthetic credit portfolio had grown so severe that a risk limit relating to "widening credit spreads" that applied to the CIO as a whole was breached in January 2012.  Rather than "reduce" the "trading position" or take "appropriate action," as JPMorgan represented was required, the Company simply ignored the breach.  ¶¶64-67, 101-04.

   e)   Moreover, this reprieve from the CIO-wide risk limit was granted at the same time that JPMorgan had implemented a new VaR model that was specifically intended and designed to reduce the CIO's VaR and conceal the growing risk of the synthetic-credit portfolio.  ¶¶104-05.

   f)   Furthermore, in January 2012, after the credit spread limit breach had been waived, JPMorgan's firm-wide VaR limits were breached – and once again, JPMorgan ignored it.  Instead, Dimon approved yet another exception to the Company's risk limits, granting an increase to JPMorgan's firm-wide VaR limits to accommodate the CIO's growing VaR.  ¶¶101-04.

   g)   The CIO's risk management controls were so deficient that CIO traders were able to, and in fact did, manipulate synthetic credit portfolio position by "painting the tape" to conceal the losses incurred by the CIO's synthetic-credit positions.  ¶¶107-09.

h) CIO traders were able to mis-mark those positions in a manner that masked the losses incurred by the CIO by hundreds of millions of dollars.  ¶¶109-11.

200.    The 2011 Form 10-K also misrepresented the effectiveness of the Company's internal controls over financial reporting.  Specifically, the 2011 Form 10-K represented that the Company's internal disclosure controls and procedures were effective, that JPMorgan was "committed to maintaining high standards of internal control over financial reporting," and that there had been "no change in the Firm's internal control over financial reporting … that occurred during the three months ended December 31, 2011, that has materially affected, or is reasonably likely to materially affect, the Firm's internal control over financial reporting."

201.    The statements regarding the Company's internal controls were materially false and misleading because there were material weaknesses in JPMorgan's internal controls when the 2011 Form 10-K issued.  Specifically:

a) Defendant Braunstein admitted that JPMorgan had "material weakness in the CIO's internal controls."  ¶¶138-41.

b) In January 2012, JPMorgan implemented a new VaR model (in development since the middle of 2011) that was specifically designed and intended to misrepresent and understate the risk posed by the CIO's synthetic portfolio positions.  ¶¶104-05.

c) The Company ultimately admitted that its representations regarding internal controls were false, citing "questions" about the "integrity of the trader marks" in the CIO because "certain individuals may have been seeking to avoid showing the full amount of the losses in the portfolio during the first quarter," and that the CIO's traders had priced their books "aggressively."  ¶¶111, 139.

d) JPMorgan lacked even the most rudimentary controls for the CIO because CIO traders were able to manipulate the credit derivative indices they traded and unilaterally mis-mark their positions in order to hide the CIO's mounting losses.  As Braunstein later admitted, the CIO traders' marks did not reflect "where the traders thought they could exit their positions," and they were recorded and reflected in JPMorgan's financial statements without independent confirmation.  This fact is particularly striking given that, as Dimon admitted, most of the CIO's synthetic-credit portfolio positions were "traded on exchanges," and JPMorgan could have readily and easily obtained verifiable market prices that would have revealed the falsity of the traders' marks.  ¶¶138-41.

e) The fact that CIO managers and traders had discretionary authority and control to mark their own positions, and the fact that those marks were not timely or appropriately monitored by an independent valuation agent, demonstrates that JPMorgan lacked the most basic internal controls in the CIO. ¶¶138-41.

f) Given the risk posed by the CIO's synthetic credit portfolio, the veracity of the values of these positions should have been the primary focus of JPMorgan's internal control apparatus. Nonetheless, despite the fact that the CIO's synthetic credit portfolio had grown to a "perilous size" and was the primary risk facing JPMorgan by the end of 2011, CIO executives and traders were able to engage in illegal market manipulation (by "painting the tape") to generate inflated values for the CIO's synthetic credit portfolio positions. ¶¶97, 107-09.

202. In addition to the above representation regarding the Company's internal controls, the 2011 Form 10-K included a certification signed by Dimon and Braunstein attesting to the effectiveness of the Company's disclosure controls and procedures and internal control over financial reporting. That certification stated that Dimon and Braunstein had disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information," as well as "any fraud, whether or not material, that involves management or other employees that have a significant role in the registrant's control over financial reporting." These statements were materially false and misleading for the same reasons set forth above in ¶201.

203. On April 4, 2012, JPMorgan filed its 2012 Proxy Statement with the SEC on Form DEF14A (the "2012 Proxy Statement") in advance of the Company's Annual Meeting of Shareholders scheduled for May 15, 2012. The 2012 Proxy Statement included the same statement set forth above in ¶173 regarding the function and activities of the CIO. This statement was materially false and misleading for the same reasons alleged above in ¶¶172, 174 and 178. The 2012 Proxy Statement specifically incorporated by reference the statements

regarding JPMorgan's risk management from the 2011 Form 10-K, as set forth above in ¶¶197-98.

204.    Among the other misrepresentations repeated from the 2011 Form 10-K, the 2012 Proxy stated that "Any substantial introduction of emerging risks or increase in risks routinely taken <u>would be largely controlled by risk limits in place.</u>…"  That statement was false because, by the time the Company issued the 2012 Proxy, the Company had repeatedly ignored breaches to the CIO's risk limits – which Cavanagh conceded were "clearly inadequate" and "unsophisticated" – and had failed to establish other critical limits, such as position limits or stop loss limits, as discussed in detail in ¶¶64-67, 94-122.  Moreover, when the VaR threatened to reveal the "increase in risks" within the CIO, the Company – with Dimon's approval – manipulated the model to conceal those risks.  ¶¶91-93, 103-05.

205.    Also on April 4, 2012, the Company released Dimon's annual letter to shareholders, which was dated March 30, 2012.  In that letter, Dimon made a point of reaffirming the Company's focus on risk management, highlighting the work of JPMorgan's Risk Committees and the use of limits to control risk.  Specifically, Dimon stated that "[o]ur Risk Committees provide general oversight into any and all risk in the business and set overall risk limits from credit extensions to any market-making activities. Risk limits are set by product, by counterparty and by type of specific risk (for example, liquidity risk, interest rate risk, credit risk, country risk, market risk, private equity risk, and legal and fiduciary risk, etc.)."

206.    Dimon's assurances regarding the use of limits to manage risk were materially false and misleading.  Indeed, by the time Dimon issued his letter to shareholders, losses in the CIO were already mounting into the hundreds of millions of dollars.  Cavanagh later admitted

that by March 23, well before Dimon's letter, "<u>the cake was fully baked on this thing and</u> <u>essentially all of the loss-making positions were already on the books</u>."

207.     On April 5 and 6, *Bloomberg* and the *Wall Street Journal* reported for the first time that the CIO had amassed such a large portfolio of synthetic-credit derivatives that a lead trader on the portfolio, Bruno Iksil, had been nicknamed the "London Whale" by credit derivatives traders.  This was the first time that it was publicly reported that a CIO trader was taking enormous positions in the credit-derivatives market.

208.     The *Wall Street Journal* story, titled *"London Whale' Rattles Debt Market,"* quoted a JPMorgan spokesperson stating that "<u>CIO activities hedge structural risks and invest to</u> <u>bring the company's assets and liabilities into better alignment</u>."  The April 6, 2012 *Wall Street Journal* article also quoted the JPMorgan spokesperson as saying that the CIO is "focused on managing the long-term structural assets and liabilities of the firm and <u>is not focused on short-</u> <u>term profits</u>."  According to the article, the JPMorgan spokesperson added that the CIO's "results are disclosed in our quarterly earnings reports and are fully transparent to our regulators."

209.     The statements attributed to the JPMorgan spokesman in the April 6 *Wall Street Journal* article were materially false and misleading because, as set forth herein, the CIO was operating a proprietary trading desk that focused on short-term profits rather than managing risk. Indeed, by April 2012, the CIO had been operating as a high-risk trading desk for years and the positions that sparked the *Wall Street Journal*'s reporting on the CIO – the CIO's portfolio of synthetic-credit derivatives – was the unit's largest and highest-risk speculative bet.  By the time the JPMorgan spokesman made his statement to the *Wall Street Journal*, losses on the CIO's bet on corporate debt were approaching $1 billion, and the Company was actively cooking its books

to conceal these losses. *See supra* Section IV.J. Moreover, JPMorgan specifically deceived regulators and investors to keep the CIO's activities a secret. ¶¶112-22.

210. On April 9, 2012, *Bloomberg* published an article titled "JPMorgan Trader Iksil Fuels Prop-trading Debate With Bets," that provided more information about Iksil's trades, and questioned whether his positions had been proprietary trades, rather than hedges as the Company claimed. The article quoted Joe Evangelisti, a member of the JPMorgan Executive Committee who was in charge of JPMorgan's Corporate Communications and spoke on behalf of JPMorgan, assuring investors that the CIO did not engage in proprietary trading. Specifically, Evangelisti stated: "[t]he Chief Investment Office is responsible for managing and hedging the firm's foreign-exchange, interest-rate and other structural risks. [It is] focused on managing the long-term structural assets and abilities of the firm and is not focused on short-term profits."

211. Evangelisti's statement to *Bloomberg* was materially false and misleading because, as set forth above in ¶¶43-76, 163, 168, the CIO was operating a proprietary trading desk that was focused on short-term profits, and not on managing risk.

212. On April 13, 2012, JPMorgan announced its financial results for the three months ended March 31, 2012, and held a previously scheduled conference call to discuss those financial results. The Company also filed its quarterly financial results, including the Company's net income, with the SEC pursuant to a Form 8-K that included three exhibits: (i) a press release dated April 13, 2012 containing the Company's 1Q 2012 financial results (the "1Q 2012 Press Release"); (ii) the Earnings Release Financial Supplement for 1Q 2012 (the "1Q 2012 Financial Supplement"); and (iii) a copy of the presentation slides JPMorgan provided to investors and analysts (the "1Q 2012 Earnings Presentation Slides"). The Press Release reported that the Company had earned net income of $5.4 billion for the first quarter of 2012.

213.   JPMorgan has now admitted that the net income and earnings per share reported for the first quarter of 2012 were materially overstated.   Specifically, JPMorgan has now admitted that net income for the first quarter was overstated by $459 million, or 8.5%, because the CIO's internal controls lacked "integrity," which enabled CIO traders to manipulate the value of their positions.   This admitted overstatement is in addition to the Company's failure to establish a liquidity reserve, which separately caused JPMorgan's net income to be materially overstated by at least $2 billion.

