**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

| | |
|---|---|
| | ) |
| IN RE JPMORGAN CHASE & CO. | ) Master File No. 1:12-cv-03852-GBD |
| SECURITIES LITIGATION | ) |
| | ) **SECOND AMENDED** |
| | ) **CONSOLIDATED** |
| | ) **CLASS ACTION COMPLAINT** |
| | ) |
| | ) **JURY TRIAL DEMANDED** |
| | ) |
| | ) **ECF CASE** |
| | ) |

_____

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................... 2

II.     JURISDICTION AND VENUE ........................................................................... 13

III.    PARTIES ............................................................................................................... 13

        A.      LEAD PLAINTIFFS.................................................................................. 14

        B.      DEFENDANTS ......................................................................................... 16

        C.      CONFIDENTIAL WITNESSES ............................................................... 18

IV.     FACTS ................................................................................................................... 19

        A.      JPMORGAN TOUTED ITS SUPERIOR RISK MANAGEMENT ACUMEN
                AND CULTIVATED DIMON'S REPUTATION AS THE "KING OF RISK
                MANAGEMENT" ...................................................................................... 19

        B.      THE CIO PURPORTEDLY WAS A CORE COMPONENT OF JPMORGAN'S
                RISK MANAGEMENT ............................................................................. 20

        C.      DIMON SECRETLY TRANSFORMED THE CIO INTO A HIGH-RISK
                PROPRIETARY TRADING DESK, DIRECTLY CONTRADICTING
                JPMORGAN'S REPRESENTATIONS THAT THE CIO MANAGED RISK ... 22

        D.      JPMORGAN SECRETLY ELIMINATED THE RISK MANAGEMENT
                DISCIPLINE AND TRANSPARENCY IT TOUTED TO INVESTORS IN
                ORDER TO FACILITATE HIGH-RISK PROPRIETARY TRADING IN THE
                CIO, AND DIMON REJECTED ANY EFFORT TO IMPROVE THE CIO'S
                RISK MANAGEMENT ............................................................................. 27

        E.      THE JPMORGAN TASK FORCE REPORT AND SENATE REPORT
                CONFIRM THAT JPMORGAN UNDERMINED AND REMOVED RISK
                CONTROLS AND LIMITS IN THE CIO ................................................. 32

        F.      FREED FROM RISK MANAGEMENT PROTOCOLS, DIMON'S
                PROPRIETARY TRADING DESK SECRETLY GENERATED MASSIVE
                GAINS AND LOSSES .............................................................................. 36

        G.      THE CIO'S PROPRIETARY TRADING STRATEGIES DID NOT HEDGE
                ANY RISKS FACED BY JPMORGAN'S OTHER BUSINESS UNITS ........... 42

        H.      JPMORGAN CONCEALED THE CIO'S PROPRIETARY TRADING
                OPERATIONS FROM REGULATORS ..................................................... 45

I.     JPMORGAN MISSTATED ITS FINANCIAL RESULTS BY FAILING TO RESERVE FOR THE CIO'S ILLIQUID POSITIONS IN THE SYNTHETIC CREDIT PORTFOLIO .......................................................................... 49

J.     SURGING VAR LEVELS AND RISK LIMIT BREACHES ALERTED SENIOR MANAGEMENT TO THE SIGNIFICANT LEVELS OF RISK GENERATED BY THE CIO .................................................................................. 54

K.     DEFENDANTS MANIPULATED THE CIO'S RISK MODELS TO TRY TO CONCEAL THE CIO'S RISKS AND TO ENABLE THE CIO TO MAKE EVEN BIGGER BETS .................................................................................. 59

L.     THE "LONDON WHALE'S" MOUNTING LOSSES THREATENED TO EXPOSE THE CIO'S TRUE FUNCTION .......................................... 66

M.     JPMORGAN'S OWN INVESTMENT BANK TRADED AGAINST THE CIO, EXACERBATING ITS LOSSES ........................................................ 70

N.     JPMORGAN DISREGARDED AND MANIPULATED THE CIO AND FIRM-WIDE RISK LIMITS THAT WERE BREACHED BY THE SYNTHETIC CREDIT PORTFOLIO IN JANUARY 2012 ........................................ 71

O.     THE CIO'S DEFICIENT RISK-MANAGEMENT PROTOCOLS PERMITTED TRADERS TO MANIPULATE THE VALUATION OF THEIR CREDIT DERIVATIVES ........................................................................ 76

P.     JPMORGAN DECEIVED INVESTORS AND REGULATORS AS TO THE TRUE IMPACT OF THE CIO'S TRADES ........................................ 83

Q.     JPMORGAN DISCLOSED THE CIO'S MASSIVE TRADING LOSS, REVEALING THE CIO'S TRUE NATURE FOR THE FIRST TIME .............. 95

R.     JPMORGAN RESTATED EARNINGS AND VAR, ADMITTING THAT ITS PRIOR FINANCIAL STATEMENTS LACKED INTEGRITY AND WERE TAINTED BY FRAUDULENT MISVALUATIONS OF THE SYNTHETIC CREDIT PORTFOLIO, AND THAT ITS INTERNAL CONTROLS WERE DEFICIENT ............................................................................ 100

V.     FALSE AND MISLEADING STATEMENTS ............................................ 107

A.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ABOUT THE CIO ...................................................................... 108

B.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS CONCERNING THE COMPANY'S RISK MANAGEMENT STRUCTURE AND ITS ABILITY TO ADEQUATELY MONITOR AND CONTROL RISK ........................................................................................ 116

1.   Misrepresentations in the 2009 Form 10-K and Documents that Incorporated the 2009 Form 10-K by Reference .................................... 116

2.   Material Misrepresentations Contained in the 2010 Form 10-K and Documents that Incorporated the 2010 Form 10-K by Reference .......... 120

C.   DEFENDANTS' FALSE STATEMENTS ABOUT JPMORGAN'S FINANCIAL RESULTS ...................................................................... 124

D.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS CONTINUED IN 2012 AS THE COMPANY EMPLOYED MULTIPLE SCHEMES TO CONCEAL THE CIO'S LOSSES .................................................................... 127

1.   The January 13, 2012 Form 8-K ........................................... 128

2.   The February 13, 2012 Comment Letter ................................... 129

3.   The 2011 Form 10-K ........................................................ 130

4.   The April 4, 2012 Proxy Statement and Dimon's Annual Letter to Shareholders ........................................................... 139

5.   Statements to the Press Regarding the "London Whale" and the CIO ... 141

6.   The April 13, 2012 Form 8-K and Conference Calls ...................... 143

VI.   DEFENDANTS MADE THE FOREGOING FALSE AND MISLEADING STATEMENTS WITH SCIENTER ............................................... 151

A.   DIMON ................................................................ 153

B.   CAVANAGH ............................................................ 163

C.   BRAUNSTEIN .......................................................... 166

D.   DREW ................................................................ 173

E.   ZUBROW .............................................................. 181

F.   JPMORGAN ............................................................ 184

VII.   LOSS CAUSATION .......................................................... 188

VIII.   THE FRAUD ON THE MARKET PRESUMPTION OF RELIANCE APPLIES ........ 195

IX.   THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE .......................................................... 196

X.   CLASS ACTION ALLEGATIONS ............................................. 197

XI.    CAUSES OF ACTION .................................................................................................. 199

COUNT I ............................................................................................................................. 199

     FOR VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE
     10B-5 PROMULGATED THEREUNDER AGAINST JPMORGAN AND THE
     INDIVIDUAL DEFENDANTS.................................................................................... 199

COUNT II ............................................................................................................................ 204

     FOR VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT AGAINST THE
     INDIVIDUAL DEFENDANTS.................................................................................... 204

PRAYER FOR RELIEF ....................................................................................................... 205

JURY TRIAL DEMANDED ................................................................................................. 205

1.     Court-appointed Lead Plaintiffs the Arkansas Teacher Retirement System ("Arkansas Teachers"), the Ohio Public Employees Retirement System ("Ohio PERS"), the School Employees Retirement System of Ohio ("SERS Ohio"), the State Teachers Retirement System of Ohio ("STRS Ohio"), Sjunde AP-Fonden ("AP7"), and the State of Oregon by and through the Oregon State Treasurer on behalf of the Common School Fund and, together with the Oregon Public Employee Retirement Board, on behalf of the Oregon Public Employee Retirement Fund ("Oregon") (collectively, "Lead Plaintiffs") bring this action individually and on behalf of all persons and entities, except Defendants and their affiliates (defined below in ¶¶36-41, 393), who purchased or otherwise acquired the publicly traded common stock of JPMorgan Chase & Co. ("JPMorgan" or the "Company") between February 24, 2010 and May 21, 2012, inclusive (the "Class Period") and were injured thereby.

2.     Lead Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters.  Lead Plaintiffs' information and belief is based on, *inter alia*, the investigation of Court-appointed Co-Lead Counsel, Bernstein Litowitz Berger & Grossmann LLP, Grant & Eisenhofer P.A, and Kessler Topaz Meltzer & Check, LLP.  The investigation included, but was not limited to, interviews and consultations with former employees of JPMorgan and its subsidiaries, as well as review and analysis of: (i) JPMorgan's public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) research reports by securities and financial analysts; (iii) transcripts of investor conference calls; (iv) publicly available presentations and reports issued by JPMorgan, including the Report of JPMorgan Chase & Co. Management Task Force Regarding 2012 CIO Losses (the "JPMorgan Task Force Report") and the Report of the Review Committee of the Board of Directors of JPMorgan Relating to the Board's Oversight Function with Respect to

Risk Management (the "CIO Board Review Report"); (v) orders, reports and findings issued by regulatory agencies, including a January 14, 2013 Cease and Desist Consent Order detailing the Office of the Comptroller of the Currency's ("OCC") findings regarding the CIO losses (the "OCC Cease and Desist Consent Order") and a January 14, 2013 Consent Order setting forth the CIO review findings of the Board of Governors of the Federal Reserve System (the "Federal Reserve Consent Order"), (vi) press releases and media reports; (vii) economic analyses of securities movement and pricing data; (viii) public material obtained in connection with the continuing investigation by the United States Congress, including the Majority and Minority Staff Report issued on March 14, 2013 by the U.S. Senate Permanent Subcommittee on Investigations (the "Senate Subcommittee") titled "JPMorgan Chase Whale Trades: A Case History of Derivatives Risk and Abuses" (the "Senate Report"), which was based on the Senate Subcommittee's review of thousands of internal JPMorgan documents, telephone and instant message transcripts, and interviews with JPMorgan and regulatory personnel, as well as related evidence, including exhibits and testimony presented at the Senate Subcommittee's March 15, 2013 hearing; and (ix) consultation with various relevant experts.

## I.      INTRODUCTION

3.      This action arises from JPMorgan's misrepresentations about the risk-management role that the Company's Chief Investment Office (the "CIO") supposedly played in furthering JPMorgan's putative "commitment to world-class risk management." Throughout the Class Period, JPMorgan held itself out as a paragon of risk management and touted to investors the Company's "robust risk management discipline." The Company's Chairman and Chief Executive Officer ("CEO"), Defendant James Dimon ("Dimon"), was credited with having shepherded JPMorgan through the financial crisis while other financial institutions crumbled,

2

earning a reputation as the "king of risk management."  That reputation distinguished JPMorgan from other banks and caused JPMorgan stock to trade at a premium.

4.      In particular, JPMorgan represented that the CIO, a unit in the Company's Corporate Division, played the central role in managing the Company's risks.  The Company repeatedly told investors that the CIO had "responsibility for managing . . . risk," and did so by monitoring risk throughout the Company and entering into hedging transactions to offset positions held by other JPMorgan units.  Based upon JPMorgan's public representations concerning the function and activities of the CIO, analysts considered the CIO to be JPMorgan's "principal risk management unit."[1]  The Company made clear that the CIO's primary role was to mitigate risk – not to trade for profit.

5.      Defendants' representations concerning the risk management activities of the CIO were false.  By the start of the Class Period, Dimon had secretly transformed the CIO from a risk management unit into a proprietary trading desk whose principal purpose was to engage in speculative, high-risk bets designed to generate profits.  Indeed, generating profits through the CIO had become "Jamie's new vision for the company," according to a former JPMorgan executive.

6.      To facilitate the aggressive trading required to meet Dimon's profit objectives, the CIO abandoned JPMorgan's purported "risk management discipline."  Among other things, the Company removed the "stop loss limits" that previously required CIO traders to exit positions when losses reached $20 million, and Defendants made the conscious decision not to impose any risk limits on the CIO's complex portfolio of synthetic-credit derivatives – exotic investments tied to corporate and government debt – despite public assurances to the contrary.  To keep the

---

[1]      All emphasis in quotations herein is added, except as otherwise noted.

CIO's aggressive trading secret, JPMorgan excluded executives from business units outside the CIO from the CIO's risk meetings.  Executives who pushed Dimon and the head of the CIO, Defendant Ina Drew ("Drew"), to impose risk controls on the CIO were terminated or demoted. And because the Company publicly represented that the CIO merely managed risk, the CIO was not closely monitored by regulators – a fact that was well known to JPMorgan's senior management, and which allowed the CIO to engage in increasingly risky trading without government supervision.

7.     Reflecting the fact that the CIO was not a risk management tool but one intended to generate substantial profits, the earnings generated by the CIO's secret trading operation became a major undisclosed basis for JPMorgan's financial performance.  Although during the Class Period the Company never disclosed separately the CIO's profits, analysts later determined that the CIO contributed as much as $0.80 per share to JPMorgan's earnings – or 35% of the Company's earnings – at certain points during the Class Period.

8.     The riskiest component of the CIO's portfolio was its synthetic credit portfolio. That multi-billion dollar portfolio became the CIO's largest position during the Class Period, and constituted such a large part of the market for synthetic-credit derivatives that, by the end of 2009, the position was illiquid.  Because the synthetic credit portfolio could not be sold, JPMorgan faced enormous losses if the market moved against the CIO's position in this portfolio.

9.     The illiquidity risk presented by the synthetic credit portfolio was so severe that, in early 2010 (the start of the Class Period), a senior JPMorgan executive prepared a detailed report documenting the need for a $2 to $4 billion reserve to guard against losses in the CIO. Creating such a reserve, however, would have materially reduced the earnings of the entire

Company.  Unwilling to sacrifice profits, JPMorgan did not establish any reserve for the CIO, and thereby caused the Company's net income to be overstated by billions of dollars throughout the Class Period.

10.     The CIO's synthetic credit portfolio continued to swell during the Class Period. Remarkably, the Company's own model for measuring risk, known as "value at risk" or "VaR," which measured and monitored how much money a trader could lose on a given day, showed that the synthetic credit portfolio could lose as much money in a single day as the Company's entire Investment Bank.  In other words, JPMorgan knew that a single position in the CIO – which purportedly did not make risky investments – could lose as much money in one day as the hundreds of positions in the Investment Bank, which managed more than twice as much capital as the entire CIO.

11.     By no later than mid-2011, JPMorgan knew that the CIO's synthetic credit portfolio had grown to such "a perilous size" (as Defendant Cavanagh described it) that the Company's publicly reported VaR would spike if accurately calculated and reported.  Indeed, the size of the synthetic credit portfolio increased more than ten-fold during 2011.  Although JPMorgan's senior management recognized that the Company needed to reduce the size of that portfolio, doing so would have required JPMorgan to sell its positions at enormous losses, and would have revealed to investors the truth about the CIO's proprietary trading.

12.     Accordingly, rather than reducing the risky position held by the CIO, JPMorgan developed a new VaR model that was designed to artificially lower the CIO's VaR, and thus conceal the true purpose and risk of the CIO.  Defendant Dimon personally approved the implementation of this new model in January 2012.  Using the new VaR model, JPMorgan reported in the first quarter of 2012 that the CIO's VaR was virtually unchanged from the prior

quarter when the original VaR model showed that the risk of loss had <u>doubled</u>.  But Defendants did not disclose that the CIO's VaR model had been changed in either JPMorgan's 2011 annual report or when announcing results for the first quarter of 2012, after the change was made.

13.     The existence of the CIO's synthetic credit portfolio was only first revealed to investors in April 2012, when *Bloomberg* and the *Wall Street Journal* reported that the CIO had amassed a portfolio of credit derivatives so large that Bruno Iksil – a London-based trader who helped manage the portfolio – had been nicknamed the "London Whale" by credit derivatives traders.  Although the losses in the synthetic credit portfolio had already reached $1.2 billion by that point, and internal JPMorgan reports were warning that the synthetic credit portfolio could lose as much as $9 billion, Dimon dismissed analysts' questions about the CIO, calling the news about the portfolio a "tempest in a teapot."

14.     Just weeks later, on May 10, 2012, Dimon shocked investors by disclosing that, despite JPMorgan's public representations that the CIO was primarily charged with managing risk, the trades within the CIO's synthetic credit portfolio had caused $2 billion in losses to the Company.  According to Dimon, the losses were the result of "self-inflicted" "egregious mistakes" in a strategy that was "flawed, complex, poorly reviewed, poorly executed, and poorly monitored."  The disclosure of these losses caused the price of JPMorgan stock to fall nearly 10%.  That decline wiped out over $14 billion of shareholder wealth.  Within days, the CIO's loss had grown to $3 billion.  Then, on May 21 – the last day of the Class Period – JPMorgan revealed that the CIO's losses were so severe that the Company was forced to abandon a share repurchase program that it had initiated in March 2012.  All told, the revelations about the CIO's high-risk trading and the losses it caused drove the price of JPMorgan stock down more than $8 per share, wiping out over $31 billion of the Company's market capitalization.  To date, the

CIO's losses have surpassed $6.25 billion, or 63% of the Company's publicly reported net income for the first half of 2012.

15.     Two months after the end of the Class Period, JPMorgan announced that it would restate its financial results for the first quarter of 2012, conceding that those financial results were materially misstated because the valuation of the synthetic credit portfolio lacked "integrity," and had been deliberately misstated "to avoid showing the full amount of the losses in the portfolio."   Virtually every employee associated with the CIO's high-risk strategy and disastrous trades – except Dimon – was terminated, and JPMorgan has now clawed back tens of millions of dollars in compensation from the members of senior management responsible for the CIO bets that resulted in the losses.   For example, when Defendant Drew was terminated, she forfeited more than $20 million of compensation – her entire income for the previous two years. Dimon, whose own compensation for 2012 was slashed by the JPMorgan Board to half of what he earned in 2011, has admitted to "egregious mistakes," and testified that there were no risk limits for the synthetic credit portfolio, he was fully aware of the CIO's extraordinarily risky trading strategy, and he was directly responsible for the losses that strategy caused, stating "I am absolutely responsible.  The buck stops with me."

16.     The United States Senate, the Company's regulators, and JPMorgan's own CIO Task Force have now confirmed that Defendants' representations about JPMorgan's risk management infrastructure and the purpose and function of the CIO were false.  First, on January 14, 2013, JPMorgan's principal regulator, the OCC, entered into a Cease and Desist Consent Order with the Company.  In a strong rebuke of JPMorgan's risk management practices, the OCC specifically found that: (i) JPMorgan abandoned its risk controls, (ii) JPMorgan's risk

control failures enabled the CIO to engage in high-risk trading, and (iii) such improper trading strategies directly caused the losses in the CIO.  Specifically, the OCC Consent Order stated that:

- the "Bank's risk management process and procedures for the credit derivatives trading conducted by the CIO did not provide an adequate foundation to identify, understand, measure, monitor and control risk,"

- the "Bank's valuation control processes and procedures for the credit derivatives trading conducted by the CIO were insufficient to provide rigorous and effective assessment of valuation," and

- as a direct result of these deficiencies, the CIO was "able to increase its positions and risk, and ultimately losses, without sufficiently effective intervention by the bank's control groups."

As a result, the OCC concluded that JPMorgan engaged in unsafe and unsound practices that violated federal law.  That same day, the Federal Reserve entered into a Consent Order with JPMorgan which tracked the findings of the OCC and concluded that the Company had "deficiencies" in risk management, internal controls, valuation and internal financial reporting for the CIO.   JPMorgan did not deny the findings of the OCC or the Federal Reserve.

17.     Then, on January 16, 2013, JPMorgan issued its own Task Force Report, which shed further light on the CIO's focus on proprietary trading and the gross deficiencies in JPMorgan's risk management practices that existed throughout the Class Period.  Indeed, as the JPMorgan Task Force Report revealed, rather than serving as the Company's principal risk management unit, the CIO had virtually no risk management infrastructure at all.  The JPMorgan Task Force Report further documented how, rather than managing risk, the CIO's principal function was to engage in highly speculative proprietary trading, unfettered by any risk management controls or limits.

18.     Indeed, while JPMorgan publicly represented that the CIO was JPMorgan's principal risk management tool, the JPMorgan Task Force Report revealed the opposite; namely,

that the "CIO was subjected to less rigorous scrutiny than client-facing lines of business" for "a significant period of time prior to the first quarter of 2012." Thus, the JPMorgan Task Force Report admitted that, unlike other lines of business at JPMorgan, the CIO did not have a Chief Risk Officer or a formal "Risk Committee," and the "committee" purportedly responsible for risk management within the CIO had no membership, no charter, and met only three times in all of 2011. As the JPMorgan Task Force Report concluded, the "CIO Risk Management lacked the personnel and structure necessary to properly risk manage the Synthetic Credit Portfolio," and as a result it "failed to serve as a meaningful check on the activities of the CIO management and traders."

19.     In contrast to the Company's representations in its SEC filings that it adhered to "granular" "established [risk] limits" to monitor and control risk, in reality the CIO had no risk limits. As the JPMorgan Task Force Report admitted, the CIO's risk limits were not "sufficiently granular," and there were "<u>no limits by size, asset type or risk factor for the Synthetic Credit Portfolio; indeed, there were no limits of any kind specific to the Synthetic Credit Portfolio</u>." Moreover, in direct contravention of JPMorgan's policy, which required at least annual reviews of risk limits to ensure they were appropriate, the Company failed to review the risk limits in the CIO at any time between 2009 and 2012. As the JPMorgan Task Force Report concluded, the CIO's risk limits were "inadequate" and there was "<u>no meaningful effort to ensure that…[the] CIO was subject to appropriately rigorous risk and other limits and was updating those limits on a regular basis</u>."

20.     In stark contrast to the Company's public representations, the CIO was not a risk mitigation unit, and did not hedge the risks generated by the Company's other business units. Specifically, the JPMorgan Task Force Report and the CIO Board Review Report conceded that,

rather than mitigate the risks generated by JPMorgan's profit-making businesses, the CIO pursued its own profit-making "[t]actical credit strategies," with the synthetic credit portfolio generating over $2.8 billion in "economic value" and a 100% return on equity from inception until December 2010. In fact, as the JPMorgan Task Force Report admitted, none of the "priorities" for the synthetic credit portfolio involved managing risk for JPMorgan's other divisions, but rather were focused on generating profit and managing internal risks the portfolio itself had created within the CIO.

21. The JPMorgan Task Force Report also described how JPMorgan deliberately manipulated its VaR model to conceal the CIO's true risk. Specifically, the JPMorgan Task Force Report admitted that the personnel involved in the implementation of JPMorgan's "new" VaR model – including Dimon, Braunstein, and Drew – knew that it would "produce a lower" VaR, yet neither Dimon nor anyone else required any adjustments to the CIO's or the Company's VaR risk limits to account for this fact. As the JPMorgan Task Force Report admitted, the model was approved under "pressure" from the CIO, after the synthetic credit portfolio had breached CIO and Company-wide risk limits, without adequate testing and without comparing the model's results to data that JPMorgan was required under law to maintain— practices which directly violated Company policy. The Company's primary regulators, the OCC and Federal Reserve, ultimately determined that JPMorgan's implementation of that new VaR model evidenced deficiencies, unsafe practices and violations of federal law that enabled JPMorgan to conceal the growing risk within the CIO.

22. JPMorgan knew that the CIO was experiencing massive losses long before those losses were disclosed, and that the Company's financial statements were materially misstated by the Company's failure to record appropriate mark-to-market losses. Indeed, the JPMorgan Task

Force Report disclosed that in late 2011, Defendants Drew and Braunstein were specifically told that unwinding only 35% of the synthetic credit portfolio would result in losses of at least $500 million.  Under Generally Accepted Accounting Principles ("GAAP"), such information required JPMorgan to either adjust the marks on the synthetic credit portfolio positions to reflect the losses or take a liquidity reserve.  However, doing so would have resulted in JPMorgan's 2011 fourth quarter net income being reduced by more than 13%.  Accordingly, CIO traders were instead ordered to "defend the P&L" of the synthetic credit portfolio, and JPMorgan did not record <u>any</u> losses on the portfolio's positions.  To the contrary, JPMorgan embarked on an extraordinarily speculative trading strategy, requiring even riskier positions, which ultimately led to the massive losses in the CIO.

23.     The Senate Report issued on March 14, 2013 concluded that JPMorgan and its senior executives, including Dimon, intentionally deceived investors and regulators regarding the CIO's purpose, risk oversight and the trading that ultimately caused the CIO's massive losses. Specifically, the Senate Report found that the Defendants named herein made "written and verbal representations" that were "<u>incomplete, contained numerous inaccuracies, and misinformed investors, regulators, and the public about the CIO's Synthetic Credit Portfolio</u>." Those misrepresentations and omissions – which the Senate Report specifically stated "were fictions irreconcilable with the bank's obligation to provide material information to its investors in an accurate manner" – included:

- Dimon's claim that the CIO's trades were a "tempest in a teapot," a representation that the Senate Subcommittee found to be false and misleading in light of Dimon's knowledge about the "complex and sizeable portfolio, its sustained losses for three straight months, the exponential increase in those losses during March, and the difficulty of exiting the [] positions."

- Braunstein's statement that "[a]ll" of the CIO's "positions are put on pursuant to the risk management at the firm-wide level."  As the Senate Report explained, this

statement was an attempt to "instill investor confidence in the trades," and "it was not true."

- JPMorgan's mischaracterization of the synthetic credit portfolio as being "fully transparent to the regulators." As the Senate Subcommittee found, this statement "had no basis in fact" and, in fact, JPMorgan "had dodged OCC oversight of the [synthetic credit portfolio] for years."

- JPMorgan's claim that the synthetic credit portfolio was a "hedge" to "keep the Company balanced from a risk management standpoint." JPMorgan further represented that the portfolio provided "stress loss protection" in which "[a]ll of the decisions are made on a very long-term basis." According to the Senate Report, the synthetic credit portfolio was not a hedge, but "a high risk proprietary trading operation that had no place at a federally insured bank."

- JPMorgan's concealment of the change in the CIO VaR that the Company implemented to hide the CIO's losses.

24. The Senate Subcommittee also found that the CIO engaged in high-risk proprietary trading throughout the Class Period. Indeed, the synthetic credit portfolio started as a "Proprietary Positions Book" in the Investment Bank, and was transferred to the CIO in 2008. Significantly, while JPMorgan attempted to disguise the CIO's trading by claiming that it was "hedging," JPMorgan was unable to provide any documentation to the Senate Subcommittee substantiating that claim. Thus, for example, JPMorgan was unable to provide such basic information setting forth the synthetic credit portfolio's "hedging objectives and strategies; the assets, portfolio, risks, or tail events it was supposed to hedge; or how the size, nature, and effectiveness of its hedges were determined." As the Senate Report noted, JPMorgan offered no plausible innocent explanation for its failure to maintain such documentation, which OCC regulations required JPMorgan to maintain. The Senate Report also confirmed that the CIO's proprietary trading activities were conducted at the direction of Dimon, as Drew told the OCC in 2010 and confirmed in her testimony before Congress: the CIO's "investment decisions are made with the full understanding of executive management, including Jamie Dimon."

25.     JPMorgan is now the subject of a host of criminal and civil investigations into the CIO's trading and JPMorgan's disclosures.  Specifically, in addition to the examinations by the OCC, the Federal Reserve, and the Senate Subcommittee, JPMorgan is currently the target of investigations by, among others, the SEC, the U.S. Department of Justice, the Federal Deposit Insurance Corporation ("FDIC"), and the U.K. Financial Services Authority.

## II.     JURISDICTION AND VENUE

26.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5 (17 C.F.R. § 240.10b-5).

27.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and under 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

28.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and under 28 U.S.C. § 1391(b), (c) and (d) because many of the acts and transactions that constitute violations of law complained of herein, including the dissemination of the materially false and misleading statements set forth herein, occurred in this District, and were perpetrated by the Company that is headquartered in this District.

29.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the New York Stock Exchange ("NYSE").

## III.     PARTIES

A.      **LEAD PLAINTIFFS**

30.     Lead Plaintiff Arkansas Teacher Retirement System ("Arkansas Teachers") is a public pension fund established in 1937 for the benefit of the employees of Arkansas' education community and manages billions of dollars in assets.  As reflected on its certification previously filed in this action (ECF No. 16-1), Arkansas Teachers purchased shares of JPMorgan common stock on the NYSE during the Class Period and suffered losses as a result of the conduct complained of herein.

31.     Lead Plaintiff Ohio Public Employees Retirement System ("Ohio PERS") is a public pension fund organized under Ohio law for the benefit of public employees throughout the State of Ohio who are not covered by another state or local retirement plan or system. As of December 31, 2011, Ohio PERS managed more than $74 billion in assets and served more than 986,000 members.  As reflected on its certification previously filed in this action (ECF No. 16-1), Ohio PERS purchased shares of JPMorgan common stock on the NYSE during the Class Period and suffered losses as a result of the conduct complained of herein.

32.     Lead Plaintiff School Employees Retirement System of Ohio ("SERS Ohio") is a public pension fund organized under Ohio law for the benefit of current and retired public school, non-teaching employees in the State of Ohio.  As of December 31, 2011, SERS Ohio managed more than $10.5 billion in assets and served more than 125,000 active, inactive and retired Ohio public school, non-teaching employees.  As reflected on its certification previously filed in this action (ECF No. 16-1), SERS Ohio purchased shares of JPMorgan common stock on the NYSE during the Class Period and suffered losses as a result of the conduct complained of herein.

33.     Lead Plaintiff State Teachers Retirement System of Ohio ("STRS Ohio") is a public pension fund organized under Ohio law for the benefit of current and retired educators in

the State of Ohio.  As of December 31, 2011, STRS Ohio managed more than $67 billion in assets and served more than 475,200 active, inactive and retired Ohio public educators.  As reflected on its certification previously filed in this action (ECF No. 16-1), STRS Ohio purchased shares of JPMorgan common stock on the NYSE during the Class Period and suffered losses as a result of the conduct complained of herein.

34.     Lead Plaintiff Sjunde AP-Fonden ("AP7") is part of the Swedish national pension system and is located in Stockholm, Sweden.  AP7 manages approximately $18 billion in premium pension assets on behalf of more than 6 million Swedish investors.  As reflected on its certification previously filed in this action (ECF No. 16-1), AP7 purchased shares of JPMorgan common stock on the NYSE during the Class Period and suffered losses as a result of the conduct complained of herein.

35.     Lead Plaintiff State of Oregon by and through the Oregon State Treasurer on behalf of the Common School Fund and, together with the Oregon Public Employee Retirement Board, on behalf of the Oregon Public Employee Retirement Fund ("Oregon") operates and oversees public funds for the benefit of public schools and retirees, respectively.  The Oregon Public Employee Retirement Fund is a state pension fund for retired public employees overseeing approximately $61 billion in assets as of December 31, 2012.  The Common School Fund is a fund with approximately $1.1 billion in assets as of December 31, 2012 that seeks to generate investment earnings to support Oregon public schools.  As reflected on its certification previously filed in this action (ECF No. 16-1), Oregon purchased shares of JPMorgan common stock on the NYSE during the Class Period and suffered losses as a result of the conduct complained of herein.

### B.    DEFENDANTS

36.    Defendant JPMorgan is a Delaware corporation headquartered in New York, New York.  The Company's stock is listed on the NYSE under the ticker symbol "JPM," and it is a component of the Dow Jones Industrial Average.  JPMorgan is a worldwide holding company that, through its subsidiaries, provides broad-based banking services across the globe.  JPMorgan is the largest bank in the United States with $2.32 trillion in assets and $189.73 billion of shareholder equity, as of March 31, 2012.

37.    Defendant Dimon is the Chairman of the Board of Directors, President, and CEO of JPMorgan.  Dimon arrived at JPMorgan in 2004 and assumed the role of President and Chief Operating Officer ("COO").   On December 31, 2005, he was promoted to CEO, and on December 31, 2006, Dimon took on the additional role of Chairman of the Board.  During the Class Period, Dimon signed the Company's Forms 10-K for 2009, 2010 and 2011, and certified the accuracy of its Forms 10-Q for each quarter.  These documents contained materially false and misleading statements and omissions concerning the function of the CIO, the Company's risk-management procedures and practices, and various financial metrics.  He also participated in the Company's quarterly earnings conference calls on April 14, 2010; July 15, 2010; October 13, 2010; January 14, 2011; April 13, 2011; July 14, 2011; October 13, 2011; January 13, 2012; and April 13, 2012, during which the Company made materially false and misleading statements and omissions, as alleged below.

38.    Defendant Michael J. Cavanagh ("Cavanagh") served as the Executive Vice President and Chief Financial Officer ("CFO") of JPMorgan from before the beginning of the Class Period until June 2010, when he became CEO of the Company's Treasury and Securities Services Business ("TSSB"), a position he retained throughout the end of the Class Period.  Cavanagh reported directly to Dimon during the Class Period, and continues to directly

16

report to Dimon today.  During the Class Period, Cavanagh signed the Company's 2009 Form 10-K and certified the accuracy of its Forms 10-Q for each quarter when he was CFO.  These documents contained materially false and misleading statements and omissions concerning the function of the CIO, the Company's risk-management procedures and practices, and various financial metrics. He also participated in the Company's quarterly earnings conference calls on April 14, 2010 and July 15, 2010, during which the Company made materially false and misleading statements and omissions, as alleged below.  Since July 2012, Cavanagh has served as Co-Chief Executive Officer of the Corporate & Investment Bank at JPMorgan.

39.     Defendant Douglas L. Braunstein ("Braunstein") was the Executive Vice President and CFO of JPMorgan from June 2010 through the end of the Class Period, and reported directly to Dimon during this time.  During the Class Period, Braunstein signed the Company's Forms 10-K for 2010 and 2011 and certified the accuracy of its Forms 10-Q for each quarter when he was CFO. These documents contained materially false and misleading statements and omissions concerning the function of the CIO, the Company's risk-management procedures and practices, and various financial metrics.  He also participated in the Company's quarterly earnings conference calls on July 15, 2010; October 13, 2010; January 14, 2011; April 13, 2011; July 14, 2011; October 13, 2011; January 13, 2012; and April 13, 2012, during which the Company made materially false and misleading statements and omissions, as alleged below. He was ousted from his role as CFO after the end of the Class Period, but remains with the Company.

40.     Defendant Drew was the Chief Investment Officer, a member of the Operating Committee of JPMorgan, and reported directly to Dimon during the Class Period.  As part of her role, Drew oversaw and managed the CIO, including its investments and trading operations,

17

during the Class Period.  Before becoming Chief Investment Officer in February 2005, Drew was JPMorgan's Head of Global Treasury.  Drew was terminated on May 13, 2012 as a result of the CIO trading scandal and was also forced to forfeit two years of her compensation totaling more than $20 million pursuant to JPMorgan's clawback policies.

41.     Defendant Barry L. Zubrow ("Zubrow") served as JPMorgan's Chief Risk Officer from November 2007 until January 2012, and subsequently served as Head of Corporate and Regulatory Affairs.  Zubrow served on the Company's Operating Committee from 2007 until at least October 2012, and reported directly to Dimon from the time Zubrow joined the Company in 2007 until at least July 2012.  Zubrow announced his departure from JPMorgan in October 2012.

42.     The Defendants named in ¶¶37 through 41 are referred to collectively herein as the "Individual Defendants."

### C.     CONFIDENTIAL WITNESSES

43.     Certain of the allegations herein are based on information provided by confidential witnesses ("CWs") who are former employees of JPMorgan interviewed by Lead Plaintiffs' representatives.

44.     CW 1 worked as an associate in the CIO in New York from February 2007 through July 2009 and was primarily responsible for risk reporting and middle office support, which included booking trades and tracking valuations and portfolio values.  CW 1 reported to JPMorgan executive directors Tom Mauro and Matthew Davis.  While primarily supporting CIO traders in the New York office, CW 1 occasionally provided support to the CIO's London office.

45.     CW 2 worked in London for JPMorgan as a Front Office Risk Analyst in Credit Exotics & Hybrids Trading, Risk Exploration & Transparency ("RET") from May 2006 through October 2010.  Starting in 2007, CW 2 reported to the head of the RET unit for that trading group.  The RET team, which comprised a diverse group of employees with a variety of

18

backgrounds and experiences, analyzed risks associated with JPMorgan's positions and provided periodic reports to upper management.

46.     CW 3 worked for JPMorgan from 1994 until 2011.  CW 3 was a Vice President in the New York office of the CIO from April 2010 to April 2011, and reported to one of the executive directors of the CIO.

## IV.    FACTS

### A.    JPMORGAN TOUTED ITS SUPERIOR RISK MANAGEMENT ACUMEN AND CULTIVATED DIMON'S REPUTATION AS THE "KING OF RISK MANAGEMENT"

47.     From the start of the Class Period in February 2010, JPMorgan's reputation for risk management was paramount to investors.  While other Wall Street banks were roiled by the credit crisis in 2008 and 2009, either collapsing outright or requiring massive government bailouts after disclosing billion-dollar losses caused by risky investments, JPMorgan held itself apart as a paragon of prudence with unmatched risk-management expertise.  For example, throughout the Class Period, JPMorgan and its executives repeatedly touted the Company's "long standing commitment to world-class risk management practices and to building a culture of 'no surprises' and early escalation, which are cornerstones for success in our industry."  The Company also claimed that it employed a "robust risk management discipline to capture, monitor, and control the risks created by its business activities."

48.     As JPMorgan's CEO, Dimon took personal credit for having successfully steered JPMorgan through the financial crisis.  Dimon testified to the congressional Financial Crisis Inquiry Commission in January 2010 that JPMorgan's success during the financial crisis was the result of its "steadfast focus on risk management and prudent lending, and our disciplined approach to capital and liquidity management."  His stewardship of the Company represented to investors that JPMorgan stood, most of all, for the rigorous management of risk.  In his annual

19

letters to shareholders during the Class Period, Dimon stressed the Company's risk management expertise, citing its "best-in-class financial and risk systems."  Numerous commentators and news media—including the *New York Times* and *Wall Street Journal*—considered Dimon "Wall Street's best risk manager," and a CEO who "thrived through the global financial crisis and who has long been known for paying close attention to the bank's trading activity, its risk profile and the activities of its senior employees."  JPMorgan's supposed strict adherence to its risk-management policies was so significant to the market that books with titles like *The Last Man Standing* and *The House of Dimon* were devoted to praising Dimon's risk-management acumen and success in steering JPMorgan through the financial crisis.  Simon Johnson, a former Chief Economist of the International Monetary Fund, stated that Dimon "presents himself, and is believed by others to be, the king of risk management."

49.     As a result of its reputation for purportedly unparalleled risk management, JPMorgan stock traded at a premium to that of other financial institutions during the Class Period.  As analysts at Susquehanna Capital noted shortly after the start of the Class Period, "Our target multiple [for JPMorgan] represents a 20% premium to where we would expect other very large banks to trade, but we believe JPM will be accorded a premium multiple by virtue of its overall management strength and superior record of risk management."

**B.     THE CIO PURPORTEDLY WAS A CORE COMPONENT OF JPMORGAN'S RISK MANAGEMENT**

50.     Throughout the Class Period, the Company told investors that its CIO served the critical risk-management function that provided the foundation for the Company's sterling reputation.  The CIO was the unit of JPMorgan's Corporate Division that JPMorgan described in its Form 10-K as having "responsibility for managing . . . risk."  Indeed, the Company identified the CIO as one of a few select "corporate functions with risk management-related

responsibilities" at JPMorgan.   In particular, the CIO was responsible for "measuring, monitoring, reporting and managing the Firm's liquidity, interest rate and foreign exchange risk, and other structural risks."   Analysts also viewed the CIO as JPMorgan's "<u>principal risk management unit</u>."  The head of the CIO, Defendant Ina Drew, reported directly to Dimon.

51.    One of the most important functions of a bank treasury office, such as the CIO, is to manage the risks associated with an imbalance between deposits (liabilities) and loans (assets). In the wake of the recent financial crisis, hundreds of billions of dollars in excess deposits surged into JPMorgan's coffers due to the bank's perceived soundness.  As Dimon reported in an April 2011 letter to shareholders, "[i]n a two-month period, $150 billion flowed in – we barely knew what to do with it."  According to the 2011 Form 10-K, JPMorgan had $740 billion in deposits at the end of 2007 and $1.12 trillion at the end of 2011 – a $380 billion increase.  During that same period, JPMorgan's portfolio of loans only expanded from $519 billion to $723 billion – a $204 billion increase.  By the end of 2011, for every dollar that JPMorgan had on deposit, it was only lending out about $0.64.  Accordingly, since the CIO was responsible for managing excess deposits, the size of its portfolio ballooned over this time period.  JPMorgan's acquisitions of Washington Mutual and Bear Stearns also increased the importance of the CIO, by adding to both JPMorgan's excess deposits and the risks that the CIO had to manage.  Between the end of 2007 and the end of the second quarter of 2012, the CIO's investment-securities portfolio increased almost 500%, from $76 billion to $359 billion.

52.    Throughout the Class Period, the CIO's portfolio was a significant component of JPMorgan's overall assets.   The table below shows the size of the combined investment-securities portfolio of the CIO and Treasury units (whose financial data were combined and

reported together to the public) from the end of 2009 to the end of the second quarter of 2012 (all figures are in $ millions).

| 2009 | 2010 | 2011 | 2Q2012 |
|------|------|------|--------|
| 340,163 | 310,801 | 355,605 | 359,130 |

53.     To put these figures into context, JPMorgan has seven business segments: Corporate/Private Equity, which houses the CIO; the Investment Bank; Retail Financial Services; Card Services & Auto; Commercial Banking; Treasury & Securities Services; and Asset Management.  The total assets of these business segments are presented in the table below (all figures are in $ millions).

| | 2009 | 2010 | 2011 | 2Q12 |
|---|------|------|------|------|
| Investment Bank | 706,944 | 825,150 | 776,430 | 829,655 |
| Corporate/Private Equity | 340,163 | 310,801 | 355,605 | 359,130 |
| Retail Financial Services | 322,185 | 299,950 | 274,795 | 264,320 |
| Card Services & Auto | 255,029 | 208,793 | 208,467 | 198,805 |
| Commercial Banking | 130,280 | 142,646 | 158,040 | 163,698 |
| Treasury & Securities Services | 38,054 | 45,481 | 68,665 | 67,758 |
| Asset Management | 64,502 | 68,997 | 86,242 | 98,704 |

54.     Thus, during the Class Period the CIO managed a larger portfolio than any of JPMorgan's other core businesses, except for its Investment Bank.  Given the size of its portfolio, it was imperative that the CIO adhere to the strong risk management practices that JPMorgan publicly represented it followed.  As set forth herein, however, that is not what occurred.

**C.     DIMON SECRETLY TRANSFORMED THE CIO INTO A HIGH-RISK PROPRIETARY TRADING DESK, DIRECTLY CONTRADICTING JPMORGAN'S REPRESENTATIONS THAT THE CIO MANAGED RISK**

55.     In stark contrast to the portrait of the "king of risk management" that Dimon presented to investors during the Class Period, Dimon secretly transformed the CIO into a high-

risk, proprietary trading desk. Proprietary trading by a bank such as JPMorgan means the bank is trading its own capital to generate profits from the return on investment, and is thus distinct from trading customer capital (whereby the bank profits from commissions), market making (whereby the bank trades to facilitate transactions by its clients), and hedging (whereby the bank trades to offset an existing risk). By the end of 2009, the CIO had been changed to conform to Dimon's vision of a unit whose principal objective was not to manage risk, as the Company publicly represented, but to generate massive profits for JPMorgan through speculative trading which exposed the Company to tremendous risk and the potential for enormous losses.

56.     The CIO was an ideal front for Dimon's secret trading desk because the Company portrayed it as a run-of-the-mill bank treasury department, representing in the 2010 Form 10-K, for example, that the "CIO is primarily concerned with managing structural risks which arise out of the various business activities of the Firm." Typically, the core function of a bank treasury department is measuring, monitoring, and controlling interest rate risk (*i.e.*, the risk that changes in interest rates will adversely impact the value of the bank's assets and liabilities), as well as managing the bank's reserve and risk capital requirements and funding the bank's balance sheet. In contrast to the treasury department's risk-management role, a bank's commercial and investment-banking units are responsible for generating profits by putting the bank's capital at risk, whether making loans, underwriting securities, or trading for the bank's own account. JPMorgan's representations that the CIO was managing the bank's risks meant that the CIO was responsible for hedging risks incurred by the Company's other business units by entering into conservative trades that closely matched and offset those existing risks. When executing trades to hedge risk, the CIO's purported objective was to generate neither risk nor profits.

57.     By the start of Class Period, however, Dimon had secretly transformed the CIO from a risk-management unit into an internal hedge fund making huge, proprietary trades that exposed the Company to extreme, undisclosed losses.  Those trades included massive bets on over $200 billion of corporate debt and holdings of $150 billion of securities backed by residential mortgages and other asset-backed securities.  To facilitate that high-risk investing, JPMorgan staffed the CIO with former hedge fund traders who had no risk-management experience, and then abandoned the oversight and risk-management controls that would have hindered their trading.  When senior executives questioned Dimon about the CIO's bets running counter to the CIO's stated purpose, Dimon simply removed them from their positions.

58.     According to numerous former JPMorgan employees, Dimon himself directed the transformation of the CIO.  Indeed, Dimon told CIO employees explicitly that the CIO's job was not to mitigate risk, but to make money.  For example, David Olson, a former head of credit trading for the CIO in North America, told *Bloomberg* that, when he was hired in 2006, two JPMorgan executives told him that the CIO's role was "to ramp up the ability to generate profit for the firm."  According to Olson, generating profit through the CIO was "Jamie's new vision for the company."

59.     Similarly, CW 1, an associate responsible for risk reporting who worked at the CIO in New York from February 2007 through July 2009, confirmed that the role of the CIO was to generate profits, not manage risk.  CW 1 said that when he interviewed for his position at the CIO in 2007, he was told by Neil Grossman, one of the most senior CIO traders, that the CIO was working to generate profits for JPMorgan.  When CW 1 noticed that certain of the CIO trades were losing money, CW 1 questioned CIO employees as to what risks these trades were hedging.  CW 1 did not receive any answers to these questions, or to questions that CW 1 posed

concerning why JPMorgan's CIO was attempting to make profits from what were supposed to be hedge positions.

60.     At Dimon's and Drew's direction, the CIO expanded into risky investments in corporate and mortgage-debt products to increase profits.  As *Bloomberg* reported on May 14, 2012, citing five former JPMorgan executives, Dimon pushed the CIO to seek profit by speculating on higher-yielding assets such as credit derivatives.   According to a current JPMorgan executive cited by *Bloomberg* on May 14, 2012, Dimon himself suggested positions the CIO should take.  This was corroborated by CW 1, who stated that Dimon gave the CIO specific guidance for trades he wanted implemented, and the CIO handled those trades for Dimon.  As one former JPMorgan banker told the *Telegraph*, "I think the CIO was effectively a way for [Dimon] to take his own views on the market without the processes of the rest of the bank getting in the way of things."

61.     To build Dimon's secret hedge fund, Drew – whom Dimon appointed to run the CIO – hired a team of proprietary traders to take speculative positions in currencies and interest-rate products, as well as structured credit, equities and derivatives, according to *Bloomberg*. These traders included Achilles Macris, who ran the proprietary trading desk for Dresdner Kleinwort Wasserstein before taking control of the CIO's London office.  Macris, who had a reputation as an aggressive, high-risk trader, surrounded himself with other traders he worked with at Dresdner, including Javier Martin-Artajo, who directly oversaw the synthetic credit portfolio, as well as former hedge fund traders.

62.     These new hires lacked any experience in risk management.  Instead, they were brought in specifically for their skill and reputation as aggressive proprietary traders with experience in trading credit derivatives for profit.  As reported by *Bloomberg* on April 13, 2012,

these traders received permission from senior management to put more of the Company's capital at risk.

63.    The CIO was an attractive vehicle for proprietary trading.  First, as alleged below in Section IV.H., because JPMorgan deceived its regulators into believing that the CIO was not engaged in high-risk, proprietary trading, the CIO was shielded from regulatory oversight.  In addition, the CIO's cost of investment capital was lower than the Investment Bank's cost.  While JPMorgan's Investment Bank traded with capital borrowed primarily under securities repurchase agreements, the CIO invested cash received from depositors, which cost JPMorgan less than cash borrowed under repurchase agreements.  In explaining the disparity between the cost of capital in the CIO and Investment Bank, a former JPMorgan employee cited by *Reuters* on May 16, 2012 stated that the CIO "was very large, but was never very transparent, and it wasn't clear that they had an appropriate funding cost.  They were running more risk than the investment bank – and with no peer review process [from those in the investment bank]."

64.    In addition to using cheaper investment capital, proprietary trading in the CIO was more profitable for JPMorgan than comparable trading by the Investment Bank because, as reported by *Bloomberg*, traders in the CIO retained a smaller share of their trading profits than did traders in the Investment Bank.  This compensation structure provided Dimon with an additional incentive to build his secret proprietary trading desk within the CIO.

65.    The individual traders within the CIO were also incentivized to take on bigger risks because JPMorgan directly linked their compensation to their ability to generate larger returns than a standard bank treasury portfolio would generate.  A former CIO executive cited by *Reuters* on July 12, 2012 explained that compensation for CIO traders was tied to their ability to

outperform an index of the return on a standard bank treasury portfolio—clear evidence that the CIO's function was to make bets, not mitigate risk.

66.     The Senate Report specifically cited the CIO traders' outsized compensation as evidence that the unit was engaged in proprietary trading, and not risk management.  As noted by the Senate Report, Drew, Macris, Martin-Artajo and Iksil—the JPMorgan employees with the most direct responsibility for the synthetic credit portfolio—were among the most highly-paid employees at JPMorgan, and together collected tens of millions of dollars in compensation per year.  Moreover, these individuals' incentive compensation closely tracked the profits generated by the synthetic credit portfolio – thus confirming that they were paid based on their ability to generate returns, not reduce risk.  Their compensation was so substantial that it was reviewed and approved by the Operating Committee and Dimon himself.  Moreover, in determining their incentive compensation, JPMorgan developed a "reference group" for each of these employees which consisted of Investment Bank employees in profit-oriented positions, rather than employees who held positions that were risk management-based.   As the Senate Report concluded, the "compensation history for key employees with responsibility for [synthetic credit portfolio] trading suggests that the bank rewarded them for financial gain and risk-taking more than for effective risk management."

**D.     JPMORGAN SECRETLY ELIMINATED THE RISK MANAGEMENT DISCIPLINE AND TRANSPARENCY IT TOUTED TO INVESTORS IN ORDER TO FACILITATE HIGH-RISK PROPRIETARY TRADING IN THE CIO, AND DIMON REJECTED ANY EFFORT TO IMPROVE THE CIO'S RISK MANAGEMENT**

67.     According to JPMorgan executives cited by *Bloomberg*, Dimon treated the CIO differently from other JPMorgan departments, and exempted it from the scrutiny he applied to risk management in JPMorgan's Investment Bank.  As reported by *Bloomberg*, the CIO's risk-management systems, especially in credit-derivative transactions, did not keep pace with the

27

expansion of the CIO.  While the CIO's London office grew tenfold in staffing, the Company did

not install risk-management staff or technology at the CIO, according to *Bloomberg*.  According

to a JPMorgan executive cited in the *Telegraph*, "[the CIO] took on [an] enormous amount of

risk with very few staff and the reporting was very poor."  Indeed, as Defendant Cavanagh would

admit after the end of the Class Period, "[T]he level of scrutiny of CIO did not evolve

commensurate with its increased complexity. . . . So as a result, we collectively ended up with a

level of scrutiny that fell short of the high standards we apply to our client businesses, especially

as the complexity increased."

68.     Beginning before the start of the Class Period, the lack of risk controls and

oversight of the CIO was readily apparent to senior executives at JPMorgan.  For example, in

2009, Bill Winters ("Winters") and Steven Black ("Black"), then co-CEOs of the Investment

Bank, challenged Dimon regarding the proprietary trading by the CIO.  JPMorgan executives

who participated in those conversations told *Bloomberg* that Winters and Black specifically

questioned Dimon regarding the adequacy of risk management at the CIO.

69.     To try to remedy the glaring risk-control deficiencies at the CIO, Winters and

Black asked Dimon to disclose the CIO's risk positions in greater detail at review meetings, and

to involve other members of JPMorgan's Operating Committee in assessing the CIO's risks.  In

particular, Winters and Black proposed that Ashley Bacon, then head of market risk of the

Investment Bank, be allowed to extend his oversight to the CIO, according to sources cited by

*Bloomberg*.  Dimon rejected these requests.

70.     Winters also pressed Dimon to implement within the CIO a Risk Exploration &

Transparency ("RET") Unit, a team of specially trained risk analysts used at other JPMorgan

divisions to assess risk in exotic credit and hybrid trading.  CW 2 worked as a Front Office Risk

Analyst in JPMorgan's London office from May 2006 through October 2010 and, as a member of the RET, was directly involved in Winters' effort to improve transparency and risk management at the CIO.  According to CW 2, the RET team improved risk transparency at other divisions in the Company by drafting and distributing risk reports that were presented to Dimon and other senior executives.  In stark contrast, according to CW 2, the CIO had no transparency to the rest of the Company.

71.     According to a *Bloomberg* report on June 14, 2012, Dimon did not implement the improved risk controls requested by Winters and Black, and refused to implement an RET Unit within the CIO.  Instead, in September 2009, Dimon fired Winters and relieved Black of operating responsibility.  CW 2 said that he believed Winters was fired because he was "the one person who promoted transparency" at the CIO.  After Dimon fired Winters, the efforts to create a RET unit for the CIO stopped, according to CW 2.

72.     Dimon further concealed the CIO's high-risk trading by excluding executives from the Company's other segments from the CIO's risk-committee meetings.  By comparison, weekly risk-committee meetings in the Investment Bank were open to all members of the Company's senior management, with Drew and Macris frequently in attendance, according to a *Bloomberg* report on June 12, 2012.  By limiting scrutiny of the CIO, Dimon freed Drew's team of traders to pursue a less-disciplined approach to investing, according to numerous former JPMorgan executives cited by *Bloomberg* on May 14, 2012.

73.     The JPMorgan Task Force Report further confirmed that the CIO lacked even the most rudimentary risk management infrastructure that was in place at JPMorgan's other business units.  For example, the JPMorgan Task Force Report revealed that, unlike other business units, the CIO had no functioning risk committee.  Thus, there "was no official membership or charter

for the CIO Risk Committee," and the CIO's "Risk Committee" met only three times for all of 2011.  Moreover, unlike Risk Committee meetings in JPMorgan's other business units, which were attended by senior risk management personnel from units throughout the Company to ensure that risk management procedures were uniform and actually adhered to, the CIO's Risk Committee "meetings" were not typically attended by <u>any</u> risk management personnel from outside the CIO.  Indeed, the Company's Chief Risk Officer, who attended Risk Committee meetings for all other JPMorgan business units, was notably absent from most CIO "Risk Committee" meetings.  As the JPMorgan Task Force Report stated, the Company's former Chief Risk Officer, Defendant Zubrow, typically did not attend the infrequent CIO "Risk Committee" meetings, "in contrast with his frequent participation in Investment Bank Risk Committee meetings."

74.     Further, as the JPMorgan Task Force Report admitted, unlike other businesses at JPMorgan, the CIO did not even have a Chief Risk Officer for most of the Class Period.  As the JPMorgan Task Force Report explained, by late 2010, Defendants Drew and Zubrow recognized that the CIO needed to create the Chief Risk Officer position because "they needed to enhance CIO's Risk staffing."  However, the position of CIO Chief Risk Officer was not even created until January 2012, or more than one year later.  As discussed below at ¶¶163-64, when that position was finally created, it was given to Irvin Goldman, a JPMorgan executive who, like the majority of the CIO staff, lacked risk management experience – and received the position principally through nepotism, because he was Zubrow's brother-in-law.

75.     The Senate Report documented additional risk management deficiencies in the CIO, and revealed that the CIO's risk managers played virtually no role in managing risk.  For example, as disclosed in the Senate Report, Peter Weiland, who served as the most senior risk

officer in the CIO from 2008 to 2012 and reported directly to Drew, admitted that "it was not his job to enforce risk limits" and that CIO "risk managers played no role in evaluating or approving trading strategies."   Instead, it was up to Drew to enforce limits, resulting in a "lack of independence in the risk management function."   The passivity of the risk management staff in the CIO did not change even after regulators pressured JPMorgan to improve the independence of CIO risk managers who reported to Drew, including Weiland, in 2009.   Moreover, as the Senate Subcommittee concluded, the CIO traders "were much more influential than the risk managers."   As a result, when the synthetic credit portfolio breached its risk limits in January 2012, Weiland "did not enforce those limits, or direct the traders to exit any positions."   Instead, the risk managers, including Weiland, "repeatedly worked with CIO traders and quantitative analysts to challenge or modify the risk metrics, or approve limit increases or exemptions."

76.     That the "Risk Committee" responsible for overseeing the Company's primary risk management division had no members, no Chief Risk Officer, no charter, virtually no meetings, and received no input from representatives of the various JPMorgan businesses whose risks the CIO was purportedly hedging, did not happen by accident.   Indeed, as the JPMorgan Task Force Report described, the insularity of the CIO's "Risk Committee" and the lack of adequate and competent risk management personnel facilitated the high-risk proprietary trading strategies employed by the CIO:   "Had there been senior traders or risk managers from outside CIO or had the CIO Risk Committee met more often, the process might have been used to more pointedly vet the traders' strategies in the first quarter of 2012."   Further, in stark contrast to what would be required of a unit with responsibility for managing risk, the JPMorgan Task Force Report acknowledged that "the CIO Risk organization did not mature into the type of robust and independent function that is needed for trading activities that involve significant risk.   The CIO

Risk function was not staffed with as many experienced or strong personnel as it should have been.  The Firmwide Risk organization bears responsibility for not having built, over time, a strong, independent Risk function within CIO."   And, as the JPMorgan Task Force Report concluded, because "CIO Risk Management lacked the personnel and structure necessary to properly risk-manage the Synthetic Credit Portfolio…it failed to serve as a meaningful check on the activities of the CIO management and traders."

> ### E.   THE JPMORGAN TASK FORCE REPORT AND SENATE REPORT CONFIRM THAT JPMORGAN UNDERMINED AND REMOVED RISK CONTROLS AND LIMITS IN THE CIO

77.   To further facilitate the high-risk, high-profit trading that Dimon desired, Drew and her lieutenant Macris eliminated stop loss limits to allow traders to pursue increasingly larger bets before the start of the Class Period.  Drew and Macris abandoned these limits, which required traders to exit positions if losses exceeded $20 million, to enable higher-stakes trading by the CIO, according to one former London CIO trader cited in the May 14, 2012 *Bloomberg* report.  Moreover, as Dimon admitted in testimony he provided to Congress after the end of the Class Period, JPMorgan never imposed <u>any</u> specific risk limits on the CIO's portfolio of complex derivative instruments that ultimately caused the $6.25 billion loss to the Company.

78.   Three former executives cited by *Bloomberg* in a June 12, 2012 article confirmed that the CIO's stop loss limits were scrapped and that CIO traders were thus free to make trades that could result in massive gains or losses.  Moreover, Cavanagh conceded in a post-Class Period conference call that the CIO lacked "a well-designed limit structure" and did not have limits on specific portfolios or stop loss limits on trades.  According to Cavanagh, the few limits applicable to the CIO were "clearly inadequate," "unsophisticated" and "of little use as a control measure."

79.     The Senate Report likewise confirmed that the CIO's stop loss limits were either virtually nonexistent or ignored.   Indeed, the Senate Report documented the OCC's determination that JPMorgan calculated stop loss limits in a way that provided a "misleading picture" of the CIO's losses.   In fact, when the OCC questioned JPMorgan after the end of the Class Period about the manner in which its stop loss limits were calculated, CIO personnel admitted that their calculations purposely minimized losses.   Moreover, unlike stop loss limits in the Investment Bank, which were actively enforced, the CIO did not respond to stop loss advisory breaches—a fact that was confirmed by both the OCC and the FDIC.   As an OCC examiner explained to the Senate Subcommittee, "the evidence indicated JPMorgan Chase was either ignoring the stop loss advisories, or simply not doing anything about the CIO breaches." The OCC examiner in turn concluded that "senior CIO traders had clearly been given leeway with respect to the stop loss advisories" and the "CIO was allowed to exceed them."

80.     The Senate Report also confirmed that the CIO lacked concentration limits that applied to the Investment Bank for the same types of instruments that were included in the CIO's synthetic credit portfolio.   Concentration limits, which JPMorgan represented were in place during the Class Period, are intended to limit total exposures to specific credit instruments and counterparties.   JPMorgan has now admitted that had appropriate concentration limits been in place, the CIO would not have been able to accumulate the large and illiquid positions that led to the CIO's losses.   According to the Senate Report, "[c]oncentration limits are such a well-known, fundamental risk tool, that their absence at the CIO is one more inexplicable risk failure."

81.     The JPMorgan Task Force Report similarly confirmed that there were no effective risk limits in the CIO.   Significantly, the JPMorgan Task Force Report found that CIO risk

managers "did not conduct <u>any</u> review of the adequacy of CIO's risk limits between 2009 and 2011" and "<u>there was no meaningful effort</u> to ensure that [the] CIO was subject to appropriately rigorous risk and other limits and was updating those limits on a regular basis."   As the JPMorgan Task Force Report noted, this failure directly contravened JPMorgan policy, which until May 2011 required annual assessments of the CIO's risk limits, and thereafter required semi-annual assessments.  Indeed, CIO's risk limits were so deficient that, by the first quarter of 2012, during which the CIO's losses approached $1 billion, the CIO was merely "in the process of developing a proposal to revise the CIO limit structure."

82.    As a result, the JPMorgan Task Force Report acknowledged that the CIO was not "subject to appropriately rigorous risk controls."  Specifically, despite the fact that "risk limits for the Synthetic Credit Portfolio should have been specific to that portfolio and should have applied to the specific risks being taken," there were "<u>no limits by size, asset type or risk factor for the Synthetic Credit Portfolio; indeed, there were no limits of any kind specific to the Synthetic Credit Portfolio</u>."   According to the JPMorgan Task Force Report, the specific risk limits that should have been imposed on the synthetic credit portfolio (but were not), and which were applied by JPMorgan's other profit-making business lines, included "specific controls on notional size (particularly for less liquid positions) as well as specific limits on credit risk and on counterparty risk."

83.    JPMorgan's wholesale abandonment of basic risk-control measures at the CIO directly contradicted the Company's statements in its Forms 10-K filed during the Class Period that the CIO, like all of JPMorgan's other divisions, was "responsible for adhering to established limits, against which exposures are monitored and reported."  Moreover, the removal of stop loss limits directly contradicted the repeated representation in JPMorgan's annual reports during the

Class Period that "Businesses are responsible for <u>adhering to established limits, against which</u> <u>exposures are monitored and reported</u>.  Limit breaches are reported in a timely manner to senior management, and the affected business segment is required to reduce trading positions or consult with senior management on the appropriate action."

84.     As the OCC concluded following its post-Class Period investigation into the CIO's trading, JPMorgan's failure to implement basic risk management practices and its abandonment of risk controls enabled it to engage in unsafe or unsound practices in violation of federal banking regulations.  As set forth in the January 14, 2013 Cease and Desist Consent Order, the OCC concluded that:   (i) JPMorgan's "oversight and governance of the credit derivatives trading conducted by the CIO were inadequate to protect the Bank from material risks in those trading strategies, activities and positions," (ii) the Company's "risk management processes and procedures for the credit derivatives trading conducted by the CIO did not provide an adequate foundation to identify, understand, measure, monitor and control risk," (iii) JPMorgan's "valuation control processes and procedures for the credit derivatives trading conducted by the CIO were insufficient to provide a rigorous and effective assessment of valuation," (iv) the Company's "internal audit processes and procedures related to the credit derivatives trading conducted by the CIO were not effective," and (v) JPMorgan's "model risk management practices and procedures were inadequate to provide adequate controls over certain of the Bank's market risk and price risk models."  Tellingly, the Company did not deny any of these findings.

85.     In addition, after the end of the Class Period, JPMorgan entered into a Consent Order with the Federal Reserve Bank of New York, which had also identified similar risk management failures and deficiencies which contravened JPMorgan's public statements during

the Class Period following its review of the CIO losses. Specifically, as set forth in the January 14, 2013 Consent Order, the Federal Reserve identified "deficiencies" in, among other things, (i) "the risk management function's oversight of the risks associated with the synthetic credit portfolio"; (ii) "the model governance function's oversight of the model validation processes relating to the CIO"; (iii) "the finance function's development of appropriate internal financial reporting for the CIO;" and (iv) "the internal audit function's assessment of the CIO's internal controls." Both the Federal Reserve and the OCC required JPMorgan to implement significant remedial measures to address the deficiencies and other legal violations identified in their respective investigations. As the Senate Report concluded, "[i]n contrast to JPMorgan Chase's reputation for best-in-class risk management, the whale trades exposed a bank culture in which risk limit breaches were routinely disregarded, risk metrics were frequently criticized or downplayed, and risk evaluation models were targeted by bank personnel seeking to produce artificially lower capital requirements."

### F.   FREED FROM RISK MANAGEMENT PROTOCOLS, DIMON'S PROPRIETARY TRADING DESK SECRETLY GENERATED MASSIVE GAINS AND LOSSES

86.   Unencumbered by risk controls, risk oversight, or stop loss limits, by the end of 2009, the CIO had become a secret hedge fund charged with high-risk proprietary trading intended to generate substantial profits. Indeed, individual trades grew so large that they could affect the profitability of JPMorgan's entire Corporate Division. In one example concealed from investors, the CIO made approximately $1 billion in profits in 2007 and 2008 on a series of bets against subprime mortgages, which paid off when the housing market collapsed, according to sources cited by the *Wall Street Journal* and *Bloomberg* on June 12, 2012. Significantly, while those CIO trades generated $1 billion in profit, JPMorgan reported that the entire Corporate Division earned just $557 million in 2008. Dimon was aware of those trades and spoke directly

with the traders who executed them, according to the *Wall Street Journal*.  One of those traders was Bruno Iksil.  In 2007, Iksil was promoted to head the CIO's credit desk, and began trading in an asset class in which the CIO did not previously invest.

87.     According to CW 1, a CIO employee in New York, the CIO's profitable bet against subprime mortgages was one "obvious" example of the CIO trading for profit rather than to mitigate risk.  Based upon discussions that CW 1 had with David Olson, the CIO's former head of North American credit trading, CW 1 "knew for sure" that Dimon was aware of the bets that Olson and Iksil made against subprime mortgages, and it was Dimon himself who ordered the CIO traders to close out their position so that the Company could "lock-in" the profits from that trade.  As revealed in the Senate Report, Dimon's intimate involvement in the CIO's profit-making activities is further evidenced by the fact that he personally established a "private equity" portfolio in the CIO in 2010, as well as a portfolio that consisted of stressed or distressed investment opportunities "related to undervalued or underperforming loans" on the Company's balance sheet.  Moreover, during her testimony to the Senate Subcommittee, Drew admitted that the CIO's "underline: investment decisions are made with the full understanding of executive management including Jamie Dimon."

88.     The high-risk trading that Dimon encouraged in the CIO also led to massive losses.  For example, according to the *Wall Street Journal*, in 2008, a group of CIO traders in New York, including Olson, lost about $1 billion on investments in Fannie Mae and Freddie Mac preferred stock.  The *Wall Street Journal* reported that Dimon knew of those trades, and CW 1 confirmed that Olson informed CW 1 that Dimon "explicitly approved" them.  In fact, Olson himself admitted to *Bloomberg* that the only reason he was not fired was because Dimon had been "intimately familiar with the positions."

89.     Similarly, in 2010 the CIO's London traders incurred large losses on complex bets tied to foreign currencies.  According to the *Wall Street Journal*, those foreign currency trades lost the CIO about $300 million over the course of just a few days.  Joseph Bonocore, then the CIO's CFO, concluded that the trades had been made without any corresponding gains to offset the losses, meaning that the trades were not hedges.  Bonocore brought the matter to the attention of Defendant Cavanagh, then JPMorgan's CFO, and Defendant Zubrow, both of whom reported to Dimon.  Dimon was told of the trades, and knew that the trades were not hedges, according to the *Wall Street Journal*.

90.     Some of the concealed, high-risk positions taken by the CIO were so massive that they affected entire markets.  For example, starting in 2009 the CIO began to amass a portfolio of risky asset-backed securities, including European mortgage-backed securities ("MBS") and other complex debt securities, according to a dozen senior traders and credit experts cited by the *Financial Times*.  That position ultimately grew to over $150 billion—nearly half of the total investment assets of the CIO and Treasury combined, and an amount comparable to JPMorgan's current market capitalization.  The CIO's purchases of nearly $20 billion in U.K. MBS single-handedly rejuvenated the market for such securities in the United Kingdom, according to the *Financial Times*.  The CIO also became the largest investor in tranches of collateralized debt obligations ("CDOs"), exotic, complex securities of which the CIO purchased $1 billion at the end of 2008, according to *Bloomberg*.  The CIO's substantial investments in high-risk instruments such as MBS and CDOs were particularly striking given that these were the very kinds of securities that caused many investment banks to suffer staggering losses during the financial crisis – losses that JPMorgan purportedly avoided due to its "best-in-class . . . risk systems."

91.     The CIO's high-risk proprietary trading continued throughout the Class Period. For example, in the fall of 2011, JPMorgan realized approximately $500 million in profits from a risky gamble in illiquid credit derivatives.  The bet was a short-term position on corporate debt that would pay off only if two major U.S. corporations defaulted on their obligations in a narrow, four-month window.  Although the bet seemed poised to lose millions of dollars as that four-month period neared its close, it ultimately paid off after American Airlines unexpectedly declared bankruptcy on November 29, 2011.  As the Senate Report concluded, this trade was not a hedge:  JPMorgan could not identify any corresponding positions that benefited from the trade, and Drew admitted that the credit protection did not serve to offset any JPMorgan positions or loans involving American Airlines.  The OCC explained that "the CIO had essentially engaged in a high stakes, high risk wager that ended up paying off, but could have easily gone the other way," and was something the CIO "shouldn't have been doing."

92.     Despite the fact that the trade was not appropriate for the CIO, it was viewed favorably by CIO management because it produced a profit.  Accordingly, after winning big on American Airlines' bankruptcy, Drew instructed Iksil to "recreate" the American Airlines situation because those were the kinds of trades JPMorgan wanted in the CIO.  Drew later admitted to the Senate Subcommittee that she instructed CIO traders to position the synthetic credit portfolio to profit from another American Airlines-type default.

93.     Just as the gains from the successful American Airlines bet fueled the CIO's pursuit of profits, a material loss that the CIO incurred on another speculative bet led JPMorgan senior management to warn CIO traders that they could not afford to take losses on their positions.  Specifically, in early 2012, the CIO incurred a loss of approximately $50 million on another complex credit derivative position when Eastman Kodak filed for bankruptcy.

According to the Senate Report, the CIO traders were told to continue to pursue American Airlines-type gains but "not to let an Eastman Kodak-type loss happen again."

94.     The investments described above, including the CIO's bets against American Airlines and subprime mortgages and on Fannie Mae and Freddie Mac securities, were examples of the CIO's proprietary trading activities and were not undertaken to hedge or manage risk. When CW 1 asked CIO traders what risks they were hedging, they did not identify any positions being hedged by their trades.

95.     Further establishing that the CIO was not a risk-management unit but a business segment engaging in high-risk trading in order to generate enormous profits, the CIO secretly accounted for a substantial portion of JPMorgan's earnings during the Class Period.  Tellingly, during the Class Period, JPMorgan never separately disclosed the CIO's contributions to its net income.  It was only after the Class Period ended that JPMorgan for the first time separately disclosed the earnings of the CIO, and admitted that one portfolio of the CIO – the synthetic credit portfolio – accounted for at least 20% of the Company's net income for most of the Class Period – a total of $2 billion during 2007-2011.  But even these belated admissions about the CIO's earnings understated the CIO's contributions: analysts noted that because the CIO invested capital for other JPMorgan divisions, some of the profits it generated flowed to, and were reported by, units other than the CIO.  For example, according to a report by Portales Partners quoted by *Bloomberg* on June 12, 2012, the CIO contributed as much as $0.80 per share to the Company's earnings during the Class Period.  According to the Portales Partners analysis, at the start of the Class Period, when the Company reported earnings of $2.26 per share for 2009, the CIO would have been responsible for 35% of the Company's earnings.

96.     The findings of the JPMorgan Task Force Report confirmed that the CIO's primary function was not to hedge risk within the Company, but to generate profit.  Indeed, the remarkable profitability of the CIO's synthetic credit portfolio—which generated an annualized return on equity of 100%—demonstrates that the unit did not engage in a risk-mitigating function.  As set forth in the CIO Board Review Report issued after the Class Period, a December 2010 CIO presentation to the Board of Directors' Risk Policy Committee stated that the CIO employed "[t]actical credit strategies" to generate income, and had contributed "approximately $2.8 billion in 'economic value' from inception, with an average annualized return on equity of 100%."   By comparison, the return on equity for JPMorgan as a whole for 2007—at the height of the Company's profitability prior to the financial crisis—was approximately 13%.  The JPMorgan Task Force Report also confirmed that the trading strategies used to generate these remarkable rates of return were not "hedges," and that "the actual trading strategies employed by CIO did not involve exclusively buying protection or always maintaining a net credit short position….rather, CIO traded in an array of these products, with long and short positions in different instruments."

97.     As John Fullerton, the founder and president of Capital Institute who was a JPMorgan Managing Director for over 18 years, explained in a February 6, 2013 article on the *Huffington Post*, the CIO's "tactical credit" trading strategies were not hedges designed to mitigate risk, but to generate profits.  As he explained: "'Tactical credit strategies' that produced $2.8 billion in 'economic value,' with no mention of the underlying positions it was designed to hedge, certainly can't be confused with 'hedging.'"   Fullerton described as "[f]rightening" the fact that JPMorgan's Board "would find it credible that Ina Drew and the crew that couldn't shoot straight compounded returns on equity at an annualized 100 percent," explaining that "such

an implausible claim should have been seen as a flashing red warning signal for the $6 billion

disaster it would become…and grounds for an immediate termination of duties."

### G.   THE CIO'S PROPRIETARY TRADING STRATEGIES DID NOT HEDGE ANY RISKS FACED BY JPMORGAN'S OTHER BUSINESS UNITS

98.   Bruno Iksil, the CIO trader who managed JPMorgan's bet against subprime

mortgages, managed the CIO's synthetic credit portfolio under the supervision of Ina Drew in

New York and Achilles Macris in London.  According to an internal JPMorgan document cited

by the *New York Times*, the CIO assigned Iksil to "relative value investing," a strategy used by

hedge funds to "exploit price differences between various assets."  Relative value investing was

a proprietary trading strategy designed to generate profits, and inconsistent with the CIO's

publicly touted risk-management function.  The JPMorgan Task Force Report stated that the

CIO's proprietary trading strategies "sought, among other things, to take advantage of changes in

the relative prices (the 'basis') among different CDS indices and tranche instruments,"

relationships that "reflect supply and demand in the market."  Attempting to profit from

perceived mispricing in the marketplace did nothing to hedge against JPMorgan's other existing

positions or exposures.

99.   The Senate Report confirmed that the CIO's synthetic credit portfolio was a

proprietary trading operation, and was not used to hedge any risks.  As revealed in the Senate

Report, JPMorgan itself acknowledged in a November 2007 internal audit of the CIO's synthetic

credit portfolio that the "Chief Investment Office (CIO) credit trading activities commenced in

2006 and are proprietary position strategies executed on credit and asset backed indices."  The

audit made no mention of hedging or credit stress loss protection, contained no analysis of the

credit trading activity as lowering risk, and did not identify any assets or portfolios that were

being hedged.  Indeed, the CIO's most senior quantitative analyst, Patrick Hagan, who joined the

CIO in 2007 and spent about 75% of his time on the synthetic credit portfolio, told the Subcommittee that he was never asked at any time to analyze another portfolio of assets within the Company, as would be necessary to use the synthetic credit portfolio as a hedge for those assets.  In fact, Hagan told the Senate Subcommittee that he was never even permitted to know any of the assets or positions held in other divisions of the Company.

100.    Significantly, the Company was unable to provide the Senate Subcommittee with any evidence of the synthetic credit portfolio being used to hedge other JPMorgan positions or to otherwise manage risk.  The Senate Report stated that "JPMorgan Chase claimed at times that its Synthetic Credit Portfolio functioned as a hedge against bank credit risks, but failed to identify the assets or portfolios being hedged, test the size and effectiveness of the alleged hedging activity, or show how the [synthetic credit portfolio] lowered rather than increased bank risk." Indeed, JPMorgan had "no contemporaneous records detailing the risk reduction strategy or the assets being hedged, no analysis showing how the size and nature of the hedge were determined, and no tests gauging the hedge's effectiveness," even though "[h]edging claims require those types of contemporaneous records in order to be substantiated."

101.    Such lack of documentation not only demonstrated that the synthetic credit portfolio was not a hedge, but also violated OCC regulations requiring the Company to establish "clearly defined trading and hedging strategies for its trading positions," "articulate for each portfolio of trading positions the level of market risk the bank is willing to accept," and "detail the instruments, techniques, and strategies the bank will use to hedge the risk of the portfolio." As one OCC official who reviewed the synthetic credit portfolio told the Senate Subcommittee, the synthetic credit portfolio reflected "classic prop[rietary] trading," as all of the trades were conducted to generate profit for JPMorgan.  As another OCC official put it, the synthetic credit

portfolio amounted to a "make believe voodoo magic 'composite hedge.'"  Indeed, the Senate Subcommittee concluded that, "Far from reducing or hedging the bank's risk, the CIO's Synthetic Credit Portfolio functioned instead as a high risk proprietary trading operation that had no place at a federally insured bank."

102.    Further, the JPMorgan Task Force Report made clear that CIO management understood that its mission was to generate profit for the Company, and not to mitigate risks generated by JPMorgan's other business units.  Had the CIO been engaged in a hedging or risk-mitigating function, its "priorities" would have been dictated by the existing positions and risks taken on by the Company's profit-making lines of business.  Similarly, had the CIO been focused on developing positions to hedge specific risks within JPMorgan, Drew – as the head of the CIO – would have had to assess those specific risks and the positions taken by the CIO to hedge them.  However, the JPMorgan Task Force Report did not identify any positions within JPMorgan that were purportedly being hedged by the CIO's synthetic credit portfolio, or provide any explanation of any process or the lines of communication between the CIO and the rest of the Company that would enable the CIO's traders to identify risks that needed hedging and develop positions to hedge them.  To the contrary, the JPMorgan Task Force Report described the CIO as unduly insular and the synthetic credit portfolio as being developed within a vacuum, modified only in response to the risk created by that portfolio itself.

103.    Indeed, in a clear acknowledgment that the CIO did not perform the risk management function JPMorgan represented to investors during the Class Period, the JPMorgan Task Force Report conceded that it was only _after_ the disclosure of the CIO's losses that the "CIO has _refocused_ on its core mandate of traditional asset-liability management."  In so doing, the JPMorgan Task Force Report admitted that the CIO's trading during the Class Period was

designed to generate profit, not to balance specific risks at the Company.  As the JPMorgan Task Force Report stated, the "CIO <u>no longer</u> engages in the type of trading that generated the losses, and any CIO synthetic credit positions <u>in the future</u> will be simple and expressly linked to a particular risk or set of risks"—*i.e.*, the very "hedging" that JPMorgan repeatedly represented the CIO was conducting throughout the Class Period.

### H.   JPMORGAN CONCEALED THE CIO'S PROPRIETARY TRADING OPERATIONS FROM REGULATORS

104.   From Dimon's and Drew's perspective, the CIO was a particularly good unit in which to house JPMorgan's proprietary trading activities because it was shielded from regulatory oversight.  That is because the CIO was housed in JPMorgan's Corporate Division alongside its Treasury Department and, as Dimon knew, regulators were not typically stationed at banks' treasury departments.  Indeed, JPMorgan convinced its regulators that the CIO acted in a manner similar to the treasury departments of other Wall Street banks and did not take any risks that would be a cause for concern.  As reported by the *New York Times*, while JPMorgan's primary federal regulators had approximately 110 regulatory personnel embedded inside the Company to monitor risks, not one was stationed in the CIO during the Class Period.  That is because the regulators, like investors, had no idea that the CIO engaged in proprietary trading and instead believed that the CIO was engaged in risk management.

105.   For example, in a post-Class Period letter explaining why the OCC did not have regulators within the CIO during the Class Period, Thomas Curry, the head of the OCC, wrote that "[t]he CIO activities were not historically considered to be high-risk."  Explaining that the high-risk trading JPMorgan conducted through the CIO constituted a departure from the typical and expected conduct of bank treasury departments, the OCC stated that "a similar level of activity or situation (large hedges that are illiquid and otherwise very complex) is not present in

other large national banks. . . . [O]ther large banks do not conduct activity with synthetic credit derivatives to the extent (in size or complexity) that JPMC has in this situation."  Indeed, as noted in the Senate Report, attempting to use "excess deposits to engage in short term credit derivatives trading" is "an approach no other major U.S. bank employs."  According to over a dozen current and former regulators cited by the *New York Times* on May 25, 2012, JPMorgan strongly resisted regulatory oversight of the CIO following the financial crisis.

106.    The Senate Subcommittee examined JPMorgan's relationship with the OCC and concluded that JPMorgan deliberately housed its proprietary trading operation in the CIO to evade regulatory oversight.  Among other things, the Senate Subcommittee cited the OCC's determination that JPMorgan violated OCC notification requirements when, in 2008, it secretly increased the risk of the CIO by adding credit index tranche positions to the synthetic credit portfolio without informing the OCC.  As documented in the Senate Report, these derivative positions were transferred to the CIO from the "Proprietary Positions Book" in the Investment Bank, and were housed in the CIO's "Tactical Asset Allocation" portfolio, which was formerly known as the "Discretionary Trading Book."  The former co-head of the Investment Bank Bill Winters told the Senate Subcommittee that discretionary trading was the equivalent of proprietary trading.  Although OCC regulations required JPMorgan to disclose these positions to the OCC because they were a "new product" which represented a "substantial change in business strategy," the Company never even disclosed the existence of that proprietary portfolio to the OCC – let alone the synthetic credit portfolio's positions – until the portfolio was mentioned in a routine report JPMorgan provided to the OCC in January 2012.  Even then, JPMorgan did not disclose to the OCC the size and high-risk nature of that portfolio until after the "London Whale" trades had attracted substantial media attention in April 2012.  As the Senate Report explained,

prior to disclosure of the CIO's losses, "the OCC had very little understanding of the strategies, size, or risk profile of the CIO's Synthetic Credit Portfolio…due primarily to a lack of disclosure by the bank."

107.    Indeed, the Senate Report detailed how Dimon and Drew vigorously opposed OCC oversight of the CIO.  For example, in December 2010 the OCC issued a Supervisory Letter to Dimon, Braunstein, Drew and Zubrow that included detailed risk management deficiencies within the CIO.   That Supervisory Letter cited the CIO's failure to "document investment policies and portfolio decisions" and criticized the CIO's "risk management framework for the investment portfolios" as lacking "a documented methodology" and "clear records of decisions," among other deficiencies.  In a close-out meeting with the OCC prior to the issuance of the Supervisory Letter, Drew "sternly" objected to the regulator's findings and recommendations, claiming that enhanced controls and reporting requirements would "destroy" JPMorgan's business and take away necessary flexibility from the CIO.  As explained in the Senate Report, Drew told the OCC that the CIO's "investment decisions are made with the full understanding of executive management including Jamie Dimon" and that "everyone knows what is going on and there is little need for more limits, controls, or reports" – a statement that Drew confirmed in her testimony to the Senate Subcommittee.  The Senate Report further found that Drew's reaction to the OCC's 2010 report was not an isolated incident, and that it was "very common" for JPMorgan to push back on examiner findings and recommendations.

108.    In addition, in order to protect the CIO from regulatory scrutiny, Dimon and Drew publicly campaigned against the Volcker Rule.  A central component of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, the Volcker Rule prohibits proprietary trading by commercial banks, precisely the kind of trading in which the CIO was secretly

engaged.   Under the Dodd-Frank Act, the rule was to be implemented by regulations to be promulgated by the federal financial regulatory agencies effective July 21, 2012.   Because enforcement of the Volcker Rule threatened to expose the CIO's proprietary trading activities, Dimon led a team of JPMorgan representatives who met with regulators on dozens of occasions during the Class Period to lobby for exemptions to the Volcker Rule that would permit "portfolio hedging"—a term that JPMorgan misleadingly used to describe the proprietary trading in which the CIO engaged.   A former Treasury official quoted by the *New York Times* on May 12, 2012 stated that "JPMorgan was the one that made the strongest arguments to allow hedging, and specifically to allow this type of portfolio hedging."   As the Senate Report made clear, rather than serve any hedging function, the CIO's synthetic credit portfolio was a "high risk proprietary trading operation."

109.    JPMorgan also directly misrepresented the nature of the CIO's proprietary trading activities to the SEC.  Specifically, as Dimon was lobbying Congress and regulators to loosen the Volcker Rule's restrictions, the SEC pressed JPMorgan to disclose the extent of revenue "generated from your proprietary-trading business…that would be affected by the Volcker Rule" in a series of letters in 2011 and 2012 that were made public only after the end of the Class Period.  In its July 1, 2011 response, JPMorgan falsely represented to the SEC that the CIO's "risk management activities using derivative instruments," such as those in the CIO's synthetic credit portfolio, were "designed to mitigate the Firm's structural risk exposure and preserve the Firm's longer-term capital value through economic cycles and, as such, are clearly distinguishable from proprietary trading activity."   Consistent with the position it took with the SEC, the Company did not increase transparency into the proprietary trading by the CIO, and

never disclosed to investors that the CIO's derivative trading scheme constituted proprietary trading designed to generate profits, rather than "risk management activities."

110.    The JPMorgan Task Force Report confirmed that JPMorgan  maintained the illusion that the CIO was involved in risk management activities in order to limit regulatory scrutiny into the CIO's proprietary trading activities – and that the CIO was actually subject to less rigorous risk oversight than JPMorgan's other businesses.  As the JPMorgan Task Force Report explained, because regulators understood that the CIO was not intended to generate risk like JPMorgan's other "client-facing businesses," JPMorgan was able to avoid "the host of regulatory, risk and other limits applicable to dealings between the lines of business and their clients, which require more attention from various control functions, including compliance, audit, legal and finance."  Accordingly, instead of having the controls and limits that would have been in place had the CIO truly been engaged in "risk management activities," the CIO – which was purportedly the Company's chief risk management unit – was actually "subjected to less rigorous scrutiny than client-facing lines of business" for "a significant period of time prior to the first quarter of 2012."  The JPMorgan Task Force Report further admitted that this lack of scrutiny, and the absence of limits and controls that such scrutiny would have necessitated, enabled the CIO to pursue its "flawed and risky trading strategies."

## I.    JPMORGAN MISSTATED ITS FINANCIAL RESULTS BY FAILING TO RESERVE FOR THE CIO'S ILLIQUID POSITIONS IN THE SYNTHETIC CREDIT PORTFOLIO

111.    By 2009, the CIO's synthetic credit portfolio had grown so large that it "could move markets," according to CW 2.  Indeed, as noted by one trader cited by the *International Financing Review* on July 21, 2012, JPMorgan's CIO was, until recently, the major source of liquidity in the market for the credit derivatives that were included in the synthetic credit portfolio.  Several current and former CIO employees cited by the *New York Times* on May 15,

2012, likewise said that the size and illiquidity of these large positions caused the CIO's internal risk managers to raise specific concerns as early as 2009.  The JPMorgan Task Force Report cited internal Company emails discussing that just one portion of the synthetic credit portfolio, in a specific credit derivative, grew so large that the CIO's "position represented the equivalent of 10-15 trading days of 100% of the average daily trading volume" for that security.  Because the CIO's position in those derivatives was multiple times the daily trading volume for such derivatives, the position was by definition illiquid.

112.     Defendants have now admitted that the synthetic credit portfolio was an improper trading strategy that did not belong in the CIO.  As Dimon conceded on July 13, 2012, the portfolio "was too big, it was un-vetted, it shouldn't have been done, it was illiquid. It was bad." Indeed, the liquidity risk of the CIO's synthetic credit portfolio was a primary concern of JPMorgan executives during the Class Period.  The market for synthetic-credit derivatives, in which the CIO was the largest player, was thinly traded and limited to a small number of highly sophisticated investors.  As a result, the CIO faced substantial risks by taking a large position in synthetic-credit derivatives because there was no assurance that JPMorgan would be able to locate counterparties for a given trade.  The CIO therefore faced a material risk that it would not be able to sell those positions if it wanted to liquidate them, and could face enormous losses in the event of adverse market moves.  As reported by the *Wall Street Journal*, by early 2010, the size and risk of the CIO's undisclosed synthetic credit portfolio had become untenable to CIO managers in New York, who were actively discussing how to rein in the CIO's traders in London.

113.     Specifically, according to executives cited by *Bloomberg* on June 14, 2012, the CIO's most senior risk officer, Peter Weiland, had become concerned by 2010 that the CIO's

synthetic credit portfolio was a complex and illiquid position that would generate significant losses if the CIO were forced to sell. Weiland therefore confronted Drew and Macris repeatedly in 2010 regarding the illiquidity of that position. Weiland's concerns were shared by other CIO executives, and the synthetic credit portfolio became a frequent topic of discussion at the CIO's global weekly meetings run by Drew.

114.    Concerns about the illiquidity of the CIO's synthetic credit portfolio were so severe that, in early 2010, a senior CIO executive recommended that JPMorgan establish a $2 to $4 billion liquidity reserve to guard against possible losses in that portfolio. As reported by the *New York Times* on June 28, 2012, that executive documented that such a reserve was required after conducting a detailed review in the beginning of 2010. This review concluded that the size, risk, and illiquidity of the CIO's synthetic-credit positions required the establishment of a liquidity reserve. The CIO executive supported his recommendation with a detailed internal report that estimated the amount of money the Company would lose if it had to liquidate the CIO's positions within 30 days. On May 31 and June 13, 2012 *Bloomberg Surveillance* podcasts, Christopher Whalen, a senior managing director at Tangent Capital Partners and an analyst who has been covering the banking industry, including JPMorgan, for the past several years, said that he had spoken about the need for that reserve to "people that were inside." Whalen reported on *Bloomberg* that JPMorgan's senior management had internal discussions at least two years prior to the disclosure of the CIO's losses about the need to take the reserve, and that the required reserve needed to be at least $2 billion – and as much as $4 billion – to account for the illiquidity of the CIO's positions. According to Whalen, the required reserve was discussed "at the CFO level." As confirmed in the Senate Report, JPMorgan's CFO had the

responsibility for approving the establishment and size of the reserves for the synthetic credit portfolio.

115.    Significantly, according to Whalen, the mere fact that the synthetic credit portfolio needed to be reserved against meant that the trades comprising that portfolio were not hedges.  As Whalen explained on the *Bloomberg Surveillance* program on June 13, 2012, "this . . . goes back to the issue of was this a hedge?  No, <u>if we are posting a reserve against it, it is not a hedge, right, it is a separate exposure</u>."

116.    The size of the needed reserve was highly material to JPMorgan's bottom line. Under Statement of Financial Accounting Standards No. 5, which is part of GAAP, creating such a reserve would offset net income on a dollar-for-dollar basis.  In 2010, the Company reported net income of $1.258 billion for the Corporate Division and $17.37 billion for the entire Company.  Accordingly, establishing even the minimum required reserve of $2 billion in 2010 would have wiped out all of the profits reported by the Corporate Division, and reduced the Company's overall profit by almost 12%.

117.    Despite the CIO executive's detailed internal report about the need for a $2 to $4 billion reserve, because the Company did not want to reduce its profits, JPMorgan did not establish any reserve to account for the illiquidity of the CIO's synthetic credit portfolio.  As Drew admitted to the Senate Subcommittee, no reserve was established to account for the liquidity risk in the synthetic credit portfolio until December 2011, at which time a reserve of just $30 million was established.  Because the Company never took the liquidity reserve it was required to have taken, the Company's net income was overstated by at least $2 billion each quarter during the Class Period, rendering JPMorgan's financial statements materially false.

118.   The JPMorgan Task Force Report confirmed that JPMorgan was required, but failed, to take a liquidity reserve against the CIO's synthetic credit portfolio.  As the JPMorgan Task Force Report explained, "a liquidity reserve is taken to mitigate uncertainty when a price is not available or where the exit cost may be uncertain due to illiquidity."  Indeed, in April 2012, when the CIO's losses were approaching $1 billion, JPMorgan belatedly (and insufficiently) established a liquidity reserve of just $155 million for one subset of the positions in the synthetic credit portfolio.  As revealed in the Senate Report, the OCC concluded in August 2012 that the $155 million liquidity reserve belatedly taken by JPMorgan in April 2012 was "wholly inadequate."  The insufficiency of that reserve is reflected by the fact that the $155 million liquidity reserve was increased to over $700 million by August 2012, even though the CIO did not add any positions during that time.

119.   The JPMorgan Task Force Report made clear that the illiquidity that necessitated that reserve did not first arise in April 2012.  Rather, according to the JPMorgan Task Force Report, by the fourth quarter of 2011, Braunstein and Drew were informed that unwinding just 35% of the synthetic credit portfolio's positions would result in losses of <u>over $500 million</u> because those derivative positions were so large and illiquid.  Shortly thereafter, that analysis was revised to show that just a 25% reduction would result in losses of $500 million.  Those analyses demonstrated that the same illiquidity that ultimately led JPMorgan to establish a liquidity reserve in April 2012 existed in the fourth quarter of 2011.  Indeed, Iksil himself blamed the CIO's losses on the illiquidity of the synthetic credit portfolio positions that existed in January 2012.

120.   The Senate Report revealed that JPMorgan had specifically identified deficiencies in the CIO's procedures for requiring reserves for the synthetic credit portfolio.  Specifically, an

internal audit that examined the CIO's risk management as of year-end 2011 found that the CIO had deficient procedures for requiring reserves. According to the audit, which was distributed to Braunstein and JPMorgan's newly-installed Chief Risk Officer, John Hogan, among others, the CIO valuation group gave "insufficient consideration [to] potentially applicable fair value adjustments," including the need for reserves for the illiquidity and concentrations of positions in the synthetic credit portfolio.

### J.   SURGING VAR LEVELS AND RISK LIMIT BREACHES ALERTED SENIOR MANAGEMENT TO THE SIGNIFICANT LEVELS OF RISK GENERATED BY THE CIO

121.   JPMorgan utilized a financial metric known as value-at-risk, or "VaR," to track how much money the Company might lose on any given trading day as a result of the positions taken by its various business units, including the CIO and the Investment Bank. The VaR models calculated how much money the Company could potentially lose from a particular position within a certain degree of confidence, *e.g.*, a certain trader or unit with a VaR of $20 million would be projected to lose no more than $20 million in an adverse market on 95 out of 100 trading days. The VaR for the positions of the CIO and other business units was calculated daily and was "reported to senior management and regulators, and they [fed] regulatory capital calculations," according to the Company's 2010 Form 10-K. As explained in the Senate Report, the Company's VaR measurements were so significant that the Company's Operating Committee, which during the Class Period included each of the Individual Defendants, received daily VaR updates that detailed the VaR measurements for each business segment – including the CIO – and the reasons for any significant changes in the VaR for each segment. In addition, the Company's VaR, and the VaR of its individual business units, was regularly communicated to investors so that investors could assess and track the risks being assumed by JPMorgan and its various business units.

122.    While JPMorgan publicly reported the VaR of both the CIO and the Investment Bank throughout the Class Period, JPMorgan deceived investors about the meaning of the CIO's VaR by falsely representing that the CIO's positions on which the VaR was based were hedges of risks that existed in other divisions of the Company.  Specifically, in describing the CIO's VaR to investors in its SEC filings, the Company stated that it "includes positions employed as part of the Firm's risk management function," and that it "includes positions, primarily in debt securities and credit products, used to manage structural and other risks including interest rate, credit and mortgage risks arising from the Firm's ongoing business activities."  Those representations led investors to understand that the market risk reflected by the CIO's VaR was offset by other positions within the Company, because the CIO's positions were purportedly hedges used to manage risk, not proprietary trades.  Investors therefore believed that, unlike the Investment Bank, which engaged in proprietary trading that created risk, the CIO's positions mitigated risk.  Accordingly, investors attempting to compare the reported VaR of the CIO and Investment Bank understood that, even when the two numbers were the same, because the CIO was purportedly hedging risks, the losses it experienced would largely be balanced out by corresponding gains in other units of JPMorgan's business.

123.    Beginning in 2010, JPMorgan's own VaR models showed that the CIO's synthetic-credit positions could lose tens of millions of dollars on a given trading day, according to several JPMorgan employees cited in a June 1, 2012 *Bloomberg* article.  Investors were not told during the Class Period that the VaR for the CIO's synthetic credit portfolio was larger at times than the VaR of the Company's entire Investment Bank.  That meant that a single portfolio of exotic instruments being managed by the CIO could lose JPMorgan more money than all of the investments of the entire Investment Bank.  That fact is even more striking given that, unlike

the CIO, the Investment Bank was supposed to be taking on risk to generate profit, and the Investment Bank's assets were more than double the size of the CIO's total portfolio. Specifically, the combined Treasury and CIO (whose financial data were combined and reported together to the public) had a total investment securities portfolio of $311 billion at the end of 2010 and $356 billion at the end of 2011, while the Investment Bank had total assets of $825 billion and $776 billion, respectively, at those times. Accordingly, during the Class Period, JPMorgan's own risk models, which on a daily basis were reported to the Individual Defendants, established that the CIO had abandoned its publicly stated risk-management function and was aggressively trading for profit, exposing JPMorgan to incredible amounts of risk relative to the size of its investments.

124.    JPMorgan represented that it closely tracked the VaR "to estimate the potential loss from adverse market moves" by each day undertaking "a comprehensive VaR calculation that includes the majority of its material market risks." Both the facts in the Senate Report and reporting by *Bloomberg* make clear that the Company internally broke out the VaR for individual traders' positions, including Iksil's, on a daily basis.

125.    JPMorgan's senior officers, including Dimon, also knew that a significant portion of the CIO's VaR was attributable to one portfolio of illiquid synthetic-credit derivatives. While JPMorgan's SEC filings reflected that the CIO had an average VaR of approximately $76 million by the beginning of 2010, internal JPMorgan reports showed that Iksil's daily individual VaR accounted for between $30 million and $40 million of that amount, according to JPMorgan executives cited by *Bloomberg*. Indeed, as Weiland later admitted in his March 15, 2013 written testimony to Congress, "the size of the synthetic credit portfolio was well understood among the senior management at JPMorgan," and was so large and comprised such "significant risk" that it

"<u>dominated CIO VaR for most of the period from 2008 to 2012</u>, and it had significant impact on stress test results as well."

126.    The CIO's synthetic credit portfolio size and risk also repeatedly breached other risk limits during the first half of 2011.  Specifically, as disclosed in the Senate Report, the synthetic credit portfolio breached stress limits eight times from January to June 2011, sometimes for weeks at a stretch.  For example, a stress limit that was breached on January 27, 2011, continued for over seven straight weeks, exceeding the limit by as much as 50%.  JPMorgan's senior management was informed of these breaches, but no action was taken to reduce the size or risk of the synthetic credit portfolio.  Indeed, as documented in the Senate Report, the OCC concluded after the Class Period that the breaches in stress limits in 2011 showed that the synthetic credit portfolio was not "providing stress loss protection to the bank, or acting as a hedge" but rather "engaging in a strategy to earn profits for the bank."

127.    The growing risk presented by the CIO's synthetic credit portfolio sparked intense conflict between the CIO's New York and London offices in 2010 and 2011.  During daily 7 a.m. conference calls between London and New York over which Drew presided, CIO executives in New York, who became increasingly concerned about the size and illiquidity of that portfolio, frequently argued with the CIO's London office, led by Achilles Macris, about the risk profile of that investment, according to former traders cited by *Bloomberg* on June 12, 2012.

128.    According to a senior JPMorgan executive cited by the *Telegraph*, "Achilles [Macris] used to say [during these discussions] that Jamie [Dimon] was his *de facto* boss and that he effectively reported to [Dimon]."  This executive said that Dimon was repeatedly warned about the risks presented by the positions taken by the CIO in London, but did absolutely nothing to address those concerns.

129.    Indeed, according to numerous JPMorgan executives cited by the *Wall Street Journal* in a May 11, 2012 report, Dimon was regularly briefed on the details of the CIO's positions.  According to a senior JPMorgan executive cited by *Bloomberg* on May 14, 2012, Dimon knew about the losing synthetic credit portfolio trades because Dimon reviewed the profit-and-loss reports on large positions in the CIO every day.  In addition, the CIO produced a regular report called "Jamie's Report" that contained financial information, including aggregate trade positions and associated risk.  "Jamie's Report" was sent to the CIO's Chief Financial Officer for presentation to Dimon, according to CW 1, who prepared spreadsheets that were part of "Jamie's Report."

130.    CW 1 believed that most CIO deals were approved by JPMorgan's senior executives, "going all the way up to Jamie Dimon," who met with CIO traders to discuss their trades.  CW 1 also said that Dimon approved trading strategies in the CIO, and was a "huge micromanager."  That was corroborated by Norma Corio, who took over the CIO's Special Investments Group in 2012 after working as a Managing Director in JPMorgan's Treasury Department.  Corio told the *Wall Street Journal* that Dimon was intimately aware of the CIO's positions during the Class Period.  As reported in a May 24, 2012 *Wall Street Journal* article, Corio said that Dimon "likes to know what is going on all the time, everywhere at this firm. . . . Full stop."  This is confirmed by Drew's statement that Dimon and the rest of the Company's executive management had a "full understanding" of the CIO's investments.

131.    In fact, after the Class Period, Dimon conceded his involvement in and responsibility for the CIO's disastrous trades in testimony before the U.S. House of Representatives Financial Services Committee, acknowledging that he was aware of the CIO's

trading strategy and monitored the CIO.  As Dimon admitted, "I am absolutely responsible.  The buck stops with me."

### K. DEFENDANTS MANIPULATED THE CIO'S RISK MODELS TO TRY TO CONCEAL THE CIO'S RISKS AND TO ENABLE THE CIO TO MAKE EVEN BIGGER BETS

132.    Given the size and complexity of the synthetic credit portfolio, any effort to reduce the size of the CIO's synthetic credit portfolio was problematic.  Selling off the CIO's positions in the synthetic credit portfolio would have resulted in significant losses, which would have revealed the proprietary trading program within the CIO and violated Dimon's and Drew's directive that the CIO had to earn profits.  According to one JPMorgan executive cited by *Bloomberg* on June 12, 2012, Weiland – then the most senior risk officer in the CIO – compared efforts to reduce the illiquid credit-derivative positions to trying to land a Boeing 747 without flying lessons.  Because the position was so large and illiquid, Weiland said he could not get the plane below 35,000 feet.

133.    In the summer of 2011, Weiland began a review of the CIO's risk limits and spoke with other CIO executives about tightening restrictions on the CIO's trading positions, according to a *Wall Street Journal* article published on June 12, 2012.  But the controls that Weiland wanted were not implemented.  According to the JPMorgan Task Force Report, Weiland's proposal was driven by the Company's failure to update CIO risk limits since 2009 in violation of JPMorgan policy.  That proposal, which Weiland discussed with Drew in the summer of 2011, included changes to the "Credit Spread Basis Point Value" – which the JPMorgan Task Force Report described as a measure of a portfolio's sensitivity to price changes.  Drew referred to those limits as "old and outdated."  Weiland's proposal to revise CIO risk limits was still pending in February 2012.

134.    Instead of adopting Weiland's proposal, and unable to reduce the risk presented by the CIO's synthetic credit portfolio, the CIO began an effort in mid-2011 to conceal that risk by developing a new model that would understate the publicly-reported VaR of that portfolio. As Cavanagh would later admit on July 13, 2012, by mid-2011, the CIO began work on a "new" VaR model that would show that the CIO was taking on less risk than it actually was incurring.

135.    According to Cavanagh's statement on July 13, 2012, in the process of testing the new CIO VaR model, the employees responsible for implementing that change—including individual CIO traders and risk officers, together with officials from JPMorgan's "independent" model review group in the corporate risk management group—understood that the purpose of the new model was to produce a VaR figure that was lower (*i.e.*, reflected less risk) than the model in place at the time.  In fact, the new model reflected that the purported VaR for the CIO would be only half of what would have been calculated under the old model for the identical positions. Thus, the new model deliberately – and materially – understated the synthetic credit portfolio's risk.  Dimon has admitted that he knew that the CIO was implementing a new VaR model, and that he personally approved the adoption of that new model on January 23, 2012.  Cavanagh also admitted that the VaR change was deliberately undertaken with the "expectation of all parties involved in the model approval" that the new model would generate a "lower measure [of] VaR."

136.    The Senate Report revealed that both Dimon and Braunstein were not only told that the new model would produce a lower VaR, but were also explicitly told that the rationale for the change was to lower the CIO's VaR and "cure" a breach of the Company-wide VaR that had been caused by the synthetic credit portfolio.  As discussed below in Section IV.N., in January 2012, the increasing risk of the CIO's trades had caused a breach in not only the CIO VaR limit, but also JPMorgan's firm-wide VaR limit.  As explained in the Senate Report, a

breach of the firm-wide VaR limit was considered a "Level 1" notification – the most serious risk notification – and was required to be reported to the highest levels of the Company, including Dimon and the Operating Committee.   Under Company policy, Dimon's approval was required to adjust the limit or waive the breach.   Accordingly, in a January 23, 2012 email, after Dimon had been informed through "Level 1" notifications that the CIO had caused the firm-wide VaR to breach its limit for four consecutive trading days, the Company's Market Risk Management unit requested that Dimon approve a temporary adjustment in the firm-wide VaR limit.   That email noted that the adjustment would only be "temporary" because the new CIO VaR model would "reduce" the CIO's "VaR by 44% to $57mm," and cause the firm-wide VaR to "revert back to the original" limit.   Dimon responded later that day: "I approve."

137.   As confirmed by the JPMorgan Task Force Report, the adoption of a "new" VaR model was improper, and a deliberate attempt to hide the risks posed by the CIO's synthetic credit portfolio.   First, the JPMorgan Task Force Report admitted that CIO traders selected an individual from the CIO's Quantitative Research department—who reported directly to those same CIO traders and who had never before developed or implemented a VaR model—to develop a new VaR model that would "produce a lower" VaR for the CIO's synthetic credit portfolio.   Second, the "new" VaR model employed a formula for determining the pricing for the CIO's positions that was designed by the VaR modeler himself, and which had never been reviewed or approved by the Model Review Group as was standard practice within the Company.   Third, because the new model was operated through a series of Excel spreadsheets, it was not automated and could be (and in fact was) manipulated by its users.   Fourth, as reflected in a January 23, 2012 email, the CIO trader to whom the VaR modeler reported instructed the

modeler to "pressure" the Model Review Group to approve the new VaR model, and the Model Review Group accelerated its review "as a result of this pressure."

138.    The fact that the "new" model was intentionally designed to understate the amount of risk being taken on by the CIO is corroborated by the JPMorgan Task Force Report's findings concerning the model's approval by the purportedly "independent" Model Review Group.  Specifically, the JPMorgan Task Force Report disclosed that, in violation of JPMorgan's standard procedures, the Model Review Group "performed only limited back-testing of the model" by "comparing the VaR under the new model computed using historical data to the daily profit-and-loss over a subset of trading days during a two-month period." By contrast, Lesley Daniels Webster, a former head of market and fiduciary risk management at JPMorgan, told *Bloomberg* that before new VaR models were implemented at JPMorgan, they were typically tested "in parallel" with old models for about three months to ensure they are working properly. Moreover, the modeler specifically informed the Model Review Group in the fall of 2011 that a more extensive back-testing of the model, which required position data for the 264 previous trading days, could not be conducted because the "CIO lacked the data necessary for more extensive back-testing of the model."

139.    According to the JPMorgan Task Force Report, "[n]either the Model Review Group nor CIO Market Risk expressed concerns about the lack of more extensive historical data," even though such data covering the twelve months ended September 30, 2011 should have been used to perform the CIO's VaR calculations that were reported in the Company's third quarter Form 10-Q filed on November 5, 2011. Indeed, federal banking regulations governing the calculation of bank regulatory capital ratios required JPMorgan to maintain such data. Specifically, under regulations in effect at the time, JPMorgan was required to conduct quarterly

back-testing of all VaR models, in which daily VaR-based measures were compared to each of the preceding 250 business days to the actual daily trading profit or loss, and required JPMorgan to update its data sets more frequently than every three months in anticipation of market conditions that would require such updating.  *See, e.g.,* 12 CFR Part 3, Appendix B, Section 4.

140.    The findings of the OCC likewise confirmed that JPMorgan's implementation of the new VaR model enabled the Company to disguise the true risk of the CIO, because corresponding VaR risk limits were not adjusted to account for the reduced VaR results produced by the new VaR model.  Specifically, the OCC Cease and Desist Consent Order stated:  "the Bank implemented a new VaR model, which had the effect of significantly reducing the CIO's VaR measurement.  While the process for measuring VaR changed, the VaR limits established under the previous model were retained.  As a result, the CIO continued to increase its risk without continuing to exceed the VaR limits." According to a November 6, 2012 OCC Supervisory Letter, the OCC found that during the Class Period the "bank was using several VaR models that were not properly reviewed internally and others did not receive regulatory approval," and that JPMorgan's "VaR Model risk management is weak and constitutes an unsafe and unsound banking practice."

141.    That JPMorgan acted to deceive investors in implementing the new CIO VaR model is further confirmed by the fact that the SEC was particularly focused on the Company's disclosure to investors of the results of its VaR model analysis during the Class Period.  Specifically, as was disclosed after the Class Period, the SEC questioned JPMorgan about the VaR disclosures in the Company's 2010 Form 10-K, and specifically asked in an August 3, 2011 comment letter to Defendant Braunstein whether the Company's method for establishing its VaR "model was statistically appropriate."  In JPMorgan's September 7, 2011 response, the Company

told the SEC that providing further disclosure to investors of the risk factors and other information used to calculate VaR "could be misleading" and affirmatively represented that the Company "believes that the qualitative description of its VaR calculation allows financial statement users to understand the basis of the Firm's VaR calculation and the usefulness and limitations of VaR." JPMorgan's assurances to the SEC were flatly contradicted by the Company's contemporaneous development of a new VaR model that was designed to specifically conceal the large and growing risk in the CIO's synthetic credit portfolio.

142.    As revealed in the JPMorgan Task Force Report, the CIO's VaR model was not the only model JPMorgan manipulated to hide the CIO's risks from investors and regulators. Indeed, senior CIO executives attempted to adopt a new model to calculate the synthetic credit portfolio's risk-weighted assets ("RWA"), which were used by regulators to determine JPMorgan's capital requirements. As noted in the JPMorgan Task Force Report, one of the CIO's "priorities" was to reduce its own RWA. As with the VaR manipulation described above, the Company sought to achieve that reduction by manipulating the RWA model to make it appear as though the risks posed by the synthetic credit portfolio had been reduced, instead of actually reducing the portfolio's positions. Specifically, a January 2012 email sent by a CIO trader to Drew, Weiland, and John Wilmot, who was then the Chief Financial Officer of the CIO, among others, stated that the "preferred approach" to complying with an anticipated regulatory change that JPMorgan believed would require it to reduce the CIO's RWA was to "modify the model that it used to calculate RWA for the Synthetic Credit Portfolio, and delay any efforts to reduce RWA through changes in positions."

143.    The Senate Report provided additional detail on JPMorgan's attempt to artificially reduce the CIO's RWA, revealing that JPMorgan tried to lower RWA by manipulating yet

another risk limit, the comprehensive risk measure ("CRM"), to hide the CIO's growing risk and losses. While VaR quantified possible losses over the course of a day, CRM quantified losses likely to be incurred over the course of a year in markets undergoing high levels of stress. Both VaR and CRM were used to calculate the Company's RWA, which in turn, was used to determine JPMorgan's capital requirements. The need to reduce CRM was driven by the directive in 2011 that the CIO reduce its RWA. As the Senate Report documented, the CIO traders knew that they could not reduce CRM by selling positions without taking massive losses. Accordingly, as Macris explained to Martin-Artajo in an email cited by the Senate Report, "if we need to [a]ctually reduce the book, we will not be able to defend our positions," and, therefore, "[w]e need to win on the methodology." Citing that same email, the JPMorgan Task Force Report concluded that, without manipulating the CRM model, any reduction of the CIO's RWA would have "force[d]" the CIO "to recognize losses."

144.  "Winning on the methodology" meant cherry picking the most favorable model for each position to generate the lowest RWA, rather than consistently applying the most appropriate model across the portfolio or similar positions. As explained in the Senate Report, contrary to OCC regulations, JPMorgan developed a risk model "optimization" plan in which it "sought to apply the CRM or IRC models to individual positions, not on the basis of which book they were in, or the nature of the trades, but rather on the basis of what arrangement would result in the lowest CRM and IRC totals and, therefore, the lowest RWA."[2]

145.  The Senate Report confirmed that JPMorgan knew the "optimization" plan was wrong and would deceive regulators and investors concerning the CIO's true risks. Specifically, after a CIO analyst set forth the regulatory capital "optimization" plan in an internal March 2012

---

[2]  The "IRC" refers to the Incremental Risk Change, an alternative to the CRM model.

email, he was warned by at least two senior CIO personnel not to put the details of the "optimization" plan in writing. The efforts to manipulate the CRM, IRC and RWA models continued through April 2012. Indeed, as the Senate Report concluded, "emails, telephone conversations, and internal presentations offer evidence that efforts to manipulate RWA results to artificially lower the bank's capital requirements were both discussed and pursued by the bank's quantitative experts." For example, Macris informed Drew in an April 3, 2012 email that a quantitative research analyst was "now in our office and he is 100% involved with the RWA projections of our book and ways to bringing it lower [sic]." As OCC Chair Thomas Curry testified to the Senate Subcommittee on March 15, 2013, JPMorgan's "optimization" scheme was not "legitimate," and violated OCC regulations.

### L. THE "LONDON WHALE'S" MOUNTING LOSSES THREATENED TO EXPOSE THE CIO'S TRUE FUNCTION

146. According to multiple sources, in late 2011 the CIO developed a trading strategy purportedly intended to offset the CIO's synthetic-credit positions by entering into additional synthetic credit positions. The *New York Times* reported that Drew approved this strategy, and the *Wall Street Journal* reported that Dimon personally approved the concept behind that strategy; after the Class Period, Dimon admitted his role in the CIO's trading strategy in his testimony before a U.S. Senate committee.

147. While the CIO's synthetic credit portfolio included a variety of positions, according to JPMorgan's recent admissions the net position of that portfolio in 2011 was a bet against corporate debt. That is, the CIO was generally wagering that corporations, particularly those issuing U.S. high-yield, or "junk" bonds, would default on those bonds. Instead of selling off the instruments that constituted that wager, the CIO purportedly tried to balance its portfolio by placing an offsetting—and much larger—bet that other corporations (all investment grade)

66

included in separate indices would remain financially sound and not default on their obligations. After the end of the Class Period, JPMorgan claimed that these two trades were intended to balance each other out.

148. Drew remained in close contact with the London traders as they attempted to balance the synthetic credit portfolio, and spoke with them weekly, in addition to receiving daily profit-and-loss reports and VaR information concerning the synthetic credit portfolio. As reported by the *New York Times*, Drew met with Macris and Javier Martin-Artajo, the chief deputy to Macris in the CIO's London office, in New York in December 2011 to discuss the positions being taken by the CIO.

149. However, instead of providing any offset or hedge, the proprietary-trading strategy approved by Dimon and Drew materially increased the risk in the CIO's synthetic credit portfolio. Because the original CIO position – the bet that companies issuing high-yield debt would default – was so large, the CIO was required to amass an enormous bet that the companies issuing investment grade-rated debt would remain sound. At the same time, the new strategy implemented by the CIO required the original position – the bet that certain companies would default – to increase as well. Specifically, the CIO's bet that highly-rated companies would remain sound more than tripled during the first quarter of 2012. At the same time, the CIO's bet that companies issuing high-yield debt would default doubled. In a January 30, 2012 email to Martin-Artajo, Iksil said the increasing size of the positions was "scary." As Cavanagh later put it, the portfolio grew to a "perilous size with numerous embedded risks . . . ."

150. Cavanagh's description actually understated the risk presented by the size and complexity of the CIO's trading strategy. As the OCC explained to the Senate Subcommittee, contrary to the Company's assertion that the strategy would balance existing risk, the new

trading strategy consisted of "aggressive positions" that were "risk additive" rather than "risk reducing" and which carried so much risk, "<u>no matter what happened, they would lose money</u>."

151.    The fact that the CIO was permitted to engage in such a high-risk strategy that expanded the size of the synthetic credit portfolio by such a material amount itself evidences that the Defendants' Class Period statements concerning JPMorgan's risk management infrastructure were false and misleading.  Indeed, as the JPMorgan Task Force Report concluded, this "growth in the notional size of the Synthetic Credit Portfolio during the first quarter of 2012 should have prompted additional scrutiny by the Risk organization (at both the Firm and CIO level) into both the trading strategies that had caused this growth and the proposed exit strategy."  It did not.

152.    Not only did the increased size of the synthetic credit portfolio not prompt any additional scrutiny from CIO risk managers, but none of the key CIO managers or risk personnel even understood the trading strategy that had led to the dramatic increase in risk.  Indeed, <u>no one</u> interviewed by the Senate Subcommittee, including Defendant Drew, Weiland, or Goldman, was able to explain how the trading strategy was intended to work.  As noted in the Senate Report, before approving billions of dollars in trades, senior CIO management obviously should have understood what was being proposed and been able to explain the strategy.  However, as revealed in the Senate Report, the only clear fact understood by CIO managers and risk personnel about the trading strategy was that it was undertaken at a time when the CIO had already lost $100 million, and that, as Iksil warned, it could result in losses of an additional $500 million.

153.    Significantly, as confirmed by the JPMorgan Task Force Report, this high-risk trading strategy was implemented specifically in order to avoid disclosing the CIO's losses. Defendant Braunstein directed the CIO to calculate how much money the CIO's synthetic credit

portfolio would lose if it had to unwind its positions by reducing the portfolio by $20, $40, or $60 billion of RWAs. In response, the CIO determined in December 2011 that a reduction of $10 billion of RWA (or half the lowest reduction amount requested by Braunstein) would require a proportional unwind of the synthetic credit portfolio by 35%, and result in losses to the CIO of more than $500 million. A subsequent CIO analysis in January 2012 concluded that unwinding only 25% of the synthetic credit portfolio would cost approximately $516 million. Drew was informed of both of these analyses. However, after being told that unwinding a fraction of the positions in the portfolio had caused losses of $15 million in early January, Drew ordered the CIO to revise the RWA unwind plan in order to "maximize p [&] l" – that is, to avoid taking losses and protect the CIO's profitability by attempting to replicate "windfall gains" from an "American Airlines-type situation." As the Senate Report noted, while the CIO traders did not want to lose money at all and would be "angry" if they did, they "particularly did not want to lose money from unwinding the book" – that is, selling assets at a loss – a concern that was shared by Drew. Ultimately, Defendant Braunstein acquiesced to the CIO's strategy when he was specifically asked to approve a "one quarter request" to enable the CIO to increase the RWA budget for the synthetic credit portfolio by $7 billion to $176 billion so that the CIO could execute the trading strategy endorsed by Drew.

154.    Moreover, the JPMorgan Task Force Report admitted that Drew and Braunstein knew that the CIO's positions were not marked-to-market. Indeed, the fact that a 25% proportional reduction in the synthetic credit portfolio would result in losses of $500 million meant that the synthetic credit portfolio positions were not marked-to-market. That is because if those positions had been properly marked to reflect market pricing, unwinding them would not have caused JPMorgan to incur any additional losses. As noted by the JPMorgan Task Force

Report, GAAP requires that positions be marked at a "good-faith estimate of the exit price for a reasonably sized lot of each position," and that positions be assigned values reflecting those estimates, including the costs of unwinding the synthetic credit portfolio's positions. Accordingly, by no later than the end of 2011, both Drew and Braunstein knew that the CIO's positions were not being marked to market, and that the CIO was carrying hundreds of millions of dollars in undisclosed losses on its books.

155.    In amassing this huge position in the thinly traded market for synthetic-credit derivatives, the CIO drew the attention of hedge funds that typically trade those instruments. These hedge fund traders recognized that a single market participant was accruing a major position in credit derivatives, but in 2011 did not yet know that the trader behind those positions was at JPMorgan's CIO.   Not knowing his identity, the hedge-fund traders nicknamed the unknown trader the "London Whale," due to the outsized positions he had taken.

### M.    JPMORGAN'S OWN INVESTMENT BANK TRADED AGAINST THE CIO, EXACERBATING ITS LOSSES

156.    Knowing that a single market participant had so much exposure in an illiquid market enabled other market participants to trade against the CIO's position.   Seizing upon the price distortions that the CIO had created, hedge fund traders – such as Boaz Weinstein, the founder of Saba Capital and former co-head of credit trading at Deutsche Bank – took direct aim at the "London Whale" and thus at JPMorgan itself.   Weinstein advised investors to take positions adverse to the London Whale, thus compromising the CIO's ability to manage its existing risk.

157.    Remarkably, JPMorgan's <u>own</u> Investment Bank division also traded against the CIO's synthetic credit portfolio, seeking to increase profits for the Investment Bank (and the bonuses of individual traders) at the expense of the CIO and the Company itself.   Specifically, as

detailed in a January 29, 2013 *Reuters* report and a January 31, 2013 *Wall Street Journal* account, Martin-Artajo and Iksil complained to JPMorgan's Internal Compliance department that JPMorgan's own Investment Bank traders had tried to move the market against the CIO's synthetic credit portfolio in January 2012 by leaking information about the CIO's positions to certain hedge funds.  According to news accounts, Iksil's and Martin-Artajo's concerns were eventually reported to the SEC and the U.S. Attorney for the Southern District of New York.

158.  That JPMorgan's Investment Bank was trading against the CIO's positions demonstrates that those positions were not hedges, and belies the notion that the CIO was involved in managing the risks of JPMorgan's other business units.  Clearly, had the CIO been responsible for hedging the risks of JPMorgan's other business units, the Investment Bank would not have been trading against those positions.

159.  Further evidencing the fact that the CIO's positions were not appropriately marked-to-market, CIO traders responded to the hedge funds and the Investment Bank's trading by continuing to add to the CIO's long and short positions in order to "defend the position" or "defend the P&L."  The CIO traders did so because they believed that "if they did not respond through additional trading, they would be forced to recognize losses."  In other words, rather than mark their positions at the "good faith" price which they could be sold in the market, CIO traders entered into additional trades to manufacture prices that could be used to artificially inflate the value of the CIO's synthetic credit portfolio.

### N.    JPMORGAN DISREGARDED AND MANIPULATED THE CIO AND FIRM-WIDE RISK LIMITS THAT WERE BREACHED BY THE SYNTHETIC CREDIT PORTFOLIO IN JANUARY 2012

160.  In January 2012, the synthetic-credit positions breached the few remaining risk limits applicable to the CIO.  While JPMorgan never established any risk limits specific to the multi-billion dollar synthetic credit portfolio (despite the fact that the Investment Bank, which

maintained a similar portfolio, was subject to granular, portfolio-level risk limits), and Drew and

Macris had removed the $20 million stop loss risk limits for individual trades, certain risk limits

still applied to the CIO as a whole.   In January 2012, the positions in the synthetic credit

portfolio triggered those risk limits, which Cavanagh later described as "clearly inadequate" and

"unsophisticated."

161.    Specifically, on January 6, 2012, a measurement of the impact of credit spreads

exceeded the limits established for the CIO.   Although JPMorgan publicly represented in its

Forms 10-K that such a breach in credit-spread limits should have been reported in a "timely

manner to senior management, and the affected line-of-business [wa]s <u>required to reduce trading

positions</u> or consult with senior management on the appropriate action," the CIO's positions

were not reduced.   Instead, as JPMorgan later admitted, the credit-limit violation in January was

"reviewed by CIO's Market Risk Officer," Weiland, but nothing was done in response.   As the

JPMorgan Task Force Report disclosed, in addition to Weiland, Defendant Drew, Goldman,

other senior CIO management, and personnel from JPMorgan's Firm-wide Market Risk

Management were aware of the credit spread limit breach, which continued throughout 2012.

162.    As reflected in the Senate Report, the limit breaches were ignored so that CIO

traders could continue to "defend" their positions in order to hide the CIO's mounting losses.

Indeed, the breaches continued to grow—with the credit spread limits exceeding their thresholds

by over 270% on February 9, over 900% by March 30, 2012, and over 1074% by April 17—after

these limits were dismissed by Defendant Drew as "old and outdated."

163.    At the same time that those limits were breached, JPMorgan demoted Weiland,

the CIO's most senior risk officer, who months earlier had pushed for new, tighter risk limits

within the CIO.   In place of Weiland, Drew finally created the position of CIO Chief Risk

Officer.  For that top risk position, Drew selected Irvin Goldman, a former trader whose conduct when he was employed at Cantor Fitzgerald resulted in a regulatory sanction for that firm. Goldman was the brother-in-law of JPMorgan's then-Chief Risk Officer, Barry Zubrow.  As reported by *Bloomberg* and the *Wall Street Journal* on May 20, 2012 and *Bloomberg* journalist Stephanie Ruhle on May 21, 2012, Goldman lacked risk-management experience and had no experience trading the synthetic-credit products that presented the single largest risk to the CIO, yet was put in a "critical oversight role" that included "overseeing risk limits and trading positions" for that portfolio.  Moreover, Drew's involvement with Goldman's appointment – effectively hand-picking her own risk officer – created dual loyalties and constituted a flagrant conflict of interest, according to sources cited by *Reuters*.

164.    The JPMorgan Task Force Report admitted JPMorgan's appointment of Goldman as Chief Risk Officer of the CIO was improper and the result of nepotism, and that he was wholly unqualified to serve in that role.  The JPMorgan Task Force Report highlighted that Goldman's primary qualifications for the position appeared to be that he was Zubrow's brother-in-law, had worked directly for Drew on "strategic projects," and had an unspecified "understanding of the markets"—even though he had no experience in synthetic credit derivatives.  In fact, the JPMorgan Task Force Report admitted that the newly-installed Chief Risk Officer, John Hogan, "considered the hiring of Mr. Goldman as CIO Chief Risk Officer as effectively Mr. Zubrow's last personnel appointment rather than as [Hogan's] first," concluding that the "Firm should have a more formal process in place…to assure that, in connection with the hiring of Operating Committee members and their direct reports, the Firm and all appropriate personnel are aware of all relevant background information."

165.    Just two weeks after the CIO-wide credit spread risk limits were breached, both the CIO's and the Company's firm-wide VaR risk limits were breached because of the CIO's holdings.   The JPMorgan Task Force Report makes clear that JPMorgan failed to resolve the underlying risks that caused that breach, instead relying upon the new VaR model to conceal that risk while allowing the CIO to continue to actively trade its positions.   Indeed, Dimon himself personally granted the reprieve from the Company's risk limits, which JPMorgan had repeatedly told shareholders were the cornerstone of its risk-management protocol.   As noted in a January 20, 2012 email sent by Goldman, Dimon's approval came after the firm-wide VaR had been breached for three consecutive days, and the "third consecutive breach notice" had been sent to Dimon and the rest of the Operating Committee.   Specifically, on January 23, 2012, in response to an email seeking an exemption from the Company's firm-wide VaR limit following consecutive breaches of that limit, Dimon and JPMorgan's newly installed Chief Risk Officer, John Hogan, permitted a "temporary increase of firm-wide VaR" to accommodate the spiking CIO VaR that was driven by the increased risk of the synthetic credit portfolio.

166.    As set forth in ¶¶136-40, Dimon called the breach "temporary" because he knew that the new VaR model being developed for the CIO's synthetic credit portfolio would significantly – and artificially – reduce the VaR of that portfolio, and bring the CIO's VaR back within limits.   Indeed, the email to which Dimon and Hogan responded in granting their approval of the Company-wide increase in the VaR explicitly noted that the new CIO VaR model would reduce "CIO VaR by 44%" and bring the firm-wide VaR within the previous limit.   In other words, within days of credit-spread risk limits in the CIO exceeding their maximum permitted levels, Dimon approved an exception to the Company's firm-wide VaR limit, knowing that, with

the implementation of the new VaR model for the CIO's synthetic credit portfolio, the Company's risk would appear to have decreased.

167.    By the end of January, the new VaR model was implemented solely within the CIO – but not any other division of JPMorgan.  This new model produced a drastically lower CIO VaR than the prior model, and thus also artificially lowered JPMorgan's firm-wide VaR. The Company's 2011 Form 10-K, which was issued on February 29, 2012, just one month after JPMorgan implemented the new VaR model, did not disclose that a new VaR model was being applied to the CIO.  Moreover, when JPMorgan ultimately reported its VaR for the first quarter of 2012 (in a Financial Supplement issued on April 13, 2012), the Company reported CIO VaR of $67 million when, in reality, the VaR had increased nearly 100%, to $129 million, under the prior model.  Furthermore, even though Dimon, Drew and everyone else involved in creating and implementing the new CIO VaR model knew it would "significant[ly]" reduce the CIO's VaR, no change was made to the actual Firm-wide or the CIO-wide VaR limits; instead, according to the JPMorgan Task Force Report, "[f]ollowing the implementation of the new model, the CIO VaR fell below the [prior CIO] limit, as expected."   In sum, the new VaR model allowed JPMorgan to falsely represent that the CIO VaR was roughly half of what it truly was.  As the OCC concluded, as a result of this manipulation, "the CIO continued to increase its risk without continuing to exceed its VaR."

168.    Also on February 29, 2012, JPMorgan's senior management (including Dimon, Braunstein, Drew, and Zubrow) and senior executives of the CIO met and discussed the CIO's synthetic credit portfolio, the CIO's risk limits, and the CIO's VaR model change.   A presentation distributed at the meeting explained in a "VaR Highlights" section that the CIO's new "VaR methodology" was "helping to reduce VaR and RWA usage" by the CIO, and showed

that the CIO VaR had peaked in January 2012 and declined precipitously following the implementation of the new VaR model. Goldman, then CRO for the CIO, told the Senate Subcommittee that he "specifically remembered going over the implementation of the new VaR methodology at the February meeting." Further, that presentation also demonstrated that the synthetic credit portfolio's function was to generate profit, not hedge risk. Specifically, the presentation showed that the synthetic credit portfolio: (i) generated $2.4 billion in "total return" from 2007 to 2011, (ii) took directional positions that could generate $200 to $500 million in "P&L gains" upon certain credit events, such as the default of specific U.S. mortgage-related companies or the restructuring of certain European sovereign debt issuers, and (iii) had the shortest investment time horizon of any investment in the CIO. Yet again, following this presentation, no effort was made to reduce the CIO's positions or provide any disclosure to shareholders.

### O. THE CIO'S DEFICIENT RISK-MANAGEMENT PROTOCOLS PERMITTED TRADERS TO MANIPULATE THE VALUATION OF THEIR CREDIT DERIVATIVES

169. The implementation of the new VaR model helped to conceal the CIO's true risk profile from investors and regulators, but did nothing to change the actual risk of the synthetic credit portfolio, which was known to Defendants. To further conceal the CIO's risky positions from regulators and investors, the CIO's traders resorted to "painting the tape"—a term for trades that are designed to manipulate prices in a thinly-traded market, as reported by *Bloomberg* on July 24, 2012. As discussed above, the CIO's synthetic-credit derivatives were instruments linked to specific indices of companies and countries that issued debt. The value of those instruments was therefore tied to those indices. According to market data, the daily volume of trading on one particular index of corporate debt issuers that the CIO traded against – known as the CDX.NA.IG.9 index – more than doubled at the end of January and doubled yet again at the

end of February.  As the JPMorgan Task Force Report admitted, Iksil engaged in a "significant amount of trading at the end of February," and explained in an email he sent to another trader on February 29 that those large trades were "related to month end price moves that were all adverse although we could limit the damage."   The massive increase in trading on that index occurred just before the Company's end-of-the month audits to verify prices, and enabled JPMorgan to raise the value of the CIO's positions that were linked to that index.

170.    As explained in the JPMorgan Task Force Report, an internal control group within the CIO, the Valuation Control Group ("VCG"), verifies all CIO prices at the end of each month and quarter.  In this instance, JPMorgan was able to influence the index in its favor by trading on the CDX.NA.IG.9 index in large enough volumes to affect the price of the index.  Thus, JPMorgan manipulated the price of the index, as evidenced by the fact that other comparable indices failed to mimic the large price swings in the CDX.NA.IG.9 caused by JPMorgan.

171.    The Senate Report confirmed that JPMorgan's "defending" of the CIO's positions and "painting the tape" artificially lowered the CIO's losses.  Indeed, once the CIO traders stopped selling large amounts of CDX.NA.IG.9 protection to "support" the price, JPMorgan's own internal charts showed that the prices of the CIO's positions – *i.e.*, the premiums or credit spreads paid for that protection – began to rise.  JPMorgan itself admitted to the Senate Subcommittee that when this trading stopped, it stopped "supporting the price."  The OCC likewise concluded that the CIO traders' increased trading at the end of the month had the effect of "artificially driving the prices lower."

172.    Despite the benefit to the CIO's position achieved by "painting the tape," the effect of that manipulation was still insufficient to bring the CIO's valuation marks to where

JPMorgan needed them to be.  Having already manipulated the pricing of the underlying index and changed the VaR model, the CIO traders moved on to cooking their books by simply choosing marks that suited them, rather than using true market prices.  As reported by the *Wall Street Journal* on August 3, 2012, a person who reviewed communications at issue in JPMorgan's investigation into the trading losses said that Iksil was told by Javier Martin-Artajo, his supervisor in the CIO's London office (and who reported to Macris), to mark the CIO's credit derivatives at higher values than those positions could have fetched on the open market.  Iksil agreed on repeated occasions to intentionally mismark the value of the CIO's credit derivatives.  Such manipulations would not have been possible if Defendants had not weakened the CIO's risk management protocols, as described herein.

173.    In the communications discussed in the *Wall Street Journal*, Martin-Artajo is shown prodding Iksil toward higher prices, stating that "[w]e should not be showing" a certain amount of losses from the trades "until we see where the market is going," according to people who have reviewed those communications.  Instead, Martin-Artajo told Iksil that he would "prefer" that a higher price be put on certain positions.  According to a source cited by *Bloomberg*, the CIO was valuing its trades at prices that differed from those at JPMorgan's Investment Bank, the largest dealer in such credit derivatives in the United States.  Because of the enormous size of the CIO's positions, even small differences in how the trades were marked could result in a huge difference in the value of the positions, potentially masking the CIO's losses by hundreds of millions of dollars, according to a source cited by *Bloomberg*.

174.    The JPMorgan Task Force Report confirmed that a CIO trader with responsibility for estimating the fair value of each position in the synthetic credit portfolio on a daily basis, "at the direction of his manager…assigned values to certain of the positions in the Synthetic Credit

Portfolio that were more beneficial to CIO than the values being indicated by the market."  As the JPMorgan Task Force Report admitted, the "result was that CIO underreported the losses, both on a daily basis and on a year-to-date basis."

175.    Indeed, the JPMorgan Task Force Report revealed the extent to which the traders' selection of marks within the bid ask spread misrepresented the true values of the synthetic credit portfolio positions.  Specifically, the JPMorgan Task Force Report admitted that by mid-March 2012, the "divergence" between the "crude mid"—the mathematical mid-point of the "bid ask spread"—and the actual marks assigned to the CIO's synthetic credit positions enabled JPMorgan to disguise up to $292 million in losses.  On March 16, one CIO trader informed another that the divergence—*i.e.*, the difference in losses reflected by assigning the CIO's preferred values to the synthetic credit portfolio marks, all of which were within the "bid ask spread"—would likely reach $400 million in the near future.  In fact, according to an internal spreadsheet maintained by one of the CIO traders, which Drew later referred to as a "shadow P&L document," the "lag" or "distance" between the midpoint prices and the preferred marks selected by the CIO had already resulted in aggregate year-to-date losses of $432 million by March 16, 2012.  That is, the CIO concealed a loss of $432 million simply by mismarking its positions.  Recognizing how egregious the CIO's mismarking had become, Iksil admitted to a fellow CIO trader that the mismarking by that point was "becoming idiotic," as the synthetic credit portfolio was growing "more and more monstrous."

176.    The Senate Report made clear that Drew and other senior managers were informed of and involved with the CIO traders' mismarking.  For example, on March 20, 2012, CIO traders circulated a daily profit and loss analysis to Drew, Wilmot, Macris, and Weiland, among others, which reported a loss of $43 million for the synthetic credit portfolio, and

explained that the portfolio had a "lag in P&L [that] is material ($600-800M)" – a figure that Drew told the Senate Subcommittee represented the CIO's unreported losses.  Just a few weeks later, Drew specifically instructed Martin-Artajo to "tweak" the CIO's marks.  Specifically, on April 17, 2012, Drew ordered Martin-Artajo to "tweak" the synthetic credit portfolio marks in order to get "an extra basis point" that Drew was "trying to show."  After Drew's instruction, the synthetic credit portfolio showed a gain of $10 million, after eight consecutive days of losses.

177.    Moreover, the fact that JPMorgan's Investment Bank was actively trading against the CIO at this time, as discussed above, made the mismarking by the CIO readily apparent to JPMorgan's senior management.  Because the two units of the Company were trading with each other, their marks for those positions should have matched.  However, the CIO's mismarking created a significant disparity between the CIO's marks and those of the Investment Bank.  As noted by the Senate Report, the CIO was supposed to be using the Investment Bank's marks for the same positions in the CIO, and any disparity between the marks of the two divisions meant that the CIO was not marking its positions according to Company policy.

178.    According to the Senate Report, Drew and the CIO traders were particularly concerned about trades with the Investment Bank specifically because settling those trades using the Investment Bank's marks resulted in much larger losses for the CIO than it would otherwise record using its own, more favorable marks.  To try and convince the Investment Bank to change its marks, CIO traders complained to senior Investment Bank executives that Investment Bank traders were improperly marking positions in which the CIO was on the other side of the trade in order to benefit the Investment Bank.  While the CIO traders' efforts to convince the Investment Bank to adjust its marks were ultimately unsuccessful, the Senate Subcommittee concluded that the fact that the Investment Bank disagreed on the CIO's marks – and that this issue was raised

by Drew and CIO traders with Internal Compliance and the senior-most executives at the Investment Bank – was a "red flag" that should have immediately alerted JPMorgan senior management of "a mismarking problem." Indeed, the CIO's fraudulent mismarking was so severe that other counterparties began challenging the CIO's valuations, leading to collateral disputes that grew to $690 million.

179.    The selection of prices for the synthetic credit positions on March 30, 2012 (the last trading day of the quarter), which were used as the basis of the Company's financial reporting, masked the CIO's losses by hundreds of millions of dollars. Specifically, under orders from senior traders to use the "best" prices, or those closest to the most advantageous boundary of the bid-offer spread, the CIO selected marks that resulted in an estimated loss for the day of $138 million—a figure that understated the CIO's true year-to-date losses by at least $500 million. Even though the Valuation Control Group confirmed that the CIO's selected marks were at or near the boundary of the bid-offer spread, and some were even outside Valuation Control Group's thresholds, they were used to report JPMorgan's earnings guidance to investors on April 13, 2012 and its first quarter results.

180.    Indeed, in assessing the CIO's marks to report JPMorgan's first quarter financial results, the Company's Controller's office generated a report in May 2012 that detailed how the CIO traders' marks had changed over time. That report showed that the CIO's marks deviated not only from the bid-offer midpoints and marks obtained from independent pricing services, but the actual "exit" prices at which the CIO had executed trades in those same instruments. In fact, the Controller concluded that the CIO's marks understated losses by $512 million—or 70% more than the losses that the CIO reported. Nevertheless, despite the Controller's findings of blatant

mismarking, the CIO's fraudulent marks were approved by the Controller and used to report the Company's financial results on May 10, 2012.

181.    Notably, even these figures and JPMorgan's restated first quarter results, which were calculated based on the bid-offer midpoints for the CIO's positions, understated the full extent of the CIO's losses.  As revealed in the Senate Report, following its examination of the CIO's marks, the OCC concluded that "in most cases longs were marked at offer and shorts a[t] bid," when the CIO should have done the opposite.  In other words, the CIO should have marked long positions at the bid price and short positions at the offer, as those values more closely approximated the "exit" price at which the CIO could trade those positions, and thus fair value under GAAP.  As revealed in the Senate Report, because the CIO's actual "exit" prices for its positions diverged from the bid-offer midpoint, JPMorgan's practice of using the bid-offer midpoint prices as a proxy for fair value violated GAAP and the Company's own policy requiring JPMorgan to make "adjustments" to its marks if the Company "cannot exit a position at mid-market."

182.    CW 3 confirmed that JPMorgan's marking process could be subject to manipulation.  CW 3, who worked in the New York office of the CIO until April 2011 and saw the CIO's positions in 2010-2011, knew of at least one occasion when the CIO had marked an asset at a different value than other divisions within the Company.  CW 3 said that even though valuation control should have been handled by a single department and determined in a uniform manner across all divisions of the Company, the CIO was treated differently and permitted more leeway in terms of valuation.  As the Company itself ultimately admitted, information within JPMorgan "raise[d] questions about the integrity of the trader marks and suggest[ed] that certain

individuals may have been seeking to avoid showing the full amount of the losses in the portfolio during the first quarter."

### P. JPMORGAN DECEIVED INVESTORS AND REGULATORS AS TO THE TRUE IMPACT OF THE CIO'S TRADES

183. Despite the fact that the CIO's synthetic credit portfolio had already breached risk limits, in February 2012 Dimon and Drew stepped up their campaign to prevent regulatory scrutiny of the CIO. Specifically, on February 2, 2012, Drew and a five-member team from JPMorgan met with Federal Reserve staff to urge that "portfolio hedging" be permitted under the regulations implementing the Volcker Rule. According to the *New York Times*, Drew argued that anything but a loose implementation of the Volcker Rule would hinder the Company's "hedging" activities purportedly performed by her office.

184. Then, on February 13, 2012, JPMorgan submitted a detailed comment letter, signed by Defendant Zubrow, that ridiculed the suggestion that "banking entities will camouflage prohibited proprietary trading to evade the rule." Indeed, JPMorgan falsely claimed in the comment letter that the CIO was "responsible for making investments to hedge the structural risks of our balance sheet on a consolidated basis" when, in truth, the CIO was engaged in precisely the kind of proprietary trading that the Volcker Rule sought to rein in.

185. At the same time, Dimon explained his opposition to the Volcker Rule directly to investors. During an interview on *Fox Business News* just weeks after Dimon had secretly approved an exception to JPMorgan's risk limits to accommodate and mask the CIO's mounting losses, Dimon falsely told investors that "we don't make huge bets."

186. Specifically, on February 13, 2012, *Fox Business News* Reporter Melissa Francis asked Dimon: "[a] lot of people wanted me to ask you about the Volcker rule. I know you wrote comments on how it should be different. What do you think?" In response, Dimon stated, in

relevant part, "so there are two parts.  The part where they said no proprietary trading, we're fine with.  We've never had an issue with that.  The part about market making is the part that everyone is writing long issues about, like being an aggressive market maker….And we don't make huge bets.  So I understand the goal to make sure that these companies don't take huge bets on the balance sheets…."

187.    On March 22, 2012, the London Whale's positions breached an additional "mark-to-market" risk limit in the CIO relating to the widening of credit spreads, which was quickly followed by a breach of stress loss limits on March 29, and a breach of "aggregate" credit spread widening limits on April 10.  The stress loss limit breaches were reported to Dimon, Braunstein, Zubrow, Drew, Goldman and Weiland, among others, and this and the other limit breaches continued throughout April.  Despite the implementation of the new VaR model that was designed to conceal the level of risk within the CIO, and despite the trades designed to paint the tape, credit-risk limits were still being breached.  Indeed, with the breach of the stress limits on March 29, the synthetic credit portfolio had breached all of the risk limits purportedly used by the Company to monitor the portfolio, with CIO risk limits and advisories having been breached more than 330 times over the prior three months.  As reported by the *New York Times* on October 3, 2012, Drew became so concerned that she ordered the CIO traders to stop trading the synthetic credit portfolio, and began holding daily teleconferences with traders in London to manage the position.  In fact, as revealed in the Senate Report, on March 23, 2012, the day Drew ordered the traders to "put phones down" and stop trading, Iksil told Martin-Artajo that the CIO had a one-day loss of between $300 and $600 million, depending on whether the prices were marked using the midpoint or the "best" prices in the daily price range, *i.e.*, the fraudulent marks most favorable to the CIO.  As Iksil told another trader, "It is over/it is hopeless now…we are

dead i tell you."   Repeating this sentiment, Macris told Drew on March 30, 2013, that "clearly, we are in crisis mode on this."

188.   As revealed in the Senate Report, after being informed that reporters from *Bloomberg* and the *Wall Street Journal* were going to publish a story identifying the CIO and Bruno Iksil as the "London Whale," JPMorgan's senior management—including Defendants Dimon, Braunstein, Drew and Zubrow—crafted the Company's messages concealing the truth about the CIO.   Specifically, Dimon personally approved the talking points that JPMorgan's head of Corporate Communications, Joe Evangelisti, was to use in discussions with reporters in an April 5 email chain.   Those talking points included: "CIO is focused on managing the long-term structural liabilities of the firm and is not focused on short-term profits;" "Our CIO activities hedge structural risks and invest to bring the company's assets and liabilities into better alignment;" and "We cooperate closely with our regulators, who are aware of our hedging activities."   Significantly, that same day, both Drew and Zubrow, the head of the CIO and the Chief Risk Officer of the Company, respectively, reviewed, approved and ratified those same talking points in responses to the same email chain sent to Evangelisti.   These statements were materially all false.   As the Senate Report concluded, "from the beginning of the bank's public discussion of the [synthetic credit portfolio] in April 2012, JPMorgan Chase planned to describe the portfolio as a risk-reducing hedge that was transparent to the bank's regulators, even though neither characterization was accurate."

189.   On April 5 and 6, *Bloomberg* and the *Wall Street Journal* relayed the Company's misleading statements concerning the CIO in articles reporting on rumors in the derivatives markets about the "London Whale," whom they identified as Bruno Iksil.   This was the first time it was publicly reported that a CIO trader was taking enormous positions in the credit-derivatives

market.  However, rather than reveal the truth about the CIO, Evangelisti repeated the false and misleading statements approved by Dimon, Braunstein, Drew and Zubrow, and told the *Wall Street Journal* that the CIO's positions were hedges that were "fully transparent to our regulators," and that the CIO was "focused on managing the long-term structural assets and liabilities of the firm and is not focused on short-term profits." Similarly, *Bloomberg*, which specifically identified Drew as the head of the CIO, repeated the Company's statements that the CIO was responsible for "managing and hedging the firm's foreign exchange, interest-rate and other structural risks" and "focused on managing the long-term structural assets and liabilities of the firm and is not focused on short-term profits."  The Company's press and investor relations personnel repeated the same misstatements approved by Dimon, Braunstein, Drew and Zubrow in discussions with investors and analysts who inquired about the news articles, assuring them that the CIO was focused on "long-term hedging positions," was "not focused on short-term profits, and that the CIO's results were "fully transparent to our regulators."  As noted in the Senate Report, the Senate Subcommittee did not find any evidence of action "taken by any personnel within the bank to correct this description of the [synthetic credit portfolio]."

190.  On April 10, 2012, the first trading day following the publication of the *Bloomberg* and *Wall Street Journal* stories about the London Whale, JPMorgan internally reported losses of $415 million.  That same day, the Company's communications officer and chief investment liaison circulated the same talking points approved by Dimon, Braunstein, Drew and Zubrow, and met with reporters and analysts to communicate JPMorgan's materially false and misleading statements that the CIO's positions were for "hedging purposes," that regulators were "fully aware" of the CIO's positions, and to otherwise "deliver reassuring messages about the [synthetic credit portfolio]."  Those misleading statements were also relayed

by JPMorgan's investor relations personnel in discussions with analysts, and summaries of those discussions conveying the Company's false and misleading statements were reported to Dimon, Braunstein, Drew and Zubrow, who approved and ratified JPMorgan's statements. The next day, the CIO traders acknowledged that JPMorgan's misleading statements had the intended effect, with Martin-Artajo writing in an email to Drew that the press articles had reduced market pressure, and that the "bank's communications yesterday are starting to work."

191.    At this same time, JPMorgan was actively misleading its regulators about the CIO's losses. For example, according to a senior supervisor at the Federal Reserve cited by the *New York Times* on May 25, 2012, JPMorgan's senior management assured its regulators that the CIO's trades were not a concern. Specifically, the Federal Reserve supervisor cited by the *New York Times* said he was told in the first week of April 2012 that JPMorgan's senior management was not worried about the CIO's synthetic-credit trades.

192.    Similarly, JPMorgan took a series of concerted steps to mislead the OCC about the growing risks and losses in the synthetic credit portfolio. First, in a January 30, 2012 quarterly meeting with the OCC, JPMorgan informed OCC regulators that the synthetic credit portfolio was "decreasing in size in 2012" and the CIO would be reducing its RWA, even though Drew had already approved a trading strategy to more than triple the size of the synthetic credit portfolio. Second, JPMorgan stopped providing information about the CIO in regular monthly Treasury Executive Management Reports ("EMR") in January 2012. Instead, the CIO began to issue its own EMR, but did not inform the OCC of this change, and failed to provide the OCC with any CIO EMRs until after the CIO's trades were publicly disclosed in April 2012. Third, JPMorgan stopped providing the OCC with monthly Valuation Control Group reports, which

contained verified valuations of portfolio assets, in February and March 2012—the very time when the CIO traders were hiding losses by mismarking their books and "painting the tape."

193.     It was only after Iksil's trades were made public at the beginning of April 2012 that JPMorgan first alerted its regulator to problems in the CIO.   But even then, JPMorgan continued to mislead the OCC.   Specifically, on April 9, 2012, in the OCC's first meeting with JPMorgan following the media reports of the London Whale trades, the Company downplayed the trades and reassured the OCC that JPMorgan was not concerned about the synthetic credit portfolio's positions and possible losses.   In fact, on April 10, 2012, JPMorgan provided a presentation to the OCC that falsely represented that the synthetic credit portfolio was a "dedicated hedge" designed to lower risk.   On April 16, 2012, JPMorgan provided the OCC with a 13-page presentation describing the synthetic credit portfolio trades.   The OCC later determined that the April 16 presentation contained "material misrepresentations," including the misrepresentation that the synthetic credit portfolio's losses for the first quarter totaled $580 million, when, in fact, the CIO's losses then totaled $1.2 billion.   Following a May 9 meeting with the OCC in which Hogan flatly denied any mismarking, the OCC concluded that JPMorgan had "lied to" and "deceived" its regulator.

194.     Dimon ordered a review of the CIO synthetic credit portfolio in preparation for JPMorgan's previously scheduled quarterly earnings conference call on April 13, 2012. According to Cavanagh, Drew led that review, which included the participation of Dimon and Braunstein.   Before the April 13 conference call, the losses in the synthetic credit portfolio had ballooned to over $700 million for the quarter.   According to the JPMorgan Task Force Report, prior to that conference call, Dimon and Braunstein received at least three reports, including analyses that had been reviewed Drew, Zubrow, Hogan, Goldman, and Wilmot, that showed that

the synthetic credit portfolio's losses could exceed $1 billion in the second quarter and that the synthetic positions represented over $150 billion in net notional exposure.  Indeed, these same individuals, including Dimon and Braunstein, were informed by Drew that the CIO lost over $400 million in just one day following the publication of articles disclosing that Iksil was the "London Whale."

195.    On April 10, 2012, the daily loss reported for the synthetic credit portfolio was $415 million, the largest daily loss up until that point in time, bringing year-to-date losses to at least $1.2 billion.  That day, Drew sent an email to Dimon, Braunstein and others alerting them to the over $400 million loss, explaining that it was "SPECIFIC" to the synthetic credit portfolio. Indeed, even this alarming figure significantly understated the true extent of the CIO's losses due to the traders' fraudulent mismarking.  Following this loss, Drew set up daily conference calls with Dimon, Braunstein, Zubrow, and Macris, among others, to discuss the CIO's positions in preparation for the April 13 conference call.  Moreover, an April 2012 internal JPMorgan report projected losses of $9 billion from the synthetic credit portfolio, according to the *New York Times* on June 28, 2012.

196.    Dimon and Braunstein were also told before the April 13 conference call of the specific reasons why the synthetic credit portfolio positions had increased so dramatically—*i.e.*, that the CIO was attempting to avoid disclosing losses in the portfolio.  Specifically, an April 10 email sent to Dimon and Braunstein explained that the CIO traders had increased their positions because, according to the JPMorgan Task Force Report, they "had been unable to trade out of" certain of the CIO's positions and instead added additional positions that they viewed as the "next best hedge."  That the CIO was "unable to trade" out of certain positions made clear to Dimon and Braunstein that either the CIO could not exit those positions without suffering

significant losses or that there was an utter lack of liquidity for those positions—meaning that either the CIO should have adjusted its marks or established a liquidity reserve.

197.    Indeed, prior to the April 13 conference call, Dimon and Braunstein were well aware of the need to establish a liquidity reserve due to the extraordinarily large size of the CIO's synthetic credit portfolio's positions.  As revealed in the JPMorgan Task Force Report, Braunstein informed Dimon on April 6, 2012 that JPMorgan needed to set aside a $155 million liquidity reserve to guard against losses on just one subset of the CIO's synthetic credit portfolio positions, explaining in an email, "[s]poke  with Ina.  Would like to add a liquidity reserve for the Series 9 Tranche Book (approx 150mm).  Wilmot will be sending e-mail detailing analysis." A subsequent email from Wilmot to Dimon, Braunstein, Hogan, Drew and others showed that just one of the CIO's positions (the so-called "Series 9" or IG-9 index position) was so large that it represented the equivalent of 10 to 15 trading days of 100% of the average daily trading volume for that instrument—an extraordinary size that confirmed the need for a liquidity reserve, as it would have been impossible to exit the position without drastically impacting its price.  As the JPMorgan Task Force Report admitted, this email and a subsequent April 12 email showing how long it would take to exit some of the other synthetic credit portfolio positions revealed to Dimon, Braunstein and other "senior Firm management" the extraordinarily large size of the CIO's positions, underscoring the need to increase the size of the liquidity reserve, which had only been established for one subset of the CIO's positions (the IG-9 index position).

198.    Prior to the April 13 conference call, Dimon and Braunstein were also explicitly informed by JPMorgan's Chief Risk Officer that the CIO lacked appropriate risk limits. Specifically, in an April 9 email, Hogan, who had just become the Company's Chief Risk Officer in January 2012 and previously served as the Chief Risk Officer of the Investment Bank,

identified the significant risk management failures in the CIO and told Dimon that the CIO needed "tighter governance/controls/escalation protocols."  Hogan sent a subsequent email to Dimon and Braunstein on April 11 that included a description of the risk limits for similar synthetic products as those included in the CIO's synthetic credit portfolio that were in place in the Investment Bank, which Hogan said should be implemented in the CIO as soon as possible. Dimon, having presided over the removal of the position-specific limits and having personally waived the breaches of the remaining CIO-wide risk limits (which JPMorgan later admitted were "clearly inadequate"), was of course already well aware of the CIO's governance, control and risk management deficiencies.

199.    As revealed in the Senate Report, as part of a coordinated effort to falsely reassure investors about the London Whale and the CIO's trades, both Drew and Zubrow developed, authorized and approved the Company's misleading messages portraying the CIO as a risk-mitigation unit that were conveyed on the April 13 conference call.  Specifically, on April 12, Drew prepared and distributed documents labeled "Synthetic Credit Materials" that served as background material and talking points to be used on the April 13 investor call.  Those materials, which were sent to Dimon, Braunstein and Zubrow in an email copying Evangelisti and Sarah Youngwood, JPMorgan's head of investor relations, included a document titled "Synthetic Credit Q&A," which provided proposed answers to mock questions on the CIO.  These proposed responses included the statements that (i) the synthetic credit portfolio was used as "a hedge against other risks on JPMC's balance sheet"; (ii) that the "book, as a dedicated hedge, continues to be balanced, and to protect our portfolio from stress events"; and (iii) that the "P+L impact on JPM" since the London Whale stories were published several days before was "a function of market prices," that the "book [was] balanced," and that the CIO's "performance has been good,

and that's reflected in our results."  In addition, later that day, Zubrow sent an email to Dimon and Braunstein, copying Drew, Youngwood and Evangelisti, instructing that "if asked about London / CIO and Volcker" to add that the synthetic credit portfolio's trading activity (i) "was NOT short term trading," (ii) "[w]as part of LONG TERM hedging of the banks portfolio," and (iii) did not "in any way go[] against the law as passed by Congress, nor the spirit or proposed rule as written."  The materially false and misleading statements prepared and approved by Drew and Zubrow were then communicated to investors by Dimon and Braunstein on the April 13 conference call.

200.    Notwithstanding the fact that the CIO accounted for at least 20% of the Company's net income during the Class Period, the April 13 conference call was the first time JPMorgan's senior management ever substantively discussed the CIO on any such call.  Even then, rather than tell investors the truth about the CIO's proprietary investments, the significant losses they had already caused and the massive additional losses that were looming, Dimon and Braunstein lied about the CIO and its role in JPMorgan's business, the "London Whale," and the synthetic-credit trades.  Indeed, Braunstein went to great lengths to stress the purportedly risk-reducing nature of the CIO's trading, describing the CIO's transactions as "hedges" on "high-grade credit" products that would protect against extremely unlikely and unexpected "stress loss" or "tail risk" events that could harm the Company in the event of a severe market downturn, such as a severe recession in Europe.  Braunstein noted that "[w]e hedge basis risk, we hedge convexity risk, foreign exchange risk is managed through CIO, and [mortgage servicing rights] risk.  We also [invest] to generate [net interest income], which we do with that portfolio."

201.    According to Braunstein, the trade by the "London Whale" that had received attention in the news media was simply the result of the Company's active management of this

risk.   Appearing to address the reported rumors concerning the size of Iksil's positions, Braunstein said the trades needed to be sufficiently large to protect against a "significant stress event in credit," even if such a "stress event" was highly unlikely to occur.   Remarkably, Braunstein dismissed concerns about the London Whale's trading, stating that JPMorgan's senior management and its regulators had reviewed and were "very comfortable" with those positions:

> We have had that position on for many years and the activities that have been reported in the paper are basically part of managing that stress loss position, which we moderate and change over time depending upon our views as to what the risks are for stress loss from credit.

> All of those decisions are made on a very long-term basis.  They are done to keep the Company effectively balanced from a risk standpoint.   We are very comfortable with our positions as they are held today.

> And I would add that all those positions are fully transparent to the regulators. They review them, have access to them at any point in time, get the information on those positions on a regular and recurring basis as part of our normalized reporting.  All of those positions are put on pursuant to the risk management at the Firm-wide level.

> The last comment that I would make is that based on, we believe, the spirit of the legislation as well as our reading of the legislation, and consistent with this long-term investment philosophy we have in CIO we believe all of this is consistent with what we believe will be the ultimate outcome related to Volcker.

202.    Dimon further assured investors that the CIO was not gambling with high-risk directional bets.  Dimon noted that "most of that portfolio is an [available for sale] portfolio," which required JPMorgan to report the fair value of the assets in the portfolio.  Dimon explained that the Company reported the portfolio's positions on a mark-to-market basis (as opposed to a more subjective "mark-to-model" basis), suggesting that there were indeed verifiable market prices for the CIO's positions.  In fact, Dimon claimed, JPMorgan was entirely transparent about the CIO and its positions: "[w]e disclosed both realized gains, unrealized gains, and mark-to-market gains.  You get all of that."

203.    When directly asked whether investors should be concerned about the reports concerning the "London Whale," Dimon dismissed such concerns outright, stating "[i]t's a complete tempest in a teapot.  Every bank has a major portfolio; in those portfolios you make investments that you think are wise to offset your exposure."  Dimon and Braunstein provided these assurances to investors despite the facts that: (i) the CIO's trades were high-risk, proprietary trades, not hedges; (ii) the trades had breached every applicable risk limit in the CIO; (iii) Dimon had approved a waiver of the Company-wide VaR limit and a secret change in the CIO's VaR model to accommodate the CIO's ballooning risk profile; (iv) internal controls were so weak that the CIO was able to "paint the tape" and fraudulently mark the synthetic credit portfolio at above-market prices to avoid recognizing the hundreds of millions of dollars in losses already incurred on the portfolio; and (v) internal reports were warning that losses from the portfolio could reach as high as $9 billion.  As discussed below, the Senate Subcommittee determined that these representations were "fictions irreconcilable with the bank's obligation to provide material information to its investors in an accurate manner."

204.    JPMorgan's deception worked.   Market analysts accepted Defendants' reassurances about the CIO, and nearly all analysts considered it a non-issue, not worthy of mention in their reports on the Company's earnings.  After the conference call ended, JPMorgan stock opened at $44.95 per share on April 13, up from the prior day's closing price of $44.84 per share.  On April 16, 2012, Macquarie (USA) Equities Research, echoing Dimon's reassurances, downplayed the role of the CIO, stating that the "company also noted that its CIO unit is housed in the corporate segment and helps the firm manage its interest rate and credit risks.  Recent attention paid to the unit in the media has distorted the largely low risk trades the unit makes."

**Q.    JPMORGAN DISCLOSED THE CIO'S MASSIVE TRADING LOSS, REVEALING THE CIO'S TRUE NATURE FOR THE FIRST TIME**

205.    Less than one month later, on May 10, 2012, Dimon shocked investors by disclosing that the CIO's trades were anything but "a tempest in a teapot," and that the Company had lost at least $2 billion on those trades.  Dimon further admitted that "egregious mistakes" were made and "what happened violate[d] our own standards and principles":

> [T]he synthetic credit portfolio was a strategy to hedge the firm's overall credit exposure, which is our largest risk overall in a stressed credit environment. We were reducing that hedge, but in hindsight <u>the new strategy was flawed, complex, poorly reviewed, poorly executed, and poorly monitored</u>. The portfolio has proven to be riskier, more volatile, and less effective as an economic hedge than we thought. . . . [I]t's obvious at this point that there are many errors, sloppiness, and bad judgment. . . . These were egregious mistakes. They were self-inflicted, <u>we were accountable, and what happened violates our own standards and principles by how we want to operate the Company</u>. This is not how we want to run a business.

206.    When an analyst questioned Dimon's statement that the losses resulted from a "new" strategy, Dimon acknowledged that it was "[n]ot new.  It was, I said new but what I meant it was the strategy to reduce the credit hedge. So it's kind of a new strategy was devised and I already said it was poorly constructed and poorly monitored, all of that. And that took place over the course of the last couple of months."

207.    Responding to questions about JPMorgan's risk management, Dimon described the failures that contributed to the CIO's loss as "egregious," stating: "[W]e operate in a risk business and obviously it puts egg on our face and we deserve any criticisms we get.  So feel free to give it to us and we'll probably agree with you. . . . We are going to make mistakes. . . . This one we would put in the egregious category and I understand fully why you or anybody else would question us generally."

208.    Notwithstanding the disclosure of the CIO's losses and the "egregious" risk-management failures that facilitated that loss, Dimon continued to conceal the transformation of

the CIO into a proprietary trading desk.  Asked on the May 10 call whether the CIO's mandate had changed over the past five years, Dimon insisted that that there had been only "[a] little change" and that while the CIO had hired "different types of people," he "wouldn't call it more aggressive."  Indeed, Dimon continued to mask the full extent of the CIO's transformation into a proprietary trading desk, saying that the CIO had been "very, very careful" in managing the credit portfolio and that JPMorgan had been "very careful" in "all of the things we've done" in the CIO.

209.   As noted in the Company's quarterly report on Form 10-Q filed that day, contrary to JPMorgan's prior guidance that it would report net income of $200 million for the first quarter of 2012, the CIO losses would result in an estimated loss of $800 million to the Company.  The 10-Q stated that the "CIO has had significant mark-to-market losses in its synthetic credit portfolio, and this portfolio has proven to be riskier, more volatile and less effective as an economic hedge than the Firm previously believed."

210.   On the May 10 call, Dimon also disclosed for the first time that the Company had changed the CIO's VaR model during the prior quarter and that the new model had artificially lowered the CIO's VaR.  As Dimon admitted, "[i]n the first quarter, we implemented a new VaR model, which we now deemed inadequate and we went back to the old one, which had been used for the prior several years, which we deemed to be more adequate."  The Form 10-Q filed on May 10 revealed the impact of the new VaR model.  Specifically, the Company reported that the CIO's VaR at the end of the first quarter was actually $129 million, or almost double the $67 million VaR reported just weeks earlier in the Company's April 13 quarterly earnings release.

211.   In response to the May 10 disclosures of the CIO's massive trading losses, the improper VaR calculation, and the risk-management failures that enabled the losses to occur,

JPMorgan stock plunged nearly 10%, falling from a $40.74 per share close on May 10, 2012 to $36.96 per share on May 11, 2012, on the highest single-day trading volume in the Company's history. The stock decline on May 11 wiped out over $14 billion in market capitalization, and was the largest single-day decline in the Company's stock price since the height of the financial crisis in 2008. As the Senate Report noted, the "magnitude of the losses shocked the investing public and drew attention to the CIO which was found, in addition to its conservative investments, to be bankrolling high stakes, high risk credit derivative trades that were unknown to its regulators."

212. Analysts were shocked by the Company's disclosures, explaining that the CIO's losses and the serious risk-management deficiencies that accompanied them took investors by complete surprise. For example, a May 11, 2012, report by the Buckingham Research Group recognized that the disclosure of the then-$2 billion loss revealed that "JPM [was] proving not to be as low risk as many investors previously believed" and was a "black eye for JPM's risk management." Also on May 11, Miller Tabak + Co., LLC issued a report stating that "[i]n yet another example of how making huge speculative bets with shareholders' funds seems to be an embedded behavioral problem for the 'Masters of the Universe' traders at giant banks, JPMorgan Chase & Co. . . . yesterday reported a major trading loss in credit derivatives by its Chief Investment Office, which is supposed to adopt prudent hedges against risks taken by its different trading units." On that same day, RBC Capital Markets published a report stating that after "this blemish, questions will be raised about further exposures and whether risk management practices are adequate."

213. The Company's disclosures on May 10 prompted other analysts to revise their ratings of JPMorgan. Paul Miller of FBR Capital Markets cut his ratings on JPMorgan to "hold"

from "buy" for the first time since he initiated coverage of the bank in June 2010. "I was one of

those guys that said if anybody can manage a major bank of this size it's Jamie," Miller told the

*Wall Street Journal*. Stifel Nicolaus's Christopher Mutascio likewise downgraded JPMorgan to

"hold" from "buy," writing that "[t]he one thing that made us comfortable with the [derivatives]

exposure was the sound risk management behind it, which now comes into question."

214.    The next trading day, following disclosures that the SEC was investigating the

Company's representations about the CIO's trades and that both Moody's and S&P put warnings

on the Company's credit rating, JPMorgan stock dropped further, from a close of $36.96 on May

11, 2012 to $35.79 on May 14, 2012.

215.    In an appearance on NBC's Meet the Press on May 13, 2012, Dimon conceded

that the trading losses were the result of a "terrible, egregious mistake," that the trading "strategy

we had was badly vetted, badly monitored," and that "there's almost no excuse for it." The next

day, JPMorgan stated in a press release that Ina Drew was being terminated as head of the CIO.

216.    At JPMorgan's annual shareholder meeting on May 15, 2012, senior management

confirmed that the trading losses would continue to be "volatile" and could increase. However,

that warning did not prepare investors for the extent of the CIO's losses that were yet to be

revealed. On May 16, 2012, after the close of trading, the *New York Times* reported that losses in

the CIO had increased by 50% in just days, to over $3 billion. In response, JPMorgan stock

dropped another 4% to close at $33.93 per share on May 17.

217.    The disclosure of additional losses from the CIO on May 16 prompted warnings

from analysts that the true impact of the CIO's trading activities on JPMorgan was not reflected

by the Company's prior disclosures. For example, Deutsche Bank issued a report stating that the

key issues related to JPMorgan's share price were "1) the ultimate level of the trading losses, 2)

the earnings impact from a likely smaller CIO/Treasury unit and 3) the regulatory/political fallout." Deutsche Bank also stated that "we have no way of knowing what potential losses may be."  A report issued by Morgan Stanley on May 18 echoed Deutsche Bank's concerns that the reduction of proprietary trading in the CIO would reduce a significant profit source that investors were not previously aware of.  Specifically, Morgan Stanley wrote that, before the disclosure of the loss and the revelations about the CIO's aggressive investments, JPMorgan investors did not appreciate the extent to which the CIO's earnings fueled the Company's performance.  Morgan Stanley estimated, for the first time, that the CIO contributed about 20% of JPMorgan's total earnings over the prior two years.  In light of the revelations about the CIO, Morgan Stanley revised its estimates for JPMorgan's future performance, stating that "[l]ooking forward we assume more plain vanilla investing/hedging in the CIO portfolio and expect earnings contribution to decline to about 2% of JPM earnings."

218.    Finally, during an investor meeting on May 21, 2012, Dimon announced that the Company was halting its $15 billion share-buyback program, which it had announced just months earlier.  Dimon attributed the decision to suspend the share-buyback program to the CIO's mounting losses and regulators' insistence that JPMorgan increase its capital cushion in light of the reduction to JPMorgan's earnings and the increased risk posed by the CIO's positions.  During that meeting, Dimon also admitted that the CIO's loss was a basic, elementary "Risk 101 mistake."  In response to this disclosure, which ends the Class Period, JPMorgan's stock fell another 3%, dropping to $32.51 per share on May 21, 2012 from its $33.49 per share close on May 18, 2012, the previous trading day.

219.    The disclosures revealing the massive losses incurred by the CIO's high-risk trading and the risk-management deficiencies that contributed to that loss caused massive

damages to JPMorgan's investors.   Indeed, in testimony before the U.S. House of

Representatives Financial Services Committee on June 19, 2012, Dimon admitted that the CIO's

trading losses resulted in JPMorgan's losing approximately $30 billion in market capitalization

and that "yes, it did affect our shareholders, yes."

### R.   JPMORGAN RESTATED EARNINGS AND VAR, ADMITTING THAT ITS PRIOR FINANCIAL STATEMENTS LACKED INTEGRITY AND WERE TAINTED BY FRAUDULENT MISVALUATIONS OF THE SYNTHETIC CREDIT PORTFOLIO, AND THAT ITS INTERNAL CONTROLS WERE DEFICIENT

220.   After the close of the Class Period, the Company provided additional information

about the CIO's transactions that caused JPMorgan's massive losses.   Specifically, on the

morning of July 13, 2012, before the Company's earnings conference call that preceded the start

of trading that day, JPMorgan disclosed that the Company would restate its financial statements

for the first quarter of 2012.   That restatement reduced the Company's previously reported net

income for the first quarter by $459 million, or 8.5%.   The Company's restatement also included

an admission that there was a "material weakness in [JPMorgan's] internal controls over

financial reporting at March 31, 2012 related to CIO's internal controls over valuation of the

synthetic credit portfolio."

221.   As Defendant Cavanagh, then CEO of the Company's Treasury & Securities

Services Division, explained on the conference call on July 13, the restatement occurred because

JPMorgan engaged in intentional fraud, and because gross deficiencies in JPMorgan's risk

management procedures and internal controls allowed that fraud to occur.   As Cavanagh

explained, JPMorgan had an internal accounting group that was supposed to monitor valuations

of trading positions to ensure that valuations were accurate.   Cavanagh admitted that these

procedures were not properly implemented in valuing the CIO's synthetic credit portfolio, and

that, as a result, senior JPMorgan traders within the CIO were able to deliberately falsify the valuation of the portfolio:

> [T]raders in CIO were expected to mark their positions where they would expect to be able to execute in the market. In this instance, while the positions were within thresholds established by an independent valuation control group within CIO, the firm has recently discovered information that raises questions about the integrity of the trader marks and suggests that certain individuals may have been seeking to avoid showing the full amount of the losses in the portfolio during the first quarter. As a result, we are no longer confident that the trader marks reflected good faith estimates of fair value at quarter end and we decided to remark the positions utilizing external "mid-market" benchmarks, adjusted for liquidity considerations.

In sum, JPMorgan admitted that its prior valuation of the synthetic credit portfolio lacked integrity and represented a fraudulent attempt to conceal the CIO's losses, resulting in materially false and misleading financial statements that had to be restated.

222.    On the call, Dimon acknowledged that most of the instruments in the CIO's synthetic credit portfolio were traded on exchanges or clearing houses and had observable prices, and thus there were verifiable sources that should have been compared with the traders' marks to verify them.

223.    Moreover, it is standard practice for a bank like JPMorgan to have its internal auditors compare valuations across different units of the bank to ensure that the same types of financial instruments are valued consistently across the bank.  This procedure also was not followed with respect to the CIO's synthetic credit portfolio.  As the Senate Report revealed, the CIO valued its positions at different prices than JPMorgan's Investment Bank valued the same positions, and these pricing disputes were raised with the most senior-level managers of the CIO and the Investment Bank.  Again, however, JPMorgan senior management did not correct the CIO's mispricing of its positions.

224.   The JPMorgan Task Force Report conceded that, as a remedial measure to "improve its oversight of the CIO[] and ensure that CIO is better integrated into the rest of the Firm" after the end of the Class Period, the CIO Value Control Group had been integrated into the Investment Bank's Valuation Control Group.  The Task Force's admission mirrors provisions of the OCC Consent Order, which required JPMorgan to remedy the deficiencies the OCC identified by ensuring, among other things, that "material differences between risk management, valuation and control processes for similar trading practices across all lines of business…are understood and each process at the Bank is appropriate and effective," and that "the Bank performs comparisons of valuations thresholds between lines of business across the Bank."

225.   Significantly, JPMorgan replaced every JPMorgan employee with responsibility for the CIO's synthetic credit portfolio other than Dimon and, in a clear acknowledgment that the portfolio should never have been part of the CIO, removed the portfolio from the CIO and transferred it to the Investment Bank, which had the risk management tools needed to manage that portfolio.  Specifically, the Company announced on July 13, 2012, that all of the CIO managers responsible for the synthetic credit portfolio in London had been "separated from the firm."  The *Times* of London reported on July 14, 2012 that those individuals included Drew, Iksil, Macris, and Martin-Artajo.   The Company said that it would not provide any severance for the recently departed individuals, that it would withhold all of their 2012 incentive compensation, and that it would claw back their past years' compensation packages.

226.   Indeed, JPMorgan disclosed that, because of her role in the fraud, Drew had forfeited two years of compensation in bonuses, share options, and deferred benefits worth an estimated $21 million.  Under JPMorgan's policies as described in its 2011 proxy statement,

such "claw backs" can be sought when, among other things, an employee is terminated for cause, or receives compensation that was based on material misrepresentations by the employee.

227.    Dimon's compensation was also slashed because of his role in the CIO trading misconduct.  Specifically, JPMorgan's Board of Directors determined that, "[a]s Chief Executive Officer, Mr. Dimon bears ultimate responsibility for the failures that led to the losses in CIO and has accepted responsibility for such failures," and as a result reduced his incentive compensation for 2012 by more than half from the prior year.  In addition, the Board determined to defer the vesting for up to an additional 18 months of two million options that had originally been granted to Dimon in 2008, even though all requirements for vesting had already been met.

228.    As Dimon also explained on July 13, "[w]e have shut down synthetic credit trading in CIO.  We'll no longer be doing it."  Instead, Cavanagh explained, the Company was "refocusing on the core mission of managing the AFS [available for sale] investment portfolio," the "synthetic credit activity has been shut down, and the liquidated portfolio transferred to the Investment Bank, where it will be better managed."

229.    A Mediobanca Securities analyst report on July 17, 2012 confirmed that the "refocusing" of the CIO actually meant that unit would start doing what the Company publicly represented it was doing throughout the Class Period: "The role of the CIO has been redefined to reflect the situation the market thought existed before the revelations on 10th May.  The CIO will no longer run a synthetic credit portfolio and will conservatively manage the bank's excess deposits (it currently has a US$323bn [available for sale] portfolio with an average rating of AA+ and unrealised [sic] gains of US$7.9bn), with the aim of protecting the bank against rapidly rising interest rates."

230.    On the July 13 conference call, Cavanagh also admitted that the CIO never had adequate risk management or controls in place, and that the CIO's lack of controls sharply distinguished it from JPMorgan's other "client" businesses.   Specifically, Cavanagh said that "the trading approach itself was poorly conceived, reviewed and executed. . . . [T]he portfolio grew to a perilous size, with numerous embedded risks. . . ."  Significantly, Cavanagh disclosed for the first time that the CIO had inadequate risk limits and that the synthetic credit portfolio was subject to no risk limits whatsoever:

> [The] risk limits in CIO were not granular enough [and] we gave ourselves too few opportunities to engage risk or other senior people as would have been the case if we had a well-designed limit structure around this portfolio.  First, there were no risk limits specific to the synthetic credit portfolio. The limits applied to more aggregated portfolios, often at the level of CIO which was clearly inadequate. Obviously, though, what was needed was granular position level limits for the portfolio itself. And I'd just say that in our Investment Bank credit derivatives business, the limits are already very granular. I believe that had the synthetic credit portfolio been risk managed under equivalent standards, it would not have experienced the unchecked transformation and growth that led to the losses.

231.    Cavanagh also acknowledged that JPMorgan's internal controls for the CIO were inadequate to effectively manage the risks associated with the CIO's complexity:

> [T]he level of scrutiny of CIO did not evolve commensurate with its increased complexity. . . . So some of the contributing factors here was [sic] the belief and experience that the core activities of CIO were managed appropriately, contributing to the unit's successful track record. Second was the capability of and experience of Ina [Drew] herself, and third was the modest but positive results of the synthetic credit portfolio historically. So as a result, we collectively ended up with a level of scrutiny that fell short of the high standards we apply to our client businesses, especially as the complexity increased.

232.    Similarly, Cavanagh stated on the same call that the CIO never should have been engaging in the synthetic-credit transactions that led to the massive loss, and that such trades were inconsistent with the CIO's publicly represented function.  As Cavanagh admitted, "the overall mistake was allowing something that wasn't like the rest of the [asset liability

management] type of activities to get housed inside CIO. That had one form of risk management structure, and then [we] put something new in that required a whole different type of risk wrapped around it, and [we] didn't do it at the time." Cavanagh also acknowledged that the "dedicated risk management team supporting CIO was ineffective in dealing with the challenges of this portfolio. . . . [and] that CIO risk management was ineffective in its responsibility to the synthetic credit portfolio."

233.    With regard to the implementation of the new VaR model in the CIO in January 2012, Cavanagh stated that the "CIO risk team did not perform adequately when it came to the VaR model approval and implementation." Cavanagh made clear that those who were involved in approving the VaR model—including Dimon—knew that it would result in a lower measure of risk. Cavanagh also admitted that changing the VaR model was part of a deliberate process that required committee approval:

> [T]he model, the approval and implementation of synthetic credit VaR model . . . that happened in the quarter, was poorly done. . . . [T]he final observation, is that the synthetic credit VaR model approval and implementation were inadequate. So there's been some speculation here that this model was approved abruptly and by CIO alone, but that's not true.

234.    While Cavanagh attempted to justify the Company's decision to restate its financial results as "conservative," given that misreported marks were "generally within the bid ask spread," the truth was that the misreported marks concealed the magnitude of the losses by hundreds of millions of dollars, as reported by *Bloomberg* on May 31, 2012. JPMorgan admitted as much in an investor presentation entitled "Executive Comments" that was released on July 13 in advance of its second-quarter analyst call. That document revealed that once transferred to the Investment Bank, the synthetic credit portfolio increased the Investment Bank's VaR from $74 million to $113 million, a 55% increase, even after the size of the position was materially reduced before the transfer.

235.    Both Dimon and Cavanagh acknowledged that the problems with the CIO's synthetic credit portfolio did not just materialize in the first quarter of 2012, and, as Dimon noted, "[w]e should have caught it earlier."   According to Cavanagh, for over five years the "complexity" of the CIO's synthetic credit portfolio had demanded greater scrutiny and risk control measures:

> I would say it's something that the complexity of synthetic credit was there over five years, and there were things that obviously we could have caught it sooner, but it didn't until the circumstances of the first quarter got us.

236.    Also on July 13, the Company for the first time provided details about the size of the CIO and its contributions to the Company's bottom line.   Specifically, the Company disclosed that the size of the CIO portfolio was $323 billion, compared to $199 billion in Treasury, and that the CIO contributed approximately $2 billion to the Company's total net income from 2007 to 2011, of which approximately $1.4 billion was from 2008 to 2010.   As noted, several analysts had questioned whether the net income directly attributed to the CIO told the full story about the CIO's contributions to the Company, given that the CIO routinely invested capital on behalf of other divisions, which would themselves report the income earned through the CIO's investment of their capital.

237.    Following the July 13 disclosures, Mike Mayo of Credit Agricole Securities criticized the Company's prior failure to disclose specific information about the CIO: "February 28 we were all here [at JPMorgan], eight hours of presentations [by the Company], over 200 slides, no mention of CIO."

238.    On October 15, 2012, JPMorgan disclosed that the losses from the CIO's synthetic-credit positions increased even more.   Specifically, JPMorgan reported that the losses on the $12 billion in synthetic-credit positions that remained in the CIO were approximately $449 million in the third quarter.   JPMorgan refused to disclose the size of losses on the more

significant and volatile $30 billion in synthetic-credit positions that were transferred to the Investment Bank.  Accordingly, while a full accounting of the CIO's synthetic-credit positions has not been disclosed, the CIO's losses exceeded $6.25 billion as of October 15, 2012.  All told, JPMorgan's losses from the synthetic credit portfolio were equal to at least 40% of the $15.59 billion of net income the Company reported for the nine months ended September 30, 2012.

239.    On November 8, 2012, JPMorgan admitted in its third-quarter Form 10-Q that the CIO's internal controls during the first quarter of 2012 were materially deficient in several respects, including deficiencies in the procedures employed by the CIO Valuation Control Group in performing price verifications, and that the Company lacked adequate "formal reviews of price testing calculations" and "procedures around the establishment and monitoring of price testing thresholds."

240.    In the months that followed the disclosure of the CIO's losses, almost all of the relevant players in the CIO's trading losses were terminated or left JPMorgan.  On October 1, 2012, having already jettisoned Drew, Macris, and Martin-Artajo, and following the departure of the "London Whale" Iksil himself, JPMorgan announced that Irene Tse, who headed the CIO's New York office from early 2011 and often complained about the levels of risk in the CIO's London office, was departing to run her own hedge fund.  Around that same time, Barry Zubrow, the former Chief Risk Officer, resigned from the Company.  In addition, on October 10, 2012, Douglas Braunstein, JPMorgan's CFO since 2010, stepped down; Weiland resigned in October 2012; Goldman resigned in July 2012; and Wilmot resigned and is expected to leave JPMorgan in 2013.

## V.    FALSE AND MISLEADING STATEMENTS

241.    During the Class Period, Defendants made materially false and misleading statements about (1) the CIO's purported role as a risk-management unit, which concealed its

role as an aggressive proprietary trading desk; (2) JPMorgan's supposedly rigorous risk-management practices; (3) JPMorgan's financial results; and (4) the CIO's trading activities during 2012, when its massive synthetic credit portfolio incurred huge net losses.

### A.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ABOUT THE CIO

242.    Throughout the Class Period, Defendants made numerous false statements about the CIO's role in the Company, consistently depicting the CIO as performing a conservative risk-management function similar to a typical bank treasury department.  Defendants did not disclose that the CIO was actually engaged in high-risk proprietary trading that was not intended to hedge risks arising from the Company's other businesses.

243.    On February 24, 2010, the first day of the Class Period, JPMorgan filed its annual report on Form 10-K for the year ended December 31, 2009 (the "2009 Form 10-K") with the SEC.  The 2009 Form 10-K was signed by Defendants Dimon and Cavanagh.

244.    The 2009 Form 10-K made the following representations about the CIO:

   a)   "The Chief Investment Office is primarily concerned with managing structural market risks which arise out of the various business activities of the Firm.  These include structural interest rate risk, and foreign exchange risk."

   b)   "[T]he Chief Investment Office manage[s] capital, liquidity, interest rate and foreign exchange risk and the investment portfolio for the Firm."

   c)   "Overlaying the line of business risk management are four corporate functions with risk management-related responsibilities, including the Chief Investment Office, Corporate Treasury, Legal and Compliance and Risk Management."

245.    These statements regarding the CIO in JPMorgan's 2009 Form 10-K were materially false and misleading because, by the end of 2009, the CIO was not "primarily concerned" with managing risk.  To the contrary, as CIO executive David Olson reported to *Bloomberg* (¶58), the CIO was a proprietary trading unit that created substantial risk in order to

"ramp up the ability to generate profit for the firm" in accordance with "Jamie's new vision."

Specifically, as set forth above:

a) The Senate Report concluded that the CIO, through its synthetic credit portfolio, did not hedge or manage any structural or other risks arising out of the Company's business activities.  According to the Senate Report, the synthetic credit portfolio "was not a hedge," and "[f]ar from reducing or hedging the bank's risk, the CIO's Synthetic Credit Portfolio functioned instead as a high risk proprietary trading operation that had no place at a federally insured bank." Among other things, the Senate Report determined that the CIO's synthetic credit portfolio had "no contemporaneous records detailing the risk reduction strategy or the assets being hedged, no analysis showing how the size and nature of the hedge were determined, and no tests gauging the hedge's effectiveness," even though "[h]edging claims require those types of contemporaneous records in order to be substantiated." ¶¶100-01.

b) As set forth in the January 14, 2013 OCC Consent Order, the OCC found that, rather than serve a risk management function, the "risk management processes and procedures" in the CIO "did not provide an adequate foundation to identify, understand, measure, monitor and control risk"—deficiencies which enabled the CIO to operate in an unsafe and unsound manner. ¶84.  Rather, as noted in the Senate Report, the OCC determined that the CIO's synthetic credit portfolio's trades were "classic prop[rietary] trading" and constituted a "make believe voodoo magic 'composite hedge.'" ¶101.

c) An OCC examination of the CIO in 2010 found that the CIO had significant risk management deficiencies that were wholly at odds with the purported risk management function Defendants represented the CIO performed.  Among other things, the OCC determined that the "risk management framework" for the CIO lacked "a documented methodology," "clear records of decisions," and other features to ensure that the CIO was controlling and managing risk.  For example, the OCC found that the Company failed to adhere to "basic banking" documentation requirements, as would have been necessary had the CIO served a risk management function.  ¶107.

d) JPMorgan's synthetic credit portfolio was comprised of positions that were originally part of the "Proprietary Positions Book" in the Investment Bank that were transferred to the CIO in 2008 as part of an effort to hide them from regulators, including the OCC.  Those positions became a portfolio that was formerly called the "Discretionary Trading Book," a portfolio that JPMorgan's senior management understood was designated for proprietary trading. ¶106.

e) A November 2007 JPMorgan internal audit of the CIO's synthetic credit portfolio's positions confirmed that they were used as "proprietary position strategies."  The audit made no mention of hedging or credit stress loss protection,

contained no analysis of the credit trading activity as lowering risk, and did not identify any assets or portfolios that were being hedged. ¶99.

f) JPMorgan was not able to provide any documentation to the Senate Subcommittee showing any assets, portfolios, or risks purportedly hedged at anytime by the synthetic credit portfolio, or any analyses measuring the effectiveness of any hedging activity, despite OCC requirements that JPMorgan maintain such documentation. Indeed, the CIO's senior quantitative analyst never analyzed any assets, portfolio or other risks in JPMorgan's other divisions as would have been necessary if the synthetic credit portfolio were used as a hedge, and was in fact prohibited from obtaining such information. ¶99-100.

g) Based on Dimon's "new vision" for the CIO, Drew staffed the CIO with traders known for their proprietary trading expertise and aggressive risk taking. ¶¶58-63. These traders lacked risk management experience, yet the CIO traders were "much more influential than the risk managers" in the CIO, according to the Senate Report. Indeed, CIO risk managers did not enforce risk limits and were not involved in approving trading strategies, even after regulators urged JPMorgan to improve the independence of CIO risk managers in 2009. ¶75

h) With the full knowledge and consent of Dimon and Drew, the CIO's proprietary traders made enormous speculative wagers, including bets on subprime mortgages ($1 billion profit), government bailouts ($1 billion loss) and foreign currency ($300 million loss). ¶¶86-94. Witnesses described those trades as proprietary bets that were not made to hedge existing risks.

i) The CIO amassed an enormous, extraordinarily risky, illiquid portfolio of synthetic-credit derivatives, which was also a proprietary bet, not a hedge. ¶¶98-101, 111-13. Indeed, Defendant Dimon later admitted the synthetic credit portfolio was extremely "risky," contained "complex and hard-to-manage risks," and, as Cavanagh explained, had "numerous embedded risks that the team did not understand, and were not equipped to manage." ¶¶230-32. Bruno Iksil, with the knowledge and consent of Dimon and Drew, developed that position using "relative value investing," which is a proprietary trading strategy, not a risk management strategy. ¶98.

j) The JPMorgan Task Force Report admitted that the CIO used proprietary trading strategies to "take advantage of changes in the relative prices (the 'basis') among different CDS indices and tranche instruments" and did not hedge existing risks generated by the Company's other divisions. ¶98.

k) The CIO's synthetic credit portfolio did not serve any risk mitigation function. Instead, the risk generated by that portfolio was so great that, by the end of 2009, GAAP required JPMorgan to establish a $2 billion to $4 billion liquidity reserve, which the Company refused to do. As alleged above, the fact that JPMorgan executives determined that the position required a reserve establishes that the position was not a hedge of existing risks. ¶¶111-17.

l)  Dimon admitted after the Class Period that the CIO lacked "the people, the expertise, the capacity, the trading platform, the market franchise to effectively trade and manage" the synthetic credit portfolio.  This conclusion was repeated in the JPMorgan Task Force Report, which admitted that "CIO Risk Management lacked the personnel and structure necessary to manage the risks of the Synthetic Credit Portfolio." As Dimon admitted after the Class Period, the synthetic credit portfolio did not belong in the CIO, and it was transferred to the Investment Bank because, unlike the CIO, the Investment Bank had the ability to effectively manage those positions.  ¶¶76, 225, 228.

m)  Cavanagh has admitted that the proprietary trading in the CIO was inconsistent with the risk management operations that were purportedly the "primar[y] concern" of the CIO, stating with regard to the "complexity of synthetic credit" in the CIO that "the overall mistake was allowing something that wasn't like the rest of the [Asset Liability Management] type of activities to get housed inside CIO." ¶232.

n)  To facilitate the CIO's proprietary trading, Drew removed stop loss limits and never established "granular" risk controls for the synthetic credit portfolio, distinguishing it from other JPMorgan units.  ¶¶77-79, 230.

o)  The JPMorgan Task Force Report admitted that "risk limits applicable to CIO were not sufficiently granular," that "there were no limits by size, asset type or risk factor specific to the Synthetic Credit Portfolio," and the lack of limits "played a role in allowing the flawed trading strategies," even though such limits for comparable products were in place in the Investment Bank.  ¶¶82, 110.

p)  The JPMorgan Task Force Report conceded that the CIO effectively had no risk management protocols, and failed to follow or implement the most basic risk management procedures followed by other businesses at JPMorgan.  Indeed, as JPMorgan admitted in the JPMorgan Task Force Report, for "a significant period of time prior to the first quarter of 2012, CIO was subjected to less rigorous scrutiny than client-facing lines of business." ¶110.  For example, CIO Risk Management failed to conduct any review of the "appropriateness of the CIO risk limits used from 2009 to 2012" in violation of Company regulations requiring at least annual assessments of risk limits.  ¶81.  Similarly, the CIO Risk Committee had no formal membership or charter, did not include anyone from outside the CIO, and met only three times in 2011. ¶¶73, 76.  Former Company Chief Risk Officer Barry Zubrow, who JPMorgan represented in its Forms 10-K filed during the Class Period served as a member of the CIO "Risk Committee," did not typically attend CIO Risk Committee meetings. ¶73.

q)  Trading on the scale the CIO pursued – with positions as large as $200 billion on credit derivatives and $150 billion on asset-backed securities (including $20 billion just on U.K. residential mortgage securities), with profits and losses as big as $1 billion – was possible only because Drew had eliminated stop loss limits for trades in the CIO and the Company had never implemented "granular" limits on

specific positions within the CIO. ¶¶77-79, 86-94. The scale of those transactions is emblematic of high-stakes proprietary trading, rather than risk management.

r) The JPMorgan Task Force Report and the CIO Board Review Report admitted that the CIO employed "[t]actical credit strategies" to generate income, and the CIO had by December 2010 contributed approximately $2.8 billion in "economic value" to JPMorgan from inception, "with an average annualized return on equity of 100%." ¶¶96-97. The CIO's proprietary trades generated a significant portion of the Company's net income during the Class Period, which was never disclosed to investors. ¶95. Moreover, the CIO's traders were not compensated based on their ability to manage risk, but on their ability to generate profits for JPMorgan. These individuals were among the highest paid employees at JPMorgan, earning tens of millions of dollars per year, and their compensation was so material that it had to be reviewed and approved by Dimon. As the Senate Report determined, the fact that the CIO accounted for such a substantial portion of the Company's net income, and that its traders were paid enormous sums to generate profits, is compelling evidence that the CIO was not a risk management unit, but one designed to generate substantial profit. ¶66.

246. The 2009 Form 10-K also specifically misrepresented the investments made by the CIO, describing those investments as hedges used to manage existing risks. Specifically, in the context of explaining the CIO's risk management function, the 2009 Form 10-K represented that the "value at risk" or "VaR" for the CIO did not reflect additional risk to which JPMorgan was exposed, stating: "The CIO VaR includes positions, primarily in debt securities and credit products, used to manage structural risk and other risks, including interest rate, credit and mortgage risks arising from the Firm's ongoing business activities."

247. The statement that the CIO took positions to "manage" or hedge existing risks was materially false and misleading because, as explained above in ¶245, the CIO operated as a proprietary trading unit that took positions in order to generate profits – not to manage risks. This statement not only deceived investors regarding the true function and investment activities of the CIO, but also misled investors regarding the meaning of the CIO's VaR. Specifically, by telling investors that the CIO's VaR reflected positions taken to "manage" risk, the Company represented that losses incurred on those positions would be offset by gains on existing positions

elsewhere in the Company.  In truth, as explained above, the CIO's positions were speculative bets that generated risk, rather than hedges designed to "manage" risk incurred by other departments within JPMorgan.  Moreover, investors were not told that a significant portion of the CIO's VaR – more than 50% at some points during the Class Period – was generated by the CIO's extremely risky portfolio of illiquid synthetic-credit derivatives.

248.    Defendants continued to misrepresent the nature and function of the CIO throughout the Class Period.  The same false and misleading statements set forth above in ¶244 describing the CIO as being "primarily concerned" with risk management and that the CIO's VaR reflected positions that were used to "manage" risk were repeated or specifically incorporated by reference in the following documents filed with the SEC by JPMorgan during the Class Period:

- Definitive Proxy Statement on Form DEF 14A, dated March 31, 2010 (the "2010 Proxy Statement");

- quarterly report on Form 10-Q for the three-month period ended March 31, 2010 filed with the SEC on May 10, 2010 (the "1Q 2010 Form 10-Q");

- quarterly report on Form 10-Q for the three-month period ended June 30, 2010, filed with the SEC on August 6, 2010 (the "2Q 2010 Form 10-Q");

- quarterly report on Form 10-Q for the three-month period ended September 30, 2010 filed with the SEC on November 9, 2010 (the "3Q 2010 Form 10-Q");

- annual report on Form 10-K for the year ended December 31, 2010 filed with the SEC on February 28, 2011 (the "2010 Form 10-K"), signed by Dimon and Braunstein;

- Definitive Proxy Statement on Form DEF 14A filed with the SEC on April 7, 2011 (the "2011 Proxy Statement");

- quarterly report on Form 10-Q for the three month-period ended March 31, 2011 filed with the SEC on May 6, 2011 (the "1Q 2011 Form 10-Q");

- quarterly report on Form 10-Q for the three-month period ended June 30, 2011 filed with the SEC on August 5, 2011 (the "2Q 2011 Form 10-Q"); and

- quarterly report on Form 10-Q for the three-month period ended September 30, 2011 filed with the SEC on November 4, 2011 (the "3Q 2011 Form 10-Q").

249.     In addition, the Company repeated the misrepresentation that the type of investments included in the CIO VaR as those that were used to "manage structural risk and other risks" in an Earnings Release Financial Supplement filed with the SEC each quarter during the Class Period as an exhibit to a Form 8-K.  The statements in the Financial Supplements representing that the CIO's VaR consisted of investments that were used to "manage" risk were materially false and misleading for the reasons set forth in ¶245 above.

250.     The description of the CIO as a risk management unit, as well as the description of the investments comprising the CIO's VaR as those used to "manage" risk, that were repeated in JPMorgan's SEC filings throughout 2010 and 2011 were false and misleading for the additional reason that the scope of the CIO's highest-risk positions continued to expand during the Class Period.  Specifically, in addition to the reasons set forth at ¶245 above:

    a)  A detailed internal report prepared in early 2010 by a senior CIO executive documented that, because the synthetic credit portfolio was illiquid, the Company was required to establish a reserve of as much as $4 billion.  As the synthetic credit portfolio grew larger during 2010 and 2011, the size of the required reserve increased commensurately.  ¶¶114-20.

    b)  In 2010 and 2011, the risk presented by the synthetic credit portfolio caused the CIO's VaR to increase.  Unbeknownst to the market, the increase in the CIO's VaR reflected the continued growth of the synthetic credit portfolio throughout 2010 and 2011.  ¶¶121-26.  Over that period, the wagers on corporate debt that comprised that portfolio grew to over $200 billion – what Cavanagh later admitted was a "perilous size with numerous embedded risks."  ¶¶57, 149, 230.  As a result, at times during the Class Period, the CIO's VaR exceeded that of the entire Investment Bank and the VaR for the synthetic credit portfolio alone was as large as the VaR of the entire Investment Bank.  ¶¶123-25.  The position grew so large that other credit-derivatives traders named the unknown figure behind the trades the "London Whale."  ¶155.

    c)  In the first half of 2011, the CIO's synthetic credit portfolio breached stress limits over eight times, by as much as 50% and for as long as seven weeks in a row, yet no action was taken to reduce the positions.  The OCC concluded that the breaches in stress limits in 2011 showed that the synthetic credit portfolio was not

"providing stress loss protection to the bank, or acting as a hedge" but was rather engaged "in a strategy to earn profits for the bank." ¶126.

d) In the fall of 2011, the CIO generated approximately $500 million in profits from a risky short-term bet in illiquid credit derivatives when American Airlines unexpectedly declared bankruptcy. The Senate Report concluded that this trade was not a hedge, and Drew admitted that trade did not offset any JPMorgan positions or loans involving American Airlines. Indeed, the trade was described by the OCC as "a high stakes, high risk wager that ended up paying off, but could have easily gone the other way." Nevertheless, Drew instructed the CIO to "recreate" trades like the American Airlines situation because those were the kinds of trades that JPMorgan wanted the CIO to execute. In early 2012, the CIO incurred a loss of approximately $50 million on a similar complex credit derivative position when Eastman Kodak filed for bankruptcy, another bet that was not a hedge. ¶¶91-93.

e) By mid-2011, the risk level in the CIO had grown so severe that the most senior officers of the Company, including Dimon, recognized the need to manipulate the CIO's reported VaR in order to conceal that risk from investors. Accordingly, JPMorgan began to develop a new VaR model specifically designed to reduce the reported VaR of the CIO. ¶¶134-41. The development of that model was approved by Defendant Dimon, who authorized the implementation of the new model in January 2012 – instantly cutting the CIO's reported VaR in half. ¶¶164-67.

f) Dimon continued to protect the secret use of the CIO for proprietary trading by removing executives who demanded greater risk controls, including Weiland, the most senior risk officer of the CIO, whom JPMorgan demoted in 2011. ¶163. Throughout 2010 and 2011, Weiland warned Dimon and Drew about the risk presented by the CIO's proprietary trading. ¶¶113, 132-34. When, in 2011, Weiland undertook an effort "to improve the risk limit structure for the CIO," including by implementing the risk limits that JPMorgan publicly represented to investors were already in place, Drew removed him as the most senior risk officer of the CIO and replaced him with Irvin Goldman, who had little to no risk management experience, and no experience in trading the synthetic credit derivatives that posed the largest risk to the CIO and JPMorgan. ¶163.

g) By late 2011, the Company's most senior officers – including Dimon and Drew – approved a high-risk plan to rapidly expand the synthetic credit portfolio's positions. ¶¶146-50. As Cavanagh later admitted, this trading strategy was "poorly conceived, reviewed and executed." ¶230. Indeed, none of the key CIO managers or risk personnel even understood or were able to explain the trading strategy. ¶¶152.

h) The JPMorgan Task Force Report disclosed that the "priorities" for the synthetic credit portfolio were to maximize profits (and avoid losses) within the CIO, and

did not include hedging the Company's exposures generated by its risk-taking lines of businesses. ¶102.

**B.      DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS CONCERNING THE COMPANY'S RISK MANAGEMENT STRUCTURE AND ITS ABILITY TO ADEQUATELY MONITOR AND CONTROL RISK**

251.    In addition to the specific statements concerning the CIO's role and function, Defendants made numerous false statements throughout the Class Period about the Company's risk management practices, which represented that JPMorgan had a robust, comprehensive risk-management system that included the use of limits to measure and control the Company's risks.

**1.      Misrepresentations in the 2009 Form 10-K and Documents that Incorporated the 2009 Form 10-K by Reference**

252.    In the 2009 Form 10-K and in the Company's subsequently filed SEC reports that incorporated statements from the 2009 Form 10-K, the Company described JPMorgan's risk-management framework, which the Company noted was "critical" to its financial condition and profitability:

> The Firm's risk management framework and governance structure are intended to provide comprehensive controls and ongoing management of the major risks inherent in its business activities.  It is also intended to create a culture of risk awareness and personal responsibility throughout the Firm. The Firm's ability to properly identify, measure, monitor and report risk is critical to both its soundness and profitability.

253.    JPMorgan further told investors that the "risk management framework" was enforced through the use of defined risk limits that all business units were required to adhere to, and that were closely monitored by senior management:

> "The [Company's] risk management policies and procedures incorporate risk mitigation strategies and include <u>approval limits</u> by customer, product, industry, country and business.  <u>These limits are monitored on a daily, weekly and monthly basis, as appropriate</u>."

"<u>Market risk is controlled primarily through a series of limits</u>.  Limits reflect the Firm's risk appetite in the context of the market environment and business strategy."

With regard to those limits, the 2009 Form 10-K also stated:

In setting limits, the Firm takes into consideration factors such as market volatility, product liquidity, business trends and management experience.  Market risk management regularly reviews and updates risk limits.  <u>Senior management, including the Firm's Chief Executive Officer and Chief Risk Officer, is responsible for reviewing and approving risk limits on an ongoing basis</u>.  The Firm maintains different levels of limits.  Corporate-level limits include VaR and stress limits.  Similarly, line-of-business limits include VaR and stress limits and may be supplemented by loss advisories, nonstatistical measurements and instrument authorities.  <u>Businesses are responsible for adhering to established limits, against which exposures are monitored and reported.  Limit breaches are reported in a timely manner to senior management, and the affected business segment is required to reduce trading positions or consult with senior management on the appropriate action.</u>

The Company also represented in the 2009 Form 10-K that it measured risk using "models and related assumptions [that] are routinely reviewed with the goal of ensuring that the Firm's risk estimates are reasonable and reflect underlying positions."  According to JPMorgan, "[t]hese measures <u>provide granular information on the Firm's market risk exposure</u>" and "[t]hey are aggregated by line of business and by risk type, and <u>are used for monitoring limits</u>, one-off approvals and tactical control."

254.    These statements regarding the Company's risk management framework and practices were materially false and misleading for the following reasons:

a)  In contrast to Defendants' statement that "[b]usinesses are responsible for adhering to established limits," the Senate Report concluded that JPMorgan had "inadequate risk management," and that "<u>risk limit breaches were routinely disregarded</u>, risk metrics were frequently criticized or downplayed, and risk evaluation models were targeted by bank personnel seeking to produce artificially lower capital requirements."  ¶85.

b)  Contrary to Defendants' representation that the CIO "adher[ed] to established limits" and that "[s]enior management, including the Firm's Chief Executive Officer and Chief Risk Officer, [was] responsible for reviewing and approving risk limits," the JPMorgan Task Force Report and Senate Report determined that the risk limits for the CIO were "inadequate," and that there were no risk limits specific to the synthetic credit portfolio,

which represented the greatest source of risk in the CIO.  Moreover, in violation of Company policy, risk limits in the CIO were never reviewed by anyone between 2009 and 2012, let alone by Dimon and Zubrow.  ¶81.

c)   Contrary to Defendants' statement that breaches in risk limits were "reported in a timely manner to senior management," and that the affected business segment was "required to reduce trading positions or consult with senior management on the appropriate action," JPMorgan senior management took no action to address risk limit breaches in the CIO.  As the Senate Report concluded, risk limits were not enforced, and traders were not required to exit positions.  Instead, risk managers in the CIO "repeatedly worked with CIO traders and quantitative analysts to challenge or modify the risk metrics, or approve limit increases or exemptions" to risk limits.  ¶75.

d)   When the Company announced on July 13, 2012 that it was restating its financial results, the Defendants admitted that the synthetic credit portfolio was never subject to appropriate risk management and protocols.  Specifically, Defendant Cavanagh stated that "CIO risk management was ineffective in its responsibility to the synthetic credit portfolio" due, in part, to a "lack of quality resources and a less robust risk committee." Cavanagh concluded that "the CIO risk failed to meet reasonable expectations" and "never developed a sufficient understanding of the risk of the portfolio…." ¶232.

e)   As Cavanagh ultimately admitted on July 13, 2012, the CIO did not have "a well-designed limit structure around the [synthetic-credit] portfolio."   According to Cavanagh, "there were no risk limits specific to the synthetic credit portfolio." Specifically, Cavanagh admitted that the CIO had "no risk limits" in place to monitor the "size, asset type or risk factor[s] for [the] Synthetic Credit Portfolio" during the Class Period.  ¶¶82, 230-32.

f)   The JPMorgan Task Force Report reiterated Cavanagh's admission that "[t]here were no limits by size, asset type or risk factor for the Synthetic Credit Portfolio; indeed, there were no limits of any kind specific to the Synthetic Credit Portfolio." Further, JPMorgan admitted that there was "no meaningful effort to ensure that…CIO was subject to appropriately rigorous risk and other limits and was updating those limits on a regular basis." ¶¶80-81, 230-32.  Moreover, the CIO Risk Committee, which had no formal membership or charter and did not include anyone from outside the CIO, did not even review the "appropriateness of the CIO risk limits used from 2009 to 2012," let alone update those limits to address the increasing size, complexity and risk of the CIO's positions.  ¶73.

g)   The CIO lacked concentration limits, which were in place in the Investment Bank and were intended to limit exposure to losses for a specific position or counterparty. Further, JPMorgan failed to set aside required concentration reserves for such positions. In fact, as revealed in the Senate Report, a JPMorgan internal audit examining 2011 year-end figures determined that the CIO had deficient procedures for establishing appropriate concentration reserves, among other control deficiencies. As the Senate Report concluded, concentration limits "are such a well-known, fundamental risk tool, that their absence at the CIO is one more inexplicable risk failure." ¶¶80, 120.

h)  Cavanagh further admitted that the Investment Bank did use such limits on similar investments during the Class Period, and "had the synthetic credit portfolio been risk-managed under equivalent standards, it would not have experienced the unchecked transformation and growth that led to the losses."  Indeed, the JPMorgan Task Force Report conceded that the CIO did not have the "granular and tailored" risk limits applied to JPMorgan's other divisions, and this evidenced a failure "to ensure that CIO was subject to appropriately rigorous risk controls."  The Company further admitted on July 13, 2012 that the CIO's synthetic credit portfolio had "required a whole different type of risk management for nearly five years," yet the CIO failed to employ any of the necessary risk-management measures during the Class Period.  ¶¶80-81, 230-32.

i)  The CIO also failed to employ stop loss limits that would have required traders to exit positions once losses reached a pre-determined threshold.  Indeed, by the start of the Class Period, the $20 million stop loss limits that were in place at the CIO were abandoned in order to allow it to engage in extremely speculative trading.  ¶¶77-79.  In fact, the OCC concluded that JPMorgan calculated its stop loss limits in a way that presented a "misleading picture" of the CIO's losses and ignored stop loss limits when they were repeatedly and excessively breached. ¶79.

j)  The JPMorgan Task Force Report concluded that for "a significant period of time prior to the first quarter of 2012, CIO was subjected to less rigorous scrutiny than client-facing lines of business," there was not a "meaningful effort to ensure that CIO was subject to appropriately rigorous risk and other limits and was updating those limits on a regular basis," and a "lower level of oversight engendered weak risk management and infrastructure within CIO." ¶81.

k)  The few limits in place at the CIO "applied to more aggregated portfolios, often at the level of CIO, which was clearly inadequate" according to Cavanagh, who described one of those few limits as "an unsophisticated tool for measuring risk" and was "of little use as a control measure."  ¶¶230-32.  Accordingly, the representation that the Company relied on "granular information" and "models" to "monitor limits" was false because, as Cavanagh later admitted, "risk limits in CIO were not granular enough" and "what was needed was granular position level limits for the [synthetic-credit] portfolio itself." ¶¶230-32.  As the JPMorgan Task Force Report conceded, "[g]ranular limits were lacking, and risk managers did not feel adequately empowered."

l)  CIO risk managers did not enforce risk limits, and "played no role in evaluating or approving trading strategies."  In fact, CIO risk managers reported directly to Drew, the CIO's top trading strategist – a blatant conflict of interest – even after regulators urged JPMorgan to improve CIO risk managers' independence in 2009.  As a result, the Senate Report concluded, CIO traders were much more "influential" than risk managers, who "repeatedly worked with CIO traders and quantitative analysts to challenge or modify the risk metrics, or approve limit increases or exemptions."  ¶75.

m) The OCC found that, among other things, JPMorgan had (i) inadequate oversight and governance of the credit derivatives trading conducted by the CIO, (ii) inadequate risk management processes and procedures for the credit derivatives trading conducted by

the CIO, and (iii) ineffective internal audit processes and procedures related to the credit derivatives trading in the CIO.  The Federal Reserve similarly identified deficiencies in (i) JPMorgan's risk management oversight of the risks of the CIO's synthetic credit portfolio, (ii) the model governance function's oversight of the model validation process, and (iii) the finance function's development of appropriate internal financial reporting for the CIO.  As the OCC and Federal Reserve concluded, these risk management failures constituted unsafe and unsound and deficient banking practices that violated federal law.  ¶¶84-85.

255.    In addition to the statements regarding risk management that were repeated from the 2009 Form 10-K, the 2010 Proxy Statement also stated the following with respect to JPMorgan's risk management:

> JPMorgan Chase has in place a robust risk management discipline that captures, monitors, and controls the risks created by its business activities.  The goal is not only to manage the dynamic risks of the Firm, but also to create a culture of risk awareness and personal accountability.  Any substantial introduction of emerging risks or increase in risks routinely taken would be largely controlled by risk limits in place or identified through the frequent risk report that occurs throughout the Firm.  This risk discipline seeks to ensure that the potential for excessive risk-taking by any individual, group, or business is controlled, regardless of motivation.

256.    These statements were materially false and misleading because, as alleged above in ¶254, JPMorgan did not have a robust risk management discipline in place and, by Defendants' own admission, the CIO and the  synthetic credit portfolio did not have adequate (or any) risk limits in place.  Additionally, the statements in the 2010 Proxy were materially false and misleading because the growing synthetic credit portfolio "increas[ed the] risks routinely taken" yet was not "controlled by risk limits."  Indeed, JPMorgan later admitted that no limits existed to control the "size, asset type or risk factor[s]" in the synthetic credit portfolio.  ¶82.

### 2.    Material Misrepresentations Contained in the 2010 Form 10-K and Documents that Incorporated the 2010 Form 10-K by Reference

257.    The Company's 2010 Form 10-K and the Company's subsequently filed SEC reports that incorporated statements from the 2010 Form 10-K, repeated the representations concerning risk management in the 2009 Form 10-K, and actually expanded upon the

Company's description of its "holistic" approach to risk management.  Specifically, the 2010

Form 10-K stated:

> The Firm's risk management framework and governance structure are intended to provide comprehensive controls and ongoing management of the major risks taken in its business activities.  <u>The Firm employs a holistic approach to risk management to ensure the broad spectrum of risk types are considered in managing its business activities.</u>  The Firm's risk management framework is intended to create a culture of risk awareness and personal responsibility throughout the Firm where collaboration, discussion, escalation and sharing of information is encouraged.
>
> * * *
>
> The Firm's ability to properly identify, measure, monitor and report risk is critical to both its soundness and profitability.

258.    The 2010 Form 10-K also tracked the representations concerning the use of limits

to manage risk that appeared in the 2009 Form 10-K as discussed above in ¶¶252-53.

Specifically, the 2010 Form 10-K stated that:

> The Firm's risk management policies and procedures incorporate risk mitigation strategies and include approval limits by customer, product, industry, country, and business.  These limits are monitored on a daily, weekly and monthly basis, as appropriate.
>
> Market risk is controlled primarily through a series of limits.  Limits reflect the Firm's risk appetite in the context of the market environment and business strategy.

With regard to the use of limits to manage risk, the 2010 Form 10-K further stated that:

> In setting limits, the Firm takes into consideration factors such as senior management risk appetite, market volatility, product liquidity, accommodation of client business and management experience. Market risk management regularly reviews and updates risk limits. <u>Senior management, including the Firm's Chief Executive Officer and Chief Risk Officer, is responsible for reviewing and approving certain risk limits on an ongoing basis.</u> The Firm maintains different levels of limits. Corporate-level limits include VaR and stress limits. Similarly, line-of-business limits include VaR and stress limits and may be supplemented by loss advisories, nonstatistical measurements and profit and loss drawdowns. <u>Businesses are responsible for adhering to established limits, against which exposures are monitored and reported. Limit breaches are reported in a timely manner to senior management, and the affected line-of-business is required to</u>

> reduce trading positions or consult with senior management on the appropriate action.

In addition, like the 2009 Form 10-K, the Company's 2010 Form 10-K falsely represented that the Company measured risk using "models and related assumptions [that] are routinely subject to internal model review, empirical validation and benchmarking with the goal of ensuring that the Firm's risk estimates are reasonable and reflective of the risk of the underlying positions." According to JPMorgan, "[t]hese measures provide granular information on the Firm's market risk exposure" and "[t]hey are aggregated by line-of-business and by risk type, and are used for tactical control and monitoring limits."

259.    The 2011 Proxy Statement, 1Q 2011 Form 10-Q, 2Q 2011 Form 10-Q, and 3Q 2011 Form 10-Q specifically incorporated by reference the misrepresentations regarding JPMorgan's risk management that appeared in the 2010 Form 10-K, as set forth in ¶¶257-58.

260.    These statements in the 2010 Form 10-K, and the documents that incorporated the 2010 Form 10-K by reference, were materially false and misleading for the same reasons alleged above in ¶254.  In addition, these statements were materially false and misleading because:

a) As JPMorgan admitted in the JPMorgan Task Force Report, contrary to JPMorgan's internal policy and its representations to investors, CIO's risk managers did not conduct any review of the adequacy of CIO's risk limits between 2009 and 2012, and "granular limits" in the CIO were utterly lacking. ¶¶19, 80-81.

b) Throughout 2011, the CIO's VaR continued to spike such that, by the middle of that year, Dimon approved a plan to manipulate the CIO's VaR.  Indeed the CIO's synthetic credit portfolio was a "perilous size" according to Cavanagh, and included wagers on more than $200 billion of corporate and other debt.  Prior to disclosure of the CIO's losses and beginning no later than the beginning of 2012, CIO executives and traders began to internally refer to the size and risk of the synthetic credit portfolio as "worrisome," "scary," and "dangerous." ¶149.  Accordingly, with Dimon's approval, in mid-2011 the Company began to develop a new VaR model for the CIO that would cut the unit's reported VaR in half.  ¶¶134-41, 164-67.

c) In contrast to the representation that "[l]imit breaches are reported in a timely manner to senior management, and the affected line-of-business is required to reduce trading positions or consult with senior management on the appropriate action," in reality

JPMorgan ignored risk limit breaches in the CIO. The CIO's synthetic credit portfolio breached stress limits at least eight times in the first half of 2011, by as much as 50% and for weeks on end. While these breaches were reported to JPMorgan's senior management, no action was taken to reduce the positions or address these breaches, and the synthetic credit portfolio was allowed to continue to grow in size and risk. ¶126.

d) Because it was not subject to risk limits, the synthetic credit portfolio became so large, illiquid and dangerous that other credit derivatives traders nicknamed Iksil the "London Whale." ¶155.

e) By no later than mid-2011, Weiland undertook an effort "to improve the risk limit structure for the CIO," including by attempting to implement the risk limits that JPMorgan publicly represented to investors were already in place. Dimon and Drew responded by rejecting Weiland's efforts and demoting him because he sought to rein in the CIO's high-risk trading. ¶¶113, 132-33, 163. The Company replaced Weiland with Irv Goldman, a trader with no experience in either risk management or synthetic-credit derivatives, who was unqualified to monitor the trading activities of the CIO's synthetic credit portfolio. ¶163.

f) Throughout 2011, as the synthetic credit portfolio continued to increase in size and illiquidity, Dimon and Drew approved a trading strategy that drastically increased the size, complexity and risk of that portfolio. ¶¶146-52. That strategy ran counter to the risk management protocols described to investors in the SEC filings discussed above. Indeed, by the end of 2011, Iksil's credit derivative positions had ballooned to over $200 billion.

g) Rather than using VaR as one of the limits to monitor and control risk, the Company ignored the clear warning signs presented by the stress limit breaches and growing VaR for the CIO and the synthetic credit portfolio. ¶75. Indeed, the Company failed to use the VaR as a risk management tool even when Iksil's VaR matched that of the entire Investment Bank. ¶123-26. When that VaR became so large that it threatened to reveal the truth about the CIO, JPMorgan's most senior officers, including Dimon, approved the manipulation of the VaR model to conceal the truth. ¶¶134-41, 164-67.

h) According to the OCC and the Federal Reserve, JPMorgan's risk management practices and procedures were deficient and did not provide adequate controls over certain of the Company's market risk models. Specifically, the OCC determined, among other things, that JPMorgan's "risk management process and procedures" for the CIO did not "provide adequate foundation to identify, understand, measure and monitor and control risk." ¶84. The Federal Reserve similarly determined JPMorgan had "deficiencies" in, among other things, the "risk management function's oversight of the risks associated with the synthetic credit portfolio." ¶85.

### C.     DEFENDANTS' FALSE STATEMENTS ABOUT JPMORGAN'S FINANCIAL RESULTS

261.    JPMorgan refused to establish the multi-billion dollar reserve that was needed to guard against the illiquidity risk presented by the CIO's synthetic credit portfolio.  The Company did not establish a reserve even after a senior executive prepared a detailed memorandum in early 2010 documenting the need for a reserve of $2 to $4 billion which was discussed at the "CFO-level" or when, as Defendant Cavanagh described it, that portfolio grew to a "perilous size."  The need for a liquidity reserve was confirmed by the JPMorgan Task Force Report, which revealed that (i) the Company ultimately took a liquidity reserve to account for the illiquidity of a portion of the synthetic credit portfolio; (ii) unwinding just 35% of that portfolio would have cost $500 million as of the fourth quarter of 2011; and (iii) the CIO's position in just one type of credit derivative was so large that the "position represented the equivalent of 10-15 trading days of 100% of the average daily trading volume" in that derivative.

262.    The Company's deliberate and knowing failure to establish the required reserve, in contravention of the memorandum documenting the need for the reserve, caused JPMorgan to materially overstate its net income (as well as its earnings per share) throughout the Class Period. Specifically, these financial results were filed with the SEC as an exhibit to a Form 8-K on April 14, 2010, July 15, 2010, October 13, 2010, January 14, 2011, April 13, 2011, July 14, 2011, October 13, 2011, January 13, 2012, and April 13, 2012.  These same financial results were also discussed on earnings conference calls on those same dates by Defendant Dimon and Defendants Cavanagh and Braunstein during the respective tenures as CFO.  In addition, the Company repeated these financial results in quarterly and annual reports filed with the SEC on Forms 10-Q and Forms 10-K as set forth above in ¶248.  These financial results were materially false and

misleading due to the Company's failure to establish the required reserve, which should have been reflected in the financial results for the relevant reporting period below, as follows:

| Reporting Period | Reported Net Income (in millions) | Maximum True Income (in millions) | Minimum Overstatement |
|---|---|---|---|
| Fourth Quarter 2009 | $3,278 | $1,278 | 156% |
| Fiscal Year 2009 | $11,728 | $9,728 | 21% |
| First Quarter 2010 | $3,326 | $1,326 | 151% |
| Second Quarter 2010 | $4,795 | $2,795 | 72% |
| Third Quarter 2010 | $4,418 | $2,418 | 83% |
| Fourth Quarter 2010 | $4,831 | $2,831 | 71% |
| Fiscal Year 2010 | $17,370 | $15,370 | 13% |
| First Quarter 2011 | $5,555 | $3,555 | 56% |
| Second Quarter 2011 | $5,431 | $3,431 | 58% |
| Third Quarter 2011 | $4,262 | $2,262 | 88% |
| Fourth Quarter 2011 | $3,728 | $1,728 | 116% |
| Fiscal Year 2011 | $18,976 | $16,976 | 12% |
| First Quarter 2012 | $5,383 | $3,383 | 59% |

263.    These overstatements had a dramatic impact on the Company's reported financial results.  Specifically, as reflected above, the Company's failure to take the required reserve throughout the Class Period overstated the Company's reported net income by at least 10% for each relevant quarter- or year-end period during which a reserve should have been (but was not) established.

264.    As the size and illiquidity of the synthetic credit portfolio increased during the Class Period, the size of the needed reserve also increased, causing a commensurate increase in the Company's overstatement of its financial results.  Accordingly, the overstatement reflected in the above chart is the underlined minimum amount by which the Company overstated its net income, assuming that it should have taken only the minimum reserve of $2 billion required at the start of the Class Period.

265.    In addition, JPMorgan has admitted in the JPMorgan Task Force Report that the Company's reported net income for the 2011 fourth quarter and year-end was overstated by at

least $500 million.   Specifically, the CIO's December 2011 analysis revealing that a 35% proportional reduction of the CIO's synthetic credit portfolio would result in at least $500 million in losses showed that these positions were not marked-to-market and were in fact overstated by at least $500 million.   The failure to adjust the CIO's marks and report that loss rendered JPMorgan's net income for the 2011 fourth quarter and year-end materially overstated by at least $500 million.   As set forth in the above chart, JPMorgan falsely reported net income of $3.728 billion for the fourth quarter of 2011, and net income of $18.976 billion for the full year 2011.

266.     In each of the Company's Forms 10-Q and 10-K reporting financial results during the Class Period, the Company stated that its financial results were prepared in conformity with GAAP.   Each of those representations was materially false and misleading.

267.     First, the Company's failure to establish a liquidity reserve for the CIO's synthetic credit portfolio violated GAAP.   As a result, the reported net income and earnings per share discussed above were not presented in conformity with GAAP.   Indeed, under well-established accounting principles, including Accounting Standards Codification ("ASC") ASC 820-10-35-6C, such a reserve was required even if JPMorgan had no intention of selling the CIO's synthetic-credit derivatives.

268.     Second, JPMorgan's failure to adjust the synthetic credit portfolio's marks based on the December 2011 analysis and reduce its reported 2011 fourth quarter and year-end income by at least $500 million violated GAAP.   As JPMorgan itself admitted in the JPMorgan Task Force Report, GAAP required JPMorgan to mark the synthetic credit portfolio positions at the "good faith" price which they could be sold in the market, and its failure to do so based on the December 2011 analysis was a clear violation of GAAP.   *See, e.g.*, ASC 820-10-30.

269.    Demonstrating that the Company was required to reserve for the illiquidity of its synthetic credit portfolio positions, JPMorgan belatedly (and insufficiently) recorded a $30 million reserve for the synthetic credit portfolio at the end of 2011, and later increased the size of that reserve to $155 million in April 2012.  As Drew told the Senate Subcommittee, no liquidity reserve had been established prior to the end of 2011.  Moreover, the OCC concluded that the $30 million reserve was a "severe underestimate," and that even the $155 million reserve was "wholly inadequate." That conclusion is supported by the fact that the reserve was increased to over $700 million by August 2012, even though the Company did not add any positions to the synthetic credit portfolio during that time and had already reported billions of dollars in losses.

## D.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS CONTINUED IN 2012 AS THE COMPANY EMPLOYED MULTIPLE SCHEMES TO CONCEAL THE CIO'S LOSSES

270.    As alleged in detail in ¶¶132-55, by no later than 2011 the CIO's synthetic credit portfolio was in crisis.  By that time, the Company was developing a new VaR model to conceal the growing risk in the CIO, and Dimon and Drew had approved a plan to "balance" the CIO's synthetic credit portfolio by expanding investments in synthetic-credit derivatives.  In January 2012, the new VaR model was implemented, and Dimon and Drew pressed their lobbying campaign against an implementation of the Volcker Rule that would have prevented them from using the CIO for proprietary trading.  However, notwithstanding the mounting crisis in the CIO and the increasingly desperate measures being taken by the Company to conceal that crisis, Defendants persisted in misrepresenting to investors the CIO's role as a risk-management unit, JPMorgan's overall risk-management system, and the Company's financial results.   When analysts raised questions about the CIO's synthetic credit portfolio, Defendants misled investors by denying the existence of any problem in the CIO.  The Company has now admitted that many of the assurances and statements it made to investors in 2012 were materially false and

misleading, and the Senate Subcommittee specifically found that many of these statements were materially false and misleading, or "fictions irreconcilable with the bank's obligation to provide material information to its investors in an accurate manner."

### 1.      The January 13, 2012 Form 8-K

271.    On January 13, 2012, JPMorgan announced "full year 2011 <u>record net income of</u> <u>$19 billion</u>."   That announcement was made in a press release disclosing the Company's financial results for the fourth quarter and full year of 2011 (the "4Q 2011 Press Release").  That press release was filed with the SEC pursuant to Form 8-K, which also included (i) the 4Q Financial Supplement and (ii) a copy of the presentation slides JPMorgan provided to investors and analysts (the "4Q 2011 Earnings Presentation Slides").  JPMorgan also held a conference call with analysts that day to discuss its financial results (the "4Q 2011 Earnings Conference Call").  Defendants Dimon and Braunstein participated in the 4Q 2011 Earnings Conference Call.  There was no mention of the CIO on that conference call.

272.    Specifically, the 4Q 2011 Press Release reported that the Company earned $4.48 per share in 2011, up from $3.96 per share in 2010.  For the fourth quarter of 2011, JPMorgan reported net income of $3.7 billion and earnings per share of $0.90.  The 4Q 2011 Financial Supplement and 4Q 2011 Earnings Presentation Slides included these same financial results, which were also repeated by Defendant Braunstein during the 4Q 2011 Earnings Conference Call.

273.    As explained above in ¶¶262, the full year and fourth quarter net income and earnings per share for the Company that JPMorgan reported on January 13, 2012 were materially overstated because the Company had not established a liquidity reserve for the CIO's synthetic credit-portfolio.  In reality, even assuming JPMorgan took only a $2 billion reserve for the portfolio, JPMorgan should have reported a profit of $1.7 billion for the fourth quarter 2011—or

less than half of what it actually reported. In addition, as set forth above in ¶265, JPMorgan admitted in the JPMorgan Task Force Report that the synthetic credit portfolio positions were not marked-to-market and, as a result, the Company's reported net income for the 2011 fourth quarter and year-end was overstated by at least $500 million.

274. In addition to overstating its financial results, the 4Q 2011 Financial Supplement represented that the Company's financial results were prepared in conformity with GAAP. That representation was materially false and misleading because the Company's failure to establish a liquidity reserve for the CIO's synthetic credit portfolio violated GAAP. As a result, the reported net income and earnings per share discussed above were not fairly presented in conformity with GAAP, as explained in ¶¶267-69, above.

### 2. The February 13, 2012 Comment Letter

275. On February 13, 2012, JPMorgan submitted a sixty-five page "Comment Letter on the Notice of Proposed Rulemaking Implementing Section 619 of the Dodd-Frank Wall Street Reform and Consumer Protection Act" (the "Dodd-Frank Comment Letter") to the SEC, the Department of the Treasury, the Board of Governors of the Federal Reserve, the Federal Deposit Insurance Corporation, and the Office of the Comptroller of Currency. The Dodd-Frank Comment Letter was published on the SEC's website on February 13, 2012, and it was thereafter available to the public. The Dodd-Frank Comment Letter was signed by Defendant Zubrow. Defendant Dimon authorized and contributed to the Dodd-Frank Comment Letter.

276. On the very first page of the Dodd-Frank Comment Letter, JPMorgan described the function and activities of the CIO by stating, in part, that, "at the corporate level, our Chief Investment Office is responsible for making investments to hedge the structural risks of our balance sheet on a consolidated basis." (Emphasis added). That description of the CIO's

purpose and function in the Dodd-Frank Comment Letter was materially false and misleading for the reasons set forth above in ¶¶245 and 250, and for the additional reasons listed below in ¶280.

277.    On the same day JPMorgan submitted the Dodd-Frank Comment Letter, Defendant Dimon participated in an interview with *Fox Business News*.  During the February 13, 2012 interview, *Fox Business News* Reporter Melissa Francis asked Dimon:  "[a] lot of people wanted me to ask you about the Volcker rule.  I know you wrote comments on how it should be different.  What do you think?"  In the course of his response, Dimon stated, in relevant part, "so there are two parts.  The part where they said no proprietary trading, we're fine with.  We've never had an issue with that … And we don't make huge bets.  So I understand the goal to make sure that these companies don't take huge bets on the balance sheets."  The foregoing statements, assuring investors that JPMorgan did not engage in proprietary trading in contravention of the spirit of the Volcker Rule and did not "make huge bets" were materially false and misleading for the reasons set forth above in ¶¶245 and 250, and for the additional reasons listed below in ¶¶280.

### 3.    The 2011 Form 10-K

278.    On February 29, 2012, JPMorgan filed its annual report on Form 10-K for 2011 (the "2011 Form 10-K") with the SEC.  The 2011 Form 10-K was signed by Defendants Dimon and Braunstein, among others.  The 2011 Form 10-K repeated the "record" financial results for the full year and fourth quarter 2011 that were first reported on January 13, 2012. Those statements, specifically the reported net income for the Corporate Division and Company and the Company's earnings per share were materially false and misleading for the reasons set forth in ¶¶261-65.

279.   In the 2011 Form 10-K, the Company continued to misrepresent the nature and purpose of the CIO.  Specifically, the 2011 Form 10-K repeated the following statements about the CIO that were previously made in the Company's 2009 and 2010 Forms 10-K:

a)   "CIO is primarily concerned with managing structural market risks which arise out of the various business activities of the Firm."

b)   "The Chief Investment Office [is] responsible for measuring, monitoring, reporting and managing the Firm's liquidity, interest rate and foreign exchange risk, and other structural risks."

c)   "Overlaying line of business risk management are four corporate functions with risk management-related responsibilities:  Risk Management, the Chief Investment Office, Corporate Treasury, and Legal and Compliance."

280.   That description of the CIO's purpose and function in the 2011 Form 10-K was materially false and misleading for the reasons set forth above in ¶245 and ¶250, and for the additional reasons listed below.  Indeed, by the end of 2011, the CIO itself had become one of the primary sources of risk at JPMorgan.  Rather than using the CIO to manage risks, the Defendants were pursuing increasingly desperate measures to conceal the risk posed by the CIO's synthetic credit portfolio.  Accordingly, in addition to the facts set forth in ¶245 and ¶250 that rendered the same description of the CIO in the 2009 and 2010 Forms 10-K materially false and misleading, these statements in the 2011 Form 10-K were also false because:

a)   The CIO breached its VaR limit and the Company's firm-wide VaR limit by no later than January 2012 due to the synthetic credit portfolio.  ¶161.  Specifically, the synthetic credit portfolio breached the CIO's VaR limit and the firm-wide VaR limits on January 16, 2012—a breach that continued for the next four trading days.  The breach of the firm-wide VaR was reported to Dimon and the rest of Operating Committee in emails explaining that the synthetic credit portfolio was responsible for the breach, but once again the breaches were ignored and no action was taken to reduce the portfolio's positions.  ¶¶161-65.

b)   Instead, Dimon approved the implementation of a new VaR model for the synthetic credit portfolio that was intentionally designed to artificially lower the VaR in that portfolio, and conceal the CIO's proprietary trading.  In January 2012, a month before the 2011 Form 10-K was issued, JPMorgan implemented the new VaR model in the CIO specifically in order to cut the CIO's VaR for the 1Q 2012 in half.  ¶166.

c)  In developing this new VaR model, the JPMorgan Task Force Report admitted that CIO traders selected an individual who reported directly to those traders and who had never before developed or implemented a VaR model to develop a model that would "produce a lower VaR" for the CIO's synthetic credit portfolio; that the "new" VaR model used a pricing formula that had never been reviewed or approved by the model validation group (as was Company practice); that CIO traders encouraged the model developer to "pressure" the model validation group to approve it, and that the model validation group accelerated its review "as a result of this pressure." ¶¶136-37.

d)  The JPMorgan Task Force Report revealed that the "new" VaR model was approved after being subjected to only limited back-testing, in contravention of Company policy. Specifically, while models were to be tested "in parallel" with prior models for at least three months, the "new" VaR model was approved after comparing its performance with the old model on only a subset of trading days over a prior two month period. Further, the model developer claimed the CIO lacked the necessary historical data requested by the model validation group to perform such back-testing, even though such data was required to be maintained by JPMorgan under federal banking regulations. ¶¶138-39.

e)  The OCC concluded that JPMorgan's "model risk management practices and procedures were inadequate to provide adequate controls over certain of the Bank's market risk and price risk models." Specifically, the OCC found that while JPMorgan changed its process for measuring VaR, "the VaR limits established under the previous model were retained. As a result, the CIO continued to increase its risk without continuing to exceed the VaR limits."   The Federal Reserve similarly identified deficiencies in JPMorgan's "model governance function's oversight of the model valuation oversight practices relating to the CIO."  ¶140.

f)  At the same time the Company was implementing the new VaR model, Iksil was working to implement a high-risk strategy – approved by Dimon and Drew – to expand the CIO's position in synthetic-credit derivatives.  As JPMorgan admitted a few months later, that strategy "was flawed, complex, poorly reviewed, poorly executed, and poorly monitored"; "it was un-vetted, it shouldn't have been done."   Indeed, as the OCC explained to the Senate Subcommittee, the CIO's strategy consisted of placing "aggressive positions" that were "risk additive" rather than "risk reducing" and which carried so much risk, "no matter what happened, they would lose money." ¶¶150, 205.

g)  Internal risk controls were so weak that CIO traders were able to manipulate the value of the synthetic credit portfolio by heavily trading the indices to which that portfolio was linked – i.e., "painting the tape" – to conceal the increasing losses in the CIO's largest position. ¶169.

h)  Similarly, JPMorgan's internal risk controls were so deficient that CIO traders were able to falsify the values of their positions, mis-marking the value of the CIO's synthetic-credit derivative holdings by hundreds of millions of dollars despite their knowledge of contrary market prices. ¶172.  As the JPMorgan Task Force Report and Senate Report confirmed, information confirming the CIO's fraudulent mismarking

was readily available to and reviewed by JPMorgan's senior management. For example, contrary to Company policy, the CIO's marks differed from the Investment Bank's marks for the same positions. ¶177. Further, because the CIO and Investment Bank were in some cases on opposing sides of the same trades, the CIO's mismarking led to valuation disputes between the two JPMorgan divisions that were discussed by the most senior managers of the Company – a fact that the Senate Report concluded was a "red flag" of a significant mismarking problem. ¶178. Indeed, in March 2012, Iksil directly informed senior CIO managers, including Drew, that there was a "lag in P&L [that] is material ($600-800M)" – a figure that Drew told the Senate Subcommittee represented the CIO's unreported losses. ¶176. Moreover, the actual prices at which the CIO executed its trades differed substantially from the marks the CIO assigned to its positions. ¶¶179-80.

281.     The 2011 Form 10-K also continued to describe the CIO's trades as positions used to manage risks. Specifically, in the context of explaining the CIO's risk management function, the 2011 Form 10-K stated that: "<u>The CIO VaR includes positions, primarily in debt securities and credit products, used to manage structural and other risks including interest rate, credit and mortgage risks arising from the Firm's ongoing business activities</u>."

282.     For the reasons detailed in ¶¶245 and 250, the above description of the CIO's trades as used to "manage structural and other risks" was materially false and misleading because the CIO was trading for profit, and not to manage risk. Indeed, throughout the Class Period, the majority of the CIO's VaR was attributable to the CIO's synthetic credit portfolio, a proprietary bet that was not used to manage risk, and was in fact extraordinarily risky. ¶125.

283.     The 2011 Form 10-K made additional misrepresentations about the CIO's VaR. Specifically, the 2011 Form 10-K stated that VaR was a "consistent" and "comparable" risk metric used to compare risks across business units. Specifically, the 2011 Form 10-K stated:

> JPMorgan Chase utilizes VaR, a statistical risk measure, to estimate the potential loss from adverse market moves. Each business day, as part of its risk management activities, the Firm undertakes a comprehensive VaR calculation that includes the majority of its material market risks. <u>VaR provides a consistent cross-business measure of risk profiles and levels of diversification and is used for comparing risks across businesses and monitoring limits</u>. These VaR results are reported to senior management and regulators, and they are utilized in regulatory capital calculations.

284.    Similarly, the 2011 Form 10-K stated that the "Firm calculates VaR to estimate possible economic outcomes for its current positions using historical simulation, which <u>measures risk across instruments and portfolios in a consistent, comparable way</u>."

285.    These statements regarding the "consistency" of VaR across units and the use of VaR to measure and compare risks across businesses and portfolios were materially false and misleading because, by early January 2012, Defendants were manipulating the CIO's VaR to conceal the significant and mounting risk presented by the synthetic credit portfolio, as explained in ¶¶134-41 and 164-67.  Thus, rather than being used to "compare" risks and "monitor limits," JPMorgan used the CIO VaR to conceal the CIO's and the Company's true risk, and to hide the CIO's and the Company's risk limit breaches – facts that both the Senate Report and JPMorgan Task Force Report confirmed.  Further, because the new VaR model was implemented only in the CIO, and not in the Investment Bank or other units, VaR did not provide a "consistent, comparable" measure of risk "across businesses."   Moreover, the representation that the Company used VaR to "estimate the potential loss" was materially false due to the implementation of a new VaR model designed to artificially lower the VaR and conceal risk, rather than accurately estimate potential losses.  Despite the unprecedented implementation of a new VaR model designed specifically to decrease VaR only in the CIO, the Company omitted any discussion of the VaR model change in the 2011 Form 10-K, even though the 2011 Form 10-K included a "Subsequent [E]vents" section which purported to disclose any and all material events that had taken place since December 31, 2011.  Indeed, JPMorgan did not disclose the model change even though, under Item 305(a)(4) of Regulation S-K, the Company was required to disclose any material change in its VaR model characteristics, assumptions, or parameters;

explain the reasons for the change; and provide information comparing the impact of the change to the VaR figures generated by the prior model.

286.    The 2011 Form 10-K also repeated the Company's prior misstatements about JPMorgan's risk management framework and the risk limits that the Company purportedly used to measure and control risk.  Specifically, the 2011 Form 10-K repeated the description of JPMorgan's risk-management framework that appeared in the Company's 2010 Form 10-K as set forth above in ¶¶257-58.    Those statements included the misrepresentation that the Company's risk management framework was "intended to provide comprehensive controls and ongoing management of the major risks inherent in its business activities" and that the Company "employs a holistic approach to risk management" where "collaboration, discussion, escalation and sharing of information is encouraged."

287.    The 2011 Form 10-K also repeated the misrepresentations in the 2009 and 2010 Forms 10-K (*see* ¶¶252-53 and 257-58) that JPMorgan used strict limits and models to manage and control risk, which were closely monitored by senior management.  Specifically, the 2011 Form 10-K once again assured investors that:

a) the Company's use of specific "risk mitigation strategies" included "<u>approval limits</u> by customer, product, industry, country and business," which were "<u>monitored on a daily, weekly and monthly basis, as appropriate</u>."

b) with regard to the use of limits used to manage risk, "[m]<u>arket risk is controlled primarily through a series of limits,</u>" that "reflect the Firm's risk appetite in the context of the market environment and business strategy."

c) individual business units, including the CIO, were "responsible for adhering to <u>established limits</u>, against which exposures are monitored and reported" and that "[l]<u>imit breaches are reported in a timely manner to senior management</u>, and the affected line-of-business is required to reduce trading positions or consult with senior management on the appropriate action."

d) JPMorgan's "models and related assumptions are routinely subject to internal model review, empirical validation and benchmarking with the goal of ensuring that the Firm's risk estimates are reasonable and reflective of the risk of the underlying

positions," and that "[t]hese measures <u>provide granular information on the Firm's market risk exposure.</u>"

e) the Company's market risk was "aggregated by line-of-business and by risk type, and are <u>used for tactical control and monitoring limits.</u>"

288. These statements concerning the Company's risk management framework and the Company's use of risk limits to "control" risk were materially false and misleading for the reasons set forth above in ¶¶254 and 260. In addition, those statements were false and misleading because:

a) In the first quarter of 2012, the synthetic credit portfolio breached risk limits and advisories over 330 times, with certain limits being exceeded by as much as 1000%, and for as long as 71 days. Contrary to the Defendants' representations, in response to hundreds of risk limit breaches, JPMorgan senior management took absolutely no action to control those risks or address the breaches. ¶¶162, 187.

b) The Company did not rely on any "granular information" or "models" to "monitor limits" in the CIO because the CIO had no such limits on specific portfolios, such as the synthetic credit portfolio, or individual trades. Indeed, the Company imposed no stop loss limits or position limits in the CIO. ¶¶77-81.

c) Cavanagh admitted in July 2012 that the CIO lacked "a well-designed limit structure" for the synthetic credit portfolio. As he further admitted, the few limits applicable to the CIO as a whole were "clearly inadequate," "unsophisticated" and "of little use as a control measure." ¶230.

d) When those "inadequate" and "unsophisticated" limits were breached, the Company simply disregarded the breach. Specifically, as JPMorgan later admitted, the risks posed by the CIO's synthetic credit portfolio had grown so severe that a risk limit relating to "widening credit spreads" that applied to the CIO as a whole was breached in January 2012. As disclosed in the Senate Report, the credit spread limit breach was ignored, and continued throughout April 2012 even as the limit was exceeded by over 1000%, yet no action was taken to reduce the CIO's positions. ¶162.

e) In January 2012, after the credit spread limit breach had been waived, JPMorgan's CIO and firm-wide VaR limits were breached – and once again, JPMorgan disregarded it. Instead, Dimon approved yet another exception to the Company's risk limits, granting an increase to JPMorgan's firm-wide VaR limits to accommodate the CIO's growing VaR. ¶¶134-41, 160-69.

f) Rather than "reduce" the "trading position" or take "appropriate action," as JPMorgan represented was required, the Company relied on its manipulation of a "new" VaR

136

model to conceal that risk in order to allow the CIO to continue to actively trade its positions.  ¶¶160-67.

g)  The JPMorgan Task Force Report admitted that the "new" model, which was intended to "produce a lower VaR" for the CIO's synthetic credit portfolio, was approved by the model valuation group even though it used an unapproved pricing formula and had not been subjected to sufficient back-testing—in contravention of Company policy—after the model review group was "pressured" by the CIO.  As the OCC found, even though the model "produced a lower VaR," the CIO's VaR risk limits were not adjusted, enabling the CIO to "increase its positions and risk, and ultimately losses, without sufficiently effective intervention by the Bank's control groups."  The OCC and Federal Reserve concluded JPMorgan's approval of the new VaR model was deficient and inadequate, and resulted in unsafe or unsound practices that violated federal law.  ¶¶137-140.

h)  The CIO's risk management controls were so deficient that CIO traders were able to, and in fact did, manipulate synthetic credit portfolio position by "painting the tape" to conceal the losses incurred by the CIO's synthetic-credit positions.  ¶¶169-71.

i)  CIO traders were able to mis-mark those positions in a manner that masked the losses incurred by the CIO by hundreds of millions of dollars.  ¶¶172-76.

j)  According to the OCC, JPMorgan's "valuation control processes and procedures for the credit derivatives trading conducted by the CIO were insufficient to provide a rigorous and effective assessment of valuation."   Similarly, the Federal Reserve found deficiencies in JPMorgan's "finance function's development of appropriate internal financial reporting for the CIO" and "the internal audit function's assessment of the CIO's internal controls."  ¶¶84-85.

289.    The 2011 Form 10-K also misrepresented the effectiveness of the Company's internal controls over financial reporting.  Specifically, the 2011 Form 10-K represented that the Company's internal disclosure controls and procedures were effective, that JPMorgan was "committed to maintaining high standards of internal control over financial reporting," and that there had been "no change in the Firm's internal control over financial reporting … that occurred during the three months ended December 31, 2011, that has materially affected, or is reasonably likely to materially affect, the Firm's internal control over financial reporting."

290.    The statements regarding the Company's internal controls were materially false and misleading because there were material weaknesses in JPMorgan's internal controls when the 2011 Form 10-K issued.  Specifically:

a)  Defendants have admitted that JPMorgan had "material weakness in the CIO's internal controls."  ¶¶220.

b)  In January 2012, JPMorgan implemented a new VaR model (in development since the middle of 2011) that was specifically designed and intended to misrepresent and understate the risk posed by the CIO's synthetic portfolio positions.  ¶¶134-41, 164-68.

c)  The Company ultimately admitted that its representations regarding internal controls were false, citing "questions" about the "integrity of the trader marks" in the CIO because "certain individuals may have been seeking to avoid showing the full amount of the losses in the portfolio during the first quarter," and that the CIO's traders had priced their books "aggressively."  ¶¶182, 221.

d)  JPMorgan lacked even the most rudimentary controls for the CIO because CIO traders were able to manipulate the credit derivative indices they traded and unilaterally mis-mark their positions in order to hide the CIO's mounting losses—a fact that is particularly striking given that JPMorgan readily obtained market prices that revealed the falsity of the traders' marks, and internally determined that the CIO's marks understated losses by over $500 million. ¶180.

e)  The fact that CIO managers and traders had discretionary authority and control to mark their own positions, and the fact that those marks were not timely or appropriately monitored by an independent valuation agent, demonstrates that JPMorgan lacked the most basic internal controls in the CIO.  ¶¶178-80.

f)  JPMorgan approved the fraudulent marks even though they deviated from the relevant bid-offer midpoints, the marks obtained from independent pricing services, and the actual "exit" prices at which the CIO had executed trades in those same instruments. The lack of internal controls was also reflected by the fact that the CIO's marks differed materially from the Investment Bank's marks for the same positions, even though the CIO was to use the Investment Bank's marks under Company policy.  The growing discrepancies between the valuations of the two separate divisions of JPMorgan grew so large that they were investigated by the senior managers of the Company—a fact that the Senate Report concluded was a "red flag" of a significant mismarking problem. ¶¶178-81.

g)  Given the risk posed by the CIO's synthetic credit portfolio, the veracity of the values of these positions should have been the primary focus of JPMorgan's internal control apparatus.  Nonetheless, despite the fact that the CIO's synthetic credit portfolio had grown to a "perilous size" and was the primary risk facing JPMorgan by the end of 2011, CIO executives and traders were able to engage in illegal market manipulation

138

(by "painting the tape") to generate inflated values for the CIO's synthetic credit portfolio positions.  ¶¶169-71.

h)  The OCC concluded that JPMorgan's "valuation control processes and procedures for the credit derivatives trading conducted by the CIO were insufficient to provide a rigorous and effective assessment of valuation" and the Company's "model risk management practices and procedures were inadequate to provide adequate controls over certain of the Bank's market risk and price risk models."  The Federal Reserve similarly identified deficiencies in the "internal financial reporting for the CIO" and the "internal audit function's assessment of the CIO's internal controls." ¶¶84-85.

291.   In addition to the above representation regarding the Company's internal controls, the 2011 Form 10-K included a certification signed by Dimon and Braunstein attesting to the effectiveness of the Company's disclosure controls and procedures and internal control over financial reporting.  That certification stated that Dimon and Braunstein had disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information," as well as "any fraud, whether or not material, that involves management or other employees that have a significant role in the registrant's control over financial reporting."  These statements were materially false and misleading for the same reasons set forth above in ¶290.

**4.      The April 4, 2012 Proxy Statement and Dimon's Annual Letter to Shareholders**

292.   On April 4, 2012, JPMorgan filed its 2012 Proxy Statement with the SEC on Form DEF14A (the "2012 Proxy Statement") in advance of the Company's Annual Meeting of Shareholders scheduled for May 15, 2012.   The 2012 Proxy Statement repeated the representation set forth above in ¶279 regarding the function and activities of the CIO as "responsible for managing the Firm's…structural risks."  This statement was materially false and misleading for the same reasons alleged above in ¶¶245, 250, and 280.   The 2012 Proxy

Statement specifically incorporated by reference the statements regarding JPMorgan's risk management from the 2011 Form 10-K, as set forth above in ¶¶286-87.

293.   Among the other misrepresentations repeated from the 2011 Form 10-K, the 2012 Proxy stated that "Any substantial introduction of emerging risks or increase in risks routinely taken <u>would be largely controlled by risk limits in place.</u>…"  That statement was false because, by the time the Company issued the 2012 Proxy, the Company had repeatedly ignored breaches to the CIO's risk limits – which Cavanagh conceded were "clearly inadequate" and "unsophisticated" – and had failed to establish other critical limits, such as position limits or stop loss limits, as discussed in detail in ¶¶77-85, 121-45 and 160-68.  Moreover, when the VaR threatened to reveal the "increase in risks" within the CIO, the Company – with Dimon's approval – manipulated the model to conceal those risks.  ¶¶160-68.

294.   Also on April 4, 2012, the Company released Dimon's annual letter to shareholders, which was dated March 30, 2012.  In that letter, Dimon made a point of reaffirming the Company's focus on risk management, highlighting the work of JPMorgan's Risk Committees and the use of limits to control risk.  Specifically, Dimon stated that "[o]ur Risk Committees provide general oversight into any and all risk in the business and set overall risk limits from credit extensions to any market-making activities. Risk limits are set by product, by counterparty and by type of specific risk (for example, liquidity risk, interest rate risk, credit risk, country risk, market risk, private equity risk, and legal and fiduciary risk, etc.)."

295.   Dimon's assurances regarding the use of limits to manage risk were materially false and misleading.  Indeed, by the time Dimon issued his letter to shareholders, losses in the CIO were already mounting into the hundreds of millions of dollars.  Cavanagh later admitted

that by March 23, well before Dimon's letter, "<u>the cake was fully baked on this thing and</u> <u>essentially all of the loss-making positions were already on the books</u>."

### 5. Statements to the Press Regarding the "London Whale" and the CIO

296. On April 5 and 6, 2012, *Bloomberg* and the *Wall Street Journal* reported for the first time that the CIO had amassed such a large portfolio of synthetic-credit derivatives that a lead trader on the portfolio, Bruno Iksil, had been nicknamed the "London Whale" by credit derivatives traders. This was the first time that it was publicly reported that a CIO trader was taking enormous positions in the credit-derivatives market.

297. The *Wall Street Journal* story, titled "London Whale' Rattles Debt Market," quoted a JPMorgan spokesperson as stating that "<u>CIO activities hedge structural risks and invest</u> <u>to bring the company's assets and liabilities into better alignment</u>." The April 6, 2012 *Wall Street Journal* article also quoted JPMorgan spokesperson Joe Evangelisti as saying that the CIO is "focused on managing the long-term structural assets and liabilities of the firm and <u>is not</u> <u>focused on short-term profits</u>." According to the article, Evangelisti added that the CIO's "results are disclosed in our quarterly earnings reports and are fully transparent to our regulators." Similarly, an April 6 *Bloomberg* article titled "JPMorgan Trader's Positions Said to Distort Credit Indexes," which specifically identified Drew as the head of the CIO, quoted Evangelisti as saying the CIO was responsible for "hedging the firm's foreign exchange, interest-rate and other structural risks," and that it was "focused on managing the long-term structural assets and liabilities of the firm" and "not focused on short-term profits." As set forth above in ¶¶188-89, Dimon, Braunstein, Drew and Zubrow were responsible for drafting, reviewing and disseminating these statements, and approved and ratified these statements by adopting them as their own.

298.    The statements attributed to the JPMorgan spokesman in the April 5 and 6 *Wall Street Journal* and *Bloomberg* articles were materially false and misleading because, as set forth herein, the CIO was operating a proprietary trading desk that focused on short-term profits rather than managing risk.  Indeed, by April 2012, the CIO had been operating as a high-risk trading desk for years and the positions that sparked *Bloomberg*'s and the *Wall Street Journal*'s reporting on the CIO – the CIO's portfolio of synthetic-credit derivatives – was the unit's largest and highest-risk speculative bet.  By the time the JPMorgan spokesman made his statement to the media, losses on the CIO's bet on corporate debt were approaching $1 billion, and the Company was actively cooking its books to conceal these losses.  *See supra* Section IV.O.  Moreover, JPMorgan specifically deceived regulators and investors to keep the CIO's activities a secret. ¶¶191-93.

299.    On April 9, 2012, *Bloomberg* published an article titled "JPMorgan Trader Iksil Fuels Prop-trading Debate With Bets," that provided more information about Iksil's trades, and questioned whether his positions had been proprietary trades, rather than hedges as the Company claimed.  The article quoted Evangelisti, who spoke on behalf of JPMorgan and relayed the false and misleading statements approved by Dimon, Braunstein, Drew and Zubrow, assuring investors that the CIO did not engage in proprietary trading.  Specifically, Evangelisti stated: "[t]he Chief Investment Office is responsible for managing and hedging the firm's foreign-exchange, interest-rate and other structural risks.  [It is] focused on managing the long-term structural assets and liabilities of the firm and is not focused on short-term profits."  The next day, on April 10, 2012, the *Wall Street Journal* published an article on the CIO's trades, which repeated Evangelisti's statement that the CIO's "recent trades were made to hedge the firm's overall risk."  As reported in the *Wall Street Journal*, Evangelisti said that the CIO "aims to

hedge the bank's global structural risks and the unit's investments are directly related to managing those risks," and that JPMorgan "views its recent selling in the context of a range of related positions" and "feels its risk is now effectively balanced."

300.    Evangelisti's statements to *Bloomberg* and the *Wall Street Journal*, which were specifically approved by Dimon, Braunstein, Drew, and Zubrow, were materially false and misleading because, as set forth above in ¶¶245, 250, 280, the CIO was operating a proprietary trading desk that was focused on short-term profits, and not on hedging or managing risk.  As the Senate Report concluded, these statements were materially false and misleading, and "misinformed investors, regulators, and the public about the nature, activities, and riskiness of the CIO's credit derivatives."

### 6.    The April 13, 2012 Form 8-K and Conference Calls

301.    On April 13, 2012, JPMorgan announced its financial results for the three months ended March 31, 2012, and held a previously scheduled conference call to discuss those financial results.  The Company also filed its quarterly financial results, including the Company's net income, with the SEC pursuant to a Form 8-K that included three exhibits:  (i) a press release dated April 13, 2012 containing the Company's 1Q 2012 financial results (the "1Q 2012 Press Release"); (ii) the Earnings Release Financial Supplement for 1Q 2012 (the "1Q 2012 Financial Supplement"); and (iii) a copy of the presentation slides JPMorgan provided to investors and analysts (the "1Q 2012 Earnings Presentation Slides").  The Press Release reported that the Company had earned net income of $5.4 billion for the first quarter of 2012.

302.    JPMorgan has now admitted that the net income and earnings per share reported for the first quarter of 2012 were materially overstated.  Specifically, JPMorgan has now admitted that net income for the first quarter was overstated by $459 million, or 8.5%, because the CIO's internal controls lacked "integrity," which enabled CIO traders to manipulate the value

of their positions.  This admitted overstatement is in addition to the Company's failure to establish a liquidity reserve, which separately caused JPMorgan's net income to be materially overstated by at least $2 billion.

303.    On that April 13 conference call, Dimon was asked to address the news reports about the London Whale and to explain the CIO's synthetic-credit trades – the very source of the undisclosed losses that rendered the Company's reported earnings false and misleading.   In response, Dimon belittled the news reports and assured investors that the CIO was not a source of risk:

> It's a complete tempest in a teapot.  Every bank has a major portfolio; in those portfolios you make investments that you think are wise to offset your exposures.  Obviously, it's a big portfolio; we are a large company and we try to run it – it's sophisticated obviously with complex things. But at the end of the day that is our job is to invest that portfolio wisely, intelligently over a long period of time to earn income and to offset other exposures that we have.

304.    Dimon's insistence that concerns about the CIO's massive synthetic credit portfolio were a "tempest in a teapot" and his description of the CIO's trading were materially false and misleading.  As noted, before that call, Dimon and Braunstein knew that the CIO's losses on the synthetic credit portfolio had already reached $1.2 billion.   Another internal JPMorgan memorandum issued in April 2012 warned that the losses in the synthetic credit portfolio could reach $9 billion.  Even before Dimon learned that the losses had reached $1.2 billion, he had approved (1) the implementation of a new VaR model to try and conceal the growing risk in the CIO; and (2) a strategy to expand the CIO's position in that portfolio. Indeed, by that time, the CIO's synthetic credit portfolio had breached every risk limit applicable to the CIO, breaching risk limits and advisories over 330 times during a three-month period, with certain limits being exceeded by as much as 1000%, and for as long as 71 days.  Accordingly, it was knowingly false to assure investors that the London Whale's position was merely a "tempest

in a teapot."   Similarly, it was false to suggest that those trades in particular, or the CIO's portfolio in general, were used to "offset other exposures" at JPMorgan.  For years, the CIO – at Dimon's direction – had engaged in high-risk proprietary trading focused on generating short-term profits, and not to "offset" risks.  The Senate Report specifically concluded that Dimon's representation misled investors, and that prior to making that misleading representation, he knew detailed information about the "complex and sizeable portfolio, its sustained losses for three straight months, the exponential increase in those losses during March, and the difficulty of exiting the [synthetic credit portfolio's] positions."

305.   During the April 13 conference call, Defendant Braunstein also continued to falsely insist that the CIO was not a source of risk but was rather merely engaged in hedging activities and only "invest[ed] … in high grade, low-risk securities."   Braunstein directly responded to reports about the CIO's investments in synthetic-credit derivatives by claiming that those positions were "hedges" to "keep the Company effectively balanced from a risk standpoint," and that JPMorgan was "very comfortable" with the positions:

> We invest those in order to hedge the interest rate risk of the Firm as a function of that liability and asset mismatch.  We hedge basis risk, we hedge convexity risk, foreign exchange risk is managed through CIO, and MSR risk.  We also do generate NII [net interest income], which we do with that portfolio.
>
> The result of all of that is we also need to manage the stress loss associated with the portfolio, and so we have put on positions to manage for significant stress event in Credit.  We have had that position on for many years and the activities that have been reported in the paper are basically part of managing that stress loss position, which we moderate and change over time depending upon our views as to what the risks are for stress loss from credit.
>
> All of those decisions are made on a very long-term basis.  They are done to keep the Company effectively balanced from a risk standpoint.   We are very comfortable with our positions as they are held today.

306.   Braunstein's statements on the April 13 conference call regarding the CIO and its synthetic credit portfolio were materially false and misleading.  First, Braunstein's reassurances

that JPMorgan was "comfortable" with the CIO's positions was false, as those positions had already generated $1.2 billion in losses, and were in the process of generating billions of dollars more. Indeed, the Company was taking drastic measures to conceal the CIO's losses on those positions, including mis-marking positions, manipulating market prices, implementing a model with the express purpose of lowering the CIO's reported VaR, subverting VaR limits by temporarily increasing them to mask limit breaches, and waiving breaches of other non-statistical risk limits. Second, as the Senate Report concluded, the synthetic credit portfolio's investments were not made on a "very long-term basis," but in fact represented the shortest investment time horizon—with positions traded actively and on a daily basis—of any portfolio within the CIO. Third, the CIO's synthetic credit portfolio was not a hedge as Braunstein represented, and was not used to manage a "stress loss position." Rather, as set forth in ¶¶55-66 and 86-110, the CIO was a proprietary trading desk and the synthetic credit portfolio was a speculative bet on corporate debt. As the Senate Report concluded, Braunstein and Dimon were provided with multiple analyses prior to the April 13 call that made clear that the CIO did not perform a hedging function, including a presentation on April 11 that showed that JPMorgan itself predicted the synthetic credit portfolio would lose money in nearly every credit stress scenario contemplated by the presentation, "thereby amplifying the bank's losses, rather than hedging, offsetting or providing stress loss protection against them." Indeed, as discussed in ¶95-97 and 115, the fact that a reserve was required for that portfolio demonstrated that it was not a hedge. In fact, as the Senate Report concluded, the synthetic credit portfolio was not a hedge, but was a "high risk proprietary trading operation that had no place at a federally insured bank."

307. On that conference call with analysts, Defendant Braunstein also misrepresented the transparency of the CIO:

> And I would add that all those positions are fully transparent to the regulators.
> They review them, have access to them at any point in time, get the information
> on those positions on a regular and recurring basis as part of our normalized
> reporting.  All of those positions are put on pursuant to the risk management at the
> Firm-wide level.

308.    These statements were materially false and misleading because, as the Senate

Report concluded, JPMorgan had "dodged OCC oversight of the [synthetic credit portfolio] for

years."  Among other things, JPMorgan violated federal regulations in failing to alert the OCC to

the establishment of the portfolio, and stopped providing crucial information concerning the

portfolio in its regular reports to the OCC in the months leading up to the April 13 call.  Indeed,

the CIO presented an ideal venue for Dimon to build his proprietary trading desk precisely

because it was not scrutinized by regulators, and JPMorgan worked to keep regulators "in the

dark" and out of the CIO by telling them that the unit did not engage in high-risk trading, as set

forth above in ¶¶104-110 and 191-93.  Further, as the Senate Report concluded, there was no

involvement by firm-wide risk managers in managing or approving the synthetic credit portfolio

positions or strategies, nor did CIO risk managers approve the CIO's trading strategies. Indeed,

rather than serving a risk management function, the CIO's trades were the cause of over 330 risk

limit and advisory breaches during the first quarter of 2012.  As the Senate Report concluded,

while Braunstein "sought to instill investor confidence in the trades as ones where firm-level risk

experts had evaluated the positions on the basis of potential risk and signed off on them," the

"problem with this representation…is that it was not true."

309.    Braunstein also misrepresented the application of the Volcker Rule to the

synthetic credit portfolio's proprietary activities:

> The last comment that I would make is that based on, we believe, the spirit of the
> legislation as well as our reading of the legislation, and consistent with this long-
> term investment philosophy we have in CIO we believe all of this is consistent
> with what we believe will be the ultimate outcome related to Volcker.

310.    As the Senate Report concluded, this statement was materially false and misleading because it was intended to fortify the "misimpression" that the synthetic credit portfolio was "hedging" risk.  In truth, however, JPMorgan had no basis to claim the synthetic credit portfolio would comply with the Volcker Rule, and Defendants knew it was a proprietary trading operation that, as the Senate Report concluded, "had no place in a federally insured bank."  Drew and Zubrow are also liable for Dimon's and Braunstein's statements concerning the CIO because, as alleged above in ¶¶195-99,  Drew and Zubrow were responsible for drafting, reviewing and disseminating the statements communicated to investors on the April 13 conference call, and approved and ratified these statements by adopting them as their own.

311.    The 1Q 2012 Financial Supplement also repeated JPMorgan's misrepresentation set forth above in ¶¶281 and 283-84 that the CIO's positions were "used to manage structural risk and other risks."  That statement was false and misleading for the reasons set forth in ¶285, as the CIO was trading for profit, and not to manage risk.  Indeed, by that time, the CIO's synthetic credit portfolio had already suffered at least $1.2 billion in losses, and JPMorgan was internally acknowledging that losses could reach $9 billion.

312.    Braunstein continued to misrepresent the CIO's purpose and the nature of the synthetic credit portfolio on a separate conference call with reporters on April 13, 2012 (the "April 13, 2012 Media Conference Call").  As reported by the *Wall Street Journal*, during the April 13, 2012 Media Conference Call, Braunstein stated that "[t]he CIO balances our risks" and that the CIO "hedge[s] against downside risk, that's the nature of protecting the balance sheet." Braunstein reiterated that "all of the positions reporters have been writing about are part of a credit book meant to hedge other risks."  In addition, Braunstein again insisted that JPMorgan is "very comfortable with the positions we have" and confirmed that the positions within the CIO

are "very long term in nature."  Braunstein assured the reporters on that call that "[w]hen we put a dollar to work we want to do so prudently and invest it in safe, smart and good-returning assets, and that is the job of CIO….  We are very conservative."

313.    Braunstein's statements on the April 13, 2012 Media Conference Call regarding the CIO's investments generally and the synthetic credit portfolio in particular were materially false and misleading for the reasons set forth in ¶¶245, 250, 280.  The CIO's synthetic credit portfolio was a speculative, proprietary trade – not a hedge.  The CIO's investments were not "conservative," but rather created an outsized risk relative to the size of the CIO's assets, as evidenced by the fact that the CIO's VaR exceeded that of the Investment Bank, and the VaR for Iksil's position alone equaled that of the Investment Bank, despite the fact that the Investment Bank held more than twice the assets of the CIO.

314.    In addition to misstating net income and earnings per share, the Company also misstated its VaR.  Specifically, based on the new VaR model implemented in the CIO in January 2012, the 1Q 2012 Financial Supplement reported CIO VaR of $67 million and total "other" VaR of $72 million.  The 1Q 2012 Financial Supplement also included a chart titled "JPMorgan Chase & Co. Market Risk-Related Information" which identified the "Quarterly Trends" of the Company's VaR calculations, including CIO VaR, Total "Other" VaR and Total IB and other VaR for 1Q 2012 and the four previous quarters.  That chart included a direct comparison of the VaR 4Q 2011 and 1Q 2011 with the VaR results for 1Q 2012 called the "1Q 2012 Change."  The chart is reproduced below:

| | **QUARTERLY TRENDS** | | | | | | |
| | | | | | | **1Q12 Change** | |
| | **1Q12** | **4Q11** | **3Q11** | **2Q11** | **1Q11** | **4Q11** | **1Q11** |
| **95% CONFIDENCE LEVEL-AVERAGE IB TRADING VAR, CREDIT PORTFOLIO VAR AND OTHER VAR** | | | | | | | |
| *** | | | | | | | |

| Other VaR: | | | | | | | |
|---|---|---|---|---|---|---|---|
| *** | | | | | | | |
| Chief Investment Office VaR | $67 | $69 | $48 | $51 | $60 | (3)% | 12% |
| *** | | | | | | | |
| **Total Other VaR** | **$72** | **$83** | **$73** | **$61** | **$62** | (13)% | 16% |
| *** | | | | | | | |
| **Total IB and other VaR** | **$116** | **$113** | **$108** | **$94** | **$88** | 3% | 32% |

315.    JPMorgan has now admitted that the CIO VaR and "other" VaR numbers for the first quarter of 2012 were materially false and misleading.  Indeed, JPMorgan reported VaR figures that understated the CIO's risk by a factor of two, even though the Company was required under federal securities regulations to disclose any new material changes to its VaR model characteristics, assumptions or parameters, and to explain any reason for the change.  As the Senate Report concluded, although Dimon knew the new VaR model would "have the effect of lowering the apparent risk for the CIO's portfolio by a dramatic amount" and that "the change in the VaR methodology effectively masked the significant changes in the portfolio," JPMorgan made no disclosure of the model change.  As noted by the Senate Report, no disclosure of the new VaR model was made despite the fact that JPMorgan directed investors to the CIO's VaR figures for prior periods when analysts began raising questions about the synthetic credit portfolio.

316.    On May 10, 2012, JPMorgan published the below chart restating the VaR for the first quarter of 2012, which revealed that CIO VaR had been understated by almost 50%.  That chart is reproduced below:

| 1Q 2012 VaR as Reported and as Corrected by JPMorgan | | | | |
|---|---|---|---|---|
| | Three Months Ended March 31, 2012 | | | |
| *$ in millions except percentage data* | Reported Amount | Corrected Amount | Amount Understated | Percent Understated |
| CIO VaR | $67 | $129 | $62 | 48% |
| Total "Other" VaR | $72 | $136 | $64 | 47% |
| Total IB and other VaR | $116 | $170 | $54 | 32% |

317.    As in prior quarters, the Company also misrepresented the meaning of the CIO's VaR by misstating the types of investments made by the CIO that contributed to its VaR. Specifically, the 1Q 2012 Financial Supplement stated that "CIO VaR includes positions, primarily in debt securities and credit products, used to manage structural risk and other risks, including interest rate, credit and mortgage risks arising from the Firm's ongoing business activities."  That statement regarding the positions underlying the CIO VaR was materially false and misleading because, as discussed extensively above, the CIO's positions were proprietary trades that created significant risk, rather than hedging transactions used to manage risk.  Indeed, when the Company made this statement – which was designed to assure investors that CIO would not really lose the amount of money reflected in its VaR, the unit had already lost at least $1.2 billion and stood to lose billions more.

## VI.    DEFENDANTS MADE THE FOREGOING FALSE AND MISLEADING STATEMENTS WITH SCIENTER

318.    During the Class Period, each of the Individual Defendants and other employees of JPMorgan, specified herein, was an active, culpable, and primary participant in the fraudulent scheme and issuance of the materially false and misleading statements and omissions of material fact alleged herein based upon:  (i) his/her actual issuance of and/or control over JPMorgan's materially false and misleading statements, and/or (ii) his/her participation in, and/or receipt of information which he/she had a duty to monitor, reflecting the improper and fraudulent behavior described above.  Each Defendant knew or recklessly disregarded that the statements made during the Class Period alleged herein were materially false and misleading and/or omitted material facts at the time that such statements were made.  Defendants participated in a scheme to defraud and engaged in acts, practices, and a course of business that operated as a fraud or deceit on purchasers of JPMorgan common stock during the Class Period.

319.    Defendants' knowledge and/or reckless disregard of the falsity of their statements is evidenced by, *inter alia*, (i) reports from internal JPMorgan sources indicating that JPMorgan senior management made a conscious, strategic decision to use the CIO for proprietary trading in pursuit of short-term profits; (ii) the fact that JPMorgan senior management received repeated warnings as to the inadequacy of risk oversight in the CIO and elsewhere, including repeated warnings about specific trades that posed risks that were inconsistent with the CIO's publicly represented risk management function; (iii) Defendants' modeling manipulations, valuation falsifications, and misrepresentations of the CIO's VaR metric so as to deliberately obfuscate the CIO's improper trading activities and assumption of risk; (iv) Defendants' publicly proclaimed direct responsibilities for overseeing and monitoring risk, including the very risks that the CIO was purportedly managing; and (v) the fact that due to its size and importance, the CIO was a core component of JPMorgan's overall business.

320.    As set forth herein, Defendants' scienter is also evidenced by the conclusions of the JPMorgan Task Force Report, which found each Individual Defendant—except for Defendant Cavanagh, who led the Task Force—culpable for the CIO's losses.   Notably, commentators have criticized JPMorgan's decision to select Defendant Cavanagh, who currently reports to Defendant Dimon and who reported to Dimon throughout the Class Period, instead of hiring an outside law firm or former prosecutor to conduct the review.  As former SEC chairman Harvey Pitt explained in a January 18, 2013 *Fortune* article, the decision to conduct the review internally is "like asking Joe Paterno to do the Penn State [sexual abuse] investigation instead of [former FBI director] Louis Freeh," and the "only reason you do a review this way is because you don't want to find anything unduly damaging."

321.    In addition to the JPMorgan Task Force Report, the Senate Report also made findings which evidence Defendants' scienter throughout the Class Period, including, among other things, Defendants' knowing disregard of risk limits in contravention of the Company's public statements, the precarious increase in speculative, non-hedging positions within the CIO, and the Company's lack of transparency regarding the synthetic credit portfolio with the Company's chief banking regulator, the OCC.

### A.    DIMON

322.    During the Class Period, Dimon was JPMorgan's President and Chief Executive Officer, Chairman of the JPMorgan Board of Directors and a member of JPMorgan's Operating Committee, which met once a week to discuss issues relating to the management of the Company.  According to the Company's 2011 Proxy Statement, as JPMorgan's CEO, Dimon was "intimately familiar with all aspects of the Firm's business activities" during the Class Period.  In this regard, the Company's 2012 Proxy Statement stated that Dimon's responsibilities as CEO included "setting the overall risk appetite for the [Company]" and, along with the Chief Risk Officer, approving the level of the risk appetite for each of JPMorgan's lines of business. The Company's Forms 10-K for 2009, 2010 and 2011 further represented that Dimon and the Chief Risk Officer were "responsible for reviewing and approving certain [market] risk limits on an ongoing basis" throughout the Class Period.  During this time, Dimon also was responsible for establishing and maintaining adequate internal control over, and for certifying the accuracy of, JPMorgan's financial reporting.

323.    According to the Company's Forms 10-K during the Class Period, as a member of senior management, Dimon received JPMorgan's VaR calculation results and reports concerning any breach of nonstatistical risk limits, VaR loss advisories and other limits on a daily basis. Dimon also received "stress-test results, trends and explanations," "market risk exposure trends,

VaR trends, profit-and-loss changes and portfolio concentrations," and an interest rate profile for the entire Company prepared by the Treasury department on a weekly basis.  The Senate Report and exhibits thereto highlight that Dimon received a daily VaR report that included firm-wide VaR as well as VaR for each segment, including the CIO, and detailed any change in VaR from the prior day and the reason for that change.  To the extent that any positions on JPMorgan's balance sheet breached risk limits, these limit breaches also were reported to Dimon.  During the Class Period, the CIO risk limits and advisories were breached over 330 times, with certain limits being exceeded by as much as 1000%, for as long as 71 days without any form of Company action to cure the breach.  *See, e.g.,* ¶162.  In January 2012, for example, Dimon received "breach notices" concerning the CIO risk limits on three consecutive days, according to the Senate Report.

324.   Dimon also was directly responsible for overseeing the CIO.   Indeed, the JPMorgan Task Force Report concluded that Dimon bears responsibility for "the risks, risk controls and personnel associated with CIO's activities."   According to witnesses, Drew implemented Dimon's "new vision" for JPMorgan by transforming the primary function of the CIO from risk management to profit generation prior to the start of the Class Period.  Dimon's hand-picked Chief Investment Officer, Drew, carried out Dimon's profit objectives for the CIO and reported directly to him.  As alleged in detail above, Dimon utilized the CIO's available investment assets before and during the Class Period, which grew to $350 billion, to effectuate trades for profit that he could not undertake elsewhere within the Company and directed that Drew and her team of traders take on increasing risks in search of profits.  Also as detailed above, throughout the Class Period, Dimon maintained direct reporting lines with the CIO and its

top executive personnel, including Drew, as well as individual traders within the CIO, keeping him informed of the unit's status and giving him control over its operations.

325.     Dimon's control of the CIO and his relationship with Drew and her team was well known throughout JPMorgan.  Dimon and Drew were members of the Company's Operating Committee, which met weekly to discuss issues within each line of business at JPMorgan.  One member of CIO management, Achilles Macris, stated that he effectively reported to Dimon as his *de facto* boss.  Witnesses cited herein stated that Dimon was aware of specific proprietary trades implemented by the CIO, including trades that generated profits or losses of $1 billion.  Dimon personally suggested proprietary trades he felt the CIO should enter into, including directional bets on economic trends or asset classes.  In addition, one CIO executive, Norma Corio, told the *Wall Street Journal* that Dimon "likes to know what is going on all the time, everywhere at this firm. . . . Full stop."

326.     As reflected in a May 11, 2012 email between OCC staff members, Drew told the OCC during a 2010 OCC examination close-out meeting that CIO "investment decisions were made with the full understanding of the executive management, including Jamie Dimon."  When asked by Senator Levin during the Subcommittee Hearing whether this was true, Drew replied, "[y]es, that's true."  The OCC email also reflects that during this 2010 close-out meeting, Drew told the OCC staff that "everyone knows what is going on and there is little need for more limits, controls or reports."

327.     Dimon took the following actions and was made aware of the following facts during the Class Period which, together with the other facts alleged herein, evidence his knowledge and/or reckless disregard of the material misrepresentations concerning the function and risk management and investment strategies of the CIO during the Class Period:

a) Dimon knew or recklessly disregarded that the CIO lacked even the most basic risk management infrastructure or protocols, including the risk management practices and protocols that were followed by other businesses at JPMorgan. *See, e.g.,* ¶¶73-85. Dimon either knew or recklessly disregarded that the CIO lacked a Chief Risk Officer, had no formal risk committee, and that the CIO's "risk committee" excluded executives from other businesses and had a total of three meetings in all of 2011. Further, contrary to the Defendants' representations in JPMorgan's Forms 10-K that Dimon himself was responsible for "reviewing and approving [market] risk limits on an ongoing basis," Dimon knew or recklessly disregarded that the CIO's risk limits were not reviewed at any time from 2009 to 2012 in violation of Company policy requiring at least annual assessments of risk limits. ¶¶81-82. As discussed below, Dimon personally approved the waiver of the few risk limits that applied to the CIO as a whole.

b) Dimon knew that the CIO (through the synthetic credit portfolio) was not a hedge, but instead operated as a profit center that was not "primarily" focused on limiting risk posed by other positions held by the bank as was publicly represented to investors. Dimon knew, understood and approved the profit-seeking strategy behind the trades implemented by the CIO within the synthetic credit portfolio that has required JPMorgan to recognize $6.25 billion in losses to date. *See, e.g.,* ¶¶58-60. As Drew testified before the Senate Subcommittee, the CIO's "<u>investment decisions are made with the full understanding of executive management including Jamie Dimon</u>." ¶87.

c) Dimon frequently met with CIO traders, including Achilles Macris, and personally approved proprietary trading strategies executed by the CIO before and throughout the Class Period. For example, Dimon approved a strategy to invest in Fannie Mae and Freddie Mac preferred securities that caused the CIO to suffer $1 billion in losses in 2008. ¶88. Dimon also approved and was personally involved in carrying out the CIO's bets against subprime mortgages which generated $1 billion in profits. ¶¶86-87.

d) Dimon knew that the CIO had gained approximately $500 million in the fourth quarter of 2011 from a $1 billion concentrated position in illiquid credit derivatives, which was essentially a bet that certain corporations on a specific index would default on their debt obligations within a specified time frame. ¶91. This trading gain came about when American Airlines filed for bankruptcy on November 29, 2011. This gain shows that the CIO was engaged in a high stakes, high risk wager that "could have easily gone the other way," according to regulators. In fact, according to Drew, but for that $500 million dollar gain, the synthetic credit portfolio would have lost money in 2011. The Company did not inform the OCC about this trade despite its enormous size. Critically, as described in the Senate Report, the Company has been unable to explain how the 2011 trading strategy served as a hedge in accordance with the CIO's stated function as it cannot link the 2011 synthetic credit portfolio gain from the American Airlines bankruptcy to any loan or credit loss suffered elsewhere in the bank. ¶91.

e) Based upon his oversight and direction of the CIO, Dimon directly received information from CIO management and traders regarding proprietary trades executed by the CIO before and throughout the Class Period. For example, Dimon knew about the CIO's $300 million loss in 2010 on a failed bet on foreign exchange options. With

respect to the $300 million loss, Cavanagh learned of the loss from Joseph Bonocore, the CIO's Chief Financial Officer, after Bonocore became concerned that the trade had been made without any corresponding gains to offset the losses, and was therefore not a hedging transaction. Cavanagh reported Bonocore's concerns to Dimon. ¶89.

f) As early as 2010, certain portfolios were added to the CIO at the specific request of Dimon, including a private equity portfolio and a "Special Investments" portfolio consisting of stressed or distressed investment opportunities related to undervalued or underperforming loans, further evidencing that Dimon was intimately familiar with the CIO, its activities and its specific investment portfolios during the Class Period. ¶87.

g) Dimon knew of, disregarded, or failed to act on warnings from regulators regarding the activities of the CIO. For example, in December 2010, by virtue of his receipt of a December 8, 2010 "Supervisory Letter" from the OCC, Dimon was aware that the CIO had an overdue "Matter Requiring Attention" with the OCC—a matter which arose in 2010 after the OCC reviewed the CIO's investment portfolios and criticized the CIO's failure to "document investment policies and portfolio decisions" and identified other control deficiencies relating to the CIO's management of related risks. Braunstein and Zubrow were also copied on this OCC Supervisory Letter. The Supervisory Letter, among other facts alleged herein, put Dimon, Braunstein and Zubrow on notice of the true, profit-making function and operations of the CIO, including the fact that no hedging documentation existed for certain CIO portfolios. ¶107.

h) Dimon disregarded repeated warnings from multiple senior executives at JPMorgan before and during the Class Period regarding the risky proprietary trading strategies executed by the CIO. Instead, Dimon exempted the CIO from the risk management protocols that JPMorgan applied to other lines of business within the Company. ¶67. These senior executives, including former co-CEOs of the Investment Bank Bill Winters and Steve Black, and Peter Weiland, then the most senior risk officer in the CIO, warned that the controls and risk management in place for the CIO were inadequate, and they pushed for greater transparency and disclosure of the CIO's positions within the Company. *See, e.g.,* ¶¶69-71. Ultimately, Dimon refused to heed these warnings and terminated or demoted the executives who sought to improve risk controls and oversight at the CIO. *See, e.g.,* ¶¶69-71, 133-34.

i) Dimon directed and was intimately involved in JPMorgan's intense lobbying effort against the provisions of the Volcker Rule that were intended to prevent banks from engaging in proprietary trading. Beginning as early as September 2010, Dimon devoted considerable time and resources to protecting the CIO's undisclosed proprietary trading activities and the profits that JPMorgan derived therefrom, through this concerted lobbying of the U.S. government, which included numerous meetings with federal regulators. Despite his knowledge of the CIO's high-risk trading activities, in February 2012, Dimon claimed that JPMorgan did not make the "huge [proprietary] bets" that the Volcker Rule was enacted to regulate. *See, e.g.,* ¶¶108-09, 183-86.

j) Dimon was aware of the SEC's concerns, set forth in correspondence between the SEC and the Company in 2011 and 2012, that JPMorgan was not fully disclosing the

revenues it generated through proprietary trading, even as the Company falsely assured the SEC that all proprietary trading was disclosed, and Dimon actively lobbied Congress to enable JPMorgan to continue to conceal the CIO's proprietary trading. ¶¶108-09.

k)  In January 2012, based on his receipt of daily reports of risk limit breaches, Dimon was aware that the synthetic credit portfolio had triggered a CIO-level credit spread widening limit.  *See, e.g.,* ¶¶160-67.  As demonstrated by a series of emails sent by and/or received by Dimon in January 2012, Dimon (i) knew that the CIO had exceeded its VaR limit; (ii) was informed that a new VaR model would result in "a reduction of CIO VaR by 44%" and permanently reduce the VaR associated with the positions within the portfolio on a going forward basis, which had the effect of masking the synthetic credit portfolio's true risk; (iii) personally approved a "temporary" increase in the firm-wide VaR limit in order to prevent further breaches of the CIO VaR limit by replying "I approve"; (iv) knew the expiration of the requested increase was intentionally aligned with the implementation and expected approval of the new CIO VaR model; and (v) knew the temporary increase in the VaR limit would "end" the CIO's breach of the firm-wide VaR limit.  ¶¶160-67.

l)  As the JPMorgan Task Force Report revealed, Dimon approved the VaR limit change without requiring corresponding adjustments to the synthetic credit portfolio or CIO-wide VaR risk limits, enabling the CIO (as the OCC determined) to "increase its risk without continuing to exceed its VaR limits." ¶¶136-40.

m)  Dimon's knowledge of the CIO's new VaR model is further evidenced by the fact he attended a February 2012 CIO business review meeting in which the VaR model was discussed, and received a presentation that included a stand-alone "VaR Highlights" section, which described the CIO's new VaR model, and stated that it helped "to reduce VaR."  The presentation also included a line graph indicating that the VaR model had reduced the CIO's risk by more than 50%, more than the expected 44% drop. ¶168.

n)  By late 2011, Dimon approved a strategy to "balance" the CIO's synthetic credit portfolio by taking on additional positions in synthetic-credit derivatives.  *See, e.g.,* ¶¶146-49.  As the JPMorgan Task Force Report revealed, Dimon knew that this strategy was undertaken in order to enable the CIO to avoid disclosing losses. ¶153-54.

o)  Dimon incentivized the CIO and its traders to take on more risk by tying their compensation to their ability to outperform an internally created index of the return on a standard bank treasury portfolio. ¶65.  Dimon personally approved the compensation of the four individuals with most direct responsibility for the synthetic credit portfolio, whose pay tracked the compensation of employees in profit-making roles in the Investment Bank. ¶66.

p)  The following facts further reveal that Dimon knew about the synthetic credit portfolio's size, the losses it had sustained throughout the first quarter of 2012, and the difficulty exiting the synthetic credit portfolio's positions prior to the April 13, 2012

first quarter earnings conference call when he dismissed the Whale trades as a "tempest in a teapot":

- Dimon received an email from the CIO's Chief Financial Officer John Wilmot which attached a presentation that contained multiple charts pertaining to the synthetic credit portfolio and an analysis of the portfolio's notional positions. Based on that presentation, which was first reviewed by Braunstein and Drew, Dimon knew or was deliberately reckless in disregarding that: (i) as detailed in the first page of the presentation, the synthetic credit portfolio had enormous concentrations in specific credit instruments, including an $82 billion net long position in the IG9 credit index and a $35 billion net long position in the ITX.9 credit index; (ii) the synthetic credit portfolio's largest positions were so large and illiquid that they represented 10-15 days of 100% trading volume for those instruments, and required the setting aside of a liquidity reserve; (iii) the synthetic credit portfolio book held the same long position as the bank and was not intended as an offset of the bank's other credit exposures or as a stress loss protection—thus flatly contradicting Dimon's public statements that the synthetic credit portfolio was a hedge; (iv) there were multiple credit spread widening scenarios that would result in the synthetic credit portfolio positions losing money, such that they could not accurately and truthfully be called positions that protect the Company against "stress events in credit"; and (v) in at least one scenario, the synthetic credit portfolio could lose as much as $918 million.  *See, e.g.,* ¶¶194-98.

- Dimon knew of the dramatic increase in the size of the synthetic credit portfolio positions, the portfolio's exposure, and that it was holding a net long position through his receipt of emails from Drew on April 5 and April 12, 2012 which included a table comparing "main exposures of the [synthetic credit portfolio] book," a profit and loss outlook and an overview of the CIO and synthetic credit portfolio, among other things.   Dimon knew that the "Investment Grade strategies" of the synthetic credit portfolio were not to hedge the risk of the Company's other lines of business, but rather to provide "some carry" (*i.e.*, profit), as was described in Drew's April 12, 2012 email to Dimon and Braunstein.

- Dimon knew that the synthetic credit portfolio had lost over $400 million in one day of trading, that the portfolio's losses had already reached $1.2 billion, and was provided with at least three separate analyses showing that losses could reach an additional $1 billion in the second quarter. *See, e.g.,* ¶194.

q) Dimon knew that the Company's Chief Risk Officer, John Hogan, wanted an immediate overhaul of the CIO's risk management in light of the Whale debacle.  In an April 11, 2012 email to Dimon and Braunstein, Hogan said that the Company needed to implement the governance used by the Investment Bank to "control what is currently going on in the CIO." ¶198.

    r)  Dimon also knew the synthetic credit portfolio positions were not accurately marked-to-market because they could not be unwound without resulting in massive losses. ¶196.

328.    In addition to the facts demonstrating Dimon's knowledge set forth above, Dimon had an additional incentive to conceal the truth from investors.  Specifically, at the same time Dimon dismissed the Whale trades as a "tempest in a teapot" on April 13, 2012, he was facing two pending shareholder proposals aimed directly at him.  First, a "say-on-pay" measure that sought shareholders' approval of Dimon's proposed 2011 compensation, nearly $23,000,000 in base salary, cash incentive payments and equity incentives, put Dimon's income and anticipated status as the most highly paid CEO on Wall Street squarely at risk.  Second, a separate shareholder proposal threatened to take away Dimon's position of Chairman of the Board, leaving him as just the Chief Executive Officer.  To Dimon, this demotion was unacceptable.  As Dimon had previously told *Fox Business News*, "I wouldn't have gone to Bank One if I had a separate chairman.  I mean, life's too short....  it would be too hard ... looking over my shoulder, maybe wanting my job."  The shareholder vote on these two proposals was set for May 15, 2012—just one month after Dimon's April 13, 2012 statements—and provided additional motivation for Dimon to conceal the severity and risk of the CIO's trading positions at that time.

329.    In his position as CEO, Dimon received and/or had a duty to monitor the following reports and/or information during the Class Period regarding the CIO and its proprietary trading, which further evidences his knowledge and/or reckless disregard of the material misrepresentations and omissions of material fact alleged above:

    a)  Dimon received a regular report from the CIO setting forth its aggregate trading positions which was known as "Jamie's Report."  Dimon also received profit-and-loss reports on large positions within the CIO on a daily basis throughout the Class Period, and these reports included the profits-and-losses associated with the Whale trades. Moreover, as a member of senior management, Dimon received weekly profit-and-loss reports on the CIO.  *See, e.g.,* ¶121.

b) Based on his receipt of daily VaR calculations as a member of senior management, Dimon knew as of the beginning of the Class Period, that JPMorgan's VaR models demonstrated that positions entered into by Bruno Iksil—one trader within the CIO— could lose tens of millions of dollars on any given trading day.  These daily VaR reports also reflected that at times throughout the Class Period, Iksil's individual positions put more of the Company's capital at risk than the trading activities of the entire Investment Bank, and represented the most significant risk within the CIO.  *See, e.g.,* ¶¶121, 123-25.

c) Based on his receipt of daily VaR calculations and VaR limit breaches as a member of senior management, Dimon was aware that the CIO had exceeded its VaR limit at numerous points throughout the Class Period, and, in particular, had exceeded its VaR limit as a result of the synthetic credit portfolio in late 2011 and early 2012.  *See, e.g.,* ¶¶121, 123-25, 165-68.

d) Based on his receipt of daily VaR calculations, Dimon was aware that the new VaR model for the synthetic credit portfolio that he approved in January 2012 significantly lowered the daily reported VaR of the CIO.  *See, e.g.,* ¶¶165-68.  Further, as JPMorgan Task Force Report admitted, Dimon knew that there was no corresponding change to the synthetic credit portfolio or CIO-wide VaR risk limits. ¶167.  In February 2012, Dimon participated in a CIO business review with senior JPMorgan management that included a discussion of the synthetic credit portfolio's positions.  ¶168.  At that same meeting, Goldman, who had recently been appointed CRO for the CIO, discussed the implementation of the new VaR methodology with Dimon.

e) As reported by *Bloomberg* on June 1, 2012, Lesley Daniels Webster, a former head of market and fiduciary risk management at JPMorgan, explained that before new VaR models are implemented, they are usually tested "in parallel" with old models for about three months to ensure they are working properly before being used.  As the JPMorgan Task Force Report conceded, that approval process was not followed with respect to the CIO's VaR model, which was approved as a result of "pressure" from the CIO without sufficient back-testing and in a manner that both the OCC and Federal Reserve determined evidenced deficiencies, unsafe or unsound practices and/or violations of federal law. ¶¶137-38.

f) On March 22, 2012, based on his receipt of daily reports concerning breaches of risk limits, Dimon was aware that the CIO's synthetic credit portfolio had triggered a second CIO-level credit spread risk limit.  As a result of this risk limit trigger, the CIO instituted a complete hold on any further trades within the synthetic credit portfolio. *See, e.g.,* ¶187.

330.    Dimon's knowledge and/or reckless disregard of the true function and purpose of

the CIO—*i.e.*, that the CIO was engaged in proprietary trading for profit rather than hedging—is

also evidenced by (i) the publicly proclaimed importance of the CIO's purported risk

management and liquidity functions; (ii) the sheer size of the CIO's portfolio in the context of JPMorgan's overall business; and (iii) the significant contributions that the CIO made to JPMorgan's overall profitability during the Class Period. Specifically:

a)  Dimon, as JPMorgan's CEO, was intimately familiar with the true function of the CIO because prudently managing structural risks and hedging exposures are core functions of banking institutions like JPMorgan.  As stated in the Company's 2011 Form 10-K, the purported functions of the CIO are "critical to both [JPMorgan's] soundness and profitability." Dimon testified before Congress that the CIO "serves as an important source of [the Company's] liquidity" which, as the Company described in its 2011 Form 10-K, "is essential to the ability to operate financial services businesses and, therefore, the ability to maintain surplus levels of liquidity through economic cycles is crucial to financial services companies, particularly during periods of adverse conditions."

b)  Furthermore, throughout the Class Period, the CIO's portfolio represented a very large and significant component of JPMorgan's overall assets.  Due to high-level strategic decisions made by JPMorgan, including the decisions to acquire Washington Mutual and Bear Stearns, and the fact that JPMorgan's deposit-to-loan ratio grew considerably, the CIO's portfolio more than quadrupled between the time of the financial crisis and the end of the Class Period.  The CIO managed a larger pool of assets than any of JPMorgan's other core businesses except for its Investment Bank.  ¶¶50-54.  Moreover, the synthetic credit portfolio represented the highest-risk position in the portfolio.

c)  Dimon was also aware that the CIO's synthetic credit portfolio represented a significant percentage of the Company's RWA, which are used in determining JPMorgan's regulatory capital ratios—one of the most critical metrics used in assessing a bank's financial health. *See, e.g.,* ¶¶143-45.

d)  Throughout the Class Period, due in large part to Dimon's decision to use the CIO's more than $300 billion portfolio for proprietary trading, the CIO was a significant component of JPMorgan's overall profitability.  The table below demonstrates the net income that the Corporate/Private Equity segment, which contained the CIO, produced as a percentage of JPMorgan's total net income.  In particular, in 2009, the Corporate/Private Equity sector produced more than a quarter of JPMorgan's net income.

|  | 2Q12 | 2011 | 2010 | 2009 |
|---|---|---|---|---|
| Corporate/Private Equity Net Income ($ millions) | (1,777) | 802 | 1,258 | 3,030 |
| Total Net Income ($ millions) | 4,960 | 18,976 | 17,370 | 11,728 |

| | | | | |
|---|---|---|---|---|
| % of Net Revenue Generated By Corporate/Private Equity | (35.8) | 4.2% | 7.2% | 25.8% |

e) JPMorgan reported, after the end of the Class Period, that the CIO contributed at least 20% of the Company's profits for almost every quarter during the Class Period. Analysts questioned whether the Company was understating the CIO's contributions, and one analyst calculated that the CIO contributed $0.80 per share to the Company's earnings, or as much as 35% of earnings at certain points during the Class Period. ¶¶236-37.

f) As revealed in the JPMorgan Task Force Report and the CIO Board Review Report, by December 2010, the CIO's synthetic credit portfolio had generated over $2.8 billion in "economic value" since its inception, generating an astounding 100% return on equity, making clear that its true function, as Dimon intended, was to generate profit, not mitigate risk. ¶¶96-97.

331. Following the disclosure of the CIO losses, JPMorgan's Board of Directors slashed Dimon's compensation by half of what he was paid the prior year, finding that he "bears ultimate responsibility for the failures that led to the losses in CIO." Indeed, Dimon has now admitted in Congressional testimony that he was aware of the CIO's trading strategy and personally monitored the CIO. As Dimon admitted, "I am absolutely responsible. The buck stops with me."

### B. CAVANAGH

332. Cavanagh was JPMorgan's Chief Financial Officer from 2004 until May 2010. As the Company's CFO, Cavanagh was a member of JPMorgan's Operating Committee, which met once a week to discuss issues relating to the management of the Company. Cavanagh was a "Named Executive Officer" in 2009 and 2010, and one of four or five of JPMorgan's most senior executives on whose compensation the Company asked shareholders to cast an advisory ballot. As CFO, Cavanagh responsibilities included managing the Company's capital and liquidity functions and needs. Cavanagh was also responsible for establishing and maintaining adequate internal control over and certifying the accuracy of JPMorgan's financial reporting.

333.    Cavanagh has worked closely with Dimon since 2000, when the two were both at Bank One before it merged with JPMorgan; Cavanagh reported directly to Dimon as JPMorgan's CFO during the Class Period, and continues to directly report to Dimon today.  Cavanagh led the JPMorgan Management Take Force regarding the CIO losses.  The JPMorgan Task Force Report does not single out Cavanagh in its analysis of the CIO losses, as it is focused on the events "at the end of 2011 and the first several months of 2012" when Cavanagh served as CEO of TSSB, but admits that the CFO is responsible for "weaknesses in financial controls applicable to the Synthetic Credit Portfolio."

334.    As a member of senior management, Cavanagh received JPMorgan's VaR calculation results and reports concerning any breaches of nonstatistical risk limits, VaR loss advisories and other limits on a daily basis.  Cavanagh also received the following reports on a weekly basis during the Class Period:   (i) "stress-test results, trends and explanations;" (ii) "market risk exposure trends, VaR trends, profit-and-loss changes and portfolio concentrations;" and (iii) an interest rate profile for the entire Company.  To the extent that any positions on JPMorgan's balance sheet breached risk limits in place, these limit breaches also were reported to Cavanagh.  During the Class Period, the CIO risk limits and advisories were breached over 330 times, with certain limits being exceeded by as much as 1000% for as long as 71 days without any form of Company action to cure the breach. *See, e.g.* 162, 187

335.    As CFO and a member of senior management, Cavanagh received and/or had a duty to monitor the following reports and/or information during the Class Period regarding the CIO and its proprietary trading which, together with the other facts alleged herein, evidence his knowledge and/or reckless disregard of the material misrepresentations alleged above:

a) Cavanagh knew that the CIO lacked even the most basic risk management infrastructure or protocols that were followed by other businesses at JPMorgan.  As

JPMorgan's SEC filings represented during the Class Period, as a member of senior management, Cavanagh was "responsible for reviewing and approving [] risk limits on an ongoing basis."  Given that role, Cavanagh either knew or recklessly disregarded that the CIO lacked adequate risk controls, a formal risk committee, and even a Chief Risk Officer.  Further, Cavanagh knew or recklessly disregarded that the CIO's risk limits were not reviewed from 2009 to 2012, in violation of Company policy requiring at least annual assessments of risk limits.  ¶¶74-85.

b) Cavanagh knew that the CIO (through the synthetic credit portfolio) was not a hedge, but instead operated as a profit center that was not "primarily" focused on limiting risk posed by other positions held by the bank as was publicly represented to investors. Cavanagh knew, based on his position and review of financial and other internal reports, that the CIO's synthetic credit portfolio generated enormous profits, including over $2.8 billion in economic value and an annualized return on equity of over 100%, that were wholly inconsistent with a risk management function.  Based on his receipt of profit-and-loss, VaR and other internal reports, Cavanagh also knew that, contrary to mitigating risk or serving as a hedging function, the CIO's synthetic credit portfolio generated tremendous risks for JPMorgan.  ¶¶89, 96-97, 146-150, 232-235.  As Drew testified before the Senate Subcommittee, the CIO's "investment decisions are made with the full understanding of executive management." ¶87.

c) As of the beginning of the Class Period, Cavanagh was a member of JPMorgan's Operating Committee, which received daily VaR calculations that informed him that positions entered into by Bruno Iksil could lose tens of millions of dollars on any given trading day.  Based on receipt of these daily VaR reports, Cavanagh also was aware that at times throughout the Class Period, Iksil's individual positions put more of the Company's capital at risk than the trading activities of the entire Investment Bank. *See, e.g.*, ¶¶121-125.

d) Based on his receipt of weekly profit-and-loss reports during his tenure as CFO, Cavanagh was aware of the following trading losses within the CIO, among others, which also informed Cavanagh that the CIO was engaged in trading activities that were wholly inconsistent with the CIO's publicly represented risk management purpose:  (i) a $1 billion loss in 2008 on positions in Fannie Mae and Freddie Mac preferred securities; and (ii) $300 million loss on a set of foreign exchange trades in 2010.  With respect to the $300 million loss, Cavanagh also learned of the loss from Joseph Bonocore, the CIO's chief financial officer, after Bonocore became concerned that the trade had been made without any corresponding gains to offset the losses, and was therefore not a hedge.  Cavanagh reported Bonocore's concerns to Dimon.  *See, e.g.*, ¶¶88-89, 94.

e) Based upon his responsibilities for managing the Company's capital and liquidity function and needs, Cavanagh knew or was reckless in disregarding the CIO's high-risk, proprietary investment strategy that contravened JPMorgan's public statements. Specifically, the CIO invested JPMorgan's $350 billion in excess liabilities—namely, deposits—that could be called back at any time.  As a result, JPMorgan had to maintain a sufficient liquidity cushion to account for these liabilities and to offset the additional

liquidity risk that the CIO's proprietary trades posed. Accordingly, Cavanagh's responsibilities as CFO required him to know and understand the nature of the CIO's risky proprietary positions. Based upon, among other things, his liquidity management responsibilities, if Cavanagh did not know about the CIO's massive directional bets during his tenure as CFO, then his failure to inform himself of and understand these positions was at least reckless. ¶¶38, 86-97.

f)  As CFO in early 2010, Cavanagh knew or should have known of a memorandum drafted by a senior executive of the CIO who reviewed the CIO's positions and determined that JPMorgan needed to establish a $2 to $4 billion liquidity reserve to protect the Company against losses within that portfolio. The need for that reserve was discussed at the CFO level, as JPMorgan's CFO is responsible for approving and establishing the size of any such reserve. *See, e.g.,* ¶¶111-20.

g)  Cavanagh was informed in an April 5, 2012 email that Drew sent to members of JPMorgan's Operating Committee that the CIO's synthetic credit portfolio had lost $500 million. That email also demonstrated that the portfolio was not a hedge, explaining that (i) synthetic credit portfolio had "been extremely profitable for the company (circa 2.5 billion) over the last several years," (ii) had generated a "fourth quarter 400 million gain" as the "result of the unexpected american airlines default" and (iii) that the synthetic credit portfolio had "moved into a long position," *i.e.*, was not providing any credit protection to the Company.

h)  Cavanagh's knowledge and/or reckless disregard of the true function and purpose of the CIO as a unit engaged in speculative proprietary trading is also evidenced by (i) the publicly proclaimed importance of the CIO's purported risk management and liquidity functions, which JPMorgan admitted were "critical to both [its] soundness and profitability"; (ii) the sheer size of the CIO's portfolio, which represented the largest pool of assets managed by any JPMorgan business unit other than the Investment Bank, and the fact that the synthetic credit portfolio represented the highest risk position in that portfolio; (iii) the significant contributions that the CIO made to JPMorgan's overall profitability, which accounted for approximately 20% of JPMorgan's net income in almost every quarter during the Class Period, and (iv) the fact that by December 2010, the CIO's synthetic credit portfolio had generated $2.8 billion in "economic value" and had generated 100% return on equity since its inception. *See, e.g.,* ¶¶50-54, 75-97.

## C.  BRAUNSTEIN

336.  Braunstein was JPMorgan's Chief Financial Officer from May 2010 until the end of the Class Period. As the Company's CFO, Braunstein was a member of JPMorgan's Operating Committee, which met once a week to discuss issues relating to the management of the Company. Braunstein was a "Named Executive Officer" in 2010 and 2011, meaning that he

was one of four or five of JPMorgan's most senior executives on whose compensation the Company asked shareholders to cast an advisory ballot.  As CFO, Braunstein was responsible for establishing and maintaining adequate internal control over, and certifying the accuracy of, JPMorgan's financial reporting.

337.    The   JPMorgan   Task   Force   Report   concluded   that   Braunstein   "<u>bears responsibility…for weaknesses in financial controls applicable to the Synthetic Credit Portfolio, as well as for the CIO Finance organization's failure to have asked more questions or to have sought additional information about the evolution of the portfolio</u>."

338.    At the Senate Subcommittee's March 15, 2013 hearing, Braunstein was shown a May 11, 2012 email between OCC personnel recounting Drew's view that "investment decisions [in the CIO] were made with the full understanding of the executive management, including Jamie Dimon."   When shown this email, Braunstein confirmed:   "As to specific investment decisions, I was certainly aware of the synthetic credit [portfolio]."

339.    According to JPMorgan's 2011 Proxy Statement for the fiscal year 2010, in his role as CFO, Braunstein "provide[d] financial leadership across all of our business in terms of planning, reporting, financial controls, defining and managing the firm's capital and liquidity needs, as well as communicating the Firm's performance to the investor community, regulators and rating agencies."   Additionally, in the 2011 Proxy Statement, the Company highlighted the fact that Braunstein's prior service as a leading executive within the Investment Bank provided him with an "understanding of the complex nature of this organization[.]"   In JPMorgan's 2012 Proxy Statement for the fiscal year 2011, the Company also noted that in his role as CFO, "Braunstein led the Firm's internal capital planning processes, which included the [Line of

Business] capital allocation process, [and] assessment of the Firm's capital under a series of baseline and adverse economic and financial scenarios[.]"

340.    As a member of senior management, Braunstein received JPMorgan's VaR calculation results and reports concerning any breaches of nonstatistical risk limits, VaR loss advisories and other limits on a daily basis.  Braunstein also received the following reports on a weekly basis during the Class Period:   (i) "stress-test results, trends and explanations;" (ii) "market risk exposure trends, VaR trends, profit-and-loss changes and portfolio concentrations;" and (iii) an interest rate profile for the entire Company.   To the extent that any positions on JPMorgan's balance sheet breached risk limits in place, these limit breaches also were reported to Braunstein.   During the Class Period, the CIO risk limits and advisories were breached over 330 times, with certain limits being exceeded by as much as 1000% for as long as 71 days without any form of Company action to cure the breach. *See, e.g.,* ¶¶162, 187.

341.    Braunstein also took the following actions and was made aware of the following facts during the Class Period regarding the CIO and its proprietary trading which, together with the other facts alleged herein, evidence his knowledge and/or reckless disregard of the material misrepresentations and omissions alleged above:

   a)  Braunstein knew that the CIO lacked even the most basic risk management infrastructure or protocols that were followed by other businesses at JPMorgan.  As JPMorgan's SEC filings represented during the Class Period, as a member of senior management, Braunstein was "responsible for reviewing and approving" risk limits "on an ongoing basis."  Accordingly, Braunstein either knew or recklessly disregarded that the CIO lacked adequate risk controls, a formal risk committee, and even a Chief Risk Officer.  Further, Braunstein knew that the CIO's risk limits were not reviewed from 2009 to 2012 in violation of Company policy requiring at least annual assessments of risk limits. ¶¶74-85.

   b)  Braunstein knew or was reckless in disregarding that the CIO's synthetic credit portfolio was not a hedge, but was a high-risk, proprietary investment strategy.  Based on his position and review of financial and other internal reports, Braunstein knew that the CIO's synthetic credit portfolio generated enormous profits, including over $2.8 billion in economic value and an annualized return on equity of over 100%, that were

wholly inconsistent with a risk management function. Based on his receipt of profit-and-loss, VaR, and other internal reports, Braunstein also knew that, contrary to mitigating risk or serving as a hedging function, the CIO's synthetic credit portfolio generated tremendous risks for JPMorgan. ¶¶119-20, 146-55. As Braunstein confirmed in his testimony before the U.S. Senate, "[a]s to specific investment decisions, I was certainly aware of the synthetic credit [portfolio]."

c)  Braunstein also knew or recklessly disregarded the CIO's proprietary trading activities due to his role in overseeing the Company's liquidity management needs. Specifically, the CIO invested JPMorgan's excess liabilities—namely, deposits—that could be called back at any time. As a result, JPMorgan had to maintain a sufficient liquidity cushion to account for these liabilities and to offset the additional liquidity risk that the CIO's proprietary trades posed. Accordingly, Braunstein's responsibilities as CFO required him to know and understand the nature of the CIO's risky proprietary positions. Based upon, among other things, his liquidity management responsibilities, if Braunstein did not know about the CIO's massive directional bets during the Class Period, then his failure to inform himself of and understand these positions was at a minimum reckless. ¶¶38, 86-97, 177-99.

d)  Based upon his responsibilities for managing the Company's capital and liquidity functions and needs, Braunstein knew of or recklessly disregarded that, rather than managing liquidity risk, the CIO's proprietary trades presented a severe liquidity risk for which the CIO did not have adequate reserves, as reflected in a 2010 memorandum issued by a senior CIO executive. This memorandum indicated that the high-risk, speculative trades that Drew endorsed and/or encouraged within the synthetic credit portfolio required JPMorgan to establish a $2 to $4 billion liquidity reserve to protect the Company against losses within that portfolio. The need for that reserve was discussed at the CFO level, and JPMorgan's CFO was responsible for approving and establishing the size of any such reserve. *See, e.g.,* ¶¶111-20.

e)  Braunstein knew of, disregarded, and failed to act on warnings from regulators regarding the activities of the CIO. Specifically, Braunstein knew of, and ignored warnings from the OCC pertaining to the CIO. As early as December 2010, by virtue of his receipt of a "Supervisory Letter" from the OCC, Braunstein was aware that the CIO had an overdue "Matter Requiring Attention" with the OCC—a matter which arose in 2010 after the OCC reviewed the CIO's investment portfolios and directed CIO management to do a better job "document[ing] investment policies and portfolio decisions" and managing the related risks. Dimon and Zubrow were also copied on this OCC Supervisory Letter. Even if they were not aware of the true nature and purpose of the CIO up to this point in time (which they were), this letter would have put these Defendants on notice of the true, profit-making function and operations of the CIO, including the fact that no hedging documentation existed for certain CIO portfolios. *See, e.g.,* ¶107.

f)  Braunstein was a member of senior management who received daily VaR calculations, which informed him that JPMorgan's VaR models demonstrated that positions entered into by Bruno Iksil could lose tens of millions of dollars on any given trading day.

Based on receipt of these daily VaR reports, Braunstein also was aware that at times throughout the Class Period, Iksil's individual positions put more of the Company's capital at risk than the entire Investment Bank. *See, e.g.,* ¶¶121-25.

g) Based on his receipt of weekly profit-and-loss reports, Braunstein was aware of the profits-and-losses within the CIO throughout his tenure as CFO. Based on his receipt of daily VaR calculations and VaR limit breaches as a member of senior management, Braunstein knew or recklessly disregarded that the CIO was exceeding its VaR limit as a result of the synthetic credit portfolio in late 2011 and early 2012. *See, e.g.,* ¶¶165-67.

h) Braunstein, on behalf of the Company, responded to an SEC comment letter asking how JPMorgan determined its VaR "model was statistically appropriate" and requesting further disclosure to investors concerning the bases for JPMorgan's VaR calculations. In Braunstein's response, JPMorgan refused to provide additional disclosure to investors, explaining that additional information "could be misleading," even as JPMorgan was at the same time developing a new VaR model for the CIO synthetic credit portfolio that was specifically designed to understate the portfolio's risk. ¶141.

i) As demonstrated by a series of January 2012 emails, by at least January 2012, Braunstein was informed about the new CIO VaR model and the expectation that the "impact of the new VaR model…will be a reduction of CIO VaR by 44% to $57mm[]" and knew the temporary increase in the VaR limit would "end" the CIO's breach of the firm-wide VaR limit. Braunstein's knowledge of the CIO's new VaR model is further evidenced by the fact he attended a February 2012 CIO business review meeting and received a presentation that included a standalone "VaR Highlights" section, which described the CIO's new VaR model. The VaR section explained that the new model helped to reduce VaR. The presentation also included a line graph indicating that the VaR model had reduced the CIO's risk rating by 50%. At that meeting, Goldman discussed the implementation of the new VaR methodology with Braunstein. ¶¶165-68.

j) In January 2012, based on his receipt of daily reports of risk limit breaches, Braunstein knew or recklessly disregarded that the synthetic credit portfolio had triggered a CIO-level credit spread widening limit. *See, e.g.* ¶¶160-67.

k) On March 22, 2012, based on his receipt of daily reports concerning breaches of risk limits, Braunstein knew or recklessly disregarded that the CIO's synthetic credit portfolio had triggered a second CIO-level credit spread risk limit. As a result of this risk limit trigger, the CIO instituted a complete hold on any further trades within the synthetic credit portfolio. *See, e.g.,* ¶¶187-88.

l) Based on his receipt of weekly profits-and-losses reports, Braunstein knew or recklessly disregarded that, as of April 13, 2012, the CIO had experienced at least $1.2 billion in losses due to positions within its synthetic credit portfolio. *See, e.g.,* ¶¶194-99.

m)  By April 11, 2012, Braunstein knew that the Company's Chief Risk Officer, John Hogan, wanted an immediate overhaul of the CIO's risk management in light of the Whale debacle.  Hogan's email to Braunstein and Dimon on that date stated that the Company needed to implement the governance used by the Investment Bank to "control what is currently going on in the CIO."  ¶198.

n)  Specifically, as the Senate Report and the JPMorgan Task Force Report revealed, prior to the April 13 conference call, Braunstein knew of the extraordinarily large size and illiquid nature of the synthetic credit portfolio, and had specifically approved a request to enable the CIO to increase the size and risk of the synthetic credit portfolio in order to avoid disclosing the CIO's losses. ¶¶153-54, 195-204.

o)  Prior to the April 13 conference call, Braunstein knew that the synthetic credit portfolio had lost over $400 million in one day of trading, that the portfolio's losses had already reached $1.2 billion for the year, and was provided with at least three separate analyses showing that losses could reach an additional $1 billion in the second quarter. ¶¶194-95.

p)  Prior to the April 13 conference call, Braunstein reviewed an April 11, 2012 CIO presentation about the synthetic credit portfolio and received various emails from senior management (including Drew) which informed him that: (i) as detailed in the first page of the presentation, the synthetic credit portfolio had enormous concentrations in specific credit instruments, including an $82 billion net long position in the IG9 credit and a $35 billion net long position in the ITX.9 credit index; (ii) exiting the synthetic credit portfolio's largest positions would take weeks or months because to do so would take 10-15 days of selling at 100% trading volume, which would trigger significant adverse price movements; (iii) the synthetic credit portfolio book held the same long position as the bank and was not intended as an offset of the bank's other credit exposures or as a stress loss protection, thus flatly contradicting Braunstein's public statements that the synthetic credit portfolio was a hedge; (iv) nearly all credit scenarios would result in the synthetic credit portfolio positions losing money, and thus the synthetic credit portfolio did not protect the Company against "stress events in credit"; (v) that the "Investment Grade strategies" of the synthetic credit portfolio were not to hedge the risk of the Company's other lines of business, but rather to provide "some carry" (*i.e.*, profit), as evidenced by an April 12, 2012 email from Drew to Dimon and Braunstein; and (v) in at least one scenario, the synthetic credit portfolio could lose as much as $918 million.

q)  Braunstein determined that the size and illiquidity of the synthetic credit portfolio positions required the setting aside of a liquidity reserve of $155 million on just one subset of the synthetic credit portfolio positions.  That position was so large that it represented the equivalent of 10 to 15 trading days of 100% of the average daily trading volume for that instrument and was thus, by definition, illiquid. ¶197.

r)  Braunstein also knew the synthetic credit portfolio positions were not accurately marked-to-market because they could not be unwound without resulting in massive losses. ¶196.

s) As CFO, Braunstein was responsible for ensuring the adequacy of internal controls for valuation of the Company's assets. Accordingly, in the first quarter of 2012, Braunstein either knew or should have known that the Company's internal controls were materially deficient and that systems were not in place to prevent traders in the CIO from (i) marking their positions without regard to the actual market prices for those positions; and (ii) "painting the tape" to manipulate the valuation of their positions. *See, e.g.,* ¶¶169-76.

t) Braunstein received and responded to correspondence from the SEC requesting that JPMorgan provide greater transparency into JPMorgan's proprietary trading activities, and he specifically misrepresented that the CIO's credit derivative trading activities solely served a risk management function. ¶141.

342.   Braunstein's knowledge and/or reckless disregard of the true function and purpose of the CIO as a unit engaged in speculative proprietary trading is also evidenced by (i) the publicly proclaimed importance of the CIO's purported risk management and liquidity functions, which JPMorgan admitted were "critical to both [its] soundness and profitability"; (ii) the sheer size of the CIO's portfolio, which represented the largest pool of assets managed by any JPMorgan business unit other than the Investment Bank and the fact that the synthetic credit portfolio represented the highest risk position in that portfolio; (iii) the significant contributions that the CIO made to JPMorgan's overall profitability, which accounted for approximately 20% of JPMorgan's net income in almost every quarter during the Class Period, and (iv) the fact that by December 2010, the CIO's synthetic credit portfolio had generated $2.8 billion in "economic value" and had generated 100% return on equity since its inception. *See, e.g.*, ¶¶50-54, 95-97.

343.   Following the disclosure of the CIO losses, JPMorgan's Board of Directors slashed Braunstein's compensation by almost half of what he was paid the prior year. Subsequent to the Class Period, and in the wake of the CIO's $6 billion scandal, Braunstein was removed as CFO.

### D.   DREW

344.   Hand-picked by Dimon, Drew was JPMorgan's Chief Investment Officer from 2005 until May 2012, and also served as a member of JPMorgan's Operating Committee during this time period.  According to JPMorgan's 2011 Proxy Statement for fiscal year 2010, as Chief Investment Officer, Drew was responsible for overseeing the CIO's efforts to measure, monitor, and manage the Company's liquidity, interest rate risk and foreign exchange risk.  The 2011 Proxy Statement also noted that in her position as Chief Investment Officer, Drew was "instrumental in setting the course and directing the Firm's repositioning of the balance sheet in anticipation of a rising interest rate environment."  The Company identified Drew as a "Named Executive Officer," meaning that she was one of four or five of JPMorgan's most senior executives whose compensation was subject to an advisory vote from shareholders.  Drew's annual compensation exceeded $15 million in 2010 and 2011.

345.   Drew described her reporting structure and responsibilities for overseeing the CIO in her written testimony before the Senate Subcommittee:

> As head of the CIO, I had a team of six experienced and accomplished financial professions who reported directly to me.  With respect to most of the various books I oversaw, including the cash and synthetic credit books, I delegated responsibility to, and relied on, my CIO management team.  Several of my direct reports – including Achilles Macris, who had supervisory responsibility for the cash and synthetic credit books, among other responsibilities – were members of the JPMorgan Chase Executive Committee, which consisted of the top 50 or so executives in the Company.

> \* \* \*

> I managed the CIO in a variety of ways.  I had daily meetings or communications with all of my direct reports and with CIO Risk Management personnel.  I reviewed key written reports, including regular Risk Management reports and regular portfolio summaries from members of my management team or their teams.  I held weekly portfolio review meetings, which covered most of the major books managed by the CIO, including the cash and synthetic credit portfolios managed by the London office.  These meetings always included London

personnel via videoconference, and always included a review of risk management issues.

346.    As a member of senior management, Drew received JPMorgan's VaR calculation results and reports concerning any breaches of nonstatistical risk limits, VaR loss advisories and other limits on a daily basis.  Drew also received the following reports on a weekly basis: (i) "stress-test results, trends and explanations;" (ii) "market risk exposure trends, VaR trends, profit-and-loss changes and portfolio concentrations;" and (iii) an interest rate profile for the entire Company.  Drew also received profit-and-loss reports and VaR information concerning the CIO's synthetic credit portfolio on a daily basis, had frequent communications with CIO traders concerning their positions and strategies, and had a practice of following up with senior traders whenever losses in the CIO's synthetic credit portfolio exceeded $5 million for any particular day.  To the extent that any positions on JPMorgan's balance sheet breached risk limits in place, these limit breaches also were reported to Drew.  During the Class Period, the CIO risk limits and advisories were breached over 330 times, with certain limits being exceeded by as much as 1000% for as long as 71 days without any form of Company action to cure the breach.  *See, e.g.* ¶¶162, 187.

347.    As Chief Investment Officer, Drew always reported directly to Dimon.  According to numerous internal sources, Dimon and Drew had a very close business relationship.  As a result, Dimon put Drew in charge of his strategy to use the CIO's $350 billion portfolio to make profits for JPMorgan through risky, proprietary trades.

348.    In order to effectuate Dimon's CIO profit generation strategy, Drew took the following actions and was aware of the following facts during the Class Period which, together with the other facts alleged herein, evidence her knowledge and/or reckless disregard—and therefore the Company's knowledge and/or reckless disregard—of the material

misrepresentations concerning the function and risk management of the CIO during the Class

Period:

a) Drew knew or recklessly disregarded that the CIO lacked even the most basic risk management infrastructure or protocols. *See, e.g.,* ¶¶77-85. As the head of the CIO, Drew knew or recklessly disregarded that the CIO lacked adequate risk controls, a formal risk committee, and a Chief Risk Officer, and knew or recklessly disregarded that there were no limits of any kind specific to the synthetic credit portfolio, including any limits by "size, asset type or risk factor." Drew also knew or recklessly disregarded that the CIO had no functioning risk committee, which met only three times in 2011, and that the CIO's risk limits were not reviewed from 2009 to 2012 in violation of Company policy. ¶¶81-82.

b) Drew, who controlled and directed the CIO's trading activities, knew the synthetic credit portfolio was not a hedge, but a high-risk proprietary trading operation. Drew approved the CIO's synthetic credit portfolio's trading strategies, and knew that the CIO's high-risk proprietary trades did not serve any risk mitigating function, did not offset any of the Company's other exposures, risks or positions, and in fact generated tremendous risk for JPMorgan. *See, e.g.,* ¶¶60, 86-97.

c) Beginning in 2006 Drew hired a team of proven proprietary traders including Achilles Macris. Drew also elevated Bruno Iksil, a trader at the CIO since 2005, to run the CIO's credit desk in 2007. These new hires and promotions had <u>no</u> risk management experience—despite the fact that JPMorgan publicly represented that the CIO's function was to manage risk for the rest of JPMorgan's business lines. *See, e.g.,* ¶¶61-62.

d) While staffing the CIO with proprietary traders, Drew did not devote additional personnel or financial resources to augment the CIO's risk management structure to address the heightened risks that Dimon's profit-seeking directive through risky, directional bets on obscure credit indices and the purchase of illiquid assets presented. Even after Drew received warnings from the CIO's most senior risk officer, Peter Weiland, concerning the inability of the CIO's risk management staff to focus on actually managing risk, she did nothing to address this known deficiency. *See, e.g.,* ¶¶67-85, 132-34, 231.

e) As head of the CIO, Drew knew or recklessly disregarded that, rather than managing liquidity risk, the CIO's proprietary trades presented a severe liquidity risk for which the CIO did not have adequate reserves, as reflected in a 2010 memorandum issued by a senior executive. This memorandum indicated that the high-risk, speculative trades that Drew approved within the synthetic credit portfolio required JPMorgan to establish a $2 to $4 billion liquidity reserve to protect the Company against losses within that portfolio. *See, e.g.,* ¶¶114-15.

f) To facilitate more high-risk, high-profit proprietary trading, Drew and Achilles Macris abandoned an established stop loss limit on all trades within the CIO which previously either triggered an internal review or required traders to exit positions if losses exceeded $20 million. *See, e.g.,* ¶¶77-80.

g) Drew received warnings in 2010 from the CIO's most senior risk officer, Peter Weiland, concerning the growth of the synthetic credit portfolio, including the fact that the position was so complex that it would generate significant losses if the CIO was forced to sell off the position.  Despite these warnings, and while engaging in frequent discussions about these positions during her daily 7 a.m. meetings, Drew and Macris did not order traders to reduce the positions and instead approved a strategy that would more than triple the size of the portfolio.  *See, e.g.,* ¶¶113, 127-34, 146-50.

h) Drew knew of, disregarded, and failed to act on warnings from regulators regarding the activities of the CIO.  For instance, in 2010, as part of its routine examination process, the OCC conducted a detailed review of the CIO's investment activities.  During the close-out meeting to discuss the findings and recommendations, Drew complained that the OCC was trying to "destroy" JPMorgan's business and that the OCC's request for more documentation of the CIO's portfolio decisions would take away "necessary flexibility" from the CIO.  According to the Senate Report, one of the staff members present at the meeting stated that Drew's level of "pushback" was "extreme." ¶107.

i) Drew was intimately involved in JPMorgan's intense lobbying efforts against the provisions within the Volcker Rule intended to inhibit proprietary trading.  For example, Drew accompanied Dimon to Washington, D.C. in February 2012 to advocate against a version of the Volcker Rule that would prevent, and thus require disclosure of, the very proprietary trades that were entered into by and were adversely affecting the CIO's synthetic credit portfolio.  *See, e.g.,* ¶¶108, 183-85.

j) In early December 2011, in the wake of the CIO's approximately $500 million gain from Iksil's bet that American Airlines would default on its credit obligations, Drew instructed Iksil to "recreate" the American Airlines situation, explaining that those were the kinds of trades they wanted at the CIO, *i.e.*, "cheap options."  That is, Drew required that CIO traders seek short-term profits in extremely risky illiquid credit derivatives.  *See, e.g.,* ¶¶91-94.  This directive from Drew establishes that she sought to continue to use the synthetic credit portfolio as a means of profiting from future corporate defaults as opposed to using it as a means to hedge risks arising from JPMorgan's non-CIO business activities.

k) In December 2011, Drew was provided with an analysis revealing that unwinding just 35% of the synthetic credit portfolio would cost more than $500 million, and a separate analysis in January 2012 showing that unwinding <u>only</u> 25% of the synthetic credit portfolio would cost approximately $500 million.  These analyses confirmed for Drew that synthetic credit portfolio positions were not marked to market and were illiquid.  In response, Drew instructed the CIO to revise a plan to unwind the synthetic credit portfolio in order to "maximize p [&] l" – that is, to avoid revealing the CIO's losses to investors. ¶¶153-54.

l) Drew was involved in implementing the "new" VaR model (discussed above in ¶¶134-41, 164-67) that drastically understated and concealed the CIO's true risk.  As revealed in the JPMorgan Task Force Report, Drew was also involved in manipulating other risk models in order to conceal the CIO's true risks from investors and regulators.

Specifically, Drew was involved in the effort to manipulate JPMorgan's comprehensive risk measure ("CRM") and the plan to artificially lower the Company's RWA by "optimizing" the models to be applied to the CIO's positions.  Further, as reflected in a January 2012 email among Drew and other senior CIO managers, Drew approved the effort to "modify the model that [the CIO] used to calculate RWA for the Synthetic Credit Portfolio, and delay any efforts to reduce RWA through changes in positions." *See, e.g.,* ¶¶142-45.

m) Drew approved the trading strategy to drastically increase the synthetic credit portfolio's size and risk in order to avoid disclosing the CIO's losses and to enable CIO traders to "defend" their positions. Drew also knew that the size and illiquidity of the synthetic credit portfolio positions required the setting aside of a liquidity reserve, and that the CIO's positions were not accurately marked-to-market. *See, e.g.,* ¶¶142-45, 159, 196-97.

n) On March 20, 2012, days before Drew ordered CIO traders to "put phones down" and cease any further trading in the synthetic credit portfolio, Drew received a daily profit-loss email from the synthetic credit portfolio, estimating a daily loss of $43 million, which was the largest daily loss to date for the synthetic credit portfolio.  That same email described a $600-800 million "lag" in the synthetic credit portfolio book, and Drew, Macris, Martin-Artajo, and Goldman had an "exhaustive" meeting concerning the "underperformance" of the synthetic credit portfolio the day after the email was sent. Signficantly, the Company's subsequent restatement resulting from the manipulation of the daily synthetic credit portfolio marks put the first quarter's unreported synthetic credit portfolio-related losses at $660 million. ¶176.

o) Drew was involved in the CIO's mismarking of the synthetic credit portfolio, as evidenced by her own instruction to Martin-Artajo on April 17, 2012 to "tweak" the marks in order to get "an extra basis point" that Drew was "trying to show."  After Drew's instruction, the synthetic credit portfolio showed a gain of $10 million, after eight consecutive days of losses. ¶176.

p) Prior to the April 13, 2012 conference call with investors Drew provided Dimon and Braunstein with detailed information concerning the synthetic credit portfolio, and drafted the Company's materially false and misleading talking points for communications concerning the "London Whale" trades with analysts and reporters on April 5, 6 and 10. *See, e.g.,* ¶¶188-90, 194-204.

349.    In her position as Chief Investment Officer, Drew received and/or had access to and a duty to monitor the following reports and/or information during the Class Period regarding the CIO and its proprietary trading which, together with the other facts alleged herein, further evidence her knowledge and/or reckless disregard—and therefore the Company's knowledge

and/or reckless disregard—of the material misrepresentations and omissions of material fact alleged above:

a) Throughout the Class Period, Drew conducted a global daily meeting at 7 a.m. for the CIO during which Drew questioned CIO traders in both the New York and London offices about their trading positions. Because of these meetings, and in combination with the weekly profit-and-loss reports Drew received as a member of senior management, Drew was fully aware not only of the size and high-risk nature of the positions within the CIO's portfolio, but also knew of all associated profits and losses, including, for example: (i) the $1 billion loss in 2008 on Fannie Mae and Freddie Mac preferred securities; (ii) the $300 million loss in 2010 on obscure foreign credit derivatives; and (iii) the positions taken by the CIO within the synthetic credit portfolio that ultimately led to over $6 billion in losses. *See, e.g.*, ¶¶86-97.

b) As a result of her daily meetings with traders, Drew also was aware that the CIO's investment strategies included trading complex securities that were antithetical to the unit's publicly represented risk management function, including multi-billion investments in tranches of CDOs and European MBS and CDOs. In fact, under Drew's direction, the CIO single-handedly rejuvenated the market for U.K. MBS eventually purchasing approximately $20 billion of U.K. MBS. *See, e.g.*, ¶90.

c) As head of the CIO, Drew knew or recklessly disregarded that, rather than managing liquidity risk, the CIO's proprietary trades themselves presented a severe liquidity risk for which the CIO did not have adequate reserves, as reflected in a 2010 memorandum issued by a senior executive. This memorandum indicated that the high-risk, speculative trades that Drew endorsed and encouraged within the synthetic credit portfolio required JPMorgan to establish a $2 to $4 billion liquidity reserve to protect the Company against losses within that portfolio. As Chief Investment Officer of the Company and head of the CIO, Drew either knew or should have known of this high-level memorandum, which was discussed at the CFO level, and addressed the need for a multi-billion dollar reserve in the unit she ran. *See, e.g.*, ¶¶111-17.

d) Based on her receipt of daily VaR calculations as a member of senior management and her duties as the head of the CIO, Drew was aware that, at the beginning of the Class Period, JPMorgan's VaR models demonstrated that positions entered into by Bruno Iksil—one trader within the CIO—could lose tens of millions of dollars on any given trading day. Based on her receipt of these daily VaR reports, Drew also was aware that at times throughout the Class Period, Iksil's individual positions put more of the Company's capital at risk than the trading activities of the entire Investment Bank. *See, e.g.*, ¶¶123-25.

e) As head of the CIO and as a result of warnings received from her risk management personnel, Drew knew or recklessly disregarded that there were no granular risk limits on the synthetic credit portfolio despite JPMorgan's representations that such risk limits were in place across all business segments. *See, e.g.*, ¶¶77-85, 107, 151.

f) Based on her position as the head of the CIO and as a member of senior management, Drew received daily VaR calculations, VaR limit breaches and stress limit breaches which informed her that the CIO was extraordinarily risky and had exceeded its VaR limit as a result of the positions taken within the synthetic credit portfolio in late 2011 and early 2012. *See, e.g.,* ¶¶125-27.

g) In January 2012, based on her position as head of the CIO and her receipt of daily reports of risk limit breaches, Drew was aware that the synthetic credit portfolio had triggered a CIO-level credit spread widening limit. *See, e.g.,* ¶¶160-62.

h) Drew was informed that the CIO's synthetic credit portfolio had triggered a second CIO-level credit spread risk limit on March 22, 2012. As a result of this risk limit trigger, Drew instituted a complete hold on any further trades within the synthetic credit portfolio. *See, e.g.,* ¶187.

i) Based on her receipt of numerous detailed loss analyses and projections, daily profit-and-loss reports and numerous discussions and communications with CIO traders, Drew was aware that as of April 13, 2012, the CIO had experienced at least $1.2 billion in losses due to positions within its synthetic credit portfolio and that losses could reach over $1 billion more. *See, e.g.,* ¶¶194-95.

j) Drew approved the trading strategy to drastically increase the synthetic credit portfolio's size and risk in order to avoid disclosing the CIO's losses and enable CIO traders to "defend" their positions. ¶153. Drew also knew that the size and illiquidity of the synthetic credit portfolio positions required the setting aside of a liquidity reserve, and that the CIO's positions were not accurately marked-to-market. ¶154.

k) As Chief Investment Officer and head of the CIO, Drew knew about or recklessly disregarded the CIO's efforts to manipulate the value of its positions in 2012, by (1) marking positions without regard to the actual market prices for those positions; and (2) "painting the tape" to manipulate the valuation of the CIO's positions. *See, e.g.,* ¶¶169-81.

350. Drew's knowledge and/or reckless disregard of the true function and purpose of the CIO as a unit engaged in speculative proprietary trading is further evidenced by (i) the publicly proclaimed importance of the CIO's purported risk management and liquidity functions, which JPMorgan admitted were "critical to both [its] soundness and profitability"; (ii) the sheer size of the CIO's portfolio, which represented the largest pool of assets managed by any JPMorgan business unit other than the Investment Bank, and the fact that the synthetic credit portfolio represented the highest risk position in that portfolio; (iii) the significant contributions

that the CIO made to JPMorgan's overall profitability, which accounted for approximately 20% of JPMorgan's net income in almost every quarter during the Class Period, and (iv) the fact that by December 2010, the CIO's synthetic credit portfolio had generated $2.8 billion in "economic value" and had generated 100% return on equity since its inception.  *See, e.g.,* ¶¶52-54, 95-97, 236.

351.   Within days after the Company's May 10, 2012 disclosure that the CIO had experienced $2 billion in losses for 2Q 2012, Drew was terminated from her post as Chief Investment Officer.   The Task Force concluded that Drew failed "to ensure that CIO management properly understood and vetted the flawed trading strategy and appropriately monitored its execution" and "to ensure that the CIO control functions – including the CIO Risk and Finance organizations – were performing well and were providing effective oversight of CIO's trading strategy."

352.   Immediately after the Company's May 10, 2012 disclosure concerning the losses within the CIO, JPMorgan disclosed that it was evaluating whether to claw-back the compensation provided to Drew, as well as the CIO traders involved, under the Company's compensation claw-back policy.   Under this policy, JPMorgan may initiate a claw-back of employee compensation "as a result of a material restatement of earnings or by acts or omissions of employees as outlined below, including a failure to supervise in appropriate circumstances." The "acts or omissions" outlined in the policy include:

> — the employee is terminated for cause or the Firm determines after termination that the employee could have been terminated for cause,
>
> — the employee engages in conduct that causes material financial or reputational harm to the Firm or its business activities,
>
> — the Firm determines that the award was based on materially inaccurate performance metrics, whether or not the employee was responsible for the inaccuracy,

— the award was based on a material misrepresentation by the employee,

— and for members of the Operating Committee and Tier 1 employees, such employees improperly or with gross negligence fail to identify, raise, or assess, in a timely manner and as reasonably expected, risks and/or concerns with respect to risks material to the Firm or its business activities.

*See* JPMorgan 2012 Proxy Statement at 24.

353.    On July 13, 2012, JPMorgan announced that Drew had returned two years' worth of compensation, totaling more than $20 million.

### E.    ZUBROW

354.    Zubrow was JPMorgan's Chief Risk Officer ("CRO") from November 2007 through January 2012.   As the Company's CRO, Zubrow was a member of JPMorgan's Operating Committee, which met once a week to discuss issues relating to the management of the Company.   The JPMorgan Task Force Report concluded that Zubrow "bears significant responsibility for failures of the CIO Risk organization, including its infrastructure and personnel shortcomings, and inadequacies of its limits and controls on the Synthetic Credit Portfolio."

355.    According to the Company's 2012 Proxy Statement, JPMorgan's CRO was responsible for, among other things, approving the setting of the risk appetite for each of JPMorgan's lines of business.   Additionally, the Company's Forms 10-K for 2009, 2010 and 2011 stated that JPMorgan's CRO was "responsible for reviewing and approving certain [market] risk limits on an ongoing basis."   To that end, according to the 2011 Form 10-K, JPMorgan's CRO was a member of the each of the individual risk committees that monitored JPMorgan's businesses.   Moreover, as a member of senior management, JPMorgan's CRO received JPMorgan's VaR calculation results and reports concerning any breaches of non-statistical risk limits, VaR loss advisories and other limits on a daily basis.   Zubrow also received the following reports on a weekly basis throughout the Class Period: (i) "stress-test results,

trends and explanations;" (ii) "market risk exposure trends, VaR trends, profit-and-loss changes and portfolio concentrations;" and (iii) an interest rate profile for the entire Company.  To the extent that any positions on JPMorgan's balance sheet breached risk limits in place, these limit breaches also were reported to the Zubrow.  During the Class Period, the CIO risk limits and advisories were breached over 330 times, with certain limits being exceeded by as much as 1000% for as long as 71 days without any form of Company action to cure the breach.  *See, e.g.* ¶¶162, 187.

356.   In his position as JPMorgan's CRO, Zubrow received and/or had a duty to monitor the following reports and/or information during the Class Period regarding the CIO and its proprietary trading which, together with the other facts alleged herein, evidence his knowledge and/or reckless disregard—and therefore the Company's knowledge and/or reckless disregard—of the material misrepresentations and omissions of material fact alleged above:

a) Zubrow either knew or recklessly disregarded that the CIO lacked even the most basic risk management infrastructure or protocols that were followed by other businesses at JPMorgan. ¶¶73-85.  As JPMorgan's SEC filings reassured investors during the Class Period, as CRO, Zubrow was "responsible for reviewing and approving" risk limits "on an ongoing basis."  Accordingly, Zubrow either knew or recklessly disregarded that there were no limits of any kind specific to the synthetic credit portfolio – and that the CIO's risk limits were not even reviewed from 2009 to 2012 – as it was his job to ensure those limits were in place and appropriately and effectively monitored and controlled risk.  Further, given the representations in JPMorgan's SEC filings that Zubrow was a member of the CIO's risk committee, Zubrow knew or recklessly disregarded that the CIO's "risk committee" did not have a charter or formal membership, and met only three times in 2011—a fact that is confirmed by Zubrow's failure to even attend the few CIO "risk committee" meetings that were actually held.  ¶¶73-76.

b) Zubrow knew that the CIO (through the synthetic credit portfolio) was not a hedge, but instead operated as a profit center that was not "primarily" focused on limiting risk posed by other positions held by the bank as was publicly represented to investors.  Indeed, Zubrow either knew or recklessly disregarded the fact that the synthetic credit portfolio was instead designed to generate profits through high-risk proprietary trading strategies that were wholly inconsistent with the CIO's purported function as a risk management unit, and posed the largest concentration of risk at the Company.  *See, e.g.,* ¶¶86-103.  As Drew testified before the Senate Subcommittee, the CIO's "<u>investment decisions are made with the full understanding of executive management</u>." ¶¶87, 107.

c) As early as December 2010, by virtue of his receipt of a "Supervisory Letter" from the OCC, Zubrow was aware that the CIO had an overdue "Matter Requiring Attention" with the OCC—a matter which arose in 2010 after the OCC reviewed the CIO's investment portfolios and directed CIO management to do a better job "document[ing] investment policies and portfolio decisions" and managing the related risks. ¶107.

d) Zubrow knew that JPMorgan manipulated the VaR model to artificially lower the CIO's Var. As demonstrated by a series of January 2012 emails, Zubrow was informed about the new CIO VaR model and the expectation that the "impact of the new VaR model…will be a reduction of CIO VaR by 44% to $57mm[]" and knew the temporary increase in the VaR limit would "end" the CIO's breach of the firm-wide VaR limit. Zubrow's knowledge of the CIO's new VaR model is further evidenced by the fact he attended a February 2012 CIO business review meeting and received presentation that included a standalone "VaR Highlights" section, which described the CIO's new VaR model. The VaR section explained that the new model helped to reduce VaR. The presentation also included a line graph indicating that the VaR model had reduced the CIO's risk rating by 50%. *See, e.g.,* ¶¶166-68.

e) Zubrow received weekly profit-and-loss reports informing him of the following trading losses within the CIO: (i) a $1 billion loss in 2008 on positions in Fannie Mae and Freddie Mac preferred securities; and (ii) $300 million loss on a set of foreign exchange trades in 2010. With respect to the $300 million loss, Zubrow also learned of the loss from Joseph Bonocore, the CIO's chief financial officer, after Bonocore became concerned that the trade had been made without any corresponding gains to offset the losses. Zubrow reported Bonocore's concerns to Defendant Dimon. ¶¶88-89.

f) In his capacity as a member of senior management, Zubrow received daily VaR calculations informing him as of the beginning of the Class Period that JPMorgan's VaR models demonstrated that positions entered into by Bruno Iksil—one trader within the CIO—could lose tens of millions of dollars on any given trading day. Zubrow also was aware that, based on his receipt of these daily VaR reports throughout the Class Period, Iksil's individual positions put more of the Company's capital at risk than the entire Investment Bank. ¶¶121-26.

g) As JPMorgan's CRO, and as a member of the individual risk committees for JPMorgan's businesses, Zubrow was aware of or recklessly disregarded concerns raised by his direct reports, including *inter alia*, Peter Weiland, then the most senior risk officer in the CIO, Winters, and Black, regarding the proprietary trades the CIO was amassing and the lack of risk management in place with respect to those risky positions. ¶¶69-76, 121-27.

h) Zubrow was informed that the CIO had breached stress loss risk limits in March 2012. Further, prior to JPMorgan's April 13, 2012 investor conference call, Zubrow was informed that the synthetic credit portfolio had lost over $400 million in just one day of trading and that losses in the synthetic credit portfolio had already reached $1.2 billion, and received numerous internal analyses showing that the synthetic credit portfolio's losses could exceed $1 billion in the second quarter. ¶¶183-99.

i) Zubrow was informed in an April 5, 2012 email that Drew sent to members of JPMorgan's Operating Committee that the CIO's synthetic credit portfolio had lost $500 million. That email also demonstrated the synthetic credit portfolio was not a hedge, explaining that it (i) had "been extremely profitable for the company (circa 2.5 billion) over the last several years," (ii) had generated a "fourth quarter 400 million gain" as the "result of the unexpected american airlines default" and (iii) had "moved into a long position," *i.e.*, was not providing any credit protection to the Company.

357.    In January 2012, Zubrow became JPMorgan's head of Corporate and Regulatory Affairs.  In that capacity, Zubrow signed the February 13, 2012 Dodd-Frank Comment Letter that JPMorgan submitted in support of looser restrictions on proprietary trading.

358.    Notwithstanding Zubrow's knowledge of the speculative (non-hedging), short-term nature of the trading activity in the synthetic credit portfolio, Zubrow urged Dimon and Braunstein in an April 12, 2012 email bearing the subject line "If asked about London / CIO and Volcker" to tell investors, if questioned about the Whale trades during the first quarter earnings call, that the synthetic credit portfolio trading "Activity was NOT short term trading" and "Was part of LONG TERM hedging of the banks portfolio."

359.    Zubrow announced his retirement from JPMorgan in October 2012, and his retirement was effective as of February 2013.

## F.    JPMORGAN

360.    JPMorgan knowingly and/or recklessly made the materially false and/or misleading statements and omissions of material fact alleged herein based on the fact that the Individual Defendants identified above, namely, the Company's CEO and CFOs throughout the Class Period, the Company's Chief Investment Officer and the Company's Chief Risk Officer, knew and/or recklessly disregarded that the Company's statements were materially false and/or misleading, and/or omitted material facts at the times that such statements were made.  Each of these Defendants was among the most senior executives of JPMorgan throughout the Class Period and a member of the Company's Operating Committee.  Each of these individuals was

also responsible for managing the risk, capital and/or liquidity functions and needs of the Company.

361. JPMorgan's knowledge of its operations, the fact that there was no risk management infrastructure in the CIO, and the true function and purpose of the CIO as a proprietary trading unit, may be imputed to the Company and its senior management based on, among other things, (i) the publicly proclaimed importance of the CIO's purported risk management and liquidity functions, which JPMorgan admitted were "critical to both [its] soundness and profitability"; (ii) the sheer size of the CIO's portfolio, which represented the largest pool of assets contained in any JPMorgan business unit other than the Investment Bank; and (iii) the significant contributions that the CIO made to JPMorgan's overall profitability, which accounted for approximately 20% of JPMorgan's net income in almost every quarter during the Class Period. *See, e.g.,* ¶¶50-54, 95-97, 252. As a result, among other things, JPMorgan knew or recklessly disregarded the facts that:

   a) The CIO lacked even the most basic risk management infrastructure or protocols that were followed by other businesses at JPMorgan—including the fact that the CIO did not have a Chief Risk Officer, had a "risk committee" which had no formal membership, lacked a charter and met only three times in 2011, and whose few actual meetings were not even attended by the Company's Chief Risk Officer. ¶¶73-76.

   b) The CIO (through the synthetic credit portfolio) was not a hedge, but instead operated as a profit center that was not "primarily" focused on limiting risk posed by other positions held by the Company. Indeed, JPMorgan either knew or recklessly disregarded the fact that the synthetic credit portfolio was instead designed to generate profits through high-risk proprietary trading strategies that were wholly inconsistent with the CIO's purported function as a risk management unit, and posed the largest concentration of risk at the Company—a fact that was confirmed by Drew, who testified to the Senate Subcommittee that the CIO's "investment decisions are made with the full understanding of executive management." ¶87.

362. Peter Weiland, Head of Market Risk for the CIO, stated in his written testimony to the Senate Permanent Subcommittee on Investigations that "the size of the synthetic credit portfolio was well understood among the senior management at JPMorgan." In fact, the

portfolio was so large and comprised of such "significant risk" that it "dominated CIO VaR for most of the period from 2008 to 2012, and it had significant impact on stress test results as well."

363.    Throughout the Class Period, JPMorgan deliberately concealed key information from the OCC—its chief banking regulator—about the synthetic credit portfolio, further evidencing the Company's intent to defraud.  Indeed, the Company did not even disclose the existence of the synthetic credit portfolio to the OCC until January 2012.   As Braunstein admitted in his testimony before the Senate Subcommittee, regulators "did not get the detailed [synthetic credit portfolio] positions regularly" or on a reoccurring basis as part of the Company's normalized reporting.  JPMorgan also concealed the following additional facts from the OCC during the Class Period:

a)  JPMorgan did not disclose to the OCC that the CIO engaged in a massive trading strategy in 2011 that was designed to last only a few months wherein the CIO traders increased the exposure of the synthetic credit portfolio by 10,000% to a particular credit index over the span of one month from October to November 2011.  The Company also did not report to the OCC that the notional size of the synthetic credit portfolio grew tenfold from $4 billion to $51 billion in 2011.

b)  In January 2012, in the Company's first quarterly meeting with the OCC after first disclosing the existence of the synthetic credit portfolio, JPMorgan falsely told the OCC that the CIO planned to reduce the synthetic credit portfolio.  However, rather than dispose of the high risk assets in the synthetic credit portfolio, JPMorgan "doubled down," adding heavily to the synthetic credit portfolio's positions.  Over the course of the first quarter, the CIO tripled the notional size of the synthetic credit portfolio from $51 billion to $157 billion, purchasing most of the positions comprising the synthetic credit portfolio during the first quarter.  Accordingly, after the Company told its regulators that it was reducing the synthetic credit portfolio, the Company rapidly increased its size by purchasing over $100 billion in positions, in the short term, none of which were intended to "hedge" any existing or identifiable positions. *See, e.g.,* ¶¶126, 132-35, 146-49.

c)  Also in January 2012—at the same time that JPMorgan was fraudulently mismarking the CIO's synthetic credit portfolio—and without any notice to the OCC, JPMorgan began to omit from its monthly Treasury Executive Management Reports ("EMRs") to the OCC any performance data on the CIO.  Rather, the CIO began to generate its own monthly EMRs.  But JPMorgan did not provide these CIO-specific EMRs to the OCC until April 10, 2012—after the London Whale stories first appeared in the press and the OCC and Federal Reserve were prompted by such stories to request information on the

Whale positions.  Braunstein testified to the Senate Subcommittee that this was the first time that the synthetic credit portfolio positions had ever been disclosed to the OCC. Even then, according to the OCC, the Company's "Summary of Positions" table provided an incomplete group of CIO positions in various credit indices and tranches by notional amount and did not provide basic profit and loss information for those positions, rendering the data the Company did provide "useless."  *See, e.g.*, ¶¶191-93.

364.    JPMorgan's senior managers knew or recklessly disregarded that CIO traders had mismarked the synthetic credit portfolio in the first quarter of 2012.  As reflected in the Senate Report, because of the CIO's fraudulent mismarking, the CIO's marks differed materially from the Investment Bank's marks for the same positions, even though the CIO was supposed to use the Investment Bank's marks under Company policy.  The discrepancies between the valuations of the two separate divisions of JPMorgan grew so large that they were investigated by the senior managers of the Company—a fact that the Senate Report concluded was a "red flag" of a significant mismarking problem.  Indeed, the CIO's collateral disputes with other counterparties grew to as large as $690 million, and were so significant that they were discussed as a cause for concern by the Company's most senior officers, including Drew, Braunstein and Hogan. *See, e.g.*, ¶¶176-80.

365.    Rather than immediately investigate or correct the mismarking, JPMorgan's Controller approved the CIO's fraudulent valuations.  Specifically, the Company's Controller's office generated a report that attempted to justify the CIO traders' fraudulent marks.  That report showed that the CIO's marks materially deviated from the bid-offer midpoints, independent prices, and the CIO's own trades, and concluded that the CIO's marks understated losses by at least $512 million.

366.    JPMorgan's scienter is further demonstrated by the fact that the Company disregarded regulators' instructions to improve the independence of CIO risk managers in 2009. As the Senate Report concluded, after regulators' warnings, there was no meaningful effort to

empower or improve the independence of CIO risk managers, who had no authority to enforce risk limits.  Indeed, as revealed in the Senate Report, CIO risk managers' primary function was to work with "CIO traders and quantitative analysts to challenge or modify the risk metrics, or approve limit increases or exemptions."

## VII.   LOSS CAUSATION

367.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Lead Plaintiffs and the Class.  Indeed, the Company's disclosures of previously misrepresented and concealed facts about the CIO's high-risk trading and resulting losses caused the price of JPMorgan's common stock to decline over $8 per share, wiping out billions of dollars of shareholder wealth.  As Defendant Dimon admitted in testimony to Congress, the CIO's trading "did affect our shareholders, yes."

368.   JPMorgan itself in the JPMorgan Task Force Report squarely attributed the CIO's losses to "flawed trading strategies" and "deficiencies in risk management" that were concealed from investors throughout the Class Period.  Indeed, the Task Force concluded that the CIO's losses were directly caused by, among other things, JPMorgan's failure to "ensure that the controls and oversight of CIO evolved commensurately with the increased complexity and risks of CIO's activities," "risk management weaknesses," and the "absence of granular" risk limits, including the lack of any limits by size, asset type or risk factor specific to the synthetic credit portfolio.

369.   During the Class Period, Lead Plaintiffs and the Class purchased JPMorgan common stock at artificially inflated prices and were damaged when the price of JPMorgan common stock declined when the truth was revealed, and/or the information alleged herein to have been concealed from the market was revealed, and/or the concealed risks alleged herein materialized, causing investors' losses.  Specifically, JPMorgan's common stock price declined

dramatically on May 10, 2012, when JPMorgan first announced that it had suffered massive trading losses in the CIO, and continued to decline as additional details concerning the CIO's losses, and their foreseeable impact on the financial prospects of the Company, were revealed to the market.

370.   Throughout the Class Period, the Defendants made materially false and misleading statements and omissions concerning the purpose and function of the CIO, the strength of the Company's risk management practices and its appetite for risk, and the Company's financial results – in particular, its quarterly and annual net income and earnings per share.   In addition, in 2012 Defendants made additional materially false and misleading statements and omissions concerning the amount of the CIO's VaR and JPMorgan's methodology for calculating the CIO's VaR, and also artificially inflated the price of JPMorgan common stock by discrediting reports about high-risk trading attributed to the London Whale and misrepresenting the CIO's purpose as a hedge against risks that the Company was exposed to in other business units.   Had the Defendants been truthful about these matters throughout the Class Period, Lead Plaintiffs and the Class would not have purchased JPMorgan's common stock, or would not have purchased their shares at the artificially inflated prices at which they were offered.

371.   As a direct result of Defendants' misrepresentations and omissions of material facts, the price of JPMorgan common stock was artificially inflated throughout the Class Period. This artificial inflation was removed from the price of JPMorgan common stock as the truth about the function and the risk associated with the CIO, JPMorgan's manipulation of the CIO's VaR, the Company's abandonment of risk controls and internal controls and its exposure to

substantial losses from the CIO's speculative trades was revealed and/or materialized as alleged in ¶¶205-18.

372. On May 10, 2012, JPMorgan's common stock closed at $40.74 per share. That day, after the markets closed, JPMorgan convened an emergency conference call with analysts. During this call, JPMorgan disclosed that it would be reducing its previously-issued guidance of $200 million in net income for the Corporate segment down to a loss of $800 million due to a $2 billion trading loss on the CIO's synthetic credit portfolio. Dimon further stated that JPMorgan would be restating its previously-reported VaR for the first quarter of 2012 from $67 million to $129 million.

373. Dimon conceded JPMorgan's fault with respect to the catastrophic losses, admitting, in part, that "these were egregious mistakes" and that the losses were caused by "violat[ing] our own standards and principles." Dimon further admitted that the proprietary trading strategy that the Company employed in the CIO's synthetic credit portfolio "was flawed, complex, poorly reviewed, poorly executed, and poorly monitored." Notwithstanding Dimon's concession and the fact that he was told a month earlier that the losses associated with the CIO position could be as high as $9 billion, he continued to conceal the full risk associated with the Class Period misstatements and omissions during the May 10, 2012 conference call by carefully downplaying the potential for realizing any additional losses on the portfolio by assuring analysts and investors that "we're not going to do something stupid. We're willing to hold as long as necessary inventory and we're willing to bear volatility." Dimon further comforted investors by assuring them that the fallout was manageable and unlikely to affect future results, stating that "[o]ne of the reasons we keep a fortress balance sheet is to handle surprises" and stressing that he estimated that JPMorgan would "still earn approximately $4 billion after-tax" for the quarter.

374.    Dimon also falsely assured investors during the May 10, 2012 conference call that the $2 billion dollar loss would not affect JPMorgan's ability to carry out the much anticipated $15 billion share buyback program announced by the Company in March 2012.  In fact, during the conference call, Dimon was asked directly for reassurance that "this [the $2 billion trading loss] doesn't change anything with the . . . buyback capability at all, does it?"  Dimon responded by assuring investors:  "I don't think so because our capital ratios are strong, going to meet all our commitments.  We can handle a highly stretched environment.  So no, we don't think so."  As Dimon stated, "One of the reasons we keep a fortress balance sheet is to handle surprises."

375.    Also on May 10, 2012, JPMorgan issued a Form 10-Q that reaffirmed the admittedly materially false and misleading financial results, including reporting net income of $5.4 billion, that the Company first reported on April 13, 2012.  In addition, the Form 10-Q also repeated the false description of the CIO's investments as being "used to manage structural and other risks," and reiterated the false and misleading description of the CIO as a risk management unit.

376.    Despite Dimon's spin and efforts at damage control, the disclosures on May 10, 2012 shocked the market, causing the price of JPMorgan's common stock to plummet from a close of $40.74 per share on May 10, 2012 to a close of $36.96 per share on May 11, 2012 – a drop of almost 10%.

377.    Several market analysts following JPMorgan immediately issued reports on the unexpected $2 billion trading loss.  For example:

- Sterne Agee said the disclosure left investors "stunned" and was a "meaningful strike against JPM and its history of sound risk management";

- Meredith Whitney and Morningstar called the disclosure of the $2 billion trading loss a "surprise";

- Baird Equity Research called the disclosure and subsequent loss "unexpected";

- Oppenheimer further confirmed that the prior press reports about the CIO's trades, which JPMorgan denied, "were indeed correct" and that the losses caused by the proprietary activity within the CIO's synthetic credit portfolio was certainly not "all a tempest in a teapot as Dimon had said on the 1Q conference call"; and

- Rochdale Research stated, "I will not disagree that the JPMorgan Chase announcement last Thursday was a shock to me."

378.   While market analysts expressed surprise at the $2 billion trading loss, they were nevertheless reassured by Dimon's comments that the Company's share repurchase program would not be affected by this catastrophic loss, noting that the share repurchase program was an important mechanism for controlling any further depression of JPMorgan's common stock price resulting from the losses stemming from the CIO's undisclosed proprietary trading activities:

- Macquarie Equities Research reported that while it was updating JPMorgan estimates to account for the "recently announced trading losses," it viewed "the buybacks as further affirmation that the impact of the trading losses is well controlled, as the company was still buying shares in April as trading losses were likely occurring. We expect repurchase activity to increase due to the recent sell off."

- Oppenheimer reported that the trading loss is "a black eye but with a…$15B buyback authorization we think the downside is limited and the upside still the same.  This too shall pass."

- Morningstar reported that "Dimon recently stated that he would rather repurchase undervalued stock...than pay out dividends—evidence, in our view, that value creation is more important at this firm than the fickle demands of market participants."

- Sterne Agee reported that "[JPMorgan's] $12B share repurchase authorization gives JPM significant flexibility to deploy capital and buy back shares in the event of outsized price weakness – providing an implicit floor for the stock."

- Oppenheimer also reported that "we also note that JPM has a fortress balance sheet and a $15 billion buyback authorization.  If the stock were significantly pressed in the coming dates we are virtually certain that JPM would be buying stock."

379.   As the market digested the May 10, 2012 announcement and additional information was disclosed to the market, including announcements that the SEC and Department

of Justice were investigating the CIO's trades, JPMorgan's common stock price continued to trade lower, and by May 16, 2012, it had fallen to $35.46 per share.

380.    On May 16, 2012, after the close of trading, the *New York Times* reported that JPMorgan's trading losses had already ballooned by "at least $1 billion," in only four trading days.  This additional disclosure confirmed that the risks posed by JPMorgan's proprietary CIO trading were still materially understated by JPMorgan and, contrary to Dimon's statements just days prior, were spiraling out of control.  Further, it was reported that the Federal Reserve was "examining the scope of the growing losses and the original bet, along with whether [the CIO] took risks that were inappropriate for a federally insured depository institution."  In light of these developments, the *Times* noted that "if the losses continue to mount, the outlook for the bank's dividend will grow uncertain."

381.    In response to the May 16, 2012 disclosure, the price of JPMorgan common stock declined even further, falling another $1.53 per share in intraday trading on May 17, 2012 to $33.93 per share.  To this point, JPMorgan's common stock price had declined by 16.7% as a direct and proximate result of the partial disclosure of the truth about the CIO's high-risk trading strategies and/or the materialization of the concealed risks of those strategies, falling from $40.74 per share on May 10, 2012 to $33.93 per share on May 17, 2012, or $6.81 per share.

382.    On May 21, 2012, JPMorgan made further disclosures about the far-reaching impact of the CIO's massive losses on the Company.  During an investor meeting sponsored by Deutsche Bank in New York, Dimon did an about-face from his May 10, 2012 comments and announced that JPMorgan was in fact halting the anticipated $15 billion share buyback program as the firm attempted to extricate itself from the CIO trading debacle. As the *Wall Street Journal* and several other news outlets reported, JPMorgan confirmed that its decision to suspend the $15

billion share repurchase was based upon the CIO's trading losses, informing the public that "we want to box this thing [with respect to the trading losses] first."  This announcement represented the materialization of another undisclosed risk, and signaled to the market that JPMorgan would be forced to change the way it operated in the wake of these massive losses.

383.    JPMorgan's disclosure of its inability to carry out the $15 billion stock buyback was the subject of analyst reports:

- Credit Suisse reported that "[t]oday's announcement represents a shift in tone from the May 10th conference call in which management indicated that the losses would not affect their capital plans" and that "we [Credit Suisse] assumed that JPM would be an active repurchaser of shares despite the disclosed trading losses."  Instead though, "Jamie Dimon announced that the buyback program is on hold until the size of potential losses becomes clearer."

- Morningstar reported that the "trade not only impairs our view of risk management practices at the bank, but also ensures that management cannot create value through repurchases in the near term."

384.    In response to the May 21, 2012 disclosure, the price of JPMorgan common stock fell further, dropping to $32.51 per share.  In total, the disclosures described above erased $8.23 per share (or over 20% of its value) from the price of JPMorgan common stock prior to the first disclosure on May 10, 2012, eliminating over $31.4 billion in shareholder wealth in just 10 days.

385.    It was entirely foreseeable to Defendants that misrepresenting and concealing from the public, *inter alia*:  (i) the Company's intentional and undisclosed transformation of the CIO from a risk management unit into a profit center; (ii) the use of the CIO to generate short-term profit through proprietary trading without augmenting the CIO's risk management controls, including the setting of appropriate market risk limits (or any at all); (iii) the Company's manipulation of its financial results through its knowing failure to increase its reserves; and (iv) the Company's manipulation of the CIO's VaR in order to conceal the growing risks related to the CIO's investment strategies, would artificially inflate the price of JPMorgan's common

stock. It was also foreseeable that the ultimate disclosures of this information, and the materialization of the concealed risks created by JPMorgan's aforementioned conduct, would cause the price of JPMorgan's common stock to decline as the inflation caused by the Company's earlier materially false and misleading statements and omissions of material fact was removed from the stock price. Accordingly, the conduct of Defendants as alleged herein proximately caused foreseeable losses for Lead Plaintiffs and the other members of the Class who purchased or otherwise acquired JPMorgan common stock during the Class Period.

## VIII. THE FRAUD ON THE MARKET PRESUMPTION OF RELIANCE APPLIES

386.    At all relevant times, the market for JPMorgan common stock was efficient for the following reasons, among others:

1.    JPMorgan common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market, under the symbol "JPM";

2.    As a regulated issuer, JPMorgan filed periodic public reports with the SEC;

3.    JPMorgan regularly communicated with public investors via conference calls and other established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communication with the financial press and other similar reporting services; and

4.    JPMorgan was followed by numerous securities analysts employed by major brokerage firms throughout the Class Period, including Bank of America/Merrill Lynch, Sanford Bernstein, Morgan Stanley, UBS, Deutsche Bank, Oppenheimer & Co., and Nomura, who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

387.    As a result, the market for JPMorgan common stock promptly digested current information with respect to JPMorgan from all publicly-available sources and reflected such information in the price of these securities. Under these circumstances, all purchasers of the

Company's publicly-traded common stock during the Class Period suffered similar injury through their purchases at artificially inflated prices, and a presumption of reliance applies.

## IX.   THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

388.   The PSLRA's statutory safe harbor and/or the bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the materially false and/or misleading statements pleaded in this Complaint.

389.   None of the statements complained of herein was a forward-looking statement. Rather, each was a historical statement or a statement of purportedly current facts and conditions at the time each statement was made.

390.   To the extent that any materially false and/or misleading statement, alleged herein, or any portion thereof, can be construed as forward-looking, such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement.  As set forth above in detail, given the then-existing facts contradicting Defendants' statements, the generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

391.   To the extent that the statutory safe harbor may apply to any materially false and/or misleading statement alleged herein, or a portion thereof, Defendants are liable for any such false and/or misleading forward-looking statement because at the time such statement was made, the speaker actually knew the statement was false, or the statement was authorized and/or approved by an executive officer of JPMorgan who actually knew that the statement was false.

392.   Moreover, to the extent that JPMorgan and the Individual Defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks," those disclosures were

also materially false and/or misleading because they did not disclose that the risks that were the subject of such warnings had materialized and/or JPMorgan and the Individual Defendants had actual knowledge of undisclosed material adverse facts that rendered such "cautionary" disclosures materially false and/or misleading.

## X.    CLASS ACTION ALLEGATIONS

393.    Lead Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a Class consisting of all persons and entities who purchased or otherwise acquired JPMorgan common stock between February 24, 2010 and May 21, 2012 inclusive, and who were damaged thereby. Excluded from the Class are (i) Defendants (as set forth herein), (ii) present or former executive officers of JPMorgan, members of JPMorgan's Board of Directors, and members of their immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii))), (iii) any of the foregoing individual's and entity's legal representatives, heirs, successors or assigns, and (iv) any entity in which Defendants have or had a controlling interest or any affiliate of JPMorgan.

394.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, JPMorgan common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least thousands of members in the proposed Class.  As of May 21, 2012, JPMorgan had approximately 3.8 billion shares of common stock outstanding.  Record owners and other members of the Class may be identified from records maintained by JPMorgan and/or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

395.    Lead Plaintiffs' claims are typical of the claims of the other members of the Class as all members of the Class purchased or otherwise acquired JPMorgan common stock during the Class Period and were similarly affected by Defendants' wrongful conduct in violation of the federal laws that is complained of herein.

396.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.  Lead Plaintiffs have no interests that are adverse or antagonistic to the Class.

397.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impracticable for Class members individually to seek redress for the wrongful conduct alleged herein.

398.    Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

1. Whether the federal securities laws were violated by Defendants' acts as alleged herein;

2. Whether Defendants' statements to the investing public during the Class Period misrepresented and/or omitted material facts;

3. Whether and to what extent the market prices of JPMorgan common stock, were artificially inflated and/or distorted during the Class Period due to the misrepresentations and/or omissions of material fact complained of herein;

4. Whether the Defendants named under Section 10(b) of the Exchange Act acted with scienter;

5. Whether reliance may be presumed pursuant to the fraud-on-the-market doctrine; and

6. Whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of damages.

399.     The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to the individual Class members, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual Class members that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair their ability to protect their interests.

400.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## XI.     CAUSES OF ACTION

### COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against JPMorgan and the Individual Defendants

401.     Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  This Count is brought pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. §78(j)(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, on behalf of Lead Plaintiffs and all other members of the Class against JPMorgan and the Individual Defendants.

402.     As set forth above, JPMorgan and the Individual Defendants disseminated or approved the false statements and/or omissions alleged above and summarized below, which each defendant knew or recklessly disregarded were misleading in that they misrepresented and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.  Defendants carried out a plan, scheme and course of conduct that:  (i) deceived the investing public, including Lead Plaintiffs

and other Class members, as alleged herein; and (ii) caused Lead Plaintiffs and other members of the Class to purchase JPMorgan common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, JPMorgan and the Individual Defendants took the actions set forth herein.

403. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Lead Plaintiffs and other members of the Class in connection with their purchases of JPMorgan common stock in an effort to maintain artificially high market prices for JPMorgan common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. As alleged herein, the material misrepresentations contained in, or the material facts omitted from, Defendants' public statements included, but were not limited to, materially false and/or misleading representations and omissions during the Class Period regarding: (i) the true purpose, objective and activities of the CIO; (ii) JPMorgan's risk management framework; (iii) the establishment of and adherence to limits to monitor the size, asset type or other risk factors associated with the CIO's synthetic credit portfolio; (iv) how JPMorgan's VaR was assessed with respect to the CIO and the amount of VaR related to the CIO positions for 1Q 2012; and (v) the net income and earnings per share results, among others, reported in the Company's SEC filings and related public documents.

404. These Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the United States mail, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead

Plaintiffs and the other members of the Class; made various false and/or misleading statements of material facts and omitted to state material facts that were required to be disclosed; made the above statements and omissions with knowledge or a reckless disregard for the truth; and employed devices, schemes and artifices to defraud in connection with the purchase or sale of securities, which were intended to, and did: (i) deceive the investing public, including Lead Plaintiffs and the other members of the Class, as alleged herein; (ii) artificially inflate, distort, and/or maintain the market price of JPMorgan common stock; and (iii) cause Lead Plaintiffs and the other members of the Class to purchase JPMorgan common stock during the Class Period at artificially inflated and/or distorted prices.

405.    Each quarterly and year-end report that JPMorgan filed with the SEC on Forms 10-K and 10-Q during the Class Period, including those identified in ¶¶161, 166, and 189 above, included certifications signed by Defendants Dimon and Cavanagh (who signed certifications that accompanied the 2009 Form 10-K and First Quarter 2010 Form 10-Q) or Braunstein (who filed certifications that accompanied the remaining Forms 10-K and 10-Qs filed during the Class Period).  In those certifications, Defendants Dimon, Cavanagh and Braunstein certified that they had reviewed the relevant Form 10-K or 10-Q, and attested to the accuracy and completeness of the information provided therein.  Specifically, each such certification stated that the executing officer had reviewed the accompanying report and, among other things, certified that:

> 1.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 2.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

Accordingly, Defendants Dimon, Cavanagh and Braunstein are liable for the misrepresentations contained in each of the SEC filings that they certified to be complete and accurate.

406.    JPMorgan and the Individual Defendants had a duty to disclose truthful, accurate, and complete information concerning the CIO's function and activities, its risk management, its VaR, and the Company's financial results to prevent their statements from being misleading. These Defendants were also required to update and/or correct their prior misstatements and/or omissions, and were obligated to update any statements or omissions that had become false and/or misleading as a result of intervening events.

407.    JPMorgan and Defendant Dimon are liable for all materially false and/or misleading statements and omissions of material fact made during the Class Period, and Defendants Cavanagh and Braunstein are liable for all materially false and/or misleading statements and omissions of material fact made during their respective tenures as CFO, including, without limitation, those set forth above in ¶¶214-317.  In addition, Defendants Drew and Zubrow made and are liable for the materially false and/or misleading statements and omissions of material fact set forth above in ¶¶297, 299-300, 303-13.  Defendant Zubrow also made and is liable for the materially false and/or misleading statements and omissions of material fact in the February 13, 2012 comment letter as set forth above in ¶¶275-76.

408.    As alleged above, the Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Defendants' material misrepresentations and/or omissions were issued knowingly or recklessly and for the purpose and effect of concealing information concerning the CIO's function and activities, its risk

management, its VaR, and the Company's financial results from the investing public and supporting the artificially inflated price of its securities.

409.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of JPMorgan common stock was artificially inflated throughout the Class Period.  In ignorance of the fact that market prices of JPMorgan common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by JPMorgan and the Individual Defendants or upon the integrity of the market in which the securities traded, and/or in the absence of material adverse information that was known to or recklessly disregarded by JPMorgan and the Individual Defendants, Lead Plaintiffs and the other members of the Class purchased or otherwise acquired JPMorgan common stock during the Class Period at artificially inflated prices and were damaged thereby.

410.    At the time of the material misrepresentations and/or omissions, Lead Plaintiffs and the other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiffs and the other members of the Class known the truth regarding JPMorgan's actual financial condition and business practices, Lead Plaintiffs and the other members of the Class would not have purchased or otherwise acquired JPMorgan common stock, or, if they had purchased or otherwise acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices that they paid.

411.    By virtue of the foregoing, JPMorgan and the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Lead Plaintiffs and to the other members of the Class, each of whom has been damaged as a result of such violations.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

412. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein. This Count is brought pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), on behalf of Lead Plaintiffs and all other members of the Class against the Individual Defendants.

413. During their tenures as officers of JPMorgan, each of the Individual Defendants was a controlling person of JPMorgan within the meaning of Section 20(a) of the Exchange Act. By reason of their positions of control and authority as officers of JPMorgan, the Individual Defendants exercised day-to-day control over the Company and had the power and authority to cause JPMorgan to engage in the wrongful conduct complained of herein. The Individual Defendants were able to and did control, directly and indirectly, the content of the public statements made by JPMorgan during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

414. In their capacities as senior officers of JPMorgan, and as alleged more fully above in ¶¶318-59, each of the Individual Defendants was made aware of the circumstances surrounding the CIO's function and activities, its risk management, and its VaR, and was a culpable participant in the underlying violations of Section 10(b) alleged above.

415. As set forth above, JPMorgan violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons of JPMorgan and, as a result of their own aforementioned conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as JPMorgan is liable under Section 10(b) of the Exchange Act and

Rule 10b-5 promulgated thereunder, to Lead Plaintiffs and other members of the Class who purchased or otherwise acquired JPMorgan common stock during the Class Period. Moreover, as detailed above, during the Class Period during which the Individual Defendants served as officers of JPMorgan, each of the Individual Defendants is responsible for the material misstatements and omissions made by JPMorgan.

416.   As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of JPMorgan common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

1.   Determining that this action is a proper class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

2.   Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

3.   Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

4.   Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated:  April 12, 2013                          Respectfully Submitted,

                                                **BERNSTEIN LITOWITZ BERGER
                                                & GROSSMANN LLP**

                                                Steven B. Singer

Avi Josefson
Jai Chandrasekhar
Michael D. Blatchley
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
steven@blbglaw.com
avi@blbglaw.com
jai@blbglaw.com
michaelb@blbglaw.com

**GRANT & EISENHOFER P.A.**
Jay W. Eisenhofer
Daniel L. Berger
Jeffrey A. Almeida
485 Lexington Avenue
New York, NY 10017
Telephone:  (646) 722-8505
Facsimile:  (302) 622-7004
jeisenhofer@gelaw.com
dberger@gelaw.com
jalmeida@gelaw.com

**KESSLER TOPAZ
MELTZER & CHECK LLP**
Andrew L. Zivitz
Matthew L. Mustokoff
Johnston de F. Whitman, Jr.
Jennifer Joost
280 King of Prussia Road
Radnor, PA 19087
Telephone:  (610) 667-7706
Facsimile:  (610) 667-7056
azivitz@ktmc.com
mmustokoff@ktmc.com
jwhitman@ktmc.com
jjoost@ktmc.com

*Lead Counsel for Lead Plaintiffs and the Class*

**STOLL STOLL BERNE LOKTING & SHLACHTER P.C.**
Keith Ketterling
Keith Dubanevich

206

209 Southwest Oak Street
Portland, OR 97204
Telephone: (503) 227-1600
Facsimile: (503) 227-6840
KKetterling@stollberne.com
KDubanevich@stollberne.com

*Special Assistant Attorneys General and
Counsel for Lead Plaintiff the State of
Oregon by and through the Oregon State
Treasurer on behalf of the Common School
Fund and, together with the Oregon Public
Employee Retirement Board, on behalf of
the Oregon Public Employee Retirement
Fund*