IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE JPMORGAN CHASE & CO. SECURITIES LITIGATION | Master File No. 1:12-cv-03852-GBD |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

Daryl A. Libow
Christopher M. Viapiano
SULLIVAN & CROMWELL LLP
1701 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Telephone: (202) 956-7500
Facsimile: (202) 956-6973
libowd@sullcrom.com
viapianoc@sullcrom.com

Richard C. Pepperman, II
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile: (212) 291-9113
peppermanr@sullcrom.com

*Counsel for Defendants*

June 11, 2013

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................1

SUMMARY OF ARGUMENT ...................................................................3

BACKGROUND ...................................................................7

    A.    Defendants ...................................................................7

    B.    CIO and Its Synthetic Credit Portfolio...................................................................7

    C.    Changes to the SCP in the First Quarter of 2012...................................................................10

    D.    CIO Risk Limit Excessions During the First Quarter of 2012...................................................................11

    E.    The Initial Media Reports and JPMorgan's Disclosure of the SCP's Losses........12

    F.    JPMorgan's Disclosure of Additional Losses in the SCP and Its Restatement of First Quarter of 2012 Reported Earnings......................................14

    G.    The Alleged False and Misleading Statements...................................................................14

PLAINTIFFS' HEIGHTENED PLEADING BURDEN ...................................................................16

ARGUMENT ...................................................................19

I.    Plaintiffs Do Not State a Section 10(b) Claim Based on General Descriptions of CIO's Overall Purposes and Activities in JPMorgan's 2010 and 2011 SEC Filings ........19

    A.    Plaintiffs Do Not Adequately Allege That These General Statements Describing CIO as a Whole Were False or Misleading........................................20

        1.    Plaintiffs Do Not Allege Specific Facts Showing That CIO Was Not "Primarily Concerned" with Managing Structural Market Risks in 2010 and 2011...................................................................20

        2.    Plaintiffs Do Not Seriously Challenge the Accuracy of the Other 2010 and 2011 Statements about CIO ...................................................................22

        3.    Plaintiffs Fail to Show That the 2010 and 2011 Description of CIO VaR Was False or Misleading ...................................................................22

    B.    Plaintiffs Do Not Adequately Allege a Strong Inference of Scienter...................23

        1.    Plaintiffs Do Not Adequately Plead That Dimon Acted with an Intent to Deceive or Defraud...................................................................24

|     | 2.  | Plaintiffs Do Not Adequately Plead That Cavanagh and Braunstein Acted with an Intent to Deceive or Defraud | 27 |

|     | 3.  | Plaintiffs Do Not Adequately Plead Corporate Scienter | 28 |

II. Plaintiffs Do Not State a Section 10(b) Claim Based on Descriptions of Firm-Wide Risk Management Practices in JPMorgan's 2010 and 2011 SEC Filings ............... 29

    A. The Challenged Descriptions of JPMorgan's Firm-Wide Risk Management Practices Are Too General to Be Material ...................... 29

    B. Plaintiffs Do Not Adequately Allege That General Descriptions of JPMorgan's Firm-Wide Risk Management Practices Were False or Misleading ............................................................ 31

    C. Plaintiffs Do Not Adequately Allege a Strong Inference of Scienter ................... 35

        1. Plaintiffs Do Not Adequately Plead That Dimon, Cavanagh or Braunstein Acted with an Intent to Deceive or Defraud ........................... 35

        2. Plaintiffs Do Not Adequately Plead Corporate Scienter ........................... 36

III. Plaintiffs Do Not State a Section 10(b) Claim Based on Alleged Earnings Misstatements Caused by a Supposed Failure To Establish a "Liquidity Reserve" ......... 37

    A. Plaintiffs Do Not Adequately Allege a Violation of GAAP ................................. 38

    B. Plaintiffs Do Not Adequately Allege That the Opinions and Judgments Reflected in JPMorgan's Reported Earnings Were Actionably False ................. 40

    C. Plaintiffs Do Not Adequately Allege a Strong Inference of Scienter ................... 41

IV. Plaintiffs Do Not State a Section 10(b) Claim Based on Statements Made in 2012. ........ 42

    A. Plaintiffs Again Fail to State a Claim Based on General Descriptions of CIO's Purposes and Activities in February 2012 ................................. 42

        1. The SCP's 2012 Trading and Resulting Losses Did Not Render the General Descriptions of CIO False or Misleading ..................................... 43

        2. Plaintiffs Take Dimon's Statement to *Fox Business News* Out of Context ................................................................ 44

        3. Plaintiffs Do Not Adequately Allege a Strong Inference of Scienter ........ 44

            a. Plaintiffs Do Not Adequately Plead That Dimon Acted with an Intent to Deceive or Defraud ..................................... 44

b.     Plaintiffs Do Not Adequately Plead That Braunstein Acted with an Intent to Deceive or Defraud ............................................. 46

c.     Plaintiffs Do Not Adequately Plead That Zubrow Acted with an Intent to Deceive or Defraud ............................................. 46

d.     Plaintiffs Do Not Adequately Plead Corporate Scienter ............... 47

B.     Plaintiffs Again Fail to State a Claim Based on General Descriptions of JPMorgan's Firm-Wide Risk Management Practices in Its 2011 Form 10-K .................................................................................................................. 48

1.     Plaintiffs Do Not Adequately Allege That These General Descriptions Were False or Misleading Based on 2012 Risk Limit Excessions Caused by the SCP ................................................. 48

2.     Plaintiffs Do Not Adequately Allege a Strong Inference of Scienter ........ 49

C.     Plaintiffs Fail to Plead Scienter and Loss Causation for the Internal Controls Disclosures and Certifications in JPMorgan's 2011 Form 10-K and for the April 13 Announcement of JPMorgan's First Quarter 2012 Earnings .................................................................................................. 50

1.     Plaintiffs Do Not Adequately Allege Scienter ........................................... 50

2.     Plaintiffs Do Not Adequately Allege Loss Causation ............................... 54

D.     Plaintiffs Fail to State a Claim Based on the Implementation of the New CIO VaR Model .................................................................................... 54

1.     The New CIO VaR Model Was Not Used in JPMorgan's 2011 Form 10-K ....................................................................................... 55

2.     Adoption of a New CIO VaR Model Did Not Render the General Descriptions of VaR in the 2011 Form 10-K False or Misleading ............ 55

3.     Plaintiffs Do Not Adequately Allege Scienter ........................................... 56

E.     Plaintiffs Fail to State a Claim Based on the CIO VaR Reported in the April 13 Earnings Release ................................................................... 59

1.     Plaintiffs Do Not Adequately Allege That Reported CIO VaR Was a Subjectively False Opinion ..................................................... 59

2.     Plaintiffs Do Not Adequately Allege Scienter ........................................... 60

F.     Plaintiffs Fail to State a Claim Based on Statements Made in April 2012 Immediately Following the Initial "London Whale" Press Reports. .................... 61

1.    Plaintiffs Do Not Adequately Allege That These Statements Were
      False or Misleading....................................................................................61

      a.    Statements Describing CIO's Overall Purposes and
            Activities Were Neither Material Nor False. .................................61

      b.    The Challenged Statements Accurately  Described the
            SCP's Intended Function ................................................................63

      c.    Plaintiffs Mischaracterize Braunstein's Statement About
            Risk Management ...........................................................................64

      d.    Statements About Regulatory Transparency Were Not
            False ...............................................................................................65

      e.    Braunstein's Statement About the Proposed Volcker Rule
            Was a Non-Actionable Opinion Stated Without Scienter.............66

      f.    The Remaining Statements Also Were Non-Actionable
            Opinions Stated Without Scienter.................................................67

2.    Plaintiffs Cannot Extend Section 10(b) Liability to Defendants
      Who Did Not Make the Challenged Statements .......................................70

3.    Plaintiffs Do Not Adequately Allege Scienter for Any of the April
      2012 Statements ......................................................................................71

      a.    Plaintiffs Do Not Adequately Plead That Dimon Acted with
            an Intent to Deceive or Defraud....................................................71

      b.    Plaintiffs Do Not Adequately Plead That Braunstein Acted
            with an Intent to Deceive or Defraud.............................................72

      c.    Plaintiffs Do Not Adequately Plead That Drew Acted with
            an Intent to Deceive or Defraud....................................................74

      d.    Plaintiffs Do Not Adequately Plead That Zubrow Acted
            with an Intent to Deceive or Defraud.............................................75

      e.    Plaintiffs Do Not Adequately Allege Corporate Scienter..............76

V.    Plaintiffs Fail to State a Section 20(a) Claim....................................................76

CONCLUSION...........................................................................................................78

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Abu Dhabi Commercial Bank* v. *Morgan Stanley & Co.*,
  2013 WL 1155420 (S.D.N.Y. Mar. 20, 2013) .............................................18, 37, 52

*ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007).................................................................7, 76, 77

*Bd. Of Trustees of City of Ft. Lauderdale Gen. Employees Retirement Sys.*
  v. *Mechel OAO*,
  2012 WL 6621391 (2d Cir. Dec. 20, 2012) ......................................................42, 58

*Billhofer* v. *Flamel Techs.*,
  2012 WL 3079186 (S.D.N.Y. 2012)...........................................................66

*Boca Raton Firefighters & Police Pension Fund* v. *Bahash*,
  2012 WL 6621391 (2d Cir. Dec. 20, 2012) ....................................................48

*Chill* v. *Gen. Elec. Co.*,
  101 F.3d 263 (2d Cir. 1996).................................................................17

*City of Brockton Ret. Sys.* v. *Shaw Grp., Inc.*,
  540 F. Supp. 2d 464 (S.D.N.Y. 2008)...........................................24, 52, 57, 74

*City of Roseville Emps. Ret. Sys.* v. *Nokia Corp.*,
  2011 WL 7158548 (S.D.N.Y. Sept. 6, 2011) ....................................................59

*Dura Pharms., Inc.* v. *Broudo*,
  544 U.S. 336 (2005)........................................................................16

*ECA & Local 134 IBEW Joint Pension Trust of Chi.* v. *JPMorgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009).......................................................... *passim*

*Edison Fund* v. *Cogent Inv. Strategies Fund, Ltd.*,
  551 F. Supp. 2d 210 (S.D.N.Y. 2008)...........................................................78

*Fait* v. *Regions Fin. Corp.*,
  655 F.3d 105 (2d Cir. 2011)................................................................40, 41

*Fait* v. *Regions Fin. Corp.*,
  712 F. Supp. 2d 117 (S.D.N.Y. 2010), *aff'd* 655 F.3d 105 (2d Cir. 2011) ...........................54

*Foley* v. *Transocean Ltd.*,
  861 F. Supp. 2d 197 (S.D.N.Y. 2012)...........................................37, 51, 52

*Furher* v. *Ericsson LM Tel. Co.*,
363 Fed. App'x 763 (2d Cir. 2009) ...................................................................... 67

*Glaser* v. *The9, Ltd.*,
772 F. Supp. 2d 573 (S.D.N.Y. 2011) ............................................................. 42, 52

*Gusinsky* v. *Barclays PLC*,
2013 WL 1955881 (S.D.N.Y. May 13, 2013) ............................................ 29, 48, 49

*Hutchison* v. *Perez*,
2013 WL 1775374 (S.D.N.Y. Apr. 25, 2013) ...................................................... 67

*In re Aegon N.V. Sec. Litig.*,
2004 WL 1415973 (S.D.N.Y. June 23, 2004) ............................................... 69, 72

*In re Alstom SA*,
406 F. Supp. 2d 433 (S.D.N.Y. 2005) ................................................................ 77

*In re AOL Time Warner, Inc. Sec. Litig.*,
503 F. Supp. 2d 666 (S.D.N.Y. 2007) ............................................................... 54

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004) ........................................................... 41-42

*In re Austl. & N.Z. Banking Grp. Sec. Litig.*,
2009 WL 4823923 (S.D.N.Y. Dec. 14, 2009) .................................................... 31

*In re Bank of Am. Corp. Sec., Deriv. & ERISA Litig.*,
757 F. Supp. 2d 260 (S.D.N.Y. 2010) ........................................................... 36, 40

*In re Barclays Bank PLC Sec. Litig.*,
2011 WL 31548 (S.D.N.Y. Jan. 5, 2011) .......................................................... 30

*In re Bisys Sec. Litig.*,
397 F. Supp. 2d 430 (S.D.N.Y. 2005) ................................................................ 75

*In re BP p.l.c. Sec. Litig.*,
843 F. Supp. 2d 712 (S.D. Tex. 2012) ............................................................... 18

*In re Bristol-Myers Squibb Sec. Litig.*,
312 F. Supp. 2d 549 (S.D.N.Y. 2004) ............................................................... 55

*In re CINAR Corp. Sec. Litig.*,
186 F. Supp. 2d 279 (E.D.N.Y. 2002) ............................................................... 77

*In re Citigroup, Inc. Sec. Litig.*,
330 F. Supp. 2d 367 (S.D.N.Y. 2004) ............................................................. 1, 34

*In re Deutsche Bank AG Sec. Litig.*,
2012 WL 3297730 (S.D.N.Y. Aug. 10, 2012)................................................................59, 68

*In re FBR Inc. Sec. Litig.*,
544 F. Supp. 2d 346 (S.D.N.Y. 2008)..........................................................................34, 73

*In re Healthco Int'l, Inc. Sec. Litig.*,
777 F. Supp. 109 (D. Mass. 1991) ...................................................................................67

*In re Lehman Bros. Sec. & ERISA Litig.*,
799 F. Supp. 2d 258 (S.D.N.Y. 2011)...............................................................................36

*In re Livent, Inc. Noteholders Sec. Litig.*,
151 F. Supp. 2d 371 (S.D.N.Y. 2001).......................................................................... 18-19

*In re Manulife Fin. Corp. Sec. Litig.*,
276 F.R.D. 87 (S.D.N.Y. 2011) .................................................................................54, 69

*In re MBIA, Inc., Sec. Litig.*,
700 F. Supp. 2d 566 (S.D.N.Y. 2010)....................................................................... 77-78

*In re NVIDIA Corp. Sec. Litig.*,
2010 WL 4117561 (N.D. Cal. Oct. 19, 2010)..................................................................39

*In re Optionable Sec. Litig.*,
577 F. Supp. 2d 681 (S.D.N.Y. 2008)................................................... 19, 22, 24-25

*In re Paramalat Sec. Litig.*,
497 F. Supp. 2d 526 (S.D.N.Y. 2007).............................................................................78

*In re PXRE Group, Ltd. Sec. Litig.*,
600 F. Supp. 2d 510 (S.D.N.Y 2009).......................................................................42, 57

*In re Royal Bank of Scotland PLC Sec. Litig.*,
2012 WL 3826261 (S.D.N.Y. Sept. 4, 2012)...................................................................34

*In re Salomon Analyst Level 3 Litig.*,
373 F. Supp. 2d 248 (S.D.N.Y. 2005)......................................................................41, 42

*In re Sanofi-Aventis Sec. Litig.*,
774 F. Supp. 2d 549 (S.D.N.Y. 2011).................................................................. *passim*

*In re Travelzoo Inc. Sec. Litig.*,
2013 WL 1287342 (S.D.N.Y. Mar. 29, 2013) ................................................................48

*In re UBS AG Sec. Litig.*,
2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012) ........................................................41, 74

*In re Wachovia Equity Sec. Litig.*,
753 F. Supp. 2d 326 (S.D.N.Y. 2011).........................................................................*passim*

*In re Yukos Oil Co. Sec. Litig.*,
2006 WL 3026024 (S.D.N.Y. Oct. 25, 2006) .....................................................45

*Janbay* v. *Can. Solar, Inc.*,
2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) ....................................................25

*Janus Capital Grp., Inc.* v. *First Deriv. Traders*,
131 S. Ct. 2296 (2011)...............................................................................70, 71

*Johnson* v. *Siemens AG*,
2011 WL 1304267 (E.D.N.Y. 2011)...................................................................53

*Kalnit* v. *Eichler*,
264 F.3d 131 (2d Cir. 2001) .......................................................................24, 60

*Lenard* v. *Design Studio*,
889 F. Supp. 2d 518 (S.D.N.Y. 2012).................................................................39

*Levine* v. *NL Indus., Inc.*,
717 F. Supp. 252 (S.D.N.Y. 1989).....................................................................55

*Lighthouse Fin. Grp.* v. *Royal Bank of Scotland Grp. PLC*,
902 F. Supp. 2d 329 (S.D.N.Y. 2012)......................................................36, 67, 75

*Local No. 38 IBEW Pension Fund* v. *Am. Exp. Co.*,
724 F. Supp. 2d 447 (S.D.N.Y. 2010).............................................................21, 25

*McIntire* v. *China MediaExpress Holdings, Inc.*,
2013 WL 752954 (S.D.N.Y. Feb. 28, 2013)...................................................77, 78

*Plumbers & Pipefitters Local Union No. 719 Pension Trust Fund* v. *Conseco Inc.*,
2011 WL 1198712 (S.D.N.Y. Mar. 30, 2011) ....................................................35

*Plumbers & Steamfitters Local 773 Pension Fund* v. *CIBC*,
694 F. Supp. 2d 287 (S.D.N.Y. 2010).............................................................*passim*

*Podany* v. *Robertson Stephens, Inc.*,
318 F. Supp. 2d 146 (S.D.N.Y. 2004).................................................................59

*Port Dock & Stone Corp.* v. *Oldcastle Ne., Inc.*,
507 F.3d 117 (2d Cir. 2007).............................................................................18

*Power Auth. of State of N.Y.* v. *FERC,*
743 F.2d 93 (2d Cir. 1984)..............................................................................20

*Rombach* v. *Chang,*
355 F.3d 164 (2d Cir. 2004)........................................................................16, 17

*Salinger* v. *Projectavision, Inc.,*
934 F. Supp. 1402 (S.D.N.Y. 1996)................................................................36

*Scott* v. *Enter. Fin. Servs. Corp.,*
2013 WL 2338367 (E.D. Mo. May 29, 2013) ................................................52

*SEC* v. *Kelly,*
817 F. Supp. 2d 340 (S.D.N.Y. 2011).............................................................76

*Shemian* v. *Research In Motion Ltd.,*
2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013) ("*RIM*").....................17, 53, 55

*Shields* v. *Citytrust Bancorp, Inc.,*
25 F.3d 1124, 1129 (2d Cir. 1994).................................................................70

*Stratte-McClure* v. *Morgan Stanley,*
784 F. Supp. 2d 373 (S.D.N.Y. 2011).............................................................30

*Teamsters Allied Benefit Funds* v. *McGraw,*
2010 WL 882883 (S.D.N.Y. Mar. 11, 2010) ..................................................52

*Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.,*
531 F.3d 190 (2d Cir. 2008)..................................................................... *passim*

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.,*
551 U.S. 308 (2007).................................................................17, 53, 58, 60

*Woodward* v. *Raymond James Fin., Inc.,*
732 F. Supp. 2d 425 (S.D.N.Y. 2010)........................................................29, 30

**STATUTES, RULES, AND REGULATIONS**

17 C.F.R. § 229.10(a)......................................................................................60

17 C.F.R. 240.10b-5..................................................................................29, 76

17 C.F.R. § 229.305(a)(4)................................................................................55

15 U.S.C. § 78u-4(b)(1)...................................................................................16

15 U.S.C. § 78u-4(b)(2)(A)..............................................................................17

|  | Page(s) |
|---|---|
| 15 U.S.C. §§ 78u-5(c)(1)(B)(i)-(ii) | 30, 66 |

**OTHER AUTHORITIES**

| | |
|---|---|
| 76 Fed. Reg. 68846 (proposed Nov. 7, 2011) | 61, 66, 76 |
| A.S.C. § 450-10-15 (2011) | 39 |
| A.S.C. § 450-20-25 (2011) | 37, 39 |
| A.S.C. § 820-10-20 (2011) | 39 |
| A.S.C. § 820-10-35 (2011) | 39 |
| A.S.C. § 820-10-35-51 (2011) | 39 |
| A.S.C. § 820-10-35-54 (2012) | 39 |
| Instructions for Form 8-K, available at www.sec.gov | 60 |
| *Oxford English Dictionary*, www.oed.com (last visited June 8, 2013) | 20 |
| Statement of Financial Accounting Standards No. 5 | 39 |

## <u>TABLE OF ABBREVIATIONS</u>

| | |
|---|---|
| 2010 OCC Supervisory Letter | Letter from the OCC to JPMorgan regarding examination of CIO, dated December 8, 2010 |
| A.S.C. | Accounting Standards Codification |
| CIO | JPMorgan Chief Investment Office |
| Complaint or Compl. | Plaintiffs' Second Amended Consolidated Class Action Complaint, filed April 12, 2013 |
| CRO | Chief Risk Officer |
| CSBPV or CS01 | An estimate of potential gains or losses in one day from a one-basis-point change in credit spreads (or prices) |
| CSW10% | An estimate of potential gains or losses in one day from a 10% widening of credit spreads (or prices) |
| Dodd-Frank Comment Letter | JPMorgan's Comment Letter on the Notice of Proposed Rulemaking Implementing Section 619 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, dated February 13, 2012 |
| ISP | JPMorgan CIO investment securities portfolio |
| JPMorgan | JPMorgan Chase & Co. |
| OCC | Office of the Comptroller of the Currency |
| PSI | U.S. Senate Homeland Security and Governmental Affairs Permanent Subcommittee on Investigations |
| PSI Report or PSI Rpt. | U.S. Senate Homeland Security and Governmental Affairs Permanent Subcommittee on Investigations Majority and Minority Staff, *JPMorgan Chase Whale Trades:  A Case History of Derivatives Risks and Abuses*, dated March 15, 2013 |
| RWA | Risk weighted assets, a measure of a financial institution's assets adjusted according to the risk of those assets |
| SCP | JPMorgan CIO synthetic credit portfolio |
| SEC | Securities and Exchange Commission |
| Task Force Report or TFR | Report of JPMorgan Chase & Co. Management Task Force Regarding 2012 CIO Losses, dated January 16, 2013 |

VaR                                          Value at risk, an estimate of potential mark-to-market
                                             losses in a portfolio in a given time period at a stated
                                             confidence level, assuming historical market conditions

**FILING DATES FOR JPMORGAN SEC FILINGS
THAT CONTAIN STATEMENTS CHALLENGED BY PLAINTIFFS**

| **Document** | **Filing Date** |
|---|---|
| *2010 SEC Filings* | |
| 2009 Form 10-K | February 24, 2010 |
| 2010 Proxy Statement | March 31, 2010 |
| 2010 1Q Form 8-K | April 14, 2010 |
| 2010 1Q Form 10-Q | May 10, 2010 |
| 2010 2Q Form 8-K | July 15, 2010 |
| 2010 2Q Form 10-Q | August 6, 2010 |
| 2010 3Q Form 8-K | October 13, 2010 |
| 2010 3Q Form 10-Q | November 9, 2010 |
| *2011 SEC Filings* | |
| 2010 4Q Form 8-K | January 14, 2011 |
| 2010 Form 10-K | February 28, 2011 |
| 2011 Proxy Statement | April 7, 2011 |
| 2011 1Q Form 8-K | April 13, 2011 |
| 2011 1Q Form 10-Q | May 6, 2011 |
| 2011 2Q Form 8-K | July 14, 2011 |
| 2011 2Q Form 10-Q | August 5, 2011 |
| 2011 3Q Form 8-K | October 13, 2011 |
| 2011 3Q Form 10-Q | November 4, 2011 |
| *2012 SEC Filings* | |
| 2011 4Q Form 8-K | January 13, 2012 |
| 2011 Form 10-K | February 29, 2012 |
| 2012 Proxy Statement | April 4, 2012 |
| 2012 1Q Form 8-K | April 13, 2012 |

Defendants JPMorgan Chase & Co. ("JPMorgan" or the "Firm"), James Dimon, Michael J. Cavanagh, Douglas L. Braunstein, Ina R. Drew and Barry L. Zubrow respectfully submit this memorandum in support of their motion, pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the Second Amended Consolidated Class Action Complaint.

