**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| IN RE JPMORGAN CHASE & CO. SECURITIES LITIGATION | ) ) ) ) ) | Master File No. 1:12-cv-03852-GBD |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO**
**DISMISS THE SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................. iv

PRELIMINARY STATEMENT ........................................................................ 1

STATEMENT OF FACTS ............................................................................... 5

    A.   Defendants Misrepresented JPMorgan's Risk Management
        Practices And The True Function Of Its Primary Risk Management Unit ...................... 5

    B.   JPMorgan Transformed The CIO Into A High-Risk
        Proprietary Trading Operation ...................................................... 7

       1.   JPMorgan Dodged Regulatory Oversight To Conceal
            The CIO's Trading .............................................................. 8

       2.   Dimon And Drew Removed The CIO's Risk Controls
            To Enable The CIO To Make Riskier Bets ....................................... 9

    C.   The CIO's Proprietary Trading Secretly Generated Massive
        Gains And Losses With The Full Knowledge Of Dimon ............................. 11

    D.   The CIO's SCP Engaged In Proprietary Trading In Exotic,
        High-risk Credit Derivatives, Not Hedging Of Existing Risks ...................... 13

    E.   JPMorgan's Refusal To Reserve For The Risks In The
        SCP Enabled It To Overstate Its Financial Results ............................... 15

    F.   In 2011, The Massive Risk Of The SCP Triggered Numerous
        Risk Limit Breaches And Caused The CIO's VaR To Spike ....................... 16

    G.   Defendants Conspired To Manipulate The CIO's VaR
        To Conceal The True Risk Of The CIO ......................................... 20

    H.   JPMorgan Resorted To "Painting The Tape" And Fraudulent
        Mismarking To Conceal The CIO's Losses ..................................... 22

    I.   As CIO Losses Surpassed One Billion Dollars, Dimon Dismissed
        Concerns Over The London Whale As A "Tempest In A Teapot" ................. 24

    J.   JPMorgan Belatedly Disclosed The CIO's Massive Trading
        Losses And Restated The Company's Earnings And VaR ........................ 26

ARGUMENT ................................................................................. 28

I.   DEFENDANTS MADE MATERIALLY FALSE AND
     MISLEADING STATEMENTS AND OMISSIONS ...................................... 28

   A.   Defendants Materially Misrepresented The CIO's
        Purpose And Activities In JPMorgan's SEC Filings From 2010-2011 ......................... 29

     1.   The CIO Was Not "Primarily Concerned" With Managing
          The Risks Of JPMorgan's Other Business Lines ...................................... 29

     2.   The Failure To Disclose The CIO's Proprietary Trading
          Rendered Defendants' Other Statements Misleading ............................... 31

   B.   Defendants Materially Misrepresented JPMorgan's Risk
        Management Practices And Use Of Risks Limits in 2010-2011 .................................. 33

     1.   Defendants Materially Misrepresented The Robustness
          Of JPMorgan's Risk Management Practices ............................................ 33

     2.   Defendants Materially Misrepresented JPMorgan's Use
          And Enforcement Of Risk Limits ........................................................ 36

   C.   Defendants Continued to Make Material Misrepresentations in 2012........................... 41

     1.   Dimon's Misrepresentations On February 13, 2012 .................................. 41

     2.   Defendants Misrepresented The CIO's Role And JPMorgan's
          Risk Management Practices In The 2011 Form 10-K ................................ 42

     3.   Defendants' Material Understatement And Misrepresentation
          Of JPMorgan's First Quarter 2012 VaR ................................................ 43

     4.   Misrepresentations In April 2012 News Articles ..................................... 46

     5.   Misrepresentations During The April 13, 2012 Conference Call ............................ 48

   D.   JPMorgan's Financial Results Were Materially Misleading
        Due To Defendants' Refusal To Establish A Liquidity Reserve For The CIO............. 52

II.  DEFENDANTS ACTED WITH SCIENTER ......................................... 54

   A.   Dimon.................................................................................................... 56

     1.   The Complaint Alleges Particularized Facts Showing That
          Dimon Acted With Scienter In 2010 And 2011 ...................................... 57

     2.   The Complaint Alleges Particularized Facts Showing That
          Dimon Acted With Scienter In February 2012 ...................................... 61

(a) Dimon Knew That Statements Regarding VaR And The Use Of Risk Limits In The 2011 Form 10-K Were False ................................................. 61

(b) Dimon Knew Or Should Have Known That JPMorgan's Internal Controls Statements Were False And Misleading ...................................... 63

3. Dimon Acted With Scienter In April 2012 ................................................ 64

B. Braunstein ............................................................................................................. 66

1. The Complaint Alleges Particularized Facts Showing That Braunstein Acted With Scienter In 2010 And 2011 ................................................. 66

2. The Complaint Alleges Particularized Facts Showing That Braunstein Acted With Scienter In 2012 ................................................................... 67

C. Cavanagh ............................................................................................................... 69

D. Zubrow .................................................................................................................. 70

E. Drew ...................................................................................................................... 71

F. JPMorgan ............................................................................................................... 73

III. PLAINTIFFS HAVE PLED LOSS CAUSATION ....................................................... 75

IV. PLAINTIFFS HAVE STATED SECTION 20(A) CLAIMS ......................................... 76

CONCLUSION ......................................................................................................................... 78

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*In re Alstom SA Sec. Litig.,*
  406 F. Supp. 2d 433 (S.D.N.Y. 2005)..................................................................77, 78

*In re Am. Int'l Grp., Inc. 2008 Sec. Litig.,*
  741 F. Supp. 2d 511 (S.D.N.Y. 2010) ................................................................. passim

*In re Ambac Fin. Grp., Inc. Sec. Litig.,*
  693 F. Supp. 2d 241 (S.D.N.Y. 2010) ................................................................. passim

*In re AOL Time Warner, Inc. Sec. & ERISA Litig.,*
  381 F. Supp. 2d 192 (S.D.N.Y. 2004) ...........................................................................78

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.,*
  324 F. Supp. 2d 474 (S.D.N.Y. 2004) ...........................................................................41

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
  493 F.3d 87 (2d Cir. 2007) ...........................................................................................54

*Basic Inc. v. Levinson,*
  485 U.S. 224 (1988) ......................................................................................................36

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.,*
  763 F. Supp. 2d 423 (S.D.N.Y. 2011) ................................................................. passim

*In re Bradley Pharms., Inc. Sec. Litig.,*
  421 F. Supp. 2d 822 (D.N.J. 2006) ...............................................................................76

*Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.,*
  866 F. Supp. 2d 223 (S.D.N.Y. 2012) ...........................................................................75

*Caiola v. Citibank, N.A., New York,*
  295 F.3d 312 (2d Cir. 2002) ................................................................................. passim

*Chill v. Gen. Elec. Co.,*
  101 F.3d 263 (2d Cir. 1996)..........................................................................................61

*In re CIT Group Inc. Sec. Litig.,*
  No. 08-6613, 2010 WL 2365846 (S.D.N.Y. June 10, 2010) .........................................78

*In re Citigroup Inc. Sec. Litig.,*
  753 F. Supp. 2d 206 (S.D.N.Y. 2010)......................................................................31, 78

*City of Brockton Retirement System v. Shaw Grp. Inc.*,
    540 F. Supp. 2d 464 (S.D.N.Y. 2008)................................................................58

*City of Roseville Employees' Ret. Sys. v. EnergySolutions, Inc.*,
    814 F. Supp. 2d 395 (S.D.N.Y. 2011)................................................28, 59, 74

*City of Roseville Employees' Ret. Sys. v. Nokia*,
    No. 10-00967, 2011 WL 7158548 (S.D.N.Y. Sep. 6, 2011)...................................45

*City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat., PLC*,
    423 F. Supp. 2d 348 (S.D.N.Y. 2006)................................................................41

*In re Deutsche Bank AG Sec. Litig.*,
    No. 09-1714, 2012 WL 3297730 (S.D.N.Y. Aug. 10, 2012)..........................43, 45

*Dobina v. Weatherford Int'l, Ltd.*,
    909 F. Supp. 2d 228 (S.D.N.Y. 2012)................................................................64

*Dodona I, LLC v. Goldman, Sachs & Co.*,
    847 F. Supp. 2d 624 (S.D.N.Y. 2012)................................................................37

*Dura Pharms, Inc. v. Broudo*,
    544 U.S. 336 (2005) ........................................................................................75

*In re Dynex Capital, Inc. Sec. Litig.*,
    No. 05-1897, 2009 WL 3380621 (S.D.N.Y. Oct. 19, 2009)........................31, 54, 55

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)...........................................................................36

*Fait v. Regions Fin. Corp.*,
    655 F.3d 105 (2d Cir. 2011)......................................................................44, 53

*In re Fannie Mae 2008 Sec. Litig.*,
    742 F. Supp. 2d 382 (S.D.N.Y. 2010)..........................................................40, 78

*Freudenberg v. E*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)..................................................35, 37, 41, 51

*Furher v. Ericsson LM Telephone Co.*,
    363 Fed. App'x 763 (2d Cir. 2009)..................................................................65

*Ganino v. Citizens Util.*,
    228 F.3d 154 (2d Cir. 2000)............................................................................55

*In re Global Crossing, Ltd. Sec. Litig.*,
    322 F. Supp. 2d 319 (S.D.N.Y. 2004)................................................................53

*In re Globalstar Sec. Litig.*,
    No. 01-1748, 2003 WL 22953163 (S.D.N.Y. Dec. 15, 2003) .................................59

*Halperin v. eBanker USA.com, Inc.*,
    295 F.3d 352 (2d Cir. 2002)....................................................................................28

*Ho v. Duoyuan Global Water, Inc.*,
    887 F. Supp. 2d 547 (S.D.N.Y. 2012)...................................................................61

*Hunt v. Enzo Biochem, Inc*,
    530 F. Supp. 2d 580 (S.D.N.Y. 2008)...................................................................76

*IBEW Local 90 Pension Fund v. Deutsche Bank AG*,
    No. 11-4209, 2013 WL 1223844 (S.D.N.Y. Mar. 27, 2013)....................50, 51, 66

*Janus Capital Group, Inc. v. First Derivative Traders*,
    131 S. Ct 2296 (2011) ...........................................................................................47

*Katz v. Image Innovations Holdings, Inc.*,
    542 F. Supp. 2d 269 (S.D.N.Y. 2008)...................................................................77

*Lapin v. Goldman Sachs Grp.*,
    506 F. Supp. 2d 221 (S.D.N.Y. 2006 ..............................................................34, 50

*In re Lehman Bros. Sec. & ERISA Litig.*,
    799 F. Supp. 2d 258 (S.D.N.Y. 2011)......................................................... passim

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005)....................................................................................76

*In re MBIA Sec. Litig., Inc.*,
    700 F. Supp. 2d 566 (S.D.N.Y. 2010)...............................................................31, 32

*McIntire v. China MediaExpress Holdings, Inc.*,
    No. 11-804, 2013 WL 752954 (S.D.N.Y. Feb. 28, 2013).......................................73

*New Orleans Employees Ret. Sys. v. Celestica, Inc.*,
    455 F. App'x 10 (2d Cir. 2011) ...............................................................................54

*In re NovaGold Res. Inc. Sec. Litig.*,
    629 F. Supp. 2d 272 (S.D.N.Y. 2009)...................................................................44

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000).........................................................................35, 54, 70

*Operating Local 649 Annuity Trust v. Smith Barney Fund Mgmt. LLC*,
    595 F.3d 86 (2d Cir. 2010)....................................................................................32

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
    681 F.3d 114 (2d Cir. 2012)................................................................46

*In re Parmalat Sec. Litig.*,
    375 F. Supp. 2d 278 (S.D.N.Y. 2005)...............................................76

*In re Parmalat Sec. Litig.*,
    376 F. Supp. 2d 472 (S.D.N.Y. 2005)...............................................77

*In re Pfizer, Inc. Sec. Litig.*,
    No. 04-9866, 2012 WL 983548 (S.D.N.Y. Mar. 22, 2012)................48

*In re Pfizer, Inc. Sec. Litig.*,
    No. 04-9866, 2013 WL 1285173 (S.D.N.Y. Mar. 28, 2013)..............48

*Podany v. Robertson Stephens, Inc.*,
    318 F. Supp. 2d 146 (S.D.N.Y. 2004)...............................................45

*Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*,
    645 F. Supp. 2d 210 (S.D.N.Y. 2009)...............................................76

*In re Refco Inc. Sec. Litig.*,
    503 F. Supp. 2d 611 (S.D.N.Y. 2007)...............................................53

*Richman v. Goldman Sachs Grp., Inc.*,
    868 F. Supp. 2d 261 (S.D.N.Y. 2012)...............................................78

*In re Sanofi-Aventis Sec. Litig.*,
    774 F. Supp. 2d 549 (S.D.N.Y. 2011)...............................................78

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001)...........................................................54, 59

*SEC v. Greenstone Holdings, Inc.*,
    No. 10-1302, 2012 WL 1038570 (S.D.N.Y. Mar. 28, 2012)..............48

*Sgalambo v. McKenzie*,
    739 F. Supp. 2d 453 (S.D.N.Y. 2010)...............................................78

*In re Take-Two Interactive Sec. Litig.*,
    551 F. Supp. 2d 247 (S.D.N.Y. 2008)...............................................76

*Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008)........................................................59, 74

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).....................................................................54, 55

*In re Vivendi Universal, S.A. Sec. Litig.*,
    381 F. Supp. 2d 158 (S.D.N.Y. 2003)..................................................................54

*In re Vivendi Universal, S.A. Sec. Litig.*,
    634 F. Supp. 2d 352 (S.D.N.Y. 2009)..................................................................76

*Wilson v. Merrill Lynch & Co., Inc.*,
    671 F.3d 120 (2d Cir. 2011)................................................................................28

*In re Winstar Commc'ns Sec. Litig.*,
    No. 01-3014, 2006 WL 473885 (S.D.N.Y. Feb. 27, 2006)).......................... passim

## STATUTES

15 U.S.C. § 78u-4(b)(1) .......................................................................................28

## PRELIMINARY STATEMENT

Throughout the Class Period, JPMorgan and the Individual Defendants represented to investors that the Company's "steadfast" "commitment to world-class risk management" and "robust" risk management infrastructure distinguished it from its peers.   Because risk management was "critical to both its soundness and profitability," JPMorgan said that its superior "risk management discipline" included strict adherence to and enforcement of "granular" risk limits and controls.   The centerpiece of the Company's risk management infrastructure was the Company's Chief Investment Office ("CIO"), which managed risk for the Company as a whole.   Standing behind those representations was JPMorgan's CEO, Jamie Dimon, who held himself out as the "king of risk management."   On the basis of the Company's representations and Dimon's reputation, JPMorgan stock traded at a premium throughout the Class Period when compared to its competitors.

However, JPMorgan's purported commitment to risk management was a sham.   In reality, Dimon secretly transformed the CIO – the Company's "principal risk management unit" – into a high-risk trading desk that was hidden from regulatory scrutiny and exempted from any risk controls.   As a result, throughout the Class Period, the CIO secretly engaged in "proprietary" trading for its own account, taking massive, speculative positions in exotic securities.   This trading "dominated" the CIO's risks throughout the Class Period, and caused the Company's Value-at-Risk ("VaR") – the primary risk metric that the Company reported to regulators and investors – to increase dramatically.   Faced with this precipitous rise in VaR, JPMorgan, with Dimon's specific approval, developed and adopted a new VaR model in January 2012 that materially understated the true risks in the CIO by nearly 50%.

Investors did not know anything about JPMorgan's high-risk trading practices until April 2012, when the WALL STREET JOURNAL printed a front-page story tying unusual movements in

the market for credit derivatives to a CIO trader nicknamed the "London Whale."  In response to these reports, JPMorgan lied to investors, falsely claiming that the CIO was a risk management unit, and that the trades were "hedges" and not a cause for concern.  Indeed, Dimon expressly dismissed investors' concerns as a "complete tempest in a teapot."  The U.S. Senate, which conducted an extensive investigation of the London Whale, later concluded that these (and numerous other statements Defendants made to investors) were "fictions irreconcilable with the bank's obligation to provide material information to its investors in an accurate manner."

Just weeks later, on May 10, 2012, JPMorgan was forced to come clean.  Specifically, Dimon disclosed on a hastily arranged conference call that the CIO had already incurred $2 billion in losses.  Shortly thereafter, the CIO's losses eventually ballooned to at least $6.25 billion, wiping out more than 50% of JPMorgan's earnings for the first half of the year.  In response to these disclosures, JPMorgan's stock plunged, dropping over $10 per share and eliminating over $30 billion in market capitalization.

JPMorgan has since admitted that its secret foray into high-risk proprietary trading and its abandonment of risk controls in the CIO caused this debacle.  The Company restated its financial results, conceding that they were false and misleading.  JPMorgan was also forced to restate its VaR, while acknowledging that the implementation of the new VaR model that Dimon approved was improper, violated Company policy, and should never have been implemented.  Virtually every JPMorgan employee associated with the CIO's trading was fired, and the Company has clawed back tens of millions of dollars of compensation from senior managers.  Federal regulators and the Company itself have acknowledged massive risk management failures that were known to the senior officers of the Company during the Class Period, including the Individual Defendants.

For example, the Office of the Comptroller of the Currency ("OCC") concluded that, in contrast to Defendants' public statements, the CIO lacked any "foundation to identify, understand, measure, monitor and control risk." JPMorgan commissioned its own investigation, and provided detailed findings in its Task Force Report, including that (1) the CIO's high-risk synthetic credit derivatives portfolio ("SCP") was subject to no risk limits whatsoever (contrary to public statements that all business units "adher[ed] to established limits"); (2) the Individual Defendants knew about the secret proprietary trading; and (3) JPMorgan had improperly manipulated its VaR model, and mismarked CIO trading positions, to enable the CIO to conceal its risks and losses. Indeed, the Task Force Report admitted that CIO risk limits were not "sufficiently granular," and that "no limits by size, asset type or risk factor" applied to the SCP.

Following its investigation into JPMorgan's misconduct, a Subcommittee of the U.S. Senate released a detailed report (the "Senate Report") that made clear that JPMorgan and its officers violated the federal securities laws by lying to investors. Specifically, the Senate Report concluded, *inter alia*, that (1) "[i]n contrast to JPMorgan Chase's reputation for best-in-class risk management, the whale trades exposed a bank culture in which risk limit breaches were routinely disregarded, risk metrics were frequently criticized or downplayed, and risk evaluation models were targeted by bank personnel seeking to produce artificially lower capital requirements;" (2) JPMorgan had secretly "dodged OCC oversight for years;" (3) rather than hedging risk, the CIO housed "a high risk proprietary trading operation that had no place at a federally insured bank;" and (4) JPMorgan's representations about the CIO and its trading were "incomplete, contained numerous inaccuracies, and misinformed investors, regulators and the public."

In response to these, and other, extraordinarily detailed allegations in the Complaint, Defendants principally claim that their false statements about JPMorgan's commitment to risk

management and adherence to risk limits are not actionable as a matter of law.  For example, Defendants argue that the assurances are immaterial puffery, even though JPMorgan made these statements precisely to comfort investors that the Company employed rigorous and strict risk management practices.   Defendants also contend that their statements that the CIO was "primarily concerned" with risk management were not false because certain CIO employees may have been involved in risk management.  However, this argument ignores the well-pled facts: (1) the OCC concluded that the CIO lacked any "foundation to identify, understand, measure, monitor and control risk;" (2) the CIO was "subjected to less rigorous scrutiny than client-facing lines of business," according to JPMorgan's own Task Force Report; (3) the CIO was the only business unit at JPMorgan without a formal risk committee or Chief Risk Officer ("CRO"); (4) the CIO lacked any meaningful risk limits and failed to conduct any review of the risk limits it did have at any time between 2009 and 2011, in violation of Company policy; and, (5) the CIO's high-risk trading ultimately caused the Company to suffer a loss of more than $6 billion.

Defendants also contend that the Complaint fails to plead scienter as to any Individual Defendant because, Defendants argue, no senior officer at the Company is remotely responsible for the misstatements that concealed the CIO's disastrous trading and risk management failures. This, too, is without merit.  The Complaint pleads a plethora of detailed facts establishing that JPMorgan's most senior officers were well aware of the risk deficiencies in the CIO and the high-risk proprietary trading conducted by that unit, including the receipt of reports of hundreds of risk limit breaches throughout the Class Period (330 such breaches in the first quarter of 2012 alone).  The facts alleged not only show the direct involvement of the Individual Defendants in overseeing and approving high-risk CIO trading strategies, including that Dimon personally approved the traders' compensation each year, but also in manipulating CIO risk metrics and

fraudulently mismarking the SCP.   Indeed, Defendants' argument contradicts their own admissions.  As Defendant Ina Drew – the head of the CIO – testified to Congress, the CIO's "investment decisions [were] made with the full understanding of executive management including Jamie Dimon," and Dimon himself has admitted that he was "absolutely responsible" for the risk management failures in the CIO.  JPMorgan agreed:  Dimon's pay was cut in half, and Drew was fired, with the Company clawing back two years of her compensation (over $20 million) because of her involvement in the fraud.  Both the Task Force Report and Senate Report point the finger squarely at JPMorgan's most senior officers, concluding that they lied to investors and bore "significant responsibility" for JPMorgan's risk management failures.  In sum, the evidence of scienter is overwhelming.

