**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE JPMORGAN CHASE & CO. SECURITIES LITIGATION | ) Master File No. 1:12-cv-03852-GBD ) CLASS ACTION ) **PUBLIC VERSION** ) |

**MEMORANDUM OF LAW IN SUPPORT OF**
**LEAD PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**
<u>**AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL**</u>

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ................................................................................... ii

PRELIMINARY STATEMENT .............................................................................. 1

STATEMENT OF FACTS ....................................................................................... 3

    A.    SUMMARY OF LEAD PLAINTIFFS' CLAIMS ................................................. 3

    B.    THE PROPOSED CLASS REPRESENTATIVES ............................................... 9

ARGUMENT ......................................................................................................... 10

I.    Standards On A Motion For Class Certification ............................................ 10

    A.    RULE 23(A) IS SATISFIED ......................................................................... 11

        1.    Numerosity Is Established ..................................................... 11

        2.    Commonality Is Established .................................................. 11

        3.    Typicality Is Established........................................................ 12

        4.    Adequacy Is Established ........................................................ 13

    B.    RULE 23(B)(3) IS SATISFIED .................................................................... 15

        1.    Common Questions Of Law And Fact Predominate ............... 15

            a.    Lead Plaintiffs And The Class Are Entitled To A Presumption Of Reliance ............................................. 16

            b.    Tens Of Millions Of JPMorgan Shares Were Traded Each Day During The Class Period ............................... 17

            c.    JPMorgan Common Stock Was Thoroughly Covered By Analysts ............................................................... 18

            d.    There Were Numerous Market Makers For JPMorgan Common Stock............................................................. 18

            e.    JPMorgan Was Eligible To File Form S-3 Registration Statements ................................................................. 19

            f.    JPMorgan's Stock Price Reacted To Unexpected News ............. 19

            g.    The *Krogman* Factors Are Also Satisfied.................................... 20

            h.    Damages................................................................................. 22

        2.    Superiority Is Established ..................................................... 24

    C.    LEAD COUNSEL SHOULD BE APPOINTED CLASS COUNSEL ..................... 25

CONCLUSION...................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Alstom SA Sec. Litig.*,
 253 F.R.D. 266 (S.D.N.Y. 2008) ........................................................................18

*Amchem Prods., Inc. v. Windsor*,
 521 U.S. 591 (1997) ...........................................................................................15

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
 133 S. Ct. 1184 (2013) ...............................................................................10, 16

*Basic Inc. v. Levinson*,
 485 U.S. 224 (1988) .............................................................................16, 17, 22, 23

*Billhofer v. Flamel Techs, S.A.*,
 281 F.R.D. 150 (S.D.N.Y. 2012) ........................................................................20

*Brown v. Kelly*,
 609 F.3d 467 (2d Cir. 2010) ...............................................................................15

*Cammer v. Bloom*,
 711 F. Supp. 1264 (D.N.J. 1989) ................................................................. *passim*

*In re Celestica Inc. Sec. Litig.*,
 No. 07-cv-0312-GBD, 2014 WL 4160216 (S.D.N.Y. Aug. 20, 2014)...................13

*City of Livonia Emps.' Ret. Sys. v. Wyeth*,
 284 F.R.D. 173 (S.D.N.Y. 2012) ........................................................................12

*Comcast Corp. v. Behrend*,
 133 S. Ct. 1426 (2013) ................................................................................22, 23, 24

*Consol. Rail Corp. v. Town of Hyde Park*,
 47 F.3d 473 (2d Cir. 1995)..................................................................................11

*In re Diamond Foods, Inc. Sec. Litig.*,
 295 F.R.D. 240 (N.D. Cal. 2013)........................................................................24

*Dodona I, LLC v. Goldman, Sachs & Co.*,
 296 F.R.D. 261 (S.D.N.Y. 2014) ........................................................................22

*Dura Pharms., Inc. v. Broudo*,
 544 U.S. 336 (2005)............................................................................................15

*Enea v. Bloomberg, L.P.*,
No. 12-CV-4656-GBD, 2014 WL 1044027 (S.D.N.Y. Mar. 17, 2014) ......................11, 13, 14

*Erica P. John Fund, Inc. v. Halliburton Co.*,
131 S. Ct. 2179 (2011) ...........................................................................................................10

*In re EVCI Career Colls. Holding Corp. Sec. Litig.*,
No. 05-cv-10240-CM, 2007 WL 2230177 (S.D.N.Y. July 27, 2007) ....................................13

*FindWhat Investor Grp. v. Findwhat.com*,
658 F.3d 1282 (11th Cir. 2011) ............................................................................................22

*Fogarazzo v. Lehman Bros., Inc.*,
232 F.R.D. 176 (S.D.N.Y. 2005) ...........................................................................................12

*Glauser v. EVCI Center Colls. Holding Corp.*,
236 F.R.D. 184 (S.D.N.Y. 2006) ...........................................................................................14

*In re Groupon, Inc. Sec. Litig.*,
12-CV-2450, 2014 WL 5245387 (N.D. Ill. Sep. 23, 2014) ...................................................23

*Halliburton Co. v. Erica P. John Fund, Inc.*,
134 S. Ct. 2398 (2014)..........................................................................................16, 17, 22, 23

*In re Heckmann Sec. Litig.*,
No. 10-378, 2013 WL 2456104 (D. Del. June 6, 2013) ........................................................23

*IBEW Local 98 Pension Fund v. Best Buy Co., Inc.*,
No. 11-CV-429-DWF/FLN, 2014 WL 4746195 (D. Minn. Aug. 6, 2014) ............................24

*In re IndyMac Mortgage-Backed Sec. Litig.*,
286 F.R.D. 226 (S.D.N.Y. 2012) ...........................................................................................12

*In re IPO Sec. Litig*,
260 F.R.D. 81 (S.D.N.Y. 2009) .............................................................................................21

*Jacob v. Duane Reade, Inc.*,
289 F.R.D. 408 (S.D.N.Y. 2013) ...........................................................................................13

*Krogman v. Sterritt*,
202 F.R.D. 467 (N.D. Tex. 2001) ....................................................................................20, 21

*Lapin v. Goldman Sachs & Co.*,
254 F.R.D. 168 (S.D.N.Y. 2008) .................................................................................14, 24, 25

*McIntire v. China MediaExpress Holdings, Inc.*,
11-cv-0804, 2014 WL 4049896 (S.D.N.Y. Aug. 15, 2014) .............................................20, 21

*In re Moody's Corp Sec. Litig.*,
    274 F.R.D. 480 (S.D.N.Y. 2011) ........................................................................19

*Myers v. Hertz Corp.*,
    624 F.3d 537(2d Cir. 2010)................................................................................10

*In re Parmalat Sec. Litig.*,
    04-MD-0653, 2008 WL 3895539 (S.D.N.Y. Aug. 21, 2008)..........................15, 25

