USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: SEP 29 2015

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                              :

IN RE JPMORGAN CHASE & CO.          :           ORDER
SECURITIES LITIGATION                :     12 Civ. 03852 (GBD)

                              :

                              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GEORGE B. DANIELS, United States District Judge:

Plaintiffs Arkansas Teachers Retirement System ("Arkansas Teachers"), Ohio Public Employees Retirement System, the State of Oregon by and through the Oregon State Treasurer on behalf of the Common School Fund, and, together with the Oregon Public Employee Retirement Board, on behalf of the Oregon Public Employee Retirement Fund (collectively, "Plaintiffs") bring this action against Defendants JPMorgan Chase & Co. ("JPMorgan"), James Dimon, and Douglas Braunstein (collectively, "Defendants"). Plaintiffs assert two claims: (1) Count One alleges securities fraud against all Defendants under § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) ("§ 10(b)") and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), and (2) Count Two alleges control person liability against Dimon and Braunstein under § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). Pursuant to Federal Rule of Civil Procedure 23 ("Rule 23"), Plaintiffs now seek to certify a class of all who purchased the common stock of JPMorgan between April 13, 2012 and May 21, 2012 and were damaged thereby ("Proposed Class").[1] (Pls.' Mot. for Class

---

[1] In a previous decision, this Court dismissed all claims based on statements made before April 13, 2012. *In re JPMorgan Chase & Co. Sec. Litig.*, No. 12 Civ. 03852, 2014 WL 1297446, at *6 n.3 (S.D.N.Y. Mar. 31, 2014). Plaintiffs filed a motion for leave to amend their Second Amended Consolidated Class Action Complaint ("SAC") pursuant to Federal Rule of Civil Procedure 15(a) on January 16, 2015. (Lead Pls.' Not. of Mot. and Mot. for Leave to Amend, Jan. 16, 2015, ECF. No. 125; *see also* SAC,

Certification ("Mot. for Class Cert."), dated Feb. 13, 2015, ECF No. 131). Plaintiffs also move

pursuant to Rule 23(g) for this Court to appoint them as class representatives and to appoint

Bernstein Litowitz Berger & Grossmann LLP, Grant & Eisenhofer P.A., and Kessler Topaz

Meltzer & Check, LLP (collectively, "Proposed Class Counsel") as Class Counsel. (Mot for

Class Cert. 3; Mot. for Class Certification Oral Argument, dated Sep. 10, 2015, Tr. ("Tr.") 2:15–

21, ECF No. 188.) Defendants oppose the motion.

The Proposed Class satisfies all of the requirements of Rule 23(a) and the relevant

requirements of Rule 23(b). The Class is subject to adjustment or decertification if warranted as

facts develop. Lead Counsel have already done much work investigating and pursuing the claims

in this action, are experienced in handling such matters, are knowledgeable of the relevant law,

and have committed significant resources to this case. *See* Fed. R. Civ. P. 23(g)(1)(A).

Therefore, the Proposed Class Counsel satisfy the relevant requirements of Rule 23(g).

Plaintiffs' motion for certification of the Proposed Class, appointment as class representatives,

and appointment of Proposed Class Counsel is therefore GRANTED.

## I.  BACKGROUND

This Court more fully described the background of this case in a previous opinion, *In re*

*JPMorgan Chase & Co. Securities Litigation*, No. 12 Civ. 03852, 2014 WL 1297446, at *1–4

(S.D.N.Y. Mar. 31, 2014), incorporated herein by reference. Briefly stated, Plaintiffs' action

arises from JPMorgan's purported misrepresentations about its Chief Investment Office ("CIO"),

the unit responsible for managing the synthetic credit portfolio ("SCP"), which lost at least $6.2

billion as a result of the so-called "London Whale" trades executed by traders in JPMorgan's

---

ECF No. 61.) This Court denied that motion on May 28, 2015. (Order, May 28, 2015, ECF No. 170.)
Therefore, the SAC remains the operative complaint, and Plaintiffs seek certification of the class period
from April 13, 2012 through May 21, 2012. (*See* Mem. of Law in Supp. of Lead Pls.' Mot. for Class