214.   On that April 13 conference call, Dimon was asked to address the news reports about the London Whale and to explain the CIO's synthetic-credit trades – the very source of the undisclosed losses that rendered the Company's reported earnings false and misleading.   In response, Dimon belittled the news reports and assured investors that the CIO was not a source of risk:

> It's a complete tempest in a teapot.  Every bank has a major portfolio; in those portfolios you make investments that you think are wise to offset your exposures.  Obviously, it's a big portfolio; we are a large company and we try to run it – it's sophisticated obviously with complex things.  But at the end of the day that is our job is to invest that portfolio wisely, intelligently over a long period of time to earn income and to offset other exposures that we have.

215.   Dimon's insistence that concerns about the CIO's massive synthetic-credit portfolio were a "tempest in a teapot" and his description of the CIO's trading were materially false and misleading.   As noted, before that call, Dimon and Braunstein knew that the CIO's losses on the synthetic-credit portfolio had already surpassed $700 million.   Another internal JPMorgan memorandum issued in April 2012 warned that the losses in the synthetic-credit portfolio could reach $9 billion.   Even before Dimon learned that the losses had reached $700 million, he had approved (1) the implementation of a new VaR model to try and conceal the growing risk in the CIO; and (2) a strategy to expand the CIO's position in that portfolio.

Accordingly, it was knowingly false to assure investors that the London Whale's position was merely a "tempest in a teapot."  Similarly, it was false to suggest that those trades in particular, or the CIO's portfolio in general, were used to "offset other exposures" at JPMorgan.  For years, the CIO – at Dimon's direction – had engaged in high-risk proprietary trading focused on generating short-term profits, and not to "offset" risks.

216.   During the April 13 conference call, Defendant Braunstein also continued to falsely insist that the CIO was not a source of risk but was rather merely engaged in hedging activities and only "invest[ed] … in high grade, low-risk securities."  Braunstein directly responded to reports about the CIO's investments in synthetic-credit derivatives by claiming that those positions were "hedges" to "keep the Company effectively balanced from a risk standpoint," and that JPMorgan was "very comfortable" with the positions:

> We invest those in order to hedge the interest rate risk of the Firm as a function of that liability and asset mismatch.  We hedge basis risk, we hedge convexity risk, foreign exchange risk is managed through CIO, and MSR risk.  We also do generate NII [net interest income], which we do with that portfolio.

> The result of all of that is we also need to manage the stress loss associated with the portfolio, and so we have put on positions to manage for significant stress event in Credit.  We have had that position on for many years and the activities that have been reported in the paper are basically part of managing that stress loss position, which we moderate and change over time depending upon our views as to what the risks are for stress loss from credit.

> All of those decisions are made on a very long-term basis.  They are done to keep the Company effectively balanced from a risk standpoint.  We are very comfortable with our positions as they are held today.

217.   Braunstein's statements on the April 13 conference call regarding the CIO and its synthetic-credit portfolio were materially false and misleading because those positions had already generated at least $700 million in losses, and were in the process of generating billions of dollars more.  Indeed, the Company was taking drastic measures to conceal those positions, including mis-marking positions, manipulating market prices, implementing a model with the

express purpose of lowering the CIO's reported VaR, subverting VaR limits by temporarily increasing them to mask limit breaches, and waiving breaches of other non-statistical risk limits. Moreover, the CIO's synthetic-credit portfolio was not a hedge as Braunstein represented, and was not used to manage a "stress loss position."  Rather, as set forth in ¶¶43-76, 94-98, the CIO was a proprietary trading desk and the synthetic-credit portfolio was a speculative bet on corporate debt.  Indeed, as discussed in ¶79, the fact that a reserve was required for that portfolio demonstrated that it was not a hedge.

218.    On that conference call with analysts, Defendant Braunstein also misrepresented the transparency of the CIO:

> <u>And I would add that all those positions are fully transparent to the regulators.</u> They review them, have access to them at any point in time, get the information on those positions on a regular and recurring basis as part of our normalized reporting.  All of those positions are put on pursuant to the risk management at the Firmwide level.

219.    These statements were materially false and misleading because the CIO was not subject to regulatory oversight.  Indeed, the CIO presented an ideal venue for Dimon to build his proprietary trading desk precisely because it was not scrutinized by regulators, and JPMorgan worked to keep regulators out of the CIO by telling them that the unit did not engage in high-risk trading, as set forth above in ¶¶44, 50-53.

220.    The 1Q 2012 Financial Supplement also repeated JPMorgan's misrepresentation set forth above in ¶164 and ¶192 that the CIO's positions were "used to manage structural risk and other risks."  That statement was false and misleading for the reasons set forth in ¶165, as the CIO was trading for profit, and not to manage risk.  Indeed, by that time, the CIO's synthetic-credit portfolio had already suffered at least $700 million in losses, and JPMorgan was internally acknowledging that losses could reach $9 billion.

221.   Braunstein continued to misrepresent the CIO's purpose and the nature of the synthetic-credit portfolio on a separate conference call with reporters on April 13, 2012 (the "April 13, 2012 Media Conference Call").  As reported by the *Wall Street Journal*, during the April 13, 2012 Media Conference Call, Braunstein stated that "[t]he CIO balances our risks" and that the CIO "hedge[s] against downside risk, that's the nature of protecting the balance sheet." Braunstein reiterated that "all of the positions reporters have been writing about are part of a credit book meant to hedge other risks."  In addition, Braunstein again insisted that JPMorgan is "very comfortable with the positions we have" and confirmed that the positions within the CIO are "very long term in nature."  Braunstein assured the reporters on that call that "[w]hen we put a dollar to work we want to do so prudently and invest it in safe, smart and good-returning assets, and that is the job of CIO.…  We are very conservative."

222.   Braunstein's statements on the April 13, 2012 Media Conference Call regarding the CIO's investments generally and the synthetic-credit portfolio in particular were materially false and misleading for the reasons set forth in ¶¶163, 165, 168.  The CIO's synthetic-credit portfolio was a speculative, proprietary trade – not a hedge.  The CIO's investments were not "conservative," but rather created an outsized risk relative to the size of the CIO's assets, as evidenced by the fact that the CIO's VaR exceeded that of the Investment Bank, and the VaR for Iksil's position alone equaled that of the Investment Bank, despite the fact that the Investment Bank held more than twice the assets of the CIO.

223.   In addition to misstating net income and earnings per share, the Company also misstated its VaR.  Specifically, based on the new VaR model implemented in the CIO in January 2012, the 1Q 2012 Financial Supplement reported CIO VaR of $67 million and total "other" VaR of $72 million.  The 1Q 2012 Financial Supplement also included a chart titled

"JPMorgan Chase & Co. Market Risk-Related Information" which identified the "Quarterly Trends" of the Company's VaR calculations, including CIO VaR, Total "Other" VaR and Total IB and other VaR for 1Q 2012 and the four previous quarters.  That chart included a direct comparison of the VaR 4Q 2011 and 1Q 2011 with the VaR results for 1Q 2012 called the "1Q 2012 Change."  The chart is reproduced below:

| | **QUARTERLY TRENDS** | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | **1Q12 Change** | |
| | **1Q12** | **4Q11** | **3Q11** | **2Q11** | **1Q11** | **4Q11** | **1Q11** |
| **95% CONFIDENCE LEVEL-AVERAGE** **IB TRADING VAR, CREDIT PORTFOLIO VAR AND OTHER VAR** | | | | | | | |
| *** | | | | | | | |
| **Other VaR:** | | | | | | | |
| *** | | | | | | | |
| Chief Investment Office VaR | $67 | $69 | $48 | $51 | $60 | (3)% | 12% |
| *** | | | | | | | |
| **Total Other VaR** | **$72** | **$83** | **$73** | **$61** | **$62** | (13)% | 16% |
| *** | | | | | | | |
| **Total IB and other VaR** | **$116** | **$113** | **$108** | **$94** | **$88** | 3% | 32% |

224.    JPMorgan has now admitted that the CIO VaR and "other" VaR numbers for the first quarter of 2012 were materially false and misleading.  On May 10, 2012, JPMorgan published the below chart restating the VaR for the first quarter of 2012, which revealed that CIO VaR had been understated by almost 50%.  That chart is reproduced below:

| **1Q 2012 VaR as Reported and as Corrected by JPMorgan** | | | | |
|---|---|---|---|---|
| | Three Months Ended March 31, 2012 | | | |
| *$ in millions except percentage data* | Reported Amount | Corrected Amount | Amount Understated | Percent Understated |
| CIO VaR | $67 | $129 | $62 | 48% |
| Total "Other" VaR | $72 | $136 | $64 | 47% |
| Total IB and other VaR | $116 | $170 | $54 | 32% |

225.    As in prior quarters, the Company also misrepresented the meaning of the CIO's VaR by misstating the types of investments made by the CIO that contributed to its VaR.  Specifically, the 1Q 2012 Financial Supplement stated that "CIO VaR includes positions,

primarily in debt securities and credit products, used to manage structural risk and other risks, including interest rate, credit and mortgage risks arising from the Firm's ongoing business activities." That statement regarding the positions underlying the CIO VaR was materially false and misleading because, as discussed extensively above, the CIO's positions were proprietary trades that created significant risk, rather than hedging transactions used to manage risk. Indeed, when the Company made this statement – which was designed to assure investors that CIO would not really lose the amount of money reflected in its VaR, the unit had already lost over $700 million and stood to lose billions more.

## VI. DEFENDANTS MADE THE FOREGOING FALSE AND MISLEADING STATEMENTS WITH SCIENTER

226. During the Class Period, each of the Individual Defendants and other employees of JPMorgan, specified herein, was an active, culpable, and primary participant in the fraudulent scheme and issuance of the materially false and misleading statements and omissions of material fact alleged herein based upon: (i) his/her actual issuance of and/or control over JPMorgan's materially false and misleading statements, and/or (ii) his/her participation in, and/or receipt of information which he/she had a duty to monitor, reflecting the improper and fraudulent behavior described above. Each Defendant knew or recklessly disregarded that the statements made during the Class Period alleged herein were materially false and misleading and/or omitted material facts at the time that such statements were made. Defendants participated in a scheme to defraud and engaged in acts, practices, and a course of business that operated as a fraud or deceit on purchasers of JPMorgan common stock during the Class Period.