## PRELIMINARY STATEMENT

The Complaint here seeks to transform allegations of mismanagement of a single portfolio in London that resulted in large trading losses in the first half of 2012 into a claim of securities fraud stretching back to the beginning of 2010. The focus of plaintiffs' claim is remarks by JPMorgan's CEO and then-CFO during an April 2012 earnings call shortly after press reports of the traders' positions began to surface but before the serious flaws in the London traders' trading strategy were identified. This classic attempt to plead "fraud by hindsight" is an insufficient "basis upon which to challenge management practices that ultimately result in losses." *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) (internal quotation marks omitted). Unwilling to stop there, plaintiffs also contend that the flawed trading strategy over several months in 2012 rendered various general statements in the prior two years' worth of JPMorgan's filings with the Securities and Exchange Commission ("SEC") false and misleading. But plaintiffs here too have not come close to satisfying their pleading burden: the Complaint fails to allege facts necessary to show that those general statements were false, much less that any defendant acted with an intent to deceive or defraud in connection with JPMorgan's periodic SEC filings.

During the first quarter of 2012, a small group of London-based traders in one of JPMorgan's business units—the Chief Investment Office ("CIO")—amassed outsized positions in credit derivatives in one of the portfolios managed by CIO. Other market participants noticed the positions, nicknaming the principal trader, Bruno Iksil, the "London Whale." In early

April 2012, *Bloomberg* and *The Wall Street Journal* published articles about the so-called whale and his trading. During a regularly scheduled earnings call on April 13, 2012, JPMorgan's Chairman and CEO, James Dimon, and CFO, Douglas Braunstein, commented on the reported trading and CIO's general purpose. As has been widely reported, Dimon agreed with an analyst's characterization of the media reports as a "tempest in a teapot."

As is now clear, Dimon's initial reaction to the media reports and the reports' discussion of the London traders' positions turned out to be, in his own words, "dead wrong" (although it reflected his belief at the time). In the weeks following the April 13 earnings call, flaws in the traders' strategy were identified, as losses rapidly exceeded previous estimates. On May 10, JPMorgan voluntarily disclosed to the market that the London portfolio had incurred losses of about $2 billion in the second quarter, with more losses likely to come. On July 13, JPMorgan announced that the losses had increased to roughly $5.8 billion and that it was restating first quarter earnings. (The price of JPMorgan's stock actually increased nearly 6% that day.)

Since then, the London traders' derivative trading and the accuracy of the statements by JPMorgan's CEO and CFO in April 2012 have come under intense scrutiny. The SEC and other regulators have been conducting investigations, and the U.S. Senate Homeland Security and Governmental Affairs Permanent Subcommittee on Investigations ("PSI") issued a report raising "questions about the timeliness, completeness and accuracy of information presented about the CIO whale trades" by JPMorgan in April 2012, and criticizing JPMorgan's supervision of the London traders and the risk management protocols applicable to their portfolio.[1] Plaintiffs here

---

[1] PSI, *JPMorgan Chase Whale Trades: A Case History of Derivatives Risks and Abuses*, at 252 (Mar. 15, 2013) ("PSI Report" or "PSI Rpt.") (Ex. 1). Citations to "Ex. __" are to exhibits to the Declaration of Christopher M. Viapiano, submitted herewith. Defendants cite the PSI Report—relied on throughout the Complaint—not as an endorsement of its conclusions or its characterization of the "facts," but to show that many of plaintiffs' conclusory allegations are contradicted by the very document on which they principally rely.

seek to assert securities fraud claims based on the same April 2012 statements that are the focus of the PSI Report, even though those statements were entirely *consistent* with what Dimon and Braunstein had been told about the London traders' positions before the April 13 earnings call.

Not content to prosecute a lawsuit based solely on the April 2012 statements, plaintiffs contend that the mismanagement of the London portfolio somehow gives rise to a securities fraud claim dating back over two years to February 2010. In a transparent attempt to lengthen the putative class period beyond the one month between when JPMorgan initially responded to the London Whale press reports and when JPMorgan voluntarily disclosed the portfolio's losses on May 10, plaintiffs baldly assert, with no factual support, that Dimon had "secretly transformed" the entire CIO from a risk-management unit into "a high-risk, proprietary trading desk" by 2010. (Compl. ¶ 55.) According to plaintiffs, this supposed transformation rendered various general statements about CIO's overall purposes and activities and JPMorgan's firm-wide risk management practices in two entire years' worth of JPMorgan's SEC filings false or misleading. Plaintiffs' factual allegations, however, overwhelmingly concern the one portfolio that incurred the losses in the first half of 2012—only one of the portfolios managed by CIO and a small part of JPMorgan. The Complaint is devoid of factual allegations showing that these general statements about CIO and JPMorgan were false or misleading, let alone giving rise to a strong inference that any defendant acted with scienter in making them.

## SUMMARY OF ARGUMENT

In drafting their Complaint, plaintiffs had access to a wealth of information about the losses suffered by the London traders in 2012, including the 301-page PSI Report, JPMorgan's own 129-page report,[2] the JPMorgan Board of Directors' 18-page report and nearly 100 internal

---

[2] Report of JPMorgan Chase & Co. Management Task Force Regarding 2012 CIO Losses (Jan. 16, 2013) (the "Task Force Report" or "TFR") (Ex. 2).

JPMorgan documents attached to the PSI Report, as well as the testimony of JPMorgan employees before various Congressional committees. Yet plaintiffs still fail to state a claim.

*First*, plaintiffs fail adequately to allege that any statement in JPMorgan's 2010 or 2011 SEC filings describing CIO's overall purposes and activities was false or misleading. Even accepting as true plaintiffs' allegations, general statements such as CIO "is primarily concerned with managing structural market risks" (Compl. ¶ 244(a)) were not false or misleading when made. In arguing otherwise, plaintiffs repeatedly conflate the London-based portfolio that suffered the losses in 2012—one part of CIO—with the entire CIO, and they attempt to rely on events that occurred in 2012 to plead that statements made in 2010 and 2011 were false. Plaintiffs do not allege specific facts demonstrating that CIO as a whole was not "primarily concerned" with managing market risks in 2010 and 2011. Plaintiffs also fail to allege particularized facts that create a strong inference that any defendant acted with scienter in making the general statements in JPMorgan's lengthy SEC filings.

*Second*, plaintiffs cannot state a claim based on general statements in JPMorgan's 2010 or 2011 SEC filings describing JPMorgan's firm-wide risk management practices, such as JPMorgan "has in place a robust risk management discipline" and its "goal" is "to create a culture of risk awareness and personal accountability." (*Id*. ¶ 255.) The Second Circuit has held that such general statements are too general to be material as a matter of law. *ECA & Local 134 IBEW Joint Pension Trust of Chi.* v. *JPMorgan Chase Co.*, 553 F.3d 187, 205-06 (2d Cir. 2009). Plaintiffs also do not adequately allege that these general statements were false or misleading when made, and they again fail to plead particularized facts that give rise to a strong inference that any defendant acted with scienter in signing JPMorgan's SEC filings each quarter.

*Third*, plaintiffs fail to plead any facts to support their allegation that JPMorgan overstated its earnings each and every quarter from February 2010 through April 2012 as a result of a supposed failure to establish a liquidity reserve for positions held in the London portfolio. The sole bases for the allegation that such a reserve was required are a "rumor" of discussions among unidentified JPMorgan employees and an alleged "report" prepared by an unidentified JPMorgan employee and shared with other unidentified JPMorgan employees supposedly suggesting a liquidity reserve. Such allegations are plainly insufficient to plead that a reserve was required, but even if it were required, plaintiffs fail to allege that any defendant believed that was the case at the time or acted with scienter in reporting supposedly inaccurate earnings.

*Fourth*, plaintiffs fail to plead specific facts showing that the same general descriptions of CIO's overall purposes and activities and JPMorgan's firm-wide risk management practices were material and false or misleading when repeated in JPMorgan's 2011 Form 10-K and elsewhere in 2012. Just like in 2010 and 2011, allegations about trading in a single CIO portfolio in 2012 and risk limit excessions caused by that trading did not render any of those general statements false or misleading. Likewise, plaintiffs do not adequately plead that any defendant acted with scienter in making these statements in 2012.

*Fifth*, plaintiffs fail to state a claim based on JPMorgan's reported earnings for the first quarter of 2012. After reviewing the London traders' emails and recorded telephone calls in the months following the May 2012 announcement of the trading losses, JPMorgan determined in July 2012 to restate its earnings for the first quarter by $459 million because it concluded that certain traders may have mismarked certain positions in an effort to avoid showing the full extent of their portfolio's mark-to-market losses. This subsequent restatement, however, is not a sufficient basis to plead that Dimon or Braunstein, as CEO and CFO, acted with scienter in

certifying the effectiveness of the Firm's internal controls or that any defendant acted with an intent to deceive or defraud in reporting JPMorgan's earnings months before the potential mismarking was discovered. Plaintiffs also fail to plead loss causation for these statements—on the day the "corrective disclosure" was made, the price of JPMorgan's stock actually *increased* nearly 6%.

*Sixth*, plaintiffs fail to state a claim based on JPMorgan's implementation of a new value-at-risk ("VaR") model for CIO in January 2012. JPMorgan had no duty to disclose this model change in its 2011 Form 10-K because the new model was not in use in 2011 and thus was not used to calculate CIO's VaR in that filing. Plaintiffs also fail to allege any facts (i) supporting their contention that the new model was implemented by CIO in January 2012 for the purpose of concealing losses and risk or (ii) establishing that the general description of VaR models in the 2011 Form 10-K was false or misleading. Nor can plaintiffs state a claim based on the later reporting of CIO VaR calculated for the first quarter of 2012 using the new model in the April 13 earnings release because the Complaint does not allege facts showing that any defendant did not believe that VaR calculation—a statement of opinion—to be accurate at the time.

*Finally*, plaintiffs fail to state a claim based on the April 2012 statements by Dimon, Braunstein and a JPMorgan spokesperson responding to the initial London Whale press reports. Plaintiffs make no attempt to allege that the spokesperson acted with an intent to deceive or defraud in responding to reporters' questions. And the oft-quoted statements by Braunstein and Dimon, respectively, during the April 13 earnings call—that JPMorgan was "comfortable" with the positions and that the press reports were a "tempest in a teapot"—were entirely consistent with what Dimon and Braunstein had been told about the London traders' positions. The very documents on which the Complaint relies show that before the earnings call, Dimon and

Braunstein were repeatedly assured by CIO personnel in London and others that the London portfolio was "balanced" and "manageable," that the losses then incurred would "mean revert" and that potential future losses were a fraction of what they turned out to be.

<strong>BACKGROUND[3]</strong>

**A.    Defendants**

Defendant JPMorgan is a global financial services firm with assets of $2.3 trillion. (Compl. ¶ 36.)  Defendant Dimon is JPMorgan's Chairman and CEO.  (*Id.* ¶ 37.)  Defendant Cavanagh was JPMorgan's CFO from 2004 until June 2010, and defendant Braunstein was CFO from June 2010 through the end of the class period.  (*Id.* ¶¶ 38-39, 332.)  As CEO and CFO, Dimon and Cavanagh or Braunstein signed or certified the accuracy of many of the SEC filings at issue here.  (*Id.* ¶¶ 37-39.)  Defendant Drew was JPMorgan's Chief Investment Officer and the head of CIO throughout much of the class period.  (*Id.* ¶ 40.)  She did not make any statements challenged by plaintiffs.  Defendant Zubrow was JPMorgan's Chief Risk Officer ("CRO") from November 2007 through January 2012 and then Head of Corporate and Regulatory Affairs through the end of the class period.  (*Id.* ¶ 41.)  In the latter role, Zubrow signed a February 23, 2012 letter commenting on the implementation of the Dodd-Frank legislation that contains one statement challenged by plaintiffs.  (*Id.* ¶ 275-76.)

**B.    CIO and Its Synthetic Credit Portfolio**

CIO is a business unit within JPMorgan that is primarily responsible for managing the significant structural risk arising from imbalances between JPMorgan's loans (assets) and deposits (liabilities).  (Compl. ¶ 51; TFR at 21.)  "JPMorgan's businesses take in more in

---

[3] For this motion, the Court may "consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

deposits than they make in loans and, as a result, the Firm has excess cash that must be invested to meet future liquidity needs and provide a reasonable return." (TFR at 21; *see also* Compl. ¶ 51.) The existence of excess deposits introduces interest rate risk—the risk that interest rates will rise and the rates to be paid to depositors will exceed the return on the invested assets. (Ex. 3 at 145 (2010 Form 10-K).) JPMorgan's excess deposits increased significantly during the financial crisis as its relative financial stability made it a safe haven for depositors. (Compl. ¶ 51.) The vast majority of these excess deposits were held by CIO in its investment securities portfolio ("ISP"), CIO's largest portfolio. (Ex. 4 at 108 (2011 Form 10-K).) By the beginning of 2012, CIO's ISP held more than $350 billion of assets, up from $76 billion at the end of 2007. (Compl. ¶¶ 51-52.) CIO invested the bulk of that portfolio in high credit-quality, fixed-income securities. (TFR at 22.) CIO's ISP is not at issue in this litigation.

CIO also was responsible for managing (i) a $17 billion foreign exchange hedging book, (ii) a $9 billion Firm-owned life insurance portfolio, and (iii) a mortgage servicing rights hedging book. (Ex. 5 at 2 (Drew PSI test.); PSI Rpt. at 22-23, 41.) In addition, CIO maintained a portfolio to fund JPMorgan's retirement plans (PSI Rpt. at 22) and managed both a private equity portfolio and a portfolio of "stressed or distressed investment opportunities 'related to undervalued or underperforming loans' on the Company's balance sheet." (Compl. ¶ 87.) None of these activities are at issue in this litigation either.

This case instead concerns CIO's synthetic credit portfolio ("SCP"), the London-based portfolio that incurred significant losses in 2012. CIO created this portfolio in 2007 to help address the risk faced by JPMorgan because it is structurally "long" credit. (TFR at 22-23.) As a large lender, JPMorgan's loan book tends to perform well when credit markets perform well (and borrowers repay their loans) and to perform less well during credit downturns (when borrowers

are more likely to default).  (Ex. 4 at 10 (2011 Form 10-K).)  The "primary purpose" of the SCP

was "to provide a partial offset to losses [JPMorgan] would suffer elsewhere in CIO, and the

Company in a stressed credit environment."  (Ex. 6 at 13 (7/13/12 earnings call tr.).)  The SCP

held positions in standardized indices based on baskets of credit default swaps ("CDS") tied to

corporate debt.[4]  These positions provided broad protection against defaults by corporate

borrowers and thus partially offset JPMorgan's structural long position.  (TFR at 22-23.)

Consistent with its mandate, at the peak of the financial crisis, the SCP generated substantial

income that offset losses JPMorgan faced elsewhere.  (Ex. 6 at 13 (7/13/12 earnings call tr.)).

 Plaintiffs wrongly attempt to equate CIO with the SCP.  The SCP was only one portfolio

managed by CIO and, of course, an even smaller part of JPMorgan.  For example, CIO and

JPMorgan's Treasury unit had net revenues of $6.642 billion in 2010 and $3.196 billion in 2011.

(Ex. 7 at 102 (2012 Form 10-K).)  By contrast, the SCP had revenues of $149 million in 2010

and $453 million in 2011 (PSI Rpt. at 56)—or 2.2% and 14.2% of CIO and Treasury's revenues.

The SCP's revenues were a *de minimis* percentage of JPMorgan's overall revenues, less than

0.5% in both 2010 and 2011.  (Ex. 7 at 62, 107 (2012 Form 10-K).)  Even when compared only

to the ISP—CIO's largest portfolio—the SCP's revenues were relatively small, a little more than

3.7% of the ISP's revenues in 2010 and 13.5% in 2011.  (*Id.* at 302.)[5]  Finally, as of December

2011, CIO employed 140 traders in New York, London and elsewhere, while the SCP was

primarily managed by just two traders in London.  (PSI Rpt. at 21, 24-25.)[6]

---

 [4] The baskets of CDS in each index had a particular focus, *e.g.*, North American companies with investment grade credit ratings.  The indices enabled the London traders to purchase protection against defaults by those underlying companies by paying regular "premiums."

 [5] Although JPMorgan does not separately report revenues for the ISP, these numbers from JPMorgan's SEC filings mostly consist of ISP revenues.

 [6] Net notional amounts are a poor measure of the risk of a portfolio of credit derivatives like the SCP.  (*See* Ex. 4 at 210 (2011 Form 10-K) ("Firm does not use notional amounts of credit derivatives as the primary measure of

## C.    Changes to the SCP in the First Quarter of 2012

In December 2011, CIO began contemplating changes to the SCP to reduce its risk weighted assets ("RWA") and move it from an overall "short" position to a more credit-neutral position.  (TFR at 26.)[7]  Two factors motivated those changes:  (i) JPMorgan management had directed CIO to reduce its overall RWA, and (ii) JPMorgan and CIO management believed that the improving global economy meant that there would be less need for the SCP's credit loss protection.  (TFR at 26.)  Although the SCP's RWA and short position could have been reduced by exiting some of the portfolio's positions, the London traders estimated that reducing those positions by 25% or 35% could result in losses of $500 million.  (Compl. ¶ 119; TFR at 28-29.)

After incurring small losses in early January 2012 that the traders attributed to unwinding certain positions, the traders decided to change course by increasing the size of the portfolio's long positions in what turned out to be a misguided attempt to "balance" the portfolio.  (Compl. ¶ 147; TFR at 28.)  As part of this ongoing balancing process during the first quarter of 2012, the London traders also significantly increased the size of some of the portfolio's short positions (Compl. ¶ 149; TFR at 31), ultimately causing the SCP to grow "to a 'perilous size with numerous embedded risks'" (Compl. ¶ 149 (quoting Ex. 6 at 15 (7/13/12 earnings call tr.))).  By the end of that quarter, the SCP had incurred mark-to-market losses of $718 million (inclusive of

---

risk management for such derivatives").)  It also is not appropriate to measure the size of the SCP relative to that of other portfolios like the ISP that hold fixed-income instruments by looking to the net notional amounts of the SCP's positions.  For credit derivatives, notional amounts are only a reference used to determine the parties' payment obligations.  (*See id*. at 203.)  Nevertheless, even comparing the net notional amounts of the SCP's positions with the value of the assets held by the ISP, the SCP is small by comparison, particularly in 2010 and 2011.  As of December 31, 2010 and 2011, CIO's ISP held over $310 and $355 billion in assets, respectively.  (Compl. ¶ 52.)  By contrast, at the start of 2011, the SCP had roughly $4 billion in net notional positions in CDS indices and, by the end of 2011, $51 billion in such positions.  (PSI Rpt. at 51.)  At its peak in March 2012, the SCP had approximately $157 billion in net notional positions in CDS indices (*id*. at 84), compared to more than $355 billion in assets in the ISP alone (Compl. ¶ 52).

[7] Financial institutions generally are required to hold an amount of capital determined by their level of RWA.  New international accords increased the amount of capital financial institutions will be required to hold in the future based on their RWA, prompting them to reduce RWA levels.  (Ex. 4 at 119-22 (2011 Form 10-K).)

an additional liquidity adjustment for the first quarter taken in early April), which increased

dramatically over the following months.  (TFR at 5 & n.8.)

### D.     CIO Risk Limit Excessions During the First Quarter of 2012

Several types of risk limits applied to CIO (and to the SCP as part of CIO), including

VaR limits, two types of credit-spread widening limits ("CSBPV" and "CSW10%") and stress

loss limits.  (PSI Rpt. at 154.)[8]  These risk limits included both firm-wide limits and CIO-specific

limits.  JPMorgan's risk limits were not "ironclad limits, but . . . guidelines and red flags."  (PSI

Rpt. at 159; *see also* TFR at 76 ("Limits are not rigid restrictions, and some excessions are

expected.").)  An "excession" of a risk limit did not require immediate reduction of the relevant

positions, and exceptions could be made for ongoing excessions.  (Ex. 4 at 162 (2011 Form 10-

K); TFR at 76 & n.95.)  A limit's level dictated who at JPMorgan had the authority to approve or

change the limit, who was informed of an excession and who had the authority to approve an

exception for an ongoing excession.  (TFR at 75.)