As set forth below, Defendants' motion to dismiss should be denied in its entirety.

## STATEMENT OF FACTS

### A.    DEFENDANTS MISREPRESENTED JPMORGAN'S RISK MANAGEMENT PRACTICES AND THE TRUE FUNCTION OF ITS PRIMARY RISK MANAGEMENT UNIT

Prior to and throughout the Class Period, JPMorgan sought to distinguish itself from other Wall Street banks by focusing public attention on its supposed commitment to risk management.   ¶¶47-49.[1]   JPMorgan's CEO, Defendant Dimon, took personal credit for the Company's risk management success, touting JPMorgan's "steadfast focus on risk management and prudent lending, and our disciplined approach to capital and liquidity management."  ¶48. As Simon Johnson, a former chief economist for the International Monetary Fund, said, Dimon "presents himself, and is believed by others to be, the king of risk management."  Id.   Based on these and similar misrepresentations, analysts accorded the Company's stock price a premium to reflect its risk management discipline.  ¶49.

---

[1] All cites in the format of "¶__" are to paragraphs in Plaintiffs' Second Amended Consolidated Class Action Complaint, filed April 12, 2013 (the "Complaint").

Defendants cultivated the Company's reputation for superior risk management by repeatedly representing to investors that JPMorgan's stringent risk controls and "robust risk management discipline" included the following:

- Employing a series of "granular" risk limits that included "approval limits by customer, product, industry, country, and business [which are] monitored on a daily, weekly and monthly basis, as appropriate" ¶253;

- Charging senior management, including Dimon, Cavanagh and Braunstein, with "reviewing and approving those risk limits on an ongoing basis" *Id.*;

- Ensuring that JPMorgan's individual business lines — including the CIO — "adher[ed]" to "established [risk] limits" *Id.*; and

- Actively monitoring and responding to limit breaches by "reduc[ing] positions or consult[ing] with senior management on the appropriate action." *Id.*

JPMorgan's CIO – the business unit that the Company described in its SEC filings as being the central component of its risk management infrastructure – purportedly managed risk for the Company as a whole. ¶¶50-51. The CIO was headed by Defendant Ina Drew, the Company's Chief Investment Officer, who was appointed by Dimon and reported directly to him. ¶40. JPMorgan claimed that the CIO functioned like a traditional bank treasury department and was responsible for measuring, monitoring, and controlling the risks generated by JPMorgan's other business units. ¶56. As such, one of the CIO's primary functions was to manage the risks associated with the imbalance between deposits and loans by safely investing excess deposits. In performing this role, the CIO managed a larger investment portfolio than any of JPMorgan's other businesses, except for its Investment Bank. ¶¶52-54. The size of that portfolio increased approximately 500% from 2007 to 2012 – from $76 billion to $359 billion – due in large part to JPMorgan's perceived soundness and superior risk management. ¶51.

In portraying the CIO as a typical bank treasury department, JPMorgan represented that the CIO executed its "responsibility for managing . . . risk" by monitoring risk throughout the

Company and entering into hedging transactions to offset positions held by other units and to manage JPMorgan's "structural market risks." ¶¶50, 244, 246, 248-49.  Accordingly, investors understood that any trading by the CIO was designed to hedge risks relating to existing positions, and that the CIO was not engaged in high-risk, "proprietary" trading (in which the bank invests its own capital to generate profits).  ¶247.

In truth, as the Senate Report concluded, the culture at JPMorgan was one "in which risk limit breaches were routinely disregarded, risk metrics were frequently criticized or downplayed, and risk evaluation models were targeted by bank personnel seeking to produce artificially lower capital requirements."  ¶85.

### B.   JPMorgan Transformed The CIO Into A High-Risk Proprietary Trading Operation

Before the beginning of the Class Period, JPMorgan and Dimon secretly transformed the CIO into a high-risk proprietary trading operation in order to generate profits for the Company. ¶¶55-66.  Dimon housed JPMorgan's proprietary trading activities in the CIO in part because the CIO had a lower cost of capital than other divisions in the Company.  Specifically, the CIO's proprietary trading was funded by customer deposits, a much cheaper source of capital than the repurchase agreements that the Investment Bank used to fund its trading.  ¶¶63-64.  In addition, CIO traders kept less of the profits they made on trades than did the traders in the Investment Bank.  *Id.*  Accordingly, Dimon understood that a given trade would be more profitable to the Company if executed in the CIO rather than in the Investment Bank.  *Id.*

To build Dimon's proprietary trading operation, Drew hired a team of former hedge fund traders to take speculative positions in currencies and interest-rate products, as well as structured credit, equities, and derivatives.  ¶¶61, 98.  These aggressive traders, including Achilles Macris, Javier Martin-Artajo, and Bruno Iksil, lacked any risk management experience.  ¶¶61-62.

7

Even though CIO traders kept less of the profits earned on each trade, the scale of their proprietary trading placed them among the highest-paid employees at JPMorgan. Indeed, the compensation for the traders with primary responsibility for JPMorgan's SCP – exotic investments tied to corporate and government debt – totaled tens of millions of dollars per year. ¶¶65-66. The bonuses of these traders (including Drew, Macris, Martin-Artajo, and Iksil) closely tracked the SCP's profits, and were so high that they had to be personally approved by JPMorgan's Operating Committee and Dimon himself. *Id*. As the Senate Report concluded, "the bank rewarded [CIO employees] for financial gain and risk-taking," not for risk management. *Id*. In this way, and under the direct supervision of Dimon and Drew, the CIO secretly built a multi-billion dollar SCP, and it was this portfolio that ultimately caused JPMorgan to suffer more than $6.25 billion in losses in 2012. ¶¶86-103.

### 1.     JPMorgan Dodged Regulatory Oversight To Conceal The CIO's Trading

The CIO was an ideal vehicle in which to conceal JPMorgan's proprietary trading because, by convincing regulators and investors that the CIO performed a risk management function like a typical bank treasury department, Defendants shielded the CIO from the regulatory and investor scrutiny applied to JPMorgan's profit-making business lines. ¶¶63, 104-10. For example, the OCC said that the CIO was not closely monitored "because its activities were not historically considered to be high-risk." ¶105. As a result, none of the approximately 110 OCC examiners embedded inside the Company during the Class Period were stationed in the CIO. ¶104. JPMorgan has admitted that the CIO avoided "the host of regulatory, risk and other limits" applicable to other units because the CIO was not a "client-facing business." ¶110.

While the OCC was not aware of the high-risk trading conducted in the CIO, the OCC nevertheless had occasion to review JPMorgan's risk management practices as part of its

regulatory function.  ¶107.  After one such routine examination in December 2010, the OCC issued a Supervisory Letter to Defendants Dimon, Braunstein, Drew, and Zubrow detailing numerous "Matter(s) Requiring Attention" within that unit – serious risk management deficiencies, including a lack of controls and documentation of the CIO's investment policies and decisions.  *Id.*  However, Defendants knew that improving risk controls would have inhibited the CIO's proprietary trading.   Accordingly, Drew told the OCC that there was no need to improve the CIO's risk management systems because Dimon – the best risk manager on Wall Street – was intimately involved in the CIO's investment decisions.  *Id.*  As Drew testified to the Senate Subcommittee, she told the OCC in 2010 that the CIO's "investment decisions are made with the full understanding of executive management including Jamie Dimon," and "everyone knows what is going on and there is little need for more limits, controls or reports."  *Id.*

JPMorgan was also motivated to conceal its proprietary trading activities in light of the "Volcker Rule," a provision of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 that was intended to prohibit proprietary trading by commercial banks.  ¶108.  To evade these restrictions, Defendants falsely described the CIO's proprietary trading as performing a "risk-mitigating" function.  ¶¶108-09, 183-86.  For example, JPMorgan falsely told the SEC that the CIO employed "risk management activities using derivative instruments" that were "clearly distinguishable from proprietary trading activity."  ¶109.

### 2.   Dimon And Drew Removed The CIO's Risk Controls To Enable The CIO To Make Riskier Bets

Dimon and Drew ensured that there were no obstacles to the CIO's speculative pursuit of profits by choosing not to install – and in some cases outright eliminating – the risk controls and oversight that applied to the Company's other divisions.  ¶¶67-85.  For example, unlike every

other JPMorgan division, the CIO lacked a formal risk committee and had no CRO.[2]  Indeed, the CIO "risk committee" that was supposedly supervising trading in the CIO had no official membership, no charter, and met only three times in all of 2011.  ¶73.  Further, unlike other JPMorgan business units, the CIO "risk committee" meetings were not attended by any risk management personnel from outside the CIO – including the Company's CRO, Defendant Zubrow, who attended such meetings for other business units.  *Id.*  These deficiencies led the Task Force Report to conclude that the CIO was "subjected to less rigorous scrutiny than client-facing lines of business" for "a significant period of time prior to the first quarter of 2012." ¶110.  CIO risk managers played no role in "evaluating or approving trading strategies" and admittedly did not enforce limits.  ¶75.  Further, CIO risk managers reported directly to Drew – a blatant conflict of interest given her role as the top trading strategist – even after regulators urged JPMorgan to improve the independence of CIO risk managers in 2009.  ¶¶75, 163.

Not only did JPMorgan fail to implement basic risk management measures in the CIO, but the few limits that did exist were removed or ignored when those limits interfered with trading.  ¶¶77-85.  For example, while CIO traders were previously required to exit a position if losses exceeded $20 million, Drew scrapped this "stop loss" rule before the beginning of the Class Period.  ¶77.  The Senate Report confirmed that stop loss limits were not enforced, and identified JPMorgan's failure to apply the same "concentration limits" to the CIO that were applied to the Investment Bank as "one more inexplicable risk failure."  ¶80.

Dimon himself testified to Congress that the SCP was not subject to risk limits, and the Company's Task Force Report concluded that "there were no limits of any kind specific to the

---

[2]  When JPMorgan finally created a CIO CRO in early 2012, it hired Irvin Goldman, who lacked risk management experience and experience with the synthetic-credit products that presented the CIO's largest risks.  ¶¶163-64. JPMorgan later admitted that Goldman was unqualified, with his primary "qualification" being that he was Zubrow's brother-in-law.  ¶164.

[SCP]" and the CIO's risk limits were not "sufficiently granular," in direct contrast to Defendants' public statements.  ¶¶19, 77, 82.  The Company also admitted in that Report that, in direct violation of Company policy, JPMorgan failed to review the CIO's risk limits at any time between 2009 and 2012, and there was "no meaningful effort to ensure that … [the] CIO was subject to appropriately rigorous risk and other limits and was updating those limits on a regular basis."  ¶¶19, 81.  Similarly, Cavanagh admitted that the CIO lacked "a well-designed limit structure" and did not have limits on specific portfolios or stop loss limits on trades.  ¶78.  Cavanagh also admitted that the few limits applicable to the CIO were "clearly inadequate," "unsophisticated," and "of little use as a control measure," and as a result, the SCP grew to a "perilous size with numerous embedded risks."  ¶¶78, 149, 160, *see also* ¶¶230-32.

In fact, Dimon removed executives who sought to improve the CIO's risk controls.  ¶¶57, 68-71, 113, 132-33, 163.  In 2009, Bill Winters and Steven Black, then co-CEOs of the Investment Bank, asked Dimon to disclose the CIO's positions and to let other JPMorgan executives assess the CIO's risks.  ¶¶68-70.  Winters also pressed Dimon to implement in the CIO a Risk Exploration & Transparency ("RET") unit, a specially trained team of risk analysts utilized by other JPMorgan divisions.  Dimon refused.  *Id.*  Instead, in September 2009, Dimon fired Winters and relieved Black of operating responsibility.  ¶71.  A JPMorgan RET analyst working in London from May 2006 to October 2010 confirmed that Dimon fired Winters because he was "the one person who promoted transparency" at the CIO.  ¶¶45, 71.

### C.   THE CIO'S PROPRIETARY TRADING SECRETLY GENERATED MASSIVE GAINS AND LOSSES WITH THE FULL KNOWLEDGE OF DIMON

Freed from risk limits and other controls, the CIO operated as Dimon's personal trading desk.  A JPMorgan banker told the TELEGRAPH, "I think the CIO was effectively a way for [Dimon] to take his own views on the market without the processes of the rest of the bank getting

in the way of things." ¶60.  Defendant Drew told the OCC in 2010 and confirmed in her sworn testimony to Congress in 2012 that the CIO's "investment decisions [were] made with the full understanding of executive management, including Jamie Dimon." ¶24.  As one CIO trader was told by senior executives when he was hired in 2006, the CIO's role was "to ramp up the ability to generate profit for the firm" because that was "Jamie's new vision for the company." ¶58. The CIO's speculative, high-risk proprietary trades included the following:

- In 2007 and 2008, the CIO made approximately $1 billion in profits on bets against subprime mortgages.  ¶86.  According to a former CIO employee, Dimon personally ordered the traders to close out their position to "lock-in" the profits. ¶¶44, 87.

- In 2008, a group of CIO traders in New York lost about $1 billion on investments in Fannie Mae and Freddie Mac preferred stock.  Dimon knew of the trades, and a former CIO employee confirmed that Dimon "explicitly approved" them.  ¶88.

- Starting in 2009, the CIO began to amass a portfolio of risky asset-backed securities, including European mortgage-backed securities, collateralized debt obligations ("CDOs"), and other complex debt securities.  That position ultimately grew to over $150 billion – nearly half of the total investment assets of the CIO and Treasury combined, and an amount comparable to JPMorgan's market capitalization.  ¶90.

- In 2010, the CIO lost about $300 million in a few days on complex bets tied to foreign currencies.  The CIO's then CFO, Joseph Bonocore, concluded that the trades were not hedges.  He reported the matter to Defendants Cavanagh and Zubrow, who both reported to Dimon.  *Id.*

- In the fall of 2011, JPMorgan realized approximately $500 million in profits from a high-risk wager that would pay off only if two major U.S. corporations defaulted on their debt in a four-month window.  ¶91.  This trade was not a hedge; Drew admitted that it did not serve to offset any JPMorgan positions, and JPMorgan's internal auditor referred to the profits it generated as "windfall gains."  *Id.*, DX 1 at 54.[3]  After this successful gamble, Drew instructed a senior SCP trader to "recreate" the situation.  ¶92.

Each of these risky trades is illustrative of the CIO's extensive proprietary trading.

Tellingly, while JPMorgan did not separately report the CIO's financial results during the Class Period, the CIO's proprietary trading accounted for a highly material (albeit undisclosed) portion

---

[3] All cites in the "DX __" format are to the exhibits attached to the Declaration of Christopher M. Viapiano in Further Support of Defendants' Motion to Dismiss the Complaint, filed June 11, 2013.

of JPMorgan's earnings.   ¶95.   Indeed, after the disclosure of the CIO's losses, one analyst estimated that the CIO contributed as much as $0.80 per share to the Company's earnings, or as much as 35% of the Company's earnings at times during the Class Period.  *Id.*

JPMorgan's internal documents confirm that the CIO's trading was not intended to hedge risk, and had not acted as a hedge throughout the entirety of the Class Period.  For example, a December 2010 CIO presentation to JPMorgan's Board of Directors' Risk Policy Committee stated that the CIO's proprietary trading included "[t]actical credit strategies" which had contributed "approximately $2.8 billion in 'economic value' from inception, with an average annualized return on equity of 100%."  ¶96.  By comparison, the return on equity for JPMorgan as a whole was only 13% during the height of the Company's profitability in 2007.  *Id.*  As one former JPMorgan Managing Director explained, "'[t]actical credit strategies' that produced $2.8 billion in 'economic value,' with no mention of the underlying positions it was designed to hedge, certainly can't be confused with 'hedging.'"  ¶97.  That former Managing Director described as "[f]rightening" the fact that such a rate of return could be viewed as anything other than "a flashing red warning signal" of the CIO's high-risk trading.  *Id.*

### D.   THE CIO'S SCP ENGAGED IN PROPRIETARY TRADING IN EXOTIC, HIGH-RISK CREDIT DERIVATIVES, NOT HEDGING OF EXISTING RISKS

While the CIO's proprietary trades resulted in billion-dollar swings in gains and losses, the CIO's riskiest proprietary position was the SCP.  The trader with day-to-day responsibility for that portfolio, Bruno Iksil, was assigned to "relative value investing," a strategy used by hedge funds to "exploit price differences between various assets," not to hedge risk.  ¶98.  JPMorgan itself confirmed that the SCP's trading exploited "relative prices (the 'basis') among different CDS [credit default swap] indices and tranche instruments" to generate profit.  *Id.*

From its inception, the SCP was built as a proprietary trading vehicle.  A November 2007 JPMorgan internal audit stated that the CIO's credit derivative trading consisted of "proprietary position strategies executed on credit and asset backed indices."  ¶99.  That audit did not identify "any assets or portfolios that were being hedged by the credit derivatives" or explain how the trading would reduce bank risk.  ¶99; DX 1 at 38.  The majority of the SCP began as part of a "Proprietary Positions Book" originating in JPMorgan's Investment Bank.  ¶¶24, 106; DX 1 at 39.  In 2008, JPMorgan secretly transferred the Proprietary Positions Book from the Investment Bank to the CIO without informing the OCC.  The failure to notify the OCC of the transfer violated OCC regulations, which required JPMorgan to inform the OCC of any "substantial change in business strategy." ¶106.  In fact, JPMorgan did not disclose the existence of the SCP to the OCC until January 2012, and the OCC only became aware of the size and risks of that portfolio after the WALL STREET JOURNAL disclosed the existence of the "London Whale" in April 2012.  *Id.*  The Senate Report specifically found that by failing to inform the OCC of the transfer, JPMorgan "dodged OCC oversight of the SCP for years." ¶¶106-07, 308.

Significantly, although the Company claimed that the SCP was "hedging" to mitigate risk, the Company was unable to produce any evidence to support that assertion.  ¶100.  The Senate Report found that JPMorgan had "no contemporaneous records detailing the [SCP's] risk reduction strategy or the assets being hedged, no analysis showing how the size and nature of the hedge were determined, and no tests gauging the hedge's effectiveness."  *Id.* This lack of documentation was telling, because "[h]edging claims require those types of contemporaneous records in order to be substantiated."  *Id.*  Indeed, the CIO's most senior quantitative analyst told the Senate Subcommittee he was never permitted to know any of the assets or positions held in other divisions, or perform any analysis required to hedge those positions.  ¶99.

For these reasons, the Senate Report found that Defendants lied to investors when they claimed that the SCP was a hedge designed to mitigate risk.  Specifically, the Senate Report stated that Braunstein's representations that "[a]ll" of the CIO's "positions are put on pursuant to the risk management at the firm-wide level" and the SCP in particular was a "hedge" designed to "keep the Company balanced from a risk management standpoint" were a phony attempt to "instill investor confidence in the trades" and were "not true." ¶23.  In fact, the Senate Report concluded that "[f]ar from reducing or hedging the bank's risk, the CIO's [SCP] functioned instead as a high risk proprietary trading operation that had no place at a federally insured bank." ¶¶100-01.  The Senate Report's conclusions paralleled the OCC's findings, which determined that the SCP constituted "classic prop[rietary] trading" conducted to generate profit, and amounted to a "make believe voodoo magic 'composite hedge.'" ¶101.

### E.   JPMORGAN'S REFUSAL TO RESERVE FOR THE RISKS IN THE SCP ENABLED IT TO OVERSTATE ITS FINANCIAL RESULTS

By 2010, the SCP's positions had become so risky and illiquid that Generally Accepted Accounting Principles ("GAAP") required that JPMorgan establish a reserve to guard against potential losses.  ¶¶114-20, 261-69.  Dimon himself admitted that the SCP's positions were "illiquid." ¶112.  Specifically, as reported by the NEW YORK TIMES and confirmed by an independent analyst, in early 2010, after conducting a detailed review, a senior CIO executive prepared a detailed memorandum documenting the need for a $2 to $4 billion liquidity reserve to guard against losses in the SCP. ¶114.  However, because establishing such a reserve would have substantially reduced JPMorgan's profits, JPMorgan's senior management refused to take *any* reserve whatsoever.  As a result, JPMorgan's publicly reported net income was materially overstated by at least $2 billion in every quarter throughout the Class Period. ¶¶261-69.

Defendants were aware of the need for a liquidity reserve, and involved in the decision not to establish it.  As reported by BLOOMBERG analyst Christopher Whalen, a recommendation to set aside the $2 to $4 billion reserve was discussed at the level of the CFO (then Defendant Cavanagh) and the Senate Report confirmed that JPMorgan's CFO was responsible for approving the establishment and size of reserves for the CIO.  ¶114.  As the Senate Report noted, liquidity and concentration reserves were a focus of JPMorgan's senior management, as they "subtract, dollar for dollar, from reported revenues." DX 1 at 150; ¶116.  JPMorgan itself admitted that a liquidity reserve is necessary "when a price is not available or where the exit cost may be uncertain due to illiquidity" – *i.e.*, the conditions that perfectly described the SCP.  ¶118. By refusing to establish the needed reserve, Defendants caused JPMorgan's earnings to be overstated by at least $2 billion throughout the Class Period.  ¶262.