*In re Pfizer Inc. Sec. Litig.*,
    282 F.R.D. 38 (S.D.N.Y. 2012) ...........................................14, 15, 16, 25

*Roach v. T.L. Cannon Corp.*,
    No. 13-3070-cv, 2015 WL 528125 (2d Cir. Feb. 10, 2015) ..................................23

*Robidoux v. Celani*,
    987 F.2d 931 (2d Cir. 1993)................................................................................13

*In re Sanofi-Aventis Sec. Litig.*,
    293 F.R.D. 449 (S.D.N.Y. 2013) ........................................................................16

*In re St. Jude Med. Inc. Sec. Litig.*,
    10–cv–0851, 2014 WL 6908434 (D. Minn. Dec. 8, 2014)..................................24

*Sykes v. Mel S. Harris & Assocs., LLC*,
    13-2742-cv, 2015 U.S. App. LEXIS 2057 (2d Cir. Feb. 10, 2015) .......................23

*Wagner v. Barrick Gold Corp*,
    251 F.R.D. 112 (S.D.N.Y. 2008) ........................................................................19

*Wallace v. IntraLinks*,
    302 F.R.D. 310 (S.D.N.Y. 2014) ........................................................................24

*In re Winstar Commc'ns Sec. Litig.*,
    290 F.R.D. 437 (S.D.N.Y. 2013) .................................................... *passim*

**Statutes/Rules**

Fed. R. Civ. P. 23 .................................................................................... *passim*

**Other Authorities**

17 C.F.R. §239.13 ...............................................................................................19

H.R. Rep. No. 104-369 (1995) (Conf. Rep.), *reprinted in* 1995 U.S.C.C.A.N. 730 ....................14

S. Rep. No. 104-98 (1995) (Conf. Rep.), *reprinted in* 1995 U.S.C.C.A.N. 679............................14

The Arkansas Teacher Retirement System ("Arkansas Teachers"), Ohio Public Employees Retirement System ("Ohio PERS"), the State of Oregon by and through the Oregon State Treasurer on behalf of the Common School Fund and, together with the Oregon Public Employee Retirement Board, on behalf of the Oregon Public Employee Retirement Fund ("Oregon"), and Sjunde AP-Fonden ("AP7") (collectively, "Lead Plaintiffs") respectfully submit this memorandum of law in support of their motion pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) to certify this action as a class action and to appoint Lead Plaintiffs as Class Representatives, and, pursuant to Fed. R. Civ. P. 23(g), to appoint Bernstein Litowitz Berger & Grossmann LLP ("BLBG"), Grant & Eisenhofer P.A. ("G&E"), and Kessler Topaz Meltzer & Check LLP ("KTMC") as Class Counsel.

## PRELIMINARY STATEMENT

Lead Plaintiffs request certification of this action as a class action on behalf of a class (the "Class") consisting of all persons or entities, other than those excluded by definition in the [Proposed] Third Amended Consolidated Class Action Complaint (the "TAC"), filed January 16, 2015 (ECF No. 126 Ex. A), who purchased or otherwise acquired JPMorgan Chase & Co. ("JPMorgan" or the "Company") common stock from February 13, 2012 through May 21, 2012 (the "Class Period"), and who were injured thereby.  In the alternative, if the Court does not grant Lead Plaintiffs' pending Motion for Leave to Amend (ECF No. 125), Lead Plaintiffs request certification of the shorter class period from April 13, 2012 through May 21, 2012 (the "Alternative Class Period").

Certification under Rule 23 is appropriate if:  "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

Fed. R. Civ. P. 23(a).  Additionally, "common" issues of law or fact must "predominate over any questions affecting only individual members," and a class action must be "superior" to other methods of adjudication.  Fed. R. Civ. P. 23(b)(3).  The proposed Class satisfies these elements.

*First*, with approximately 3.8 billion shares of JPMorgan common stock outstanding throughout the Class Period, during which millions of shares traded weekly, there are likely thousands, if not hundreds of thousands, of Class members.

*Second*, this action involves many common issues of law and fact, readily satisfying Rule 23's commonality requirement.  As the TAC details, questions of law and fact common to the Class include whether:  (1) Defendants'[1] statements on February 13, 2012 and April 13, 2012 misrepresented or omitted material facts concerning the CIO's trading activities, and the then-existing and growing risks associated with and losses generated by the CIO's trading activities; (2) Defendants knew or recklessly failed to discover that their statements were false and misleading; (3) the price of JPMorgan's common stock was inflated as a result of Defendants' fraudulent statements and omissions; and (4) the Class suffered damages.

*Third*, Lead Plaintiffs' claims are typical of the claims of the Class because, like all other Class Members*,* they purchased JPMorgan common stock at prices artificially inflated by Defendants' false and misleading statements and omissions.  When Defendants' fraud was revealed, the price of JPMorgan's common stock declined, injuring Lead Plaintiffs and the Class. The injuries suffered by Lead Plaintiffs and the Class arise from exactly the same misconduct.

*Fourth*, Lead Plaintiffs are institutional investors that will adequately protect Class's interests.  No antagonism exists between Lead Plaintiffs and the Class, and Lead Plaintiffs' chosen counsel are among the most experienced securities class action law firms in the country.

---

[1] "Defendants" are JPMorgan, James Dimon, and Douglas L. Braunstein.

This action also satisfies the predominance requirement of Rule 23(b)(3).  Namely, common issues of fact and law (*e.g.*, falsity, materiality, and scienter) are subject to common proof and plainly predominate over any individual issues.  Further, the accompanying Report on Market Efficiency of Steven P. Feinstein, Ph.D., CFA attached to the Declaration of Daniel L. Berger ("Berger Decl.") as Ex. B (the "Feinstein Rpt.") establishes that common issues predominate with respect to the element of reliance.  Professor Feinstein concludes that the market for JPMorgan common stock was efficient during both the Class Period and the Alternative Class Period.  Feinstein Rpt. ¶¶1-3; 16-18.  As a result, the Class may invoke the "fraud-on-the-market" presumption of reliance.  Professor Feinstein also concludes that damages may be reliably assessed on a Class-wide basis through a common and widely accepted event study methodology that will quantify the artificial inflation per share in JPMorgan's common stock during the Class Period.  *See id.* at ¶¶149-50.

Finally, the "superiority" factor under Rule 23(b)(3) is satisfied because:  (1) thousands of investors suffered damages as a result of Defendants' misconduct; (2) it is unlikely that investors who lost relatively small amounts of money would file individual actions due to litigation costs; (3) it is desirable to hear all such claims in one court; and (4) there is no difficulty in maintaining this case as a class action.