London Office. *Id.* at *1. Plaintiffs allege that Defendants made false representations about CIO's risk-management activities. (SAC ¶ 5.) They assert that Defendant Dimon transformed CIO "from a risk management unit into a proprietary trading desk whose principal purpose was to . . . generate profits." (*Id.*) Consequently, CIO removed certain risk limits on the SCP. (*Id* ¶ 6.) In late 2011, the CIO developed a strategy intended to offset its existing synthetic-credit positions by entering into additional positions. (*Id.* ¶¶ 146–47.) In early 2012, CIO tripled the size of its synthetic-credit portfolio to $157 billion. (*Id.* ¶ 363(b).) The effort to balance the SCP proved unsuccessful, and the SCP began to suffer losses in April 2012. (*See id.* ¶¶ 189–90.) On April 5 and 6, the financial press began reporting rumors about large positions taken by a JPMorgan trader, dubbed the "London Whale." (*Id.* ¶ 189.) Plaintiffs allege that Defendants misrepresented the nature of the CIO's trading activities, the extent of the existing and potential risk posed by the SCP, and the potential losses resulting from the CIO's synthetic trading in an April 13, 2012 earnings call and Form 8-K released that day. (*Id.* ¶¶ 200–03, 301–08.)

Plaintiffs further allege that Defendants JPMorgan and Dimon made a first partial corrective disclosure on May 10, 2012 during an analyst conference call. JPMorgan disclosed a $2 billion trading loss on the CIO's synthetic portfolio. (*Id.* ¶ 372.) Dimon also disclosed during the call that JPMorgan would revise its risk measurement for the first quarter of 2012. (*Id.*) Plaintiffs argue that a second corrective disclosure occurred on May 16, 2012, when the *New York Times* reported that "JPMorgan's trading losses had already ballooned by 'at least $1 billion.'" (*Id.* ¶ 380.) Plaintiffs assert that the final corrective disclosure occurred on May 21, 2012, when Defendant Dimon announced that JPMorgan was suspending its previously-announced share buyback program. (*Id.* ¶ 382.)

---

Certification 1, ECF No. 132.)

## II.   LEGAL STANDARD FOR CLASS CERTIFICATION

Plaintiffs must show by a preponderance of the evidence that the Proposed Class meets the requirements of Rule 23 in order to qualify for class certification. *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 201–03 (2d Cir. 2008). "[A] fact has been proven by a preponderance of the evidence if . . . 'the scales tip, however slightly, in favor of the party with th[e] burden of proof' as to that fact." *Ostrowski v. Atl. Mut. Ins. Cos.*, 968 F.2d 171, 187 (2d Cir. 1992) (second alteration in original) (quoting Leonard B. Sand et al., *Modern Federal Jury Instructions* § 73.01 (1992)). Plaintiffs must establish that the Proposed Class satisfies the four prerequisites of Rule 23(a) and that certification is also appropriate under Rule 23(b). Although this Court's "class-certification analysis must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff[s'] underlying claim,' Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194–95 (2013) (internal citations omitted) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011)). The Second Circuit has construed Rule 23 liberally and directed district courts to err on the side of granting class certification. *See Green v. Wolf*, 406 F.2d 291, 298 (2d Cir. 1968) ("[I]f there is to be an error made, let it be in favor and not against the maintenance of the class action, for it is always subject to modification should later developments during the course of the trial so require.") (quoting *Esplin v. Hirschi*, 402 F.2d 94, 99 (10th Cir. 1968)).

## III.   RULE 23(A) REQUIREMENTS

The four prerequisites of Rule 23(a) require that: (1) "the class is so numerous that joinder of all members is impracticable," (2) "there are questions of law and fact common to the class," (3) "the claims or defenses of the representative parties are typical" of those of the class,

and (4) "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Defendants contest only the typicality and adequacy requirements.