227. Defendants' knowledge and/or reckless disregard of the falsity of their statements is evidenced by, *inter alia*, (1) reports from internal JPMorgan sources indicating that JPMorgan senior management made a conscious, strategic decision to use the CIO for proprietary trading in

pursuit of short-term profits; (2) the fact that JPMorgan senior management received repeated warnings as to the inadequacy of risk oversight in the CIO and elsewhere, including repeated warnings about specific trades that posed risks that were inconsistent with the CIO's publicly represented risk management function; (3) Defendants' modeling manipulations, valuation falsifications, and misrepresentations of the CIO's VaR metric so as to deliberately obfuscate the CIO's improper trading activities and assumption of risk; (4) Defendants' publicly proclaimed direct responsibilities for overseeing and monitoring risk, including the very risks that the CIO was purportedly managing; and (5) the fact that due to its size and importance, the CIO was a core component of JPMorgan's overall business.

### A.     DIMON

228.    During the Class Period, Dimon was JPMorgan's President and Chief Executive Officer, Chairman of the JPMorgan Board of Directors and a member of JPMorgan's Operating Committee, which met once a week to discuss issues relating to the management of the Company.  According to the Company's 2011 Proxy Statement, as JPMorgan's CEO, Dimon was "intimately familiar with all aspects of the Firm's business activities" during the Class Period.  In this regard, the Company's 2012 Proxy Statement stated that Dimon's responsibilities as CEO included "setting the overall risk appetite for the [Company]" and, along with the Chief Risk Officer, approving the level of the risk appetite for each of JPMorgan's lines of business. The Company's Forms 10-K for 2009, 2010 and 2011 further represented that Dimon and the Chief Risk Officer were "responsible for reviewing and approving certain [market] risk limits on an ongoing basis" throughout the Class Period.  During this time, Dimon also was responsible for establishing and maintaining adequate internal control over, and for certifying the accuracy of, JPMorgan's financial reporting.

229.    According to the Company's Forms 10-K during the Class Period, as a member of senior management, Dimon received JPMorgan's VaR calculation results and reports concerning any breach of nonstatistical risk limits, VaR loss advisories and other limits on a daily basis. Dimon also received "stress-test results, trends and explanations," "market risk exposure trends, VaR trends, profit-and-loss changes and portfolio concentrations," and an interest rate profile for the entire Company prepared by the Treasury department on a weekly basis.  To the extent that any positions on JPMorgan's balance sheet breached risk limits, these limit breaches also were reported to Dimon.

230.    Dimon also was directly responsible for overseeing the CIO.  According to witnesses, Drew implemented his "new vision" for JPMorgan by transforming the primary function of the CIO from risk management to profit generation prior to the start of the Class Period.  Dimon's hand-picked Chief Investment Officer, Drew, carried out Dimon's profit objectives for the CIO and reported directly to him.  As alleged in detail above, Dimon utilized the CIO's available investment assets before and during the Class Period, which grew to $350 billion, to effectuate trades for profit that he could not undertake elsewhere within the Company and demanded that Drew and her team of traders take on increasing risks in search of profits. Also as detailed above, throughout the Class Period, Dimon maintained direct reporting lines with the CIO and its top executive personnel, including Drew, as well as individual traders within the CIO, keeping him informed of the unit's status and giving him control over its operations.

231.    Dimon's control of the CIO and his relationship with Drew and her team was well known throughout JPMorgan.  Multiple internal sources commented on the close relationship between Dimon and Drew.  Dimon and Drew were members of the Company's Operating

Committee, which met weekly to discuss issues within each line of business at JPMorgan.  One member of CIO management, Achilles Macris, stated that he effectively reported to Dimon as his *de facto* boss.  Witnesses cited herein stated that Dimon was aware of specific proprietary trades implemented by the CIO, including trades that generated profits or losses of $1 billion.  Dimon personally suggested proprietary trades he felt the CIO should enter into, including directional bets on economic trends or asset classes.  In addition, one CIO executive, Corio, told the *Wall Street Journal* that Dimon "likes to know what is going on all the time, everywhere at this firm. . . . Full stop."

232.    Dimon took the following actions during the Class Period which, together with the other facts alleged herein, evidence his knowledge and/or reckless disregard of the material misrepresentations concerning the function and risk management and investment strategies of the CIO during the Class Period:

a)   Despite repeated warnings from multiple senior executives at JPMorgan before and during the Class Period regarding the risky proprietary trading strategies executed by the CIO, Dimon exempted the CIO from the risk management protocols that JPMorgan applied to other lines of business within the Company.  ¶¶58-63.  These senior executives, including former co-CEOs of the Investment Bank Bill Winters and Steve Black, and former CIO Chief Risk Officer Peter Weiland, warned that the controls and risk management in place for the CIO were inadequate, and they pushed for greater transparency and disclosure of the CIO's positions within the Company.  *See, e.g.,* ¶¶77-78, 92.  Ultimately, Dimon refused to heed these warnings and terminated or demoted the executives who sought to improve risk controls and oversight at the CIO.  *See, e.g.,* ¶¶62, 102.

b)   Dimon frequently met with CIO traders, including Achilles Macris, and personally approved proprietary trading strategies executed by the CIO before and throughout the Class Period.  For example, Dimon approved a strategy to invest in Fannie Mae and Freddie Mac preferred securities that caused the CIO to suffer $1 billion in losses in 2008.  ¶¶68-69.  Dimon also approved and was personally involved in carrying out the CIO's bets against subprime mortgages which generated $1 billion in profits.  ¶¶89-90.  Significantly, Dimon also knew of, understood and approved the profit-seeking strategy behind the trades implemented by the CIO within the synthetic credit portfolio that has required JPMorgan to recognize $6.25 billion in losses to date.  *See, e.g.,* ¶¶94-97.

c) Dimon directed and was intimately involved in JPMorgan's intense lobbying effort against the provisions of the Volcker Rule that were intended to prevent banks from engaging in proprietary trading.   Beginning as early as September 2010, Dimon devoted considerable time and resources to protecting the CIO's undisclosed proprietary trading activities and the profits that JPMorgan derived therefrom, through this concerted lobbying of the U.S. government, which included numerous meetings with federal regulators. *See, e.g.,* ¶¶52-53, 112-13.

d) By the middle of 2011, Dimon knew that JPMorgan was constructing a new model that was intended to lower the VaR for the CIO and disguise the CIO's increasing risk profile. ¶¶91-93.

e) By late 2011, Dimon approved a strategy to "balance" the CIO's synthetic credit portfolio by taking on additional positions in synthetic-credit derivatives. *See, e.g.,* ¶¶94-97.

f) Dimon incentivized the CIO and its traders to take on more risk by tying their compensation to their ability to outperform an internally created index of the return on a standard bank treasury portfolio. ¶56.

g) By no later than January 2012, Dimon knew that the CIO had exceeded its VaR limit, and in response he approved and implemented:  (i) a temporary increase in the firm-wide VaR limit in mid-January 2012 in order to prevent further breaches of the CIO VaR limit; and (ii) a new VaR model for the synthetic credit portfolio within the CIO that would reduce the VaR associated with the positions within the portfolio on a going forward basis, which had the effect of masking the synthetic credit portfolio's true risk. *See, e.g.,* ¶¶100-06.   As reported by *Bloomberg* on June 1, 2012, Lesley Daniels Webster, a former head of market and fiduciary risk management at JPMorgan, explained that before new VaR models are implemented, they are usually tested "in parallel" with old models for about three months to ensure they are working properly before being used.  Thus, Dimon's approval of a new model that produced lower VaR figures for the same synthetic-credit portfolio was not the result of "implementation errors," as JPMorgan self-servingly asserted after the Class Period, but rather a deliberate, calculated means of falsely understating the real risks that the CIO was taking.  Indeed, Dimon approved a breach of firm-wide VaR limits in an email that clearly stated that the new "CIO VaR model…was expected to lower VaR."

h) Prior to the Company's April 13, 2012 earnings announcement, Dimon ordered Drew to spearhead a review of the CIO's synthetic credit portfolio.  Dimon was specifically told prior to the April 13, 2012 earnings announcement that losses in the synthetic credit portfolio had already exceeded $700 million, and that projected losses could reach $1 billion. *See, e.g.,* ¶¶117.

233.    In his position as CEO, Dimon received and/or had a duty to monitor the following reports and/or information during the Class Period regarding the CIO and its

proprietary trading, which further evidences his knowledge and/or reckless disregard of the

material misrepresentations and omissions of material fact alleged above:

a)  Dimon received a regular report from the CIO setting forth its aggregate trading
    positions which was known as "Jamie's Report."  Dimon also received profit-and-loss
    reports on large positions within the CIO on a daily basis throughout the Class Period,
    and these reports included the profits-and-losses associated with the CIO trades that led
    to nearly $6 billion in losses for the first six months of 2012.  Moreover, as a member
    of senior management, Dimon received weekly profit-and-loss reports on the CIO.  *See,*
    *e.g.,* ¶89.

b)  Based upon his oversight and direction of the CIO, Dimon directly received
    information from CIO management and traders regarding proprietary trades executed
    by the CIO before and throughout the Class Period.  For example, Dimon knew about
    the CIO's $300 million loss in 2010 on a failed bet on foreign exchange options.  *See,*
    *e.g.,* ¶70.  With respect to the $300 million loss, Cavanagh learned of the loss from
    Joseph Bonocore, the CIO's Chief Financial Officer, after Bonocore became concerned
    that the trade had been made without any corresponding gains to offset the losses, and
    was therefore not a hedging transaction. Cavanagh reported Bonocore's concerns to
    Defendant Dimon.

c)  Based on his receipt of daily VaR calculations as a member of senior management,
    Dimon knew as of the beginning of the Class Period, that JPMorgan's VaR models
    demonstrated that positions entered into by Bruno Iksil—one trader within the CIO—
    could lose tens of millions of dollars on any given trading day.  These daily VaR
    reports also reflected that at times throughout the Class Period, Iksil's individual
    positions put more of the Company's capital at risk than the trading activities of the
    entire Investment Bank.  *See, e.g.,* ¶¶82-90.

d)  Based on his receipt of daily VaR calculations and VaR limit breaches as a member of
    senior management, Dimon was aware that the CIO was exceeding its VaR limit as a
    result of the synthetic credit portfolio in late 2011 and early 2012.  *See, e.g.,* ¶¶84-86,
    103-06.

e)  Based on his receipt of daily VaR calculations, Dimon was aware that the new VaR
    model for the synthetic credit portfolio that he approved in January 2012 significantly
    lowered the daily reported VaR of the CIO.  *See, e.g.,* ¶¶103-06.

f)  In January 2012, based on his receipt of daily reports of risk limit breaches, Dimon was
    aware that the synthetic credit portfolio had triggered a CIO-level credit spread
    widening limit.  *See, e.g.,* ¶¶103-05.

g)  In February 2012, Dimon participated in a CIO business review with senior JPMorgan
    management that included a discussion of the synthetic credit portfolio's positions.
    *See, e.g.,* ¶106.

h) On March 23, 2012, based on his receipt of daily reports concerning breaches of risk limits, Dimon was aware that the CIO's synthetic credit portfolio had triggered a second CIO-level credit spread risk limit.  As a result of this risk limit trigger, the CIO instituted a complete hold on any further trades within the synthetic credit portfolio. *See, e.g.,* ¶114.