On several days in January 2012, CIO exceeded its VaR limit largely as a result of the

increase in the SCP's positions, which caused JPMorgan, in turn, to exceed its firm-wide VaR

limit.  (TFR at 77; Compl. ¶ 165.)  Dimon, JPMorgan's CRO and other members of management

were notified of the excessions of this firm-wide limit.  (PSI Rpt. at 174.)  At the time,

JPMorgan's independent model valuation group was about to approve an "improved" CIO VaR

model that had been in development since August 2011 as part of an effort to implement models

that would comply with new expected regulatory requirements.  (TFR at 121-22.)  In view of the

---

[8] VaR is an estimate of the amount of potential mark-to-market losses in a portfolio in a given time period at a stated confidence level, assuming historical market conditions.  (Ex. 4 at 158 (2011 Form 10-K).)  Credit spread widening limits measure the impact of changes in credit spreads (or prices) on a portfolio of assets:  CSBPV measures the impact of a one basis point change, while CSW10% measures the impact of credit spreads widening by 10%.  (TFR at 3 n.6, 80-82.)  Stress testing estimates potential losses from adverse and abnormal markets, *e.g.*, an oil crisis.  (*Id*. at 82-83.)

imminent approval of this new model, which was expected to reduce CIO's VaR, Dimon and the CRO approved a temporary increase in JPMorgan's VaR limit. (Compl. ¶ 165.) When the new model was subsequently implemented, the VaR limit excessions ceased. (TFR at 79; Compl. ¶ 167.) Only later would JPMorgan identify errors in the implementation and operation of the new CIO VaR model. (Ex. 6 at 16 (7/13/12 earnings call tr.).)

Also in January 2012, CIO exceeded its CSBPV limits largely because of SCP trading. (Compl. ¶ 161.) Consistent with JPMorgan policy, these excessions were reported and discussed within CIO, but not reported to firm-wide management. (TFR at 80; Ex. 6 at 15 (7/13/12 earnings call tr.).) Drew was informed of the CSBPV excessions in February, but she and others, including risk management personnel in CIO, considered this particular type of limit "old and outdated" because they did not believe that it accurately measured risk. (TFR at 80-81; Compl. ¶ 133.) As the CSBPV limit excessions continued in February and March, they were the subject of discussion among CIO personnel, who also expected this limit to be adjusted or replaced as part of a then-ongoing process to revise CIO's limit structure. (TFR at 80-81.)

On March 22, 2012, SCP trading caused CIO to exceed its CSW10% limit. (PSI Rpt. at 205.) Drew "considered the CSW10% [limit] to be an 'overriding' risk limit of key importance." (*Id*. at 205.) After learning of recent, significant increases in certain SCP positions (*id*. at 84), Drew ordered the London traders to stop all trading in the SCP ("put phones down") on March 23, 2012 (Compl. ¶ 187).

### E.     The Initial Media Reports and JPMorgan's Disclosure of the SCP's Losses

On April 4-5, 2012, JPMorgan senior management learned that *Bloomberg* and *The Wall Street Journal* intended to publish articles reporting rumors that Iksil held large positions in credit derivatives. (PSI Rpt. at 91; TFR at 56.) In response, Dimon and Braunstein requested an expedited review of the SCP's positions. (Compl. ¶ 194; TFR at 57.) On April 10, the first

trading day in London after the articles were published, the SCP incurred a mark-to-market loss of over $400 million. (Compl. ¶ 190.) Drew told Dimon and Braunstein that this loss was an aberrational event and likely attributable to the media attention and the market's incorrect "belief that JPMorgan would have to liquidate" the SCP's positions. (TFR at 65.)

On April 11, CIO personnel in London presented an analysis to management, including Dimon, Braunstein and Drew, that estimated that there was an 80% likelihood that the SCP would gain as much as $350 million in the second quarter of 2012 or lose as much as $250 million; they also estimated that there was a 10% chance of an "extreme" result of a loss of $650 million. (*Id.*) A JPMorgan risk manager estimated that in "an extreme loss scenario," the SCP could lose as much as $1 billion. (*Id.* at 66; Compl. ¶ 194.) Based on additional analysis from CIO personnel in London, CIO management provided further assurances to Dimon and Braunstein that the SCP's positions were "manageable" (Ex. 6 at 15 (7/13/12 earnings call tr.)) and "balanced" (TFR at 61-62, 67-68). Based on these and other analyses and assurances, Braunstein stated during the April 13 earnings call that JPMorgan was "very comfortable" with the SCP's positions. (Compl. ¶ 201.) In response to an analyst's question, Dimon agreed that the reports about the London Whale were a "tempest in a teapot." (*Id.* ¶ 203.)

Despite these assurances, mark-to-market losses in the SCP increased significantly after the April 13 earnings call, with large almost daily losses beginning on April 23. (TFR at 70-71.) JPMorgan management directed a further review of the portfolio by non-CIO personnel and soon thereafter had the non-CIO personnel assume management of the SCP. (*Id.* at 71.) On May 10, JPMorgan voluntarily announced that the SCP had sustained quarter-to-date mark-to-market losses of roughly $2 billion, with additional future losses likely. (Ex. 8 at 2 (5/10/12 call tr.).) In disclosing those losses, Dimon admitted that he had been wrong a month earlier when he agreed

that the initial media reports were a "tempest in a teapot" and said that JPMorgan was looking into the losses and taking remedial actions.  (*Id*. at 3.)

### F.  JPMorgan's Disclosure of Additional Losses in the SCP and Its Restatement of First Quarter of 2012 Reported Earnings

On July 13, 2012, JPMorgan announced that the year-to-date mark-to-market losses in the SCP as of the end of the second quarter had increased to roughly $5.8 billion.  (Ex. 6 at 9 (7/13/12 earnings call tr.).)  JPMorgan further disclosed that its review of the London traders' emails and recorded telephone calls since its May 10 announcement had revealed information suggesting that "certain individuals may have been seeking to avoid showing the full amount of the losses" being incurred on the SCP's positions in March and April 2012.  (Ex. 9 at 3 (7/13/12 Form 8-K) (quoted at Compl. ¶ 221).)  Although the positions were marked "within . . . established thresholds" (*id*.), JPMorgan decided to restate its first quarter financials, which had the effect of shifting $459 million of losses from the second quarter to the first and reducing JPMorgan's net income in the first quarter from over $5.3 billion to approximately $4.9 billion.  (Ex. 6 at 9 (7/13/12 earnings call tr.).)  On the day JPMorgan announced this restatement and the increase in the SCP's losses, the price of its stock actually increased, closing at $36.07 per share—up nearly 6% from the previous day's close.  (Ex. 10.)

### G.  The Alleged False and Misleading Statements

Plaintiffs allege four categories of false and misleading statements.  (*See* Compl. ¶ 241.)  *First*, they contend that general statements in JPMorgan's 2010 and 2011 SEC filings describing CIO's *overall* purposes and activities were false and misleading based primarily on the subsequent 2012 activities of one CIO portfolio—the SCP.  Plaintiffs principally challenge the statement in JPMorgan's SEC filings that CIO "is primarily concerned with managing structural market risks which arise out of the various business activities of the Firm."  (*Id*. ¶ 244(a).)

*Second*, plaintiffs similarly assert that general statements in JPMorgan's 2010 and 2011 SEC filings describing firm-wide risk management practices were false and misleading. For example, they challenge the following statements repeated in JPMorgan's SEC filings throughout those years: "The Firm's risk management framework and governance structure are intended to provide comprehensive controls and ongoing management of the major risks inherent in its business activities. It is also intended to create a culture of risk awareness and personal responsibility throughout the Firm." (*Id.* ¶ 252.)

*Third*, plaintiffs assert that JPMorgan's reported earnings throughout 2010, 2011 and 2012 and JPMorgan's certifications that its earnings were prepared in accordance with GAAP were false because JPMorgan failed to establish a liquidity reserve for the SCP's positions beginning in early 2010. (*Id.* ¶¶ 261-62, 266.) That claim is premised on a newspaper article stating that an unidentified CIO executive recommended establishing a reserve in 2010. (*Id.* ¶ 114.) Plaintiffs further argue that reported earnings for the fourth quarter and year-end 2011 were false because JPMorgan failed to adjust the marks for certain positions in the SCP as a result of an analysis showing that the sale of 25% or 35% of those positions would produce a loss of $500 million. (*Id.* ¶ 265.)

*Fourth*, plaintiffs allege that the trading in the SCP in the first quarter of 2012 and the alleged mismarking of certain SCP positions rendered the following statements in early 2012 false: (i) the same or similar general statements describing CIO's overall purposes and activities and JPMorgan's firm-wide risk management practices in (a) JPMorgan's Comment Letter on the Notice of Proposed Rulemaking Implementing Section 619 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (dated February 13, 2012) (the "Dodd-Frank Comment Letter") (*id.* ¶ 276), (b) JPMorgan's 2011 Form 10-K (dated February 29, 2012) (*id.* ¶¶ 279, 286-

87), (c) Dimon's annual letter to shareholders (dated March 30, 2012) (*id*. ¶ 294),

(d) JPMorgan's 2012 Proxy Statement (dated April 4, 2012) (*id*. ¶¶ 292-93), and (e) the April 13,

2012 earnings release (*id*. ¶ 311); (ii) a statement by Dimon during a February 13, 2012

interview by *Fox Business News* (*id*. ¶ 277); (iii) Dimon's and Braunstein's certifications of the

effectiveness of JPMorgan's internal controls in JPMorgan's 2011 Form 10-K and its reported

earnings in its April 13, 2012 earnings release (*id*. ¶¶ 289-91, 302); (iv) JPMorgan's descriptions

of VaR in its fourth quarter of 2011 Form 8-K and its 2011 Form 10-K and its reported VaR

calculation in the April 13 earnings release (*id*. ¶¶ 249, 281, 283-84, 314); and (v) statements by

Dimon, Braunstein and a firm spokesperson in April following the initial "London Whale" press

reports (*id*. ¶¶ 297, 299, 303, 305, 307, 309, 312).

## PLAINTIFFS' HEIGHTENED PLEADING BURDEN

To state a claim under Section 10(b), plaintiffs must allege (i) a material misstatement or

omission; (ii) scienter; (iii) a connection between the misstatement or omission and the purchase

or sale of a security; (iv) reliance by the plaintiff (or transaction causation); (v) economic loss;

and (vi) loss causation. *Dura Pharms., Inc.* v. *Broudo*, 544 U.S. 336, 341-42 (2005).

Rule 9(b) requires a plaintiff to "(1) specify the statements that the plaintiff contends

were fraudulent, (2) identify the speaker, (3) state where and when the statements were made,

and (4) explain why the statements were fraudulent." *Rombach* v. *Chang*, 355 F.3d 164, 170

(2d Cir. 2004). The Private Securities Litigation Reform Act of 1995 ("PSLRA") expands

Rule 9(b)'s requirements in two important ways. *First*, plaintiffs must "specify" each statement

alleged to be misleading and "the reason or reasons why the statement is misleading, and, if an

allegation regarding the statement or omission is made on information and belief, the complaint

shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

Plaintiffs thus "must do more than say that the statements . . . were false and misleading; they

must demonstrate with specificity why and how that is so." *Rombach*, 355 F.3d at 174. *Second*, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" (scienter). 15 U.S.C. § 78u-4(b)(2)(A).

Scienter is "an intent to deceive, manipulate, or defraud." *JPMorgan*, 553 F.3d at 198 (internal quotation marks omitted). To qualify as strong under the PSLRA, an inference of scienter "must be 'more than merely plausible or reasonable—it must be . . . at least as compelling as any opposing inference of nonfraudulent intent.'" *Id*. The PSLRA thus requires a court to "engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged." *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

To plead scienter, plaintiffs must allege particularized facts showing "(1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *JPMorgan*, 553 F.3d at 198. Reckless conduct "'is highly unreasonable and . . . represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Chill* v. *Gen. Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996). Plaintiffs thus must plead a "'reckless disregard for the truth'" of each challenged statement and a "'state of mind approximating actual intent, and not merely a heightened form of negligence.'" *Shemian* v. *Research In Motion Ltd.*, 2013 WL 1285779, at *14 (S.D.N.Y. Mar. 29, 2013) ("*RIM*"). The PSLRA requires allegations of particularized facts showing that defendants "'knew facts or had access to information suggesting that their public statements were not accurate . . . [or] failed to review or check information they had a duty to monitor.'" *Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.*, 531 F.3d 190, 195

(2d Cir. 2008). "To make this showing, a complaint '*must specifically identify* the reports or statements' that are contradictory to the statements made." *Plumbers & Steamfitters Local 773 Pension Fund* v. *CIBC*, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010) (emphasis in original).

To plead corporate scienter, plaintiffs must allege particularized facts that create a strong inference that "someone whose intent could be imputed to the corporation" made a false or misleading statement "with the requisite scienter." *Dynex*, 531 F.3d at 195. The law imputes to the corporation the state of mind of the officers who made the statements or otherwise were responsible for them. *Abu Dhabi Commercial Bank* v. *Morgan Stanley & Co.*, 2013 WL 1155420, at *4 (S.D.N.Y. Mar. 20, 2013). It is also "possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant" if a corporate statement is so obviously and blatantly false that it creates a strong inference that the statement was approved by a corporate officer who must have known that the statement was false. *Dynex*, 531 F.3d at 195. For example:

> Suppose General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero. There would be a strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false.

*Id*. at 195-96 (quoting *Makor Issues & Rights, Ltd.* v. *Tellabs, Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) ("*Tellabs II*")); *see also In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 791 (S.D. Tex. 2012) (requiring "extraordinary and dramatic falsity" to plead corporate scienter).

Although the Complaint's factual allegations should be accepted as true, "no legal effect" should be given "to legal conclusions couched as factual allegations." *Port Dock & Stone Corp.* v. *Oldcastle Ne., Inc.*, 507 F.3d 117, 121 (2d Cir. 2007). The Court also should disregard allegations "that are contradicted . . . by documents upon which [the Complaint] rel[ies] or by facts of which the court may take judicial notice." *In re Livent, Inc. Noteholders Sec. Litig.*, 151

F. Supp. 2d 371, 405-06 (S.D.N.Y. 2001). Where, as here, factual allegations are made on information and belief, plaintiffs must allege an "adequate bas[i]s for the allegations" by "identify[ing] sufficiently the sources upon which [plaintiffs'] beliefs are based and those sources must have been likely to have known the relevant facts." *In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 689 (S.D.N.Y. 2008) (internal quotation marks omitted).

## ARGUMENT

**I.      Plaintiffs Do Not State a Section 10(b) Claim Based on General Descriptions of CIO's Overall Purposes and Activities in JPMorgan's 2010 and 2011 SEC Filings.**

Plaintiffs argue that three general descriptions of CIO's overall purposes and activities in JPMorgan's 2010 and 2011 SEC filings (none of which refers specifically to the SCP) were false and misleading when made because CIO "was not 'primarily concerned' with managing risk:"

- "The Chief Investment Office is primarily concerned with managing structural market risks which arise out of the various business activities of the Firm. These include structural interest rate risk, and foreign exchange risk."

- "[T]he Chief Investment Office manage[s] capital, liquidity, interest rate and foreign exchange risk and the investment portfolio for the Firm."

- "Overlaying the line of business risk management are four corporate functions with risk management-related responsibilities, including the Chief Investment Office, Corporate Treasury, Legal and Compliance and Risk Management."

(Compl. ¶¶ 244(a)-(c), 245.) Plaintiffs also aver that those filings falsely described CIO VaR as "includ[ing] positions . . . used to manage structural risk and other risks." (*Id.* ¶¶ 246-47.)[9]

---

[9] Plaintiffs aver that these statements were false and misleading when included in JPMorgan's (i) 2009 Form 10-K; (ii) 2010 Form 10-K; and (iii) other 2010 and 2011 SEC filings incorporating these statements from the Form 10-Ks. (Compl. ¶¶ 243, 248.) They also assert that the last statement was false and misleading when included in JPMorgan's Earnings Release Financial Supplements, filed with the SEC every quarter as an exhibit to Form 8-K. (*Id.* ¶ 249.)

**A.      Plaintiffs Do Not Adequately Allege That These General Statements Describing CIO as a Whole Were False or Misleading.**

**1.      Plaintiffs Do Not Allege Specific Facts Showing That CIO Was Not "Primarily Concerned" with Managing Structural Market Risks in 2010 and 2011.**

"Primarily" means "[t]o a great or the greatest degree; for the most part, mainly." *Oxford English Dictionary*, www.oed.com (last visited June 8, 2013). It does not mean "exclusively." *Power Auth. of State of N.Y.* v. *FERC*, 743 F.2d 93, 104 (2d Cir. 1984). Thus, to plead that the statement that CIO was "primarily concerned with managing structural market risks" was false, plaintiffs must allege specific facts demonstrating that CIO as a whole was not *for the most part* concerned with managing such risks in 2010 and 2011. It is not enough merely to allege that the SCP—only one of the portfolios managed by CIO during those years—was not primarily concerned with risk management. Yet the Complaint's limited (and highly conclusory) pre-2012 allegations mostly relate only to the SCP, attempting to equate the SCP with CIO overall. (*See, e.g.*, Compl. ¶¶ 245(d) ("*synthetic credit portfolio* was comprised of positions"), 245(k) ("The CIO's *synthetic credit portfolio* did not serve any risk management function."); 250(b) ("In 2010 and 2011, the risk presented by the *synthetic credit portfolio* caused the CIO's VaR to increase.") (emphasis added).) Conspicuously absent are specific factual allegations about the purposes of CIO's $300 billion ISP, its other multi-billion dollar portfolios or CIO as a whole, and plaintiffs' conclusory allegations do not even establish that the SCP was not primarily concerned with risk management in 2010 and 2011.

Plaintiffs make specific factual allegations about only three investments outside the SCP—one per year in 2008, 2009 and 2010—that supposedly had no risk management purpose. These allegations lack the facts necessary to plead that the investments were inconsistent with managing structural market risks, and in any case, allegations concerning three investments over

three years are hardly sufficient to plead that general statements describing the *primary* purpose of CIO as a whole were false or misleading when made.

Plaintiffs allege that CIO (i) in 2008 incurred losses of $1 billion on investments in Fannie Mae and Freddie Mac preferred stock and (ii) in 2009 accumulated a portfolio of asset-backed securities totaling more than $150 billion. (*Id*. ¶¶ 88, 90.) They allege, however, no facts showing that these investments were inconsistent with managing structural market risks, such as the risks associated with JPMorgan's significant excess deposits. Plaintiffs instead resort to pleading conclusions, describing the $1 billion loss in a $300 billion portfolio as "massive" and labeling the asset-backed securities as "risky" without factual support. *See Local No. 38 IBEW Pension Fund* v. *Am. Exp. Co.*, 724 F. Supp. 2d 447, 462 (S.D.N.Y. 2010) ("A plaintiff cannot satisfy a legal requirement merely by intoning vague descriptions bereft of any particulars."). Moreover, JPMorgan disclosed CIO's losses on the preferred stock investments (*see*, *e.g.*, Ex. 11 at 61 (2008 Form 10-K)), as well as its "significant" investment of some excess deposits in asset-backed securities (*see*, *e.g.*, Ex. 12 at 74 (2009 Form 10-K) (CIO made "significant purchases of . . . asset-backed securities . . . associated with [CIO's] management of interest rate risk and investment of cash resulting from the excess funding.")). In sum, these investments do not establish that JPMorgan's general statement that CIO as a whole was "primarily concerned with managing structural market risks" was false or misleading when made.

Plaintiffs also point to a *Wall Street Journal* article reporting that CIO suffered losses of $300 million in 2010 due to unspecified "complex bets tied to foreign currencies." (Compl. ¶ 89.) Without any attribution, this article asserts that these unspecified "bets" had no "offsetting gains to balance out the losses." (Ex. 13 at 2 (6/12/12 WSJ article) (cited at Compl. ¶ 89).) On that basis, plaintiffs contend that "the trades were not hedges." (Compl. ¶ 89.) As an initial

matter, the article provides no basis to conclude that the unidentified source is likely to have known the relevant facts, which makes the article's assertions too unreliable to be the basis for allegations made upon information and belief. *Optionable*, 577 F. Supp. 2d at 690. In addition, JPMorgan disclosed that CIO "manag[ed] . . . foreign exchange risk" (Ex. 12 at 118 (2009 Form 10-K)) and cautioned that "unanticipated or unidentified market or economic movements have in some circumstances limited the effectiveness of our risk management strategies, *causing us to incur losses*." (*Id.* at 7 (emphasis added).) Neither the assertion that there were no "offsetting gains" nor the fact that the trades may have resulted in $300 million in losses—less than 0.1% of CIO's total assets—is a basis to conclude that JPMorgan's general description of CIO's primary focus was false.

### 2. Plaintiffs Do Not Seriously Challenge the Accuracy of the Other 2010 and 2011 Statements about CIO.

Plaintiffs contend that the 2010 and 2011 statements that CIO "manage[d] capital, liquidity, interest rate and foreign exchange risk" and had "risk management-related responsibilities" were false and misleading. (Compl. ¶ 244.) But they plead no facts to support that contention. They simply conclude that "by the end of 2009, the CIO was not 'primarily concerned' with managing risk," relying primarily on allegations about the SCP and its trading in early 2012. (*Id.* ¶ 245.) As discussed above, the Complaint does not allege facts establishing that CIO as a whole was not "primarily concerned" with managing risks in 2010 and 2011.

### 3. Plaintiffs Fail to Show That the 2010 and 2011 Description of CIO VaR Was False or Misleading.

Plaintiffs allege that JPMorgan's description of CIO VaR as "includ[ing] positions . . . used to manage structural risk and other risks" was false or misleading. (*Id.* ¶ 246.) For one thing, this description states only that CIO VaR "includes" positions used to manage risk, not that it "primarily" or "exclusively" includes such positions. Plaintiffs do not allege facts

showing that CIO VaR did not *include* positions used to manage risk in 2010 and 2011. For another, plaintiffs' assertion that "a significant portion of the CIO's VaR—more than 50% at some [unspecified] points during the Class Period—was generated by" the SCP's positions (*id*. ¶ 247) is insufficient to allege that the challenged general statement about the positions included in CIO VaR was false or misleading when made in 2010 and 2011.

Plaintiffs' contention that the CIO VaR description "represented that losses incurred on those positions would be offset by gains on existing positions elsewhere in the Company" (*id*.) is incorrect. JPMorgan never told investors that its risk management positions perfectly offset the gains or losses of other positions. In fact, it told them the opposite: "[U]nanticipated or unidentified market or economic movements have in some circumstances limited the effectiveness of our risk management strategies, causing us to incur losses." (*See* Ex. 12 at 7 (2009 Form 10-K).) As JPMorgan explained in its SEC filings, CIO incurred certain risks in order to manage others. (*See id*. at 118 ("[Some of t]he highest concentrations of market risk are found in . . . [CIO] . . . [which] is primarily concerned with managing structural market risks").)