Even after JPMorgan belatedly acknowledged that the SCP required a liquidity reserve, the Company refused to establish an adequate one.  Instead, JPMorgan established a reserve of just $30 million in December 2011 (¶117), and in April 2012, when the SCP's known losses were approaching $1 billion, JPMorgan set aside a reserve of just $155 million for one subset of the SCP's positions.  ¶118.  The OCC subsequently concluded that the reserve was "wholly inadequate."  *Id.*  Tellingly, in August 2012, JPMorgan increased that reserve to over $700 million, even though no positions were added to the SCP at that time. ¶¶118-20.

**F.**     **IN 2011, THE MASSIVE RISK OF THE SCP TRIGGERED NUMEROUS RISK LIMIT BREACHES AND CAUSED THE CIO'S VAR TO SPIKE**

One of the principal metrics that JPMorgan used to measure risk, VaR, measured how much money JPMorgan could lose on a given day because of adverse market movements.  ¶121. In short, the higher the VaR, the higher the level of risk JPMorgan faced, and the more money it stood to lose on any given day.  The Individual Defendants received daily VaR reports for all of

the Company's business units – including the CIO – that explained the reasons behind any significant changes in VaR. *Id.* The Company also regularly reported its VaR to investors in SEC filings to permit assessment of the Company's risks. *Id.* To conceal the CIO's risky trading, JPMorgan falsely assured investors that the CIO's VaR comprised hedges such that any loss in the CIO would be offset by gains elsewhere. ¶122.

By 2010, and unbeknownst to investors, the SCP alone had a VaR larger than that of JPMorgan's entire Investment Bank, which had more than double the assets of the CIO, employed hundreds of traders, and was supposed to be trading to generate profits. ¶123. In other words, a secret portfolio of exotic derivatives held by a purported risk management unit (the CIO) posed as great a risk to the Company, and stood to lose as much money each day, as did all of the positions held by JPMorgan's entire Investment Bank. *Id.* The most senior risk official in the CIO, Peter Weiland, testified to Congress that the size of the SCP "was well understood among the senior management at JPMorgan," and was so large and comprised such a "significant risk" that it "dominated CIO VaR for most of the period from 2008 to 2012." ¶125.

Moreover, although JPMorgan represented that it actively monitored risk limit breaches and responded to such breaches by "reduc[ing] trading positions or consult[ing] with senior management on the appropriate action," in reality, as the Senate Report concluded, JPMorgan had a "bank culture in which risk limit breaches were routinely disregarded." ¶¶85, 253. Indeed, from January to June 2011, the SCP caused JPMorgan to breach its risk limits eight times, and one risk limit breach on January 27, 2011 continued for more than seven straight weeks, exceeding the limit by as much as 50%. ¶126. These limit breaches were reported to senior management, but no action was taken to address them. *Id.* The OCC concluded that the

limit breaches that were triggered throughout 2011 provided clear proof that the SCP was not "acting as a hedge" but was instead engaged "in a strategy to earn profits for the bank." *Id.*

The SCP's risk, size, spiking VaR, and repeated risk limit breaches sparked intense conflict between the CIO's New York and London offices in 2010 and 2011, but Drew and other CIO executives deflected concerns by invoking Dimon's oversight of the CIO. ¶¶127-28. As explained by Macris – the head trader in charge of the SCP –Dimon "was his *de facto* boss and that he effectively reported to [Dimon]." ¶128. Dimon was repeatedly warned about the risks presented by the CIO, but did absolutely nothing to address those concerns. ¶¶127-28.

In addition to causing the CIO's VaR to spike, by no later than 2011, the size and risk of the SCP also constituted a material portion of the Company's risk-weighted assets ("RWA") (DX 2 at 2), another key metric used by regulators to determine JPMorgan's capital requirements. ¶¶142-44. Because impending federal regulations would require JPMorgan to reduce its RWA, in 2011, Defendant Braunstein directed the CIO to calculate how much money the Company would lose if it reduced the SCP by $20, $40 or $60 billion of RWA. ¶153. In December 2011, the CIO determined that a reduction of just $10 billion of RWA would require a proportional unwind of 35% of the SCP and result in losses of more than $500 million. ¶¶119, 153. Then, in January 2012, the Company determined that unwinding just 25% of that portfolio would cause a loss of more than $500 million. *Id.*

The fact that selling off even relatively small portions of the SCP's positions would have resulted in a loss of at least $500 million demonstrated to senior management that the SCP's positions were not appropriately marked-to-market, as required by GAAP, and that JPMorgan's net income for the fourth quarter of 2011 was materially overstated by at least $500 million.

¶154.  Indeed, if the positions had been properly marked, unwinding them would not have caused any loss, because they would have been marked to reflect their diminished value.  *Id.*

Because JPMorgan was unwilling to take those losses, Defendants scrapped their plan of reducing the RWA by unwinding the SCP.  ¶¶146-53.  Instead, the CIO embarked on a new strategy to conceal the risk in the SCP by vastly expanding the portfolio, purportedly in the hope that new positions would operate to offset the SCP's existing positions and thereby "balance" the RWA.  *Id.*  Thus, in February 2012, Braunstein approved a "one quarter request" to increase the SCP's RWA budget by $7 billion (to $176 billion) so that the CIO could execute this strategy, which Defendant Drew closely monitored.  ¶¶146-48, 153.

Rather than providing any offset to existing risks, the trading strategy further increased the riskiness of the SCP.  ¶149.  Further, by accumulating such large positions, the strategy caught the attention of hedge fund traders, who called the unknown trader behind them the "London Whale" because of the enormous size of the trades, which had moved the entire market.  ¶155.  Recognizing that a single trader had amassed such a position, those hedge funds began to trade against the Whale's positions.  ¶156.  Remarkably, even JPMorgan's own Investment Bank division began trading against the CIO.  ¶157.  The SCP traders reacted to the hostile trading by defensively adding to the SCP's positions because they believed that "if they did not respond through additional trading, they would be forced to recognize losses."  ¶¶156-59.

While JPMorgan had never established any risk limits specific to the SCP and had removed stop-loss risk limits for individual CIO trades, in January 2012 the SCP breached certain risk limits that still applied to the CIO as a whole.  ¶160.  The Individual Defendants either ignored the breaches or modified the limits to conceal the risk, in direct contradiction of JPMorgan's representations that risk limit breaches were closely monitored and required a

response from senior management.  DX 1 at 7-8; ¶161.

For example, the SCP breached CIO credit spread limits (a common metric similar to VaR) by over 270% on February 9, 2012, by over 900% by March 30, and by over 1,074% by April 17.  ¶162.  On each occasion, the Individual Defendants ignored the breaches, even though they obviously indicated a risk that was growing exponentially.  ¶¶162, 187.  In January 2012, the SCP portfolio also breached VaR and credit-spread limits that applied to the CIO and the Company as a whole.  ¶¶160, 165.  Dimon was personally notified of these breaches, which continued for three consecutive days.  ¶165.  He also knew, as a result of daily reports he received, that these risk limit breaches were caused by the SCP's proprietary trading.  ¶129.

## G.   DEFENDANTS CONSPIRED TO MANIPULATE THE CIO'S VAR TO CONCEAL THE TRUE RISK OF THE CIO

By 2011, the risk in the SCP dominated the CIO's VaR, and caused the VaR to spike. ¶¶121-27.  However, rather than remedying the breaches by reducing the risks of the CIO, which would have required JPMorgan to unwind its positions and incur substantial losses, Dimon authorized a scheme to manipulate the CIO VaR and thereby misstate the most critical risk metric that the Company reported to investors.   According to subsequent admissions by Cavanagh, the CIO began work in mid-2011 to develop a new model for the CIO's VaR, which was intended to significantly reduce the CIO's reported VaR.  ¶¶134-39.  Dimon personally approved the new model after he was specifically informed, in a January 23, 2012 email, that the new model would "reduce" CIO VaR by 44% and therefore end the recent limit breaches.  Id.

JPMorgan's own Task Force Report concluded that the new VaR model should never have been adopted, that its implementation violated Company policy, and that the model materially understated the CIO's VaR.  According to the Task Force Report, the model was adopted under pressure from CIO traders, which forced the Model Review Group (which was

supposed to review the new model) to accelerate its review.  ¶137.  As a result of this pressure from the CIO, the Model Review Group performed only limited testing of the new VaR model, which violated both JPMorgan's standard procedures and federal regulations.  ¶¶137-38.  Indeed, the Task Force Report found that the Company did not even have the necessary data to conduct the required tests.  ¶¶138-39.  Tellingly, the new VaR model was implemented only in the CIO, not any other division of the Company, even though the Investment Bank held identical derivatives and the Company represented that VaR was applied "consistently" across business units.  ¶¶283-85.  Despite their knowledge that the new model would reduce the CIO VaR, Dimon, Drew and Braunstein determined not to lower the VaR limits accordingly, thus confirming that their intention was to use the model change to "cure" the VaR breaches, as the Senate Report concluded.  ¶¶136, 140, 167.  The OCC found that as a result of this manipulation, "the CIO continued to increase its risk without continuing to exceed its VaR."  ¶¶140, 167.

Using the new VaR model, JPMorgan publicly reported that for the first quarter of 2012, the CIO's VaR was only $67 million – an amount that was slightly less than the VaR JPMorgan had reported in the prior quarter.  ¶314.  In truth, the CIO's VaR had ballooned to $129 million – nearly double the level of risk from the prior quarter.  *Id.*  Had JPMorgan accurately reported the CIO's VaR, it would have shown that the CIO's risk had doubled in just three months.  However, JPMorgan not only reported a materially inaccurate VaR, it also failed to disclose that it had implemented a new VaR model just for the CIO.  ¶167.

On May 10, 2012, JPMorgan admitted that the CIO VaR it previously reported was false, and that the CIO's actual VaR reflected twice the amount of risk that JPMorgan had previously reported.  ¶210.  Dimon himself admitted that the new model was "inadequate," and that the Company was restating the CIO's VaR using the prior model that the CIO had used for the past

several years.  *Id*.  Under the prior model, the CIO's restated VaR was $129 million – a figure that was not only nearly double the $67 million CIO VaR JPMorgan had originally reported, but more than the VaR for all the Company's other trading portfolios *combined*, and over twice the VaR JPMorgan reported for the Investment Bank.  ¶¶314-17.

As the SCP's risky positions were causing breaches in firm-wide risk limits, Defendants continued to conceal the CIO's losing bets to maintain the fiction that the CIO managed risk. ¶¶275-76.  For example, on February 13, 2012, JPMorgan submitted a public letter to regulators that repeated the falsehood that the CIO was "responsible for making investments to hedge the structural risks of our balance sheet on a consolidated basis."  *Id.*  That same day, as the massive proprietary bets in the SCP were causing breaches of firm-wide risk limits, Dimon told investors during an interview on FOX BUSINESS NEWS that JPMorgan "never had an issue" with a ban on proprietary trading and did not "make huge bets."  ¶277.

### H.   JPMORGAN RESORTED TO "PAINTING THE TAPE" AND FRAUDULENT MISMARKING TO CONCEAL THE CIO'S LOSSES

Unable to stem the SCP losses, in the first quarter of 2012 JPMorgan took drastic measures to conceal them by using trades to manipulate prices in the credit derivatives market ("painting the tape"), and by mismarking positions to artificially lower the CIO's losses.  ¶¶169-75.  The CIO traders manipulated the market for the credit derivatives that comprise the SCP by engaging in large transactions in the thinly-traded market for those products.  ¶¶169-71.  Their objective was to trade so heavily that it would artificially change the market prices, enabling them to then use the "new" (but manipulated) market prices to report the value of the SCP, and avoid reporting a massive loss.  *Id.*  The OCC concluded that this manipulation "artificially" changed prices for the SCP's positions, and JPMorgan itself admitted to the Senate Subcommittee that its trading had been "supporting the price" for the SCP's positions.  ¶171.

When the scheme to "paint the tape" proved insufficient to conceal the SCP's growing losses, the CIO simply fabricated the prices used to value the SCP's positions.   ¶172. Specifically, in violation of GAAP and Company policy governing the pricing of derivative positions, the CIO traders simply selected the most favorable values for their positions, rather than mark them at a "good faith" estimate of the prices at which they could be sold.  ¶¶172-75.

Drew and other senior managers were directly involved with the use of fabricated prices to conceal the SCP's losses.  ¶176.  For example, one email sent to Drew, Macris, Weiland, and other CIO executives on March 20, 2012, explained that the SCP had a "lag in P&L [that] is material ($600-800M)" – a figure that Drew later admitted represented the CIO's unreported losses, and which meant that JPMorgan's publicly reported net income for the first quarter of 2012 was artificially inflated by 11% to 15%.  *Id.*  Further, on April 17, 2012, Drew ordered one of the SCP traders to "tweak" the SCP marks in order to get "an extra basis point" that Drew was "trying to show" – a blatant instruction to misstate the value of the SCP.  *Id.*  The Senate Report concluded that this mismarking should have been readily apparent to other senior officers as well, as the Investment Bank was marking the same assets at significantly lower prices.  ¶¶177-79.  In fact, Drew herself tried to persuade the Investment Bank to change its marks to match the CIO's fraudulent prices, which were carefully tracked in an internal spreadsheet that Drew referred to as the "shadow P&L document."  ¶175.  CIO traders emailing about the difference between the CIO's actual losses in the shadow P&L document and the false marks used to report JPMorgan's financial results said the discrepancy was becoming "more and more monstrous" and that the use of false marks to conceal losses was "becoming idiotic."  *Id.*

JPMorgan ultimately admitted that its financial results were materially misstated due to the fabricated prices used to value the SCP.  In announcing the restatement of its financial results

because of the mismarked value of the SCP, JPMorgan blamed "the integrity of the trader marks," which were manipulated to "avoid showing the full amount of the losses."  ¶221.

## I. AS CIO LOSSES SURPASSED ONE BILLION DOLLARS, DIMON DISMISSED CONCERNS OVER THE LONDON WHALE AS A "TEMPEST IN A TEAPOT"

Although Defendants never told investors about the CIO's high-risk proprietary trading operations, on April 5, 2012, a front-page story in the WALL STREET JOURNAL reported rumors about them.  ¶¶188-90.  That article generated an enormous amount of investor and media attention, particularly given the sheer size of rumored positions, JPMorgan's reputation for conservative risk management, and the fact that similar proprietary trading positions led to the collapse of other banks during the financial crisis.

In response to the surge in media attention, Defendants developed a calculated public-relations strategy to assuage investor concerns about the "London Whale."  ¶188.  In short, they decided to lie to investors.  *Id.*  As noted in the Senate Report, "from the beginning of the bank's public discussion of the [SCP] in April 2012, JPMorgan … planned to describe the portfolio as a risk-reducing hedge that was transparent to the bank's regulators, even though neither characterization was accurate."  *Id.*  Indeed, Dimon, Drew, and Zubrow approved the following talking points, all of which the Senate Report concluded were false: "CIO is focused on managing the long-term structural liabilities of the firm and is not focused on short-term profits;" "[o]ur CIO activities hedge structural risks;" and "[w]e cooperate closely with our regulators, who are aware of our hedging activities."  ¶¶188-90.  Those misrepresentations were provided by JPMorgan's investor relations department to analysts and the news media between April 5 and 10, 2013, and by April 11, Martin-Artajo had emailed Drew stating that market pressure had been reduced because the "bank's communications yesterday are starting to work."  ¶¶189-90.

Likewise, to coordinate the Company's response to the "London Whale" reports, Drew set up daily conference calls with Dimon, Braunstein, and Zubrow to strategize how to publicly portray the CIO and SCP as performing a risk management function.  ¶¶194-95, 199.  On April 12, Drew circulated talking points to Dimon, Braunstein, and Zubrow that again described the SCP as "a hedge against other risks on JPMC's balance sheet" that "continues to be balanced, and to protect our portfolio from stress events."  ¶199.  Zubrow also sent an email to Drew, Braunstein, and Dimon that day reminding them that "if asked about London/CIO and Volcker," to say the SCP "was NOT short term trading," and was "part of LONG TERM hedging of the banks [sic] portfolio."  *Id.*

On April 13, 2012, JPMorgan held its earnings conference call, during which Dimon and Braunstein addressed the London Whale trades directly at length and made repeated false statements from their pre-approved talking points, assuring investors that the London Whale trades were hedges used to manage risk, and that concerns about those trades were a "complete tempest in a teapot."  ¶¶200-03.  As the Senate Report concluded, those assurances had "no basis in fact" and "were fictions irreconcilable with the bank's obligation to provide material information to its investors in an accurate manner."  ¶203.

Indeed, according to the Task Force Report, Dimon and Braunstein knew prior to the conference call that the SCP represented over $150 billion in net notional exposure, had suffered a one-day loss of $415 million only three days earlier, and that SCP losses had already surpassed $1.2 billion.  ¶¶194-95.  One April 2012 internal report predicted that SCP losses could reach $9 billion.  ¶195.  On April 10, 2012, Dimon and Braunstein also received a presentation showing that nearly any conceivable market movement would cause the SCP to lose money, contradicting the notion that the SCP's positions served a hedging function.  ¶¶150, 327(p), DX 1 at 46-47.

That same day, moreover, Dimon and Braunstein were told that the CIO was "unable to trade out of" the SCP's illiquid positions, and that the CIO had instead been adding to the positions in a desperate and futile attempt to balance its position.  ¶¶196-97.  Indeed, prior to the conference call, it was well-known to the Individual Defendants that the SCP had breached all risk limits in place at the CIO over the prior three months (over 330 times collectively), with certain limits having been exceeded by as much as 1000%, and for as long as 71 days.  ¶¶162, 187, 304.

### J.   JPMORGAN BELATEDLY DISCLOSED THE CIO'S MASSIVE TRADING LOSSES AND RESTATED THE COMPANY'S EARNINGS AND VaR

On May 10, 2012, JPMorgan stunned the market by disclosing that it had lost at least $2 billion on the CIO's trades and that the Company would likely suffer billions of dollars of additional losses.  ¶¶205-10.  In revealing those losses, Dimon admitted "egregious mistakes," that the CIO's losses "were self-inflicted," and that "we were accountable, and what happened violates our own standards and principles by how we want to operate the Company."  ¶¶205-07.  According to Dimon, the CIO's massive losses were the result of a "flawed, complex, poorly reviewed, poorly executed, and poorly monitored" trading strategy, that there was "no excuse for it," and that it was a basic "Risk 101 mistake."  ¶¶205, 215, 218.  Dimon also disclosed for the first time that JPMorgan had changed the CIO's VaR model during the prior quarter, admitting that the CIO's VaR at the end of the first quarter was actually $129 million – almost *double* the $67 million the Company reported to investors.  ¶210.

In response to these revelations, JPMorgan stock plunged nearly 10%, falling from $40.74 to $36.96 on the highest single-day trading volume in the Company's history.  ¶211.  Analysts were "stunned" by the "unexpected" "surprise," calling the losses a "meaningful strike against JPM and its history of sound risk management" and noting that the news reports that JPMorgan had previously denied "were indeed correct" and that the CIO losses were not "all a

tempest in a teapot as Dimon had said on the 1Q conference call." ¶¶212-13, 377. In all, disclosures of the CIO's losses and risk management failures destroyed over $31 billion in shareholder wealth. ¶¶214, 216, 218, 384.

After the close of the Class Period, JPMorgan disclosed that the losses in the CIO had ballooned to over $6.25 billion – an amount totaling approximately 40% of the $15.59 billion in net income the Company reported for the nine months ended September 30, 2012. ¶238. The Company was also forced to restate its financial statements for the first quarter of 2012, conceding that the SCP positions had been fraudulently marked – the result of what JPMorgan conceded was a "material weakness" in internal controls. ¶220. The restatement reduced previously reported net income for the first quarter by $459 million, or 8.5%. *Id*.

JPMorgan squarely blamed the Individual Defendants for their role in the scheme, terminating or removing every employee who was responsible for the SCP other than Dimon, and clawing back two years of compensation from Drew (over $20 million) and millions of dollars from other CIO employees. ¶¶225-27. Dimon admitted his own culpability, testifying to Congress that "I am absolutely responsible. The buck stops with me." ¶15. JPMorgan likewise concluded that Dimon "bears ultimate responsibility" for the CIO's trading and risk management failures, and cut his compensation in half. ¶227. JPMorgan also admitted that the CIO should never have engaged in the high-risk trading through the SCP, and permanently "shut down" the SCP. ¶228. As one analyst noted, "The role of the CIO has been redefined to reflect the situation the market thought existed before the revelations on 10th May. The CIO will no longer run a [SCP] and will conservatively manage the bank's excess deposits." ¶229.

## ARGUMENT

**I.    DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS**

To properly allege an actionable false and misleading statement under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, a plaintiff must identify with specificity "each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1); *see also Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120, 128-29 (2d Cir. 2011).  A challenged statement or omission must be considered in context, and there is a duty to disclose information when disclosure is necessary to make defendants' other statements, whether mandatory or volunteered, not misleading.  *See, e.g., Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002) ("The touchstone of the inquiry is ... whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered.").  A court must not resolve factual disputes, but "well-pleaded allegations must be assumed to be true," so long as they are "sufficiently particularized."  *City of Roseville Employees' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 411 (S.D.N.Y. 2011).

Defendants ignore these pleading standards, raising prolix arguments that consist of little more than premature factual challenges or denials that are not suited for resolution at this stage and must fail.  The Complaint clearly satisfies the standards for pleading false and misleading statements under the Exchange Act, and Defendants' arguments lack merit.