## STATEMENT OF FACTS

### A.   SUMMARY OF LEAD PLAINTIFFS' CLAIMS

This case arises from Defendants' materially false and misleading statements and omissions concerning JPMorgan's proprietary trading activities, and its exposure to risks and losses as a result of the Company's trading in speculative, highly volatile derivative instruments, with management's full knowledge and approval.  JPMorgan's Synthetic Credit Portfolio ("SCP") was an enormous portfolio of exotic and illiquid derivatives concealed within the

Company's purported risk-management unit, the Chief Investment Office ("CIO").  Defendants secretly used the SCP to engage in hedge-fund-like trading in an effort to produce large, short-term profits based on their speculative views of the credit markets.  In early 2012, as the SCP began to incur hundreds of millions of dollars in losses and rumors of its massive derivative positions began to surface, Defendants assured investors, the market and the public – not to mention the government agencies with responsibility for overseeing the financial industry – that the SCP's trades were hedges that actually *improved* the bank's risk profile.  Defendants further assured the public that the situation was completely under control (in part by publishing doctored Value-at-Risk ("VaR") metrics for the CIO that greatly understated the unit's and the Company's risk).  Eventually, however, the falsity of Defendants' statements and the true magnitude of the SCP's failed bets were revealed, causing JPMorgan's common stock price to plummet, and inflicting heavy losses on Lead Plaintiffs and other Class members.

Before and throughout the Class Period, the SCP traded complex derivatives, unconnected to any exposures that the Company faced elsewhere, at high volumes in pursuit of short-term gains.  For example, in the fall of 2011, the SCP placed an enormous short bet on a high-yield index tracking credit default swaps, building a position that would pay off only if there were surprise defaults of companies on the index before December 20, 2011.  ¶¶86-87; 247-248.  When American Airlines unexpectedly declared bankruptcy on November 29, 2011, just weeks before the position was due to expire, the SCP reaped a profit of approximately $500 million.  *Id.*  ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

At the same time that JPMorgan was using the SCP to place huge speculative wagers with federally insured deposits, Congress was taking steps to outlaw this very activity. Before the start of the Class Period, Congress passed legislation requiring regulators to enact the Volcker Rule, a ban on proprietary trading by commercial banks. ¶¶237-44. The Volcker Rule represented a major threat to JPMorgan – and the trading profits it sought to generate through the SCP – because the exact type of derivatives trading in which JPMorgan engaged through the SCP would be banned by the Volcker Rule. After passage of the Volcker Rule, and during the period provided by regulators to allow for public comment on the Rule's implementation, JPMorgan initiated a coordinated campaign to downplay the impact that the Volcker Rule would have on its business, and denied that it engaged in the type of trading that the Volcker Rule targeted. ¶¶240-43. Specifically, on February 13, 2012, in an interview on *Fox Business News*, Dimon insisted that JPMorgan was "fine" with the proposed Volcker Rule's ban on proprietary trading, and falsely stated that the Company did not "make huge bets." ¶243.

At the time Dimon made this false and misleading statement on February 13, 2012, he and Defendant Braunstein were fully aware that JPMorgan, through its CIO, made "huge bets" with federally insured deposits. ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

The SCP's bets were huge by the time Dimon made his February 13, 2012 statement, and grew thereafter, breaching additional risk limits, and rapidly souring.  By the end of March, the SCP had breached all risk limits purportedly used by the Company to monitor the portfolio, with CIO risk limits and advisories being breached *more than 330 times in just three months*.  ¶182.

By the beginning of April 2012, the SCP had amassed positions so large that they drew the attention of the financial community and the press.  On April 5 and 6, 2012,  the media began to report on rumors circulating among derivatives traders about huge trading positions amassed by an unknown JPMorgan trader, dubbed the "London Whale."  ¶¶183-85.   In response, Defendants undertook a campaign to mislead the investing public about the nature and risks of the SCP trades, describing the SCP "as a risk-reducing hedge that was transparent to the bank's regulators, even though neither characterization was accurate."  MTD Op. (ECF 103) at 13.

Specifically, on JPMorgan's April 13, 2012 earnings call, Dimon and Braunstein made numerous statements misrepresenting the nature and purpose of the CIO's trading activities, the scope of the then-existing and growing risk generated by the SCP, and potential losses created by the CIO's synthetic credit trading.  ¶¶196-98.   Dimon notoriously claimed that public concern about the CIO's trading activities was baseless, amounting to "a complete tempest in a teapot." ¶198.  Likewise, Braunstein falsely claimed that:  (1) the CIO trades were "part of managing [a] stress loss position," and not proprietary bets; (2) the CIO's decisions were "made on a very long-term basis" and "done to keep the Company effectively balanced from a risk standpoint;" and (3) JPMorgan was "very comfortable with [its] positions as they are held today."  ¶196.  The Senate Subcommittee that investigated the trading scandal found that these statements were "fictions irreconcilable with the bank's obligation to provide material information to its investors in an accurate manner."  *Id.*

By the time of JPMorgan's quarterly earnings conference call on April 13, 2012, Defendants knew that, contrary to their public statements on that call, the SCP's losses were substantial and growing.  Specifically, Defendants knew that the losses associated with the London Whale trades had already reached $1.2 billion, over $400 million of which occurred on a single trading day, and Dimon and others had been told that the losses could reach as high as $9 billion and exceed $1 billion in the second quarter of 2012 alone.  ¶¶189-92.  Defendants also knew that compared to the prior quarter, the SCP had tripled in net notional size from approximately $51 billion to $157 billion, and that the SCP's trading positions were so large and illiquid that the portfolio's largest position would take 10-15 days of selling at 100% of the total market trading volume to exit.  In other words, these Defendants knew, before the April 13, 2012 conference call, that JPMorgan could not exit or reduce many of the SCP's trading positions without suffering severe additional losses.  ¶¶189-92; 284.

Also on April 13, 2012, Defendants made false and misleading statements about JPMorgan's VaR.  Specifically, in a Form 8-K released that day, JPMorgan reported CIO VaR of $67 million for the first quarter of 2012, a *decrease* from the prior quarter, notwithstanding the fact that the SCP had since grown exponentially in size and risk.  ¶281.  Defendants' April 13, 2012 statements concerning JPMorgan's first quarter VaR were false and misleading because Defendants failed to disclose that JPMorgan had secretly utilized a new VaR model applicable only to the CIO in late January 2012, with Dimon's approval, in order to artificially lower the CIO's VaR.  If measured using the appropriate model implemented in prior quarters, the CIO's VaR was actually $129 million, twice as large as the reported figure.  ¶¶281-82; 293.

Less than a month later, on May 10, 2012, after the markets closed, JPMorgan convened an emergency analyst conference call, on which it disclosed that it was reducing its previously-

issued guidance of $200 million in net income for the Corporate segment (which included the CIO) to an $800 million loss due to a $2 billion trading loss on the SCP. ¶350. Dimon also stated that JPMorgan would restate its previously reported VaR from $67 million to $129 million, evincing that previously reported VaR had understated the CIO's risk by at least 50%. *Id.* He did not, however, fully disclose the risks associated with the SCP's positions, and assured investors that the fallout was manageable and would not affect JPMorgan's ability to carry out a $15 billion share buyback program announced by the Company in March 2012. ¶¶351-52.