## A. Numerosity

The Proposed Class easily satisfies the numerosity requirement of Rule 23(a)(1). "Numerosity is presumed for classes larger than forty members." *Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111, 120 (2d Cir. 2014). "'In securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period.'" *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 423 (S.D.N.Y. 2014) (quoting *In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 84 (S.D.N.Y. 2007)).

JPMorgan is a publicly-traded company that had almost four billion shares of common stock outstanding in 2012, and over two-hundred thousand holders of record according to its Form 10-K. (Berger Decl., Ex. A, JPMorgan Chase & Co. 2012 Form 10-K, ECF No. 133-1.) The company's common stock had an average daily trading volume in the tens of millions of shares. (Berger Decl., Ex. B, Report on Market Efficiency by Steven P. Feinstein ("Feinstein Report") 11, ECF No. 133-2.) Given the number of JPMorgan shares that were outstanding and traded, joinder of all affected purchasers would be impracticable. *See* Fed. R. Civ. P. 23(a)(1); *see, e.g., McIntire*, 38 F. Supp. 3d at 423 (holding that a proposed class comprised of purchasers of the common stock of a corporation with 32.9 million shares outstanding and an average weekly trading volume of approximately 6 million shares satisfied the numerosity requirement).

## B. Commonality

Plaintiffs have met the Rule 23(a)(2) commonality prerequisite. "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Dukes*, 131

S. Ct. at 2551 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)).  It is a "'low

hurdle.'"  *McIntire*, 38 F. Supp. 3d at 424 (quoting *In re Sumitomo Copper Litig.*, 194 F.R.D.

480, 482 (S.D.N.Y. 2000)).  In securities fraud suits, the requirement is met when "plaintiffs

allege that class members have been injured by similar material misrepresentations and

omissions." *Id.*

Plaintiffs allege that the all members of the Proposed Class were injured by the same

misstatements.  (*See* SAC ¶ 398.)  Therefore, they have satisfied the commonality requirement.

## C.      Typicality and Adequacy

Plaintiffs have also satisfied the typicality and adequacy requirements of Rules 23(a)(3)

and 23(a)(4).  "To establish typicality under Rule 23(a)(3), the party seeking certification must

show that 'each class member's claim arises from the same course of events and each class

member makes similar legal arguments to prove the defendant's liability.'"  *In re Flag Telecom*

*Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (quoting *Robidoux v. Celani*, 987 F.2d

931, 936 (2d Cir.1993)).  The requirement is "'not demanding.'"  *In re MF Global Holdings Ltd.*

*Inv. Litig.*, No. 11 Civ. 07866, 2015 WL 4610874, at \*5 (S.D.N.Y. July 20, 2015) (quoting

*Tsereteli v. Residential Asset Securitization Trust 2006–A8*, 283 F.R.D. 199, 208 (S.D.N.Y.

2012)).

To satisfy the adequacy requirement, "the class representatives must not have interests

conflicting with the class, and the lead plaintiffs' counsel must be 'qualified, experienced, and

generally able to conduct the proposed litigation.'"  *Id.* (quoting *In re Livent, Inc. Noteholders*

*Sec. Litig.*, 210 F.R.D. 512, 517 (S.D.N.Y. 2002)).  In certain circumstances, "'certification is

inappropriate where a putative class representative is subject to unique defenses which threaten

to become the focus of the litigation . . . [r]egardless of whether the issue is framed in terms of

the typicality of the representative's claims . . . or the adequacy of the representation.'" *George v. China Auto. Sys., Inc.*, No. 11 Civ. 07533, 2013 WL 3357170, at *5 (S.D.N.Y. July 3, 2013) (alteration in original) (quoting *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990)).