234.    Dimon's knowledge and/or reckless disregard of the true function and purpose of the CIO—*i.e.*, that the CIO was engaged in proprietary trading for profit rather than hedging—is also evidenced by (i) the publicly proclaimed importance of the CIO's purported risk management and liquidity functions; (ii) the sheer size of the CIO's portfolio in the context of JPMorgan's overall business; and (iii) the significant contributions that the CIO made to JPMorgan's overall profitability during the Class Period. Specifically:

a) Dimon, as JPMorgan's CEO, was intimately familiar with the true function of the CIO because prudently managing structural risks and hedging exposures are core functions of banking institutions like JPMorgan.  As stated in the Company's 2011 Form 10-K, the purported functions of the CIO are "critical to both [JPMorgan's] soundness and profitability." Dimon testified before Congress that the CIO "serves as an important source of [the Company's] liquidity" which, as the Company described in its 2011 Form 10-K, "is essential to the ability to operate financial services businesses and, therefore, the ability to maintain surplus levels of liquidity through economic cycles is crucial to financial services companies, particularly during periods of adverse conditions."

b) Furthermore, throughout the Class Period, the CIO's portfolio represented a very large and significant component of JPMorgan's overall assets.  Due to high-level strategic decisions made by JPMorgan, including the decisions to acquire Washington Mutual and Bear Stearns, and the fact that JPMorgan's deposit-to-loan ratio grew considerably, the CIO's portfolio more than quadrupled between the time of the financial crisis and the end of the Class Period.  The CIO managed a larger pool of assets than any of JPMorgan's other core businesses except for its Investment Bank.  ¶¶41-42.  Moreover, the synthetic-credit portfolio represented the highest-risk position in the portfolio.

c) Throughout the Class Period, due in large part to Dimon's decision to use the CIO's more than $300 billion portfolio for proprietary trading, the CIO was a significant component of JPMorgan's overall profitability.  The table below demonstrates the net income that the Corporate/Private Equity segment, which contained the CIO, produced as a percentage of JPMorgan's total net income.  In particular, in 2009, the Corporate/Private Equity sector produced more than a quarter of JPMorgan's net income.

|  | 2Q12 | 2011 | 2010 | 2009 |
|---|---|---|---|---|
| Corporate/Private Equity Net Income ($ millions) | (1,777) | 802 | 1,258 | 3,030 |
| Total Net Income ($ millions) | 4,960 | 18,976 | 17,370 | 11,728 |
| % of Net Revenue Generated By Corporate/Private Equity | (35.8) | 4.2% | 7.2% | 25.8% |

d) JPMorgan reported, after the end of the Class Period, that the CIO contributed at least 20% of the Company's profits for almost every quarter during the Class Period. Analysts questioned whether the Company was understating the CIO's contributions, and one analyst calculated that the CIO contributed $0.80 per share to the Company's earnings, or as much as 35% of earnings at certain points during the Class Period.

235. Indeed, Dimon has now admitted in Congressional testimony that he was aware of the CIO's trading strategy and personally monitored the CIO. As Dimon admitted, "I am absolutely responsible. The buck stops with me."

## B.   CAVANAGH

236. Cavanagh was JPMorgan's Chief Financial Officer from 2004 until May 2010. As the Company's CFO, Cavanagh was a member of JPMorgan's Operating Committee, which met once a week to discuss issues relating to the management of the Company. Cavanagh was a "Named Executive Officer" in 2009 and 2010, and one of four or five of JPMorgan's most senior executives on whose compensation the Company asked shareholders to cast an advisory ballot. As CFO, Cavanagh was responsible for establishing and maintaining adequate internal control over and certifying the accuracy of JPMorgan's financial reporting. Cavanagh's responsibilities included managing the Company's capital and liquidity functions and needs.

237. As a member of senior management, Cavanagh received JPMorgan's VaR calculation results and reports concerning any breaches of nonstatistical risk limits, VaR loss advisories and other limits on a daily basis. Cavanagh also received the following reports on a

weekly basis during the Class Period: (i) "stress-test results, trends and explanations;" (ii) "market risk exposure trends, VaR trends, profit-and-loss changes and portfolio concentrations;" and (iii) an interest rate profile for the entire Company. To the extent that any positions on JPMorgan's balance sheet breached risk limits in place, these limit breaches also were reported to Cavanagh.

238. As CFO and a member of senior management, Cavanagh received and/or had a duty to monitor the following reports and/or information during the Class Period regarding the CIO and its proprietary trading which, together with the other facts alleged herein, evidence his knowledge and/or reckless disregard of the material misrepresentations alleged above:

a) As of the beginning of the Class Period, Cavanagh was a member of Company senior management who received daily VaR calculations, which informed him that positions entered into by Bruno Iksil—one trader within the CIO—could lose tens of millions of dollars on any given trading day. Based on receipt of these daily VaR reports, Cavanagh also was aware that at times throughout the Class Period, Iksil's individual positions put more of the Company's capital at risk than the trading activities of the entire Investment Bank. *See, e.g.,* ¶¶82-90.

b) Based on his receipt of weekly profit-and-loss reports during his tenure as CFO, Cavanagh was aware of the following trading losses within the CIO, among others, which also informed Cavanagh that the CIO was engaged in trading activities that were wholly inconsistent with the CIO's publicly represented risk management purpose: (i) a $1 billion loss in 2008 on positions in Fannie Mae and Freddie Mac preferred securities; and (ii) $300 million loss on a set of foreign exchange trades in 2010. With respect to the $300 million loss, Cavanagh also learned of the loss from Joseph Bonocore, the CIO's chief financial officer, after Bonocore became concerned that the trade had been made without any corresponding gains to offset the losses, and was therefore not a hedge. Cavanagh reported Bonocore's concerns to Dimon. *See, e.g.,* ¶¶69-70, 89.

c) Based upon his responsibilities for managing the Company's capital and liquidity function and needs, Cavanagh knew or was reckless in disregarding the CIO's high-risk, proprietary investment strategy that contravened JPMorgan's public statements. Specifically, the CIO invested JPMorgan's $350 billion in excess liabilities—namely, deposits—that could be called back at any time. As a result, JPMorgan had to maintain a sufficient liquidity cushion to account for these liabilities and to offset the additional liquidity risk that the CIO's proprietary trades posed. Accordingly, Cavanagh's responsibilities as CFO required him to know and understand the nature of the CIO's risky proprietary positions. Based upon, among other things, his liquidity management

responsibilities, if Cavanagh did not know about the CIO's massive directional bets during his tenure as CFO, then his failure to inform himself of and understand these positions was at least reckless.

d)  As CFO in early 2010, Cavanagh knew or should have known of a memorandum drafted by a senior executive of the CIO who reviewed the CIO's positions and determined that JPMorgan needed to establish a $2 to $4 billion liquidity reserve to protect the Company against losses within that portfolio.  The need for that reserve was discussed at the CFO level.  *See, e.g.,* ¶¶74-81.

e)  Cavanagh's knowledge and/or reckless disregard of the true function and purpose of the CIO as a unit engaged in speculative proprietary trading is also evidenced by (i) the publicly proclaimed importance of the CIO's purported risk management and liquidity functions, which JPMorgan admitted were "critical to both [its] soundness and profitability"; (ii) the sheer size of the CIO's portfolio, which represented the largest pool of assets managed by any JPMorgan business unit other than the Investment Bank, and the fact that the synthetic-credit portfolio represented the highest risk position in that portfolio; and (iii) the significant contributions that the CIO made to JPMorgan's overall profitability, which accounted for approximately 20% of JPMorgan's net income in almost every quarter during the Class Period.  *See, e.g.,* ¶234.

## C.  BRAUNSTEIN

239.  Braunstein was JPMorgan's Chief Financial Officer from May 2010 until the end of the Class Period.  As the Company's CFO, Braunstein was a member of JPMorgan's Operating Committee, which met once a week to discuss issues relating to the management of the Company.  Braunstein was a "Named Executive Officer" in 2010 and 2011, meaning that he was one of four or five of JPMorgan's most senior executives on whose compensation the Company asked shareholders to cast an advisory ballot.  As CFO, Braunstein was responsible for establishing and maintaining adequate internal control over, and certifying the accuracy of, JPMorgan's financial reporting.

240.  According to JPMorgan's 2011 Proxy Statement for the fiscal year 2010, in his role as CFO, Braunstein "provide[d] financial leadership across all of our business in terms of planning, reporting, financial controls, defining and managing the firm's capital and liquidity needs, as well as communicating the Firm's performance to the investor community, regulators

and rating agencies."  Additionally, in the 2011 Proxy Statement, the Company highlighted the fact that Braunstein's prior service as a leading executive within the Investment Bank provided him with an "understanding of the complex nature of this organization[.]"  In JPMorgan's 2012 Proxy Statement for the fiscal year 2011, the Company also noted that in his role as CFO, "Braunstein led the Firm's internal capital planning processes, which included the [Line of Business] capital allocation process, [and] assessment of the Firm's capital under a series of baseline and adverse economic and financial scenarios[.]"  Subsequent to the Class Period, and in the wake of the CIO's $6 billion scandal, JPMorgan announced that Braunstein will relinquish his role as CFO by the end of fiscal year 2012.

241.   As a member of senior management, Braunstein received JPMorgan's VaR calculation results and reports concerning any breaches of nonstatistical risk limits, VaR loss advisories and other limits on a daily basis.  Braunstein also received the following reports on a weekly basis during the Class Period:  (i) "stress-test results, trends and explanations;" (ii) "market risk exposure trends, VaR trends, profit-and-loss changes and portfolio concentrations;" and (iii) an interest rate profile for the entire Company.  To the extent that any positions on JPMorgan's balance sheet breached risk limits in place, these limit breaches also were reported to Braunstein.