## B. Plaintiffs Do Not Adequately Allege a Strong Inference of Scienter.

To plead scienter, plaintiffs must allege particularized facts giving rise to a strong inference that the officers who signed JPMorgan's 2010 and 2011 SEC filings—Dimon as CEO and Cavanagh or Braunstein as CFO—"knew facts or had access to information suggesting" that CIO was not "primarily concerned" with risk management and that CIO VaR did not "include[]" positions used to manage risks when they certified the accuracy of those lengthy filings, or that they "failed to check information they had a duty to monitor." *Dynex*, 531 F.3d at 194 (internal quotation marks omitted).

Plaintiffs attempt to satisfy their burden as to Dimon by relying on factually unsupported allegations of his "control of CIO," his position as CEO and his supposed receipt of various

-23-

reports.  (Compl. ¶¶ 322-26, 327(b)-(f), (h), (k).)  For Cavanagh and Braunstein, they rely almost

entirely on their position as CFO and their supposed receipt of reports.  (*Id.* ¶¶ 332-35, 336-42.)

Courts routinely reject such attempts to plead scienter based on corporate positions and supposed

receipt of general reports.  *See*, *e.g.*, *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 351-

52, 366 (S.D.N.Y. 2011) (rejecting as insufficient to plead scienter these types of allegations);

*CIBC*, 694 F. Supp. 2d at 299-300 (same).  Plaintiffs also attempt to plead scienter by citing

alleged risk management deficiencies related to CIO's SCP, but nothing about those deficiencies

would have alerted these individuals to the supposed falsity of the general descriptions of CIO

and CIO VaR in JPMorgan's lengthy SEC filings in 2010 and 2011.[10]

### 1. Plaintiffs Do Not Adequately Plead That Dimon Acted with an Intent to Deceive or Defraud.

Plaintiffs make sweeping allegations regarding Dimon's "control over [CIO's]

operations" and his "direct[] responsibil[ity] for overseeing the CIO" (Compl. ¶ 324), relying on

Drew's testimony before the PSI that "investment decisions were made with the full

understanding of the executive management, including Jamie Dimon" (*id.* ¶ 326).  But this

testimony in no way suggests that Dimon in 2010 and 2011 knew facts or had access to

information suggesting that the general descriptions of CIO and CIO VaR in JPMorgan's SEC

filings were false.  The law also is clear that allegations that an executive "likes to know what is

going on all the time" (*id.* ¶¶ 130, 325) do not suffice to plead a strong inference of scienter.  *See*

*City of Brockton Ret. Sys.* v. *Shaw Grp.*, *Inc.*, 540 F. Supp. 2d 464, 473-74 (S.D.N.Y. 2008).

Plaintiffs' allegation that "Dimon himself directed the transformation of the CIO" into an

internal hedge fund (Compl. ¶ 58) lacks an adequate factual basis.  *See Optionable*, 577 F. Supp.

---

[10] To the extent plaintiffs attempt to plead scienter by alleging a motive to generate profits (*see* Compl. ¶¶ 324, 327(b)), those allegations "do not suffice."  *Kalnit* v. *Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) (rejecting as insufficient generalized "profit" motives attributable to all corporate executives).

2d at 690.  That allegation is based on a newspaper article stating that a former CIO employee

was told by two unnamed "JPMorgan executives" when he was hired "in 2006" that CIO's role

was "'to generate profit for the firm'" and that was "'Jamie's new vision for the company.'"

(Compl. ¶ 58 (citing Ex. 14 (5/14/12 Bloomberg article).)  "[A]necdotes and conclusory

statements of belief cannot form the basis for a finding of" scienter.  *Local No. 38*, 724 F. Supp.

2d at 460.  Neither the Complaint nor the newspaper article on which it relies points to any facts

suggesting that these executives had personal knowledge of Dimon's supposed "vision for the

company."  *See Janbay* v. *Can. Solar, Inc.*, 2012 WL 1080306, at *6 (S.D.N.Y. Mar. 30, 2012)

(allegations that witness "got the information through intermediaries . . . undermin[es] the

likelihood that he had personal knowledge of his allegations.") (internal quotation marks

omitted).  In any event, generating profits is not inconsistent with management of the Firm's

structural risk from excess deposits and hardly supports plaintiffs' contention that Dimon

transformed CIO into a "hedge fund."

  Plaintiffs' allegations about CIO's investments in Fannie Mae and Freddie Mac preferred

stock and the SCP's shorting of the subprime housing market (Compl. ¶¶ 88 (alleging Dimon

"intimately familiar" with preferred stock investment); 327(c) (alleging Dimon "personally

involved" in subprime mortgage "bets")) also fail to plead scienter as to Dimon.  JPMorgan and

Dimon himself disclosed the losses on the preferred stock to investors (Ex. 15 at 47 (3Q 2008

Form 10-Q); Ex. 16 at 16 (2Q 2009 earnings call tr.)), thereby negating any inference of an intent

to defraud or maintain a "secret trading operation" (Compl. ¶ 7).  And the SCP's alleged shorting

of the subprime housing market as a means to hedge JPMorgan's risk from subprime mortgages

was consistent with the general descriptions of CIO's risk management role and thus hardly shows that Dimon had knowledge of specific facts contradicting those general statements.[11]

Plaintiffs attempt to bolster their deficient scienter allegations by pointing to "warnings" Dimon purportedly received about deficiencies in CIO risk management procedures (Compl. ¶ 327(h)) and to JPMorgan's supposed *ex post* admissions regarding such deficiencies (*id*. ¶ 327(a)). But these allegations fail to give rise to a strong inference of scienter for statements made in 2010 and 2011—whether the risk management procedures that applied to CIO's activities later were shown to be inadequate says nothing about whether the purpose of CIO was primarily to manage risks from JPMorgan's excess deposits. As a result, "warnings" of such deficiencies would not have alerted Dimon that CIO was not "primarily concerned" with risk management or that CIO VaR did not "include[]" positions used to manage risk.

In any event, plaintiffs allege no particularized facts suggesting that Dimon was even aware in 2010 or 2011 of any deficiencies in CIO risk management when he signed JPMorgan's SEC filings. Dimon's alleged receipt of a supervisory letter from the OCC in 2010 that criticized CIO's documentation of certain investment positions (the "2010 OCC Supervisory Letter") (*id*. ¶ 327(g)) adds nothing: plaintiffs do not allege that the letter suggested that CIO did not primarily manage risk, only that certain documentation procedures needed improvement (*see id*. ¶ 107).

The balance of plaintiffs' scienter allegations directed at Dimon rely on general statements about his corporate position and purported receipt of reports about CIO. (Compl.

---

[11] Plaintiffs argue that the SCP's short position on the subprime housing market during the financial crisis was an "obvious" illustration of how the SCP did not manage risk. (Compl. ¶¶ 86-87.) At the time, however, JPMorgan faced the prospect of losses from subprime mortgage defaults. (Ex. 12 at 61 (2009 Form 10-K) (reporting subprime mortgage credit exposure of $15.3 billion in 2008).) Accordingly, this position "was thought to help JPMorgan hedge its risks as the housing bust took shape." (Ex. 13 at 2 (6/12/12 WSJ article) (cited at Compl. ¶ 86).)

¶¶ 322-23, 329(a)-(c).)  Courts have long held that "accusations founded on nothing more than a defendant's corporate position are entitled to no weight."  *CIBC*, 694 F. Supp. 2d at 300.  And general allegations about the receipt of reports are similarly insufficient to plead scienter.  *Dynex*, 531 F.3d at 196.  To create a strong inference of scienter, plaintiffs must specify the particular reports and the information contained in them that would have alerted Dimon that the challenged statements were false.  *Id*.  Plaintiffs allege that Dimon "received a regular report"—dubbed "Jamie's Report"—that contained CIO's "aggregate trading positions" (Compl. ¶ 329(a)), but they fail to specify any information in that report that should have alerted Dimon to the falsity of the general descriptions of CIO's overall purpose and activities in JPMorgan's 2010 and 2011 SEC filings.  *Dynex*, 531 F.3d at 196.  General allegations about "profit-and-loss reports," "VaR calculations" and risk limit excessions (Compl. ¶¶ 329(a), (b), (f)) fail for the same reason.[12]

### 2. Plaintiffs Do Not Adequately Plead That Cavanagh and Braunstein Acted with an Intent to Deceive or Defraud.

In an effort to plead that Cavanagh and Braunstein acted with scienter in signing the Firm's SEC filings, plaintiffs rely almost entirely on their position as CFO and their supposed receipt of some of the same risk-related reports Dimon allegedly received.  (*Id*. ¶¶ 332-42.)  As with Dimon, however, plaintiffs fail to identify any specific reports received by Cavanagh or Braunstein, much less what information they supposedly contained, that should have alerted them that the general descriptions of CIO in JPMorgan's 2010 and 2011 SEC filings were false.

Plaintiffs allege that Cavanagh was informed in 2010 of CIO's loss on foreign currency trades that supposedly "were not hedges."  (*Id*. ¶¶ 89, 335(d).)  Even if true, knowledge of one

---

[12] Plaintiffs also attempt to rely on the discredited core operations theory, alleging that CIO's size and importance to JPMorgan shows that Dimon must have known facts contradicting the general descriptions of CIO. (Compl. ¶¶ 330(a)-(f).)  As discussed at length, *infra*, Part III.C, plaintiffs cannot plead scienter by alleging that the supposed fraud concerned claimed "core operations" of the Firm.

loss on a single set of trades does not suffice to create a strong inference that Cavanagh knew or was reckless in not knowing that CIO supposedly was not "primarily concerned" with managing risk or that CIO VaR did not "include" positions used to manage risk.

Plaintiffs make much of Braunstein's statement to the PSI that "[a]s to specific investment decisions, I was certainly aware of the [SCP]." (Compl. ¶¶ 338, 341(b).) But that statement does not create a strong inference that Braunstein knew of facts in 2010 or 2011 when he signed JPMorgan's SEC filings suggesting that CIO as a whole was not primarily concerned with managing the Firm's risk or that CIO VaR did not include positions used to manage risk. Similarly, Braunstein's alleged receipt of the 2010 OCC Supervisory Letter (Compl. ¶ 341(e)) and other supposed warnings about CIO's risk management practices fail for the same reasons they fail as to Dimon: they did not suggest that CIO overall was not primarily engaged in managing the Firm's risk.

### 3. Plaintiffs Do Not Adequately Plead Corporate Scienter.

Plaintiffs fail to plead a strong inference of corporate scienter in "the most straightforward way . . . [which is] to plead it for an individual defendant." *Dynex*, 531 F.3d at 195. As explained above, their scienter allegations directed at Dimon, Cavanagh and Braunstein—the only individuals whom plaintiffs attempt to connect to the challenged corporate statements in JPMorgan's 2010 and 2011 SEC filings—do not satisfy the PSLRA's heightened pleading standard.[13] Nor are the general descriptions of CIO's overall purpose and activities in those filings so blatantly false that they create a strong inference that another corporate officer responsible for the statements must have been aware they were false when made. *Id*. at 195-96.

---

[13] Plaintiffs do not allege that Drew or Zubrow made any of the challenged statements in JPMorgan's 2010 and 2011 SEC filings, nor do they plead any facts suggesting that they drafted, reviewed or otherwise were responsible for those statements.

## II. Plaintiffs Do Not State a Section 10(b) Claim Based on Descriptions of Firm-Wide Risk Management Practices in JPMorgan's 2010 and 2011 SEC Filings.

Plaintiffs contend that two categories of statements related to JPMorgan's firm-wide risk management practices in its 2010 and 2011 SEC filings were false and misleading, even though the statements made no reference to CIO in general or the SCP in particular. First, they challenge very general descriptions of JPMorgan's overall risk management practices, such as "JPMorgan Chase has in place a robust risk management discipline." (Compl. ¶ 255; *see also id*. ¶¶ 257, 259.) Second, they argue that general statements about JPMorgan's use of limits and models to manage risk were false. (*Id*. ¶¶ 253, 258, 259.)

### A. The Challenged Descriptions of JPMorgan's Firm-Wide Risk Management Practices Are Too General to Be Material.

"[T]he Second Circuit has held, as a blanket matter, that 'statements that are too general to cause a reasonable investor to rely upon them' such as 'generalizations about a company's business practices and integrity' may not form the basis for a Rule 10b-5 fraud claim." *Gusinsky* v. *Barclays PLC*, 2013 WL 1955881, at *6 (S.D.N.Y. May 13, 2013) (quoting *Boca Raton Firefighters & Police Pension Fund* v. *Bahash*, 2012 WL 6621391, at *3 (2d Cir. Dec. 20, 2012)). As one court explained, "[a] reasonable investor, by definition, does not rely upon [such] general and vague statements." *Woodward* v. *Raymond James Fin., Inc.*, 732 F. Supp. 2d 425, 433 (S.D.N.Y. 2010). Applying this well-settled rule, the Second Circuit has held that a statement that a bank has "risk management processes [that] are highly disciplined" is immaterial as a matter of law. *JP Morgan*, 553 F.3d at 205-06. Such generalizations are not material because "almost every investment bank makes these statements." *Id*. at 206. A contrary rule thus "would bring within the sweep of federal securities laws many routine representations made by investment institutions." *Id*.

Despite this clear rule, plaintiffs challenge three general and forward looking descriptions of JPMorgan's overall risk management practices:

- "The Firm's risk management framework and governance structure *are intended* to provide comprehensive controls and ongoing management of the major risks inherent in its business activities. It *is also intended* to create a culture of risk awareness and personal responsibility throughout the Firm. The Firm's ability to properly identify, measure, monitor and report risk is critical to both its soundness and profitability." (Compl. ¶ 252 (quoting Ex. 12 at 86 (2009 Form 10-K) (emphasis added).)

- "JPMorgan Chase has in place a robust risk management discipline that captures, monitors, and controls the risks created by its business activities. The *goal* is not only to manage the dynamic risks of the Firm, but also to create a culture of risk awareness and personal accountability. Any substantial introduction of emerging risks or increase in risks routinely taken would be largely controlled by risk limits in place or identified through the frequent risk report[ing] that occurs throughout the Firm. This risk discipline *seeks to ensure* that the potential for excessive risk-taking by any individual, group, or business is controlled, regardless of motivation." (*Id.* ¶ 255 (quoting Ex. 17 at 17 (2010 Proxy Statement) (emphasis added).)

- "The Firm's risk management framework and governance structure *are intended* to provide comprehensive controls and ongoing management of the major risks taken in its business activities. The Firm employs a holistic approach to risk management to ensure the broad spectrum of risk types are considered in managing its business activities. The Firm's risk management framework *is intended* to create a culture of risk awareness and personal responsibility throughout the Firm where collaboration, discussion, escalation and sharing of information is encouraged." (*Id.* ¶ 257 (quoting Ex. 3 at 107) (2010 Form 10-K) (emphasis added).)[14]

Such general statements are immaterial as a matter of law. *See*, *e.g.*, *Woodward*, 732 F. Supp. 2d at 431, 434 (statement that "we have a very conservative management approach" is "the quintessence of non-actionable puffery"); *In re Barclays Bank PLC Sec. Litig.*, 2011 WL 31548, at *10 (S.D.N.Y. Jan. 5, 2011) (statement that "[w]hen weaknesses in exposures are detected . . . action is taken to mitigate the risks" is not material); *Stratte-McClure* v. *Morgan Stanley*, 784 F. Supp. 2d 373, 385 (S.D.N.Y. 2011) ("generalized statements about the effectiveness of the

---

[14] By referring to the Firm's intent, these statements are also forward looking. The Complaint is devoid of allegations that defendants had "actual knowledge" that any forward-looking statements were false at the time they were made, as required by the PSLRA. *See* 15 U.S.C. §§ 78u-5(c)(1)(B)(i)-(ii).

Company's risk management . . . did not amount to a guaranty that [defendant's] risk management was flawless or that it would prevent any business missteps. Instead, they are properly classified as 'puffery' and therefore are not actionable as a matter of law.").

Plaintiffs attempt to bolster their allegations by pointing out that JPMorgan stated that its "ability to properly identify, measure, monitor and report risk is critical to both its soundness and profitability" (Compl. ¶ 252), but such a general statement is not material to a reasonable investor simply because it deals with a topic that is "undeniably important." *JP Morgan*, 553 F.3d at 206; *see also In re Austl. & N.Z. Banking Grp. Sec. Litig.*, 2009 WL 4823923, at *11-12 (S.D.N.Y. Dec. 14, 2009) (statement that "ANZ recogni[z]es the importance of effective risk management to its business success" is not actionable).

**B.      Plaintiffs Do Not Adequately Allege That General Descriptions of JPMorgan's Firm-Wide Risk Management Practices Were False or Misleading.**

Plaintiffs contend that the descriptions of JPMorgan's firm-wide risk management practices, including the Firm's use of limits and models, in its 2010 and 2011 SEC filings were false and misleading when made because: (i) there were no risk limits directed specifically to the SCP, (ii) CIO risk limits were not reviewed in 2010, and (iii) CIO exceeded its risk limits during the first half of 2011. Plaintiffs also refer to events that occurred after the challenged statements were made, which cannot show that the challenged statements were false.

According to the Complaint, the general statements that "[m]arket risk is controlled primarily through a series of limits" and that "line-of-business limits include VaR and stress limits" were false because there were "no risk limits specific to the [SCP]." (Compl. ¶¶ 253, 254(b), (e), (h).) But JPMorgan never said that every single portfolio would be subject to its own specific limits, only that limits applied to its various lines of business. (*See*, *e.g.*, Ex. 3 at 146 (2010 Form 10-K) (identifying corporate and line-of-business level limits).) Plaintiffs' own

allegations show that CIO had aggregate risk limits that included the SCP as one of the portfolios managed by CIO. (Compl. ¶ 254(k).) JPMorgan also did not say that particular types of limits applied to particular businesses or portfolios, only that VaR and stress limits "may be supplemented" by other measures. (Ex. 3 at 146 (2010 Form 10-K).) As a result, plaintiffs' allegations that "CIO lacked concentration limits" and that "stop loss limits were scrapped" in CIO (Compl. ¶¶ 78, 254(g)) are irrelevant to the accuracy of the general statements in JPMorgan's SEC filings. The latter allegation also ignores the existence of "one, five, and twenty day stop loss advisories in place" for the SCP. (PSI Rpt. at 208.)[15]

Plaintiffs also contend that the firm-wide statements that "[m]arket risk management regularly reviews and updates risk limits" and that "[s]enior management . . . is responsible for reviewing and approving certain risk limits on an ongoing basis" were false and misleading because "in violation of Company policy, risk limits in the CIO were never reviewed by anyone between 2009 and 2012." (Compl. ¶¶ 253, 254(b); *see also id*. ¶ 260(a).) Leaving aside that the challenged statements said nothing specific about CIO risk management, CIO risk limits were reviewed in 2009 (TFR at 101 n.112) and again beginning in July 2011 (*id*.; *see also* Compl. ¶ 260(e)). The mid-2011 review culminated in a presentation to the CIO Risk Committee in March 2012, and new limits were implemented in May 2012. (TFR at 101 n.112.) Although CIO risk limits were not reviewed in 2010 (Compl. ¶ 254(b)), JPMorgan never told investors that it reviewed risk limits annually, only "regularly" (*id*. ¶ 253).

The suggestion that these general statements about the Firm as a whole were false because Dimon and Zubrow (as CRO) did not personally review CIO risk limits on a regular

---

[15] Plaintiffs even argue that the general statement that risk models "provide granular information on the Firm's market risk exposure" was false because "risk limits in CIO were not granular enough." (Compl. ¶¶ 253, 254(k), 258.) They fail to explain, however, how an assessment of the limit structure in one business renders false a general statement about how models *function* throughout JPMorgan.

basis (Compl. ¶ 254(b)) is wrong. JPMorgan's 2010 Form 10-K said only that "senior management, including the Firm's [CEO] and [CRO], is responsible for reviewing and approving *certain* limits," not each and every limit across the entire Firm. (Ex. 3 at 146 (2010 Form 10-K) (emphasis added).)[16]

Plaintiffs further allege that the statement "[l]imit breaches are reported in a timely manner to senior management, and the affected line-of-business is required to reduce trading positions or consult with senior management on the appropriate action," was false and misleading when made in 2011 because the SCP "breached stress limits at least eight times in the first half of 2011." (Compl. ¶ 260(c).) Plaintiffs acknowledge, however, that these excessions were reported to JPMorgan senior management. (*Id.*) Their allegation that "no action was taken to reduce the positions or address these breaches" (*id.*) is insufficient to plead that the general statement in JPMorgan's SEC filing was false: to be accurate, the line of business only had to "consult with senior management." Senior management could well have concluded that the appropriate action was to maintain the positions. JPMorgan never told investors that management always responded to limit excessions by reducing the size of the relevant position.

Although the Complaint includes a number of allegations regarding events in 2012 (*e.g.*, Compl. ¶¶ 254(a), (c); 260(b), (g)), those events cannot possibly show that general descriptions of JPMorgan's firm-wide risk management practices in 2010 and 2011 were false when made. For example, plaintiffs allege that the SCP grew to a "perilous size" (*id.* ¶ 260(b)), but that did not happen until the first quarter of 2012 (Ex. 6 at 17 (7/13/12 earnings call tr)), long after the statements were made. Plaintiffs also allege that CIO's Chief Market Risk Officer was

---

[16] Although the 2009 Form 10-K omitted the word "certain," that filing cannot reasonably be read as an assurance that JPMorgan's CEO and CRO personally reviewed every risk limit on a regular basis. Rather, the statement simply identified JPMorgan's CEO and CRO as two of the members of "senior management" who reviewed risk limits "on an ongoing basis." (Compl. ¶ 253.)

"demot[ed]" because "he sought to rein in the CIO's high-risk trading."  (Compl. ¶ 260(e).)  But that purported demotion allegedly occurred in 2012 (*id*. ¶¶ 161-63), and thus says nothing about whether the statements in 2010 and 2011 were false.  These and other events post-dating the challenged statements provide no support for the allegation that the general risk management procedures described in JPMorgan's 2010 and 2011 SEC filings "were not followed."  *In re Royal Bank of Scotland PLC Sec. Litig.*, 2012 WL 3826261, at *8 (S.D.N.Y. Sept. 4, 2012) (internal quotation marks omitted).