A.   **Defendants Materially Misrepresented The CIO's Purpose And Activities In JPMorgan's SEC Filings From 2010-2011**

1.   **The CIO Was Not "Primarily Concerned" With Managing The Risks Of JPMorgan's Other Business Lines**

In JPMorgan's 2010 and 2011 SEC filings, Defendants represented that the CIO was "primarily concerned with managing structural market risks."  ¶¶244(a), 248.  These statements were false because in reality the CIO operated as a high-risk, proprietary trading desk and thus created and exacerbated the very risks that JPMorgan told investors the CIO was working to manage.  ¶¶245-48, 250.  The Second Circuit has held that such statements are actionable.  *See Caiola v. Citibank, N.A., New York,* 295 F.3d 312, 330-31 (2d Cir. 2002) (sustaining claims where trading was "totally inconsistent with [the] hedging investment strategy" represented).

In challenging Plaintiffs' allegations of falsity, Defendants minimize the significance of the SCP to argue that, notwithstanding that portfolio, the CIO as a whole was "primarily" engaged in managing risk.  Def. Br. 20-22.[4]  This ignores JPMorgan's own admissions and the findings of its regulators that *the CIO* effectively had no risk management protocols and failed to implement basic risk procedures that were utilized by JPMorgan's other lines of business.  ¶¶67-85, 107, 110, 137, 142-43, 164-65, 245, 250.  Indeed, the OCC concluded that the CIO lacked an "[]adequate foundation to identify, understand, measure, monitor and control risk."  ¶84.  The Senate Report similarly concluded that, "[i]n contrast to JPMorgan Chase's reputation for best-in-class risk management, the whale trades exposed a bank culture in which risk limit breaches were routinely disregarded, risk metrics were frequently criticized or downplayed, and risk evaluation models were targeted by bank personnel seeking to produce artificially lower capital requirements."  ¶85.  The Task Force Report and Dimon himself admitted that the CIO lacked

---

[4] All cites in the "Def. Br. ___" format are to pages in Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Complaint.

risk limits, and Cavanagh further acknowledged that the few limits applicable to the CIO were "clearly inadequate," "unsophisticated," and "of little use as a control measure."  ¶¶19, 77, 82, 230-31.  These admissions and findings are totally inconsistent with Defendants' public refrain that the CIO was "primarily concerned" with risk management.

The Complaint alleges numerous additional facts that establish the falsity of Defendants' statement that the CIO was "primarily" engaged in risk management.  For example, the CIO had no CRO or functioning risk committee in 2010 and 2011, and contrary to Company policy failed to conduct "any review of the adequacy of CIO's risk limits between 2009 and 2011."  ¶¶74, 76, 81.  The SCP's investments were managed by traders with experience in proprietary trading, not risk management.  These traders – whose compensation was approved by Dimon himself – were compensated based on their ability to generate profits, not hedge risks, and ranked among the Company's most highly-paid employees.  ¶¶60-66.[5]

Indeed, rather than managing risk, the CIO actually *created* extraordinary risk for JPMorgan, a conclusion compelled by the facts that (1) the SCP "dominated [the] CIO['s] VaR for most of the period from 2008 to 2012" (¶125), (2) the SCP's VaR actually exceeded the VaR for the entire Investment Bank (¶123), and (3) the CIO's speculative proprietary trading generated out-sized profits (¶¶95-96) and a massive loss of more than $6 billion.  The Task Force Report, moreover, determined that the CIO was "subjected to less rigorous scrutiny" than other JPMorgan business units.  ¶110.  Given these facts, Defendants cannot credibly claim that the statements the CIO was "primarily concerned" with risk management were true.

Significantly, when describing the CIO as "primarily" focused on risk management, Defendants never warned investors that a substantial component of the CIO exposed the

---

[5] For example, in 2010, Drew was paid $15 million; Macris was paid $17.25 million; Martin-Artajo was paid $12.75 million; and Iksil was paid $7.32 million.  DX 1 at 58.

Company to billions of dollars in losses through proprietary trading in exotic derivatives. Having chosen to describe the CIO to investors, Defendants were compelled to make that description accurate and complete, including by disclosing that a substantial part of the CIO was engaged in extraordinarily high-risk, speculative trading. *Caiola,* 295 F.3d at 331("[O]nce [the company] chose to discuss its hedging strategy, it had a duty to be both accurate and complete."); *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 235 (S.D.N.Y. 2010) (same). The description of the CIO as "primarily" engaged in managing risk was not "accurate and complete," to say the least.[6]

## 2. The Failure To Disclose The CIO's Proprietary Trading Rendered Defendants' Other Statements Misleading

The Complaint further alleges that Defendants' failure to disclose the CIO's proprietary trading in 2010-11 rendered the following statements materially misleading:

- The CIO had "risk management-related responsibilities" for JPMorgan – "manag[ing] capital, liquidity, interest rate and foreign exchange risk and the investment portfolio for the [Company]." ¶¶244(b-c), 248, 250; and

- The CIO VaR included "positions . . . used to manage structural risks and other risks . . . arising from the Firm's ongoing business activities." ¶¶246, 248-50.

As detailed above, Defendants secretly utilized the CIO to create and exacerbate the very risks that they represented the CIO was managing and mitigating. ¶¶245, 247, 250. Thus, Defendants' argument that Plaintiffs "plead no facts" that show Defendants' descriptions of the CIO's "risk management-related responsibilities" were materially misleading is meritless. Def.

---

[6] Defendants' use of the word "primarily" was also misleading because it created the false impression that any non-risk management activities of the CIO were immaterial. *Cf. In re Dynex Capital, Inc. Sec. Litig. ("Dynex II")*, No. 05-1897, 2009 WL 3380621, at *8 (S.D.N.Y. Oct. 19, 2009) (statements that a defendant "'generally' adheres to a particular policy become misleading when in fact there is no such policy or the policy is something else altogether"). Moreover, the fact that the SCP (through which most, but not all, of this trading occurred) comprised just a portion of the CIO does not detract from its materiality. *See, e.g., In re MBIA Sec. Litig., Inc.,* 700 F. Supp. 2d 566, 585 (S.D.N.Y. 2010) (CDO investments were material to investors despite being a "small fraction of MBIA's overall insured portfolio" where plaintiffs alleged that "the CDO-squared exposure was 25% larger than MBIA's capital base" and "CDO-squared were risky investments").

Br. 22.   Defendants ignore the Complaint's allegations that the CIO had eschewed its risk management role to pursue profits and itself lacked the risk management tools that were necessary to fulfill its purported responsibilities.   ¶¶245, 247, 249-50; *see supra* § I.A.1.   As the Senate Report concluded, "[f]ar from reducing or hedging the bank's risk, the CIO's [SCP] functioned instead as a high risk proprietary trading operation that had no place at a federally insured bank."   ¶101.

Importantly, JPMorgan never disclosed during the Class Period that the CIO was involved in *any* proprietary trading, let alone the high-risk trading that took place in the SCP. JPMorgan only described the CIO as a risk management unit, thereby creating the materially false impression that the CIO was not involved in high-risk activity.   The law is clear that, once the Company described the CIO as being engaged in risk management, JPMorgan had a duty to disclose material information necessary to make the description of the CIO accurate and complete.   *See, e.g.*, *Caiola*, 295 F.3d at 331; *In re MBIA Sec. Litig.*, 700 F. Supp. 2d at 578.

For similar reasons, Defendants are not insulated from liability with respect to their statements that the CIO VaR was comprised of positions used to manage risks merely because, Defendants contend, the CIO VaR did in fact "include" some risk management positions.   Def. Br. 22-23.   Throughout the Class Period, the CIO's VaR was "dominated" by the SCP's high risk trades, which were not used to manage risk.   ¶¶124-25, 246-50, 362.   Thus, failing to disclose that the CIO VaR was driven by high-risk proprietary positions rendered Defendants' description of the CIO VaR misleading.   *See Operating Local 649 Annuity Trust v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010) ("the veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead").

Defendants also point to JPMorgan's purported "warning" that market movements can "limit[] the effectiveness of our risk management strategies," causing losses, and its disclosure that the CIO incurred risks by managing other risks.  Def. Br. 23.  But the CIO's losses were not caused by "market movements" or "limitations" on "risk management strategies."  JPMorgan has admitted those losses were caused by the improper proprietary trading and lack of risk controls in the CIO.   ¶¶14, 230-38.   Thus, the SCP's positions simply were not part of a "risk management strategy" – they were, as the Senate Report found, directional bets that had "no place at a federally insured bank."  ¶101.  Accordingly, Defendants' boilerplate disclosures did not correct their affirmative misrepresentations regarding the CIO's VaR.  ¶¶245, 250.  *See In re Am. Int'l Grp., Inc. 2008 Sec. Litig.* ("*AIG*"), 741 F. Supp. 2d 511, 531 (S.D.N.Y. 2010) (generic disclosures cannot shield defendants who "fail[] to disclose known specific risks").[7]

**B.    DEFENDANTS MATERIALLY MISREPRESENTED JPMORGAN'S RISK MANAGEMENT PRACTICES AND USE OF RISKS LIMITS IN 2010-2011**

Throughout 2010 and 2011, Defendants repeatedly misrepresented (1) the robustness of JPMorgan's risk management framework; and (2) the Company's use of and adherence to risk limits.  As the Task Force Report, the Senate Report, and the OCC concluded – and Dimon and Cavanagh have themselves admitted – the CIO lacked fundamental risk controls and had no capacity to manage the extreme risks created by the SCP.

**1.    Defendants Materially Misrepresented The Robustness Of JPMorgan's Risk Management Practices**

JPMorgan's repeated assertions that its risk management framework was "robust," "comprehensive," "holistic," and able to manage risks were highly material to investors, especially in light of the Company's representations that its "ability to properly identify,

---

[7] Defendants' contention that investors were never told the CIO's losses would be "perfectly offset" by other gains (Def. Br. 23) fails because the SCP trades were not hedging *any* risks.  ¶¶99-101, 247, 250.

measure, monitor and report risk is critical to both its soundness and profitability." ¶¶252, 255, 257, 259.  These representations were also acutely important to investors in light of the financial crisis, where risk management failures at large banks caused massive investor losses.  Indeed, relying on Defendants' representations, analysts accorded JPMorgan a premium over other banks, citing "its overall management strength and superior record of risk management." ¶49.

Ignoring the critical importance of JPMorgan's representations regarding its "robust" risk management framework, Defendants argue that these statements are inactionable puffery, on which no reasonable investor would rely.  Def. Br. 29-31.  This flies in the face of well-established law, and is contrary to the well-pled facts in the Complaint.

*First*, a statement that "goes to the heart of" a company's "corporate value and financial stability is not immaterial." *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig. ("Bear Stearns")*, 763 F. Supp. 2d 423, 498 (S.D.N.Y. 2011).  As Judge Karras stated in *Lapin v. Goldman Sachs Group, Inc.*, when a defendant puts "the cause of its financial success at issue, then it is obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would significantly alter the mix of available information."  506 F. Supp. 2d 221, 240 (S.D.N.Y. 2006) (internal quotation omitted).

Further, "[b]y addressing the quality of a particular management practice" – in this case, risk management – "a defendant declares the subject of its representation to be material to the reasonable shareholder, and thus is bound to speak truthfully." *In re Ambac Fin. Grp., Inc. Sec. Litig.,* 693 F. Supp. 2d 241, 271 (S.D.N.Y. 2010) (given characterizations of "underwriting standards as 'rigorous' and 'conservative,' the failure to disclose a lowering of such standards was a material omission"); *accord Caiola*, 295 F.3d at 330-31.  There can be no debate that

JPMorgan put its risk management practices at issue.  The Company's annual reports admitted that risk management was "critical" to JPMorgan's "soundness and profitability."  ¶252.

*Second*, "misrepresentations of existing facts" that are knowingly and verifiably false when made are actionable.  *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (sustaining statements "that the inventory situation was in 'good shape' or 'under control' while they allegedly knew that the contrary was true").  Courts in this District have repeatedly held that statements by financial institutions touting risk management practices are actionable when juxtaposed against particularized allegations of a contemporaneous lack of risk oversight.  For example, in *AIG*, the court sustained allegations that Defendants "materially misled the market [by] … repeatedly emphasizing the strength of the Company's risk controls."  741 F. Supp. 2d at 530.  There, the defendants failed to disclose that, like here, the securities portfolio at issue "was in fact not subject to either the risk control processes that governed other divisions of the Company or the risk control processes that previously had been in place."  *Id.*  Similarly, in *Bear Stearns*, 763 F. Supp. 2d at 493-94, the court upheld the statement that "[c]omprehensive risk management procedures have been established to identify, monitor and control each of [the] major risks" because, like here, such procedures were not in place or applied as represented.  Further, representations concerning "strong" and "conservative" risk management are actionable where, as here, plaintiffs allege "significant departures from…internally stated policies."  *In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 284-85 (S.D.N.Y. 2011).[8]

Here, Defendants represented that JPMorgan had "comprehensive" and "robust" risk management for its "major risks" when, in truth (1) the CIO had virtually no risk limits and

---

[8] *See also Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 189 (S.D.N.Y. 2010) ("[M]isstatements regarding risk management, discipline, monitoring and credit quality are not 'puffery' where [] they were 'misrepresentations of existing facts.'") (quoting *Novak*, 216 F.3d at 315).

unreliable risk reporting (¶¶19, 82, 245(o), 254(c, e-i), 256, 260(c)); and (2) the CIO was engaging in wildly speculative proprietary bets.  ¶¶62-64, 86-94, 245(a, d-f, h, k, m).[9]  These are actionable false statements, not puffery, because they clearly "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).[10]

## 2.    Defendants Materially Misrepresented JPMorgan's Use And Enforcement Of Risk Limits

Defendants made four types of materially false and misleading statements concerning the use and enforcement of "risk limits" throughout the Class Period.

*First*, JPMorgan told investors that "[m]arket risk is controlled primarily through a series of limits" that "reflect the Firm's risk appetite," including "approval limits by customer, product, industry, country and business."  ¶¶253, 258-59.  These statements were false because, *inter alia*:

- As admitted in the Task Force Report, "[t]here were no limits by size, asset type, or risk factor for the [SCP]; indeed there were no limits of any kind specific to the [SCP]."  No one at the Company reviewed risk limits in the CIO between 2009 and 2011, and there was "no meaningful effort to ensure that ... [the] CIO was subject to appropriately rigorous risk and other limits" or that such limits were updated "on a regular basis," even though the SCP "required a whole different type of risk management for nearly five years."  ¶¶80-82, 110, 230-32, 245(o), 254(b, e-f, h, j), 256, 260(c);

- The CIO did not have concentration limits, "a well-known fundamental risk tool," whose absence was an "inexplicable risk failure," according to the Senate Report.  ¶¶80, 254(g);

- The CIO did not have or adhere to stop loss limits, including those which would have required traders to exit positions when losses reached limits.  ¶¶83, 160, 245(n), 254(i);

---

[9] Defendants also argue that certain of these statements were not false because they were expressions of "intent" and therefore protected as forward-looking statements.  Def. Br. 30.  Clearly, Defendants' statement that "JPMorgan has in place a robust risk management discipline" (¶255) is a statement of "present fact," not intent.  But here, even statements of intent are actionable because Defendants concealed high-risk trading in the CIO in order to avoid regulatory oversight – conduct that reflects their true "intent" was to *avoid* risk controls.

[10] Defendants' reliance on *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,* 553 F.3d 187 (2d Cir. 2009) is misplaced.  Here, Defendants expressly represented that JPMorgan's risk management framework was critical to the Company's profitability, (¶252) an allegation that was lacking in *ECA*.  *See ECA*, 553 F.3d at 25-27; *see also Bear Stearns*, 763 F. Supp. 2d at 492 n.8 (distinguishing *ECA*).

- The Senate Report concluded that JPMorgan deliberately manipulated stop-loss limits in a way that presented a "misleading picture" of the CIO's losses, and that JPMorgan was either "ignoring…or simply not doing anything about the CIO breaches." ¶79;[11] and

- Cavanagh admitted that CIO risk limits were "clearly inadequate," "an unsophisticated tool for measuring risk," and "of little use as a control measure." ¶¶230-32, 254(b, k).

Such a disparity between Defendants' representations and actual state of affairs in the CIO supports a finding of falsity. *See, e.g., Bear Stearns*, 763 F. Supp. 2d at 458-59 (holding actionable statements "that 'the Company's Risk Management Department … monitor[s] exposure to market and credit risk … and establish[es] limits and concentrations of risk").[12]

Defendants further claim that their statements that "[m]arket risk is controlled primarily through a series of limits" (¶¶253, 258-59) were sufficiently "general" as to render them immaterial, and that "JPMorgan never said that every single portfolio would be subject to its own specific limits." Def. Br. 31-32.  This attempt to split hairs fails, as a reasonable investor reading the Company's repeated assurances that "[m]arket risk is controlled primarily through a series of limits" would conclude that these limits applied throughout the Company, including most obviously to the CIO (the unit specifically charged with managing risk), as well as the SCP (the Company's riskiest portfolio).[13]  Indeed, JPMorgan *never* disclosed that certain business units ignored or did not follow market risk limits, let alone its principal risk management unit.  *See AIG*, 741 F. Supp. 2d at 529 ("once a corporation does speak" it must be accurate and complete).

---

[11] Accordingly, Defendants' contention that Plaintiffs ignore these "stop loss advisories" is wrong.  Def. Br. 32.

[12] *See also Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 644 (S.D.N.Y. 2012) (statements actionable where there was "'vast gap' between the picture that Defendants presented … and the actions that [defendants] took"); *E*Trade*, 712 F. Supp. 2d at 190 (statements touting risk management actionable where "woefully inadequate or non-existent [] risk procedures" alleged); *AIG*, 741 F. Supp. 2d at 530 ("risk controls" statements actionable where portfolio was not subject to risk processes governing other divisions).

[13] Defendants also argue that allegations concerning the CIO's lack of "concentration limits" and scrapping of "stop loss limits" are "irrelevant" because JPMorgan "did not say that particular types of limits applied to particular businesses or portfolios."  Def. Br. 32.  Given the findings of the OCC and the Federal Reserve that the lack of CIO limits violated banking regulations (¶¶84-85, 254(g)), Defendants' statements were misleading.

*Second*, Defendants falsely told investors that JPMorgan's "[b]usinesses are responsible for adhering to established limits, against which exposures are monitored and reported" (¶¶83, 253, 258-59), despite the fact that the CIO breached its risk limits and advisories on a regular basis. ¶¶85, 254(a). In fact, during the first half of 2011 *alone*, the SCP breached stress limits at least eight times by as much as 50%, sometimes for weeks at a stretch. ¶¶126, 260(c). The Senate Report specifically concluded that "risk limit breaches [at the CIO] were routinely disregarded" and "risk metrics were frequently criticized or downplayed." ¶85. Indeed, JPMorgan itself admitted that risk limits were routinely ignored. ¶¶80-81, 230-32, 254(f, h, j).

Rather than "adhere" to risk limits, Defendants in fact removed risk limits in the CIO when they interfered with trading, and refused to implement basic limits or controls recommended by other JPMorgan senior executives and the Company's regulator. ¶¶68-72, 107. Indeed, JPMorgan refused to implement "basic banking" documentation requirements, limits and controls that the OCC identified as lacking in the CIO in December 2010. ¶¶106-07. Instead, Drew "sternly" objected to installing any additional risk limits and controls – a reaction the OCC described as one that was "very common" from JPMorgan when the regulator recommended the Company enhance controls and limits. ¶107. Accordingly, these affirmative misrepresentations are actionable. *See Lehman*, 799 F. Supp. 2d at 287 ("it would be materially misleading for a company to claim that it 'enforce[d] adherence' to its risk management policies while failing to disclose it 'routinely' alters them as the [complaint] alleges Lehman to have done").

*Third*, Defendants represented that "[l]imit breaches [were] reported in a timely manner to senior management, and the affected [JPMorgan] business segment [was] required to reduce trading positions or consult with senior management on the appropriate action." ¶¶253, 258-59. These statements were clearly false: while limit breaches were reported to senior management,

the CIO was never required to reduce its trading position, and senior management either ignored or manipulated risk limits to allow the breaches to continue.  ¶¶75, 134-41, 165-67, 254(c, l), 260(b, c).    These statements satisfy the pleading standards for alleging a material misrepresentation.  *See AIG*, 741 F. Supp. 2d at 530 (sustaining misstatements that failed to disclose portfolio "was in fact not subject to either the risk control processes that governed other divisions of the Company or the risk control processes that previously had been in place").

In response, Defendants argue that, with respect to the reporting of limit breaches, "[s]enior management could well have concluded that the appropriate action was to maintain the positions."  Def. Br. 33.  This argument is nothing more than wishful thinking on the part of Defendants, as it is directly contradicted by the fact that the OCC, the Federal Reserve, and the Senate Report each concluded that "risk limit breaches were routinely disregarded."  ¶¶79, 84-85.  In fact, JPMorgan itself has admitted that, in the face of risk limit breaches, the Company's senior management, including Dimon, implemented a new VaR model without adequate testing and in violation of Company policy and federal law – a response that the Company itself found was wholly improper and inappropriate, and which was designed to conceal risk.  ¶¶134-41.  Moreover, the SCP breached risk limits hundreds of times in 2011 and 2012, without senior management reducing the position or taking any action (other than to adopt a fraudulent new VaR model).  In sum, Defendants' argument should be rejected.