As a result of these disclosures, the price of JPMorgan's common stock plummeted nearly 10%, from $40.74 on the close of May 10 to $36.96 on the close of May 11. ¶354. Following these disclosures, analysts and the financial press immediately recognized that these losses resulted from the exact kind of big proprietary bets that the Volcker Rule was intended to prevent, and Dimon's prior assurances that JPMorgan did not make "huge bets" were lies. ¶ 275.

JPMorgan's stock price continued to fall after additional disclosures concerning trading losses, the SCP's risks, and pending government investigations, reaching a price of $33.93 per share by the close on May 17. ¶¶357-59. Finally, on May 21, Dimon announced that JPMorgan was halting its share buyback program as a result of the CIO's failed bets, causing the stock to fall to $32.51 per share. ¶¶360-62. In total, these disclosures erased $8.23 per share (or over 20% of the value) from the price of JPMorgan common stock before the first disclosure on May 10, 2012, *eliminating over $31.4 billion in shareholder wealth in just 10 days*. ¶362.

### B. THE PROPOSED CLASS REPRESENTATIVES

Each of the Lead Plaintiffs is an institutional investor pension fund that purchased JPMorgan common stock during the Class Period at artificially inflated prices and suffered substantial losses when the truth about the matters alleged in the TAC was revealed to the market. *See* ECF No. 16-1. An authorized representative of each Lead Plaintiff has certified that

Arkansas Teachers, Ohio PERS, Oregon and AP7:  (1) reviewed complaints filed in this matter; (2) did not purchase securities at the direction of counsel, or in order to participate in any private securities action; (3) is willing to serve as a representative party on behalf of the Class; and (4) will not accept any payment for serving as a representative party for the Class beyond its respective *pro rata* share of any recovery, except as ordered or approved by the court.  *See id.*

## ARGUMENT

## I.   STANDARDS ON A MOTION FOR CLASS CERTIFICATION

To certify a class, a district court must find by a preponderance of the evidence, that the proposed class action satisfies the requirements of Rule 23.  *See In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 442 (S.D.N.Y. 2013) (citing *Myers v. Hertz Corp.*, 624 F.3d 537, 554 (2d Cir. 2010)).  Although the Rule 23 inquiry may overlap with the merits to some degree, courts should not engage in "free-ranging merits inquiries at the certification stage."  *Id.* (quoting *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013)).  Further, a plaintiff is not required to prove loss causation or materiality at the class certification stage.  *See Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2185-86 (2011) ("*Halliburton I*"); *Amgen Inc.*, 133 S. Ct. at 1197.

Rule 23(a) sets four threshold requirements for class certification:  (1) the class must be so numerous that joinder of all members is impractical ("numerosity"); (2) there must be questions of law or fact common to the class ("commonality"); (3) the claims of the representative parties must be typical of the claims of the class ("typicality"); and (4) the representative parties must fairly and adequately protect the interests of the class ("adequacy"). Fed. R. Civ. P. 23(a).

Once a putative class representative has shown that its proposed class meets these four requirements, the court then must determine whether the action can be maintained under one of

the three subsections of Rule 23(b).  Here, Lead Plaintiffs seek class certification under Rule 23(b)(3) because "questions of law or fact common to class members predominate over any questions affecting only individual members" and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

### A.   RULE 23(A) IS SATISFIED

#### 1.   Numerosity Is Established

"Numerosity is presumed when a class consists of forty or more plaintiffs."  *Winstar*, 290 F.R.D. at 442 (citing *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995)). "In securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period."  *Id.* at 442-43 (quoting *In re Bank of Am. Corp. Sec. Litig.*, 281 F.R.D. 134, 138 (S.D.N.Y. 2012)).  The exact number of class members need not be known, so long as the class can be ascertained by objective methods.  *See id.* at 443.

JPMorgan's Form 10-K for 2012 reported that, as of January 31, 2013, there were 3.8 billion shares of JPMorgan common stock outstanding and 217,055 holders of record of JPMorgan common stock.  *See* Berger Decl., Ex. A.  Moreover, before and throughout the Class Period, JPMorgan's common stock was actively traded on the New York Stock Exchange ("NYSE") with an average daily trading volume in the tens of millions of shares.  Feinstein Rpt. ¶¶45-47.  The Class easily satisfies the numerosity requirement.

#### 2.   Commonality Is Established

Rule 23(a)(2) requires a showing that common issues of law or fact affect all class members.  The commonality requirement does not, however, require that all class members' claims are identical, only that there is some "unifying thread" among the claims warranting class treatment.  *Enea v. Bloomberg, L.P.*, No. 12-CV-4656-GBD, 2014 WL 1044027, at *3 (S.D.N.Y.

Mar. 17, 2014) (quoting *Meyer v. USTA*, No. 11-cv-6268, 2013 WL 1777556, at *4 (S.D.N.Y. Apr. 25, 2013)).  "The commonality requirement has been applied permissively in securities fraud litigation.  In general, where putative class members have been injured by similar material misrepresentations and omissions, the commonality requirement is satisfied."  *Fogarazzo v. Lehman Bros., Inc.*, 232 F.R.D. 176, 180 (S.D.N.Y. 2005).[2]

Here, all Class members were injured as a result of the same misrepresentations and omissions by Defendants.  The TAC alleges many questions of law and fact common to the Class, including but not limited to whether:  (1) Defendants' statements on February 13, 2012 and April 13, 2012 misrepresented or omitted material facts concerning the CIO's trading activities and the scope of the then-existing and growing risks generated by the CIO's trading; (2) Defendants acted knowingly or recklessly in issuing such statements; and (3) Defendants' conduct has resulted in damages to the Class and in what amount.  ¶376.  Each of the foregoing questions focuses on Defendants' conduct and its Class-wide impact, making it subject to common proof.  Rule 23(a)(2) is therefore satisfied.

### 3.    Typicality Is Established

Rule 23(a)(3)'s typicality requirement is met by demonstrating that "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability."  *Winstar*, 290 F.R.D. at 443 (quoting *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009)).[3]  "It is axiomatic that

---

[2] *See also, e.g., Winstar*, 290 F.R.D. at 443 ("Lead Plaintiffs claim that the same misstatement and the same irregular accounting practices caused injury to all shareholders and bondholders by artificially inflating the price of Winstar's securities. Such a common course of conduct routinely satisfies the commonality requirement."); *In re IndyMac Mortgage-Backed Sec. Litig.*, 286 F.R.D. 226, 233 (S.D.N.Y. 2012) (the commonality requirement is "plainly satisfied in a securities case where the alleged misrepresentations in the prospectus relate to all the investors.").