Defendants argue that, because certain Plaintiffs are subject to a unique defense, Plaintiffs fail to satisfy the typicality and adequacy requirements. (*See* Defs.' Mem. of Law in Opp'n ("Defs.' Opp'n") 27–30, dated May 18, 2015, ECF No. 162.) This argument, however, is unpersuasive. Defendants note that Plaintiffs made a significant fraction of their class-period purchases of JPMorgan common stock after May 10, 2012—the date of the first alleged corrective disclosure.[2] (Defs.' Opp'n 27–28.) Defendants argue that Plaintiffs are therefore subject to the unique defense that "it was 'unreasonable' for them after May 10 'to continue to be misled by the defendants' alleged misrepresentation.'" (*Id.* at 28 (quoting *GAMCO Investors, Inc. v. Vivendi, S.A.*, 917 F. Supp. 2d 246, 261–62 (S.D.N.Y. 2013)).) Defendants claim that the purchases made after May 10 expose the named Plaintiffs to the argument that they entered into those transactions on the belief that the market had overreacted to the first disclosure. (Tr. 67:17–68:09.) As that defense would not apply to class members who purchased their JPMorgan stock before May 10, Defendants argue that Plaintiffs cannot establish typicality or adequacy.

Defendants do not cite a single case—nor is this Court aware of one—holding that a lead plaintiff seeking class certification in a securities fraud suit fails to establish adequacy or typicality where that plaintiff made securities purchases after an alleged partial corrective

---

[2] The percentage of Plaintiffs' class-period purchases made after May 10, 2012 are as follows: the Oregon Common School Fund: 100%; Arkansas Teachers: 88.1%; Oregon Public Employee Retirement Board: 58.9%; and Ohio Public Employees Retirement System: 42.4%. (Corrected Pepperman

disclosure but before the final corrective disclosure. (*Id.* at. 70:22–71:05.)  As Plaintiffs allege

that the corrective disclosures were only complete on May 21, 2015, the possible unique defense

that Defendants contemplate is unlikely to become the focus of litigation.

Defendants further argue that Arkansas Teachers is an inadequate class representative

because its designated representative was purportedly unfamiliar with the suit.  (Defs.' Opp'n

28–30.)  "The Supreme Court . . . [has] expressly disapproved of attacks on the adequacy of a

class representative based on the representative's ignorance."  *Baffa v. Donaldson, Lufkin &*

*Jenrette Sec. Corp.*, 222 F.3d 52, 61 (2d Cir. 2000) (citing *Surowitz v. Hilton Hotels Corp.*, 383

U.S. 363, 370–374 (1966)).  A class representative is not inadequate due to ignorance so long as

the representative is not so unfamiliar with the facts of the case as to be "unwilling or unable to

pursue the litigation on behalf of the class."  *Id.* at 61–62.  Arkansas Teachers has demonstrated

its willingness to pursue this litigation by reviewing pleadings and otherwise cooperating with

Plaintiffs' counsel, (July 24, 2015 Graziano Decl., Ex. 4, Graves Dep. 141:09–142:02, 142:23–

143:04, April 17, 2015), and it has indicated its willingness to pursue the suit, (*id.* at 152:18–

153:24).

Therefore, Plaintiffs have shown by a preponderance of the evidence that the Proposed

Class satisfies Rule 23(a)'s typicality and adequacy requirements.

## IV.     RULE 23(B)(3) REQUIREMENTS

In addition to satisfying the prerequisites of Rule 23(a), certification must be appropriate

under Rule 23(b).  *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015).  Plaintiffs

seek certification under Rule 23(b)(3), which permits certification when both (1) "questions of

law or fact common to class members predominate over any questions affecting only individual

---

Decl. ¶ 5.)

members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

### A.    Predominance

The predominance prong of Rule 23(b)(3) is satisfied when the "resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Roach*, 778 F.3d at 405 (quoting *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 118 (2d Cir. 2013)). "Predominance is a test readily met in certain cases alleging . . . securities fraud . . . ." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). "Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2181 (2011) (quoting Rule 23(b)(3)). The elements of a § 10(b) and Rule 10b-5 private securities fraud claim are: "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Id.* (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1317 (2011)). Plaintiffs have undisputedly met five of the six elements. Defendants only dispute whether Plaintiffs have sufficiently established reliance. (*See* Defs.' Opp'n 10–18.)