242.   As CFO and a member of senior management, Braunstein received and/or had a duty to monitor the following reports and/or information during the Class Period regarding the CIO and its proprietary trading which, together with the other facts alleged herein, evidence his knowledge and/or reckless disregard of the material misrepresentations and omissions alleged above:

a) Braunstein was a member of senior management who received daily VaR calculations, which informed him that JPMorgan's VaR models demonstrated that positions entered

into by Bruno Iksil—one trader within the CIO—could lose tens of millions of dollars on any given trading day.  Based on receipt of these daily VaR reports, Braunstein also was aware that at times throughout the Class Period, Iksil's individual positions put more of the Company's capital at risk than the entire Investment Bank.  *See, e.g.,* ¶¶82-90.

b) Based on his receipt of weekly profit-and-loss reports, Braunstein was aware of the profits-and-losses within the CIO throughout his tenure as CFO.

c) Based upon his responsibilities for managing the Company's capital and liquidity function and needs, Braunstein knew or was reckless in disregarding the CIO's high-risk, proprietary investment strategy.  Specifically, the CIO invested JPMorgan's excess liabilities—namely, deposits—that could be called back at any time.  As a result, JPMorgan had to maintain a sufficient liquidity cushion to account for these liabilities and to offset the additional liquidity risk that the CIO's proprietary trades posed.  Accordingly, Braunstein's responsibilities as CFO required him to know and understand the nature of the CIO's risky proprietary positions.  Based upon, among other things, his liquidity management responsibilities, if Braunstein did not know about the CIO's massive directional bets during the Class Period, then his failure to inform himself of and understand these positions was at a minimum reckless.

d) Based upon his responsibilities for managing the Company's capital and liquidity functions and needs, Braunstein knew of or recklessly disregarded that, rather than managing liquidity risk, the CIO's proprietary trades presented a severe liquidity risk for which the CIO did not have adequate reserves, as reflected in a 2010 memorandum issued by a senior CIO executive**.**  This memorandum indicated that the high-risk, speculative trades that Drew endorsed and/or encouraged within the synthetic credit portfolio required JPMorgan to establish a $2 to $4 billion liquidity reserve to protect the Company against losses within that portfolio.   The need for that reserve was discussed at the CFO level.  *See, e.g.,* ¶¶74-81.

e) Based on his receipt of daily VaR calculations and VaR limit breaches as a member of senior management, Braunstein knew or recklessly disregarded that the CIO was exceeding its VaR limit as a result of the synthetic credit portfolio in late 2011 and early 2012.  *See, e.g.,* ¶¶82-90.

f) In January 2012, based on his receipt of daily reports of risk limit breaches, Braunstein knew or recklessly disregarded that the synthetic credit portfolio had triggered a CIO-level credit spread widening limit.  *See, e.g.* ¶¶89, 101-05.

g) On March 23, 2012, based on his receipt of daily reports concerning breaches of risk limits, Braunstein knew or recklessly disregarded that the CIO's synthetic credit portfolio had triggered a second CIO-level credit spread risk limit.  As a result of this risk limit trigger, the CIO instituted a complete hold on any further trades within the synthetic credit portfolio.  *See, e.g.,* ¶¶91-93, 100-06.

102

h) Based on his receipt of weekly profits-and-losses reports, Braunstein knew or recklessly disregarded that as of April 13, 2012, the CIO had experienced at least $700 million in losses due to positions within its synthetic credit portfolio. *See, e.g.,* ¶¶89, 116-18.

i) As CFO, Braunstein was responsible for ensuring the adequacy of internal controls for valuation of the Company's assets.  Accordingly, in the first quarter of 2012, Braunstein either knew or should have known that the Company's internal controls were materially deficient and that systems were not in place to prevent traders in the CIO from (1) marking their positions without regard to the actual market prices for those positions; and (2) "painting the tape" to manipulate the valuation of their positions. *See, e.g.,* ¶¶107-11.

j) Braunstein's knowledge and/or reckless disregard of the true function and purpose of the CIO as a unit engaged in speculative proprietary trading is also evidenced by (i) the publicly proclaimed importance of the CIO's purported risk management and liquidity functions, which JPMorgan admitted were "critical to both [its] soundness and profitability"; (ii) the sheer size of the CIO's portfolio, which represented the largest pool of assets managed by any JPMorgan business unit other than the Investment Bank and the fact that the synthetic-credit portfolio represented the highest risk position in that portfolio; and (iii) the significant contributions that the CIO made to JPMorgan's overall profitability, which accounted for approximately 20% of JPMorgan's net income in almost every quarter during the Class Period. *See, e.g.,* ¶¶41, 73, 234.

## D.    JPMORGAN

243.    JPMorgan knowingly and/or recklessly made the materially false and/or misleading statements and omissions of material fact alleged herein based on the fact that the Individual Defendants identified above, namely, the Company's CEO and CFOs throughout the Class Period, and the Company's Chief Investment Officer, knew and/or recklessly disregarded that the Company's statements were materially false and/or misleading, and/or omitted material facts at the times that such statements were made.  Each of the Individual Defendants identified above and Defendant Drew were among the most senior executives of JPMorgan throughout the Class Period and were members of the Company's Operating Committee.  Each of these individuals was responsible for managing the risk, capital and/or liquidity functions and needs of the Company.

244.     JPMorgan's knowledge of its operations, and the true function and purpose of the CIO as a proprietary trading unit, may be imputed to the Company and its senior management based on, among other things, (i) the publicly proclaimed importance of the CIO's purported risk management and liquidity functions, which JPMorgan admitted were "critical to both [its] soundness and profitability"; (ii) the sheer size of the CIO's portfolio, which represented the largest pool of assets contained in any JPMorgan business unit other than the Investment Bank; and (iii) the significant contributions that the CIO made to JPMorgan's overall profitability, which accounted for approximately 20% of JPMorgan's net income in almost every quarter during the Class Period.  *See, e.g.,* ¶¶41, 73, 234.

**E.     DREW**

245.     Hand-picked by Dimon, Drew was JPMorgan's Chief Investment Officer from 2005 until May 2012, and also served as a member of JPMorgan's Operating Committee during this time period.  According to JPMorgan's 2011 Proxy Statement for fiscal year 2010, as Chief Investment Officer, Drew was responsible for overseeing the CIO's efforts to measure, monitor, and manage the Company's liquidity, interest rate risk and foreign exchange risk.  The 2011 Proxy Statement also noted that in her position as Chief Investment Officer, Drew was "instrumental in setting the course and directing the Firm's repositioning of the balance sheet in anticipation of a rising interest rate environment."  The Company identified Drew as a Named Executive Officer or NEO, meaning that she was one of four or five of JPMorgan's most senior executives whose compensation was subject to an advisory vote from shareholders.   Drew was one of the most highly compensated executives at the Company, with annual compensation exceeding $15 million in 2010 and 2011.

246.     As a member of senior management, Drew received JPMorgan's VaR calculation results and reports concerning any breaches of nonstatistical risk limits, VaR loss advisories and

other limits on a daily basis. Drew also received the following reports on a weekly basis: (i) "stress-test results, trends and explanations;" (ii) "market risk exposure trends, VaR trends, profit-and-loss changes and portfolio concentrations;" and (iii) an interest rate profile for the entire Company. To the extent that any positions on JPMorgan's balance sheet breached risk limits in place, these limit breaches also were reported to Drew.

247. As Chief Investment Officer, Drew always reported directly to Dimon. According to numerous internal sources, Dimon and Drew had a very close business relationship. As a result, Dimon put Drew in charge of his strategy to use the CIO's $350 billion portfolio to make profits for JPMorgan through risky, proprietary trades.

248. In order to effectuate Dimon's CIO profit generation strategy, Drew took the following actions during the Class Period which, together with the other facts alleged herein, evidence her knowledge and/or reckless disregard—and therefore the Company's knowledge and/or reckless disregard—of the material misrepresentations concerning the function and risk management of the CIO during the Class Period:

a) Beginning in 2006 Drew hired a team of proven proprietary traders including Achilles Macris. Drew also elevated Bruno Iksil, a trader at the CIO since 2005, to run the CIO's credit desk in 2007. These new hires and promotions had *no* risk management experience—despite the fact that JPMorgan publicly represented that the CIO's function was to manage risk for the rest of JPMorgan's business lines. *See, e.g.,* ¶¶48-49.

b) While staffing the CIO with proprietary traders, Drew did not devote additional personnel or financial resources to augment the CIO's risk management structure to address the heightened risks that Dimon's profit-seeking directive through risky, directional bets on obscure credit indices and the purchase of illiquid assets presented. Even after Drew received warnings from the CIO's chief risk officer, Peter Weiland, concerning the inability of the CIO's risk management staff to focus on actually managing risk, she did nothing to address this known deficiency. *See, e.g.,* ¶¶77, 91-92.

c) As head of the CIO, Drew knew or recklessly disregarded that, rather than managing liquidity risk, the CIO's proprietary trades presented a severe liquidity risk for which the CIO did not have adequate reserves, as reflected in a 2010 memorandum issued by a senior executive. This memorandum indicated that the high-risk, speculative trades that Drew endorsed and/or encouraged within the synthetic credit portfolio required

JPMorgan to establish a $2 to $4 billion liquidity reserve to protect the Company against losses within that portfolio. *See, e.g.,* ¶¶74-81.

d) To facilitate more high-risk, high-profit proprietary trading, Drew and Achilles Macris abandoned an established stop-loss limit on all trades within the CIO which previously either triggered an internal review or required traders to exit positions if losses exceeded $20 million. *See, e.g.,* ¶¶64-65.

e) Drew received warnings in 2010 from the CIO's chief risk officer, Peter Weiland, concerning the growth of the synthetic credit portfolio, including the fact that the position was so complex that it would generate significant losses if the CIO was forced to sell off the position. Despite these warnings, and while engaging in frequent discussions about these positions during her daily 7 a.m. meetings, Drew and her lieutenant Macris did nothing to prevent further augmentation of these positions. *See, e.g.,* ¶¶77, 87, 91-92.

f) Drew was intimately involved in JPMorgan's intense lobbying efforts against the provisions within the Volcker Rule intended to inhibit proprietary trading. For example, Drew accompanied Dimon to Washington, D.C. in February 2012 to advocate against a version of the Volcker Rule that would prevent, and thus require disclosure of, the very proprietary trades that were entered into by and were adversely affecting the CIO's synthetic credit portfolio. *See, e.g.,* ¶¶52, 112-13.

g) Drew engaged in a face-to-face meeting with Macris and Iksil concerning the synthetic credit portfolio in December 2011. ¶96.

h) Prior to the April 13, 2012 conference call with investors Drew provided Dimon with information concerning the synthetic credit portfolio. *See, e.g.,* ¶¶117-18.