Finally, plaintiffs argue that defendants should have ensured that the "level of scrutiny of CIO . . . evolve[d] commensurate with its increased complexity."  (Compl. ¶ 231.)  The claim that management could "have caught [this] sooner" (*id*. ¶ 235) and imposed a better risk management structure in CIO is a claim of mismanagement, not securities fraud.  *See In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 359-60 (S.D.N.Y. 2008) (rejecting claim that "compliance program's aims misled investors into believing that they had an effective compliance program that would root out any impropriety, including the alleged [fraud]").  "The securities laws were not designed to provide an umbrella cause of action for the review of management practices." *Citigroup*, 330 F. Supp. 2d at 377.  Moreover, JPMorgan repeatedly cautioned investors that, as its "businesses change and grow and the markets in which they operate continue to evolve, the Firm's risk management framework may not always keep sufficient pace with those changes.  As a result, there is the risk that the credit and market risks associated with new products or new business strategies may not be appropriately identified, monitored or managed."  (Ex. 3 at 7 (2010 Form 10-K).)

### C. Plaintiffs Do Not Adequately Allege a Strong Inference of Scienter.

#### 1. Plaintiffs Do Not Adequately Plead That Dimon, Cavanagh or Braunstein Acted with an Intent to Deceive or Defraud.

Plaintiffs contend that Dimon, Cavanagh and Braunstein acted with scienter in signing or certifying the accuracy of JPMorgan's 2010 and 2011 SEC filings because they "knew or recklessly disregarded that the CIO lacked even the most basic risk management infrastructure or protocols." (Compl. ¶ 327(a).) At most, however, plaintiffs' allegations show that these executives failed to identify deficiencies in CIO's risk management practices in time to prevent the SCP from suffering losses in 2012, not that they were aware of risk management deficiencies in 2010 and 2011 that rendered the general descriptions of the Firm's overall risk management practices in JPMorgan's contemporaneous SEC filings false or misleading. A "failure to identify problems . . . does not constitute reckless conduct sufficient for § 10(b) liability." *Plumbers & Pipefitters Local Union No. 719 Pension Trust Fund* v. *Conseco Inc.*, 2011 WL 1198712, at *22 (S.D.N.Y. Mar. 30, 2011) (internal quotation marks omitted).

For example, plaintiffs allege that Dimon, Cavanagh and Braunstein generally received reports of limit excessions and thus should have known that the SCP purportedly exceeded unspecified "stress limits" in 2011. (Compl. ¶¶ 126, 323, 334, 340.) These allegations fail to "specify which reports revealed the [limit excessions], what information those reports contained, and whether the reports contradicted the public declarations of Defendants." *Wachovia*, 753 F. Supp. 2d at 352. Plaintiffs also allege that Dimon and Braunstein were aware of an "overdue 'Matter Requiring Attention'" ("MRA") because they were copied on the 2010 OCC Supervisory Letter criticizing "CIO's 'risk management framework for the investment portfolios' as lacking 'a documented methodology' and 'clear records of decisions.'" (Compl. ¶¶ 107, 327(g), 341(e).) But nothing in that letter discussing documentation deficiencies in CIO would have alerted

Dimon or Braunstein that CIO's risk management practices were inconsistent with the general descriptions of JPMorgan's firm-wide practices in the Firm's SEC filings. *See Salinger* v. *Projectavision, Inc.*, 934 F. Supp. 1402, 1415 (S.D.N.Y. 1996) (no scienter where information known to defendants was not inconsistent with public statements).

Plaintiffs contend that Dimon's signing of JPMorgan's SEC filings was reckless because he did not implement changes to CIO's risk management practices allegedly proposed in 2009 by the then co-CEOs of JPMorgan's Investment Bank. (Compl. ¶ 327(h).) Plaintiffs' "retrospective critiques" of Dimon's alleged decisions, however, are insufficient to raise a strong inference that he acted with scienter in signing JPMorgan's 2010 and 2011 SEC filings. *See In re Bank of Am. Corp. Sec., Deriv. & ERISA Litig.*, 757 F. Supp. 2d 260, 312 (S.D.N.Y. 2010). Even if adoption of the suggested changes would have prevented the losses, the appropriateness of controls and risk management practices is "inherently a matter of judgment or opinion," *In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 285 (S.D.N.Y. 2011), and "[b]usiness judgments that, with the benefit of hindsight, prove to be wrong, do not necessarily equate to fraudulent conduct," *Lighthouse Fin. Grp.* v. *Royal Bank of Scotland Grp. PLC*, 902 F. Supp. 2d 329, 342 (S.D.N.Y. 2012). Plaintiffs do not "allege with particularity provable facts to demonstrate" that Dimon believed that JPMorgan's firm-wide risk management practices were inadequate when he signed the 2010 and 2011 SEC filings. *See In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 567 (S.D.N.Y. 2011) (internal quotation marks omitted).

### 2. Plaintiffs Do Not Adequately Plead Corporate Scienter.

Plaintiffs contend that scienter is imputable to JPMorgan because Drew and Zubrow (in addition to Dimon, Cavanagh and Braunstein, discussed above) "knew or recklessly disregarded that the CIO lacked even the most basic risk management infrastructure or protocols." (Compl. ¶¶ 348(a), 356(a), 360, 361(a).) To start, plaintiffs allege *no* facts showing that Drew or Zubrow

made or otherwise were responsible for the challenged statements in JPMorgan's 2010 and 2011 SEC filings. *Abu Dhabi*, 2013 WL 1155420, at *4. Plaintiffs also fail to allege that Drew or Zubrow engaged in any conduct in connection with those filings that shows "an extreme departure from the standards of ordinary care" that "approximat[es] actual intent, and not merely a heightened form of negligence." *Foley* v. *Transocean Ltd.*, 861 F. Supp. 2d 197, 210 (S.D.N.Y. 2012) (internal quotation marks omitted). Plaintiffs' allegation that "CIO lacked even the most basic risk management infrastructure or protocols" is a claim of mismanagement, not securities fraud. Although the risk management procedures that applied to the SCP eventually proved to be inadequate to address the large positions and flawed trading strategy pursued in the first quarter of 2012, CIO in 2010 and 2011 had all of the risk management features described in JPMorgan's SEC filings. (*See*, *e.g.*, Compl. ¶¶ 72-82.)

### III. Plaintiffs Do Not State a Section 10(b) Claim Based on Alleged Earnings Misstatements Caused by a Supposed Failure to Establish a "Liquidity Reserve."

Plaintiffs contend that JPMorgan overstated its earnings by $2 billion every quarter from the fourth quarter of 2009 until the first quarter of 2012 (and falsely represented that its financial results were prepared consistent with GAAP) because it failed to establish a "liquidity reserve" for the SCP in "early 2010." (Compl. ¶¶ 9, 116, 261-64, 272-74.) This allegation—which conflates the accounting concepts of liquidity valuation adjustment and loss reserve—is insufficient to state a claim for fraud because plaintiffs do not adequately allege that (i) the failure to make an adjustment violated GAAP, (ii) defendants' opinions regarding the need for an adjustment were actionably false, or (iii) any defendant acted with scienter in signing JPMorgan's SEC filings.[17]

---

[17] Plaintiffs exaggerate the significance of the alleged failure to make the adjustment by claiming that it resulted in an overstatement of earnings in every subsequent quarter. Because plaintiffs allege only a single potential loss, there would be only one charge for that loss in one quarter. *Cf.* A.S.C. § 450-20-25-2 (requiring loss

## A.    Plaintiffs Do Not Adequately Allege a Violation of GAAP.

Plaintiffs do not adequately allege that JPMorgan violated GAAP—let alone that it repeatedly did so for more than two years—by failing to make a liquidity valuation adjustment in early 2010 or in any subsequent quarter.  Based on a newspaper article, plaintiffs assert that a "detailed report documenting the need for a $2 to $4 billion reserve" supposedly was prepared in 2010 by an unidentified JPMorgan employee.  (*Id*. ¶¶ 9, 114.)  This article reported that "a senior CIO executive" conducted "a detailed review in the beginning of 2010" and "concluded that the size, risk, and illiquidity of the CIO's synthetic-credit positions required the establishment of a liquidity reserve."  (*Id*. ¶ 114.)  But the article does not identify the executive who supposedly made this recommendation, and it acknowledges that it "is not known how much was recommended as a reserve or whether Mr. Dimon saw the report."  (Ex. 19 at 3 (6/28/12 NYT article) (cited at Compl. ¶ 114).)  Plaintiffs also point to the podcast of a third-party pundit, Christopher Whalen, who claimed that "the required reserve needed to be at least $2 billion— and as much as $4 billion."  (Compl. ¶ 114.)  Whalen admitted, however, that he was reporting only a "rumor" that unnamed "officials at JPM held internal discussions."  (Ex. 20 at 2 (5/30/12 Zero Hedge post).)  Although Whalen later claimed that he was "told" there were internal "discussions two years ago about posting a reserve," he never identified who supposedly was involved in those discussions and did not provide any reason to think that his unnamed source had personal knowledge of the alleged discussions.  (Ex. 21 at 8 (6/13/12 Bloomberg podcast tr.) (cited at Compl. ¶ 114).)  These unsubstantiated rumors do not provide the requisite factual basis

---

contingencies be charged against net income in reporting period in which information indicates asset is impaired). Plaintiffs' assertion that a $2 billion adjustment was required *every quarter* over a two-year period also defies logic given the significant changes in the size of the SCP during those two years.  (*See* PSI Rpt. at 51 (SCP net notional positions in credit derivatives totaled just $4 billion at the beginning of 2011).)

for plaintiffs' allegations about the need for a reserve.  *Lenard* v. *Design Studio*, 889 F. Supp. 2d 518, 529 (S.D.N.Y. 2012).

Even assuming that a "CIO executive" in 2010 prepared a "report that estimated the amount of money the Company would lose if it had to liquidate the CIO's positions within 30 days" (Compl. ¶ 114)—and JPMorgan did not make any valuation adjustment as a result— that still would not establish a GAAP violation.  GAAP requires that certain assets be marked at their "fair value" at the end of each reporting period.  Accounting Standards Codification ("A.S.C.") § 820-10-35 (FASB 2011).[18]  "Fair [v]alue" is the price JPMorgan would receive "to sell an asset . . . in an orderly transaction between market participants at the measurement date." *Id*. § 820-10-20 (2011).  If market activity has decreased at the measurement date, GAAP requires the "reporting entity [to] evaluate the significance and relevance" of at least eight different factors.  *Id*. § 820-10-35-51A (2011) (superseded *id*. § 820-10-35-54C (2012) (same)). The reporting entity must make a judgment call based on the "weight of the evidence" about how the state of the market on a given day affects the price of a particular asset.  *Id*. § 820-10-35-51A (2011).  Plaintiffs do not allege the facts that would be necessary to determine whether the supposed 2010 report established that GAAP *required* a liquidity valuation adjustment.[19]

More fundamentally, the report allegedly estimated the prices JPMorgan would receive "if it had to liquidate the CIO's positions within 30 days."  (Compl. ¶ 114.)  Under GAAP, that is

---

[18] Although plaintiffs cite Statement of Financial Accounting Standards No. 5 (Compl. ¶ 116), that standard does not apply to assets "measured at fair value."  A.S.C. § 450-10-15-2A.  Moreover, an unattributed report predicting "possible losses" ranging between $2 and $4 billion (Compl. ¶ 114) would not meet SFAS No. 5's requirement that a loss be taken in the period when it becomes both "probable" and "reasonably estima[ble.]" A.S.C. § 450-20-25-1; *see also In re NVIDIA Corp. Sec. Litig.*, 2010 WL 4117561, at *4 (N.D. Cal. Oct. 19, 2010).

[19] Plaintiffs' own allegations demonstrate that JPMorgan made liquidity valuation adjustments when required.  When market conditions changed in late 2011, JPMorgan made such an adjustment.  (Compl. ¶¶ 118, 269.)  In April and August 2012, JPMorgan increased that adjustment.  (*Id*. ¶¶ 261, 269.)  That the SCP made no new investments during this period (*id.* ¶ 269) is irrelevant.  Fair value is based upon market movements, not actual transactions by JPMorgan.

a forced sale, not an orderly transaction, and is therefore irrelevant to the assets' "fair value." A.S.C. § 820-10-35-51D (defining "orderly transaction" as "not a forced liquidation or distressed sale") (superseded *id*. § 820-10-35-54I (same)). For the same reason, plaintiffs' allegation that an estimate prepared in the fourth quarter of 2011 that unwinding 25% or 35% of the SCP's positions would result in losses of over $500 million (Compl. ¶119) does not show that a liquidity valuation adjustment was necessary. Selling such large portions of the SCP's positions would constitute liquidations, not orderly sales.

### B. Plaintiffs Do Not Adequately Allege That the Opinions and Judgments Reflected in JPMorgan's Reported Earnings Were Actionably False.

Even if GAAP did require JPMorgan to make an adjustment in 2010 or at some point thereafter, plaintiffs do not show that the failure to do so was fraudulent. GAAP recognizes that the need for and size of a liquidity valuation adjustment "require[] the use of significant judgment." A.S.C. 820-10-35-51D. When an inquiry under GAAP "reflect[s] . . . opinion or judgment," a plaintiff must plead that management did not honestly believe that its judgment was appropriate. *Fait* v. *Regions Fin. Corp*., 655 F.3d 105, 113 (2d Cir. 2011). Plaintiffs do not come close to meeting that burden. Without an allegation that a JPMorgan officer responsible for earnings announcements saw *and* credited the conclusions of the supposed internal CIO report, plaintiffs have not pled that the earnings announcements were "false" within the meaning of Section 10(b). *Bank of Am.*, 757 F. Supp. 2d at 317.

Even assuming "a detailed internal report" was prepared (Compl. ¶ 114), plaintiffs do not allege that JPMorgan's CEO or CFO ever saw it. Their broad-brush allegation that the report "was discussed 'at the "CFO level"'" (*id*. (citing Whalen's reporting of rumor)) does not allege when it supposedly was discussed or whether that discussion involved Dimon, Cavanagh or Braunstein. Even if one of those defendants saw the alleged report, plaintiffs do not plead facts

suggesting that he nonetheless could not have honestly held the opinion that no adjustment was required by GAAP. The exercise of judgment necessary to determine whether a liquidity valuation adjustment is appropriate "depend[s] . . . heavily on . . . discretionary choices," and individuals within an organization "may have different opinions or analytic approaches." *In re Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d 248, 251-52 (S.D.N.Y. 2005); *see also In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *16 (S.D.N.Y. Sept. 28, 2012) (holding that letter from confidential witness allegedly warning of "serious flaw in UBS's valuation model . . . simply reflect[ed] a different business judgment"). Plaintiffs do not allege facts suggesting that any JPMorgan officer with the authority to make an adjustment believed that doing so was necessary before late 2011 when an adjustment was made. (*See supra* n.19.)

### C. Plaintiffs Do Not Adequately Allege a Strong Inference of Scienter.

The "requirement that a plaintiff plausibly allege that defendant misstated his truly held belief and an allegation that defendant did so with fraudulent intent [are not] one and the same." *Fait*, 655 F.3d at 112 n.5. In an attempt to plead scienter, plaintiffs point only to the same supposed report by a "CIO executive." (Compl. ¶¶ 335(f), 341(d).) Because plaintiffs do not allege that any defendant or other JPMorgan officer responsible for the firm's reported earnings knew that the report existed and agreed with its conclusions, plaintiffs do not plead facts raising a strong inference that he or she acted with an intent to deceive by ignoring the report's contents.

Unable to connect any defendant to the supposed report, plaintiffs turn to the now-discredited core operations doctrine. (*Id.* ¶¶ 330, 335(h), 342, 361.) Under that doctrine, "[k]nowledge of the falsity of a company's financial statements [could once be] imputed to key officers who should have known of facts relating to the core operations of their company that would have led them to the realization that the company's financial statements were false when issued." *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489

(S.D.N.Y. 2004). That doctrine has no application to plaintiffs' claim of an earnings misstatement based on a single supposed report prepared by an unidentified "CIO executive." In any event, courts have questioned the doctrine's viability as a means of pleading scienter under the PSLRA. *Glaser* v. *The9, Ltd.*, 772 F. Supp. 2d 573, 596 n.17 (S.D.N.Y. 2011). The trend in this Circuit has been to allow plaintiffs to rely on it only "to bolster other substantial grounds for scienter." *Bd. Of Trustees of City of Ft. Lauderdale Gen. Employees Retirement Sys.* v. *Mechel OAO*, 811 F. Supp. 2d 853, 872 (S.D.N.Y. 2011). Assuming the SCP constituted a "core" JPMorgan operation—and it did not—there are no "other substantial grounds for scienter" to bolster.

Plaintiffs also do not allege particularized facts that give rise to a strong inference of corporate scienter. They do not identify the rumored report's author, let alone what role (if any) he or she had in preparing JPMorgan's reported earnings. "[T]he fact that [the author] may have had views different" from others at JPMorgan "does not provide any basis for an inference" of corporate scienter. *Salomon*, 373 F. Supp. 2d at 252; *see also In re PXRE Group, Ltd. Sec. Litig.*, 600 F. Supp. 2d 510, 537-38 (S.D.N.Y 2009) (holding that non-defendant chief actuary's concerns about accuracy of loss estimation reports were insufficient to plead corporate scienter). Nor do plaintiffs allege that JPMorgan's reported earnings each quarter over a two-year period were so blatantly false that some executive with responsibility for them must have known they were inaccurate. *See Dynex*, 531 F.3d at 195-96.

## IV.    Plaintiffs Do Not State a Section 10(b) Claim Based on Statements Made in 2012.

### A.    Plaintiffs Again Fail to State a Claim Based on General Descriptions of CIO's Purposes and Activities in February 2012.

According to the Complaint, "the Company continued to misrepresent the nature and purpose of the CIO" in 2012. (Compl. ¶ 279.) Plaintiffs contend that the same general

descriptions of CIO and CIO VaR contained in JPMorgan's 2010 and 2011 SEC filings were false when repeated in JPMorgan's 2011 Form 10-K filed on February 29, 2012. (*Id.* ¶¶ 279-81.) Plaintiffs also challenge a nearly identical statement in the February 13, 2012 Dodd-Frank Comment Letter (*id.* ¶ 276), as well as a statement by Dimon that same day in response to a *Fox Business News* reporter's question that "we don't make huge bets" (*id.* ¶ 277).

### 1. The SCP's 2012 Trading and Resulting Losses Did Not Render the General Descriptions of CIO False or Misleading.

Plaintiffs' allegations about increased trading and mark-to-market losses in the SCP in January 2012 (*id.* ¶¶ 153, 280(f)) do not show that CIO as a whole (or even the SCP) was not "primarily" concerned with managing the Firm's risk when JPMorgan filed its 2011 Form 10-K. As in 2010 and 2011, the SCP was just one part of CIO in January and February 2012 (*compare* TFR at 39 (SCP mark-to-market losses of $169 million year-to-date through February 2012) *with* Ex. 9 at 33 (7/13/12 Form 8-K) (Corporate sector (CIO, Treasury and Private Equity) restated net revenue of $1.029 billion)), and plaintiffs make no allegations about the purpose of the much larger ISP or any of the other multi-billion dollar portfolios managed by CIO.[20]

Plaintiffs broadly assert that the London traders' attempt to balance the SCP by adding positions was inconsistent with prudent risk management and instead was done "specifically in order to avoid disclosing the CIO's losses." (Compl. ¶ 153; *see also id.* ¶¶ 250(g), 280(f).) But plaintiffs allege no facts to support that assertion. They allege only that the London traders estimated that unwinding a large portion of the SCP would reduce RWA by $10 billion and cost $500 million and then allege that the traders devised an alternative strategy that they thought

---

[20] Plaintiffs allege that defendants sought "to conceal the risk posed by" the SCP by manipulating the CIO VaR model and suggest that such conduct shows that general descriptions of CIO were false and misleading. (Compl. ¶¶ 280(a)-(d).) Plaintiffs are wrong: their contention that the CIO VaR model was manipulated to conceal risk lacks any factual support, as addressed in detail, *infra*, Part IV.D.

would reduce RWA without large losses.  (*Id*. ¶ 153.)  These allegations do not render any of the general statements in February 2012 about the overall purpose and activities of CIO false.[21]

### 2. Plaintiffs Take Dimon's Statement to *Fox Business News* Out of Context.

Plaintiffs take Dimon's February 13, 2012 statement that "we don't make huge bets" (Compl. ¶ 277) completely out of context.  In discussing the proposed Volker Rule during a *Fox Business News* interview, Dimon stated:

> The part where they said no proprietary trading, we're fine with.  We've never had an issue with that.  The part about market making is the part that everyone's writing long issues about, like being an aggressive market maker.  We are a store.  Okay.  We, when you come to JPMorgan, we give you great prices in corporate bonds, you know, FX, interest rates. . . .  And so, remember, when the client calls up JPMorgan, if we don't give them the best price, we don't get the business.  But the best price is a huge benefit for them.  That's not an insult, and we don't make huge bets.  So, I understand the goal to make sure that these companies don't take huge bets on their balance sheets, but market making—just like these stores down the street—when they buy a lot of polka dot dresses, they hope they're going to sell.  They're making a judgment call.  They may be wrong.

(Ex. 23.)  Dimon's statement about "huge bets" concerned the JPMorgan Investment Bank's market-making activities; it had absolutely nothing to do with CIO or its risk-management activities.  Hence, plaintiffs' allegations about supposed "bets" by CIO (*e.g.*, Compl. ¶ 245(i)) do not show that Dimon's statement to *Fox Business News* was false.

### 3. Plaintiffs Do Not Adequately Allege a Strong Inference of Scienter.

#### a. Plaintiffs Do Not Adequately Plead That Dimon Acted with an Intent to Deceive or Defraud.

Plaintiffs do not adequately allege that Dimon acted with scienter in signing JPMorgan's 2011 Form 10-K or making the February 2012 statement on *Fox Business News*.  Plaintiffs

---

[21] Plaintiffs rely on the same allegations to challenge general descriptions of CIO in JPMorgan's April 13 earnings release (Compl. ¶ 311), and thus, their challenge fails for the same reasons.  Similarly, because plaintiffs fail to show that the purpose of CIO was other than risk management, they also fail to allege that the statement that "CIO VaR includes positions . . . used to manage structural and other risks" (*id*. ¶ 281) was false or misleading when included in the 2011 Form 10-K.

conclusorily assert that "[b]y late 2011, Dimon approved a strategy to 'balance' the [SCP] by taking on additional positions in synthetic-credit derivatives," which he knew was undertaken "to enable the CIO to avoid disclosing losses." (*Id.* ¶ 327(n).) The documents cited in the Complaint, however, contradict that assertion: Dimon could not possibly have approved this strategy in late 2011 because the London Traders did not conceive of the plan to balance the SCP by adding positions until January 2012. (TFR at 29-31.) More fundamentally, plaintiffs allege no facts suggesting that this strategy was ever communicated to Dimon. The news report cited for the proposition that Dimon "personally approved the concept behind the strategy" references only an unnamed source and states that, while Dimon "approved a reduction in [the SCP] amid signs of economic recovery," he "never vetted the 'particular means to execute' the strategy." (Ex. 24 at 3 (5/18/12 WSJ article) (cited at Compl. ¶ 146).) Contrary to plaintiffs' allegation, the Task Force Report makes clear that Dimon was told that the size of the SCP would be reduced through expiration of certain positions and "active reduction" of others (TFR at 28 n.30) and that he was not informed of the London traders' new strategy (*id.* at 38-39). Because plaintiffs' allegation is contradicted by the sources they themselves cite, it should be disregarded. *In re Yukos Oil Co. Sec. Litig.*, 2006 WL 3026024, at *12, 20 (S.D.N.Y. Oct. 25, 2006).