*Fourth*, Defendants represented that "[s]enior management" – and in particular Defendants Dimon and Zubrow – was "responsible for reviewing and approving risk limits on an ongoing basis" and that "[m]arket risk management regularly reviews and updates risk limits." ¶¶253, 258-59.  Indeed, as noted above, JPMorgan has admitted that the CIO's risk limits were not substantively reviewed between 2009 and 2011, in direct contravention of the Company's

own policy requiring "regular" assessments of risk limits, and there was "no meaningful effort" to ensure the CIO was subject to appropriate risk limits or that limits were updated "on a regular basis."  ¶¶80-81, 230-32, 254(f, h, j).  Again, these allegations of falsity are actionable.[14]

Defendants' only response to these allegations is to argue that there was a review of CIO risk limits, once in 2009 and again in 2011, and that therefore their statement that "management *regularly* reviews and updates risk limits" was truthful.  Def. Br. 32 ("JPMorgan never told investors that it reviewed risk limits annually, only 'regularly.'").  But Defendants' factual argument – and implausible reading of the word "regular" – cannot be reconciled with JPMorgan's *admissions* in the Task Force Report that there was no effort in the CIO to update "[risk] limits on a regular basis," the fact that risk limits were not reviewed between 2009 and 2011  ¶¶80-81, 230-32, 254(f, j), or Defendants' assurances that risk limits were "monitored on a daily, weekly and monthly basis, as appropriate." ¶¶253, 258-59.[15]

*Finally*, Defendants argue that Plaintiffs rely upon events after 2011 to allege the falsity of the 2010-2011 statements about JPMorgan's adherence to and review of risk limits.  Def. Br. 33.  In fact, the Complaint alleges – based on JPMorgan's own admissions – that (1) for "a significant period of time prior to the first quarter of 2012" the CIO was "subjected to less rigorous scrutiny than client-facing lines of business" (¶110); (2) the Company "did not conduct any review of the adequacy of the CIO's risk limits between 2009 and 2011" (¶81); and (3) "there were no limits of any kind specific to the [SCP]" at any point in time.  ¶82.  Cavanagh himself called the CIO's risk limits "clearly inadequate."   ¶230.  Moreover, as noted in the

---

[14] *See, e.g., Bear Stearns*, 763 F. Supp. 2d at 458-59 (sustaining statement that risk managers monitored "exposure to market and credit risk [and] establish[ed] limits and concentrations of risk"); *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 406 (S.D.N.Y. 2010) (statements that "processes and controls" and "process of setting standards and setting limits" in place upheld as actionable misrepresentations).

[15] Moreover, the 2011 "review" was initiated by Weiland, who was demoted after proposing to tighten CIO trading restrictions based on his review.  ¶¶133, 163.  His proposals were not implemented during the Class Period.  ¶134.

Senate Report, between January and June 2011, the SCP breached stress limits at least eight times by as much as 50% – in one instance for seven straight weeks.  ¶¶126, 260(c).  *See E*Trade*, 712 F. Supp. 2d at 189-90 ("statements touting risk management…juxtaposed against detailed factual descriptions of the Company's woefully inadequate or non-existent [] risk procedures" were actionable).  Thus, Defendants' argument that Plaintiffs improperly rely on facts post-dating certain false statements is wrong; Defendants just ignore the allegations.[16]

### C.   DEFENDANTS CONTINUED TO MAKE MATERIAL MISREPRESENTATIONS IN 2012

#### 1.   Dimon's Misrepresentations On February 13, 2012

On February 13, 2012, Defendants made additional misstatements about the CIO as part of JPMorgan's campaign against the Volcker Rule, which would prohibit the type of proprietary trading the Company was secretly conducting in the CIO.  First, the Company publicly issued a comment letter, signed by Zubrow, that falsely claimed the CIO was "responsible for making investments to hedge the structural risks of our balance sheet on a consolidated basis."[17]  Second, the same day, Dimon falsely assured investors during a FOX BUSINESS NEWS interview that, with respect to proprietary trading, "we don't make huge bets."  ¶277.  Defendants assert that Dimon's statement was not false because he was referring to market making, not proprietary trading.  Def. Br. 44.  But, when Dimon said JPMorgan did not "make huge bets," he expressly distinguished between proprietary trading and market making:  "The part where they said no proprietary trading, we're fine with.  We've never had an issue with that . . . . [W]e don't make

---

[16] Defendants' effort to recast allegations that JPMorgan abandoned risk protocols as mere mismanagement (Def. Br. 34) also must be rejected.  *See In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 494 (S.D.N.Y. 2004) (while "'poor business judgment is not actionable,'" false statements about "historical facts" are); *see also City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat., PLC*, 423 F. Supp. 2d 348, 355 (S.D.N.Y. 2006) (false statements may be actionable "even when those material facts relate to corporate mismanagement").

[17]   Defendants do not specifically challenge the falsity of the comment letter, but argue generally that all their representations regarding the CIO's risk management function were not rendered false by the SCP's trading.

huge bets." ¶277.  That statement was affirmatively false when made because JPMorgan was then sitting on a multi-billion-dollar proprietary bet that Defendants knew had gone horribly wrong.  Defendants' flawed interpretation of Dimon's statement, at most, raises an issue of fact unsuitable for resolution on this motion.

### 2. Defendants Misrepresented The CIO's Role And JPMorgan's Risk Management Practices In The 2011 Form 10-K

In the Company's 2011 Form 10-K filed on February 29, 2012, JPMorgan repeated the misrepresentations that it made in its 2009 and 2010 Forms 10-K about (1) the CIO's purposes and activities; and (2) the Company's risk management practices and use of risk limits.  ¶¶279, 281, 283-84, 286-87.[18]  In addition to the myriad reasons set forth in Sections I.A-B, *supra*, these statements were materially false and misleading as of February 29, 2012, because:

- In response to VaR limit breaches in 2011 and January 2012, Defendants manipulated the CIO's VaR by devising and implementing a new CIO VaR model that was designed to artificially lower the reported VaR in order to "cure" the VaR limit breaches and conceal the CIO's risk.  ¶¶134-41, 161-68, 280(a, b), 288(f-g);

- In the first quarter of 2012 alone, the SCP breached risk limits and advisories "more than 330 times," with certain limits being exceeded as much as 1074% and for as long as 71 days.  Indeed, over 100 risk limit breaches were reported to the Individual Defendants from January to February 2012, or more than one per day.  ¶¶160-68, 288(a);[19]

- By January 2012, Defendants were implementing a high-risk trading strategy – approved by Dimon and Drew – to increase, rather than decrease, the size of the SCP.  ¶280(f);

- Drew instructed the CIO in early January 2012 to "maximize p [&] l" (¶153) and to avoid taking further losses by replicating the "American Airline-type" trades.  *Id*.; and

---

[18] Certain false statements identified at ¶¶279, 286-87 were repeated in substantially the same form in JPMorgan's proxy statement filed on April 4, 2012 and/or its February 13, 2012 Comment Letter.  ¶¶275-76.  Dimon also made additional statements (¶294) that are false for the same reasons set forth in ¶288.

[19] Defendants contend that the "majority" of the 330 limit breaches occurred after the 2011 Form 10-K was filed on February 29, 2012, and therefore cannot support an inference that the risk limit statements in that filing were materially misleading.  Def. Br. 48-49.  In addition to impermissibly arguing a factual matter, Defendants' argument effectively concedes that over 100 limit breaches occurred *before* the 2011 Form 10-K was filed.  *Id.*

- According to the OCC, by 2012, the SCP's high-risk trading strategy consisted of "aggressive positions" that were "risk additive" rather than risk managing and which carried so much risk, "no matter what happened, they would lose money." ¶150.

These facts further establish that – contrary to Defendants' public statements – the CIO was not "primarily concerned" with managing the Company's risks. ¶279. Nor were risk limits within the CIO "monitored on a daily, weekly and monthly basis," (¶287(a)), or used to control "market risk," as Defendants assured investors. ¶287(b).

### 3.   Defendants' Material Understatement And Misrepresentation Of JPMorgan's First Quarter 2012 VaR

Defendants materially understated the Company's VaR in the first quarter of 2012, and misrepresented the consistency of VaR models across JPMorgan's business units. In an April 13, 2012 earnings release, Defendants represented that JPMorgan's VaR was $67 million, when, as the Company later admitted, the VaR was actually $129 million – almost twice as large as first reported. ¶¶314-16. The misstatement of the VaR in that earnings release also rendered false and misleading the representations in JPMorgan's 2011 Form 10-K – issued after the Company implemented its new VaR model in the CIO – that VaR was a "consistent cross-business measure of risk profiles" used "to estimate potential loss from adverse market moves" and "for comparing risks across businesses and monitoring limits." ¶¶283-85.

Despite the Company's admission that the first-quarter 2012 VaR was materially understated by almost 100%, Defendants insist that the VaR is an inactionable subjective opinion. Def. Br. 59-60 (citing *In re Deutsche Bank AG Sec. Litig.*, No. 09-1714, 2012 WL 3297730, at *2 (S.D.N.Y. Aug. 10, 2012)). They are wrong. *First*, JPMorgan's VaR inputs are based on objective, verifiable historical trading data, and thus JPMorgan's VaR is not a

subjective "valuation metric" constituting an opinion.[20]  *Second*, by reporting that VaR remained relatively unchanged from the prior quarter, Defendants falsely communicated that the risk profile of the CIO and the Company were effectively unchanged.  Indeed, JPMorgan represented that the very purpose of the VaR metric was to provide a "consistent" comparison of risk between reporting periods and, after questions arose regarding the London Whale, the Company specifically directed analysts to compare the CIO's first-quarter 2012 VaR with its VaR in prior periods to falsely assure them that the CIO's risk had not suddenly increased.[21]  ¶315.  As a result, reporting an unchanged VaR without disclosing that the model used to calculate that figure had been replaced (and replaced for the sole purpose of reducing the VaR) made the reported VaR itself an actionable misstatement, not a subjective "opinion."  ¶¶283-84, 314-17.  *Third*, because the new VaR model was implemented only in the CIO and not in the Investment Bank, the VaR figures reported by JPMorgan did not provide a "consistent" comparison of risk.  ¶¶134-39.  Neither was VaR used by JPMorgan to "monitor[] limits" or "estimate potential loss," but rather to conceal risk limit breaches and losses.  ¶¶21, 136-40, 285, 314-16.

*Finally*, even if the VaR is deemed an opinion, the Complaint alleges that Defendants knew the Company's reported VaR was materially misleading.  Indeed, the Complaint alleges that the Company implemented the new VaR model specifically in order to artificially lower the CIO's VaR.  ¶¶134-145, 160-67, 288(e)-(g), 290(b), 327(k), 341(i).  In fact, Cavanagh admitted after the Class Period that the VaR model change was deliberately undertaken with the

---

[20] Specifically, JPMorgan used *historical* pricing from actual transactions based on data from the previous 12 months to calculate VaR.  ¶139; *see also In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 301-02 & n.21 (S.D.N.Y. 2009) (holding statements not opinions because they could be determined quantitatively); *cf. Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110-11 (2d Cir. 2011) (noting lack of objective standards like market price in concluding statements were opinions).

[21] The Company emphasized the purported consistency of VaR across periods, and its utility as a metric to measure change in risk over time, by including VaR in a "Quarterly Trends" chart that reflected CIO VaR for first quarter of 2012 and the four previous quarters.  ¶¶314-16.  This chart was itself materially misleading to investors.

"expectation of all parties involved in the model approval" that the new model would generate a "lower measure [of] VaR."  ¶135.  Dimon personally approved the new model after being told that it would cut the VaR in half.  *Id*.  That the model was implemented in violation of Company policy and federal law in a manner that the OCC concluded was "unsafe and unsound" supports the inference that Defendants knew the reported VaR was misleading.  ¶¶135-40.[22]

Defendants' counter-narrative is that Dimon and Braunstein were told that the new VaR model was "improved" from the old model, and thus the fact that it would lower reported VaR "would not have given them reason to question the reliability of the new model and its VaR calculations."  Def. Br. 59-60.  This factual argument cannot trump the allegations that JPMorgan specifically designed the new VaR model to lower the CIO's VaR, and implemented the new model in violation of Company policy and federal law.  Moreover, if Defendants actually believed that the new VaR model provided a more accurate measure of risk, they would have implemented that model in the Investment Bank and lowered the VaR risk limits to account for the new model.  ¶285.  Their failure to do so confirms that their intention was solely to reduce VaR below the existing limits, and thereby conceal the SCP's risks.

In addition to affirmatively misrepresenting the VaR and its meaning, Defendants misled investors by not disclosing the critical fact that the model change in the Company's 2011 Form 10-K was responsible for the VaR appearing to be similar to prior quarters, when in fact, it clearly was not.  Pursuant to SEC Regulation S-K, that change was a material "Subsequent

---

[22] *Deutsche Bank*, 2012 WL 3297730 (Def. Br. 59) is inapposite because it did not involve manipulation of a VaR model, but turned instead on allegations that the pricing inputs used to calculate VaR were incorrect.  *Cf. id.* at *2; *Bear Stearns*, 763 F. Supp. 2d at 458 (the reported VaR was "misleading, in that the Company knew that its VaR modeling failed to reflect its [actual risk] exposure").  Plaintiffs in *Deutsche Bank* also relied "exclusively" on theories of strict liability and negligence, and never alleged that defendants knew that the VaR was false, as Plaintiffs do here.  ¶¶135-36, 327, 341(i).  The other cases on which Defendants rely, *City of Roseville Employees' Retirement System v. Nokia*, No. 10-00967, 2011 WL 7158548 (S.D.N.Y. Sep. 6, 2011) (Def. Br. 59) and *Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146 (S.D.N.Y. 2004) (Def. Br. 59), also lacked specific allegations that defendants knew their statements were false when made.

[E]vent" that had taken place between December 31, 2011 (the end of the fiscal year), and February 29, 2012 (the date of the Form 10-K). ¶285. *See Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114 (2d Cir. 2012) (failure to disclose known information in contravention of a disclosure obligation under Regulation S-K rendered registration statement materially false). Indeed, when the Company filed that Form 10-K, the undisclosed modification of the CIO VaR model change concealed the fact that JPMorgan had secretly increased its risk profile due to the increase in the size and risk of the SCP's positions. But for the secret model change, the SCP would have continued to breach Company-wide risk limits. ¶¶136-41; *see Lehman*, 799 F. Supp. 2d at 296 (actions taken to "temporarily and artificially" reduce certain financial measures "paint[ed] a misleading picture of the company's financial position….").

### 4.   Misrepresentations In April 2012 News Articles

After the news about the "London Whale" trades first broke on April 5, 2012, Defendants mounted a public relations campaign to falsely assure investors and downplay concerns about proprietary trading in the CIO. This campaign was orchestrated and scripted by Defendants Dimon, Braunstein, Drew and Zubrow (¶¶188-89). Accordingly, these Defendants are liable for the false statements made by JPMorgan representatives in this campaign, including:

- "CIO activities hedge structural risks and invest to bring the company's assets and liabilities into better alignment." ¶297;

- The CIO is "focused on managing the long-term structural assets and liabilities of the firm and is not focused on short-term profits." *Id.*;

- The CIO was responsible for "hedging the firm's foreign exchange, interest rate and other structural risks." *Id.*;

- The CIO's "recent trades were made to hedge the firm's overall risk." ¶299;

- The CIO "aims to hedge the bank's global structural risks and the unit's investments are directly related to managing those risks," and that JPMorgan "views its recent selling in

the context of a range of related positions" and "feels its risk is now effectively balanced." *Id.*; and

- The CIO's "results are disclosed in our quarterly earnings reports and are fully transparent to our regulators." ¶297.

The Senate Report concluded that these statements were "fictions irreconcilable with the bank's obligation to provide material information to its investors in an accurate manner." ¶¶23, 270. The Complaint further alleges that these statements were materially false and misleading for the reasons stated at § I.A.1., *supra,* and for the following additional reasons:

- The CIO's proprietary trades, including the "London Whale" trades, were not hedges, as evidenced by the Senate Report, the admissions in the Task Force Report, and the lack of hedging documentation for the trades. ¶¶99-103;

- The risk within the CIO was in no way "balanced" when, in fact, (1) multiple risk limits had been breached regularly and repeatedly (¶¶160-61, 165-68, 288); (2) Defendants conspired to alter the VaR model to artificially lower risk, concealing the fact that the CIO's VaR had spiked to over twice that of the entire Investment Bank, (¶¶288(e, g), 290(b)); and (3) the CIO traders were manipulating the indices ("painting the tape") and mismarking asset valuations to avoid taking losses. ¶¶171, 288(h), 290(g); and

- Defendants deliberately concealed the CIO's proprietary trading and the existence of the SCP from the OCC, moving the SCP from the Investment Bank to the CIO in order to avoid regulatory scrutiny (¶¶23, 104-10) and when the OCC learned of the SCP, Defendants falsely told the OCC they planned to reduce the size of that portfolio. ¶¶192, 363(a-b); *see also* ¶363(c).

Defendants' primary response is the contention that, under *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct 2296 (2011), Plaintiffs' claims against Dimon, Drew, Braunstein and Zubrow for the above statements and against Zubrow and Drew for the statements on the April 13 call (discussed below) must be dismissed. Def. Br. 70. As Defendants effectively concede, the statements are indisputably attributable to JPMorgan and therefore cannot be dismissed as to the Company under *Janus*.

Defendants incorrectly argue that, under *Janus*, Section 10(b) liability only attaches where a statement is expressly attributed to the defendant who made it. Def. Br. 70-71. Rather,

*Janus* recognized that attribution can be "implicit from surrounding circumstances." *In re Pfizer, Inc. Sec. Litig.*, No. 04-9866, 2012 WL 983548, at *4 (S.D.N.Y. Mar. 22, 2012). Where the "Individual Defendants approved or ratified any statements issued by [the company], the [complaint] adequately pleads that such statements were attributed to and ultimately controlled by the Individual Defendants." *In re Pfizer,* 2012 WL 983548, at *4. Thus, courts have held that corporate executives with authority over the content of press releases may be held liable under the Exchange Act, even when those statements are not expressly attributed to them. *See, e.g., In re Pfizer, Inc. Sec. Litig.*, No. 04-9866, 2013 WL 1285173, at *11-12 (S.D.N.Y. Mar. 28, 2013) (finding liability under *Janus* where top management reviewed the press releases at issue); *SEC v. Greenstone Holdings, Inc.*, No. 10-1302, 2012 WL 1038570, at *9 (S.D.N.Y. Mar. 28, 2012) (holding, on summary judgment motion, that corporate executive who drafted and had responsibility for the content of press releases was the "maker" under *Janus*).

Here, Plaintiffs allege that the Individual Defendants conspired to develop a coordinated public response to the London Whale rumors, this response misstated the function of the CIO, and each Individual Defendant participated in preparing and authorizing the misleading communications. Further, there can be no question here that investors understood statements addressing this critical issue were approved by Dimon and Braunstein (JPMorgan's CEO and CFO), as well as Zubrow (the public face of JPMorgan's opposition to the Volcker Rule) (¶357) and Drew (the head of the CIO, who was identified by name in the articles alongside the statements). ¶189. Thus, attribution under *Janus* is appropriate.

### 5. Misrepresentations During The April 13, 2012 Conference Call

On April 13, 2012, Defendants held a first quarter earnings conference call during which Defendants Dimon and Braunstein made material misrepresentations concerning the "London Whale" trades and the purpose and function of the CIO. ¶¶303, 305, 307, 309, 312. These

statements were drafted, reviewed, approved and ratified by both Drew and Zubrow.  ¶310.  On

that critical call, Dimon emphatically assured investors that the market frenzy over the London

Whale trades was nothing more than a "complete tempest in a teapot" because the CIO "is

invested wisely, intelligently over a long period of time to earn income and to offset other

exposures." ¶303.  These statements, however, were patently false because, *inter alia*:

- The losses associated with the London Whale trades had already reached $1.2 billion, over $400 million of which occurred on a single trading day, and Dimon and others had been told that the losses could reach as high as *$9 billion* (¶¶193-95, 304);

- The risk posed by the SCP was so severe that JPMorgan implemented a new CIO VaR model specifically designed to conceal that risk (¶¶136, 166); and

- The SCP's positions were so disastrous that the minimal risk limits and advisories in place in the CIO had been breached over 330 times between January and March 2012, with certain limits being exceeded by more than 1000% and for as long as 71 days.  ¶304.

Indeed, the Senate Report concluded that Dimon's statements on this date misled investors at a

time when he had detailed information about the "complex and sizeable portfolio, its sustained

losses for three straight months, the exponential increase in those losses during March, and the

difficulty of exiting the [SCP's] positions." ¶304.

Defendants wrongly contend that Dimon's statements were immaterial, and only

reflected his genuinely-held opinions.  Def. Br. 67.  This contention is meritless.  *First*, these

statements were highly material, as they were made immediately after the financial news media

revealed that the CIO had amassed a huge position in exotic derivative instruments, and

Defendants were scrambling to reassure investors that those trades were under control.  ¶¶188-

90, 296-313.   Indeed, it is difficult to conceive of a more material statement than Dimon's

reassurances denying news reports that JPMorgan's primary "risk management" division was

secretly amassing large, risky positions.   Moreover, Defendants ignore that the Senate

Subcommittee, after obtaining discovery, determined that this statement was false.  ¶¶199-203.