[3] The class representatives must also demonstrate that they have standing to assert the claims at issue.  *See City of Livonia Emps.' Ret. Sys. v. Wyeth*, 284 F.R.D. 173, 178 (S.D.N.Y. 2012).  A class representative has standing where it has purchased the same securities as absent class members.  *See id.*  As demonstrated by the Lead Plaintiffs' certifications already on file, the Lead Plaintiffs satisfy this requirement.  *See* ECF No. 16-1.

'[w]hen it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met[.]'" *Jacob v. Duane Reade, Inc.*, 289 F.R.D. 408, 417 (S.D.N.Y. 2013) (quoting *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993)).  "Courts have emphasized that the typicality requirement is not demanding[.]"  *In re EVCI Career Colls. Holding Corp. Sec. Litig.*, No. 05-cv-10240-CM, 2007 WL 2230177, at *13 (S.D.N.Y. July 27, 2007).  Moreover, "minor variations in the fact patterns underlying individual claims" will not defeat class certification, so long as the same unlawful conduct was directed at or affected both the named plaintiff and the Class.  *Robidoux*, 987 F.2d at 937.

Here, Lead Plaintiffs' claims are typical of the claims of the Class because the claims all arise out of Defendants' material misrepresentations and omissions during the Class Period, and Lead Plaintiffs suffered damages when the price of JPMorgan common stock declined.  ¶¶345-63.  The proof necessary for Lead Plaintiffs to prevail on their individual claims is exactly the same that is required to prove the claims of the rest of the Class.  Lead Plaintiffs' claims are therefore typical of the claims of the Class.  *See Duane Reade*, 289 F.R.D. at 417.

### 4.    Adequacy Is Established

"Courts generally interpret [the adequacy] requirement to mean that the named plaintiffs must be similarly situated to the proposed class in terms of interests and injury, and that they may have no interests averse to those of the putative class."  *In re Celestica Inc. Sec. Litig.*, No. 07-cv-0312-GBD, 2014 WL 4160216, at *5 n.3 (S.D.N.Y. Aug. 20, 2014).  Furthermore, "[p]art and parcel of the adequacy inquiry is the requirement that proposed counsel be able to 'fairly and adequately represent the interests of the class.'"  *Enea*, 2014 WL 1044027, at *6.  "This Circuit has interpreted this requirement to mean that class counsel must be 'qualified, experienced and

generally able to conduct the litigation.'"  *Id.* (quoting *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 291 (2d Cir. 1992)).

Lead Plaintiffs are adequate representatives because each purchased JPMorgan common stock during the Class Period, and was injured by the same wrongful conduct as the Class. Accordingly, Lead Plaintiffs have every reason to prosecute this action vigorously.  Further, Lead Plaintiffs understand their roles and obligations as Class representatives, and have diligently prosecuted this action for more than two years.  Through counsel, Lead Plaintiffs have: (1) investigated and filed a consolidated complaint and two amended complaints; (2) successfully opposed Defendants' motion to dismiss; (3) retained and consulted experts; (4) evaluated approximately ten million pages of documents; and (5) conducted third-party discovery.  Berger Decl. ¶4.  Lead Plaintiffs also have maintained frequent contact with counsel, receiving regular status reports concerning this action.  Furthermore, Lead Plaintiffs have assisted in responding to discovery requests and intend to continue to perform similar activities throughout this action, including participating in discovery, trial preparation, and any settlement discussions.  These facts support a finding of adequacy.  *See In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 49 (S.D.N.Y. 2012) (similar facts supported adequacy); *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 176 (S.D.N.Y. 2008) (same).

Additionally, as institutional investors, Lead Plaintiffs are especially well-qualified to serve as Class representatives.  The Private Securities Litigation Reform Act of 1995 was intended "to increase the likelihood that institutional investors will serve as lead plaintiffs."  *See* H.R. Rep. No. 104-369 (1995) (Conf. Rep.), *reprinted in* 1995 U.S.C.C.A.N. 730, 733; S. Rep. No. 104-98 (1995) (Conf. Rep.), *reprinted in* 1995 U.S.C.C.A.N. 679, 690; *see also Glauser v. EVCI Center Colls. Holding Corp.*, 236 F.R.D. 184, 188 (S.D.N.Y. 2006).

Finally, Lead Plaintiffs have protected the interests of the Class by retaining BLBG, G&E and KTMC as Class Counsel.  Lead Plaintiffs respectfully submit that proposed counsel satisfy the adequacy requirement of Rule 23(a)(4), as Lead Counsel are among the most experienced securities class action law firms in the country.  *See* BLBG Resume; G&E Resume; and KTMC Resume, ECF Nos. 16-6, 16-7 and 16-8, respectively.

**B.    RULE 23(B)(3) IS SATISFIED**

**1.    Common Questions Of Law And Fact Predominate**

"[T]he predominance requirement is met if the plaintiff can establish that the issues in the class action that are subject to generalized proof and thus applicable to the class as a whole . . . predominate over those issues that are subject only to individualized proof." *Brown v. Kelly*, 609 F.3d 467, 483 (2d Cir. 2010).  The Supreme Court has noted that "[p]redominance is a test readily met in certain cases alleging . . . securities fraud[.]" *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).

Here, common issues of law and fact predominate over any individual issues.  To recover under Section 10(b), all Class members must establish:  (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.  *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).  It is axiomatic that all such elements, "other than reliance in cases not premised on the fraud-on-the-market presumption, are subject to class-wide proof." *Pfizer*, 282 F.R.D at 52; *see also In re Parmalat Sec. Litig.*, 04-MD-0653, 2008 WL 3895539, at *8 (S.D.N.Y. Aug. 21, 2008) (same).  Lead Plaintiffs can establish reliance on a class-wide basis through the fraud-on-the-market presumption.  Moreover, damages will be determined on a class-wide basis using a widely-accepted "event study" methodology to measure the amount of artificial inflation per share attributable to Defendants' fraudulent conduct on each day of the Class Period.

a.   **Lead Plaintiffs And The Class Are Entitled To A Presumption Of Reliance**

"Reliance is 'the causal link between the defendant's misconduct and the plaintiff's decision to buy or sell securities.'" *Pfizer*, 282 F.R.D. at 52 (quoting *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003)). "In a case premised on fraud on the market, a proposed class is entitled to a presumption of reliance if the security at issue traded in an efficient market – that is, a market that 'reflects all publicly available information, and, hence, any material misrepresentations.'" *Id.* (quoting *In re SCOR Holding (Switz.) AG Litig.*, 537 F. Supp. 2d 556, 574 (S.D.N.Y.2008)). As discussed below, JPMorgan stock traded in an efficient market during the Class Period, and the Class is entitled to a presumption of reliance. *See id.*

The Supreme Court has recently and conclusively determined that the fraud-on-the-market presumption of reliance, as originally articulated in *Basic Inc. v. Levinson*, 485 U.S. 224, 241-47 (1988), continues to apply in securities class actions, and when the presumption is established, the element of reliance is subject to class-wide proof. *See Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2408 (2014) (*"Halliburton II"*). To establish the *Basic* presumption, a plaintiff must show that: "(1) the alleged misrepresentations were publicly known, (2) they were material, (3) the stock traded in an efficient market, and (4) the plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed." *Halliburton II*, 134 S. Ct. at 2413. The second element, materiality, need not be proven at the class certification stage, since the materiality of the alleged misrepresentations is itself a question common to the class to be determined at summary judgment or trial. *See Amgen,* 133 S. Ct. at 1196-97; *see also In re Sanofi-Aventis Sec. Litig.*, 293 F.R.D. 449, 457 (S.D.N.Y. 2013) ("[T]he Supreme Court squarely held that plaintiffs need not prove materiality

at the class certification stage."). Lead Plaintiffs are also not required to prove that the alleged misrepresentations had an impact on the stock price to invoke the *Basic* presumption. *See Halliburton II*, 134 S. Ct. at 2414.