In securities fraud cases, plaintiffs seeking class certification may establish a class-wide presumption of reliance through the fraud-on-the-market theory. *See Basic Inc. v. Levinson*, 485 U.S. 224, 241–43 (1988). "The fraud-on-the-market premise is that the price of a security traded in an efficient market will reflect all publicly available information about a company;

accordingly, a buyer of the security may be presumed to have relied on that information in purchasing the security." *Amgen*, 133 S. Ct. at 1190. To invoke the fraud-on-the-market presumption, plaintiffs "must demonstrate that [1] the alleged misrepresentations were publicly known . . . , [2] that the stock traded in an efficient market, and [3] that the relevant transaction took place 'between the time the misrepresentations were made and the time the truth was revealed.'" *Halliburton*, 131 S. Ct. at 2185 (quoting *Basic*, 485 U.S. at 248 n.27).

Defendants contest only the efficiency prong of the fraud-on-the-market test. (*See* Defs.' Opp'n 10–11.) In an efficient market, "the 'market price of shares' will 'reflec[t] all publicly available information.'" *Amgen*, 133 S. Ct. at 1192 (quoting *Basic*, 485 U.S. at 246). "[D]efendants must be afforded an opportunity before class certification to defeat the presumption through evidence that an alleged misrepresentation did not actually affect the market price of the stock." *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2417 (2014); *see also In re Vivendi Universal, S.A. Sec. Litig.*, No. 02 Civ. 05571, 2014 WL 4080950, at *1 (S.D.N.Y. Aug. 18, 2014).

Although the Second Circuit had never explicitly adopted a test for the efficiency of equity markets, it has noted that district courts "routinely" apply the factors first articulated in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989). *Bombardier*, 546 F.3d at 204 n.11. Courts in this District have also applied the three additional factors laid out in *Krogman v. Sterritt*, 202 F.R.D. 467, 477–78 (N.D. Tex. 2001). *See, e.g., Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, No. 12 Civ. 05329, 2015 WL 5000849, at *5 (S.D.N.Y. Aug. 20, 2015); *McIntire*, 38 F. Supp. 3d at 431–33. These factors are properly used as an "'analytical tool.'" *Bombardier*, 546 F.3d at 210 (quoting *Unger v. Amedisys Inc.*, 401 F.3d 316, 325 (5th Cir. 2005)). The five *Cammer* factors are:

> (1) a large weekly trading volume; (2) the existence of a significant number of analyst reports; (3) the existence of market makers and arbitrageurs in the security; (4) the eligibility of the company to file an S-3 registration statement; and (5) a history of immediate movement of the stock price caused by unexpected corporate events or financial releases.

*McIntire*, 38 F. Supp. 3d at 431. The *Krogman* factors are: "(1) the company's market capitalization; (2) the relative size of the bid-ask spread for the security; and (3) the company's float, or the degree to which shares of the security are held by the public, rather than insiders." *Id.* After evaluating the *Cammer* and *Krogman* factors, this Court finds that Plaintiffs have demonstrated that JPMorgan shares traded in an efficient market.

### 1. *First Four* Cammer *Factors*

The first, second, third, and fourth *Cammer* factors all weigh in favor of finding that the market for JPMorgan common stock was efficient. Indeed, Defendants do not dispute the first four *Cammer* factors. (Tr. 54:1–3; *see* Defs.' Opp'n 10–12.)

The average weekly trading volume of JPMorgan common stock was 246.5 million shares, or 6.5% of shares outstanding during the Class Period. (Feinstein Report 11 n.15); *see also Cammer*, 711 F. Supp. at 1293 ("Turnover measured by average weekly trading of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one.") (citing Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud* § 8.6 (1988)). The first factor therefore weighs in Plaintiffs' favor.

The second factor also weighs in favor of a finding of market efficiency because at least thirty-three firms covered JPMorgan during the Class Period. (Feinstein Report 12 n.18.)

Considering the third factor, there were at least 155 market makers for JPMorgan common stock during the Class Period. (*Id.* at 14 n.23); *see also Cammer*, 711 F. Supp. at 1293 ("'Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one . . . .'") (quoting Bromberg, *supra*, at § 8.6). The third factor therefore weighs in Plaintiffs' favor.