249. In her position as Chief Investment Officer, Drew received and/or had a duty to monitor the following reports and/or information during the Class Period regarding the CIO and its proprietary trading which, together with the other facts alleged herein, further evidence her knowledge and/or reckless disregard—and therefore the Company's knowledge and/or reckless disregard—of the material misrepresentations and omissions of material fact alleged above:

a) Drew's knowledge and/or reckless disregard of the true function and purpose of the CIO as a unit engaged in speculative proprietary trading is evidenced by (i) the publicly proclaimed importance of the CIO's purported risk management and liquidity functions, which JPMorgan admitted were "critical to both [its] soundness and profitability"; (ii) the sheer size of the CIO's portfolio, which represented the largest pool of assets managed by any JPMorgan business unit other than the Investment Bank, and the fact that the synthetic-credit portfolio represented the highest risk position in that portfolio; and (iii) the significant contributions that the CIO made to JPMorgan's overall profitability, which

accounted for approximately 20% of JPMorgan's net income in almost every quarter during the Class Period. *See, e.g.,* ¶¶41, 73, 234.

b) Throughout the Class Period, Drew conducted a global daily meeting at 7 a.m. for the CIO during which Drew questioned CIO traders in both the New York and London offices about their trading positions. Because of these meetings, and in combination with the weekly profit-and-loss reports Drew received as a member of senior management, Drew was fully aware not only of the size and high-risk nature of the positions within the CIO's portfolio, but also knew of all associated profits and losses, including, for example: (i) the $1 billion loss in 2008 on Fannie Mae and Freddie Mac preferred securities; (ii) the $300 million loss in 2010 on obscure foreign credit derivatives; and (iii) the positions taken by the CIO within the synthetic credit portfolio that ultimately led to nearly $6 billion in losses for the first six months of 2012. *See, e.g.,* ¶¶67-73, 87, 89-90, 94-97.

c) As a result of her daily meetings with traders, Drew also was aware that the CIO's investment strategies included trading complex securities that were antithetical to the unit's publicly represented risk management function, including multi-billion investments in: (i) tranches of CDOs; and (ii) European MBS and CDOs. In fact, under Drew's direction, the CIO single-handedly rejuvenated the market for U.K. MBS eventually purchasing approximately $20 billion of U.K. MBS. *See, e.g.,* ¶¶71-72.

d) As head of the CIO, Drew knew or recklessly disregarded that, rather than managing liquidity risk, the CIO's proprietary trades themselves presented a severe liquidity risk for which the CIO did not have adequate reserves, as reflected in a 2010 memorandum issued by a senior executive. This memorandum indicated that the high-risk, speculative trades that Drew endorsed and/or encouraged within the synthetic credit portfolio required JPMorgan to establish a $2 to $4 billion liquidity reserve to protect the Company against losses within that portfolio. As Chief Investment Officer of the Company and head of the CIO, Drew either knew or should have known of this high-level memorandum, which was discussed at the CFO level, and addressed the need for a multi-billion dollar reserve in the unit she ran. *See, e.g.,* ¶¶74-81.

e) Based on her receipt of daily VaR calculations as a member of senior management and her duties as the head of the CIO, Drew was aware that, at the beginning of the Class Period, JPMorgan's VaR models demonstrated that positions entered into by Bruno Iksil—one trader within the CIO—could lose tens of millions of dollars on any given trading day. Based on her receipt of these daily VaR reports, Drew also was aware that at times throughout the Class Period, Iksil's individual positions put more of the Company's capital at risk than the trading activities of the entire Investment Bank. *See, e.g.,* ¶¶82-90.

f) As head of the CIO and as a result of warnings received from her risk management personnel, Drew knew or recklessly disregarded that there were no granular risk limits on the synthetic credit portfolio despite JPMorgan's representations that such risk limits were in place across all business segments. *See, e.g.,* ¶¶63-64, 77, 87, 100-02.

g) Based on her position as the head of the CIO and as a member of senior management, Drew received daily VaR calculations and VaR limit breaches which informed her that

the CIO was exceeding its VaR limit as a result of the positions taken within synthetic credit portfolio in late 2011 and early 2012. *See, e.g.,* ¶¶100-02.

h) In January 2012, based on her position as head of the CIO and her receipt of daily reports of risk limit breaches, Drew was aware that the synthetic credit portfolio had triggered a CIO-level credit spread widening limit. *See, e.g.,* ¶101.

i) Drew was aware that the CIO's synthetic credit portfolio had triggered a second CIO-level credit spread risk limit on March 23, 2012. As a result of this risk limit trigger, the CIO instituted a complete hold on any further trades within the synthetic credit portfolio. *See, e.g.,* ¶114.

j) Based on her receipt of weekly profit-and-loss reports, Drew was aware that as of April 13, 2012, the CIO had experienced at least $700 million in losses due to positions within its synthetic credit portfolio. *See, e.g.,* ¶¶117-78.

k) As Chief Investment Officer and head of the CIO, Drew either knew or should have known about the CIO's efforts to manipulate the value of its positions in 2012, by (1) marking positions without regard to the actual market prices for those positions; and (2) "painting the tape" to manipulate the valuation of the CIO's positions. *See, e.g.,* ¶¶107-11.

250. Within days after the Company's May 10, 2012 disclosure that the CIO had experienced $2 billion in losses for 2Q 2012, Drew was terminated from her post as Chief Investment Officer.

251. Immediately after the Company's May 10, 2012 disclosure concerning the losses within the CIO, JPMorgan disclosed that it was evaluating whether to claw-back the compensation provided to Drew, as well as the CIO traders involved, under the Company's compensation claw-back policy. Under this policy, JPMorgan may initiate a claw-back of employee compensation "as a result of a material restatement of earnings or by acts or omissions of employees as outlined below, including a failure to supervise in appropriate circumstances." The "acts or omissions" outlined in the policy include:

> — the employee is terminated for cause or the Firm determines after termination that the employee could have been terminated for cause,

> — the employee engages in conduct that causes material financial or reputational harm to the Firm or its business activities,

— the Firm determines that the award was based on materially inaccurate performance metrics, whether or not the employee was responsible for the inaccuracy,

— the award was based on a material misrepresentation by the employee,

— and for members of the Operating Committee and Tier 1 employees, such employees improperly or with gross negligence fail to identify, raise, or assess, in a timely manner and as reasonably expected, risks and/or concerns with respect to risks material to the Firm or its business activities.

*See* JPMorgan 2012 Proxy Statement at 24.

252. On July 13, 2012 JPMorgan announced that Drew had returned two years' worth of compensation, totaling more than $20 million.

## VII. LOSS CAUSATION

253. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Lead Plaintiffs and the Class. Indeed, the Company's disclosures of previously misrepresented and concealed facts about the CIO's high-risk trading and resulting losses caused the price of JPMorgan's common stock to decline over $8 per share, wiping out billions of dollars of shareholder wealth. As Defendant Dimon admitted in testimony to Congress, the CIO's trading "did affect our shareholders, yes."

254. During the Class Period, Lead Plaintiffs and the Class purchased JPMorgan common stock at artificially inflated prices and were damaged when the price of JPMorgan common stock declined when the truth was revealed, and/or the information alleged herein to have been concealed from the market was revealed, and/or the concealed risks alleged herein materialized, causing investors' losses. Specifically, JPMorgan's common stock price declined dramatically on May 10, 2012, when JPMorgan first announced that it had suffered massive trading losses in the CIO, and continued to decline as additional details concerning the CIO's

losses, and their foreseeable impact on the financial prospects of the Company, were revealed to the market.

255.   Throughout the Class Period, the Defendants made materially false and misleading statements and omissions concerning the purpose and function of the CIO, the strength of the Company's risk management practices and its appetite for risk, and the Company's financial results – in particular, its quarterly and annual net income and earnings per share.   In addition, in 2012 Defendants made additional materially false and misleading statements and omissions concerning the amount of the CIO's VaR and JPMorgan's methodology for calculating the CIO's VaR, and also artificially inflated the price of JPMorgan common stock by discrediting reports about high-risk trading attributed to the London Whale and misrepresenting the CIO's purpose as a hedge against risks that the Company was exposed to in other business units.   Had the Defendants been truthful about these matters throughout the Class Period, Lead Plaintiffs and the Class would not have purchased JPMorgan's common stock, or would not have purchased their shares at the artificially inflated prices at which they were offered.

256.   As a direct result of Defendants' misrepresentations and omissions of material facts, the price of JPMorgan common stock was artificially inflated throughout the Class Period. This artificial inflation was removed from the price of JPMorgan common stock as the truth about the function and the risk associated with the CIO, JPMorgan's manipulation of the CIO's VaR, the Company's abandonment of risk controls and internal controls and its exposure to substantial losses from the CIO's speculative trades was revealed and/or materialized as alleged below in ¶¶257-69.

257.    On May 10, 2012, JPMorgan's common stock closed at $40.74 per share.  That day, after the markets closed, JPMorgan convened an emergency conference call with analysts. During this call, JPMorgan disclosed that it would be reducing its previously-issued guidance of $200 million in net income for the Corporate segment down to a loss of $800 million due to a $2 billion trading loss on the CIO's synthetic-credit portfolio.  Dimon further stated that JPMorgan would be restating its previously-reported VaR for the first quarter of 2012 from $67 million to $129 million.

258.    Dimon conceded JPMorgan's fault with respect to the catastrophic losses, admitting, in part, that "these were egregious mistakes" and that the losses were caused by "violat[ing] our own standards and principles."  Dimon further admitted that the proprietary trading strategy that the Company employed in the CIO's synthetic credit portfolio "was flawed, complex, poorly reviewed, poorly executed, and poorly monitored."  Notwithstanding Dimon's concession and the fact that he was told a month earlier that the losses associated with the CIO position could be as high as $9 billion, he continued to conceal the full risk associated with the Class Period misstatements and omissions during the May 10, 2012 conference call by carefully downplaying the potential for realizing any additional losses on the portfolio by assuring analysts and investors that "we're not going to do something stupid.  We're willing to hold as long as necessary inventory and we're willing to bear volatility."  Dimon further comforted investors by assuring them that the fallout was manageable and unlikely to affect future results, stating that "[o]ne of the reasons we keep a fortress balance sheet is to handle surprises" and stressing that he estimated that JPMorgan would "still earn approximately $4 billion after-tax" for the quarter.