Plaintiffs thus are left only with allegations about Dimon's approval of the new CIO VaR model and his purported knowledge of CIO limit excessions in February 2012. (Compl. ¶¶ 327(k)-(m).) Neither shows, however, that Dimon had specific knowledge that the general descriptions of CIO in the 2011 Form 10-K or his statement "we don't make huge bets" were false, or that he was reckless as to the truth of those statements. When he was informed of excessions of the firm-wide VaR limit caused by CIO's trading on January 23, 2012, Dimon also was told that "CIO has developed an improved VaR model" that would appropriately reduce

CIO's VaR. (PSI Rpt. at 177; *see also infra* Part IV.D.) Plaintiffs allege no facts to support their contention that Dimon approved the new model knowing that it was supposedly designed to lower artificially CIO VaR. Dimon was not informed (and there was no requirement that he be informed) of the other January and February 2012 excessions of CIO's risk limits. (PSI Rpt. at 159 & n.879, 200-02; TFR at 75-76, 80-81.) In any event, plaintiffs do not allege facts suggesting that these limit excessions would have alerted Dimon that the challenged general descriptions of CIO as a whole were false.

### b. Plaintiffs Do Not Adequately Plead That Braunstein Acted with an Intent to Deceive or Defraud.

As CFO, Braunstein also signed the 2011 Form 10-K. (Compl. ¶ 278.) Plaintiffs make just one specific allegation regarding Braunstein's purported knowledge in early 2012 of the London traders' new strategy: "Braunstein acquiesced to the CIO's strategy when he was specifically asked to approve a 'one quarter request' to enable the CIO to increase the RWA budget for the synthetic credit portfolio by $7 billion to $176 billion so that the CIO could execute the trading strategy [allegedly] endorsed by Drew." (Compl. ¶ 153.) Plaintiffs do not actually plead facts to suggest that Braunstein knew the trading strategy when he was asked to approve the RWA request. In any event, this allegation says nothing about whether CIO as a whole was primarily concerned with risk management, and thus does not establish that Braunstein knew that the general descriptions of CIO in JP Morgan's 2011 Form 10-K were false or that he was reckless as to the truth of those statements when he signed that filing.

### c. Plaintiffs Do Not Adequately Plead That Zubrow Acted with an Intent to Deceive or Defraud.

Zubrow signed the 65-page Dodd-Frank Comment Letter dated February 13, 2012. (*Id*. ¶ 275.) One sentence of that letter states: "our [CIO] is responsible for making investments to hedge the structural risks of our balance sheet on a consolidated basis." (*Id*. ¶ 276.) Plaintiffs

allege that Zubrow's position as CRO and his receipt of various reports should have alerted him that this general statement was supposedly false.  (*Id.* ¶ 356.)  Such allegations about Zubrow's position and his supposed receipt of reports are insufficient to plead that Zubrow acted with scienter in signing the letter.  *See Wachovia*, 753 F. Supp. 2d at 351-52, 366.  Nor can plaintiffs plead Zubrow's scienter based on Drew's general statement that "investment decisions are made with the full understanding of executive management."  (*Id.* ¶ 356(b).)

### d. Plaintiffs Do Not Adequately Plead Corporate Scienter.

Plaintiffs do not adequately allege that Dimon, Braunstein or Zubrow acted with scienter, and they fare no better with Drew.  Plaintiffs allege no facts showing that Drew was responsible for the general descriptions of CIO in JPMorgan's SEC filings or the Dodd-Frank Comment Letter.  Even if Drew's knowledge and intent could be imputed to JPMorgan in connection with those statements, plaintiffs do not allege specific facts suggesting that she was aware in January or February 2012 that those statements were false.  Plaintiffs allege that Drew directed the London traders to "revise a plan to unwind the [SCP] in order to 'maximize p[&]l'" (Compl. ¶ 348(k)), but that is not inconsistent with general statements that CIO is primarily concerned with risk management.  Nor is Drew's reference to "cheap options" (*id.* ¶ 348(j)) inconsistent with CIO's primarily serving a risk management function.  (*See* PSI Rpt. at 51 (CIO wanted a "smart short" that "did not cost much, but provided effective protection against corporate defaults").)  The Complaint does not allege any facts to support plaintiffs' contention that Drew "approved" the London traders' strategy "in order to avoid disclosing the CIO's losses and to enable CIO traders to 'defend' their positions."  (Compl. ¶ 348(m).)

Even if false, the general descriptions of CIO included in the 2011 Form 10-K and the Dodd-Frank Comment Letter also certainly are not the type of blatantly false statements that otherwise raise a strong inference of corporate scienter.  *See Dynex*, 531 F.3d at 195-96.  That

the London traders' strategy is now known to have been flawed does not establish that someone with responsibility for those general descriptions of CIO knew they supposedly were false when they were made. "[F]raud by hindsight [is not] a viable basis upon which to challenge management practices that ultimately result in losses." *In re Travelzoo Inc. Sec. Litig.*, 2013 WL 1287342, at *7 (S.D.N.Y. Mar. 29, 2013) (internal quotation marks omitted).

**B.     Plaintiffs Again Fail to State a Claim Based on General Descriptions of JPMorgan's Firm-Wide Risk Management Practices in Its 2011 Form 10-K.**

Plaintiffs contend that the same general descriptions of JPMorgan's firm-wide risk management practices in JPMorgan's 2010 and 2011 SEC filings were false and misleading when repeated in the 2011 Form 10-K. (Compl. ¶¶ 286-88.) As explained above, such general statements about a company's risk management practices are immaterial as a matter of law. *See*, *e.g.*, *Bahash*, 2012 WL 6621391, at *3; *JP Morgan*, 553 F.3d at 205-06.[22] That rule of law alone is fatal to plaintiffs' claims based on several challenged statements. (*See supra* Part II.A.) More broadly, plaintiffs do not adequately allege that any of the general descriptions in JPMorgan's 2011 Form 10-K were false or made with scienter.[23]

**1.     Plaintiffs Do Not Adequately Allege That These General Descriptions Were False or Misleading Based on 2012 Risk Limit Excessions Caused by the SCP.**

In arguing that the general descriptions of JPMorgan's firm-wide risk management practices in its 2011 Form 10-K were false, plaintiffs allege that the SCP exceeded risk limits over 330 times in the early 2012. (Compl. ¶¶ 288(a)-(d) (citing PSI Rpt.).) As an initial matter,

---

[22] Plaintiffs contend that the statement "[a]ny substantial introduction of emerging risks or increase in risks routinely taken would be largely controlled by risk limits in place" was false when included in JPMorgan's 2012 proxy statement. (Compl. ¶ 293.) This "generalizatio[n] regarding JPMC's business practices" is not material as a matter of law. *JP Morgan*, 553 F.3d at 206. It is also forward looking and thus not actionable. (*See supra* n.14.)

[23] Plaintiffs' contention that the general descriptions of firm-wide risk management practices were false and misleading because the London traders allegedly mismarked certain positions (Compl. ¶¶ 288(h)-(j)) fails because the challenged statements have nothing to do with the valuation of assets. *Gusinsky*, 2013 WL 1955881, at *6.

the majority of those excessions occurred *after* JPMorgan filed its 2011 Form 10-K on February 29, 2012. (*See* PSI Rpt. Ex. 39 (Ex. 25) (over 200 excessions occurred in March and April).) These subsequent excessions cannot show that the challenged statements were false or misleading when made. *Sanofi-Aventis*, 774 F. Supp. 2d at 562.

More importantly, these excessions do not show that the general descriptions in the 2011 Form 10-K were false. First, plaintiffs allege no facts showing that the excessions were not "reported in a timely manner to senior management" or that those responsible did not "consult with senior management on the appropriate action," as set forth in the Form 10-K. (Compl. ¶ 287(c).) Rather, plaintiffs' allegations and the PSI Report on which those allegations are based show that the alleged limit excessions were handled in accordance with JPMorgan's descriptions of its risk management practices. Plaintiffs allege that CIO's Market Risk Officer reviewed the excessions of CIO's CSBPV limits (*id.* ¶ 161), and the PSI Report states that CIO personnel discussed them (PSI Rpt. at 200-03). Similarly, plaintiffs' allegations regarding VaR limit excessions do not establish that JPMorgan's descriptions of its risk management practices were false. Those allegations instead show that the excessions were reported to senior management and that management responded by approving a temporary increase in the limit pending the implementation of a new CIO VaR model. (Compl. ¶ 136.)[24]

## 2. Plaintiffs Do Not Adequately Allege a Strong Inference of Scienter.

Plaintiffs assert that Dimon and Braunstein were notified of CIO's excessions of its CSBPV limits in January and February 2012. (Compl. ¶¶ 327(k), 341(j).) That assertion is

---

[24] Plaintiffs contend that two statements in Dimon's annual letter to shareholders dated March 30, 2012 were false and misleading because "losses in the CIO were already mounting:" (i) "our Risk Committees provide general oversight into any and all risk in the business and set overall risk limits" and (ii) "[r]isk limits are set by product, by counterparty and by type of specific risk." (Compl. ¶ 294.) These statements, however, say nothing about CIO's profits and losses and are not rendered false because risk management practices failed to prevent losses. *See Gusinsky*, 2013 WL 1955881, at *6 (holding that "connection between" alleged misstatements and alleged conduct was "too attenuated" to find that conduct rendered statements at issue "materially misleading").

contrary to the discussion in the PSI and Task Force Reports, which state that these risk limit excessions were handled by both CIO and firm-wide risk management personnel, not the Firm's CEO and CFO. (PSI Rpt. at 198-203; TFR at 80-81.) Even if Dimon and Braunstein were notified of the excessions of this one risk limit in one business unit, however, that would not have alerted them that the general descriptions of JPMorgan's firm-wide risk management practices in its 2011 Form 10-K were false. Plaintiffs also allege that Dimon approved, and Braunstein was aware of, a temporary increase in CIO's VaR limit. (Compl. ¶¶ 327(k)-(m); 341(g), (i).) But these allegations are entirely consistent with the challenged statements—CIO VaR limit excessions were elevated to senior management and what was believed to be appropriate action was taken.

To the extent that the knowledge or intent of Drew or Zubrow is at all relevant to these statements in JPMorgan's 2011 Form 10-K, plaintiffs allege only that they received the same or similar reports that Dimon and Braunstein supposedly received. (Compl. ¶¶ 349(f)-(g), 356(f).) Although plaintiffs allege that Drew was told in February 2012 of the January and February excessions of the CIO CSBPV limits (*id*. ¶¶ 161-62), excessions of one risk limit, which Drew knew were being addressed by CIO risk management personnel, would not have alerted her to the possibility that the general descriptions of JPMorgan's firm-wide risk management practices in its 2011 Form 10-K were false. Plaintiffs allege nothing specific about Zubrow, who was no longer JPMorgan's CRO when the 2011 Form 10-K was filed. (Compl. ¶ 41.)

### C.  Plaintiffs Fail to Plead Scienter and Loss Causation for the Internal Controls Disclosures and Certifications in JPMorgan's 2011 Form 10-K and for the April 13 Announcement of JPMorgan's First Quarter 2012 Earnings.

#### 1.  Plaintiffs Do Not Adequately Allege Scienter.

Pointing to JPMorgan's July 2012 restatement of its first quarter of 2012 earnings and determination of a "material weakness" in its internal controls as of March 31, 2012, plaintiffs

allege that JPMorgan's 2011 Form 10-K misrepresented the effectiveness of the Firm's internal controls over financial reporting and that Dimon's and Braunstein's certifications attesting to the effectiveness of those controls were false. (Compl. ¶¶ 289-91.) "For obvious reasons," scienter allegations "cannot be premised on information that was not reasonably available to the speaker at the time of the alleged misrepresentations." *Foley*, 861 F. Supp. 2d at 214. Plaintiffs allege no facts showing that any information regarding the London traders' intent in marking certain positions that ultimately led to the July 2012 restatement was "reasonably available" to Dimon or Braunstein before the 2011 Form 10-K was filed on February 29, 2012. *Id.* at 215.[25]

As Cavanagh explained during JPMorgan's July 13, 2012 earnings call—upon which plaintiffs rely (*see, e.g.*, Compl. ¶¶ 221, 230-36)—JPMorgan did not discover the potential mismarking until late spring 2012, after an "exhaustive" review of "lots of e-mails" and "tens of thousands of voice tapes, many of them in foreign languages." (Ex. 6 at 17 (7/13/12 earnings call tr.).) Even after that exhaustive review, JPMorgan concluded that the London traders' marks "were generally within the bid ask spread, which is . . . acceptable for GAAP." (*Id.*; Compl. ¶ 175, 234.) JPMorgan became concerned, however, that these objectively reasonable marks might not represent the prices at which traders subjectively "thought they could exit their positions," (Ex. 6 at 17 (7/13/12 earnings call tr.)), and thus decided to take the "most conservative" approach and restate earnings (*id.* at 3). All of this happened months after JPMorgan filed its 2011 Form 10-K and Dimon and Braunstein certified the effectiveness of the Firm's internal controls over financial reporting in February 2012.

---

[25] Plaintiffs also allege that these disclosures were false because the London traders supposedly were "painting the tape" to manipulate the month-end price of one index. (Compl. ¶ 290(g).) But plaintiffs plead no facts suggesting that Dimon or Braunstein was aware of this alleged misconduct.

Based on the same allegations, plaintiffs also assert that JPMorgan fraudulently overstated its first quarter earnings in its initial April 13 earnings release. (Compl. ¶¶ 301-02.) It is well settled, however, that "the mere fact of a restatement of earnings does not support a strong, or even a weak, inference of scienter." *City of Brockton*, 540 F. Supp. 2d at 472. "[A]bsent facts indicating that defendants knew of the falsity of their statements, that an eventual write-off was large does not support the required strong inference of misbehavior." *Glaser*, 772 F. Supp. 2d at 596-97. Because plaintiffs allege no facts suggesting that information about the London traders' potential mismarking was "reasonably available" to Dimon or Braunstein by April 13, *Foley*, 861 F. Supp. 2d at 214, or that "the misstatements were so obvious that Defendants must have been aware of, or recklessly disregarded them," *Scott* v. *Enter. Fin. Servs. Corp.*, 2013 WL 2338367, at *15 (E.D. Mo. May 29, 2013), they have not raised a strong inference that either defendant acted with scienter in connection with the earnings release.

Unable to allege that Dimon or Braunstein knowingly misrepresented JPMorgan's first quarter earnings, plaintiffs make a number of allegations regarding Drew's supposed knowledge of the potential mismarking. Even if Drew had such knowledge, it would be irrelevant because plaintiffs do not allege that she was responsible for reporting JPMorgan's earnings. *Abu Dhabi*, 2013 WL 1155420, at *4. In any event, plaintiffs' reliance on Drew's position (*id*. ¶ 349(k)) does not raise a strong inference of scienter. *Teamsters Allied Benefit Funds* v. *McGraw*, 2010 WL 882883, at *11 (S.D.N.Y. Mar. 11, 2010). And plaintiffs' allegation that Drew instructed a CIO employee in London on April 17, 2012 "to 'tweak' the marks in order to get 'an extra basis point'" for the marks (Compl. ¶ 348(o)) ignores Drew's clear direction that the marks be "appropriate" and based on "demonstrable data" (PSI Rpt. Ex. 32c at 3 (Ex. 26)). In any event,

that allegation does not establish that Drew knew that JPMorgan's already-issued April 13 earnings release (for the quarter ended March 31) was materially false.

Plaintiffs contend that Drew knew of the potential mismarking because she (and others) received a March 20 email from a junior CIO trader noting a $600-800 million "lag in P&L." (Compl. ¶¶ 176, 348(n).) That email, however, does not raise a strong inference that Drew acted with a "mental state embracing intent to deceive, manipulate, or defraud" in connection with the April 13 earnings release. *Tellabs*, 551 U.S. at 319 (internal quotation marks omitted). Plaintiffs do not allege that Drew had any role in preparing or approving that release. Even if she did, the March 20 email suggests that the "lag" referred to the SCP's underperformance in the market, not any mismarking (PSI Ex. 16b at 3 (Ex. 27); *see also* TFR at 48 n.57), and the more cogent inference is that in trying to address a portfolio that already was reporting losses, Drew "did not grant the [email] the attention lead plaintiff argues [it] deserved," which does not constitute recklessness for purposes of Section 10(b). *Johnson* v. *Siemens AG*, 2011 WL 1304267, at *19 (E.D.N.Y. 2011).

Nor can plaintiffs establish that the April 13 earnings release constituted the sort of blatantly false statement that alone creates a strong inference of corporate scienter under *Dynex*. Plaintiffs' conclusory allegations regarding the size of CIO (Compl. ¶ 361) are insufficient. *See RIM*, 2013 WL 1285779, at *1, 17-18 (finding no scienter even though alleged fraud involved business line constituting 80.2% of RIM's revenue). Plaintiffs also cannot rely on differences between the marks of CIO and JPMorgan's Investment Bank for positions in the same credit indices to plead corporate scienter. (Compl. ¶ 364.) Among other reasons, because the assets were "not traded on the New York Stock Exchange or some other efficient market," such differences would not inform those responsible for JPMorgan's reported earnings that CIO's

marks were inconsistent with GAAP. *Fait* v. *Regions Fin. Corp.*, 712 F. Supp. 2d 117, 122 (S.D.N.Y. 2010), *aff'd* 655 F.3d 105 (2d Cir. 2011).

### 2. Plaintiffs Do Not Adequately Allege Loss Causation.

To plead loss causation, plaintiffs must allege that (i) "the market reacted negatively to a corrective disclosure, which revealed an alleged misstatement's falsity or disclosed that allegedly material information had been omitted," or (ii) "a defendant's misstatements or omissions concealed a risk that later materialized to cause the plaintiff's loss." *In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 677 (S.D.N.Y. 2007) (internal quotation marks omitted). Plaintiffs do neither. JPMorgan did not restate first quarter of 2012 earnings and disclose a material weakness in its financial reporting controls until July 13, 2012—"[t]wo months after the end of the Class Period." (Compl. ¶¶ 15, 220.) Far from a negative market reaction to this "corrective disclosure," the price of JPMorgan's stock actually increased on July 13, closing up nearly 6% from its previous day's close. (Ex. 10.) Because they do not (and cannot) allege that they suffered any economic loss as a result of the purported misstatements, plaintiffs fail to plead loss causation. *See In re Manulife Fin. Corp. Sec. Litig.*, 276 F.R.D. 87, 104 (S.D.N.Y. 2011) ("Because the Amended Complaint fails to allege facts sufficient to attribute the Class members' economic loss to the disclosure of an alleged fraudulent scheme, Lead Plaintiffs have failed to show loss causation.").

### D. Plaintiffs Fail to State a Claim Based on the Implementation of the New CIO VaR Model.

Citing Item 305(a)(4) of Regulation S-K, plaintiffs argue that the January 2012 change in CIO's VaR model should have been disclosed in JPMorgan's 2011 Form 10-K. (Compl. ¶ 285.) They also contend that two general descriptions of VaR in the 2011 Form 10-K were false: (i) "VaR provides a consistent cross-business measure of risk profiles . . . and is used for

comparing risks across businesses and monitoring limits" (*id.* ¶¶ 283, 285); and (ii) "VaR . . . measures risk across instruments and portfolios in a consistent, comparable way" (*id.* ¶¶ 284-85).

### 1. The New CIO VaR Model Was Not Used in JPMorgan's 2011 Form 10-K.

An omission is actionable "only where there is a duty to disclose the information at issue." *RIM*, 2013 WL 1285779, at *20. "A duty to disclose arises when the undisclosed fact is necessary to make a statement made not misleading, or when a statute or regulation requires disclosure of the fact." *Levine* v. *NL Indus., Inc.*, 717 F. Supp. 252, 254 (S.D.N.Y. 1989). Item 305(a)(4) of Regulation S-K similarly requires a registrant to disclose certain information regarding a change to a VaR model if "the effects were material." 17 C.F.R. § 229.305(a)(4).

JPMorgan had no duty to disclose the January 2012 model change in its 2011 Form 10-K because the period covered by that filing ended before the new model was implemented and thus the new model was not used to determine CIO VaR in the 2011 Form 10-K. JPMorgan implemented the new model in late January 2012. (Compl. ¶ 135.) The 2011 Form 10-K, by contrast, provided CIO VaR calculations for 2011 and compared them with 2010 calculations. (Ex. 4 at 159 (2011 Form 10-K).) Because the new model was not "used in providing [any] quantitative information" in the 2011 Form 10-K, information about the new model would not have been material to a reasonable investor in evaluating the CIO VaR calculations in that filing. *See* 17 C.F.R. § 229.305(a)(4).

### 2. Adoption of a New CIO VaR Model Did Not Render the General Descriptions of VaR in the 2011 Form 10-K False or Misleading.

Plaintiffs argue that the adoption of the new CIO VaR model was "a deliberate attempt to hide the risks posed by the CIO's [SCP]" based on JPMorgan's Task Force Report. (Compl. ¶ 137.) But that report states that the new model was developed because it was believed that the existing CIO VaR model overstated risk. (TFR at 77-79 & n.98, 121-23.) "The court need not

accept as true an allegation that is contradicted by documents on which the complaint relies." *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 555 (S.D.N.Y. 2004)  That the employees responsible for the new model "understood" that it would produce a lower VaR (Compl. ¶ 135) simply reflects their belief that the existing CIO model overstated VaR.  And the assertion that the new model was developed to conceal the risk posed by the London traders' positions in 2012 is undermined by plaintiffs' concession that work on the new model began in "mid-2011" (*id*. ¶ 134), months *before* the SCP trading that led to excessions of CIO's VaR limit in 2012.  The Complaint thus does not adequately allege that VaR was not used to "compar[e] risks" or "monitor[] limits," as stated in the 2011 Form 10-K.