*Second*, these statements were not opinions.  They were objective misstatements of the verifiable fact that the CIO's trades were not a concern, when in fact they were:  the CIO faced a multi-billion dollar loss in a secret, illiquid portfolio.  *Third,* even if Dimon's statements were an opinion (which they were not), the Complaint adequately alleges that Dimon, who knew the extent of the losses mounting in the SCP, could not reasonably believe the truth of his own statements.[23]  Thus, for all of these reasons, Dimon's statement is actionable.

Braunstein's material misrepresentations during the April 13 conference call are also actionable.  On that call, Braunstein assured investors that JPMorgan was "very comfortable" with the CIO's SCP positions, and that:

- "[A]ll of [the] decisions [regarding CIO positions] are made on a very long-term basis" and "are done to keep the Company effectively balanced from a risk standpoint." ¶305;

- "We invest those in order to hedge the interest rate risk of the Firm as a function of that liability and asset mismatch" and "hedge basis…convexity…[and] foreign exchange risk [all of which] is manage[d] through the CIO." *Id.*;

- "[W]e have put on [the SCP's] positions to manage for significant stress event[s] in Credit," ¶305, and "[a]ll of those positions are put on pursuant to the risk management at the firm-wide level." ¶307;

- "[A]ll of those positions are fully transparent to the regulators … [t]hey review them, have access to them at any point in time, [and] get the information of those positions on a regular and recurring basis as part of our normalized reporting." *Id.*; and

- CIO trading activity is "consistent with this long-term investment philosophy we have in CIO [and] we believe [the SCP's trading activity] is consistent with what we believe will be the ultimate outcome related to Volcker." ¶309.

Significantly, the Senate Report found that all of these statements "were not true" and had "no basis in fact."  ¶¶23; 308.

---

[23] *See AIG,* 741 F. Supp. 2d at 527 (defendant's conference call statement actionable where he "characterized the response to the Company's GAAP-required markdown of the portfolio as 'hysteria' disconnected from 'economic reality'"); *Lapin,* 506 F. Supp. 2d at 240 (claims sustained where defendants "were aware of undisclosed facts that seriously undermined the accuracy of their professed opinions"); *IBEW Local 90 Pension Fund v. Deutsche Bank AG,* No. 11-4209, 2013 WL 1223844, at *13-14 (S.D.N.Y. Mar. 27, 2013) (holding that statements were not opinions under *Fait* because facts supported objective and subjective falsity).

Still though, Braunstein continued to misrepresent the CIO's function and SCP trading on a separate conference call later that day.   ¶312.   Specifically, Braunstein stated, among other things, that "all of the [SCP] positions … are part of a credit book meant to hedge other risk" and "are very long term in nature," again insisting that JPMorgan was "very comfortable with the positions we have [in the SCP]" and that JPMorgan is "very conservative."  *Id.*

The Complaint alleges that Braunstein's April 13 statements were materially false and misleading when made for the same reasons as Dimon's statements, and also because, *inter alia*:

- JPMorgan was not "comfortable" with the SCP positions, as JPMorgan had taken drastic measures to conceal the CIO's growing losses from the public, mis-marking positions, masking or ignoring the risk limit breaches caused by the SCP, and outright manipulating risk models, such as the CIO VaR, to conceal losses within the CIO.  ¶306;

- As confirmed by the Senate Report, the CIO's investments in high-risk, synthetic credit derivatives were not made on a "very long term basis," and in fact, they had the shortest investment time horizon in the CIO – with positions traded on a daily basis.  *Id.*;

- The Senate Report found that the SCP did not perform a hedging function.  *Id.*  Instead, the SCP held proprietary positions intended to generate short-term profits, and had no "long term investment philosophy."  ¶¶245, 247, 250, 280, 282, 288.

Again, such a "glaring disparity" between defendants' representations and reality renders these representations actionable under the federal securities laws.  *E\*Trade*, 712 F. Supp. at 185-86; *IBEW Local, Inc.,*  2013 WL 1223844, at *6.  These statements cannot be protected as opinions (Def. Br. 66-70), because Braunstein himself had specific knowledge of the SCP's high-risk, illiquid positions (¶¶341-42), and admitted before Congress that "as to specific investment decisions, [he] was certainly aware of the [SCP]."  ¶338.  What Braunstein told the public and what was actually occurring behind closed doors at JPMorgan is irreconcilable.

### D.   JPMORGAN'S FINANCIAL RESULTS WERE MATERIALLY MISLEADING DUE TO DEFENDANTS' REFUSAL TO ESTABLISH A LIQUIDITY RESERVE FOR THE CIO

The Complaint alleges that in violation of GAAP, Defendants refused to take a multi-billion dollar reserve needed to account for the liquidity risk of the SCP, resulting in a $2 to $4 billion overstatement of net income during the Class Period.  ¶¶111-20, 261-69.  The need for that reserve was documented in a memorandum prepared by a senior CIO executive in early 2010, and Plaintiffs' allegations regarding the reserve are supported by both the NEW YORK TIMES and an independent analyst who spoke with JPMorgan executives.  *Id.*  Defendants refused to establish the needed reserve because doing so would have reduced JPMorgan's profits by as much as 150%.  ¶262.  Because the SCP existed (and in fact grew) throughout the Class Period, the need for this reserve existed throughout the Class Period as well.  Indeed, that JPMorgan needed to reserve against the illiquidity of the SCP is confirmed by a December 2011 internal report showing that the SCP was so illiquid that exiting just a portion of its positions would result in over $500 million in losses.  ¶¶114, 117, 119, 153, 261-62, 348(k).  JPMorgan itself eventually admitted that the SCP required a liquidity reserve by establishing one, but did so belatedly and insufficiently, creating a reserve of just $155 million for a subset of the SCP's positions in April 2012.[24]  ¶118. The OCC deemed this reserve "wholly inadequate." *Id.*  Indeed, JPMorgan subsequently increased the size of the reserve to over $700 million in the months after the SCP's losses were revealed (and after the SCP's positions had been reduced).[25]  *Id.*

---

[24] Drew confirmed in her testimony to Congress that, before a $30 million liquidity reserve taken in December 2011, no reserve had been established for the SCP.  ¶269.

[25] Defendants seek to minimize the reserve's four-fold increase by claiming that the reserve size depends on market movements, "not actual transactions." Def. Br. 39 n.19.  Not only is this claim wrong – as the reserve size is based on the position sizes – but Defendants' argument requires the implausible assumption that the SCP's illiquidity increased despite significant position reductions, and ignores the OCC's finding that prior reserves were inadequate.

Given these well-pled facts, Defendants cannot complain that the alleged misstatement of JPMorgan's financial results is based simply on "unsubstantiated rumor." Def. Br. 38-39. Further, while Defendants quibble about the interpretation of certain GAAP provisions, those arguments ignore the fact that a senior CIO executive concluded that a reserve was required – *i.e.*, mandated by GAAP.  ¶¶111-20, 261-69.  While discovery may clarify where in the $2 to $4 billion range the reserve should have been established, Defendants' contention that *no* reserve was required cannot be credited on a motion to dismiss.  Def. Br. 39-40.[26]

Defendants also contend that the determination to take a liquidity reserve under GAAP requires subjective judgment and that Plaintiffs fail to plead that Defendants did not "honestly believe that [their decision to forego a $2-4 billion liquidity reserve] was appropriate."  Def. Br. 40 (citing *Fait*, 655 F.3d at 113).  To the contrary:  the Complaint alleges that Defendants refused to establish the needed reserve to avoid the impact such a reserve would have on JPMorgan's financial results.  ¶¶116-17.  In addition, the Complaint places this refusal within the context of Defendants' long-term scheme to conceal the risky proprietary trading taking place within the CIO, and specifically alleges that establishing the required reserve would have revealed the true nature of the CIO.  ¶¶86-87, 111-20, 327(c), 335(d).  Given Defendants' (1) knowledge of the mounting risks in the SCP; (2) concealment of the CIO's proprietary trading; and (3) disregard of the CIO's executive's report calling for a reserve, Plaintiffs have alleged that the refusal to establish the reserve was not based on a subjective belief that it was not required, thus distinguishing this case from *Fait*.  *See Bear Stearns*, 763 F. Supp. 2d at 492 (valuations actionable where there is "evidence that the defendants were aware of undisclosed facts that

---

[26] *See, e.g., In re Refco Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 656-57 (S.D.N.Y. 2007) (well-pled GAAP violations raise complex issues of fact that cannot be resolved on a motion to dismiss);  *Ambac*, 693 F. Supp. 2d at 273 (same); *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 338-39 (S.D.N.Y. 2004) (same).

seriously undermined the accuracy of their alleged opinions or beliefs").

## II.   DEFENDANTS ACTED WITH SCIENTER

The scienter requirement is satisfied by "alleging facts (1) showing that the defendant[] had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).   The requisite "strong inference" of scienter under the PSLRA "need not be irrefutable, *i.e.*, of the smoking gun genre, or even the most plausible of competing inferences." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).   Rather, scienter is adequately alleged when, viewing Plaintiffs' allegations collectively and holistically, the inference of scienter is at least as compelling as an inference of non-fraudulent intent.   *Id.*

Scienter can be pled in a variety of ways, including allegations that:

(1)   Defendants actually possessed "knowledge of facts or access to information contradicting their public statements," or "failed to review or check information that they had a duty to monitor." *Novak,* 216 F.3d at 308-09; *New Orleans Employees Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 15 (2d Cir. 2011) (same);

(2)   Executives and senior management alleged to have participated in the fraud were terminated or resigned, *see Celestica*, 455 Fed. App'x at 14 n.3, and the company recorded a loss following the executives' departures.  *See In re Vivendi Universal, S.A. Sec. Litig.,* 381 F. Supp. 2d 158, 176–77 (S.D.N.Y. 2003);

(3)   The fraud led to the restatement of the corporate defendant's financial statements. *See Dynex II,* 2009 WL 3380621, at *14-15 (financial restatement provides indicia of scienter); *see also In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 77 (2d Cir. 2001);

(4)   The misrepresentations involved the "core operations" of the corporate defendant. *In re Winstar Commc'ns Sec. Litig.*, No. 01-3014, 2006 WL 473885, at *7 (S.D.N.Y. Feb. 27, 2006) (Daniels, J.) ("[k]nowledge…can be imputed to key officers who should have known of facts relating to the core operations of their company"); and

(5)   The alleged fraud was of such a "magnitude" that management must have known about it. *Id.* at *7.

As detailed below, Plaintiffs have pled scienter through all of the foregoing means and, when viewed "collectively," as they must be under *Tellabs*, the Complaint's allegations support an overwhelming inference of scienter.  551 U.S. at 323.

In responding to Plaintiffs' scienter allegations, Defendants commit two principal errors. *First,* Defendants cherry-pick certain of Plaintiffs' allegations and attack them in isolation, disregarding the rule that, on a motion to dismiss, a court must consider "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Id.*  Plaintiffs need not plead that any one particular fact or document provided Defendants with knowledge of the fraud, so long as the totality of the information available to them contradicted their public statements.[27]

*Second*, even though the Complaint is replete with statements by witnesses who worked with the Individual Defendants, detailed allegations regarding reports made and/or provided to the Individual Defendants, decisions that they authorized, and their own admissions, Defendants claim that it is insufficiently particularized to state a claim.  The Second Circuit does not "require great specificity" in pleading scienter, so long as a plaintiff alleges "enough facts to support 'a strong inference of fraudulent intent.'"  *Ganino v. Citizens Util.*, 228 F.3d 154, 169 (2d Cir. 2000).  Here, Plaintiffs have alleged detailed facts regarding Defendants' actual knowledge and myriad red flags they disregarded, which amply support a strong inference that they acted with scienter in misrepresenting JPMorgan's risk management in general and the operation of the CIO in particular.  These allegations are based upon internal JPMorgan documents, numerous witnesses, the admissions of the Company and the Individual Defendants, as well as the detailed

---

[27] *See Dynex II*, 2009 WL 3380621, at *14 (no requirement that "the contradictory facts must be summarized in a single report that explicitly states the direct opposite of the misleading statement"); *see also Ambac*, 693 F. Supp. 2d at 267-68 (holding that multiple reports and documents, taken together, supported alleged scienter).

findings of the Senate Subcommittee, OCC and Federal Reserve, which standing alone provide compelling evidence of fraudulent intent. When viewed "holistically," there can be no doubt that Plaintiffs have satisfied their burden with respect to each Defendant.

### A.   DIMON

Dimon held himself out as the "king of risk management" and, at the start of the Class Period, personally assured Congress in public testimony that JPMorgan's "steadfast focus on risk management" and "disciplined approach to capital and liquidity management" distinguished the Company from its peers. ¶48. The Company's proxy statements told investors that Dimon himself was "intimately familiar with all aspects of the Firm's business activities" and "set[] the overall risk appetite for the [Company]." ¶322. According to multiple witnesses, including Drew, Dimon personally oversaw the CIO's secret plunge into high-risk, proprietary trading, and was actively involved in those trades. ¶¶24, 58, 86-91. Dimon also personally approved the scheme to manipulate the CIO's VaR and materially understate that critical risk metric to conceal the high risk trading in the CIO. ¶¶136-40, 160-68. After being expressly warned that the SCP's losses exceeded $1.2 billion and could reach $9 billion, Dimon dismissed concerns about the "London Whale" as a "complete tempest in a teapot." ¶¶194-201.

When JPMorgan was finally forced to reveal the full scope of the SCP's losses, Dimon admitted that "I am absolutely responsible. The buck stops with me." ¶331. Dimon's admission of responsibility means exactly that – that as CEO, Chairman and President, he was at fault, and either knew of or recklessly disregarded the risk management failures and high-risk trading that caused investors' losses. Now, just one year later, Dimon denies all responsibility for his numerous misstatements. The CEO, Chairman and President of one of Wall Street's largest banks claims that his assurances that the "London Whale" posed no risk to the Company were just his "opinion." Def. Br. 67. He claims that he approved a scheme to manipulate the

Company's VaR because the new model – designed to reduce VaR, developed in violation of Company policy, and not implemented outside the CIO – was an "improvement." Def. Br. 56-58.   And the man who took credit for steering JPMorgan through the financial crisis by his "steadfast focus on risk management" (¶48) now disclaims any knowledge of the risk failures that permeated the CIO – JPMorgan's "principal" risk management division.  Def. Br. 24-27.

This is nonsense.  The Senate Report concluded that Dimon had actual knowledge of the SCP's "complex and sizeable portfolio, its sustained losses for three straight months, the exponential increase in those losses during March, and the difficulty of exiting the [] positions" when he lied to investors to conceal the risks in the CIO.  ¶304.  JPMorgan itself said that Dimon "bears ultimate responsibility for the failures that led to the losses in CIO."  ¶331.

1. **The Complaint Alleges Particularized Facts Showing That Dimon Acted With Scienter In 2010 And 2011**

The Complaint alleges with particularity that Dimon acted with scienter in 2010 and 2011 when he made (or caused to be made) false statements about (1) the CIO's risk management function, and (2) JPMorgan's overall risk management structure and protocols.  ¶¶242-69.

*First*, Drew has testified that the CIO's investment decisions were "made with the full understanding of executive management including Jamie Dimon."[28] ¶87.  Drew's admission is corroborated by numerous sources cited in the Complaint, including:  (1) two JPMorgan executives told CIO trader David Olson that "Jamie's new vision for the company" was for the CIO to generate profits (¶58; *see also* DX 1 at 36); and (2) a former CIO employee responsible for risk reporting ("CW 1") said that Dimon "knew for sure" of "obvious" examples of the CIO's

---

[28] Defendants argue that Drew's testimony does not establish that Dimon knew of the CIO's proprietary trading activity in 2010 and 2011.  Def. Br. 24.  Defendants' position fails, however, as Drew was confirming and reiterating a statement that she had made to the OCC *in December 2010.*  ¶107; *see* DX 1 at 222-23. Indeed, Drew specifically testified that what was true in 2010 was also true in 2012:  Dimon and the other Individual Defendants, who were members of JPMorgan's "executive management," had a "full understanding" of the CIO's proprietary trading.  ¶87.

proprietary trading and provided guidance to the CIO about trades he wanted implemented and approved trading strategies.  ¶¶59-60, 87, 130.[29]

*Second,* consistent with Dimon's reputation as a micromanager (¶¶48, 130, 325) and his "intimate[] familiar[ity]" with the Company's activities (¶322), the Complaint identifies specific CIO trades that Dimon knew of or "explicitly approved."[30]  These include:  (1) bets on subprime mortgages that made approximately $1 billion; (2) bets on Fannie Mae and Freddie Mac securities that lost $1 billion; (3) a failed bet on foreign currency movements that caused a $300 million loss, which Dimon was told was not a hedge; and (4) a bet on corporate bankruptcies that produced a $500 million "windfall" profit.  ¶¶86-89, 91.[31]  Dimon also communicated directly with the CIO executives and traders who conducted these trades throughout the Class Period and incentivized them to take on risk by tying their compensation to their ability to generate outsized profits.  ¶¶65-66, 324.  Indeed, the fact that Dimon personally approved the compensation of the four CIO employees with primary responsibility for the SCP – which totaled tens of millions of dollars per year – establishes that he *knew* these individuals were being paid to generate profits through proprietary trading, not to manage risk.  *Id.*

---

[29] These allegations cite numerous *named* sources (*e.g.*, Olson and Grossman) confirming Dimon's "vision" for the CIO, and are more than sufficient (Def. Br. 24-25).  *Local No. 38* and *Janbay*, which concerned the use of confidential sources without providing detail about their positions or other corroborating allegations, are inapposite.

[30] Defendants argue that allegations that an executive "likes to know what is going on all the time" are insufficient, citing *City of Brockton Retirement System v. Shaw Group, Inc.*, 540 F. Supp. 2d 464, 473-74 (S.D.N.Y. 2008).  But that court added that such an allegation *would suffice* if coupled with "allegations of fact from which one could infer that the alleged [fraudulent actions] are either being committed by the officer or were reported to him."  *Id.* at 473 (citations omitted).  In that case, the plaintiffs did not allege those facts; by contrast, here, Plaintiffs have provided very detailed allegations about Dimon's awareness of and involvement in the fraud (¶¶322-31), and allegations regarding Dimon's management style are corroboration for those allegations.

[31] Defendants incorrectly assert that JPMorgan disclosed (1) losses on Fannie and Freddie securities and (2) that the CIO had invested in asset-backed securities.  This argument fails because the Company's disclosure of Fannie and Freddie losses did not even reference the CIO.  Def. Br. 25-26.  Nor did JPMorgan's disclosures about the CIO's investments in asset-backed securities reveal that the CIO was heavily invested in high-risk, complex debt instruments such as CDOs and European mortgage-backed securities.  Def. Br. 21; ¶90.

*Third*, Dimon received regular reports alerting him to heightened levels of risk within the CIO, including:  (1) daily VaR calculations and reports detailing any change in VaR from the prior day and the reason for that change; (2) weekly stress test results; (3) market risk exposure trends; (4) profit-and-loss changes; and (5) portfolio concentrations.  ¶323; *see also* DX 2 at 173-74.  The CIO also produced a regular report for Dimon called "Jamie's Report," which contained aggregate trade positions and risks.  ¶129.  These reports provided detailed information to Dimon showing that (1) during the Class Period, the SCP alone was incurring greater risk than the entire Investment Bank (¶123); (2) as a CIO executive testified, the SCP "dominated CIO VaR for most of the period from 2008 to 2012" (¶362); and (3) the SCP breached stress limits eight times from January to June 2011, sometimes for weeks at a stretch (¶126) – information that was incompatible with JPMorgan's public statements concerning the CIO's purpose and the enforcement of risk limits.  Defendants' argument about the "specificity" of these allegations is specious.  Def. Br. 27, 35, 57.  Plaintiffs cite to specific reports Dimon received during the Class Period that contained detailed information that contradicted Dimon's statements or alerted Dimon to the falsity of the Company's statements.  *See, e.g.*, ¶96 (report showing CIO "[t]actical credit strategies" generated "annualized return on equity of 100%"); ¶107 (OCC Supervisory Letter detailing CIO deficiencies); ¶¶108-09, 141 (SEC correspondence concerning proprietary trading and VaR disclosures); ¶¶120-25 (daily VaR reports); ¶126 (risk limit breach reports); ¶136 (VaR model change emails).  This is sufficient.[32]

---

[32] *See, e.g., City of Roseville,* 814 F. Supp. 2d at 395 (claims upheld when defendants were "briefed on the allegedly misrepresented or omitted facts"); *Lehman*, 799 F. Supp. 2d at 295 (receipt of regular reports supports scienter); *In re Scholastic*, 252 F.3d at 76 (same); *In re Globalstar Sec. Litig.*, No. 01-1748, 2003 WL 22953163, at *7 (S.D.N.Y. Dec. 15, 2003) (same).  *Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) is inapposite because there the alleged information had not "been collected into reports" or provided to executives.