Lead Plaintiffs easily satisfy the prerequisites to invoking the fraud-on-the-market presumption. *First*, each alleged misrepresentation in this case was a public statement addressed to investors and the marketplace. *Second*, each Lead Plaintiff purchased JPMorgan common stock between the time when at least one of these misrepresentations was made and May 21, 2012, the end of the Class Period. *Finally*, there can be no doubt that the market for JPMorgan common stock was efficient during the Class Period. The seminal judicial decision outlining the features of an efficient market is *Cammer v. Bloom*, 711 F. Supp. 1264, 1276 (D.N.J. 1989).[4] Under *Cammer* and its progeny, courts consider the following factors when assessing market efficiency: (1) a large weekly trading volume; (2) the existence of a significant number of analyst reports; (3) the existence of market makers and arbitrageurs in the security; (4) eligibility to file an S-3 registration statement; and (5) reasonably prompt movement of the stock price caused by unexpected corporate events or financial releases. *See Cammer*, 711 F. Supp. at 1286-87. As set forth in Professor Feinstein's Report and discussed below, Lead Plaintiffs have established each *Cammer* factor, confirming that JPMorgan common stock traded on an efficient market during the Class Period and Alternative Class Period. *See* Feinstein Rpt. ¶¶33-38; 45-66.

> **b.    Tens Of Millions Of JPMorgan Shares Were Traded Each Day During The Class Period**

"Average weekly trading volume of 2% or more of outstanding securities justifies a 'strong presumption' of an efficient market for that security." *Winstar*, 290 F.R.D. at 447

---

[4] "The Second Circuit has not adopted a test for the market efficiency of stocks or bonds, but has noted that use of the factors enumerated in *Cammer* . . . may be appropriately used as analytical tools to guide the efficiency inquiry." *Winstar*, 290 F.R.D. at 446 (internal quotations omitted) (citing *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 204-11 (2d Cir. 2008)).

(quoting *Cammer*, 711 F. Supp. at 1286).   During the Class Period, an average of 39.9 million

JPMorgan shares changed hands daily, and the average weekly trading volume was 199.4 million

shares, or **5.2**% of shares outstanding.   Feinstein Rpt. ¶¶45-47.   This heavy trading strongly

supports the conclusion that the market for JPMorgan common stock was efficient during the

Class Period.[5]

### c. JPMorgan Common Stock Was Thoroughly Covered By Analysts

"The existence of a number of analysts who report on a security supports a finding of

market efficiency because it permits an inference that financial statements relating to a security

are closely watched by investment professionals, who in turn inject their views on the company

and the security into the market."   *Winstar*, 290 F.R.D. at 446 (citing *Bombardier*, 546 F.3d at

205).   During both the Class Period and the Alternative Class Period:  (1) at least 33 different

analyst firms covered JPMorgan; and (2) at least 1,369 major institutional investors (many of

which employed their own financial analysts) owned JPMorgan common stock.   Feinstein Rpt.

¶¶48-54.   Courts have held that substantial holdings by institutional investors support a finding

of market efficiency.   *See, e.g., In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y.

2008).   Accordingly, this *Cammer* factor supports a finding of market efficiency.

### d. There Were Numerous Market Makers For JPMorgan Common Stock

The third *Cammer* factor, the number of market makers and arbitrageurs, is primarily

relevant to stocks traded over the counter or on NASDAQ.   *See* Feinstein Rpt. ¶¶57; 60.

JPMorgan's common shares, however, traded on the NYSE, which is generally acknowledged to

---

[5] During the Alternative Class Period, the average weekly trading volume was 246.5 million shares, or 6.5% of shares outstanding (Feinstein Rpt. ¶46 n.15), thus, this *Cammer* factor is easily satisfied both during the Class Period and the shorter Alternative Class Period.

be an efficient market.  *See id.* at ¶¶58-62.  If a "security is listed on the NYSE . . . or a similar national market, the market for that security is presumed to be efficient."  *Wagner v. Barrick Gold Corp*, 251 F.R.D. 112, 119 (S.D.N.Y. 2008) (internal quotation marks and citation omitted); *see also In re Moody's Corp Sec. Litig.*, 274 F.R.D. 480, 489 n.3 (S.D.N.Y. 2011) ("[T]he NYSE is a paradigmatic efficient market.").  This *Cammer* factor is therefore satisfied.

### e.      JPMorgan Was Eligible To File Form S-3 Registration Statements

A company is eligible to file a Form S-3 registration statement if it has filed SEC reports for twelve consecutive months and possesses a market capitalization of at least $75 million.  *See* 17 C.F.R. §239.13.  "The ability to file this form indicates that the company is easily able to issue new securities."  *Winstar*, 290 F.R.D. at 447.  JPMorgan satisfied the conditions for S-3 registration eligibility throughout the entire Class Period.  Feinstein Rpt. ¶¶63-66.

### f.      JPMorgan's Stock Price Reacted To Unexpected News

Finally, in analyzing the fifth *Cammer* factor, Professor Feinstein conducted an event study to examine the causal relationship between the announcement of new, Company-specific news and a response in the price of JPMorgan common stock.   Feinstein Rpt. ¶¶79-144. Statistical analysis determines how much of that stock price response can be explained by market and peer group factors rather than company-specific information.  The portion of the stock price change that cannot be attributed to market and peer-group factors is called the "residual return." *Id.* at ¶87.  If the residual return over a particular event period is statistically significant, this indicates that the stock price movement was caused by company-specific information.  *Id.* at ¶88. A cause-and-effect relationship between new company-specific information and the reaction in the stock price is evidence of market efficiency.  *Id.*

Here, Professor Feinstein first examined the alleged corrective disclosure dates.  *Id*. at ¶¶93-128.  This analysis determined that JPMorgan's common stock price experienced a highly statistically significant price movement on each of the dates where Lead Plaintiffs allege new JPMorgan-specific information was released to the market.  *Id*. at ¶¶116-17; 121-22; 125-26. Professor Feinstein next performed two other statistical tests, an F-test and an Ansari-Bradley test, to compare more generally the behavior of the price of JPMorgan common stock on earnings and guidance announcement dates to all other dates in the examination period (which includes the Class Period), to determine whether the stock price reacts to the greater flow of Company-specific information that transpires on earnings and guidance dates.  *Id*. at ¶¶129-44. Through these analyses, Professor Feinstein's event study analysis demonstrates market efficiency during the Class Period and Alternative Class Period.