The fourth factor favors a finding of efficiency as well because JPMorgan satisfied the conditions for S-3 registration eligibility during the Class Period. (Feinstein Report 16.)

### 2.     *Fifth* Cammer *Factor*

The fifth *Cammer* factor that courts consider is whether plaintiffs have demonstrated "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Cammer*, 711 F. Supp. at 1287. It "has been considered 'the most important[] *Cammer* factor.'" *Bombardier*, 546 F.3d at 207 (quoting *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 512 (1st Cir. 2005)). Without this causal relationship, it is "difficult to presume that the market will integrate the release of material information about a security into its price." *Id.* "An event study that correlates the disclosures of unanticipated, material information about a security with corresponding fluctuations in price has been considered *prima facie* evidence of the existence of such a causal relationship." *Id.* at 207–08.

Plaintiffs proffered an event study by their expert purporting to demonstrate that the release of unanticipated, material information during the Class Period was associated with changes in the price of JPMorgan common stock. (Feinstein Report 18–35.) Defendants argue that Plaintiffs' event study is "deeply flawed." (Defs.' Opp'n 2; *see* Corrected Pepperman Decl., Ex. 1, Class Certification Report of Christopher M. James ("James Report") 12–25.)

The principle fault that Defendants ascribe to Plaintiffs' event study is that it examines only the dates on which corrective disclosures allegedly occurred.  (Defs.' Opp'n 2.)  Defendants' expert argues that Plaintiffs' event study should instead have "focus[ed] on an objectively defined set of events" and Plaintiffs' expert's failure to use objective criteria renders his methodology "vague, subjective, and undocumented."  (James Report 19.)  Plaintiffs' expert, however, describes two criteria he used to identity events most suitable to an event study: "disclosure of allegation-related information" and "information of such magnitude as to reasonably be expected to elicit a significant stock price reaction if the market is efficient."  (Feinstein Report 22.)

Plaintiffs' event study need not be flawless in order to support a finding of market efficiency.  *See Carpenters*, 2015 WL 5000849, at *8–9, *15.  As Defendants' expert offers no opinion on market efficiency through an event study of his own, the fifth *Cammer* factor can only weigh against Defendants or be neutral.  It weighs in Plaintiffs' favor because Defendants have not demonstrated that the work of Plaintiffs' expert is so flawed as to fail to be probative of market efficiency.

### 3.      Krogman *Factors*

The three *Krogman* factors, like the five *Cammer factors*, favor a finding that JPMorgan common stock traded in an efficient market during the Class Period.  "[S]ubstantial market capitalization with a narrow bid-ask spread[] and a large public float . . . indicate that [a corporation's securities] trade[] in an efficient market such that the *Basic* presumption is appropriate."  *Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 160 (S.D.N.Y. 2012).  JPMorgan's market capitalization averaged $155.2 billion during the Class Period.  (Feinstein Report 16 n.25); *see, e.g.*, *McIntire*, 38 F. Supp. 3d at 433 (finding that a market capitalization ranging from $292 to $585 million weighed in favor of the conclusion that the market for a

corporation's securities was efficient). Additionally, the average bid-ask spread for JPMorgan

common stock during the Class Period was 0.02%. (Feinstein Report 17 n.30); *see, e.g.,*

*Billhofer*, 281 F.R.D. at 154, 160 (finding that a bid-ask spread of 0.198% supported an inference

of efficiency). Moreover, JPMorgan's common stock float averaged $153.8 billion, or 99.0% of

shares outstanding, during the Class Period. (Feinstein Report 17 nn.27 & 29); *see, e.g.,*

*Billhofer*, 281 F.R.D. at 154, 160 (finding that a public float exceeding $286 million supported

an inference of efficiency). Thus, these factors support a finding that JPMorgan stock traded in

an efficient market.

### 4. *Additional Efficiency Considerations*

As noted above, the *Cammer* and *Krogman* factors are to be used as an "analytical tool."