259.    Dimon also falsely assured investors during the May 10, 2012 conference call that the $2 billion dollar loss would not affect JPMorgan's ability to carry out the much anticipated

$15 billion share buyback program announced by the Company in March 2012.  In fact, during the conference call, Dimon was asked directly for reassurance that "this [the $2 billion trading loss] doesn't change anything with the . . . buyback capability at all, does it?"  Dimon responded by assuring investors:  "I don't think so because our capital ratios are strong, going to meet all our commitments.  We can handle a highly stretched environment.  So no, we don't think so."  As Dimon stated, "One of the reasons we keep a fortress balance sheet is to handle surprises."

260.    Also on May 10, 2012, JPMorgan issued a Form 10-Q that reaffirmed the admittedly materially false and misleading financial results, including reporting net income of $5.4 billion, that the Company first reported on April 13, 2012.  In addition, the Form 10-Q also repeated the false description of the CIO's investments as being "used to manage structural and other risks," and reiterated the false and misleading description of the CIO as a risk management unit.

261.    Despite Dimon's spin and efforts at damage control, the disclosures on May 10, 2012 shocked the market, causing the price of JPMorgan's common stock to plummet from a close of $40.74 per share on May 10, 2012 to a close of $36.96 per share on May 11, 2012 – a drop of almost 10%.

262.    Several market analysts following JPMorgan immediately issued reports on the unexpected $2 billion trading loss.  For example:

- Sterne Agee said the disclosure left investors "stunned" and was a "meaningful strike against JPM and its history of sound risk management";

- Meredith Whitney and Morningstar called the disclosure of the $2 billion trading loss a "surprise";

- Baird Equity Research called the disclosure and subsequent loss "unexpected";

- Oppenheimer further confirmed that the prior press reports about the CIO's trades, which JPMorgan denied, "were indeed correct" and that the losses caused by the proprietary activity within the CIO's synthetic credit portfolio was

certainly not "all a tempest in a teapot as Dimon had said on the 1Q conference call"; and

- Rochdale Research stated, "I will not disagree that the JPMorgan Chase announcement last Thursday was a <u>shock to me</u>."

263.    While market analysts expressed surprise at the $2 billion trading loss, they were nevertheless reassured by Dimon's comments that the Company's share repurchase program would not be affected by this catastrophic loss, noting that the share repurchase program was an important mechanism for controlling any further depression of JPMorgan's common stock price resulting from the losses stemming from the CIO's undisclosed proprietary trading activities:

- Macquarie Equities Research reported that while it was updating JPMorgan estimates to account for the "recently announced trading losses," it <u>viewed "the buybacks as further affirmation that the impact of the trading losses is well controlled, as the company was still buying shares in April as trading losses were likely occurring. We expect repurchase activity to increase due to the recent sell off."</u>

- Oppenheimer reported that the trading loss is "a black eye <u>but with a…$15B buyback authorization we think the downside is limited and the upside still the same.  This too shall pass.</u>"

- Morningstar reported that "<u>Dimon recently stated that he would rather repurchase undervalued stock...than pay out dividends—evidence, in our view, that value creation is more important at this firm than the fickle demands of market participants.</u>"

- Sterne Agee reported that "<u>[JPMorgan's] $12B share repurchase authorization gives JPM significant flexibility to deploy capital and buy back shares in the event of outsized price weakness – providing an implicit floor for the stock.</u>"

- Oppenheimer also reported that "we also note that <u>JPM has a fortress balance sheet and a $15 billion buyback authorization.  If the stock were significantly pressed in the coming dates we are virtually certain that JPM would be buying stock.</u>"

264.    As the market digested the May 10, 2012 announcement and additional information was disclosed to the market, including announcements that the SEC and Department of Justice were investigating the CIO's trades, JPMorgan's common stock price continued to trade lower, and by May 16, 2012, it had fallen to $35.46 per share.

265.    On May 16, 2012, after the close of trading, the *New York Times* reported that JPMorgan's trading losses had already ballooned by "at least $1 billion," in only four trading days.  This additional disclosure confirmed that the risks posed by JPMorgan's proprietary CIO trading were still materially understated by JPMorgan and, contrary to Dimon's statements just days prior, were spiraling out of control.  Further, it was reported that the Federal Reserve was "examining the scope of the growing losses and the original bet, along with whether [the CIO] took risks that were inappropriate for a federally insured depository institution."  In light of these developments, the *Times* noted that "if the losses continue to mount, the outlook for the bank's dividend will grow uncertain."

266.    In response to the May 16, 2012 disclosure, the price of JPMorgan common stock declined even further, falling another $1.53 per share in intraday trading on May 17, 2012 to $33.93 per share.  To this point, JPMorgan's common stock price had declined by 16.7% as a direct and proximate result of the disclosure of the truth about the CIO's high-risk trading strategies and/or the materialization of the concealed risks of those strategies, falling from $40.74 per share on May 10, 2012 to $33.93 per share on May 17, 2012, or $6.81 per share.

267.    On May 21, 2012, JPMorgan made further disclosures about the far-reaching impact of the CIO's massive losses on the Company.  During an investor meeting sponsored by Deutsche Bank in New York, Dimon did an about-face from his May 10, 2012 comments and announced that JPMorgan was in fact halting the anticipated $15 billion share buyback program as the firm attempted to extricate itself from the CIO trading debacle. As the *Wall Street Journal* and several other news outlets reported, JPMorgan confirmed that its decision to suspend the $15 billion share repurchase was based upon the CIO's trading losses, informing the public that "we want to box this thing [with respect to the trading losses] first."  This announcement represented

the materialization of another undisclosed risk, and signaled to the market that JPMorgan would

be forced to change the way it operated in the wake of these massive losses.

268.   JPMorgan's disclosure of its inability to carry out the $15 billion stock buyback

was the subject of analyst reports:

- Credit Suisse reported that "[t]oday's announcement represents a shift in tone from the May 10th conference call in which management indicated that the losses would not affect their capital plans" and that "we [Credit Suisse] assumed that JPM would be an active repurchaser of shares despite the disclosed trading losses."  Instead though, "Jamie Dimon announced that the buyback program is on hold until the size of potential losses becomes clearer."

- Morningstar reported that the "trade not only impairs our view of risk management practices at the bank, but also ensures that management cannot create value through repurchases in the near term."

269.   In response to the May 21, 2012 disclosure, the price of JPMorgan common stock

fell further, dropping to $32.51 per share.  In total, the disclosures described above erased $8.23

per share (or over 20% of its value) from the price of JPMorgan common stock prior to the first

disclosure on May 10, 2012, eliminating over $31.4 billion in shareholder wealth in just 10 days.

270.   It was entirely foreseeable to Defendants that misrepresenting and concealing

from the public, *inter alia*:  (i) the Company's intentional and undisclosed transformation of the

CIO from a risk management unit into a profit center; (ii) the use of the CIO to generate short-

term profit through proprietary trading without augmenting the CIO's risk management controls,

including the setting of appropriate market risk limits (or any at all); (iii) the Company's

manipulation of its financial results through its knowing failure to increase its reserves; and (iv)

the Company's manipulation of the CIO's VaR in order to conceal the growing risks related to

the CIO's investment strategies, would artificially inflate the price of JPMorgan's common

stock.   It was also foreseeable that the ultimate disclosures of this information, and the

materialization of the concealed risks created by JPMorgan's aforementioned conduct, would

115

cause the price of JPMorgan's common stock to decline as the inflation caused by the Company's earlier materially false and misleading statements and omissions of material fact was removed from the stock price.   Accordingly, the conduct of Defendants as alleged herein proximately caused foreseeable losses for Lead Plaintiffs and the other members of the Class who purchased or otherwise acquired JPMorgan common stock during the Class Period.

## VIII.   THE FRAUD ON THE MARKET PRESUMPTION OF RELIANCE APPLIES

271.   At all relevant times, the market for JPMorgan common stock was efficient for the following reasons, among others:

1.   JPMorgan common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market, under the symbol "JPM";

2.   As a regulated issuer, JPMorgan filed periodic public reports with the SEC;

3.   JPMorgan regularly communicated with public investors via conference calls and other established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communication with the financial press and other similar reporting services; and

4.   JPMorgan was followed by numerous securities analysts employed by major brokerage firms throughout the Class Period, including Bank of America/Merrill Lynch, Sanford Bernstein, Morgan Stanley, UBS, Deutsche Bank, Oppenheimer & Co., and Nomura, who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

272.   As a result, the market for JPMorgan common stock promptly digested current information with respect to JPMorgan from all publicly-available sources and reflected such information in the price of these securities.   Under these circumstances, all purchasers of the Company's publicly-traded common stock during the Class Period suffered similar injury through their purchases at artificially inflated prices, and a presumption of reliance applies.

## IX.    THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

273.    The PSLRA's statutory safe harbor and/or the bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the materially false and/or misleading statements pleaded in this Complaint.

274.    None of the statements complained of herein was a forward-looking statement. Rather, each was a historical statement or a statement of purportedly current facts and conditions at the time each statement was made.

275.    To the extent that any materially false and/or misleading statement, alleged herein, or any portion thereof, can be construed as forward-looking, such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement.  As set forth above in detail, given the then-existing facts contradicting Defendants' statements, the generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

276.    To the extent that the statutory safe harbor may apply to any materially false and/or misleading statement alleged herein, or a portion thereof, Defendants are liable for any such false and/or misleading forward-looking statement because at the time such statement was made, the speaker actually knew the statement was false, or the statement was authorized and/or approved by an executive officer of JPMorgan who actually knew that the statement was false.

277.    Moreover, to the extent that JPMorgan and the Individual Defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks," those disclosures were also materially false and/or misleading because they did not disclose that the risks that were the subject of such warnings had materialized and/or JPMorgan and the Individual Defendants had

actual knowledge of undisclosed material adverse facts that rendered such "cautionary" disclosures materially false and/or misleading.

## X.   CLASS ACTION ALLEGATIONS

278.   Lead Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a Class consisting of all persons and entities who purchased or otherwise acquired JPMorgan common stock between February 24, 2010 and May 21, 2012 inclusive, and who were damaged thereby. Excluded from the Class are Defendants (as set forth herein), present or former executive officers of JPMorgan, members of JPMorgan's Board of Directors, members of their immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii))) and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

279.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, JPMorgan common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least thousands of members in the proposed Class.  As of May 21, 2012, JPMorgan had approximately 3.8 billion shares of common stock outstanding.  Record owners and other members of the Class may be identified from records maintained by JPMorgan and/or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

280.   Lead Plaintiffs' claims are typical of the claims of the other members of the Class as all members of the Class purchased or otherwise acquired JPMorgan common stock during the

Class Period and were similarly affected by Defendants' wrongful conduct in violation of the federal laws that is complained of herein.

281.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.  Lead Plaintiffs have no interests that are adverse or antagonistic to the Class.