Nor does JPMorgan's adoption of a new VaR model to be used only in CIO render false or misleading the general statement in the 2011 Form 10-K that VaR "provides a consistent cross-business measure of risk profiles."  (Compl. ¶ 238.)  JPMorgan never stated that it used the same VaR model across its many different businesses.  Instead, the 2011 Form 10-K disclosed that "[t]he Firm's VaR calculation is highly granular and incorporates numerous risk factors, which are selected based on the risk profile of each portfolio."  (Ex. 4 at 158, 162 (2011 Form 10-K).)  The 2011 Form 10-K also disclosed that JPMorgan's risk models were subject to regular review and change.  (*Id*. at 162-63.)  No reasonable investor would have concluded based on those disclosures that JPMorgan used a uniform and static VaR model to measure risk across its many different business lines and portfolios and amid constantly changing market conditions.

### 3.    Plaintiffs Do Not Adequately Allege Scienter.

Plaintiffs do not allege that Dimon or Braunstein, in signing the 2011 Form 10-K, "knew facts or had access to information suggesting that" JPMorgan was not using VaR to measure and compare risks or monitor limits throughout the Firm, as stated in that filing.  *CIBC*, 694 F. Supp. 2d at 298 (internal quotation marks omitted).  Nor do plaintiffs allege that Dimon and Braunstein

received any information contradicting the 2011 Form 10-K's statement that "VaR provides a consistent cross-business measure of risk profiles." (Compl. ¶ 283.)

Plaintiffs allege that Dimon and Braunstein received daily VaR reports (Compl. ¶¶ 323; 329(b)-(d); 340; 341(b), (f)), but they do not allege that any of those reports contained "*specific contradictory information*" suggesting that the general descriptions of VaR and its functions in the 2011 Form 10-K were inaccurate. *PXRE*, 600 F. Supp. 2d at 536; *see also City of Brockton*, 540 F. Supp. 2d at 474-75 (no scienter unless defendants "were furnished with information that would have allowed them to discern the financial data was wrong"). Plaintiffs also allege that Dimon and Braunstein received an email in January 2012 that said that the new CIO VaR model was expected to reduce CIO VaR by 44%. (Compl. ¶¶ 327(k), 341(i).) But a lower VaR calculation is not necessarily less accurate, particularly in the context of an "improved" model. (PSI Rpt. at 176; *see also* Ex. 6 at 18 (7/13/12 earnings call tr.) (explaining that old CIO VaR model produced overly "conservative calculation of VaR").) Thus, knowing that the new model was expected to reduce CIO VaR by itself would have provided Dimon and Braunstein with no reason to question the accuracy of the 2011 Form 10-K's general descriptions of VaR. Moreover, knowledge of a change to a risk model, which occurred regularly (*see* Ex. 4 at 162-63 (2011 Form 10-K)), would not have caused Dimon and Braunstein to question the accuracy of the general descriptions of VaR in the Form 10-K.

Citing the PSI Report, plaintiffs assert that Dimon and Braunstein were "explicitly told that the rationale for the change [in the VaR model] was to . . . 'cure' a breach of the Company-wide VaR [in January 2012] that had been caused by the [SCP]." (Compl. ¶ 136.) In fact, the PSI Report states that Dimon, Braunstein and other members of JPMorgan senior management received a January 20, 2012 email stating:

> The Firm's 95% 10Q VaR breached its $125mm limit for the fourth consecutive day on January 19th, 2012, primarily driven by CIO. . . .
>
> Action has been taken to reduce the VaR and will continue. In addition, *CIO has developed an improved VaR model for synthetic credit* and has been working with MRG [Model Review Group] to gain approval, which is expected to be implemented by the end of January.
>
> The impact of the new VaR model based on Jan. 18 data will be a reduction of CIO VaR by 44% to $57mm.

(PSI Rpt. at 176 (emphasis added).) This email does not say that the "rationale" for the model change was to "cure" the firm-wide VaR excession. It instead states that "action" was being taken to reduce VaR, and "[i]n addition," if approved, the new "improved"—*i.e.*, more accurate—CIO VaR model would have the effect of reducing VaR below the firm-wide limit.

The more compelling inference from the facts (as opposed to conclusions) alleged is that Dimon and Braunstein believed that the general descriptions of the purpose of VaR in the 2011 Form 10-K were accurate and that the implementation of the new "improved" CIO VaR model was proper. *See Tellabs*, 551 U.S. at 314. This inference is especially compelling given JPMorgan's express disclosure to the OCC "that CIO was poised to implement a new VaR model" and "that the new model would significantly reduce the CIO's VaR results." (PSI Report at 233.) Such disclosure is flatly inconsistent with plaintiffs' assertion that the new model was secretly implemented to conceal risk. *See, e.g., Mechel*, 811 F. Supp. 2d at 881-82 (finding no "strong inference of scienter" where defendant "expressly sent a letter to [a customer] stating its intent" to engage in conduct it allegedly attempted to conceal).

Plaintiffs also fail to plead corporate scienter because they do not allege that the general descriptions of VaR in JPMorgan's 2011 Form 10-K were so blatantly false that they give rise to a strong inference that a corporate officer must have approved those descriptions knowing that they were false. *Dynex*, 531 F.3d at 195-96.

### E. Plaintiffs Fail to State a Claim Based on the CIO VaR Reported in the April 13 Earnings Release.

Based on JPMorgan's May 10, 2012 restatement of the CIO VaR reported in the April 13 earnings release, plaintiffs argue that the VaR reported in that release was fraudulent. (Compl. ¶ 315.) They also contend that the comparison in the earnings release between CIO's fourth quarter of 2011 VaR (calculated using the old model) and first quarter of 2012 VaR (calculated using the new model) was intentionally or recklessly misleading because the model change was not disclosed. (*Id.*) And plaintiffs assert that the failure to disclose the model change was an actionable omission under Section 10(b). (*Id.*)

#### 1. Plaintiffs Do Not Adequately Allege That Reported CIO VaR Was a Subjectively False Opinion.

VaR models are "valuation metrics" that are "matter[s] of opinion rather than fact." *In re Deutsche Bank AG Sec. Litig.*, 2012 WL 3297730, at *2 (S.D.N.Y. Aug. 10, 2012). Thus, to plead a Section 10(b) claim, plaintiffs must allege with particularity facts showing that the reported VaR calculations were both objectively and subjectively false. *Podany* v. *Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 154 (S.D.N.Y. 2004). It is not enough to allege that "[d]efendants *should have known* that [the calculations] were false or misleading." *Deutsche Bank*, 2012 WL 3297730, at *2. Plaintiffs must allege that defendants did not honestly believe, or knew that there was no reasonable basis for, the reported VaR calculations at the time, *City of Roseville Emps. Ret. Sys.* v. *Nokia Corp.*, 2011 WL 7158548, *7 & n.8 (S.D.N.Y. Sept. 6, 2011), which they do not do here.

Plaintiffs allege that Dimon and Braunstein were aware that the new CIO VaR model was expected to reduce CIO VaR by 44% and that this reduction would "end" a firm-wide VaR limit excession. (Compl. ¶¶ 327(k), 341(i).) But this information—communicated to them along with the fact that the new model was "improved" and was being reviewed and needed approval by

-59-

JPMorgan's model review group (PSI Rpt. at 176)—would not have given them reason to question the reliability of the new model and its VaR calculations. Likewise, the fact that Dimon and Braunstein attended a February 2012 meeting at which the new VaR model purportedly was discussed (*id*. ¶¶ 327(m), 341(i)) does not show that they believed that the reported VaR calculated by that new model was inaccurate.

## 2. Plaintiffs Do Not Adequately Allege Scienter.

Plaintiffs do not allege that anyone involved in the preparation of the April 13 earnings release received information about the new CIO VaR model that would create a strong inference that they knew, or were reckless in not knowing, that the reported CIO VaR calculations for the first quarter of 2012 were inaccurate. To the contrary, Dimon and Braunstein had no reason prior to April 13 to question the CIO VaR calculations produced by the "improved" VaR model. Although JPMorgan later discovered errors associated with that model, plaintiffs allege no facts suggesting that any defendant knew of such errors on or before April 13. (*See* PSI Rpt. at 298 ("CIO management . . . discovered these problems only a few days after the April 8-K was filed" on April 13).)

In addition, the absence of a "clear duty to disclose" the model change cuts against a strong inference of scienter. *Kalnit*, 264 F.3d at 144. The April 13 earnings release was filed on Form 8-K. SEC regulations require that information regarding certain model changes be disclosed in filings on Forms 10-K and 10-Q, but not on Form 8-K. *See* 17 C.F.R. § 229.10(a); *see also* Instructions for Form 8-K, available at www.sec.gov (last visited May 10, 2013). Accordingly, defendants could reasonably have believed that they were under no obligation to disclose the model change in the earnings release.

Under *Tellabs*, the inference of scienter is not as "compelling" as the "opposing inference of nonfraudulent intent." 551 U.S. at 314. As discussed above (*see supra*, Part IV.D.3),

JPMorgan disclosed the implementation of the new model to the OCC, as well as its expectation that the model would significantly reduce CIO VaR. (PSI Rpt. at 233.) Given this transparency, the omission of information about the model change from the earnings release was unlikely to have been motivated by an intent to deceive or defraud. The far more plausible inference is that Dimon and Braunstein believed that the new "improved" model more accurately calculated CIO VaR.

## F. Plaintiffs Fail to State a Claim Based on Statements Made in April 2012 Immediately Following the Initial "London Whale" Press Reports.

Plaintiffs challenge a variety of statements made between April 5, when media reports of the London Whale first appeared, and April 13, when JPMorgan held its earnings call. These statements concerned (i) CIO's overall purposes and activities; (ii) the SCP's purpose; (iii) firm-wide risk management; (iv) the transparency of the SCP to the OCC; (v) the Volcker Rule;[26] and (vi) senior management's opinions at the time about the SCP's positions. (Compl. ¶¶ 297-313.)

### 1. Plaintiffs Do Not Adequately Allege That These Statements Were False or Misleading.

#### a. Statements Describing CIO's Overall Purposes and Activities Were Neither Material Nor False.

Plaintiffs challenge a long list of statements describing CIO's overall purposes and activities that were very similar to those included in JPMorgan's earlier SEC filings:

- Spokesperson: "CIO activities hedge structural risks and invest to bring the company's assets and liabilities into better alignment." (*Id.* ¶ 297.)

- Spokesperson: CIO is "focused on managing the long-term structural assets and liabilities of the firm and is not focused on short-term profits." (*Id.*)

- Spokesperson: CIO is responsible for "hedging the firm's foreign exchange, interest-rate and other structural risks." (*Id.*)

---

[26] The Volcker Rule is intended to prohibit certain proprietary trading by banks holding federally insured deposits. 76 Fed. Reg. 68846, 68849-51 (proposed Nov. 7, 2011). The rules that would make it effective have not been finalized.

- Spokesperson:  CIO "aims to hedge the bank's global structural risk and the unit's investments are directly related to managing these risks."  (*Id*. ¶ 299.)

- Dimon:  "Every bank has a major portfolio; in those portfolios you make investments that you think are wise to offset your exposures.  Obviously, it's a big portfolio; we are a large company and we try to run it—it's sophisticated obviously with complex things.  But at the end of the day that is our job is to invest that portfolio wisely, intelligently over a long period of time to earn income and to offset other exposures that we have."  (*Id*. ¶ 303.)

- Braunstein:  CIO "invests . . . in high grade, low-risk securities."  (*Id*. ¶ 305.)

- Braunstein:  "We invest those in order to hedge the interest rate risk of the Firm as a function of that liability and asset mismatch.  We hedge basis risk, we hedge convexity risk, foreign exchange risk is managed through CIO, and MSR risk. We also do generate NII [net interest income], which we do with that portfolio."  (*Id*.)

- Braunstein:  "The CIO balances our risks" and "hedge[s] against downside risk, that's the nature of protecting the balance sheet."  (*Id*. ¶ 312.)

- Braunstein/Dimon:  "When we put a dollar to work we want to do so prudently and invest it in safe, smart and good-returning assets, and that is the job of CIO . . . . We are very conservative."  (*Id*.)[27]

As an initial matter, Dimon's statement that "our job is to invest that portfolio wisely, intelligently over a long period of time" (Compl. ¶ 303) and the statement that "[w]hen we put a dollar to work we want to do so prudently and invest in safe, smart and good-returning assets, and that is the job of CIO . . . .  We are very conservative" (*id.* ¶ 312) are "too general to cause a reasonable investor to rely on them" and thus are immaterial as a matter of law.  *JPMorgan*, 553 F.3d at 206; *see also Wachovia*, 753 F. Supp. 2d at 354 & n.18 (statements about "conservative" underwriting and credit risk management were not actionable because "adjectives which otherwise constitute puffery" do not "become actionable when attached to a particular noun").

Plaintiffs also allege no facts to support their assertion that CIO as a whole "was operating [as] a proprietary trading desk that was focused on short-term profits" in April 2012.

_____

[27] Plaintiffs attribute the last sentence to Braunstein, but the *Wall Street Journal* article in which it appears attributes it to Dimon.  (Ex. 28 at 3 (5/25/2012 WSJ article) (quoted at Compl. ¶ 312).)

(Compl. ¶ 300.)  Rather, all of plaintiffs' allegations are directed at the SCP, only one of the

portfolios managed by CIO.  Likewise, plaintiffs' allegations about changes to the SCP in the

first quarter of 2012 do not show that the challenged statements about CIO's overall purposes

and activities were false.  In each article quoting a JPMorgan spokesperson (with one exception,

addressed next), the spokesperson declined to comment on the London traders' positions,

providing only general descriptions of CIO's overall purposes and activities.[28]  Similarly,

Braunstein was referring to CIO portfolios other than the SCP when he said that we "invest those

in order to hedge the interest rate risk of the Firm."  (Ex. 31 at 7 (4/13/12 earnings call tr.) ("We

have got about $175 billion worth of mortgage securities . . . . We invest those in order to hedge

the interest rate risk of the Firm").)  And Dimon was referring to CIO as a whole when he said:

"[e]very bank has a major portfolio; in those portfolios you make investments that you think are

wise to offset your exposures."  (*Id*. at 9.)

### b.     The Challenged Statements Accurately Described the SCP's Intended Function.

Plaintiffs also challenge these three statements:  (i) CIO's "recent trades were made to

hedge the firm's overall risk" (Compl. ¶ 299 (JPMorgan spokesperson)), (ii) the SCP's positions

were "put on . . . to manage for significant stress event in Credit" and "[a]ll of those decisions are

made on a very long-term basis" (*id*. ¶ 305 (Braunstein)), and (iii) "all of the positions reporters

have been writing about are part of a credit book meant to hedge other risks" (*id*. ¶ 312

(Braunstein)).  These statements accurately described the intended function of the SCP.

Plaintiffs cannot plead that these statements were false simply by arguing that the SCP ultimately

failed to perform as intended in the first quarter of 2012.

---

[28] *See, e.g.*, Ex. 29 at 1 (4/5/2012 Bloomberg article) (cited at Compl. ¶ 297) (spokesperson "declined to comment on Iksil's specific transactions"); Ex. 30 at 1 (4/9/2012 Bloomberg article) (cited at Compl. ¶ 299) (same).

Plaintiffs acknowledge that the SCP generated substantial income during the financial crisis, thus successfully hedging the risk that JPMorgan might suffer losses from defaults. (Compl. ¶ 86.)  This activity and the later reduction in the SCP's size in 2010 when economic conditions improved (PSI Rpt. at 50) are consistent with the SCP's mandate of making investment decisions "on a very long-term basis."  Braunstein expressly stated that JPMorgan "moderate[d] and change[d]" the SCP "over time depending upon our views as to what the risks are for stress loss from credit."  (Compl. ¶ 305.)  Far from denying the reports about the SCP's 2012 trading,[29] Braunstein placed that trading in context by stating that "the activities that have been reported in the paper are basically part of managing [the SCP's] stress loss position."  (*Id*.) The JPMorgan spokesperson similarly stated that JPMorgan views "its recent selling [of credit derivatives] in the context of a range of related positions" and that "the recent trades were made to hedge the firm's overall risk" by making the SCP's risk "effectively balanced."  (Ex. 32 at 1 (4/10/12 WSJ article).)  That the SCP allegedly had "the shortest investment time horizon . . . of any portfolio within the CIO" and contained "positions traded actively on a daily basis" (Compl. ¶ 306) do not establish that the challenged statements were false.  Because markets fluctuate daily, daily trading may be necessary simply to maintain balance in a portfolio, and thus, daily trading is not necessarily inconsistent with the portfolio's having a long-term strategy.

### c.     Plaintiffs Mischaracterize Braunstein's Statement About Risk Management.

Plaintiffs challenge Braunstein's statement that the SCP's "positions are put on pursuant to the risk management at the Firm-wide level" (Compl. ¶ 307), wrongly suggesting that this sentence implied that "firm-wide risk managers" were involved "in managing or approving the

---

[29] *See*, *e.g.*, Ex. 32 (4/10/2012 WSJ article) (cited at Compl. ¶ 299); Ex. 30 (4/9/2012 Bloomberg article) (cited at Compl. ¶ 299).

[SCP] positions or strategies" (*id.* ¶ 308). Risk managers do not "manage" or "approve" trading strategies; that is what traders do. Braunstein's statement instead accurately reported that the SCP was subject to JPMorgan's risk management procedures and that the SCP's positions were included in JPMorgan's risk metrics. For example, the January 2012 excession of CIO's VaR limit, in turn, caused an excession of JPMorgan's firm-wide VaR limit that was reported to senior management, as required by JPMorgan policy. (*Id.* ¶ 165.) As the Complaint itself alleges, the CIO had other risk limits that applied to the SCP (*id.* ¶¶ 230, 254(k)), and CIO's risk management personnel monitored excessions of CIO risk limits and reported them (as required) to firm-wide risk management personnel (*id.* ¶¶ 136, 161).

### d. Statements About Regulatory Transparency Were Not False.

Plaintiffs contend that a JPMorgan spokesperson incorrectly stated that CIO's "results . . . are fully transparent to our regulators" and that Braunstein falsely stated that "all those positions are fully transparent to the regulators." (Compl. ¶¶ 297-98, 307-08.) These statements were not false. The PSI Report (the basis for plaintiffs' allegations) states that JPMorgan's regulators received monthly profit-and-loss results for CIO (PSI Rpt. at 231) and that the OCC "received contemporaneous notice when all five of the risk limits covering the SCP were breached in the first quarter of 2012" (*id.* at 233).[30] Plaintiffs' assertion that JPMorgan "'dodged OCC oversight of the [SCP] for years'" (Compl. ¶ 308 (quoting PSI Rpt.)) appears to be based largely on the fact that JPMorgan inadvertently failed to provide the OCC with two specific reports in February and March 2012 (PSI Rpt. at 230-31; Compl. ¶ 192), hardly the basis for a fraud claim.[31] That

---

[30] *See also* PSI Rpt. at 216-17, 232-33 (providing information about stress loss data and risk excessions), 216, 231 (profit and loss reports), 216, 233-34 (January 2012 VaR model change).

[31] The PSI Report also contradicts plaintiffs' assertion that JPMorgan did not reveal "the existence" of the SCP to the OCC until January 2012. (Compl. ¶¶ 106, 308.) Although the SCP was not mentioned *by name* in JPMorgan-OCC communications, the OCC was aware of a "macro-hedge against the credit risk of the bank's balance sheet using [CDS]" as early as 2007. (PSI Rpt. at 221 n.1218.)

JPMorgan could have provided additional information or that regulators could have requested more does not show that the challenged statements were false or misleading. No reasonable investor would understand the statements to mean that JPMorgan disclosed *all available* information about CIO and the SCP to regulators.

### e. Braunstein's Statement About the Proposed Volcker Rule Was a Non-Actionable Opinion Stated Without Scienter.

Plaintiffs challenge Braunstein's statement on April 13 that "we believe, the spirit of legislation as well as our reading of the legislation, and consistent with this long-term investment philosophy we have in CIO we believe all of this is consistent with what we believe will be the ultimate outcome related to Volcker." (Compl. ¶ 309.) This vague statement "conveys no meaningful, objective data that an investor would rely upon" and thus is immaterial as a matter of law. *See Billhofer* v. *Flamel Techs.*, 2012 WL 3079186, at *9 (S.D.N.Y. 2012). More fundamentally, the statement expresses an opinion about the outcome of future events. *See id*. at 10.[32] Plaintiffs therefore must allege "that [Braunstein] did not actually hold the belief or opinion stated." *Sanofi-Aventis*, 774 F. Supp. 2d at 567 (internal quotation marks omitted). Plaintiffs allege no facts showing that Braunstein did not believe his opinion that CIO's activities were consistent with what he believed would "be the ultimate outcome related to Volker." For example, plaintiffs allege no facts showing that the Volcker Rule's exception for "hedging . . . risks on a portfolio basis" (76 Fed. Reg. at 68875) would not apply to CIO. (*See*, *e.g.*, Ex. 33 at 2 (5/12/2012 NYT article) (cited at Compl. ¶ 108).) Indeed, plaintiffs themselves allege that Zubrow—who signed JPMorgan's Dodd-Frank Comment Letter addressing the Volcker Rule—

---

[32] The statement is also forward looking and therefore not actionable absent allegations that it was made "with actual knowledge" that it was false or misleading. 15 U.S.C. §§ 78u-5(c)(1)(B)(i)-(ii).

reassured Braunstein that CIO's activities would comport with the anticipated implementation of the rule.  (Compl. ¶ 199.)

<strong>f.    The Remaining Statements Also Were Non-Actionable<br/>Opinions Stated Without Scienter.</strong>

With the benefit of hindsight, plaintiffs challenge three statements of opinion expressed shortly after the initial "London Whale" reports:  (i) a spokesperson's statement that JPMorgan "views its recent selling in the context of a range of related positions" and "feels its risk is now effectively balanced" (Compl. ¶ 299),[33] (ii) Braunstein's statements that "[w]e are very comfortable with our positions as they are held today" (*id*. ¶ 305; *see also id*. ¶ 312), and (iii) Dimon's agreement with the characterization of the media reports as a "tempest in a teapot" (*id*. ¶ 303).