*Fourth*, Dimon knew or recklessly disregarded that the CIO lacked the infrastructure, policies, and personnel to fulfill its supposed risk management purpose, and that it did not comply with the risk limits that JPMorgan claimed to apply firm-wide.  ¶¶73-85.  For example:

- While JPMorgan represented that Dimon was "responsible for reviewing and approving risk limits on an ongoing basis" (¶253), the Task Force Report found that no one "conduct[ed] *any* review of the adequacy of CIO risk limits between 2009 and 2011," and that "there was no meaningful effort to ensure that [the] CIO was subject to appropriately rigorous risk and other limits and was updating those limits on a regular basis." ¶81;

- Dimon knew that Drew hired traders who had no risk management experience, and he personally approved their pay, which was based on the profits they generated.  ¶¶60-66.

- The CIO lacked a CRO for most of the Class Period, and Dimon obviously knew or should have known that the key risk management position in the principal risk management unit was vacant.  ¶¶52; 73-74; and

- In December 2010, Dimon received a Supervisory Letter from the OCC that cited the CIO's "risk management framework for the investment portfolios" as lacking "a documented methodology" and "clear records of decisions," and criticized the CIO's failure to "document investment policies and portfolio decisions."  ¶107.[33]

Indeed, when Dimon received reports and was challenged by colleagues and regulators concerning the CIO's proprietary trading and the risk deficiencies in the CIO, he affirmatively acted to conceal those facts and prevent transparency into the CIO.  For example, in 2009, when the co-CEOs of the Investment Bank asked Dimon to improve controls and oversight of the CIO, Dimon removed them from their positions.  ¶¶68-71.[34]

Against these particularized allegations, Defendants claim that Dimon simply "fail[ed] to identify problems" (Def. Br. 35).  But the Complaint shows that Dimon was not oblivious to the risk management failures or high-risk trading that caused investors' losses.  To the contrary,

---

[33] Defendants' claim that the OCC letter merely raised a "bookkeeping" matter is belied by its reference to a deficient risk management "framework" and "methodology," raising, at most, a fact question.  Def. Br. 26; 35-36.

[34] Defendants' attempt to recast Dimon's response to Winters and Black as a "retrospective critique" ignores the witness who said that Dimon fired Winters because he was the "one person who promoted transparency."  ¶71.

Plaintiffs allege that Dimon *actually knew* of those deficiencies.  ¶¶84-85, 323-24, 327(a, g, h, j).  *See Bear Stearns*, 763 F. Supp. 2d at 501 (holding warnings from the SEC regarding deficiencies in risk and valuation models helped to establish scienter).  But even if Dimon failed to identify some of the problems that contributed to the Company's loss, he would not escape liability for his misstatements.   JPMorgan has *admitted* that Dimon was responsible for "the risks, risk controls and personnel associated with CIO's activities," and therefore any failure to learn of the deficiencies in the CIO's risk controls was at least reckless.  ¶324.  *See Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996) (scienter may be pled by "an egregious refusal to see the obvious").  Moreover, the law is clear that Dimon cannot disclaim knowledge of the systemic risk deficiencies in the Company's principal risk management unit.[35]

## 2. The Complaint Alleges Particularized Facts Showing That Dimon Acted With Scienter In February 2012

Like JPMorgan's 2010 and 2011 SEC filings, the 2011 Form 10-K filed on February 29, 2012, which Dimon signed, reiterated statements regarding the CIO's purported risk management function and firm-wide risk practices (¶¶279-82; 286-87), which Dimon knew to be false and misleading for the reasons discussed in § II.A.1, *supra*.  This filing also contained representations regarding VaR, the Company's use of risk limits, and the Company's internal controls, which Dimon knew to be false or was reckless in making.

### (a) Dimon Knew That Statements Regarding VaR And The Use Of Risk Limits In The 2011 Form 10-K Were False

The 2011 Form 10-K contained several false statements regarding VaR, including that it was a "consistent" and "comparable" risk metric used to compare risks across business units.  ¶¶281-87.  Just weeks before signing the 2011 Form 10-K, Dimon had been alerted to firm-wide

---

[35] *See Winstar*, 2006 WL 473885, at *7 ("[h]igh level corporate officers" have a duty to know "core operations"); *Ho v. Duoyuan Global Water, Inc.*, 887 F. Supp. 2d 547, 575 (S.D.N.Y. 2012) (same) (Daniels, J.).

VaR breaches caused by the SCP's trading.  ¶¶161, 165-67.  Rather than take the "appropriate action" that was required of senior management to address those breaches, Dimon concealed the breaches by approving a new (and admittedly manipulated) VaR model for the CIO alone, which permanently reduced the VaR and masked the SCP's true risk.  ¶¶287(c), 327(k-m).

Defendants contend that the allegation that Dimon "approved the new model knowing that it was supposedly designed to lower artificially CIO VaR" is inadequately pled, and that the more compelling inference is that Dimon innocently believed that the new model was an "improvement" and did not need to be disclosed.  Def. Br. 46, 56-58.  This argument is contradicted by the Complaint, the Company's admissions, and the findings of federal regulators:

- The Senate Report concluded that the VaR JPMorgan reported based on the manipulated model that Dimon approved was one of the "fictions irreconcilable with the bank's obligation to provide material information to its investors in an accurate manner."  ¶23;

- The Task Force Report confirmed that Dimon knew the model was not an "improvement":  Dimon approved the VaR limit change in contravention of Company policy (¶¶134-41, 327(k-m)); he knew the Investment Bank traded the same instruments, but that the same new VaR model was not also implemented in that division (¶167), and he knew that risk limits were not changed to account for the new model (¶¶165-67);

- Cavanagh admitted that the VaR change was deliberately undertaken with the "expectation of all parties involved in the model approval," including Dimon, that the new model would generate a "lower measure [of] VaR."  ¶135;

- Dimon knew that the CIO VaR limit was regularly exceeded prior to the implementation of the new model he approved.  ¶¶165-67, 327(k);[36]

- A January 23, 2012 email to Dimon stated that the new VaR model would result "in a reduction of CIO VaR by 44%" overnight, which the Senate Report concluded would "lower[] the apparent risk for the [SCP] by a dramatic amount," "mask the changes in the [SCP]," and permanently reduce the VaR associated with the SCP positions.  ¶¶166, 315;

---

[36] Relying on their own Task Force Report, Defendants argue that Dimon and Braunstein were not notified of CSBPV limit breaches in January and February 2012 (Def. Br. 49-50) even though Defendants represented that such breaches were reported "in a timely manner to senior management" and "appropriate action" was taken.  ¶253.  But the Senate Report found that Dimon *was* informed about this risk limit breach.  DX 1 at 204 n.1142.

- Dimon himself approved the "temporary increase" in the firm-wide VaR limit and approved the new VaR model without requiring corresponding adjustments to the CIO or SCP VaR risk limits.  ¶136.  As noted by the OCC, the CIO "increase[d] its risk without continuing to exceed its VaR limits."  ¶327(k-m); and[37]

- After the end of the Class Period, the Company acknowledged that its implementation of the new VaR model was improper and should never have been done, and that it allowed JPMorgan to report a materially false and misleading VaR.  ¶¶137-39.

In sum, Dimon himself approved the use of a new VaR model for the specific purpose of misrepresenting the CIO's VaR to conceal the SCP's growing risks.  ¶¶165-67, 327(k-m).  It is therefore implausible that Dimon believed the new model was an "improvement" over the old model.  Def. Br. 56-57.  Furthermore, it defies logic that the new VaR model, which Defendants admit was utilized only by the CIO, and not by the Investment Bank or other divisions, could somehow provide any form of "consistent" and "comparable" risk across business units.[38]

### (b) Dimon Knew Or Should Have Known That JPMorgan's Internal Controls Statements Were False And Misleading

Defendants concede that JPMorgan misrepresented the effectiveness of its internal controls in its 2011 Form 10-K.  ¶¶289-291; *see* Def. Br. 50-54.  As a result of mismarking its positions and manipulating thinly-traded markets to conceal the CIO's losses, the Company was forced to admit a material weakness in internal controls and restate earnings for the first quarter of 2012 by $459 million.  ¶¶220-23, 230, 239.  Prior to signing the 2011 Form 10-K and attesting to the effectiveness of the Company's disclosure and internal controls over financial reporting, Dimon knew or was reckless in disregarding that such controls did not exist in, or were not applied to, the CIO.  For example, Dimon knew or recklessly disregarded that:

---

[37] Defendants make the same argument with respect to Braunstein's scienter concerning the implementation of and intent behind the new VaR model.  The argument fails for the same reasons.  Def. Br. 56-58; *see also* ¶341(i).

[38] These same facts are sufficient to plead scienter for both Dimon and Braunstein with respect to the false CIO VaR.  Defendants claim that their purported disclosures of the new CIO VaR model to the OCC insulate them.  Def. Br. 60.  But a confidential disclosure to a regulator cannot obviate the "duty to be both accurate and complete" to investors, *Caiola*, 295 F.3d at 331, and the OCC's conclusion that it was "lied to" confounds this argument.  ¶193.

- The necessary controls, which were absent within the CIO, were in place at JPMorgan's Investment Bank, which traded identical derivatives for profit.  ¶¶223-225; DX 1 at 6. Contrary to Company policy, the CIO used materially different marks than the Investment Bank – a fact the Senate Report identified as a "red flag."  ¶¶177-81;[39] and

- The manipulation of the CIO's VaR to conceal risk, using the model Dimon approved, was itself evidence of the lack of internal controls.  ¶¶134-41, 165-68, 290.[40]

Such allegations in the context of the Complaint are sufficient to give rise to a strong inference that Dimon was, at a minimum, reckless in certifying the effectiveness of JPMorgan's internal controls and the accuracy of its earnings report.  *See, e.g., Dobina v. Weatherford Int'l, Ltd.*, 909 F. Supp. 2d 228, 247-48 (S.D.N.Y. 2012) (CEO's "personal involvement," fact that "deficiencies [were] expressly raised," and that unit was uniquely "experiencing problems," held sufficient).

### 3.   Dimon Acted With Scienter In April 2012

In April 2012, in response to media reports outing the CIO's "London Whale" trades, Dimon helped orchestrate the Company's public response, which was designed to mislead investors by downplaying the risks in the CIO.  Dimon personally assured investors to assuage their concerns.  The Senate Report determined that Dimon's own statements were "fictions" made after he learned detailed information about the SCP's losses.  ¶¶23; 297-98, 303-04.

Defendants argue that Dimon's statements were "entirely consistent with what [Dimon and Braunstein] had been told internally" and that they therefore did not intentionally lie to

---

[39] Defendants argue that no inference can be drawn from the fact that the CIO and Investment Bank marked the same assets at different prices because the market was not "efficient."  Def. Br. 53-54.  This is wrong.  The Company policy requiring the same marks was, in fact, more important for securities that were not traded on an efficient market.  Further, Dimon admitted the assets were traded on exchanges with observable prices.  ¶222.

[40] These facts also establish that Defendant Braunstein acted with scienter in signing the 2011 Form 10-K and certifying the effectiveness of JPMorgan's internal controls.

investors.  Def. Br. 68-69.[41]  Defendants simply ignore the Senate Report's finding that Dimon

knew about the "complex and sizable [SCP], its sustained losses for three straight months, the

exponential increase in those losses during March, and the difficulty of exiting the [SCP]

positions."  ¶¶304, 327-30.  Before making his "tempest in a teapot" statement and providing

other assurances to investors, Dimon knew that:

- The SCP was a proprietary book of high-risk, illiquid credit derivatives.  ¶327(b-f);

- Over the first quarter of 2012, the SCP had tripled in size from $51 billion to $157 billion.  DX 1 at 259, n.1462;

- The SCP's surging VaR exceeded the VaR of the entire Investment Bank, and Dimon had approved the use of a new model designed to artificially lower it.  ¶123, 136;

- The SCP made directional bets that could generate hundreds of millions of dollars in profit or loss upon the occurrence of certain credit events.  ¶168;

- As of March 29, the CIO breached risk limits and advisories more than 330 times in three months, exceeding certain limits by over *1000*%.  ¶187.  On March 29 and April 10, breaches of the CIO's final two limits were reported to Dimon.  ¶¶162, 187;

- By the first quarter of 2012, the SCP positions were not accurately marked-to-market because they could not be unwound without incurring massive losses.  ¶196;

- The SCP represented over $150 billion in net notional exposure and its losses were already $1.2 billion (losing $415 million in just one day) and could reach $9 billion. ¶¶194-95; and

- In nearly every contemplated credit stress scenario, the SCP lost money, "amplifying" losses, not "hedging, offsetting, or providing stress loss protection against them."  ¶306.

Accordingly, before he joined the call to quell concerns about the "London Whale,"

Dimon knew that the SCP had incurred massive losses and would almost certainly continue to do

so.  Given his extensive knowledge about the proprietary trading in the CIO, the OCC's warning

---

[41] Defendants cite *Furher v. Ericsson LM Telephone Co.*, 363 Fed. App'x 763, 765 (2d Cir. 2009) to argue that the Court should not find scienter for statements made "in the context of an informal back-and-forth with analysts" (Def. Br. 68), but *Furher* does not stand for that proposition.  Rather, *Furher* holds that allegations based on "nothing more than the asserted inaccuracy of the defendants' statements" are insufficient.  *Furher*, 363 Fed. App'x at 765.  Here, Plaintiffs allege detailed facts concerning Defendants' knowledge as of the date of the call.

letter about the serious risk management deficiencies in the CIO, and the removal of standard risk management tools to facilitate high-risk trading, Dimon knew that the SCP was more like a hurricane gathering force than a "tempest in a teapot."  Such allegations plead scienter.[42]

**B.    BRAUNSTEIN**

**1.    The Complaint Alleges Particularized Facts Showing That Braunstein Acted With Scienter In 2010 And 2011**

The Task Force Report concluded that Braunstein "bears responsibility … for weaknesses in financial controls applicable to the [SCP] as well as for the CIO Finance organization's failure to have asked more questions or to have sought additional information about the evolution of the portfolio."   ¶337.   Braunstein himself admitted to the Senate Subcommittee that, "[a]s to specific investment decisions, I was certainly aware of the [SCP]." ¶338.[43]   Although these admissions are alone sufficient to show Braunstein's scienter, the Complaint alleges numerous facts establishing Braunstein's knowledge regarding the CIO's risk management void and the proprietary trading in the CIO.  For instance, as JPMorgan's Executive Vice President and CFO from June 2010 through the end of the Class Period, Braunstein received regular reports demonstrating that the CIO's VaR was "dominated" by the SCP's proprietary trading and alerting him to high levels of risk within the CIO.  ¶¶340-42.  Moreover, Braunstein knew that the SCP had generated an improbable 100% return on equity, the SCP had generated approximately 20% of JPMorgan's net income during the Class Period, and the CIO's traders were engaging in high-risk trading to accomplish these numbers.  ¶¶119-20; 146-55.

---

[42] *See IBEW Local, Inc.,* 2013 WL 1223844, at *13 (information known by senior management that contradicted statements made "as the walls closed in" evidenced scienter); *AIG,* 741 F. Supp. 2d at 533 (scienter alleged where defendants downplayed risks despite knowledge of risky assets and weak risk controls).

[43] Defendants suggest that Braunstein's knowledge of the SCP's trades did not give him knowledge that the description of the CIO as being "primarily" engaged in risk management was false.  Def. Br. 28.  This parallels Defendants' argument regarding the falsity of those statements, and fails with regard to scienter for the same reason: the SCP dominated the Company's VaR and constituted the single greatest risk to JPMorgan.  *See supra* at § I.A.1.

Plaintiffs also allege that Braunstein knew that the CIO lacked the basic risk management infrastructure and protocols to fulfill its represented risk management function.  ¶¶74-85.  In addition, Plaintiffs allege that:

- Given that Braunstein was responsible for the financial controls for the SCP, he knew or was at least reckless in not knowing that there were no risk limits for the SCP, nor was there any "meaningful effort to ensure that … [the] CIO was subject to appropriately rigorous risk and other limits," or that limits were updated "on a regular basis." ¶19.

- Braunstein also knew, or was reckless in not knowing, that the SCP had breached CIO-wide risk limits at least eight times, with one risk limit breach continuing for over seven weeks, exceeding the limit by as much as 50%, during the first half of 2011.  ¶126.

- Braunstein received the December 2010 Supervisory Letter from the OCC citing numerous weaknesses in the CIO's risk management protocols and procedures.  ¶107;

- Braunstein was aware of a 2010 report by a senior CIO executive of the need to establish a multi-billion dollar liquidity reserve for the CIO.  ¶¶111-20; and

- The Task Force Report confirmed that in December 2011 Braunstein was informed that unwinding just 35% of the SCP would result in losses of over $500 million, necessitating a reserve.  ¶153.  Thus, Braunstein knew that the SCP was not appropriately marked-to-market and that JPMorgan's financial results were misstated.

These facts, coupled with the admissions by Braunstein and JPMorgan, are more than sufficient to allege that Braunstein acted with scienter throughout the Class Period.

### 2.     The Complaint Alleges Particularized Facts Showing That Braunstein Acted With Scienter In 2012

Braunstein participated in the Company's April 13, 2012 conference call with analysts with full knowledge of the mounting losses in the SCP, having been told that those losses exceeded $1 billion and could reach $9 billion.  Braunstein nonetheless sought to quell investor concern by making a series of statements that the Senate Report determined were "not true" and "had no basis in fact."  ¶23.  The evidence of Braunstein's fraudulent intent in making those statements, and the other misrepresentations he made in 2012 leading up to that critical conference call, is overwhelming.  Defendants' arguments to the contrary parallel their

arguments regarding Dimon's scienter, and fail for the same reasons.

With respect to statements contained in the Company's 2011 Form 10-K regarding the descriptions of VaR, the CIO's function and JPMorgan's risk procedures, Braunstein knew these statements to be false when he signed that document because he knew that:

- The SCP was carrying hundreds of millions of dollars in losses that were not marked-to-market, and, by January 2012, reducing the size of the portfolio by just 25% would trigger losses of more than $516 million.  ¶¶119, 153-54;

- The SCP caused over 100 breaches of CIO risk limits and advisories, as well as breaches of firm-wide risk limits, including VaR.  ¶340;

- In violation of Company policy, JPMorgan fraudulently implemented a new VaR model specifically to manipulate the CIO's VaR and conceal the risk of the SCP.  ¶¶165-68; and

- The SCP took directional positions that could generate hundreds of millions of dollars in profit or loss upon the occurrence of certain credit events.  ¶168.

Moreover, prior to the April 13, 2012 conference call on which Braunstein assured investors that he was "very comfortable" with the SCP positions, Braunstein knew that the SCP's $150 billion net notional exposure had already caused losses of $1.2 billion, including a single-day loss of more than $400 million, and could lose $9 billion in total.  ¶¶194-95.  He also knew that the SCP would lose money in nearly every credit stress scenario contemplated.  ¶¶194-201. Like Dimon, Braunstein knew the following additional facts:

- During the first quarter of 2012, the SCP had tripled in size to $157 billion (DX 1 at 259, n. 1462) and was increasingly illiquid, prompting Braunstein to approve a request to increase the size and risk of the SCP to avoid disclosing losses.  ¶341(n);

- Hundreds of risk limits had been breached during the first quarter of 2012 alone, including every limit used to monitor the CIO and applied to the SCP.  ¶187;

- The SCP positions' size and illiquidity required a massive liquidity reserve.  ¶341(q); and

- The Company had deliberately withheld crucial and required information from the OCC about the CIO and the SCP's existence and activities.  ¶363.

In light of these allegations, Defendants' competing contention that Braunstein did not act with scienter because his public assurances were consistent with what he was "hearing internally" cannot be credited.  Def. Br. 72-73.  The only plausible inference that arises from Plaintiffs' allegations is that Braunstein intentionally lied to investors.

### C.    CAVANAGH

The Task Force Report concluded that the CFO – the position Cavanagh held at the start of the Class Period – was responsible for "weaknesses in financial controls applicable to the [SCP]."  ¶333.  As JPMorgan's CFO from 2004 to May 2010 and then as CEO of the Company's Treasury and Securities Services Business, Cavanagh actually received or had a duty to monitor internal reports and information that demonstrated the falsity of JPMorgan's SEC filings:

- Cavanagh was "responsible for approving [ ] risk limits on an ongoing basis," and thus was aware of the lack of effective risk limits and protocols at the CIO.  ¶¶; 74-85, 335(a);

- Cavanagh received regular reports of CIO risk limit violations, which alerted him to the spiraling risks of the CIO, in general, and the SCP, in particular.  ¶¶334-35;

- Cavanagh knew of at least two particular proprietary trading losses that were inconsistent with JPMorgan's public description of the CIO: a $1 billion loss on positions of Fannie Mae and Freddie Mac securities and a $300 million loss on foreign currency trades.  ¶¶88-89, 94, 335(d);[44]

- Cavanagh received regular reports demonstrating that the CIO's VaR was "dominated" by the SCP's proprietary trading, exceeded the VaR of the Investment Bank, and reflected extraordinary levels of risk within the CIO.  ¶¶123, 334, 362; and

- Cavanagh was aware of a 2010 report indicating the need for a multibillion dollar liquidity reserve for the CIO's trading activities.  ¶¶111-20, 335(f).

---

[44] Defendants claim that "knowledge of one loss on a single set of trades" is insufficient to establish Cavanagh's scienter.  Def. Br. 27-28.  At minimum, however, Cavanagh's knowledge of a $300 million loss on a single set of speculative trades is probative of scienter when viewed alongside the Complaint's myriad other scienter facts.