### g.    The *Krogman* Factors Are Also Satisfied

The court in *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001) identified three additional factors relevant to determining market efficiency: (1) the company's market capitalization; (2) the bid-ask spreads for stock sales; and (3) the public float.  Some courts have utilized the *Krogman* factors along with the *Cammer* factors in assessing market efficiency.[6]

*Market Capitalization*[7] – During the Class Period, JPMorgan's market capitalization averaged $158.7 billion, making it larger than 90% of all other publicly traded companies in the U.S.[8]  Feinstein Rpt. ¶¶68-69.  *Compare, e.g., McIntire*, 2014 WL 4049896, at *12 (market

---

[6] *See, e.g., McIntire v. China MediaExpress Holdings, Inc.*, 11-cv-0804, 2014 WL 4049896, at *12-13 (S.D.N.Y. Aug. 15, 2014); *Billhofer v. Flamel Techs, S.A.*, 281 F.R.D. 150, 160 (S.D.N.Y. 2012).

[7] Market capitalization is an indicator of market efficiency because investors have greater incentive to invest in more highly capitalized corporations, and such companies tend to be more well-known, and closely followed.  *See Krogman*, 202 F.R.D. at 478; Feinstein Rpt. ¶41.

[8] During the Alternative Class Period, JPMorgan's market capitalization averaged $155.2 billion.  Feinstein Rpt. ¶68 n.25.

capitalization of $585 million supported market efficiency); *In re IPO Sec. Litig.*, 260 F.R.D. 81, 102-03 (S.D.N.Y. 2009) (market capitalizations above the median supported market efficiency).

*Bid-Ask Spread*[9] – During the Class Period, the average bid-ask spread for JPMorgan common stock was only 0.02%.  Feinstein Rpt. ¶¶73-78.  By contrast, the average month-end bid-ask spread for all stocks during this time in the Center for Research in Security Prices ("CRSP") database was 0.7%.  In dollar terms, JPMorgan's bid-ask spread during the Class Period was $0.01 per share, versus $0.07 per share for all stocks in the CRSP database.  *Id.*[10] *Compare, e.g., McIntire*, 2014 WL 4049896, at *12 (bid-ask spread of 0.27% was "indicative of an efficient market"); *IPO*, 260 F.R.D. at 103 (bid-ask spreads below the median indicated an efficient market).

*Float*[11] – During the Class Period JPMorgan's common stock float represented $157.2 billion, with 99% of the Company's shares held by outsiders.[12]  Feinstein Rpt. ¶¶70-72. *Compare, e.g., McIntire*, 2014 WL 4049896, at *12 (finding insider holdings between 57% and 69% of the total shares outstanding to be consistent with market efficiency).

All of the *Cammer* and *Krogman* factors support a finding that the market for JPMorgan common stock was efficient during both the full Class Period and the Alternative Class Period. Thus, class-wide reliance is presumed by the fraud-on-the-market doctrine.

---

[9] The "bid-ask spread" is the difference between the prices at which investors are willing to buy shares and current stockholders are willing to sell, with a low bid-ask spread indicating a more efficient market.  *See Krogman*, 202 F.R.D. at 478; Feinstein Rpt. ¶43.

[10] During the Alternative Class Period, JPMorgan's bid-ask spread was also 0.02% and $0.01 per share. Feinstein Rpt. ¶¶75 n.30; 77 n.33.

[11] A stock's float is the number of shares outstanding excluding shares held by insiders and affiliated corporate entities.  A higher float indicates greater market efficiency.  *See Krogman*, 202 F.R.D. at 478; Feinstein Rpt. ¶42.

[12] During the Alternative Class Period, JPMorgan's common stock float was $153.8 billion.  Feinstein Rpt. ¶70 n.27.

**h.       Damages**

Courts routinely hold that damages in securities cases may be demonstrated on a class-wide basis through use of an event study, which measures the dollar impact of company-specific information alleged to be a corrective disclosure on the issuer's stock price and, thus, quantifies the artificial inflation per share attributable to defendants' misstatements.  *See FindWhat Investor Grp. v. Findwhat.com,* 658 F.3d 1282, 1313 & n.31 (11th Cir. 2011) ("[E]vent studies are a "common method' of establishing loss causation, 'used routinely in the academic literature to determine whether the release of particular information has a significant effect on a company's stock price'…. The methodology of event studies has been sustained by many circuits.").  Lead Plaintiffs' expert here will use the same, well-accepted methodology to calculate damages on a Class-wide basis in this case.

Because the event study method of computing damages is so closely tied to the Class-wide theory of liability, the Supreme Court's decision in *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433-35 (2013) is inapposite.  *Comcast* was an antitrust case, and has no bearing in the context of a securities fraud class action where plaintiffs invoke the *Basic* presumption of reliance.  Indeed, in securities cases, the existence of an efficient market that continuously updates and publishes the prices at which buyers and sellers uniformly transact obviates the need for the kind of guesswork about individual damages suffered by *Comcast*'s antitrust plaintiffs. *See Dodona I, LLC v. Goldman, Sachs & Co.*, 296 F.R.D. 261, 270-71 (S.D.N.Y. 2014) (*Comcast* not a concern where plaintiff's expert has opined that "damages to each of the Class members can be calculated in a formulaic manner").  For this reason, in *Halliburton II*, the Supreme Court expressly found that the predominance inquiry in *Comcast* was satisfied in

securities cases by meeting the elements set forth in *Basic*,[13] thereby rejecting Halliburton's

argument that *Basic* should be overturned because it could not be reconciled with *Comcast*.  *See*

134 S. Ct. at 2412.  Subsequent to *Halliburton II*, courts have recognized that *Comcast* "is

inapposite in a securities fraud class action such as this."  *In re Groupon, Inc. Sec. Litig.*, 12-CV-

2450, 2014 WL 5245387, at *2 (N.D. Ill. Sep. 23, 2014).[14]

Even if the Court were to find that *Comcast* applies to securities class actions after

*Halliburton II* (which it should not), Lead Plaintiffs' damages methodology easily satisfies

*Comcast*.  The Second Circuit has made clear in two recent decisions that *Comcast*'s holding is

narrow, and "[a]ll that is required at class certification is that 'the plaintiffs must be able to show

that their damages stemmed from the defendant's actions that created the liability.'"  *Sykes v.*

*Mel S. Harris & Assocs., LLC*, 13-2742-cv, 2015 U.S. App. LEXIS 2057, *40 (2d Cir. Feb. 10,

2015) (citing *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013)).  *Comcast* does

not mandate that there be *no* individualized damages issue to warrant Rule 23(b)(3) certification

(*see id.* at *22), nor does it require "a finding that damages are capable of measurement on a

classwide basis."  *Roach v. T.L. Cannon Corp.,* No. 13-3070-cv, 2015 WL 528125, at *1 (2d Cir.