*Bombardier*, 546 F.3d at 210. This Court may consider other factors as well. Most courts to

consider the issue have concluded that a stock's listing on the New York Stock Exchange is a

strong indication that the market for the stock is efficient. *See, e.g., Carpenters*, 2015 WL

5000849, at *7; *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 183 (S.D.N.Y. 2008); *Wagner*

*v. Barrick Gold Corp.*, 251 F.R.D. 112, 119 (S.D.N.Y. 2008). As another court in this District

has recently explained, "[i]n the usual case of common or other highly traded and analyzed stock,

there is no reason to burden the court with review of an event study and the opposing expert's

attack on it." *Carpenters*, 2015 WL 5000849, at *10; *see also In re Goldman Sachs Grp., Inc.*

*Sec. Litig.*, No. 10 Civ. 03461, 2015 WL 5613150, at *6 (S.D.N.Y. Sept. 24, 2015) (finding that

"there is no real dispute concerning the market efficiency for [Defendant]'s stock . . . [where]

[w]hile Defendants take issue with [Plaintiffs' expert's] evaluation of the fifth *Cammer* factor . . .

they do not otherwise suggest that the market for [Defendant's] stock was not efficient").

Defendants' criticisms of Plaintiffs' event study distracts from the central question: Does the

weight of the evidence tip in favor of the finding that the market for JPMorgan's common stock was efficient during the Class Period?  As detailed above, the simple answer to that question is yes.

### 5.    *Damages*

Defendants argue that Plaintiffs must show that they are able to calculate damages on a classwide basis in a manner consistent with their theory of liability, under *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013).  (Defs.' Opp'n 3–5, 18–27.)  The Second Circuit, however, has explicitly rejected that argument, "hold[ing] that *Comcast* does not mandate that certification pursuant to Rule 23(b)(3) requires a finding that damages are capable of measurement on a classwide basis." *Roach*, 778 F.3d at 402.  *Comcast* did not overrule "'well-established'" Second Circuit precedent that "'the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification' under Rule 23(b)(3)." *Id.* at 405 (quoting *Seijas v. Republic of Argentina*, 606 F.3d 53, 58 (2d Cir. 2010)).  Instead, *Comcast* merely requires that "'plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability.'" *Sykes v. Mel S. Harris & Assocs.*, 780 F.3d 70, 82 (2d Cir. 2015) (quoting *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013)).  Individual damages issues do not predominate in this case.

Plaintiffs' expert proposes to calculate classwide, per-share damages through an event study analysis of the stock price inflation caused by Defendants' alleged misrepresentations or omissions.  (Feinstein Report 36–37.)  Defendants argue that Plaintiffs' expert may not be able to control for the price impact of information other than Defendants' alleged misrepresentations and omissions.  (Defs.' Opp'n 18–27.)  That question, however, applies to the calculation of damages for every member of the Proposed Class.  *See Carpenters*, 2015 WL 5000849, at *20–21

(holding that plaintiffs satisfied *Comcast* where their expert testified that he would use a "damages methodology [that he] customarily appl[ies, which] involves [ ] measuring the abnormal return on [the security] on the correct[ive] disclosure date . . . and then adjusting for any confounding news"); *see also In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2015 WL 5613150, at \*8 ("The possibility that Defendants could prove that some amount of the price decline is not attributable to Plaintiffs' theory of liability does not preclude class certification."). Therefore, the issue of damages does not preclude a finding that questions of law or fact common to class members predominate over questions affecting only individual members.

## B.     Superiority

Plaintiffs have satisfied Rule 23(b)(3)'s superiority requirement, which  Defendants do not contest. (Tr. 49:21–22.)  "[A] class action [must be] superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P.  23(b)(3).  "'In general, securities suits such as this easily satisfy the superiority requirement of Rule 23.'"  *McIntire*, 38 F. Supp. 3d at 426 (quoting *In re Blech Sec. Litig.*, 187 F.R.D. 97, 107 (S.D.N.Y.1999)).

## V.     CONCLUSION

Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel is GRANTED.

The Clerk of the Court is instructed to close the motion at ECF No. 131.

Dated: September 29, 2015
        New York, New York

SO ORDERED:

GEORGE B. DANIELS
United States District Judge