282.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impracticable for Class members individually to seek redress for the wrongful conduct alleged herein.

283.    Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

1. Whether the federal securities laws were violated by Defendants' acts as alleged herein;

2. Whether Defendants' statements to the investing public during the Class Period misrepresented and/or omitted material facts;

3. Whether and to what extent the market prices of JPMorgan common stock, were artificially inflated and/or distorted during the Class Period due to the misrepresentations and/or omissions of material fact complained of herein;

4. Whether the Defendants named under Section 10(b) of the Exchange Act acted with scienter;

5. Whether reliance may be presumed pursuant to the fraud-on-the-market doctrine; and

6. Whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of damages.

284.    The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to the individual Class members, which would establish incompatible standards of conduct for Defendants, or adjudications with respect

to individual Class members that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair their ability to protect their interests.

285.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## XI.    CAUSES OF ACTION

### COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against JPMorgan and Defendants Dimon, Cavanagh and Braunstein

286.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  This Count is brought pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. §78(j)(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, on behalf of Lead Plaintiffs and all other members of the Class against JPMorgan and Defendants Dimon, Cavanagh and Braunstein.

287.    Throughout the Class Period, JPMorgan and Defendants Dimon, Cavanagh and Braunstein disseminated or approved the false statements and/or omissions alleged above and summarized below, which each defendant knew or recklessly disregarded were misleading in that they misrepresented and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Defendants carried out a plan, scheme and course of conduct that:  (i) deceived the investing public, including Lead Plaintiffs and other Class members, as alleged herein; and (ii) caused Lead Plaintiffs and other members of the Class to purchase JPMorgan common stock at

artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, JPMorgan and Defendants Dimon, Cavanagh and Braunstein took the actions set forth herein.

288.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:  (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Lead Plaintiffs and other members of the Class in connection with their purchases of JPMorgan common stock  in an effort to maintain artificially high market prices for JPMorgan common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. As alleged herein, the material misrepresentations contained in, or the material facts omitted from, Defendants' public statements included, but were not limited to, materially false and/or misleading representations and omissions during the Class Period  regarding:  (i) the true purpose, objective and activities of the CIO; (ii) JPMorgan's risk management framework; (iii) the establishment of and adherence to limits to monitor the size, asset type or other risk factors associated with the CIO's synthetic-credit portfolio; (iv) how JPMorgan's VaR was assessed with respect to the CIO and the amount of VaR related to the CIO positions for 1Q 2012; and (v) the net income and earnings per share results, among others, reported in the Company's SEC filings and related public documents.

289.    These Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the United States mail, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the other members of the Class; made various false and/or misleading statements of material facts and omitted to state material facts that were required to be disclosed; made the

above statements and omissions with knowledge or a reckless disregard for the truth; and employed devices, schemes and artifices to defraud in connection with the purchase or sale of securities, which were intended to, and did: (i) deceive the investing public, including Lead Plaintiffs and the other members of the Class, as alleged herein; (ii) artificially inflate, distort, and/or maintain the market price of JPMorgan common stock; and (iii) cause Lead Plaintiffs and the other members of the Class to purchase JPMorgan common stock during the Class Period at artificially inflated and/or distorted prices.

290.    Each quarterly and year-end report that JPMorgan filed with the SEC on Forms 10-K and 10-Q during the Class Period, including those identified in ¶¶161, 166, and 189 above, included certifications signed by Dimon and Cavanagh (who signed certifications that accompanied the 2009 Form 10-K and First Quarter 2010 Form 10-Q) or Braunstein (who filed certifications that accompanied the remaining Forms 10-K and 10-Qs filed during the Class Period).   In those certifications, Dimon, Cavanagh and Braunstein certified that they had reviewed the relevant Form 10-K or 10-Q, and attested to the accuracy and completeness of the information provided therein.   Specifically, each such certification stated that the executing officer had reviewed the accompanying report and, among other things, certified that:

> 1.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 2.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

Accordingly, Dimon, Cavanagh and Braunstein are liable for the misrepresentations contained in each of the SEC filings that they certified to be complete and accurate.

291.    JPMorgan, Dimon, Cavanagh, and Braunstein had a duty to disclose truthful, accurate, and complete information concerning the CIO's function and activities, its risk management, its VaR, and the Company's financial results to prevent their statements from being misleading.  These Defendants were also required to update and/or correct their prior misstatements and/or omissions, and were obligated to update any statements or omissions that had become false and/or misleading as a result of intervening events.

292.    These Defendants are liable for all materially false and/or misleading statements and omissions of material fact made during the Class Period, as alleged above, including, without limitation, the materially false and/or misleading statements and omissions of material fact set forth above in ¶¶159-225.

293.    As alleged above, the Defendants named in this Count acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Defendants' material misrepresentations and/or omissions were issued knowingly or recklessly and for the purpose and effect of concealing information concerning the CIO's function and activities, its risk management, its VaR, and the Company's financial results from the investing public and supporting the artificially inflated price of its securities.

294.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of JPMorgan common stock was artificially inflated throughout the Class Period.  In ignorance of the fact that market prices of JPMorgan common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by JPMorgan, Dimon,

Cavanagh, and Braunstein, or upon the integrity of the market in which the securities traded, and/or in the absence of material adverse information that was known to or recklessly disregarded by JPMorgan and Defendants Dimon, Cavanagh and Braunstein, Lead Plaintiffs and the other members of the Class purchased or otherwise acquired JPMorgan common stock during the Class Period at artificially inflated prices and were damaged thereby.

295.    At the time of the material misrepresentations and/or omissions, Lead Plaintiffs and the other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiffs and the other members of the Class known the truth regarding JPMorgan's actual financial condition and business practices, Lead Plaintiffs and the other members of the Class would not have purchased or otherwise acquired JPMorgan common stock, or, if they had purchased or otherwise acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices that they paid.

296.    By virtue of the foregoing, JPMorgan, Dimon, Cavanagh, and Braunstein have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Lead Plaintiffs and to the other members of the Class, each of whom has been damaged as a result of such violations.

## COUNT II

**For Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

297.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein. This Count is brought pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), on behalf of Lead Plaintiffs and all other members of the Class against the Individual Defendants.

298. During their tenures as officers of JPMorgan, each of the Individual Defendants was a controlling person of JPMorgan within the meaning of Section 20(a) of the Exchange Act. By reason of their positions of control and authority as officers of JPMorgan, the Individual Defendants exercised day-to-day control over the Company and had the power and authority to cause JPMorgan to engage in the wrongful conduct complained of herein. The Individual Defendants were able to and did control, directly and indirectly, the content of the public statements made by JPMorgan during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

299. In their capacities as senior officers of JPMorgan, and as alleged more fully above in ¶¶228-42 and ¶¶245-52, each of the Individual Defendants was made aware of the circumstances surrounding the CIO's function and activities, its risk management, and its VaR, and was a culpable participant in the underlying violations of Section 10(b) alleged above.

300. As set forth above, JPMorgan violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons of JPMorgan and, as a result of their own aforementioned conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as JPMorgan is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs and other members of the Class who purchased or otherwise acquired JPMorgan common stock during the Class Period. Moreover, as detailed above, during the Class Period during which the Individual Defendants served as officers of JPMorgan, each of the Individual Defendants is responsible for the material misstatements and omissions made by JPMorgan.

301.     As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of JPMorgan common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

1.     Determining that this action is a proper class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

2.     Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

3.     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

4.     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated:  November 20, 2012

Respectfully Submitted,

BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP

Steven B. Singer
Avi Josefson
Jai Chandrasekhar
Michael D. Blatchley
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
steven@blbglaw.com
avi@blbglaw.com
jai@blbglaw.com

michaelb@blbglaw.com

**GRANT & EISENHOFER P.A.**
Jay W. Eisenhofer
Daniel L. Berger
Jeffrey A. Almeida
485 Lexington Avenue
New York, NY 10017
Telephone:  (646) 722-8505
Facsimile:  (302) 622-7004
jeisenhofer@gelaw.com
dberger@gelaw.com
jalmeida@gelaw.com

**KESSLER TOPAZ
MELTZER & CHECK LLP**
Andrew Zivitz
Matthew Mustokoff
Johnston de F. Whitman, Jr.
Jennifer Joost
280 King of Prussia Road
Radnor, PA 19087
Telephone:  (610) 667-7706
Facsimile:  (610) 667-7056
azivitz@ktmc.com
mmustokoff@ktmc.com
jwhitman@ktmc.com
jjoost@ktmc.com

*Lead Counsel for Lead Plaintiffs and the
Class*

**STOLL STOLL BERNE LOKTING &
SHLACHTER P.C.**
Keith Ketterling
Scott Shorr
209 Southwest Oak Street
Portland, OR 97204
Telephone: (503) 227-1600
Facsimile: (503) 227-6840
KKetterling@stollberne.com
SShorr@stollberne.com

*Special Assistant Attorneys General and
Counsel for Lead Plaintiff the State of
Oregon by and through the Oregon State*

*Treasurer on behalf of the Common School Fund and, together with the Oregon Public Employee Retirement Board, on behalf of the Oregon Public Employee Retirement Fund*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE JPMORGAN CHASE & CO. SECURITIES LITIGATION | )<br>)  Master File No. 1:12-cv-03852-GBD<br>)<br>)  **CERTIFICATE OF SERVICE**<br>)<br>)  **JURY TRIAL DEMANDED**<br>)<br>)  **ECF CASE**<br>)<br>)<br>) |

I hereby certify that on November 20, 2012, I caused copies of the foregoing

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

to be served on the parties listed on the attached service list via Federal Express.

Dated:  November 20, 2012

Michael Blatchley

U.S DISTRICT COURT SDNY

2012 NOV 20 P 8: 26

RECEIVED

# SERVICE LIST

Daryl Andrew Libow
Sullivan & Cromwell LLP
1701 Pennsylvania Avenue, N.W.
Washington, DC 20006
(220)-956-7650
Fax: (220)-293-6330
Email: libowd@sullcrom.com

Richard C. Pepperman , II
Sullivan and Cromwell, LLP
125 Broad Street
New York, NY 10004
(212) 558-3493
Fax: (212) 558-3588
Email: peppermanr@sullcrom.com

Christopher Michael Viapiano
Sullivan & Cromwell LLP (Washington DC)
1701 Pennsylvania Avenue, N.W.
Washington, DC 20006
(202) 956-6985
Fax: (202) 956-7056
Email: viapianoc@sullcrom.com

*Counsel for Defendant JPMorgan Chase &
Co., James Dimon, Ina R. Drew and Douglas
L. Braunstein*