To start, the statements by Braunstein and Dimon are devoid of factual content and thus immaterial as a matter of law.  Statements that convey no concrete factual information on which a reasonable investor could rely—such as we are "happy" with what we see or we feel "better" about an acquisition target—are immaterial.  *Lighthouse Fin. Grp.*, 902 F. Supp. 2d at 341; *Hutchison* v. *Perez*, 2013 WL 1775374, at *2 (S.D.N.Y. Apr. 25, 2013) (CEO's statement that "we feel very comfortable with the level of cash we have and we feel very comfortable with the level we will have at the end of the year" is nonactionable puffery); *In re Healthco Int'l, Inc. Sec. Litig.*, 777 F. Supp. 109, 115 (D. Mass. 1991) (comment that company was "comfortable" deal would close is nonactionable).  Plaintiffs allege no "facts that would demonstrate that a reasonable investor could have understood [the] statement[s] to convey a guarantee" that the SCP's positions would not result in a loss.  *See Sanofi-Aventis*, 774 F. Supp. 2d at 566.  Dimon's statement in particular conveyed no factual information because it was in the context of a vague

<hr/>

[33] Plaintiffs allege no facts suggesting that the spokesperson made this statement with scienter.

exchange with an analyst. *See Furher* v. *Ericsson LM Tel. Co.*, 363 Fed. App'x 763, 765 (2d Cir. 2009) (statements were not misleading and inference of scienter was not strong in part because statements were made "in the context of an informal back-and-forth with analysts— partially in response to questions that were themselves imprecise and potentially ambiguous").

Plaintiffs also do not allege that the speakers did not honestly believe their opinions at the time they were expressed. Allegations that "defendants *should have known* that their [opinions] were false or misleading" are insufficient to plead fraud. *Deutsche Bank*, 2012 WL 3297730, at *2. Here, plaintiffs allege only that Dimon and Braunstein knew that (i) the SCP had incurred losses of $400 million in one day and $1.2 billion to date (Compl. ¶¶ 327(o), 341(p)), (ii) the SCP contained large concentrated positions in specific credit indices (*id.* ¶¶ 327(p), 341(p)), (iii) there were "multiple . . . scenarios" in which the SCP might lose money (*id.* ¶ 327(p); *see also id.* ¶ 341(p)), and (iv) "at least three reports . . . showed that [the SCP's] losses could exceed $1 billion in the second quarter" (*id.* ¶ 194). These allegations are insufficient to plead that Dimon and Braunstein did not believe their opinions, much less to give rise to a strong inference that they made the statements with an intent to deceive or defraud.

As a threshold matter, the allegation that Dimon and Braunstein were aware that the SCP had incurred $1.2 billion in losses to date is insufficient to plead fraud. CIO managed portfolios with assets totaling over $350 billion (*id.* ¶ 51) and at that time had unrealized gains of $8 billion (Ex. 8 at 2 (5/10/12 earnings call tr.).) The more plausible inference is that Braunstein was in fact comfortable with CIO's positions and that Dimon considered a mark-to-market loss of little more than 0.3% of CIO's portfolios in one quarter to be a "tempest in a teapot."

More fundamentally, the documents on which the Complaint is based show that the statements by Dimon and Braunstein on April 13 were entirely consistent with what they had

been told internally about the SCP's prior losses and the likelihood of future losses. On April 10, "the first trading day in London after the 'London Whale' articles were published," the SCP suffered a "mark-to-market loss of $412 million." (TFR at 64-65.) That same day, Drew told Dimon and Braunstein that this loss was an aberrational event caused by "the market's belief that JPMorgan would have to liquidate the positions described in the articles." (*Id*. at 65.) Drew confirmed to Dimon that "CIO could hold the [SCP] positions until the market returned to normal levels, and that there was no contractual risk that CIO would be required to sell." (*Id*. at 68-69.) Moreover, the report that Dimon and Braunstein received on April 10 "showed an 80% likelihood" that the SCP would gain as much as $350 million in the second quarter of 2012 or lose no more than $250 million. (*Id*. at 65.) On April 11, Dimon and Braunstein were provided with a similar estimate of the SCP's future performance and told that the market would "'mean revert'" such that the SCP would recover its mark-to-market losses. (*Id*. at 67-68.) Dimon and Braunstein also received "an 'Executive Summary' email written by one of the [London] traders" that "characterized the [SCP] as 'balanced in terms of directionality'" and stated that the SCP would recover its losses because, among other reasons, market conditions were likely to improve and future corporate defaults could generate revenue. (*Id*. at 67-68.)

Plaintiffs allege no facts that "present[] a contrast between" what Dimon and Braunstein "were hearing internally" and what they were "telling the public at the same time." *In re Aegon N.V. Sec. Litig.*, 2004 WL 1415973, at *17 (S.D.N.Y. June 23, 2004) (internal quotation marks omitted). To the contrary, their public statements were entirely consistent with the internal reports they received before the April 13 earnings call, and plaintiffs' scienter allegations amount to an improper attempt to plead fraud by hindsight. *See Manulife Fin.*, 276 F.R.D. at 100-02 (finding more compelling inference that executives honestly believed company would profit in

long term and could "weather the storm" in short term). That these opinions later were proven to be mistaken is not sufficient to plead fraud under the PSLRA. *Shields* v. *Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) ("misguided optimism is not a cause of action, and does not support an inference of fraud").[34]

### 2. Plaintiffs Cannot Extend Section 10(b) Liability to Defendants Who Did Not Make the Challenged Statements.

Plaintiffs seek to impose liability under Section 10(b) on individual defendants for statements they did not make. They contend that Dimon, Braunstein, Drew and Zubrow should be held liable for the statements made by a JPMorgan spokesperson to the media in April 2012 and that Drew and Zubrow should be held liable for the statements made by Dimon and Braunstein on April 13. (Compl. ¶ 407.) Controlling authority forecloses these claims.

As the Supreme Court has held, "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Capital Grp., Inc.* v. *First Deriv. Traders*, 131 S. Ct. 2296, 2302 (2011). Because "[o]ne who prepares or publishes a statement on behalf of another is not its maker," plaintiffs cannot rely on allegations that a speaker consulted with another defendant before making a statement. *Id*. As a result, plaintiffs' allegations that Dimon, Braunstein, Drew and Zubrow reviewed "talking points" used by the JPMorgan spokesperson is not enough to establish that they "made" the statements orally conveyed to the media. *Id*. Similarly, plaintiffs' allegation that Drew and Zubrow provided information to Dimon and Braunstein before the April 13 earnings call is not enough to establish that Drew and Zubrow made the challenged statements.

---

[34] Plaintiffs allege that "internal reports were warning that losses . . . could reach as high as $9 billion." (Compl. ¶ 203; *see also id*. ¶ 195 (citing NYT article).) That allegation misstates the contents of an anonymously-sourced news article that itself lacks any indicia of reliability. The article states that the $9 billion estimate was a "worst case" scenario, does not say how probable that scenario was, and, more importantly, does not state that Dimon or Braunstein ever saw this estimate. (Ex. 19 at 1 (6/28/12 NYT article).)

*Id*. at 2303-04 (rejecting interpretation of word "make" that would subject person who participates in drafting false statement made by another to liability pursuant to Section 10(b)).[35]

### 3. Plaintiffs Do Not Adequately Allege Scienter for Any of the April 2012 Statements.

#### a. Plaintiffs Do Not Adequately Plead That Dimon Acted with an Intent to Deceive or Defraud.

Plaintiffs argue that Dimon acted with scienter in making his April 2012 statements based on (i) JPMorgan's lobbying about the Volcker Rule, and (ii) information he received from CIO personnel between April 5 and April 13, 2012. (Compl. ¶¶ 327(i), (p).)[36] Neither basis is sufficient to give rise to a strong inference of scienter. JPMorgan's Volcker Rule lobbying says nothing about what Dimon knew about the SCP's trading on April 13. As explained above, what Dimon had been told about the SCP trading at that time was entirely *consistent* with his April 13 statements. Although he was advised that the SCP could lose as much as $1 billion in the second quarter of 2012 under certain scenarios (Compl. ¶ 327(p)), he also was informed that there was "an 80% likelihood" that the SCP would gain as much as $350 million or lose no more than $250 million in that quarter (TFR at 65). Given the size of CIO's portfolios, an 80% likelihood of anything from a gain of $350 million to a loss of $250 million in one portfolio does not give rise to a strong inference that Dimon knowingly misled investors or was reckless as to the truth of his statements. Dimon's later acceptance of responsibility for CIO's losses (Compl. ¶ 331)

---

[35] Plaintiffs also cannot rely on group pleading to attribute oral statements made by others to Dimon, Braunstein, Drew and Zubrow. *UBS*, 2012 WL 4471265, at *10 ("[A] theory of liability premised on treating corporate insiders as a group cannot survive a plain reading of the *Janus* decision").

[36] The receipt by Dimon and Braunstein of an April 11 email from JPMorgan's CRO about the need for "tighter governance/controls/escalation protocols" in CIO (Compl. ¶¶ 198, 327(q), 341(m)) adds nothing to plaintiffs' scienter allegations because none of the challenged statements concerned CIO's risk management practices (with one exception, addressed *infra* at 73-74). Indeed, in that same email, the CRO described the current issue—the SCP's losses—as "fine." (TFR at 63.)

-71-

says more about his integrity and sense of responsibility as JPMorgan's CEO than it does his intent in April 2012.

### b. Plaintiffs Do Not Adequately Plead That Braunstein Acted with an Intent to Deceive or Defraud.

Plaintiffs contend that Braunstein acted with scienter in making his April statements based on (i) his knowledge of the "size and illiquidity" of the SCP's positions and the mark-to-market losses incurred to date (Compl. ¶¶ 341(l), (o), (p), (q)), and (ii) projections he received from CIO management regarding potential future losses (*id.* ¶¶ 341(o), (p)).

Braunstein's April 13 statements about "high grade" securities and the hedging of interest rate and other risks (*id.* ¶ 305) were directed at CIO as a whole. These comments came shortly after Braunstein said he was "tak[ing] a step back" from the news coverage to "remind our investors about [CIO's] activity and performance." (Ex. 31 at 7 (4/13/12 earnings call tr.).) Plaintiffs allege no facts showing that Braunstein received any information before April 13 that contradicted his general descriptions of CIO as a whole. In challenging Braunstein's statements about the SCP, plaintiffs fail to allege facts creating a strong inference that Braunstein recklessly characterized the SCP's activities as reflecting "decisions . . . made on a very-long term basis" and "done to keep the Company effectively balanced from a risk standpoint." (Compl. ¶ 305.) Before April 13, Braunstein repeatedly was told that the SCP was positioned to profit from corporate defaults in a manner that reflected its long-term strategy. (TFR at 62 ("[t]oday there is considerable default protection").) Based on analysis from CIO personnel in London, Drew also told Braunstein that the SCP was "balanced." (*Id.* at 62.) In short, plaintiffs fail to plead any facts showing that what Braunstein was "hearing internally" was different from what he was "telling the public." *Aegon*, 2004 WL 1415973, at *17 (internal quotation marks omitted).

Plaintiffs likewise fail to plead a strong inference of scienter with respect to Braunstein's statements that the SCP contained "positions" put on "to manage for [a] significant stress event" and that the SCP's 2012 trading was "part of managing" these positions. (Compl. ¶ 305.) According to the Complaint, Braunstein was told in the week before the April 13 earnings call that the SCP contained certain concentrated long credit positions and was losing money. (*Id.* ¶ 341(p).) Although the SCP was allegedly long credit by some measures (*id.*), Braunstein had been advised that the SCP still provided considerable protection in the event of corporate defaults due to its mix of long and short positions, thus defeating any strong inference of an intent to deceive or defraud. (TFR at 24 n.24, 62, 66.) Plaintiffs also cannot plead scienter by alleging that Braunstein was told that certain long positions within the SCP were designed "to provide 'some carry'" (Compl. ¶ 341(p)), *i.e.*, positive cash flow over time. Because carry also offsets losses, this fact is not inconsistent with Braunstein's general statements about the SCP.

Nor do plaintiffs allege that Braunstein received any specific information that contradicted his statements that CIO's positions were transparent to regulators. In fact, Braunstein was informed on April 12—the day before his statements—that the SCP's positions were "included in our regulatory reporting practices." (*See* PSI Rpt. Ex. 91 at 6 (Ex. 34).)

Plaintiffs' sole scienter allegation directed at Braunstein's statement that the SCP's positions were "put on pursuant to" firm-wide risk management is based on an email from JPMorgan's CRO about the purported inadequacy of CIO's risk controls. (Compl. ¶ 341(m).) At most, this document suggests that CIO's risk management protocols needed improvement, not that those protocols did not exist. *See FBR*, 544 F. Supp. 2d at 359-60. Plaintiffs thus fail to plead any facts creating a strong inference that Braunstein knew that the SCP was not subject to JPMorgan's firm-wide risk management processes. To the contrary, allegations that Braunstein

personally received reports regarding limit excessions caused by the SCP (Compl. ¶ 341(j)) undermine any such inference.

<strong>c.      Plaintiffs Do Not Adequately Plead That Drew<br>Acted with an Intent to Deceive or Defraud.</strong>

Although Drew made none of the challenged statements—which should be the end of the analysis—plaintiffs contend that she was at least reckless with respect to every April statement. (*Id*. ¶¶ 344-53.)  In so arguing, plaintiffs rely on allegations about Drew's corporate position and her receipt of reports of CIO stress test results, interest rate profiles and risk limit excessions. (*See*, *e.g.*, *id*. ¶¶ 346, 349(d)-(g).)  These allegations do not give rise to a strong inference that Drew acted with scienter because plaintiffs "fail to specify . . . what information those reports contained, and whether [they] contradicted" defendants' statements.  *Wachovia*, 753 F. Supp. 2d at 352.  Allegations based on Drew's "daily meetings or communications" with her direct reports and risk management personnel and on her "weekly portfolio review meetings" (Compl. ¶¶ 345, 349(a)-(b)) are also insufficient to plead scienter.  *City of Brockton*, 540 F. Supp. 2d at 473-74.  The isolated pieces of information Drew received in the busy week before the April 13 earnings call would not have informed her that the statements by Dimon, Braunstein and a JPMorgan spokesperson were supposedly false.  Moreover, given the London traders' clear lack of candor with Drew (PSI Rpt. at 96-97) and failure to provide her with relevant information (TFR at 59-60, 89), the more compelling inference is that Drew at most made "mistakes . . . based on false information fed" to her.  *Dynex*, 531 F.3d at 197 (internal quotation marks omitted).

In seeking to hold Drew responsible for Braunstein's statements about regulatory transparency, plaintiffs point to Drew's involvement with an OCC MRA in 2010.  (Compl. ¶ 348(h).)  That allegation likewise does not support a strong inference of scienter because Drew ultimately responded to the MRA and believed it was "closed out."  (PSI Rpt. at 224.)  Further,

any imperfections in CIO risk management structure do not establish that Drew somehow acted recklessly in connection with Braunstein's statement that the SCP's positions were "put on pursuant to" firm-wide risk management. If anything, the PSI Report demonstrates that risks within CIO were managed in accordance with JPMorgan's limit structure and that Drew monitored and used the limits she trusted and found reliable (VaR and CSW10%). (PSI Rpt. at 173 (discussing Drew's questions when VaR approached its limit in January); *see also id*. at 85-86 (excession of CSW10% limit caused Drew to order a halt to trading).)[37]

### d. Plaintiffs Do Not Adequately Plead That Zubrow Acted with an Intent to Deceive or Defraud.

Although Zubrow also made none of the challenged statements in April—which, again, should be the end of the analysis—plaintiffs contend that he acted with scienter in connection with the April statements based on his position, alleged receipt of reports and supposed knowledge of SCP losses. (Compl. ¶¶ 356(e), (h), (i)).) Even if scienter could be inferred from his position—and it cannot, *see CIBC*, 694 F. Supp. 2d at 299-300—Zubrow was no longer CRO in April 2012, having left that position in January. Plaintiffs also cannot plead scienter based on "concerns raised by his direct reports" (Compl. ¶ 356(g)) unless those concerns were communicated to him and contradicted a public statement he made. *Wachovia*, 753 F. Supp. 2d at 352.[38] Plaintiffs similarly fail to allege that Zubrow acted with an intent to defraud based on his internal April 12 email reassuring Dimon and Braunstein that the London traders' strategy

---

[37] Plaintiffs' allegations regarding Drew's departure from JPMorgan do not raise a strong inference of scienter. (Compl. ¶¶ 351-53.) "[T]here are any number of reasons that an executive might resign, most of which are not related to fraud." *In re Bisys Sec. Litig.*, 397 F. Supp. 2d 430, 446 (S.D.N.Y. 2005). CIO had lost roughly $2 billion when Drew retired. Under those circumstances, her departure was "at least as consistent with punishing those at the helm for their poor judgment and leadership" as with "concocting a scheme to defraud." *Lighthouse Fin. Grp.*, 902 F. Supp. 2d at 343.

[38] Plaintiffs' allegation that Zubrow was informed of certain CIO trading activity in 2010 (Compl. ¶ 89) is irrelevant because this activity preceded the statements in question by two years.

"[w]as part of LONG TERM hedging of the banks portfolio" and thus complied with the proposed Volcker Rule. (Compl. ¶ 358.) As discussed above, there was a reasonable basis for this opinion: the proposed Volcker Rule allows portfolio hedging and recognizes that "a banking entity may need to . . . rebalanc[e] its current hedge position(s)." 76 Fed. Reg. at 68875.

### e. Plaintiffs Do Not Adequately Allege Corporate Scienter.

Plaintiffs fail to allege that the individual defendants—or any other JPMorgan officer responsible for making the challenged April 2012 statements—had knowledge of specific information that contradicted the statements. *See Dynex*, 531 F.3d at 196-97. Moreover, none of the challenged statements were so blatantly false at the time that a strong inference exists that they were approved by officials who knew they were false, particularly given that they were oral statements made in response reporters' and analysts' questions. *See id.* at 195-96.[39]

## V. Plaintiffs Fail to State a Section 20(a) Claim.

Plaintiffs seek to hold all of the individual defendants liable as control persons for JPMorgan's purported violations of Section 10(b). (Compl. ¶¶ 412-16.) "To establish a prima facie case of control person liability [under Section 20(a)] . . . plaintiff[s] must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant[s], and (3) that the defendant[s] [were], in some meaningful sense, . . . culpable participant[s] in the controlled person's fraud." *ATSI Commc'ns*, 493 F.3d at 108. Plaintiffs fail to allege these elements.

First, plaintiffs fail to plead a primary violation of Section 10(b). As a result, their Section 20(a) claim fails as a matter of law and should be dismissed as to all defendants. *Id.*

---

[39] To the extent that plaintiffs seek to bring claims pursuant to Rule 10b-5(a) or (c) (Compl. ¶¶ 403-04), plaintiffs do not allege with sufficient particularity that any defendant engaged in any "inherently deceptive conduct"— aside from purported misstatements and omissions—with the requisite intent to defraud. *See SEC* v. *Kelly*, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011).

Second, plaintiffs fail to plead that Drew and Zubrow had control over a primary violator in connection with the alleged Section 10(b) violations. Control "may be established by showing that the defendant possessed the power to direct or cause the direction of the management and policies of a person." *In re Alstom SA*, 406 F. Supp. 2d 433, 486 (S.D.N.Y. 2005) (internal quotation marks omitted). "[A] § 20(a) defendant must not only have actual control over the primary violator, but have actual control over the *transaction* in question." *McIntire* v. *China MediaExpress Holdings, Inc.*, 2013 WL 752954, at *11 (S.D.N.Y. Feb. 28, 2013) (internal quotation marks omitted). "[M]erely alleging that the defendant was a director or officer of the primary violator" is insufficient. *In re CINAR Corp. Sec. Litig.*, 186 F. Supp. 2d 279, 319 (E.D.N.Y. 2002). Plaintiffs thus cannot plead that Drew and Zubrow exercised control simply by alleging that they were high-level executives, and they do not allege facts showing that either had "actual control" over a primary violator. *Sanofi-Aventis*, 774 F. Supp. 2d at 572. Although Drew and Zubrow are alleged to have played a role in formulating the April statements (Compl. ¶¶ 188-89, 195-99), such allegations show only that they had "influence," which is "not sufficient to establish control for purposes of Section 20(a)." *Alstom*, 406 F. Supp. 2d at 487. Plaintiffs also fail to allege that Drew and Zubrow had the authority to direct the spokesperson (let alone Dimon or Braunstein) to issue any statements on behalf of JPMorgan.[40]

Third, plaintiffs do not adequately allege that any of the individual defendants was a "culpable participant" in JPMorgan's purported fraud. *ATSI Commc'ns*, 493 F.3d at 108. To plead culpable participation, plaintiffs "must allege, at a minimum, particularized facts of the controlling person's conscious misbehavior or recklessness." *In re MBIA, Inc., Sec. Litig.*, 700

---

[40] Plaintiffs also do not allege any facts showing that Cavanagh or Braunstein had "actual control" over JPMorgan's SEC filings when they were not JPMorgan's CFO. Cavanagh was CFO until May 2010. (Compl. ¶ 332.) Braunstein became CFO when Cavanagh stepped down. (*Id.* ¶¶ 336.)

F. Supp. 2d 566, 598 (S.D.N.Y. 2012).[41]  This element must be pled in accordance with "the heightened pleading standards of the PSLRA."  *McIntire*, 2013 WL 752954, at *11.  As set forth above, plaintiffs fail to allege with sufficient particularity that any of the individual defendants engaged in conscious misbehavior or recklessness in connection with JPMorgan's purported violations of Section 10(b).

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint in its entirety with prejudice and without leave to amend.

Dated:  June 11, 2013

Respectfully submitted,

s/ Daryl A. Libow
Daryl A. Libow (libowd@sullcrom.com)
Christopher M. Viapiano
(viapianoc@sullcrom.com)
SULLIVAN & CROMWELL LLP
1701 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Telephone:  (202) 956-7500
Facsimile:  (202) 956-6973

Richard C. Pepperman, II
(peppermanr@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone:  (212) 558-4000
Facsimile:  (212) 291-9113

*Counsel for Defendants*

---

[41] While several district courts have stated that culpable participation is not a required element of Section 20(a), *see, e.g., In re Paramalat Sec. Litig.*, 497 F. Supp. 2d 526, 532 n.42 (S.D.N.Y. 2007), "[t]he weight of well-reasoned authority is that to withstand a motion to dismiss a section 20(a) controlling person liability claim, a plaintiff must allege some level of culpable participation at least approximating recklessness in the section 10(b) context," *Edison Fund* v. *Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 231 (S.D.N.Y. 2008) (internal quotation marks omitted).