### D.   ZUBROW

As JPMorgan's CRO from November 2007 through January 2012 (¶41), who was responsible for reviewing and approving risk limits throughout the Company, Zubrow was intimately aware of the deficiencies in the CIO's risk controls.  ¶¶73-76.  In fact, JPMorgan condemned Zubrow in the Task Force Report, stating that he "bears significant responsibility for failures of the CIO Risk organization, including its infrastructure and personnel shortcomings, and inadequacies of its limits and controls on the [SCP]."  ¶354.  Although this admission alone is sufficient to establish his scienter, the following additional facts also establish that Zubrow acted with scienter when he signed the February 13, 2012 comment letter regarding the Volker Rule, and when he made statements in April 2012 (¶¶275-76, 297, 299-300, 303-13, 407):

- Zubrow knew (or was reckless in not knowing) that there were no risk limits for the SCP and that the CIO risk limits were not meaningfully reviewed between 2009 and 2011, that there was no formal CIO risk committee, that it had no charter and no membership, that it rarely met, and that he did not attend the few meetings it actually held.  ¶¶73-85;[45]

- Zubrow knew that the CIO lacked its own CRO.  When the Company belatedly installed a CRO in the CIO at the end of the Class Period, Zubrow's brother-in-law got that job, despite having no risk management experience.  ¶¶163-64;

- Throughout the Class Period, Zubrow received many of the same reports as Dimon and other Operating Committee members (¶¶121-26), including VaR reports and reports of risk limit breaches, which are discussed in § II.A.1, *supra*; ¶355;

- Zubrow was aware of hundreds of millions of dollars in losses the CIO incurred on proprietary trades in 2008 and 2010 (¶¶88-89; *see also* § I.C., *supra*);

- In December 2010, Zubrow received the OCC Supervisory Letter identifying the CIO's risk management deficiencies. (¶107);

- Direct reports, including Weiland, warned Zubrow about the risk associated with the CIO's proprietary trading and lack of controls.  ¶¶69-76, 121-27;

---

[45] Indeed, there is no doubt that Zubrow had access to CIO risk limit information (¶355) which is probative of scienter.  *See Novak,* 216 F.3d at 308-09 (holding that access to information is probative of scienter).

- Zubrow was aware of the implementation of the new CIO VaR model and that it was designed to artificially lower CIO VaR and end the CIO VaR breach. ¶¶166-68; and

- Zubrow knew the SCP served no hedging function and knew of the short-term, speculative nature of the CIO's trading. Drew informed him that the SCP had "been extremely profitable for the company … over the last several years" and had generated a "fourth quarter 400 million" dollar gain on a bankruptcy wager. ¶356(i).

Zubrow also served as JPMorgan's spokesperson to oppose the Volcker Rule's ban on proprietary trading. ¶¶41, 184. That ban would prohibit precisely the kind of trading that JPMorgan concealed in the CIO. With full knowledge of the SCP's secret proprietary trading, Zubrow signed the February comment letter that misrepresented the CIO's function and urged that credit derivatives be exempt from the Volcker Rule. Given the findings of the Senate Report that the Company had no documentation of any hedging achieved through the SCP, Zubrow had no basis for that representation. ¶¶99-102.

Nor can Defendants plausibly suggest that there was a "reasonable basis" (Def. Br. 75) for Zubrow's April 12 email advising Dimon and Braunstein to tell investors that the SCP trading "[a]ctivity was NOT short term trading" and "was part of LONG TERM hedging of the banks [sic] portfolio." ¶199. Zubrow knew when he sent that email that the SCP had the shortest time horizon of any CIO investment, had generated $2.4 billion in "total return" from 2007 to 2011, and consisted of enormous directional positions that were not hedges. ¶¶168, 358. Plaintiffs' allegations (¶¶354-59) are more than sufficient to plead scienter against Zubrow.

## E.   DREW

JPMorgan has admitted that Drew is responsible for the CIO trading debacle. Following disclosure of the CIO losses, the Company fired Drew and took the extraordinary step of clawing back two years of her compensation – over $20 million – because of her culpability in the fraud.

Drew was hand-selected by Dimon to implement and facilitate his "new vision" for the

CIO.  ¶347.  As JPMorgan's Chief Investment Officer, Drew was intimately aware of the CIO's activities, its true purpose and the lack of the represented risk management protocols.  Drew's written testimony to the Senate Subcommittee documents the numerous meetings, communications, reports and portfolio summaries on which she relied to stay informed about the CIO and its trading activities.  ¶345.  Indeed, it was Drew who spearheaded the April 2012 review of the SCP, wherein she authored and/or reviewed the same reports and communications as Dimon and Braunstein (¶348(p)), and was responsible for disseminating false information regarding the SCP.  Drew's scienter with respect to Defendants' April 2012 misrepresentations, which she made, drafted, approved and ratified, and which were publicly attributed to her (¶¶189, 297, 299-300, 303-13, 407), is supported by the following allegations:

- Together with Dimon, Drew directed the CIO's proprietary trading, which she knew did not mitigate risk, and staffed the CIO with traders who had no risk management experience and who were paid based on the profits they generated.  ¶¶60-62;

- Drew knew that the CIO lacked basic risk management infrastructure, such as a CRO, or formal risk committee, and disregarded warnings from Weiland regarding this lack of controls.  ¶¶77-85;

- Drew knew (or recklessly disregarded) that there were no risk limits for the SCP, and that the CIO risk limits were not reviewed between 2009 and 2011.  ¶¶73-85.  Drew removed the $20 million stop loss limits for individual trades.  ¶77;

- Drew was involved in the effort to manipulate the CIO VaR model and other risk metrics.  ¶¶134-45; 165-67.  For example, Drew approved the effort to "modify the model that [the CIO] used to calculate RWA for the [SCP], and delay any efforts to reduce RWA."  ¶142;

- Drew received the same regular reports received by the other Individual Defendants, including the daily VaR report.  ¶346;

- Drew knew of sizeable trades that did not hedge any risks and encouraged traders to "recreate" them to boost profits.  ¶¶91-94, 349(a);

- Drew evaded regulatory efforts to ensure that the CIO's trades fulfilled hedging functions by concealing the CIO's proprietary trading from regulators, claiming that such efforts "sought to destroy" JPMorgan and that improving the CIO's documentation on positions would take away "necessary flexibility" from the CIO.  ¶¶107-08; 348(h-i);

- In early 2010, Drew knew or recklessly disregarded that the SCP's positions were illiquid, but that JPMorgan failed to establish any liquidity reserve.  ¶¶114-15;

- In 2012, Drew approved the trading strategy to increase the SCP's size and risk so as to avoid disclosing its losses.  ¶¶142-45; 159; 196-97;

- Drew demoted Weiland after he tried to improve CIO risk controls, and hired Zubrow's brother-in-law as CRO to help her strategize on trades, even though he lacked risk management experience, had no experience trading the derivatives posing the largest risk to the CIO, and engaged in misconduct in his prior employment.  ¶¶163-64;

- Drew knew the SCP's positions were not marked-to-market based on reports she reviewed showing that unwinding 35% of the SCP in December 2011 would result in losses of over $500 million, and that by January 2012 a 25% reduction of the SCP would generate similar losses.  ¶¶153-54; and

- Drew participated in the CIO's mismarking of the SCP.  After being alerted to a $600-800 million "lag in P&L" representing unreported losses, Drew ordered an SCP trader to "tweak" the marks in order to get "an extra basis point" (¶¶176, 347-49)[46] and attempted to convince the Investment Bank to change its marks to conceal losses (¶¶177-78).

These allegations are more than sufficient to plead that Drew knew the April 2012 assurances about the CIO were false.  The notion that Drew's extensive knowledge of the CIO is negated because, as Defendants contend, it was a "busy week" before the April 13 call is nonsense.  Def. Br. 74.  Similarly, it is irrelevant whether, as Defendants contend, Drew did not have "complete information" because of the CIO's traders' "lack of candor."  Drew had more than enough information to know her representations were false.  Clearly, in clawing back two years of compensation, the Company did not believe that a "busy week" excused her conduct.[47]

## F.     JPMORGAN

As the Senate Report concluded, "JPMorgan [] misinformed investors, regulators, policymakers and the public about its [SCP] by [1] downplaying the portfolio's size, risk profile,

---

[46] Defendants' strained interpretations of the "P&L" and "tweak" emails (Def. Br. 52-53) are not credible, and Drew's understanding of them presents a factual dispute demanding discovery.  *See AIG*, 741 F. Supp. 2d at 532.

[47] *See, e.g., McIntire v. China MediaExpress Holdings, Inc.*, No. 11-804,  2013 WL 752954, at *16 (S.D.N.Y. Feb. 28, 2013) (resignations support scienter).

and losses; [2] describing it as the product of long-term investment decision-making to reduce risk and produce stress loss protection; and [3] claiming it was vetted by the bank's risk managers and was transparent to regulators, none of which was true." DX 1 at 16. JPMorgan's corporate scienter is pled in extraordinary detail. ¶¶360-66.

As an initial matter, because the Complaint "properly alleges scienter against [each Individual Defendant], it necessarily alleges scienter against [JPMorgan]." *City of Roseville*, 814 F. Supp. 2d at 420. Nothing more is required to plead corporate scienter. *See Teamsters Local,* 531 F.3d at 195 ("the most straightforward way to raise such an inference for a corporate defendant will be to plead it for an individual defendant").[48] Moreover, the importance of the CIO prevents the Company from disclaiming knowledge of the deficient risk controls and high-risk investments in the SCP that caused investors' losses. *See Winstar,* 2006 WL 473885, at *7.

The findings of the Company's regulators provide further evidence that JPMorgan acted to intentionally conceal the CIO's proprietary trading and losses. As admitted by the Task Force Report, JPMorgan avoided a "host of regulatory … limits" by hiding the SCP within the CIO. ¶110. Moreover, Braunstein admitted that regulators "did not get the detailed [SCP] positions regularly," leading the Senate Report to conclude that JPMorgan "had dodged OCC oversight of the [SCP] for years." ¶¶191-93, 308. The OCC concluded that it was "lied to" and "deceived" by JPMorgan regarding the SCP. ¶193. Finally, JPMorgan's restatement of $459 million of its first quarter 2012 earnings and admission that the Company had mismarked the SCP's positions

---

[48] *See Ambac,* 693 F. Supp. 2d at 265 ("Courts routinely impute to the corporation the intent of officers and directors acting within the scope of their authority."). Even if Plaintiffs did not allege scienter as to the Individual Defendants, the facts here are sufficient to show the Company's scienter. *See Teamsters Local*, 531 F.3d at 195.

to "avoid showing the full amount of the losses in the portfolio during the first quarter" (¶221)

demonstrates scienter.[49]

## III.   PLAINTIFFS HAVE PLED LOSS CAUSATION

Defendants' assertion that Plaintiffs fail to plead loss causation with respect to certain

claims is baseless.  "The pleading of loss causation – even for securities fraud claims – is

governed by Rule 8 notice pleading standards . . . ." *Bricklayers & Masons Local Union No. 5*

*Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 245 (S.D.N.Y. 2012).  Thus, a

"complaint need only provide the defendant with 'some indication of the loss and the causal

connection that the plaintiff has in mind.'"  *Id.* (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S.

336, 347 (2005)).  Plaintiffs easily meet this standard.  ¶¶367-85 (detailing disclosures between

May 10 and May 21, 2012 that caused JPMorgan's stock price to decline substantially).  Indeed,

Dimon admitted that the SCP's trading loss "did affect our shareholders, yes."  ¶219.

Defendants assert that because JPMorgan did not restate its first-quarter 2012 financial

results or admit to material weaknesses in its internal controls until after the end of the Class

Period, Plaintiffs have not pled loss causation with respect to three statements: (1) the

Company's representation in its 2011 Form 10-K that its internal controls were effective (¶289);

(2) Dimon's and Braunstein's certifications in its 2011 Form 10-K attesting to the effectiveness

of its internal controls (¶291); and (3) JPMorgan's first-quarter 2012 financial results (¶301).

Def Br. at 54.  This argument fails because "neither a restatement of financial statements nor an

admission of wrongdoing is necessary to establish loss causation."  *Bear Stearns*, 763 F. Supp.

2d at 520; *see also Winstar*, 2006 WL 473885, at *14.  A plaintiff may plead loss causation with

---

[49] Furthermore, the Company's compliance department was alerted by traders within the CIO and Drew herself that materially inconsistent marks were being used by the CIO and the Investment Bank for the exact same positions – a clear violation of Company policy and a significant red flag that senior management ignored.  ¶¶223, 364.

evidence that "the alleged misstatement conceals a condition or event which then occurs and causes the plaintiff's loss" – it is "the materialization of the undisclosed condition or event that causes the loss." *Hunt v. Enzo Biochem, Inc*, 530 F. Supp. 2d 580, 594 (S.D.N.Y. 2008); *accord Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005). "[F]or an event to qualify as a materialization of the risk, it need only disclose part of the truth that was previously concealed by the fraud [and need] not identify specific company statements as false or misleading." *In re Vivendi Universal, S.A. Sec. Litig.,* 634 F. Supp. 2d 352, 364 (S.D.N.Y. 2009).

Here, Plaintiffs allege that the CIO's multi-billion-dollar losses disclosed between May 10 and 21, 2012 were the materialization of the previously concealed risk embedded in the CIO's proprietary trading portfolios and the risk created by the lack of risk controls in the CIO. ¶¶370-85. The three statements Defendants challenge all concealed the true risks of JPMorgan's investments, the true state of its internal controls, and the insufficiency of its reserves for trading losses. ¶¶289, 291, 301.[50]

The fact that JPMorgan's stock increased the day the restatement was announced is equally unavailing. Plaintiffs allege that the truth had emerged *before* the restatement, and so the artificial inflation had already been removed from JPMorgan's stock by the time the Company restated its financial results. Under these circumstances, the price increase is irrelevant.[51]

## IV.   PLAINTIFFS HAVE STATED SECTION 20(a) CLAIMS

Defendants assert that Plaintiffs have failed to plead § 20(a) claims because Plaintiffs purportedly have failed to plead (1) a primary § 10(b) violation; (2) that Defendants Drew and

---

[50] *See, e.g., In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 307 (S.D.N.Y. 2005) (that "extent of the fraud was not revealed … until [later] … is immaterial where" allegedly concealed risk "materialized during that time"); *Lehman*, 799 F. Supp. 2d at 306.

[51] *See, e.g., In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 289 (S.D.N.Y. 2008) (lack of reaction meant negative news already absorbed); *Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 231 (S.D.N.Y. 2009) (same); *In re Bradley Pharms., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 829 (D.N.J. 2006) (same).

Zubrow controlled JPMorgan; and (3) that any Individual Defendant was a "culpable participant" in the fraud.  Defendants' arguments should be rejected.

*First*, as set forth at length above, Plaintiffs have pled a primary violation of § 10(b).

*Second*, pleading that a defendant is a control person under § 20(a) is governed by Rule 8. *See, e.g., In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 517 (S.D.N.Y. 2005).  And even with notice pleading, "[w]hether a person is a 'controlling person' is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss." *Katz v. Image Innovations Holdings, Inc.*, 542 F. Supp. 2d 269, 276 (S.D.N.Y. 2008).  Here, Plaintiffs have alleged that Drew and Zubrow controlled JPMorgan with respect to its violations of § 10(b).  ¶¶40-41, 188-89.  Drew's control over the CIO, which lies at the heart of the false and misleading statements at issue, is beyond dispute.  Plaintiffs allege that as the CIO's top executive, Drew oversaw and managed all aspects of the CIO, including its investments and trading (¶40), and was directly involved in transforming it into a proprietary trading desk.  ¶¶60-61, 77, 92.  Zubrow was responsible for setting, approving, and reviewing the Company's risk management protocols and ensuring a proper infrastructure was in place. ¶¶41, 354-55.  Moreover, as pled, both Drew and Zubrow prepared or approved materially false and misleading statements concerning the CIO and its risk management practices.[52]  Plaintiffs' allegations establish that Drew and Zubrow controlled JPMorgan with respect to all of the alleged false and misleading statements concerning the CIO (Drew) and JPMorgan's risk management practices (Zubrow).  *See, e.g., Sgalambo v. McKenzie*,

---

[52] *See, e.g.,* ¶188 (Drew and Zubrow crafted, reviewed, and approved false "talking points"); ¶199 (Drew and Zubrow developed and approved statements portraying CIO as risk mitigation unit); ¶¶275-76 (Zubrow signed Dodd-Frank letter); ¶¶299-300 (Drew and Zubrow approved statements spokesperson made to press).  Defendants' argument that Plaintiffs' allegations show only that Drew and Zubrow had "influence" over the April 13 statements is flatly contradicted by the Complaint. ¶188 (Drew and Zubrow "crafted," "reviewed, approved and ratified" the statements).  *In re Alstom SA Securities Litigation*, 406 F. Supp. 2d 433 (S.D.N.Y. 2005) – the only case Defendants cite for the proposition that Plaintiffs pled only "influence" over the April statements – did not dismiss a Section 20(a) claim against any defendant alleged to have "crafted," "reviewed, approved and ratified" a false statement.

739 F. Supp. 2d 453, 473-75, 486-87 (S.D.N.Y. 2010) (allegations that defendants were senior officers and had power to direct company's management and policies satisfy "control" element of control-person liability); *Ambac*, 693 F. Supp. 2d at 274 (allegations that CEO and CFO "participated in writing or reviewing" statements plead control); *Fannie Mae*, 742 F. Supp. 2d at 416 (control pled for executive responsible for risk controls and setting loss reserves).

*Finally*, because Plaintiffs have pled that each Individual Defendant acted with scienter, Plaintiffs have pled that each was a "culpable participant" in the fraud. *See, e.g., Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 284 (S.D.N.Y. 2012) (scienter allegations satisfy culpable-participation); *Citigroup*, 753 F. Supp. 2d at 249 (same); *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, 381 F. Supp. 2d 192, 235 (S.D.N.Y. 2004) (same).

Even if Plaintiffs' allegations pertaining to the Individual Defendants' scienter were deemed insufficient, the Complaint pleads that each Defendant was "in some meaningful sense, a culpable participant in the controlled person's fraud." *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 572 (S.D.N.Y. 2011). Regardless of whether a Section 20(a) Defendant has made a statement, Plaintiffs may plead that he or she had "actual control" over the statements when they were made or "otherwise played some discernible role in the making of those statements." *Id*. The Complaint pleads (*e.g.*, ¶¶346-50, 354-58), "that the defendant possessed the power to direct or cause the direction of the management and policies." *Alstom*, 406 F. Supp. 2d at 486.[53]

## CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss the Second Amended Consolidated Class Action Complaint should be denied in its entirety.

---

[53] *See In re CIT Group Inc. Securities. Litigation,* No. 08-6613, 2010 WL 2365846, at *1 (S.D.N.Y. June 10, 2010).

Dated:  August 12, 2013

Respectfully Submitted,

| **GRANT & EISENHOFER P.A.** | **BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP** | **KESSLER TOPAZ MELTZER & CHECK LLP** |
|---|---|---|
| s/  Jeffrey A. Almeida | s/ Steven B. Singer | s/  David Kessler |
| Jay W. Eisenhofer | Steven B. Singer | David Kessler |
| Daniel L. Berger | Avi Josefson | Andrew L. Zivitz |
| Jeffrey A. Almeida | Jai Chandrasekhar | Matthew L. Mustokoff |
| 485 Lexington Avenue | Michael D. Blatchley | Johnston de F. Whitman, Jr. |
| New York, NY 10017 | 1285 Avenue of the Americas | 280 King of Prussia Road |
| Telephone:  (646) 722-8505 | New York, NY 10019 | Radnor, PA 19087 |
| Facsimile:  (302) 622-7004 | Telephone: (212) 554-1400 | Telephone:  (610) 667-7706 |
| jeisenhofer@gelaw.com | Facsimile: (212) 554-1444 | Facsimile:  (610) 667-7056 |
| dberger@gelaw.com | steven@blbglaw.com | dkessler@ktmc.com |
| jalmeida@gelaw.com | avi@blbglaw.com | azivitz@ktmc.com |
| | jai@blbglaw.com | mmustokoff@ktmc.com |
| | michaelb@blbglaw.com | |

*Co-Lead Counsel for Lead Plaintiffs and the Class*

*Additional Counsel:*

| **MICHAEL DEWINE ATTORNEY GENERAL OF OHIO** | **STOLL STOLL BERNE LOKTING & SHLACHTER P.C.** |
|---|---|
| *For Ohio Public Employees Retirement System, State Teachers Retirement System of Ohio, and School Employees Retirement System of Ohio* | Keith Ketterling |
| | Scott Shorr |
| | 209 Southwest Oak Street |
| | Portland, OR 97204 |
| | Telephone: (503) 227-1600 |
| | Facsimile: (503) 227-6840 |
| | KKetterling@stollberne.com |
| | SShorr@stollberne.com |
| | |
| | *Special Assistant Attorneys General and Counsel the State of Oregon by and through the Oregon State Treasurer on behalf of the Common School Fund and, together with the Oregon Public Employee Retirement Board, on behalf of the Oregon Public Employee Retirement Fund* |