Feb. 10, 2015).  *Comcast* merely held "that a model for determining classwide damages . . . must

actually measure damages that result from the class's asserted theory of injury."  *Id.* at *5.  That

is precisely what the event study methodology does here.

Professor Feinstein has opined that damages can be readily calculated in this action by

using the generally accepted event-study methodology of the same kind discussed above with

---

[13] As Justice Roberts noted, the *Basic* presumption does not impermissibly eliminate the predominance requirement but, rather, "establishes that a plaintiff satisfies that burden by proving the prerequisites for invoking the presumption–namely, publicity, materiality, market efficiency, and market timing."  134 S. Ct. at 2412.

[14] *See also In re Heckmann Sec. Litig.,*, No. 10-378, 2013 WL 2456104, at *14 (D. Del. June 6, 2013) ("[P]laintiff correctly points out that while *Comcast* addresses class action certification, it was not in regard to a securities fraud litigation, which have generally been certified for class status.").

respect to market efficiency, which ties Lead Plaintiffs' damages calculation to their theory of injury.  Feinstein Rpt. ¶¶149-50.  In those securities class actions where *Comcast* is addressed, courts have routinely held that securities plaintiffs can satisfy *Comcast* by showing that damages can be calculated via an event study.  *See, e.g., Wallace v. IntraLinks*, 302 F.R.D. 310, 318 (S.D.N.Y. 2014)  ("Plaintiff's proposed determination of damages by event study appears to be a workable methodology of determining damages on a class-wide basis that conforms to its theory of liability, thus meeting the requirements of Comcast[.]").[15]  Thus, *Comcast* presents no barrier to class certification here.

### 2.    Superiority Is Established

Rule 23(b)(3) identifies four factors that courts should consider in determining whether a class action is superior to other methods of adjudication:  (1) the interests of members of the class in "individually controlling the prosecution or defense of separate actions"; (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (4) the difficulties likely to be encountered in the management of a class action.  Here, each of these factors supports a finding that superiority is established.  Lead Plaintiffs seek to represent a Class consisting of a large number of geographically-dispersed JPMorgan common stock purchasers whose individual damages are likely small enough to render individual litigation prohibitively expensive.   Given these circumstances, the Class members have little interest in asserting separate claims.  *See Lapin,* 254 F.R.D. at 187.

---

[15] *See also, In re Diamond Foods, Inc. Sec. Litig.*, 295 F.R.D. 240, 251-52 (N.D. Cal. 2013) (finding *Comcast* satisfied where plaintiffs provided an event study analyzing the impact of corrective disclosures on the share price, and an expert affidavit that individual damages will be calculated using a similar event study analysis); *IBEW Local 98 Pension Fund v. Best Buy Co., Inc.*, No. 11-CV-429-DWF/FLN, 2014 WL 4746195, at *7 (D. Minn. Aug. 6, 2014) (finding that *Comcast* was satisfied where plaintiffs' expert "performed an event study using methodology for the quantification of damages to show that damages are capable of calculation on a class-wide basis"); *In re St. Jude Med. Inc. Sec. Litig.*, 10–cv–0851, 2014 WL 6908434, at *8-9 (D. Minn. Dec. 8, 2014) (same).

Concentrating this litigation in a single forum has numerous benefits, including eliminating the risk of inconsistent adjudication and promoting the fair and efficient use of the judicial system. Multiple lawsuits, on the other hand, would be costly and inefficient. *See id*. Finally, domestic securities class actions generally raise no unusual manageability issues. Nor does this one. *See, e.g., In re Parmalat*, 2008 WL 3895539, at *11 n.95 (noting that denial of class certification on manageability grounds is "disfavored") (quotation omitted). Accordingly, superiority is established.

### C.   LEAD COUNSEL SHOULD BE APPOINTED CLASS COUNSEL

Fed. R. Civ. P. 23(g) requires a court to appoint class counsel when certifying a class action. As detailed above, and as the Court is aware, Lead Counsel have already done substantial work in investigating and prosecuting claims in this action, are experienced in handling complex litigation, especially of the type asserted in this action, and have extensive knowledge of the applicable securities laws. Finally, Lead Counsel have devoted considerable resources to this action. These facts all support appointing BLBG, G&E and KTMC as Class Counsel. *See* Fed. R. Civ. P. 23(g); *In re Pfizer*, 282 F.R.D. at 47 (appointing class counsel that had "devoted considerable resources to this case since it was first filed, and has effectively protected the interests of Plaintiffs and the putative class.").

### CONCLUSION

For the foregoing reasons, the Class should be certified, Lead Plaintiffs should be appointed Class Representatives, and BLBG, G&E, and KTMC should be appointed Class Counsel.

Dated:  February 13, 2015

Respectfully Submitted,

**GRANT & EISENHOFER P.A.**

s/  Jeffrey A. Almeida
Jay W. Eisenhofer
Daniel L. Berger
Jeffrey A. Almeida
485 Lexington Avenue
New York, NY 10017
Telephone:  (646) 722-8505
Facsimile:  (302) 622-7004
jeisenhofer@gelaw.com
dberger@gelaw.com
jalmeida@gelaw.com

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

s/ Salvatore Graziano
Salvatore Graziano
John Rizio-Hamilton
John Uslaner
Jai Chandrasekhar
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
salvatore@blbglaw.com
johnr@blbglaw.com
jonu@blbglaw.com
jai@blbglaw.com

**KESSLER TOPAZ MELTZER & CHECK LLP**

s/  David Kessler
David Kessler
Andrew L. Zivitz
Matthew L. Mustokoff
Johnston de F. Whitman, Jr.
280 King of Prussia Road
Radnor, PA 19087
Telephone:  (610) 667-7706
Facsimile:  (610) 667-7056
dkessler@ktmc.com
azivitz@ktmc.com
mmustokoff@ktmc.com
jwhitman@ktmc.com

*Co-Lead Counsel for Lead Plaintiffs and the Class*

**STOLL STOLL BERNE LOKTING & SHLACHTER P.C.**
Keith Ketterling
Scott Shorr
209 Southwest Oak Street
Portland, OR 97204
Telephone: (503) 227-1600
Facsimile: (503) 227-6840
KKetterling@stollberne.com
SShorr@stollberne.com

*Special Assistant Attorneys General
and Counsel to the State of Oregon by and
through the Oregon State Treasurer on
behalf of the Common School Fund and,
together with the Oregon Public Employee
Retirement Board, on behalf of the Oregon
Public Employee Retirement Fund*

26